UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: TIKTOK, INC., ) <br> CONSUMER PRIVACY ) <br> LITIGATION, ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> **This Document Relates to All Cases** ) | MDL No. 2948 <br><br> Master Docket No. 20 C 4699 <br><br> Judge John Z. Lee <br><br> Magistrate Judge Sunil R. Harjani |

### DECLARATION OF EKWAN E. RHOW

I, Ekwan E. Rhow, declare as follows:

1. I am a principal with Bird Marella Boxer Wolpert Nessim Drooks Lincenberg & Rhow, P.C. Together with co-counsel, I filed the first case pending in this MDL, which is now captioned *In re: TikTok, Inc. Privacy Litigation*, Case No. 1:20-cv-04723 (previously, "*Hong*," after the first plaintiff). I make this declaration in support of the application, made pursuant to the Court's Case Management Order No. 1 ("CMO 1") and No. 2 ("CMO 2"), to appoint (1) me and Megan Jones of Hausfeld LLP as Co-Lead Counsel for this MDL; (2) Kara Wolke of Glancy Prongay & Murrary, LLP, David Given of Phillips Erlewine Given & Carlin LLP, and Amanda Klevorn of Burns Charest LLP to the Plaintiffs' Steering Committee; and (3) Shannon McNulty of Clifford Law Offices, LP as Liaison Counsel. I have personal knowledge of the facts stated herein, and if called to testify about such statements, I could and would competently do so.

2. This declaration addresses the factors set forth in Fed.R.Civ.P. 23(g), with a particular emphasis, pursuant to CMO 1, on "(a) counsel's willingness and availability to commit to a time-consuming project; (b) counsel's ability to work cooperatively with others; and (c) counsel's professional experience in this type of litigation, including any prior appointments as lead counsel or liaison counsel in multi-party litigation." CMO 1 at 6-7. At the Court's direction, this declaration also addresses "other relevant matters" supporting this application. *Id.*

3. Cooperation through strong teamwork and collaborative strategic decision-making with others have been the foundation of our years of work on this case, which began well before TikTok's notoriety resulting from Congressional investigations and the recent Executive Orders. Our willingness, availability, and commitment of time and resources substantially predated that of any other applicant and, as the case has progressed, this commitment has deepened. We have the longest and strongest team-building in this case, growing our working relationship from two to three firms and from three to five, all of which have worked together cohesively as a single unit. We have also worked cooperatively with other counsel in this case who are not formally part of our team. We are eager to collaborate with anyone else who is willing to advance this important case for benefit of the 100 million or more TikTok users nationwide.

## COUNSEL'S WILLINGNESS AND AVAILABILITY TO COMMIT TO A TIME-CONSUMING PROJECT

4. My firm and I are uniquely situated to take on the role of Co-Lead MDL Counsel in this complex litigation. Our involvement in this case arose from a personal interest I had in this subject matter. Since 2010, beginning with a copyright case that involved keystroke encryption technology designed to protect users' privacy (discussed below), I have regularly investigated and litigated matters focused on various areas of internet privacy.

5. Beginning in 2018, before the Congressional investigations of TikTok became trending news, my colleague Marc Masters – who is working on the TikTok class action with me – and I began to suspect the existence of, and initiated research on, privacy issues relating to a number of smartphone applications, including TikTok and its predecessor Musical.ly. This research, including technical expert investigation, led me and Mr. Masters to suspect the app was misappropriating private and personally-identifiable user data and transferring it to servers in China.

6. We continued this internal investigation, but when it became clear the issues and the potential class action might have nationwide and even global implications, we decided a broader coalition of lawyers would be necessary to address the full scope of any violations of law. That coalition would need to cooperate, leverage resources, and develop a comprehensive complaint to

remedy the myriad threats to U.S. users our investigation was uncovering.

7. Accordingly, in early 2019, we reached out to the Glancy firm, which has a strong national reputation in the class action space. Our two firms subsequently teamed up with the Phillips firm (another very reputable plaintiff-side class action firm) in early 2020, to systematically build a broad and comprehensive case.

8. Our efforts, which started in early 2019 well before our initial complaint was filed, included:

- working closely with highly trained source code experts in analyzing multiple versions of the Musical.ly and TikTok apps to uncover (1) the various types of private and personally-identifiable data stolen by defendants and third-party entities whose software development kits and analytic libraries are secretly embedded within the apps, and (2) the domestic and foreign destinations of such misappropriated data;

- collecting and analyzing numerous iterations of the TikTok terms of use and privacy policies upon which defendants will rely for their arbitration and consent defenses, and developing the arguments and evidence necessary to defeat those defenses;

- thoroughly researching the defendant corporations – with the aid of two teams of investigators in California and in China, an ESI expert, and colleagues with Chinese-language skills to translate documents – to better understand defendants' corporate structure, document and data collection and retention systems, internal reporting systems, business and advertising models, artificial intelligence and patent development programs, and other relevant foreign and domestic activities, all of which is relevant to establishing the statutory and common law violations, the class's damages, defendants' unjust enrichment, and the alter ego defense to the foreign defendant companies' anticipated personal jurisdiction challenge;

- consulting with well-credentialed experts who have conducted original research into the intersection of data privacy, artificial intelligence, Chinese corporations and the Chinese government, including Chinese laws requiring corporations to share data

      with the government; and

- researching numerous legal issues in the data privacy field as they relate to this case – such as (1) jurisdiction and venue; (2) potential causes of action; (3) standing; (4) damages; (5) injunctive relief; (6) notice and consent, and (7) arbitration and class action waivers – to craft our November 27, 2019 complaint, and our May 11, 2020 amended complaint.

9. Our investigation has been and remains organic and based on our genuine interest in this area. Armed with this long history of legal, technical and investigative work performed by our lawyers, technical experts, and investigators, my firm and I are uniquely situated to take on the role of Co-Lead Counsel in this complex litigation and we are deeply committed to the case.

## **COUNSEL'S ABILITY TO WORK COOPERATIVELY WITH OTHERS**

10. My career is marked by a long history of cooperative work on numerous cases, as explained further below. This case is a good example. Bird Marella originally developed this case in cooperation with Glancy Prongay, expanded our working relationship to other firms as the case progressed, achieved the appointment of a five-firm executive committee in the consolidated Northern District of California TikTok case, and worked hand-in-glove with that five-firm group since that time.

11. As is sometimes necessary in litigation, we have had genuine, principled, and professional disagreements with defendants and competing plaintiffs' counsel in this case, but we continually have sought cooperation, including by proposing to all plaintiffs' counsel the following leadership structure that equitably blended different groups: (1) myself and an attorney chosen by the Settling Firms as Co-Lead Counsel; and (2) a PSC comprised of two attorneys from my team, two attorneys from the Settling Firms, and one attorney from the remaining plaintiffs' counsel. The Settling Firms declined and instead sought both co-Lead positions and three PSC slots. We also sought cooperation with other plaintiffs' counsel by agreeing to attend the August 13, 2020 mediation (before defendants barred our participation as discussed below) and by agreeing to attend a subsequent mediation (before certain Settling Plaintiffs expressed concern about the mediation and

scuttled it) for the purpose of determining whether a global resolution could be reached.

12. My firm and I have significant class action experience. However, because that experience is most often, although not exclusively, on the defense side, shortly after my firm began developing the *Hong* case, Mr. Masters of my firm contacted Jonathan Rotter at Glancy Prongay. Messrs. Masters and Rotter previously had worked together to require a publicly-traded residential real estate company to repair flood damage that was adversely affecting tenants with health issues.

13. After the extensive investigation above, my firm, in concert with Glancy Prongay, filed the first class action against TikTok in this MDL, over five months before any of the other TikTok class actions were filed, and publicly announced our intention to amend to add Illinois clients and an Illinois Biometric Information Privacy Act ("BIPA") claim on April 15, 2020 – weeks prior to the filing any of the other TikTok class actions at issue.

14. In early 2020, Bird Marella and Glancy Prongay decided to collaborate with Phillips Erlewine to develop the factual and legal foundation for a BIPA claim. Our three firms invested substantial time and resources to this end, including hiring another highly trained source code expert and a biometrics expert with notable experience in BIPA litigation, both of whom helped to develop the unlawful face geometry scanning allegations.

15. The 89-page amended *Hong* complaint constitutes the first-filed BIPA claim against the China-based defendants, and the only one served on them. It contains the most thorough BIPA allegations among the competing lawsuits, focusing not just on the app's conspicuous Augmented Reality ("AR") features that are the cornerstone of other lawsuits, but also on considerably stronger evidence of BIPA violations (and violations of other statutes and common law), such as:

- the functionality and code of the TikTok app, including (1) content recommendations based on TikTok users' race/ethnicity and age; (2) scans of face geometry to determine TikTok users' age; (3) censoring video content to remove people defendants consider "ugly"; (4) code for deepfake videos; and (5) code for age, race/ethnicity and emotion recognition;
- ongoing work in China, including (1) the application of facial recognition technology

to TikTok users' videos by highly-trained engineers skilled in computer vision, convolutional neural network and machine learning; (2) patent applications for face, voice, age, race/ethnicity and emotion recognition technologies; and (3) the publicly-known functionality of the Chinese version of TikTok (Douyin) that allows its users to perform facial recognition on faces selected by such users from other users' videos; and

- the defendants' legal and political obligations to accumulate and share vast troves of data, including biometrics, in order to assist the Chinese government in achieving world dominance in artificial intelligence, and population surveillance and control.

16. Bird Marella, Glancy Prongay, and Phillips Erlewine also participated in an April 6, 2020 mediation of the eight original claims and the BIPA claim before former United States District Judge Layn Phillips *before* any other actions had been filed. Preparation for this mediation involved additional technical expert work, further developing responses to defendants' anticipated motions, and formulating specific changes to defendants' business practices that would bring them into compliance with applicable law. Bird Marella and Glancy Prongay served eight sets of discovery on defendants prior to mediation, and defendants responded to each. The two firms also negotiated and agreed to a protective order with defendants to facilitate discovery.

17. Our collaboration and team-building did not stop there. Although we had informed the Honorable Lucy H. Koh, before any BIPA cases were filed, that we would be amending our complaint to add a BIPA claim, we teamed up with the first firms to actually file such a claim: Hausfeld and Burns Charest. After follow-on cases were filed, Judge Koh consolidated all of those cases filed in the Northern District of California into *In re: TikTok, Inc. Privacy Litigation*.

18. On July 14, 2020, before *In re: TikTok, Inc. Privacy Litigation* was transferred to this Court, I was appointed interim lead counsel pursuant to Fed.R.Civ.P. 23(g) by Judge Koh after contested proceedings involving six other highly-qualified applicants. Judge Koh also appointed an executive committee as set for the below. In submitting our executive committee team to Judge Koh, the group discussed the roles that were necessary and attempted to fill them in a cooperative

and cohesive matter. What resulted from this collaborative effort – which Judge Koh ordered – was the following:

- **Ekwan Rhow**, Bird Marella Boxer Wolpert Nessim Drooks Lincenberg & Rhow P.C.: Interim Lead Counsel and Chairperson of the Executive Committee with general oversight of all work, including work assignments and billing review.
- **Kara Wolke**, Glancy Prongay & Murray LLP: Executive Committee Member with oversight of offensive discovery, including e-discovery and China-related discovery.
- **David Given**, Phillips Erlewine Given & Carlin LLP: Executive Committee Member with oversight of all expert work and analysis.
- **Megan Jones**, Hausfeld LLP: Executive Committee Member with oversight of settlement, including mediation, motions for preliminary and final approval, addressing potential objections, and claims administration.
- **Amanda Klevorn**, Burns Charest LLP: Executive Committee Member with oversight of pleadings, motions, plaintiff vetting, coordination and management, and responding to discovery.

19. We respectfully proposed that, while each of the four substantive areas of responsibility enumerated above be under the purview the designated executive committee member (and interim lead counsel), the designated executive committee member in question and interim lead counsel would also use attorneys from the other firms in the leadership group to perform work in that area of responsibility as demanded by efficiency concerns and the best interests of the class. That approach has worked well in practice. We also noted, and respectfully continue to note, that there are other experienced and talented law firms vying for a role in the case, and we would work well with other firms and lawyers in the case.

20. Leading up to and since that appointment, I have worked closely (indeed, nearly every day) with this group of experienced lawyers and their colleagues. Together, and following up on the work of plaintiff's counsel Lesley Weaver and Amy Keller, who were the first to assert a claim in this litigation for violation of the Video Privacy Protection Act ("VPPA"), we further

developed that claim, as reflected in our group's consolidated amended complaint, ECF Doc. No. 89 in 1:20-cv-04723. Doing so required original work with experts to determine that information concerning TikTok users' video viewing histories is transmitted to Facebook and Google in a way that allows identification of the user and what content they view, in violation of the VPPA.

21. Further, we have worked together tirelessly in an attempt to bridge the gaps that remain between the various plaintiffs' groups, and to bring to the Court's attention important issues concerning the conduct of the case, leading to the issuance of CMO 2. We have organized and held multiple meet and confer discussions among various counsel on the topics covered by CMO 1. We created and distributed among plaintiffs' counsel a List of Related Cases per CMO 1; created and distributed among various plaintiffs' counsel a list of proposed litigation dates; and coordinated and led the drafting of the joint proposed case management statement to be filed today.

22. We also have raised with all counsel and the Court the unique data preservation issues in play in this case as a result of the August 6, 2020 and August 14, 2020 Executive Orders that will affect the data and United States operations of defendants, as explained in the Litigating Plaintiffs' Status Report, ECF Doc. No. 5, and Emergency Motion, ECF Doc. Nos. 11, 11-1, 12 and 17. We have cleared conflicts with a respected retired U.S. District Court Judge, Shira Scheindlin, who is well known for her work on preservation and electronic discovery issues. While defense counsel may have the best of intentions concerning preservation, the dueling demands of the United States and Chinese governments, coupled with defendants' repeated public assurances concerning TikTok's technical operations and separation from the China-based defendants that have later proven untrue, present unique circumstances in which the class will best be protected by the immediate appointment of a special master.

### COUNSEL'S PROFESSIONAL EXPERIENCE IN THIS TYPE OF LITIGATION

23. I have substantial experience in litigating cutting-edge complex civil matters and leading the teams of lawyers that handle them. In over 25 years of practice, following my graduation from Stanford University and Harvard Law School, I have tried over 40 cases as lead counsel to a final verdict or award, and have litigated to resolution numerous other complex civil cases. I am a

Fellow of the American College of Trial Lawyers, I have been named by Benchmark Litigation as one of the top 20 trial lawyers in California and one of the top 100 trial lawyers in the United States, and I have been recognized by Chambers & Partners as a "trial expert" who is often called upon to "undertake high-profile work" and "bet-the-firm litigation." A true and correct copy of my resume is attached as **Exhibit 1**. A true and correct copy of my firm's 2019 Year in Review, which emphasizes our recent accomplishments and awards, as well as our diversity, is attached as **Exhibit 2**.

24. I am also particularly proud of our firm's commitment to diversity. As a minority name partner at Bird Marella, I have been fully supported by my partners in further developing diversity at the firm. As a testament to these efforts, Law360 named Bird Marella as the third best firm in the country for minority attorneys (for firms between 20 and 149 attorneys).

25. Class actions have been a significant area of my practice. I personally have litigated and resolved numerous class actions involving the automotive, electronics, telecommunications, financial services and apparel industries with potential liabilities ranging from $100 million to $1 billion. Clients of mine in this area include Samsung, Hyundai and Vizio. My class action experience also includes serving as lead trial counsel for a class of current and former account and sales manager employees of IBM-spinoff Lexmark. We prevailed on behalf of plaintiffs and the class in Lexmark after a lengthy trial and again on appeal.

26. My firm is also currently serving as lead counsel for plaintiffs in two class actions in federal court brought on behalf of all prisoners at Terminal Island and Lompoc prisons. These actions are based on the Bureau of Prisons' failure to take constitutionally sufficient measures to protect prisoners from contracting COVID-19. We are working with the ACLU of Southern California and the Prison Law Office. My firm took primary responsibility for drafting both class action complaints, the motions for temporary restraining orders, and the motions for provisional class certification. In one of the cases, we were granted a preliminary injunction, a class was provisionally certified, and we were appointed class counsel. In that case, we have been taking the lead in enforcing the injunction. In both cases, we are taking the lead in propounding discovery and negotiating with the government over the scope of discovery and inspection of the prison.

27. Potentially crucial to the development and litigation of the TikTok class action is familiarity with working in China and a sophisticated appreciation of how things function in that complex culture. My firm and I have substantial relevant experience in that regard. In the past 25 years, Bird Marella has represented at least a dozen major Chinese corporations, as well as Chinese individuals and others doing business in China and the United States. I personally have represented numerous Chinese and Asian entities in various litigations and international arbitrations.

28. I have particular expertise in the sensitive interplay between the Chinese government and its unique relationship with Chinese companies. Among my high profile matters involving the Chinese government, I represented David Ji, an American executive doing business in China, who was imprisoned in Sichuan province to force him to cede control of his electronics company to the Chinese government. I spent many weeks in China on that case, and coordinated with the U.S. State Department and many high level government officials for this politically sensitive matter. Given how business is done in China, I had to engage in a three year direct negotiation with the Chinese government, the provincial government in Sichuan, and one of the largest government-owned electronics companies in the country in order to secure Mr. Ji's release. My partner Thomas Freeman, who is also working on the TikTok class action with me, assisted me with Mr. Ji's case, which became the subject of a *New York Times* Pulitzer Prize winning investigative report. These negotiations left us with a keen understanding of the complicated and sensitive relationships that exist between large Chinese companies and the Chinese government, such as those presented by this case.

29. Further, I am currently representing the corporate entities holding assets allegedly affiliated with Jho Low in the worldwide 1MDB investigation. This is the largest criminal forfeiture matter in the world, with over $4 billion at stake, and one of the most politically sensitive and high-profile legal matters in Asia. It has required an understanding and consideration of the interplay of political interests between China, Malaysia, Saudi Arabia and the United States and has had political implications for the Trump administration and its relationship to the new administration in Malaysia. As part of balancing these political sensitivities and managing the case, I am responsible for

overseeing and ensuring cooperation among a world class group of law firms and attorneys throughout the United States, London, the Cayman Islands, and Asia.

30. Through these varied and nuanced experiences in Asia, I have developed an informed understanding of the culture and politics in China, which I believe will be critical to navigating the complexities of the TikTok class actions.

31. In addition to my class action experience and my experiences in Asia, I also have had a long personal and professional interest in privacy issues attendant to new and emerging technologies. My personal interest in data privacy litigation arose organically from two prior copyright infringement actions. My colleague Mr. Masters and I represented a start-up Korean company that invented a certain type of keystroke encryption security software designed to protect one's privacy and private data. The start-up had negotiated licenses for such software with various companies, including a very large multinational cyber security company with headquarters in Japan. That multinational cyber security company sold enterprise security software and included the start-up's keystroke encryption technology in some of its security software packages.

32. The start-up filed suit against the multinational cyber security company in which it brought claims of copyright infringement and breach of contract, among others. Mr. Masters and I litigated and tried the case before a federal jury. At trial, I cross-examined several witnesses concerning the keystroke encryption technology and its source code, and Mr. Masters performed the direct examination of the start-up's CEO, during which the CEO explained aspects of the keystroke encryption technology and its source code to the jury with Mr. Masters' guidance. On the morning of closing arguments, we reached a favorable settlement agreement that resolved the case. The jury was polled and indicated its intent to award damages in the eight figures.

33. The same start-up filed a separate copyright infringement and breach of contract action concerning its keystroke encryption technology against a Delaware corporation with its principal place of business in Israel. Mr. Masters and I represented the start-up again and litigated this action, including depositions around the country and in Israel. In preparation for technical depositions of an engineer in Tel Aviv and one who had left the defendant company and was

working for Microsoft near Seattle at the time, Mr. Masters was trained by a UCLA graduate student pursuing an advanced degree in computer science. Following these two depositions and others, we resolved the action through another favorable settlement agreement.

34. As a result of these lawsuits involving data privacy issues, I developed personal relationships with executives and technical teams who focus on this area. Those relationships have driven my interest in this area and have led to my litigating other matters touching on data privacy, including other class actions on behalf of U.S. and Asia-based companies.

35. My other representative and recent litigation experience highlights my familiarity with complex and high profile litigation and trials. In a federal jury trial last year, I served as lead trial counsel for a Global Fortune 500 semiconductor company, SK Hynix. At this trial which took placed before a Seattle jury in Microsoft's backyard, I defended against a $175 million claim involving allegations that my client had breached a semiconductor chip supply contract, thereby jeopardizing the launch of Microsoft's Xbox One gaming console. The jury returned a complete defense verdict after a three-week trial. Another recent matter that I completed involved a multi-billion dollar *qui tam* matter – one of the largest ever tried to a jury in California – in which the judge granted a motion for judgment after a bellwether trial ended in a hung jury. This concluded the matter for my client – a company owned by the patriarch of one of the most prominent Taiwanese families – which had been facing damages of over $2 billion. My other trials over the years have involved issues ranging from trade secrets to securities matters, and industries ranging from technology to entertainment.

36. In an effort to further expand my experience beyond simply litigating as a plaintiff or defendant, I was recently selected to serve as an ICC arbitrator in a matter involving two Asian companies. That matter is ongoing.

37. To litigate the TikTok class action, I put together a team of lawyers with broad experience to conduct the case, including Mr. Freeman and Mr. Masters. We also have two lawyers with Chinese language skills and knowledge of the country, Fanxi Wang and Kimmy Yu, who are available to assist with discovery requiring such skills and experience.

38. Mr. Freeman, a graduate of Rollins College and Northwestern University School of Law, has been a principal in the firm for 26 years. He has broad experience in trial and appellate courts at the federal and state levels, is certified as a Specialist in Appellate Law by the State Bar of California Board of Specialization, and is an elected member of the California Academy of Appellate Lawyers. He also has class action experience representing both plaintiffs and defendants. For example, Mr. Freeman worked with me on the Lexmark case above, in which we represented plaintiffs and the class challenging the company's vacation policies that violated the California Labor Code. Mr. Freeman was the primary author of significant pre-trial motions, a successful writ petition, a remand motion, and the successful appellate briefing defending the judgment we secured at trial. Additionally, Bird Marella represented Nokia in two consumer class actions concerning a Nokia cellular phone and a Nokia rebate program. In the cellular phone class action, Mr. Freeman was the primary author of the winning terminating sanctions motion that was upheld on appeal on the strength of Mr. Freeman's appellate briefing. In the rebate program class action, Bird Marella won a demurrer that was sustained with prejudice, and successfully defended that ruling on appeal. Moreover, Bird Marella represented Canon USA in connection with an alleged defect in their color laser copiers. Mr. Freeman was the primary author of the firm's successful writ petition attacking the trial court's denial of Canon's motion to strike the nationwide scope of the putative class. The case proceeded through discovery and settled on terms favorable to Canon without a class being certified.

39. Mr. Masters, a graduate of the University of California at Berkeley and New York University School of Law, is of counsel to the firm and possesses approximately 20 years of experience litigating and trying major commercial cases in both federal and state courts. He has relevant experience with both data privacy issues and source code from his extensive work with me on the two copyright matters discussed above. His class action experience includes representing, along with me and Mr. Freeman, one of the world's largest PVC pipe manufacturers. This class action is related to a False Claims Act suit against the same pipe manufacturer that Bird Marella – including me and Mr. Masters – successfully defended through a two-phase trial and a winning

motion for judgment as a matter of law following a hung jury in Phase II. Mr. Masters also was the author of a winning motion to compel arbitration in another class action filed against a major medical apparel company represented by me and Mr. Masters. In this TikTok class action, Mr. Masters has been a primary author of the original and amended *Hong* complaints, the August 14, 2020 consolidated complaint filed in this Court, as well as the other briefing, and he has been deeply involved as a leader in all other aspects of this case.

40. Ms. Wang, a graduate of the University of Oxford and the University of California at Berkeley School of Law, is a senior associate with the firm. She is a fluent Mandarin speaker who was born in China and raised in Beijing through age 11. Ms. Wang has helped conduct internal investigations of Chinese companies in connection with SEC investigations, and she has used her language skills in witness interviews and the review and analysis of documents. Ms. Wang also has assisted in taking depositions, and has defended depositions in Hong Kong in connection with a lawsuit involving a very wealthy Chinese national. To the extent we conduct discovery in China, Ms. Wang will be an invaluable resource with her combination of knowledge of the country and culture, and strong legal and Chinese-language skills.

41. Ms. Yu, a graduate of the University of California at Berkeley and Syracuse University College of Law, is an attorney with the firm. She is a fluent Mandarin and Cantonese speaker who was born and raised in Hong Kong before moving to the United States at age 8. Ms. Yu interned at a Chinese law firm in Shanghai, she has extensive experience in reviewing and translating Chinese-language documents in litigation, and she already has assisted our team with the review and translation of important Chinese-language documents relevant to the case.

**OUR EFFORTS AND POSITION CONCERNING MEDIATION**

42. Because of the controversy resulting from defendants' exclusion of me and others from our group from the August 13, 2020 mediation, I describe the relevant circumstances below.

43. In April 2020, before any competing cases were filed, and thus with no competition or uncertainty concerning leadership or venue at the time, we attended the aforementioned mediation with defendants before the Hon. Layn Phillips, former United States District Judge.

Despite our best efforts, we did not settle. Our assessment at the time was that further discovery and litigation was necessary – including collection of TikTok's internal e-mails and source code. Such discovery would be critical to forcing TikTok to present a reasonable settlement offer.

44. Shortly after the MDL petition was filed in mid-May, Ms. Katrina Carroll arranged a mediation with the defendants, and sought participants from the four districts in which TikTok class actions were pending. While some counsel agreed to attend, others, including but not limited to our group, believed that scheduling a mediation before venue and leadership were determined would allow the defendants to play plaintiffs' counsel against each other, leading to a "reverse auction," in which the desire of mediating counsel to utilize the mediation to obtain a leadership position in the case could affect, whether consciously or unconsciously, that counsel's approach to mediation, and ultimately, its outcome. Our group therefore took the position that a second mediation was premature and, given the circumstances, could work to the detriment of the class. As explained above, further discovery would also make sense given TikTok's position at our first mediation.

45. After I was appointed interim lead counsel in mid-July by Judge Koh in *In re: TikTok, Inc. Privacy Litigation*, both Ms. Carroll and Anthony Weibell, counsel for defendants, suggested I attend the scheduled August 13, 2020 mediation. Given the uncertainty concerning centralization as a result of the then-upcoming July 30, 2020 MDL hearing, I believed, and communicated, that the timing and circumstances of the mediation were not appropriate, but that our group remained open to a second mediation. I also noted that, given Judge Koh's order limiting the ability of lawyers to work on the case without prior Court approval, other lawyers from the N.D. Cal. cases were not able to represent the class at the mediation.

46. After the MDL petition was decided on August 4, 2020 and it was clear that other plaintiffs' counsel were going forward with the August 13, 2020 mediation as scheduled, our group decided that the class's interests would be best protected if I, as the only Court-appointed interim lead counsel authorized to speak on behalf of the class at the time, attended. Mr. Weibell, with whom we had mediated the case in April 2020, had previously encouraged me to attend, and Ms. Carroll agreed that it was important that I attend, highlighting in particular the extensive work

reflected in our group's original and amended complaints. While certain plaintiffs' counsel other than Ms. Carroll were to attend by video, Ms. Carroll and I agreed that I would attend in person (along with Ms. Jones of Hausfeld, who at the time was designated by Judge Koh as our group's Executive Committee member in charge of settlement, and Jon Jagher, who was and is working with Ms. Carroll). I planned to interrupt a family vacation to do so. Ms. Carroll and I also agreed to mutually share confidential mediation materials and participate in pre-mediation strategy meetings ahead of the August 13, 2020 mediation.

47. As I was preparing to attend mediation and collaborate with Ms. Carroll, on August 6, 2020 defendants unilaterally changed their position, and disinvited us from the mediation. Defendants gave no explanation for their sudden change in position except to say they had a "feeling" that Bird Marella and Glancy Prongay had secret clients and were part of an unspecified conspiracy to attack defendants.

48. I worked tirelessly over the next week to clarify to defendants that we had no secret clients in the case, and to enlist the assistance of Ms. Carroll in presenting a united front to defendants by insisting on our participation. I further clarified in repeated communications that it was inappropriate for defendants to dictate who represented the class at the mediation. Also, I confirmed in writing that Bird Marella and Glancy Prongay had no secret clients, and I explained that defendants' conduct violated Judge Koh's order appointing me interim lead counsel and my group as the executive committee for the class. A true and correct copy of my August 11, 2020 email on these points is attached as **Exhibit 3**.

49. Defendants refused to explain the basis of their unfounded "feeling." Their subsequent offer that Ms. Jones could still attend was illusory because it was conditioned on her pledge that she would not communicate anything about the mediation with the Bird Marella and Glancy Prongay firms during or after the mediation. In other words, there would be no way for Judge Koh's interim lead counsel and the executive committee as a whole to assess what was being discussed at the mediation or any resulting offers or demands. Consistent with her professional obligations and duties under Judge Koh's order, including to report to me about settlement issues,

Ms. Jones rejected those conditions and thus was not permitted to attend.

50. Despite my efforts, defendants and Mr. Weibell barred us from the mediation, and the participating plaintiffs' attorneys proceeded to attend and participate at mediation in our absence. Prior to my being barred, Ms. Carroll and I mutually agreed to waive confidentiality as to the materials prepared in connection with the April 6, 2020 and August 13, 2020 mediations, and we scheduled a pre-mediation meeting to coordinate our efforts. After my group and I were barred, however, Ms. Carroll no longer could share her confidential mediation materials and I also felt it was improper to share ours (from the April 2020 mediation) because participating in any fashion would have condoned the defendants' misconduct and a structurally-tainted mediation. I believe the mediation should have been rescheduled to allow our participation.

51. To this day, defendants have not provided any evidence to support their "feeling" and have not raised these issues with Judge Koh or this Court. Defendants' conduct is all the more suspicious given that, as explained below, defendants later agreed on August 22, 2020 to mediate with Bird Marella in a third mediation despite their alleged "feeling." ECF Doc. No. 7. I believe defendants' flip-flop reveals that their "feeling" was nothing more than an attempt to gain strategic advantage by excluding from the August 13, 2020 mediation the only Court-appointed interim lead counsel authorized to represent the class at the time, and the same lawyers who also had not acceded to defendants' demands in the first April 2020 mediation. Defendants apparently used this tactic to choose the lawyers they would be negotiating against.

52. Moreover, despite our repeated requests, to date we have not been informed of the terms and conditions of the purported settlement. As of August 19, 2020, Ms. Carroll's group "took no position" on our request to see the terms, and did not affirmatively join in our request that defendants disclose such terms and conditions to us and other plaintiffs' counsel. My understanding is that, at present, the only plaintiffs' counsel who know the purported settlement's terms and conditions are those limited Settling Plaintiffs' counsel who attended the August 13, 2020 mediation, and thus many plaintiffs' counsel who are now endorsing the purported settlement and a case management schedule premised upon it have never actually seen or analyzed it.

53. Our group has continued to attempt to resolve this issue, and agreed with defendants to attend what would have been the third mediation before Judge Phillips in the case in an attempt to resolve all outstanding issues. We and defendants jointly reported that development to the Court on August 23, 2020. ECF Doc. No. 7.

54. We have been informed that, immediately thereafter, Ms. Carroll's group spoke with Judge Phillips and the mediation was scuttled, a result defendants reported to the Court in vague terms. ECF Doc. No. 8. While Ms. Carroll then retracted her opposition, defendants were no longer willing to mediate. ECF Doc. Nos. 12, 16, 17. I have received no explanation from Ms. Carroll or Mr. Weibell as to what happened or why defendants' offer was retracted.

55. My group and I remain committed to objectively evaluating the purported settlement terms and conditions if and when we receive them, and we are also ready and willing to protect the class's interests by litigating the case.[1]

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that I executed this declaration on September 8, at Los Angeles, California.

*s/Ekwan E. Rhow*
Ekwan E. Rhow

---

[1] The August 6, 2020 and August 14, 2020 Executive Orders and the Beijing ByteDance negotiations with Microsoft, Walmart, Oracle and others have changed the landscape and require class counsel to carefully analyze the "settlement in principle" announced by the Settling Plaintiffs as well as the possibility that recent events are being used by defendants to create artificial leverage. Some relevant questions include: (1) What is the current state of negotiations with Microsoft, Walmart, Oracle, and other third parties?; (2) Are the Settling Plaintiffs being given verifiable information about these negotiations?; (3) Have the Settling Plaintiffs obtained an ironclad memorandum of understanding covering all material issues?; (4) Are defendants placing any settlement funds in an escrow and, if so, how much?; (5) Are efforts being made to prevent transfer of funds to entities in China as a result of any purported sale of TikTok's U.S. assets?; (6) Have defendants agreed to place key data and evidence in the hands of a trusted third party?; and (7) What, if any, injunctive relief and business practice changes have defendants agreed upon?