I, David M. Given, declare as follows:

1. I am a member in good standing of the State Bar of California and the State Bar of New York admitted to practice before various federal district and appellate courts. I am a founding member in the law firm of Phillips, Erlewine, Given & Carlin LLP, with offices in San Francisco and Los Angeles. My firm serves as co-counsel in the so-called *Hong* case (Case No. 19-CV-07792-LHK), consisting of six separately filed actions consolidated into *In re: TikTok Inc. Privacy Litigation* and previously pending before the Honorable Lucy H. Koh in the Northern District of California.

2. Before transfer of that case to this Court, Judge Koh appointed me as one of a five-member Plaintiffs' Executive Committee in that case, and I have worked in coordination with that group in this matter since then. I submit this declaration in support of the joint application of the "Litigating Plaintiffs" (as that term is used elsewhere) for positions as co-interim lead counsel and as members of the Plaintiffs' Steering Committee, as well as for my own role as a member of that Committee, in accordance with the Court's orders on the subject. See ECF Nos. 3 & 24.

3. My firm and I stand ready, willing and able to commit ourselves to the role to which we respectfully ask the Court to appoint us. My firm and I also stand committed to the **adequate and zealous prosecution** of this matter. Among the many excellent class action attorneys seeking a leadership appointment in this matter, any of whom I trust my firm and I can and will work with constructively, I believe I am uniquely qualified to serve given my background and experience in the entertainment, media, technology and venture industries.

1

## EDUCATIONAL AND LAW PRACTICE BACKGROUND

4.  I graduated from the University of Virginia School of Law. I have practiced law for over 30 years. I have appeared before this Court once in the last two years, in the matter entitled *Kapoor v. National Rifle Association*, Case No. 18-cv-4252.

5.  My legal practice consists of, among other things, commercial and class action litigation, as well as transactional matters, with an emphasis on the entertainment and technology industries. Over the course of my professional career, I have represented a diverse range of individuals and businesses in those industries, and have advised clients on legal and business matters relating to subjects (like data privacy, intellectual property, app development and distribution, etc.) pertinent to this case. My experience in this area has given me a **valuable perspective on the inner workings** of the entertainment, media, venture, and technology industries in which defendants in this case operate.

6.  Attached as Exhibit 1 are selected pages from the firm's website with further details of my clientele, background and experience.

## DATA PRIVACY CLASS ACTION EXPERIENCE

7.  My firm and I have 10+ years of history as plaintiffs' counsel in the class action field, serving in leadership roles in a variety of class cases in the state and federal courts. This has included data privacy matters like the one here. For example, from 2013-18, my firm served as interim co-lead and settlement class counsel in *Opperman v. Path, et al.*, Case No. 13-cv-00453-JST (N.D. Cal.), the former upon appointment by the Honorable Jon S. Tigar following contested leadership proceedings.

8.	The *Opperman* case concerned the surreptitious uploading by certain app developers (like Twitter, Yelp, and Instagram) of iDevice users' personal address book data without notice to or consent from them. To the best of my knowledge, this was the first case to pursue claims of this kind.

9.	I personally invested **hundreds of hours of my own time** in the case, and had a hand in supervising and managing virtually every aspect of the prosecution of claims against the app developer defendants in the *Opperman* case as the lead lawyer from our firm with primary responsibility for the matter. In particular, my firm and I played the central role on plaintiffs' side of the case in dealing with the technical aspects of the programming and computer source code used in the apps in issue. In consultation with technical and data privacy experts, I became immersed in the review and analysis of the source code, functionality, and data privacy practices of the apps and app developer defendants in the case. This work included developing methodologies on valuing personal data; analyzing the operations and functionality of each app and the capture and transmission of data; investigating the use by each app developer of encryption technology and security best practices (like data hashing) in the transmission of private personally-identifiable data; and investigating the use to which the app developers put this data (like "social graphing"), and the implications of same.

10.	The *Opperman* case resulted in several decisions, some published in the official reports.  The *Opperman* plaintiffs were successful in a class certification motion, which I was the principal author of. As far as I am aware, this was one of the first such motions granted by a federal court in the data privacy field (2016 WL 3844326).

11.	A second certification motion which I also authored was pending when the case settled.  To the best of my knowledge, the settlement in that case ($5.3 million for 1.9 million class

3

members), finally approved in March 2018, ranks as one of the best of its kind in a data privacy class case in which statutory damages were lacking.

12. Attached as Exhibit 2 are selected pages from the firm's website with further details of the above. These pages may be found at http://www.phillaw.com/idevice-privacy-class-action, and include links to many of the papers, pleadings and court orders and decisions in the case.

13. Attached as Exhibit 3 are selected pages from the firm's website with further details of our firm's and my class action experience in leadership roles. Additional information and biographical data illustrating the firm's experience in handling those and other class actions (in both federal and state court), complex litigation, and the types of claims asserted in the instant action as well as demonstrating the firm's knowledge of the applicable law and possession of resources adequate for providing committed representation of the class in this case may be found at http://www.phillaw.com.

## WORK IN THE TIKTOK DATA PRIVACY CASE

14. I first discussed the data privacy claims against TikTok with lawyers from the Glancy Prongay firm in **December 2019**, shortly after that firm and Bird Marella filed the *Hong* case. That case was of interest because of my experience in the *Opperman* matter and because I had done research into TikTok's domestic predecessor in connection with a previous legal engagement.

15. Beginning in early 2020, I took a closer look at TikTok and its privacy policies and practices, we were retained by several clients to represent them in their privacy claims against TikTok, and I discussed the case in detail with the lawyers from the Glancy Prongay and Bird Marella firms. My law partners and I gave careful consideration to joining the *Hong* case as co-counsel, as opposed to filing a separate action for our clients. This included review and analysis of the factual underpinnings of the case as well as certain jurisdictional, venue, and standing issues. It

also included research into the various legal theories giving rise to the data privacy claims against TikTok, including those claims potentially arising under the Illinois Biometric Information Privacy Act ("BIPA"), as well as assessment of the availability of our firm's resources (both personnel and financial) to devote to the case.

16. Early in this engagement, my firm prepared research memoranda as well as identified, retained, and consulted with programming and data privacy/biometric data experts to help us analyze the functionality of and data retention and transfers performed from the TikTok app, especially as it related to the collection, transmission and use of biometric data. I performed this work together with two other lawyers at my firm, associate Brian Conlon (Harvard Law '11) and partner Nick Carlin, a Harvard-trained physicist and former computer programmer with years of experience in the technology and start-up fields, both of whom assisted in the *Opperman* case and who I expect will continue to assist in this one.

17. In March 2020, I acted to opt out both of our minor clients from the so-called COPPA settlement pending in the Northern District of Illinois, *T.K. v. Bytedance Technology Co.*, Case No. 1:19-cv-07915. I did so because of the risk of TikTok's attempting to use that settlement and its release of claims as a bar against potential claims my firm thought we might make here. While that risk was low due to the "identical factual predicate" and dissipated given TikTok's more recent record statements on the subject, we believed at the time that the best interests of the client and some portion of the putative class were served by opting out of that settlement.

18. On April 6th, I participated in an all-day mediation previously scheduled in the *Hong* case before the Honorable Layn Phillips (Ret.). While my firm had not yet appeared in the *Hong* case, TikTok's counsel agreed to our participation and my firm became a party to the mediation and confidentiality agreements pertaining to that event. The mediation did not result in a settlement. On

May 11th, my firm joined as counsel of record in the *Hong* case via the filing of an amended complaint in the case.

19.     In the lead up to that filing, in consultation and close collaboration with the Glancy Prongay and Bird Marella lawyers, my firm researched, reviewed and analyzed the TikTok/Bytedance corporate structure, including the complex foreign entity relationships; researched, reviewed and analyzed the TikTok/Bytedance terms of use and privacy policies and their presentation or lack thereof to users of the TikTok app; researched, reviewed and analyzed various TikTok/Bytedance patents; researched, reviewed and analyzed other TikTok/Bytedance public filings and statements; identified and retained programming and data privacy/biometric data experts; consulted with those experts; consulted with our investigators including one in China; conducted further legal research into the class claims; and helped draft the amended complaint.

20.     In addition, in consultation with those two firms as well as the Hausfeld and Burns Charest firms, our legal team proposed primary roles in their respective leadership capacity for work in the case, which Judge Koh adopted in her leadership order and which we have since implemented among us. I have therefore taken primary responsibility among our team of lawyers for the expert work and code analysis in the case.

21.     Since then, my firm and I have continued to work on matters related to the substantive claims of the class. This has included further legal and factual research into the those claims, consultation with our experts, drafting of a consolidated amended complaint, continued communication with our plaintiff clients, coordination on various procedural and substantive matters with other Interim Counsel of Record (as defined in the Court's Case Management Order No. 1, ECF No. 3), participation in various meet and confer conferences, and continued review and analysis of the technical and corporate and business aspects of defendants and their app.

22.     During the period described above, we have developed what I consider to be an excellent working relationship with the lawyers from the Glancy Prongay, Bird Marella, Hausfeld and Burns Charest firms. I have also had several interactions with other lawyers involved in this case (including the defense attorney), and those interactions have all been cordial and professional. The lawyers at our firm always endeavor to work collaboratively with our partners (and, when possible, with opposing counsel) in any given matter, whether litigation or transactional in nature. I expect that to be no different here.

23.     Finally, as a meaningful part of my practice has been and continues to be hourly fee based, I am mindful of delivering legal work to clients in an efficient and cost-effective manner. My firm's timekeepers are all directed to record and, generally speaking, record their time in legal matters in which the firm is engaged contemporaneously and on a daily basis by time and task, and we employ a full-time staff member who keeps those records and can generate reports of same.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed this 8th day of September 2020 at San Francisco, California.

*/s/ David M. Given*
David M. Given