**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: TIKTOK, INC., CONSUMER PRIVACY LITIGATION, | MDL No. 2948 |
| | Master Docket No. 20-cv-4699 |
| | Judge John Z. Lee |
| | Magistrate Judge Sunil R. Harjani |
| This Document Relates to All Cases | |

**DECLARATION OF KATRINA CARROLL IN SUPPORT OF**
**APPLICATION FOR APPOINTMENT AS CO-LEAD COUNSEL**

KATRINA CARROLL declares as follows:

***Introduction***

1.      I submit this Declaration in support of my joint Leadership Application with Jonathan Jagher, which seeks our appointment as Co-Lead Counsel and proposes a Steering Committee and Liaison Counsel pursuant to the Case Management Orders entered by this Court. Mr. Jagher and I, with the support of the vast majority of cases and their counsel comprising the MDL, believe that it is in the class' best interest to have us lead this litigation.

2.      Under our leadership, and with an inclusive approach, the Settling Parties (defined below) reached an excellent settlement for the class at a particularly opportune time. We also meet all the Rule 23(g) criteria in spades. Importantly, appointing both Mr. Jagher and me as Co-Lead Counsel will ensure that the settlement is documented and proposed for approval by this Court under Rule 23, despite the unusual and tumultuous circumstances surrounding the company and this litigation. If we are appointed and able to present the settlement in the normal course, all

parties will have an ample opportunity to weigh in on the settlement terms. Such discussions can and properly should take place after Defendants agree to make the settlement public, **on or before October 26, 2020**, as we have proposed to the Court. There will be no prejudice to any party if the Court adopts our suggested approach, which is consistent with Rule 23 and will even permit issues to be vetted and "front loaded" at or before preliminary approval, before this Court makes any decision concerning whether the settlement justifies sending notice to the class.

3.  To date, Settling Plaintiffs have not taken an opportunity to set forth all of the relevant facts pertaining to the manner in which the Settlement was achieved, the cooperation and collaboration of nearly all counsel in that endeavor, and the antagonistic role played by Non-Settling Plaintiffs[1] who, at nearly every juncture, chose their self-interest in controlling this litigation over the best interests of the class. Once the record is set straight, it will become clear that, contrary to Non-Settling Plaintiffs' inaccurate representations, the settlement was not reached by "hand-picked" counsel (actually, it was reached by an agreed-upon delegation of a large coalition of firms who all actively participated in the process.) And the attorneys who now complain that they were "excluded" acted repeatedly to the detriment of the class, refused to collaborate with other counsel, tried to prevent the mediation from ever occurring, and intentionally withheld information that could have benefitted the class. When the Court considers all these facts, we hope it will find that the settlement should proceed in its normal course through

---

[1] Non-Settling Plaintiffs' group consists only of counsel who filed cases in the Northern District of California and no counsel from any other district in the MDL. This group is essentially Mr. Rhow and his executive committee from the Northern District of California, along with two firms who supported Mr. Rhow and his committee during the leadership proceedings in that case. These two firms also separately applied for leadership positions, which Judge Koh denied in favor of Mr. Rhow's application. Non-Settling Plaintiffs' group now also includes Illinois-based proposed Liaison Counsel, who we believe were recently retained by Mr. Rhow's group after the MDL transfer order was issued on August 4, 2020 and one additional firm from the Northern District of California, which also applied for leadership in that court.

2

counsel responsible for achieving it. We believe this measured approach is in keeping with Rule 23 and in the best interests of the class.

### *My Experience, Qualifications and Ability to Serve as Co-Lead Counsel in this Matter*

4.      I am the managing partner of the Chicago, Illinois office of Carlson Lynch LLP, a nationally recognized litigation boutique specializing in the prosecution of plaintiff-side class actions. I have personal knowledge of the facts stated in this Declaration and describe all of my collaborative efforts in this case for the benefit of this Court.

5.      By way of my background, I have litigated complex matters and class actions for twenty years and have devoted my career to representing plaintiffs in class cases like this one. In total, I have litigated over one hundred class actions and have obtained recoveries in excess of $1 billion in all types of cases, including consumer, securities and antitrust cases. I have been recognized as one of the top 25 class action lawyers in the State of Illinois by the National Trial Lawyers Association and have been named multiple times as a Super Lawyer.

6.      Outside the courtroom, I am an active participant and panelist at symposiums and conferences related to class action topics and the promotion of women attorneys in the field. In April 2018, I was honored to appear as a panelist at "May it Please the Court: Symposium on Women Lawyers in the Courtroom," a prestigious event sponsored by the United States District Court for the Northern District of Illinois and the Chicago Bar Association. I currently serve on the Law360 Products Lability Litigation Editorial Advisory Board and am also an active member of the Advisory Board of Loyola University School of Law's Institute for Consumer and Antitrust Studies. My personal *curriculum vitae* is attached hereto as **Exhibit A** and my firm's biography is attached hereto as **Exhibit B**.

7.     I have significant experience litigating biometric privacy matters arising from the collection and use of data by technology companies.  I have litigated some of the earliest biometric privacy cases on record in our District, including cases against Google and Shutterfly that have shaped BIPA jurisprudence across the country. *See e.g., Norberg v. Shutterfly, Inc.*, 152 F. Supp. 3d 1103 (N.D. Ill. 2015) (finding jurisdiction against defendant and that plaintiff stated a claim under the Illinois Biometric Information Privacy Act); *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1095-96 (N.D. Ill. 2017) (interpreting meaning of "biometric identifier" within the meaning of BIPA).

8.     I am currently litigating other BIPA matters in various courts against some of the largest companies in the world, including IBM, Amazon, Google, Microsoft and Facebook. *See e.g., Vance v. International Business Machines Corp.*, No. 20cv577 (N.D. Ill.) (Carlson Lynch appointed as Co-Lead Counsel); *Wise v. Ring LLC*, No. 20-cv-1298 (W.D. Wash.); *Vance, et al. v. Amazon.com, Inc*., No.: 2:20-cv-01084 (W.D. Wash.); *Vance, et al. v. Google, LLC*, No.: 5:20-cv-04696 (N.D. Cal.); *Vance, et al. v. Microsoft Corporation*, No.: 2:20-cv-01082 (W.D. Wash.); *Whalen v. Facebook, Inc.*, No. 20-CIV-03346 (Sup. Ct. San Mateo County, CA).

9.     I have been personally appointed to leadership positions in numerous complex class cases, including privacy-related actions like this one.  Some of my personal appointments as Co-Lead Counsel include:

- *Albrecht v Oasis Power, LLC*, No. 1:18-cv-01061 (N.D. Ill.) (TCPA class action; class settlement approved).

- *Lewert v. PF Chang's China Bistro, Inc.*, No. 1:14-cv-04787 (N.D. Ill.): (one of the first data breach cases on record with landmark ruling in the Seventh Circuit on Article III standing, hailed by Law360 as one of the "top privacy cases" of 2016).

- *Salam v. Lifewatch, Inc.*, No. 1:13-cv-09305 (N.D. Ill.): (plaintiffs prevailed on contested class certification motion and matter is currently being actively litigated).

- *Bakov v. Consolidated World Travel Inc.*, No. 1:15-cv-02980 (N.D. Ill.) (TCPA litigation proceeding on behalf of a certified class of consumers).

- *Mednick v. Precor, Inc.*, No. 14-cv-03624 (N.D. Ill.) (in products liability class action, plaintiffs obtained class certification for a multi-state consumer class and the case ultimately settled on a class-wide basis).

- *Bishop et al. v. Behr Process Corp. et al.*, No. 1:17-cv-4464 (N.D. Ill.): (national products liability class action matter relating to defective deck paint resulting in substantial settlement).

10.    I also have extensive MDL experience and have been personally appointed to serve in leadership in several national matters. For instance, I successfully served as co-lead counsel in *In Re: Rust-Oleum Restore Marketing, Sales Practices and Products Liability Litigation*, 1:15-cv-1364 (N.D. Ill.), a sprawling products liability MDL class action which ended in a favorable class settlement. During the final approval hearing, the Honorable Amy J. St. Eve, now a sitting Justice of the Seventh Circuit, praised my professionalism and that of defense counsel (Lori Lightfoot, who was then a partner at Mayer Brown) as a "model I wish all lawyers would follow."  My other personal MDL appointments include *In re Community Health Systems, Inc., Customer Data Security Breach Litigation*, 2:15-cv-00222, MDL 2595 (N.D. Ala.) (member of the plaintiffs' steering committee in consolidated multidistrict litigation stemming from data breach involving one of the nation's largest hospital chains) and *In re Ashley Madison Customer Data Security Breach Litig.,* MDL No. 2669 (E.D. Mo.) (member of executive committee in well-publicized data breach relating to social media company; significant class settlement for $11.2 million was approved in November 2017).

11.    Apart from my own appointments, my firm has additional and far-ranging MDL experience in some of the country's largest privacy and data breach matters.  Just some of the MDL cases where my firm served or serves in the leadership include: *In re Equifax, Inc. Customer Data Security Breach Litig.*, MDL 2800 (N.D. Ga.); *In re Marriott International Customer Data*

*Security Breach Litigation,* MDL No. 2879 (D. MD.). *In re Home Depot Customer Data Breach Litig.*, 1:14-md-02583, MDL 2583 (N.D. Ga.). *In re Target Corporation Customer Data Breach Litig.*, 0:14-md-02522, MDL 2522 (D. Minn.) and *In re Vizio, Inc. Consumer Privacy Litig.*, MDL No. 2693 (C.D. Cal.).

12.     My firm and I have the expertise, resources, and personnel necessary to prosecute this action to the fullest extent necessary. I am experienced, committed, and able to devote my full attention to this matter, as I have already demonstrated in litigating this case since its inception.

13.     I have a proven track record of working collaboratively with other attorneys, both on the plaintiffs' side and the defense side. I am familiar with and have longstanding, productive working relationships with scores of plaintiffs' attorneys across the country. In fact, this case in and of itself is a testament to my ability to work collaboratively and bring groups of counsel together to achieve results for the benefit of our collective clients and members of putative classes.

### *The Settlement and Current Procedural Status*

14.     In this case, I am counsel of record for Plaintiff E.R. and I filed the first related action in this District on May 8, 2020 (*E.R. v. TikTok, Inc. et al.,* 1:20-cv-02810 (N.D. Ill.)). Mr. Jagher is counsel of record for Plaintiff D.M. and filed a related action shortly thereafter on May 13, 2020 (*D.M. v. TikTok, Inc. et al.,* 1:20-cv-02884 (N.D. Ill.)). Together, and at all times since we filed our cases, Mr. Jagher and I have worked to organize and coordinate all of the actions involved in this MDL for the benefit of all parties, the putative class and this Court.

15.     When Defendants presented an opportunity for class-wide settlement, Mr. Jagher and I *immediately* galvanized an inclusive process to pursue that opportunity. Most of the other plaintiffs' counsel joined in this process, which culminated in a settlement in principle on August 13, 2020.

16.     As part of our organizational process, sixteen firms[2] (representing *all* the districts involved in the MDL) came together and collaborated with us in the months leading up to the mediation. These sixteen firms, sacrificing their own self-interests for the good of the group, agreed on a delegation[3] of seven representatives to attend the session.

17.     Mr. Jagher and I traveled to California during the pandemic to appear in person for the extensive, hard-fought, arms-length negotiations conducted for over twelve hours with the Honorable Layn Phillips, one of the country's most prominent mediators.  The settlement is the product of input from a top expert, the majority of the plaintiffs in the MDL and experienced counsel including firms who have litigated the earliest BIPA claims on record and other large firms in the plaintiffs' class action bar, and it capitalizes on the entire team's collective knowledge and experience.

18.     The settlement was made possible through the collaborative and inclusive process Mr. Jagher and I organized.  At all times, we acted in the best interest of the class and, because of our leadership, nearly all counsel in this MDL are currently working together vigorously, efficiently and expeditiously to finalize the relevant documents.  We look forward to presenting the settlement to this Court for its consideration.

---

[2] The sixteen firms who came together and prepared for mediation are: Carlson Lynch LLP; Freed Kanner London & Millen LLC; Cafferty Clobes Meriwether & Sprengel LLP; Sauder Schelkopf LLP; Gordon Law Offices, Ltd.; Stephan Zouras, LLP; Erik H. Langeland P.C.; Tostrud Law Group, P.C.; Consumer Protection Legal, LLC; Scott+Scott Attorneys at Law LLP; Baird Law Firm; Wood Law Firm, LLC; Ahdoot & Wolfson, PC; Susman Godfrey LLP; Fegan Scott, LLC and Foote, Mielke, Chavez & O'Neil, LLC.

[3] The seven delegates who participated in the mediation were: me, Mr. Jagher, Robert Foote (Foote, Mielke, Chavez & O'Neil, LLC); Michael Gervais (Susman Godfrey LLP); Joseph Guglielmo (Scott+Scott Attorneys at Law LLP); Tina Wolfson (Ahdoot & Wolfson, PC) and Tiffany Yiatras (Consumer Protection Legal, LLC).

19.     It bears mentioning that, at the time of the settlement, this MDL was in a state of procedural limbo: the administrative transfer of the related actions had not been fully effectuated. For over two months before we announced the settlement, we repeatedly advised the Court in several joint status reports (filed on June 3, 2020, June 25, 2020 and July 10, 2020) that we were proceeding to mediation, alongside counsel from the other Districts involved in the MDL. [*E.R. v. TikTok*, No. 20-cv-02810 (the "E.R. Docket"), at ECF Nos. 27, 40, 44]. Because of this Court's prior Order of June 18, 2020 in *E.R.*, which required the parties in that case to report on the status of settlement [*Id.*, at ECF No. 37], we filed a joint status report with Defendants on August 16, 2020 in the *E.R.* Docket [ECF No. 51]. Out of an abundance of caution, we also filed our report in the "MDL" docket in this District, which had been assigned a docket number with no further action taken by the Court.

20.     The day after we filed our status report, the Clerk of Court proceeded to effectuate the administrative transfer of cases comprising the MDL. That same day, the Court entered CMO No. 1. [Docket No. 20-cv-4699 (MDL 2948) (the "MDL Docket"), at ECF No. 4].

21.     Upon entry of CMO No. 1, and in light of the fact of settlement, Mr. Jagher and I met and conferred with the various Interim Counsel concerning an efficient path forward. In recognition of our work and efforts at collaboration throughout the history of this case and long before the MDL ruling, the majority of counsel, including all counsel for all Settling Plaintiffs and other Interim Counsel representing actions filed in the Northern District of California, submitted a proposed Case Management Schedule to the Court on August 21, 2020. [*Id.*, at ECF No. 6]. Under our proposed schedule, the Settling Plaintiffs propose to file a motion for preliminary approval **on or before October 26, 2020**.

22.     Since reaching the settlement, we reached consensus with an additional six independent firms with cases in the Northern District of California.  These independent firms now support our appointment as Co-Lead Counsel and we expect that they will support the settlement after it is publicly disclosed. [4] Because of this consensus, the "Settling Plaintiffs" group should ultimately expand to include the vast majority of cases and counsel in the MDL.

23.     With respect to disclosure of the settlement terms, Settling Plaintiffs' position is and *always* has been that the settlement negotiations were to be inclusive and that the terms should be disclosed to all litigants, including Non-Settling Plaintiffs, who we had repeatedly invited to participate in the mediation.[5]  After reaching the settlement, we spent substantial time and effort trying to convince Defendants to make those terms available.  We also waived mediation privilege weeks ago for purposes of disclosure to all counsel and are in favor of Defendants doing the same at any time they deem appropriate.

24.     Settling Plaintiffs understand that Defendants continue to oppose disclosure of the settlement terms at this juncture for a variety of reasons (including the pending Presidential Executive Orders and ongoing acquisition discussions).  To further the interests of transparency and recognizing that the Court is a fiduciary of the class, Settling Plaintiffs suggested to Defendants that they allow us to present the settlement for *in camera* review, prior to the filing of a motion for preliminary approval.  Defendants are considering our proposal.

---

[4] These additional firms are: Girard Sharp LLP; Chimicles Schwartz Kriner & Donaldson-Smith LLP; Law Office of Francis J. Flynn, Jr.; Onderlaw LLC; Bottini & Bottini, Inc.; and Cotchett, Pitre & McCarthy, LLP.

[5] Due to TikTok's articulated need for strict secrecy, only the seven delegates who attended the mediation have seen the settlement terms.  The broader group has agreed to respect confidentiality pending public disclosure.

25.     All along, Settling Plaintiffs have acted to provide full transparency so long as the best interests of the class (namely, protecting the settlement) are met. We are confident that the settlement is an excellent outcome.  We are also confident that the process and circumstances surrounding the mediation were inclusive and fair and that we did everything possible to secure the best result for the class.

26.     For these reasons, Settling Plaintiffs never objected to Non-Settling Plaintiffs' receipt of the settlement information or their ability to be heard, at or before preliminary approval, regarding any issue concerning the settlement.  In fact, we welcome any effort (including effort by this Court and input of Non-Settling Plaintiffs) to ensure the best settlement possible, *after* the settlement is publicly disclosed.

### *Litigation History: the Northern District of Illinois Consolidated Action and the MDL*

27.     As we previously advised the Court in three status reports filed in *E.R.*, the history leading up to the settlement began long before the MDL Panel issued its order on August 4, 2020. As the Court evaluates the leadership applications, I respectfully ask that this history be taken into consideration.

28.     While Settling Plaintiffs have made every attempt to coordinate with and include Non-Settling Plaintiffs, and will work with whomever the Court appoints, the Court should consider the effects of a "forced marriage" of leadership between Settling Plaintiffs and Non-Settling Plaintiffs on the settlement approval process.  Settling Plaintiffs are concerned that, in light of Non-Settling Plaintiffs' repeated conduct aimed at undermining the settlement efforts for personal gain and at the class's peril, any such "forced marriage" order could derail the settlement entirely and irreparably harm the class.

29.     As the Court knows, with minor variation, the actions comprising this MDL are nearly all putative class actions arising under the Illinois Biometric Identification Privacy Act ("BIPA"), 740 ILCS §14/1, *et seq.,* against Defendants, TikTok Inc. and ByteDance Technology Inc.

30.     Related cases in various districts ultimately became the subject of a May 15, 2020 MDL petition filed by counsel from the Southern District of Illinois seeking transfer and coordination in the Southern District of Illinois, or in the alternative, in this Court.

31.     As it does when any motion to transfer and centralize is filed, the MDL Panel's initial briefing order asked the various counsel involved "to pursue alternatives to centralization (including, but not limited to, engaging in informal coordination of discovery and scheduling, and seeking Section 1404 transfer of one or more of the subject cases.)." [MDL Docket, MDL No. 2948, at ECF No. 4].  Mr. Jagher and I did exactly that. In contrast, Non-Settling Plaintiffs (then consisting of *Hong* counsel) embarked on a path designed to "squander [this Court's] resources (and those of the parties)" during the pendency of the MDL without any attendant benefit to the class.  [*E.R.* Docket, at ECF No. 46, at 6-7].

32.     Because only three districts were involved at the time the MDL petition was filed in mid-May, I believed that the related cases could be coordinated informally to obviate any need for centralization.  I believed the appropriate first step in that process was to organize all the cases in our District.  To that end, I persuaded counsel in the Illinois cases that the best course, given that the MDL was pending, was to swiftly self-organize.  As a result of my efforts, we immediately began coordinating our cases with speed and efficiency.  In fact, in its transfer order, the MDL Panel lauded our progress and praised this Court for its role and active management in our process. [MDL Docket, ECF No. 2 at 1-2].

33.     The driving force behind our success was the effective inclusion of *all* Districts. Recognizing the fact that the cases were subject to the MDL, that a leadership process in our case would not bind cases outside of our District and that the proceedings would properly be re-opened after an MDL decision, I suggested (with the agreement of all counsel) that the Court appoint me as interim lead counsel in our consolidated action *solely* during the pendency of the MDL, without prejudicing the rights of anyone to seek leadership post-MDL. [*E.R.* Docket, at ECF No. 12]. The Court agreed. [*Id., at* ECF No. 18].

34.     Because of my efforts to convince counsel to take MDL leadership off the table until appropriate leadership proceedings could be had in the ultimate transferee court, all Plaintiffs' counsel in this District coordinated seamlessly and worked toward the common goal of litigating in the most efficient way possible.[6] Together, we filed a Consolidated Complaint, served discovery, worked with our expert and prepared for the mediation, which ultimately resulted in the excellent settlement which we would like to present to this Court.  We did all this alongside nearly all counsel involved in all cases comprising the MDL, and despite substantial interference in the process by Non-Settling Plaintiffs' counsel, who *repeatedly* rejected our invitations to participate and took many steps that could have eliminated a critical settlement opportunity for the class.

### *Non-Settling Plaintiffs' Northern District of California Litigation*

35.     For context, some history of the Non-Settling Plaintiffs' California litigation is important.  Non-Settling Plaintiffs' "first filed" case of all related cases is *Hong v. ByteDance, Inc. et al.*, 5:19-cv-07792-LHK, filed in the Northern District of California in November of 2019.  *Hong* was *not* the first BIPA case against TikTok.  As originally pled, *Hong* was not a BIPA case at all,

---

[6] To preserve judicial resources and avoid unnecessary litigation, we also chose *not* to intervene in the Northern District of California case to pursue leadership since leadership would need to be revisited after the MDL Panel's ruling.

was not brought on behalf of any Illinois plaintiffs, and did not seek to represent a putative class of any Illinois residents. While *Hong* was subsequently amended to add a BIPA claim (*after* I filed *E.R.* in this District), *Hong* pled a broad panoply of California causes of action.

36. Before any BIPA claims were included and any MDL was created, Non-Settling Plaintiffs (then, solely *Hong* counsel) and defense counsel selected Judge Layn Phillips and proceeded to mediation on April 6, 2020. That effort was unsuccessful.[7]

37. In any event, despite the fact that *Hong* was filed in November 2019 and counsel proceeded to an unsuccessful mediation, no significant litigation progress occurred: no dispositive motions were ever filed and no discovery was ever produced (though requests were served). Judge Rosenstengel in the Southern District of Illinois actually recognized *Hong's* lack of any significant advancement, stating that "the Northern District of California does not in fact appear to have taken any significant action in regard to BIPA claims against the TikTok defendants." *A.S. v. TikTok, Inc. et al.*, 3:20-cv-00457-NJR (S.D. Ill.), ECF No. 40 at 3-4.

38. Non-Settling Plaintiffs' lack of progress in *Hong* stands in contrast to the substantial progress we made in this Court and outside of it. While we were making strides, Non-Settling Plaintiffs refused to contribute altogether and instead focused on positing defense arguments that TikTok publicly waived (advocating that this federal Court sitting in Illinois has no personal jurisdiction with regard to TikTok's BIPA violations) and making *ad-hominem* attacks

---

[7] To date, Non-Settling Plaintiffs' counsel refuse to waive privilege and presumably *no one else knows* what happened at that mediation. For their part, Defendants have waived privilege, yet Non-Settling Plaintiffs still refuse to share this information. We simply cannot understand how Non-Settling Plaintiffs can "demand" to know confidential settlement terms while, at the same time, withholding information about their mediation.

in public filings before the MDL panel and the Illinois and California federal courts in an effort to secure control of the case.[8]

### Non-Settling Plaintiffs' Intervention

39.     Rather than focusing on a collaborative effort to benefit the class, Non-Settling Plaintiffs (originally through *Hong* counsel) opted to intervene in both this District and the Southern District of Illinois (curiously, they did not pursue intervention in the Central District of California, making their attempt to transfer the actions to the Northern District of California an incomplete endeavor).   The attempted intervention was motivated by Non-Settling Plaintiffs' counsel's self-interest, to the detriment of the Illinois class, because there is no other reasonable explanation for a *plaintiff* to assert jurisdictional and venue arguments belonging to Defendants, particularly arguments that Defendants had never raised.

40.     The attempted intervention was even more unreasonable given that *Defendants publicly admitted that such arguments were moot*. *See* Joint Response to Motion to Intervene (setting forth Defendants' position that "the personal jurisdiction issues raised by the putative plaintiffs in intervention will likewise be moot if the cases are centralized by the J.P.M.L.") [*E.R.* Docket, ECF No. 40 at 19].   In denying intervention, this Court specifically recognized Defendants' position.  [*E.R.* Docket, ECF. No. 46 at 8].   But Non-Settling Plaintiffs refused to

---

[8] Non-Settling Plaintiffs, specifically *Hong* counsel, told this Court that we "cooked up" a "hasty reverse auction … in an attempt to bolster [our] own leadership position." [*E.R.* Docket, at ECF No. 39, at 3.]  They also resorted to pejorative characterizations of our mediation in their leadership effort in front of Judge Koh stating, "[w]e declined the mediation to *protect the class* from a reverse auction established to serve Illinois counsel's attempt to move all the cases to Illinois despite jurisdictional barriers in Illinois that places these cases in a poor bargaining position." (emphasis in original). *In re: TikTok, Inc. Privacy Litig.*, 5:19-cv-07792 (N.D. Cal.), ECF No. 80 at 2.  Of course, all this angry rhetoric is false since we suggested to this Court that it take no action on leadership until after the MDL ruling. And in any event, these attacks served no purpose since our case was not before Judge Koh.  We chose *not* to intervene in the California matter, in fact, to preserve judicial resources because the MDL was pending.

withdraw their intervention motions after it became plainly obvious that their duplicative transfer motions were not at all appropriate given the MDL and the position publicly taken by Defendants.

41.     Just like their publicly filed pleadings before the MDL Panel, in this Court and in California, Non-Settling Plaintiffs' counsel's intervention briefs were replete with personal attacks. I attempted to correct several of these blatant misrepresentations in the intervention briefing. [*E.R.* Docket, ECF No. 40 (Status Report) at ¶¶ 6-9]. One such misrepresentation was an accusation that Mr. Jagher and I colluded with Defendants in filing a joint response to the intervention motion, even though we were specifically ordered by the Court to do so and the response contained separate sections setting forth our respective positions. [*Id.*, ¶ 7].

42.     We took particular issue with Non-Settling Plaintiffs' false narrative that we were organizing some "reverse auction." In fact, we acted specifically to *prevent* a "reverse auction" *by immediately involving all counsel, including Non-Settling Plaintiffs*. "Reverse auctions" occur when a settlement is reached in secret, where plaintiffs in one action settle unilaterally with a defendant to the detriment of the class. We did exactly the opposite: we invited all counsel to participate and were completely transparent. [ECF No. 26 , at 1, fn1]. For this reason, any notion that we were "hand-picked" by Defendants to sell out the class is not credible.[9]

43.     In any event, Non-Settling Plaintiffs' unnecessary attempts at intervention both failed. Chief Judge Rosenstengel of the Southern District of Illinois first denied Non-Settling Plaintiffs' motion to intervene on July 1, 2020 and this Court agreed shortly thereafter. [*E.R. v. TikTok*, ECF No. 46]. In denying intervention, this Court was unpersuaded by Non-Settling

---

[9] Non-Settling Plaintiffs' statements that we were planning a "reverse auction" are even more troubling, since, at the same time, they were still refusing to share information concerning their first mediation. By withholding this information, Non-Settling Plaintiffs precluded us from beginning our negotiation where they left off. If they had simply provided it, they would have ensured that there would *never* be a reverse auction.

Plaintiffs' jurisdictional arguments and saw no need to "squander its resources (and those of the parties) to address this issue before the MDL Panel rules." [*Id*., at 6-7]. "More fundamentally," this Court observed, intervention would "distort lawyers' incentives" during the pendency of an MDL, since "the filing of an MDL petition would act like a starter's pistol" and trigger a "pre-centralization scramble" by lawyers to dismiss each other's cases before the Panel rules. [*Id*. at 7].

44.     The "pre-centralization scramble" Non-Settling Plaintiffs initiated resulted in zero benefit to the class and nothing but wasted litigation effort by the parties and multiple courts.

### *Chronology of Our Attempts at Inclusion and Non-Settling Plaintiffs' Interference*

45.     The "pre-centralization scramble" was not the only action taken by Non-Settling Plaintiffs that was *adverse* to the class. All the relevant history is recounted here and in a series of emails exchanged between June 3, 2020 and August 25, 2020. I also succinctly summarized this history in an email I circulated on August 19, 2020 (9:55 a.m.) among all Interim Counsel after the Court entered CMO No. 1. The relevant emails are organized by date and attached as **Exhibit C** hereto.

46.     When Defendants expressed an interest in mediation in late May and early June, Mr. Jagher and I organized counsel to propose a fair way to proceed collectively. Given Non-Settling Plaintiffs' (then only *Hong* counsel) and Defendants' prior selection of Judge Phillips and his knowledge and familiarity with the facts of the case, we believed it best to propose that the next round of mediation also proceed with Judge Phillips. Our goal was to capitalize and build upon whatever prior efforts were already made.

47.     Recognizing the MDL Panel's pronouncement that we should coordinate with counsel in the related actions, and also our fiduciary duty to explore the possibility of settlement

for the class, on June 3, 2020, Mr. Jagher and I immediately notified all plaintiffs' counsel and invited them to participate in the mediation. *See* **Exhibit C**, at 1-2 (my email to all counsel on 6/3/20 (8:59 a.m.)). To ensure that the process was fair to everyone and all districts were involved, I proposed as follows:

> Recognizing the various interests and cases on file in multiple districts, we sincerely hope you will participate in the mediation. To maximize the benefit to the class and efficiency, we propose to form a mediation team consisting of two attorneys representing the ND. Ill. cases, two attorneys representing the ND. Cal. cases, and one attorney each for the SD. Ill. and CD. Cal. cases. Certainly, we will welcome input from all counsel and will schedule an all-counsel strategy session to make sure everyone has a voice.

*Id.*

48.     At this time, Non-Settling Plaintiffs had just filed their intervention papers in our case. To avoid further motion practice on intervention and in an attempt to foster collaboration, I advised this Court promptly that we were proceeding to mediation with an inclusive approach and that "[i]f settlement talks are ultimately successful, the litigation may be streamlined on consent of all parties, obviating the need for further motion practice in multiple courts." [*E.R.* Docket, ECF No. 27 (June 3, 2020 Joint Status Report), at ¶12].

49.     In response to our invitation to participate alongside all other counsel, and despite having mediated already with Judge Phillips, Non-Settling Plaintiffs immediately declined. *See* **Exhibit C**, at 12-13 (Masters response email of 6/3/20 (8:27 p.m.)). The refusal was based ostensibly on the desire to await Judge Koh's appointment of interim lead counsel in the consolidated Northern District of California cases. Non-Settling Plaintiffs' counsel further indicated to all counsel that they would continue their pursuit of intervention in our case for purposes of dismissal and transfer. *Id.*

50.     The next day, June 4, 2020, we again reached out to all counsel seeking full participation and collaboration. *See id.*, at 11-12 (my email to all counsel of 6/4/2020 (8:45 a.m.)).

In keeping with our fiduciary duty and because we did not want to forego an opportunity to pursue meaningful relief for the class, we even suggested that all counsel in the Northern District of California cases could self-order for purposes of mediation or else pursue expedited leadership proceedings before Judge Koh. *Id*. Non-Settling Plaintiffs declined to pursue either of our suggestions for a logical path forward. Instead, Non-Settling Plaintiffs dug into their refusal to collaborate with other counsel.

51. On June 8, 2020, we held an organizational conference call among all counsel to discuss the mediation, our negotiation strategy, and how best to proceed. Representatives from all districts participated on that call. Non-Settling Plaintiffs declined.

52. Also on June 8, 2020, in our preparations for mediation, we asked Non-Settling Plaintiffs to provide us with the information exchanged during the prior mediation with Judge Phillips. In response, Non-Settling Plaintiffs accused us of improperly rushing to mediation and being unprepared. *See id*., at 16-18 (Jagher email of 6/8/2020 (8:23 a.m.); Masters response of 6/9/2020 (8:45 a.m.)). Non-Settling Plaintiffs refused to share any information whatsoever, even though Defendants were then willing to waive the mediation privilege (and have since expressly waived that privilege). The decision to withhold information was shockingly at odds with the best interests of the class and was driven by Non-Settling Plaintiffs' desire to maintain their perceived proprietary and self-serving interest over the history of the negotiations with Defendants.

53. On June 12, 2020, we learned that certain counsel who supported Mr. Rhow in the leadership proceedings before Judge Koh (who had been invited to participate in the mediation along with everyone else) contacted defense counsel insisting that TikTok pull out of the mediation based on the false "reverse auction" narrative. Though unclear whether these lawyers acted at the

specific direction of Mr. Rhow, these lawyers affirmatively attempted to thwart a settlement opportunity for the class.

54.     On June 16, 2020, we reiterated our request that Non-Settling Plaintiffs' counsel reveal what happened at the prior mediation so that we could be as informed as possible.  They again refused.

55.     Instead of collaborating with the rest of plaintiffs' counsel, an overture which should have been given appropriate consideration in light of Defendants' recently surfaced political issues and acute business challenges, Non-Settling Plaintiffs opted to focus their efforts on intervention and waging a "turf war."

56.     Non-Settling Plaintiffs' attempts at intervention were denied by the Southern District of Illinois and this Court on July 1, 2020 and July 13, 2020, respectively.  Still recognizing the pendency of the MDL, I again attempted to bridge the gap with Non-Settling Plaintiffs.

57.     On July 17, 2020, following Mr. Rhow's appointment by Judge Koh as interim lead counsel in the Northern District of California case, I told Mr. Rhow that I continued to desire a productive collaboration and once more invited participation from his group.  Mr. Rhow responded the same day and reiterated Non-Settling Plaintiffs' prior refusal to participate in the mediation. **Exhibit C**, at 20-21 (my email of 7/17/20 (9:35 a.m.); Rhow response email of 7/17/20 (12:50 p.m.)).

58.     On July 30, 2020, the MDL Panel heard oral argument.  A copy of the transcript is attached hereto as **Exhibit D**.  During that argument, I focused my presentation on our collaborative efforts and preparation for mediation, in support of my request for transfer to the Northern District of Illinois.  The panel asked no questions of me.  The Panel did, however, inquire into Non-Settling Plaintiffs' refusal to participate in an upcoming mediation, especially since it

was to be conducted by the *same mediator* they had previously used. [Ex. D, 10:13-20]. Mr. Rhow did not have any credible justification to explain this refusal. He simply confirmed that Non-Settling Plaintiffs would not participate, again falsely painting the mediation as a "reverse auction." [*Id.*, 10:21-11:19]. Non-Settling Plaintiffs did not reconsider this refusal in the days following the argument.

59. On August 4, 2020, just days after the argument, and with my having fully apprised the Panel of the mediation and progress made by nearly all counsel, the MDL panel issued its transfer order sending the cases to this Court. [MDL Docket, ECF No. 2].

60. Meanwhile, in our late July and early August discussions with the mediator's office, *we learned that Non-Settling Plaintiffs contacted the mediator without our prior knowledge or authorization, or Defendants' knowledge or authorization,* to attempt to discourage Judge Phillips from proceeding with the mediation. Non-Settling Plaintiffs again attempted to place their own selfish desire to control this litigation ahead of the class.

61. If Non-Settling Plaintiffs' efforts had been successful at that time, they would have robbed the class of an opportunity to negotiate with Defendants at a key time, given the political situation surrounding TikTok and its discussions with potential acquirors. Rather than reacting to this opportunity for the class, Non-Settling Plaintiffs focused on jockeying for control and were willing to sacrifice the class to do so.

### *Non-Settling Plaintiffs' Dramatic Reversal and Willingness to be Included*

62. After close of business on the day the MDL Panel issued its August 4, 2020 ruling sending the cases to Northern District of Illinois, Non-Settling Plaintiffs suddenly reached out to us, indicating a newfound willingness to be included in the mediation. *See* **Exhibit C**, at 23-24 (Rhow email 8/4/20 (8:35 p.m.); my response 8/5/20 (10:01 a.m.)). At this time, it became even

more apparent that Non-Settling Plaintiffs' prior refusal to attend mediation was motivated solely by self-interest and their (ultimately incorrect) calculation that the MDL Panel was sure to send the cases to the Northern District of California. If that had happened, by their estimation, they would have had the sole ability to control the litigation to the exclusion of every other plaintiffs' counsel. Other than this, what could possibly be the reason for such a reversal in position with respect to the same mediation? Certainly nothing had happened which would have alleviated their prior stated concerns about the "reverse auction." Indeed, all that had changed was the MDL Panel's decision not to transfer the case to their preferred venue.

63.     Nevertheless, in the interest of getting consensus behind the settlement in the event one was reached, I responded to Mr. Rhow [*id.*] and, on August 5, 2020, we had our first of many conversations concerning the mediation.

64.     During those conversations, Mr. Rhow twice advised that he would be sharing Non-Settling Plaintiffs' information concerning the prior mediation that we previously requested on several occasions. On August 6, 2020 (after our long conversation on August 5th), Mr. Rhow told us he was "getting together the prior mediation materials and should have a package together soon." *See id.*, at 26 (Rhow email 8/6/20 (1:26 p.m.)). We did not receive the promised package.

65.     Three days later, on August 9, 2020 (the Sunday before the mediation), Mr. Rhow again wrote that he was preparing a "package" that would include "prior briefs, a summary of what the last term sheet was and also a draft consolidated complaint" that could be used as "leverage" during the negotiations. *See id.*, at 28 (Rhow email 8/9/20 (1:13 p.m.)). We (and the class) never received any of this. Given our numerous overtures at cooperation, there was simply no good reason for Mr. Rhow to keep his group's analysis of the case a secret or to withhold information that, in Mr. Rhow's words, could have given the class more "leverage."

21

66.     Nevertheless, recognizing the importance of an inclusive approach and notwithstanding that we had already formed an army of sixteen firms and set delegates, *we specifically reserved two in-person spots* (of only four available due to COVID-19 restrictions) for Mr. Rhow and Megan Jones (Non-Settling Plaintiffs' designated "settlement" counsel pursuant to Judge Koh's order), and *instructed other counsel who had made arrangements to attend in person to cancel their travel plans and appear remotely*.

67.     We soon learned, however, that Defendants would not permit Mr. Rhow's attendance at the mediation because Defendants perceived a conflict of interest involving the Bird Marella law firm (Mr. Rhow's firm).

68.     Learning this, we spent substantial time and effort (including *hours* of telephone calls between Mr. Jagher, Ms. Jones, Mr. Rhow and myself, together with *hours* of telephone calls with defense counsel) in the nine days preceding the mediation attempting to resolve the dispute between the Bird Marella law firm and Defendants.  In these conversations, we actively implored Defendants to permit Mr. Rhow's attendance and suggested ways in which Defendants' concerns could be alleviated.[10]

69.     On August 11-12, 2020, we did our best to assist Mr. Rhow in resolving his alleged conflict, suggesting several possible avenues that Non-Settling Plaintiffs could explore with defense counsel, including sequestering Mr. Rhow during technical discussions regarding the

---

[10] Two days before the mediation, when I was already on my way to California, certain counsel from the Northern District of California action who had declined our invitation and refused to participate for months suddenly expressed interest and demanded a "seat at the table."  Both of these firms had supported Mr. Rhow's slate but separately applied for leadership positions, which Judge Koh denied.  In deference to Judge Koh's order, which expressly ordered that no counsel could perform any work without Mr. Rhow's authorization, I asked Mr. Rhow whether he would allow these lawyers to participate.  On August 12, 2020, Mr. Rhow confirmed via email that no counsel from the Northern District of California other than himself and Ms. Jones could be involved. *See* **Exhibit C**, at 30-31 (Rhow email of 8/12/20 (12:24 a.m.)).

functionality of the TikTok app and/or some type of declaration or additional confidentiality agreement by Mr. Rhow and his firm to allay Defendants' concerns. One of our other suggestions was to use Judge Phillips to assist the parties in working through these issues separately, the day before the mediation. *See id.*, at 36 (my email to defense counsel of 8/12/20 (3:24 p.m.), forwarded to Mr. Rhow). While we are not fully aware of all the discussions between Defendants and Non-Settling Plaintiffs*, we know that Non-Settling Plaintiffs did not pursue all of these options.* Nor would Mr. Rhow agree that Ms. Jones could simply participate in his stead, something that Defendants agreed to permit. Since we were supportive of their participation, any one of these alternatives could have assured Non-Settling Plaintiffs' *inclusion* at the mediation.

70.     It appears that, rather than even attempting to pursue any of our suggested paths to inclusion*, Non-Settling Parties embraced their own exclusion*. They even went as far as to suggest that we boycott the mediation. As counsel with a duty to our clients and as selected mediation delegates on behalf of the majority of the other related actions, we simply could not allow a potential conflict involving one firm to eliminate the opportunity for the class.

71.     On the day before the mediation, I again asked Mr. Rhow whether Non-Settling Plaintiffs would waive confidentiality regarding the prior mediation so that plaintiffs would not be forced to bid against themselves. *See id.*, at 35 (my 8/12/2020 email to Rhow (6:28 p.m.)). Mr. Rhow again refused. The only conclusion to be drawn was that Mr. Rhow's offer to give us the information was conditioned on his personal attendance. It is difficult to interpret this behavior as anything other than elevating counsel's own interests ahead of the class.

72.     To date, Non-Settling Plaintiffs still have not shared what happened at their earlier mediation, even though Defendants expressly consented and even though we repeatedly asked for

it. This is precisely the type of self-dealing and in-fighting among Plaintiffs' counsel that routinely draws criticism of the plaintiff class action bar.

73. As this recitation makes clear, we have from the very outset attempted to include all counsel, including Non-Settling Plaintiffs, in the mediation process because it was and is our belief that collaboration among all counsel is in the class' interest. Conversely, and to the detriment of the class, Non-Settling Plaintiffs refused our numerous attempts at cooperation, implored defense counsel not to mediate with us at all, interfered with the integrity of the settlement process by contacting the mediator to prevent the mediation from ever happening, and then appeared to be interested in cooperating with us only to ultimately withhold information from the class. This conduct is contrary to the generally recognized qualities which should be displayed by counsel who wish to be appointed to leadership. It also shows that Non-Settling Plaintiffs' counsel's interests may not be aligned with the class when the settlement is ultimately presented to the Court.

74. After the mediation concluded, and after a tentative settlement was reached, we advised Non-Settling Plaintiffs that we continue to recognize the value of full participation and welcome the opportunity to address any concerns they may have about the settlement once the settlement is made public and as we move for preliminary approval. *See id.*, at 40-43 (my 8/19/20 (9:55 a.m.) email to all counsel).

75. Since reaching the settlement, we have had many further discussions with Non-Settling Plaintiffs, have continually advocated to Defendants that the settlement terms be shared, and specifically waived the mediation privilege. *See id.*, at 47-48 (my 8/25/2020 (10:34 a.m.) email to defense counsel, copying all counsel, and confirming waiver of mediation privilege).

76. Though we have repeatedly encouraged TikTok to disclose the terms of the settlement, we cannot force them to do so. Our goal is to preserve what we believe is an excellent

24

settlement for the class, and we hope that the Court considers the consequences of appointing any of Non-Settling Plaintiffs' counsel to the leadership team in this case.

### *Non-Settling Plaintiffs' Post-Mediation "Amended" Complaint*

77.     Post-mediation, Non-Settling Plaintiffs began crafting a new narrative. What they initially portrayed as a "reverse auction" quickly morphed into a story of "exclusion." Non-Settling Plaintiffs fail to advise the Court that we *continually* created and endorsed paths to their *inclusion* and they rejected every single one of those paths.   For instance, what could have been the conceivable downside of Ms. Jones's attendance at the mediation, even if Mr. Rhow could not be there?   At the very least, Ms. Jones could have sat in the room and presented Non-Settling Plaintiffs' views on the additional claims they had analyzed and were already contemplating.  Of course, Ms. Jones and Mr. Rhow could also have simply briefed us on this information instead of withholding it altogether.  If, as they now claim, they desired to preserve these additional claims for the class, Ms. Jones and Mr. Rhow easily could have done so.  Instead, they made a calculated decision to withhold information from the mediating parties, quickly claimed their "exclusion," and rushed to file an unauthorized "consolidated complaint" the very next day after the mediation.

78.     On August 14, 2020, the day after the mediation, and consistent with their past strategy of "squandering" resources, Non-Settling Plaintiffs (without any prior discussion with the other 25 law firms in this MDL) filed an amended complaint in the docket of their transferred case with no apparent purpose other than to gain some tactical advantage in their never-ending quest to control this case.  [*In re: Tiktok, Inc. Privacy Litig.*, 1:20-cv-4723 (N.D. Ill.), ECF No. 89].

79.     The new complaint piggybacks on the Northern District of California *Hong* complaint's broad cornucopia of claims and adds a claim under the Video Privacy Protection Act, 18 U.S.C. § 2710 *et seq.* ("VPPA").   Non-Settling Plaintiffs' unilateral filing of an even more

expansive complaint, without input from anyone outside their group, is just another example of an attempt to squander the parties' and this Court's resources.

80.     Non-Settling Plaintiffs' hasty (and retaliatory) filing also seems inconsistent with this Court's prior observations that broad pleadings which assert potentially uncertifiable claims may prejudice plaintiffs and the class:

> As a fallback position, the *Hong* Plaintiffs boast that their complaint provides the best vehicle for TikTok users to obtain relief. It is true that the *Hong* complaint raises more claims, names more defendants, and seeks certification of a broader class than the consolidated complaint. [citation omitted]. If anything, however, those differences reinforce this Court's reluctance to permit intervention. At worst, the *Hong* Plaintiffs' attempt to represent an expansive class may delay or even defeat class certification. At a minimum, bringing more claims against more defendants promises to widen the scope of discovery and prolong this litigation. *See Coburn v. DaimlerChrysler Servs. N. Am., L.L.C.,* 218 F.R.D. 607, 610 (N.D. Ill. 2003). It follows that intervention would prejudice the existing Plaintiffs.

[*E.R.* Docket, ECF. No. 46 at 7-8.]

81.     Despite Your Honor's clear pronouncement, and in an attempt to manufacture an "emergency," Non-Settling Plaintiffs then filed a motion asserting that their new VPPA claim is worth "billions of dollars in statutory damages" and they should have had an opportunity to present that claim at mediation. [MDL Docket, ECF No. 11, at 6]. Of course, Non-Settling Plaintiffs could have freely shared their supposed insight at any point prior to the mediation, as they were repeatedly invited to do but continually refused.

82.     Regardless, the VPPA claim was never an "emergency" and any notion that the highly experienced counsel who mediated this case were unaware of a potential VPPA claim is not true. While we requested (and it would have been helpful) to receive Non-Settling Plaintiffs' analysis prior to the mediation, we did not need it for purposes of mediation because we had

26

*already* conducted our own analysis.[11] Without revealing confidential communications covered by mediation privilege, Settling Plaintiffs can simply say that the claim was considered and specifically discussed.

### The "Third" Mediation

83.     After the settlement was announced, we spent hours (again) coordinating with Non-Settling Plaintiffs and advocating that the settlement terms be made available. During this time, Non-Settling Plaintiffs and Defendants explored ways in which Non-Settling Plaintiffs could be apprised of the settlement in advance of its public disclosure.

84.     Unbeknownst to me, on Sunday, August 23rd, Mr. Rhow filed a "Joint Status Report by Defendants and Undersigned Plaintiffs" at approximately 10:40 p.m. Central advising this Court that Defendants and Non-Settling Plaintiffs "have agreed to mediate issues between those parties no later than August 29, 2020." They requested that this Court "take no action on any status report or proposed case management schedule previously submitted to the Court (ECF Nos. 1, 5, 6) until after the mediation occurs." [MDL Docket, ECF No. 7]. Not only was I not given a chance to review this report prior to its filing, and despite my constant efforts to include Mr. Rhow and his group in our mediation, neither he nor any of the Non-Settling Plaintiffs apprised me of this "third mediation" at all.

85.     On Monday, August 24, 2020, we had several conversations with Non-Settling Plaintiffs regarding their "third mediation," and soon learned that they perceived this mediation to

---

[11] Non-Settling Plaintiffs did not mastermind any VPPA strategy. To the contrary, the VPPA is a focal point in *T.K. et. al. v. Bytedance Technology Co. Ltd. et. al*., 1:19-cv-07915 (N.D. Ill.), an unrelated privacy class action outside of the MDL where Judge Blakey is considering whether to finally approve a settlement. *T.K.* was filed over 8 months before Non-Settling Plaintiffs amended their complaint to include this claim. The merits of the VPPA claim, including its factual underpinnings, are currently the subject of ongoing debate in *T.K.* Settling Plaintiffs are well-aware of that debate and have closely followed all relevant developments in this other case.

present some new opportunity to negotiate additional relief for the class. We soon learned, however, that this was absolutely *not* the purpose of this "mediation."

86.     Because Settling Plaintiffs believe that the parties' communications about this post-settlement "mediation" are subject to Rule 408 and disclosure is wholly improper, Settling Plaintiffs are not in a position to provide further details. What we can say, however, is that this *ex post facto* settlement discussion was never intended to be a true mediation. Defendants did not extend any invitation to Non-Settling Plaintiffs to re-write or re-negotiate any aspect of the settlement. Defendants confirmed this in the "Status Report by Defendants and Designation of Defendants' Lead Counsel" informing the Court that Defendants' view of the purpose of the "third mediation" was not shared by the Non-Settling Plaintiffs. [MDL Docket, ECF No. 8]. Any attempt by Non-Settling Plaintiffs to argue that we somehow interfered with an opportunity for the class to obtain more relief than we already obtained is simply incorrect.

87.     Of course, if any opportunity exists to better the settlement and achieve greater results for the class, we are supportive, and every single action we have taken to date shows that our interests are squarely aligned with our clients and the class.

I declare under penalty of perjury that the foregoing is true and correct.

Date: September 8, 2020

_____
Katrina Carroll