# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE: TIKTOK, INC., CONSUMER PRIVACY LITIGATION<br><br>This Document Relates to All Cases | MDL No. 2948<br><br>Master Docket No. 20-cv-4699<br><br>Judge John Z. Lee<br><br>Magistrate Judge Sunil R. Harjani |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

On behalf of himself and all others similarly situated, Plaintiff M.G., a minor child, by and through his father and legal guardian Bartosz Grabowski (collectively, "Plaintiff"), hereby moves for a temporary restraining order or preliminary injunction to enjoin TikTok Inc. ("TikTok") and ByteDance, Inc. ("ByteDance") (collectively, "Defendants") from selling, transferring or otherwise disseminating without consent the uniquely identifying data in their possession pertaining to the voices and faces of Plaintiff and the other unnamed Illinois Voice Class and Illinois Face Class[1] members – data that Plaintiff contends constitute biometric identifiers[2] and biometric information[3] (referred to collectively as "biometrics") within the meaning of Illinois' Biometric Information Privacy Act ("BIPA") – to Oracle Corp. ("Oracle").

**I.      INTRODUCTION**

This Motion seeks to stop Defendants, owners of the "TikTok" mobile application (hereinafter, the "TikTok App"), from selling, transferring or otherwise disseminating without

---

[1]    The proposed "Illinois Voice Class" and "Illinois Face Class" are defined in paragraph 107 of Plaintiff's Class Action Complaint (*M.G. v. TikTok Inc. et al.*, Case No. 20 C 5305, ECF No. 1 (hereinafter, "Compl."), at 29.)

[2]    The term "biometric identifier" includes voiceprints, scans of face geometry, fingerprints and handprints, and iris and retinal scans.

[3]    "Biometric information" is any information captured, converted, stored, or shared based on a person's biometric identifier used to identify an individual.

consent the "biometric identifiers" and "biometric information" of Plaintiff and the members of the Illinois Voice Class and Illinois Face Class proposed in Plaintiff's Class Action Complaint.

The TikTok App is used by hundreds of millions of people worldwide (including over 100 million people in the United States, the majority of whom are children) to create and share short music videos in a social network-like environment. Unbeknownst to its users, the TikTok App has been programmed by Defendants to surreptitiously capture, collect, and store their "scans of face geometry" (or "face templates") and "voiceprints" whenever certain features of the App are used or a video depicting a human face or voice is uploaded. (Compl. ¶¶ 4-7.) The voiceprints and scans of face geometry that Defendants collect and store are unique to each user, in the same way that a fingerprint uniquely identifies one and only one person. (*Id.* ¶ 6.) As set forth in the Complaint, by capturing and collecting Plaintiff's and its other Illinois-based users' voiceprints and face templates in Illinois, on servers located at data warehouses in Chicago, without first obtaining their informed written consent, Defendants have directly violated BIPA on an extraordinary scale. (Compl. ¶¶ 53-61.)

On August 6, 2020, the President issued an executive order compelling ByteDance to divest TikTok's assets to a domestic entity by no later than September 20, 2020, or to effectively cease doing business in the United States. *See* Pres. Donald J. Trump, "Executive Order on Addressing the Threat Posed by TikTok," The White House, Aug. 6, 2020, *available at* https://www.whitehouse.gov/presidential-actions/executive-order-addressing-threat-posed-tiktok/. That was followed eight days later by a similar order compelling ByteDance to divest any data collected about Americans through the TikTok App by November 12, 2020. *See* Donald J. Trump, "Executive Order on Addressing the Threat Posed by TikTok," The White House, Aug. 14, 2020, *available at* https://home.treasury.gov/system/files/136/EO-on-TikTok-8-14-20.pdf.

As a recent filing in this consolidated litigation readily admits, rather than simply transferring ownership of TikTok, Inc. to a domestic buyer and terminating ByteDance's access to American user data (while leaving TikTok, Inc.'s control over the data intact), Defendants also plan on transferring all user data (including biometric identifiers and information) to the previously

undisclosed third-party buyer. *See* Master Docket, ECF No. 16 at 2 (interpreting the President of the United States' executive orders to "give **Defendants** 90 days (up to 120 with an extension) to 'divest,' i.e., **transfer their relevant data to an acquiror** before it is deleted," and stating that "Defendants are actively preserving and will continue to preserve relevant evidence" and that "[n]othing in the executive orders prohibits Defendants from ensuring that evidence relevant to the litigation be preserved by the acquiror") (emphasis added).

On September 13, 2020, Oracle was announced as the winning bidder for TikTok's U.S. business. *See* Echo Wang and Greg Roumeliotis, *ByteDance drops TikTok's U.S. sale, to partner with Oracle: sources*, Reuters (Sept. 13, 2020), https://www.reuters.com/article/us-china-bytedance-tiktok-oracle/bytedance-drops-tiktoks-u-s-sale-to-partner-with-oracle-sources-idUSKBN265000. "Under the proposed deal, Oracle will be ByteDance's technology partner and will assume management of TikTok's U.S. user data, the sources said." *Id.* (emphasis added). *See also* Rachel Lerman, Ellen Nakashima and Jay Greene, *TikTok has chosen Oracle as U.S. 'technology partner,' rejecting Microsoft's bid*, Washington Post (Sept. 13, 2020), https://www.washingtonpost.com/technology/2020/09/13/microsoft-tiktok-bid-rejected/.

Critically, BIPA prohibits private entities from either (1) selling or otherwise profiting from a person's biometrics, or (2) disclosing, redisclosing, or otherwise disseminating a person's biometrics without the consent of the person or the person's authorized representative. *See* 740 ILCS 14/15(c)-(d). Defendants are on the verge of violating both of these important provisions, leaving Plaintiff and millions of other Illinoisans left "wondering what [will] become of their biometric[s]," *see* 95th Ill. Gen. Assem., House Proceedings, May 30, 2008, at 249 (statement of Rep. Ryg) – which is exactly the set of circumstances that triggered BIPA's passage in the first place. Plaintiff and the members of the Illinois Voice Class and Illinois Face Class did not even consent to Defendants' collection of their biometrics in the first place (Compl. ¶¶ 7, 60), and they have certainly not consented to Defendants' imminent dissemination of their immutable biometric data to Oracle; in fact, Defendants have not even *asked* these individuals if they consent to have their biometrics trafficked to Oracle in this way. Thus, if allowed to go forward, Defendants'

planned sale and dissemination of Plaintiff's and the Illinois Voice Class and Illinois Face Class members' immutable biometric data to Oracle would directly violate Sections 15(c) and 15(d) of the statute, denying BIPA's promise of privacy where it is needed the most.

Plaintiff and the Illinois Voice Class and Illinois Face Class members would be irreparably harmed absent the requested injunction, *see* 740 ILCS 14/5(c) ("Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions."), but Defendants would suffer no harm from an injunction that merely requires them to abide by the law. And, as the Illinois legislature judged when it enacted the statute, the public has a strong interest in preventing the nonconsensual sale and dissemination of their biometric data, *see* 740 ILCS 14/5 ("The public welfare, security, and safety will be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information."). Accordingly, the Court should temporarily restrain and thereafter temporarily enjoin Defendants from selling or disseminating the Plaintiff's and the Illinois Voice Class and Illinois Face Class members' uniquely identifying data pertaining to their voices and faces to Oracle (or any other entity) until Plaintiff's claim for violation of BIPA is finally resolved on the merits.

## II.  BIOMETRIC INFORMATION PRIVACY ACT

In March 2008, Pay By Touch, then the largest operator of fingerprint-based payment-verification services in Illinois declared bankruptcy. *See* 95th Ill. Gen. Assem., House Proceedings, May 30, 2008, at 249 (statement of Rep. Ryg). As a result of that declaration, "thousands of customers from Albertson's, Cub Foods, Farm Fresh, Jewel Osco, Shell, and Sunflower Market" were left "wondering what [would] become of their biometric and financial data." *Id.* That question was answered by the bankruptcy court shortly thereafter, when it approved a sale of Pay By Touch's biometric database.

4

Immediately thereafter, in May 2008, the Illinois legislature recognized the importance of protecting the privacy of individuals' biometric data, finding that "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information." 740 ILCS 14/5(c). "For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." *Id.* Thus, in enacting BIPA, the Illinois legislature addressed the "very serious need [for] protections for the citizens of Illinois when it [comes to their] biometric information." Illinois House Transcript, 2008 Reg. Sess. No. 276.

Section 15(b) of BIPA makes it unlawful for a private entity to, *inter alia*, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers[4] or biometric information, unless it first:

> (1) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored;
>
> (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and
>
> (3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative."

740 ILCS 14/15(b).

Pursuant to Section 15(c) of BIPA, it is unlawful for a private entity "in possession of a biometric identifier or biometric information" to "sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information." 740 ILCS 14/15(c).

And Section 15(d) of BIPA prohibits any "private entity in possession of a biometric identifier or biometric information" from "disclos[ing], redisclose[ing], or otherwise disseminat[ing] a person's or a customer's biometric identifier or biometric information unless:

---

[4] BIPA's definition of "biometric identifier" expressly includes information collected about the geometry of the face (i.e., facial data obtained through facial recognition technology). *See* 740 ILCS 14/10.

5

> (1) the subject of the biometric identifier or biometric information or the subject's legally authorized representative consents to the disclosure or redisclosure;
>
> (2) the disclosure or redisclosure completes a financial transaction requested or authorized by the subject of the biometric identifier or the biometric information or the subject's legally authorized representative;
>
> (3) the disclosure or redisclosure is required by State or federal law or municipal ordinance; or
>
> (4) the disclosure is required pursuant to a valid warrant or subpoena issued by a court of competent jurisdiction.

740 ILCS 14/15(d).

### III. BACKGROUND

On August 6, 2020, the President of the United States issued an executive order effectively compelling Defendants to divest TikTok's assets to a domestic entity by no later than September 20, 2020 (or cease doing business in the United States). *See* Pres. Donald J. Trump, "Executive Order on Addressing the Threat Posed by TikTok," The White House, Aug. 6, 2020, *available at* https://www.whitehouse.gov/presidential-actions/executive-order-addressing-threat-posed-tiktok/. The August 6, 2020 executive order states in pertinent part:

> The following actions shall be prohibited beginning 45 days after the date of this order, to the extent permitted under applicable law: any transaction by any person, or with respect to any property, subject to the jurisdiction of the United States, with ByteDance Ltd. (a.k.a. Zìjié Tiàodòng), Beijing, China, or its subsidiaries, in which any such company has any interest[.]

*Id.*, Section (1)(a).

On August 14, 2020, the President of the United States issued a second executive order mandating that Defendants divest all interests in the user data they have collected pertaining to Americans (i.e., including the biometrics of Illinois residents at issue in this action) by no later than November 12, 2020. *See* Donald J. Trump, "Executive Order on Addressing the Threat Posed by TikTok," The White House, Aug. 14, 2020, *available at*

6

https://home.treasury.gov/system/files/136/EO-on-TikTok-8-14-20.pdf. The August 14, 2020 executive order states in pertinent part:

> (b) . . . [N]ot later than 90 days after the date of this order, unless such date is extended for a period not to exceed 30 days, on such written conditions as the Committee on Foreign Investment in the United States (CFIUS) may impose, ByteDance, its subsidiaries, affiliates, and Chinese shareholders, shall divest all interests and rights in:
>
>> (i) any tangible or intangible assets or property, wherever located, used to enable or support ByteDance's operation of the TikTok application in the United States, as determined by the Committee; and
>>
>> (ii) any data obtained or derived from TikTok application or Musical.ly application users in the United States. Immediately upon divestment, ByteDance shall certify in writing to CFIUS that all steps necessary to fully and permanently effectuate the actions required under sections 2(a) and 2(b) have been completed.
>
> (c) Immediately upon divestment, ByteDance shall certify in writing to CFIUS that it has destroyed all data that it is required to divest pursuant to section 2(b)(ii), as well as all copies of such data wherever located, and CFIUS is authorized to require auditing of ByteDance on terms it deems appropriate in order to ensure that such destruction of data is complete.

*Id.*, Section (1)(b)-(c).

On August 28, 2020, Defendants filed a response in opposition to a motion filed by certain of the plaintiffs to compel (inter alia) Defendants' preservation of data relevant to plaintiffs' claims. *See* Master Docket ECF No. 16. Defendants' August 28, 2020 brief indicates that instead of simply selling TikTok, Inc. as a turnkey operation, ByteDance intends on transferring TikTok user data to the winning bidder:

> Defendants have repeatedly affirmed that Defendants are actively preserving and will continue to preserve relevant evidence. They also affirm so here. The executive orders cited by the Emergency Motion give Defendants 90 days (up to 120 with an extension) to "divest," i.e., ***transfer their relevant data to an acquiror*** before it is deleted. Nothing in the executive orders prohibits Defendants from ensuring that evidence relevant to the litigation be preserved by the acquiror. Defendants do not intend to spoliate any evidence in complying with these orders.

7

*Id.* at 2 (emphasis added). Later that same day, the movant-plaintiffs filed a reply in support of their motion, in which they summarized Defendants' position on the issue of data-preservation as follows: "Defendants claim that <u>all relevant data</u> will be transferred to an acquirer" (ECF No. 17) (emphasis added); nothing has subsequently been filed on the docket to suggest that the Defendants dispute that they intend to transfer the Plaintiff's and the Illinois Voice Class and Illinois Face Class members' sensitive biometric data – i.e., the "relevant data" referenced by Defendants in their August 28 filing (ECF No. 16 at 2) – to Oracle immediately upon regulatory approval.

On September 8, 2020, Plaintiff filed a Class Action Complaint alleging two claims for relief against Defendants: (1) violation of BIPA on behalf of all persons in Illinois whose biometrics were collected by Defendants; and (2) unjust enrichment on behalf of all persons in the United States whose biometrics were collected by Defendants. (*M.G.*, ECF No. 1.)

## IV.    LEGAL STANDARD

The Seventh Circuit uses a two-step analysis to assess whether preliminary injunctive relief is warranted. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc*., 549 F.3d 1079, 1085-86 (7th Cir. 2008). This is the same analysis used to determine if a TRO is warranted. *Gray v. Orr*, 4 F. Supp. 3d 984, 989 n.2 (N.D. Ill. 2013). "In the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Turnell v. CentiMark Corp*., 796 F.3d 656, 661-62 (7th Cir. 2015). If the movant makes the required threshold showing, then the court moves on to the second stage and considers: "(4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties," *i.e*. the public interest. *Id*. at 662. The Court balances the potential harms on a sliding scale against the movant's likelihood of success. The greater the movant's likelihood of success, "the less strong a showing" the movant

"must make that the balance of harm is in its favor." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003).

V. ARGUMENT

### A. Absent an Injunction, Plaintiff and the Illinois Voice Class and Illinois Face Class will Suffer Irreparable Harm for Which there is no Adequate Remedy at Law

The first two factors (irreparable harm to Plaintiff absent an injunction, and the lack of an adequate remedy at law) both weigh in favor of granting the requested injunction.

Absent the requested injunction, Defendants appear poised to sell and disseminate Plaintiff's and the Illinois Voice Class and Illinois Face Class members' biometric data – without any of their consent – by September 20, 2020, in flagrant derogation of their right to biometric privacy under BIPA. *See In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1169 (N.D. Cal. 2016) ("There can be no reasonable doubt that the Illinois Biometric Information Privacy Act embodies a fundamental policy of the state of Illinois. . . . By its express terms, BIPA manifests Illinois' substantial policy of protecting its citizens' right to privacy in their personal biometric data."). BIPA confers Plaintiff and Illinois Voice Class and Illinois Face Class members with the "right to say no" to the sale and dissemination of their biometrics to a third party (as well as to the third party's collection of their biometrics), and a deprivation of that right would irreparably diminish their control over this sensitive data and magnify their risk of falling victim to identity theft, financial crimes, and other similar evils. *See Patel v. Facebook Inc.*, 290 F. Supp. 3d 948, 953–54 (N.D. Cal. 2018) ("BIPA vested in Illinois residents the right to control their biometric information by requiring notice before collection [or dissemination] and giving residents the power to say no by withholding consent. As the Illinois legislature found, these procedural protections are particularly crucial in our digital world because technology now permits the wholesale collection and storage of an individual's unique biometric identifiers—identifiers that cannot be changed if compromised or misused. When an online service simply disregards the Illinois procedures, as Facebook is alleged to have done, the right of the individual to maintain her

9

biometric privacy vanishes into thin air. The precise harm the Illinois legislature sought to prevent is then realized.").

Although Defendants' planned dissemination of Plaintiff's and the Illinois Voice Class and Illinois Face Class members' biometrics to Oracle would entitle each of these individuals to statutory damages under BIPA – from both the Defendants and the acquiring entity, *see* 740 ILCS 14/5(b) (prohibiting the "obtaining" of biometrics absent the requisite informed written consent) – no amount of monetary relief can adequately remedy the compromise of a person's biometric data. As the Illinois legislature recognized in enacting the statute: "Biometrics . . . are biologically unique to the individual; therefore, <u>once compromised, the individual has no recourse</u>, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." 740 ILCS 14/5(c) (emphasis added). Thus, if allowed to go forward, the biometrics fire sale that Defendants have planned would deny BIPA's promise of privacy precisely where it is needed the most and cause harms to Plaintiff and the members of the Illinois Voice Class and Illinois Face Class for which there is no adequate remedy at law. *See id.* That is precisely why the statute not only authorizes substantial statutory damages, but also injunctive relief to prevent an entity possessing purloined biometric data from further disclosing it. *See* 740 ILCS 14/20(4).

Accordingly, the first and second factors weigh in favor of granting the Motion.

### B. Plaintiff and the Illinois Voice Class and Illinois Face Class Have a Reasonable Likelihood of Success on the Merits

The third factor (whether Plaintiff has reasonable likelihood of success on the merits) also weighs in favor of granting the requested injunction. "At the preliminary injunction stage, the plaintiff must show that 'it has a better than negligible chance of succeeding on the merits so that injunctive relief would be justified.'" *Personeta, Inc. v. Persona Software, Inc.*, 418 F. Supp. 2d 1013, 1016 (N.D. Ill. 2005) (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 897 (7th Cir. 2001)).

The factual allegations of the Complaint and the materials to which they cite sufficiently demonstrate that Plaintiff "has a better than negligible chance of succeeding on the merits[.]"

10

*Personeta*, 418 F. Supp. 2d at 1016 (quoting *Ty, Inc.*, 237 F.3d at 897). Specifically, the factual allegations of the Complaint and the materials cited by the Complaint make a compelling showing that Defendants have used the TikTok App to surreptitiously capture, collect, store, and use the "scans of face geometry" (or "face templates") and "voiceprints" (i.e., "biometric identifiers") of everyone whose face or voice has appeared in a video uploaded using the TikTok App, including users in Illinois, without having obtained anyone's consent to these Orwellian practices. (Compl. ¶¶ 53-83.) Defendants then used the "biometric identifiers" that they collected to derive, collect, and store – also from within Illinois and absent anyone's consent – personally identifying "biometric information" pertaining to Plaintiff and each of the other members of the Illinois Voice Class and Illinois Face Class, including the person's age, gender, race, and emotional state, all of which is then linked with that person's name, e-mail address, and other unique identifiers in their database. (*Id.* ¶ 57.)

The factual allegations underlying Plaintiff's claims are corroborated by Defendants' own statements, patents, extensive reporting, and various security and scholarly reports detailing the TikTok App's biometrics collection capabilities. (Compl. ¶¶ 63-83.) Thus, Plaintiff has a strong likelihood of success (far greater than the "better than negligible chance of success[]" needed to satisfy this factor) on his claim that Defendants collected, captured, stored, and used – without obtaining the requisite signed written release or publishing the mandated data retention policies – the "biometric identifiers" and "biometric information" of millions of persons in Illinois, including Plaintiff and millions of other young children, in violation of BIPA. In other words, Plaintiff has made a sufficiently strong showing that the "relevant data" Defendants intend to transfer to the acquiring entity (ECF No. 16 at 2) – i.e., Oracle – includes Plaintiff's and the Illinois Voice Class and Illinois Face Class members' "biometric identifiers" and "biometric information," within the meaning of those terms as defined in BIPA.

Accordingly, the third factor weighs in favor of granting the Motion. *See, e.g., Lexington Healthcare Ctr. of Bloomingdale, Inc. v. Morrison Mgmt. Specialists, Inc.*, No. 20-CV-1792, 2020 WL 1820522, at *3 (N.D. Ill. Apr. 10, 2020) ("Maybe Plaintiff breached the contract, or maybe

Defendant did. In such circumstances, Plaintiff has some chance of prevailing on the merits, and certainly a better than negligible chance. This factor weighs in Plaintiff's favor.").

### C. The Balance of Harms and the Public Interest Weigh in Favor of Granting the Requested Injunction

Finally, the fourth factor (the balancing of harms to Plaintiff absent an injunction with the harm to Defendants as a result of an injunction) and fifth factor (the public interest) also each weigh in favor of granting the requested injunction.

The irreparable harm to Plaintiff and the Illinois Voice Class and Illinois Face Class members absent an injunction is immense. If Defendant's plan to transfer their users' biometric data to Oracle goes forward, millions of (mostly minor) Illinoisans will suffer not just invasions of the their right to biometric privacy, resulting in their loss of control over their biometrics, but also the possibility of additional consequential harms to their identities and financial interests going forward.

Defendants, on the other hand, cannot possibly identify any prejudice they would suffer from an injunction that merely enjoins them from committing further violations of this important statute. *See Light v. Zhangyali*, No. 15 CV 5918, 2016 WL 4429758, at *4 (N.D. Ill. Aug. 22, 2016) ("There is no harm to the defendant to being enjoined from violating the law[.]"); *Entm't One UK Ltd. v. 2012Shiliang*, 384 F. Supp. 3d 941, 955 (N.D. Ill. 2019) (same). Nor can Defendants demonstrate that the requested injunction would prevent them from complying with the President's executive orders. The executive orders merely order ByteDance to "divest" all interests in their assets in TikTok and in the TikTok user data pertaining to Americans (which would include the biometric data pertaining to Plaintiff and the Illinois Voice Class and Illinois Face Class at issue in this Motion), and to verify that the divested data has been destroyed. Contrary to what Defendants would have the Court believe in their recent filing in the consolidated action (*see* Master Docket, ECF No. 16, at 1-2), the executive orders plainly do not require Defendants to transfer any data (much less the biometric data in question) to Oracle – and, as discussed above, BIPA would clearly prohibit such a data transfer.

12

Finally, the public-interest factor weighs heavily in Plaintiff's favor. Protecting the public from the conduct sought to be enjoined in this Motion is the raison d'être of the statute. *See* 740 ILCS 14/5 ("The public welfare, security, and safety will be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information.").

Accordingly, the balance of harms between the parties and the public interest also support granting the requested injunction.

## VI. CONCLUSION

The Motion should be granted. The Court should enter a temporary restraining order (and an order to show cause why a preliminary injunction should not issue) enjoining Defendants from selling, transferring, or otherwise disseminating to Oracle (or to any intermediary entity) the uniquely identifying data in its possession pertaining to the voices and faces of Plaintiff and the other unnamed Illinois Voice Class and Illinois Face Class members until Plaintiff's claim for violation of BIPA is resolved on the merits.

Dated: September 14, 2020

Respectfully submitted,

*s/* J. Dominick Larry

**NICK LARRY LAW LLC**
J. Dominick Larry
55 E Monroe St, Suite 3800
Chicago, IL 60603
Tel: (773) 694-4669
Fax: (773) 694-4691
Email: nick@nicklarry.law

**HEDIN HALL LLP**
Frank S. Hedin
David W. Hall
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: (305) 357-2107
Fax: (305) 200-8801
E-mail: fhedin@hedinhall.com
        dhall@hedinhall.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor

        Joseph I. Marchese
        Philip L. Fraietta
        888 Seventh Avenue
        New York, NY 10019
        Tel: (646) 837-7150
        Fax: (212) 989-9163
        E-Mail: scott@bursor.com
                 jmarchese@bursor.com
                 pfraietta@bursor.com

*Counsel for Plaintiff, by and through his father and legal guardian Bartosz Grabowski, and the Putative Classes*