IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: TIKTOK, INC., | ) | MDL No. 2948 |
| CONSUMER PRIVACY | ) | |
| LITIGATION | ) | Master Docket No. 20 C 4699 |
| | ) | |
| | ) | Judge John Z. Lee |
| | ) | |
| This Document Relates to All Cases | ) | Magistrate Judge Sunil R. Harjani |

**RESPONSE AND OBJECTION OF AMY KELLER AND LESLEY WEAVER
REGARDING SUBMITTED LEADERSHIP APPLICATIONS**

Pursuant to the Court's Case Management Order No. 2, *In Re: TikTok, Inc. Consumer Privacy Litigation*, No. 1:20-cv-04699 (N.D. Ill. Sept. 1, 2020), ECF No. 24 ("CMO 2") Amy Keller of DiCello Levitt Gutzler LLC ("DLG") and Lesley Weaver of Bleichmar Fonti & Auld LLP ("BFA") respectfully respond briefly to the various applications for appointment filed with this Court on September 8, 2020. While DLG/BFA believe that this case is susceptible to early resolution, they object to any proposed leadership team that is comprised almost entirely of counsel who have pled only BIPA claims, resulting in an overly narrow settlement effort at the exclusion of counsel who have researched and pleaded viable claims on behalf of individuals outside of the State of Illinois. DLG/BFA also believe that any proposed leadership team needs to be prepared to litigate, if necessary, demonstrating the necessary credentials to do so. DLG/BFA have worked professionally and cooperatively with most of the applicant firms and bring not just past experience but knowledge about and a commitment to the entire class. If appointed, DLG/BFA will act as responsive and responsible stewards.

In addition—and of particular significance to the Court's consideration of the competing leadership applications here—is the continuous and rapidly-changing landscape of TikTok's business operations. Indeed, in the last thirty-six hours alone, Microsoft has confirmed that TikTok's owner ByteDance will not acquire TikTok's U.S. operations, as once seemed imminent. Instead, Oracle now proposes to become TikTok's "trusted technology provider," and Treasury Secretary Mnuchin confirmed that the Committee on Foreign Investment in the U.S. will review the Oracle bid, which "involves an arrangement with TikTok to move data on American users to Oracle's cloud-computing infrastructure in the U.S. to prevent it from being shared with the

Chinese government."[1] As a result of the foregoing, not just the actors but the terms of any TikTok sale are dramatically different than they were mere days ago—an ever-changing landscape that affects where data may reside and who has access to it. If the Oracle deal is the TikTok purchase transaction that is ultimately consummated on September 20, any proposed resolution of these consolidated actions will need to take these changes into account. Stated more directly: any settlement discussions that occurred before this Court's entry of CMO2—in which the Court made clear that no counsel has the authority to bind other counsel—will need to be revisited and potentially restarted or, at least, materially renewed, if the case is to presently continue toward resolution. And if no deal is consummated—either with Oracle or by way of settlement in this litigation—any leadership team that this Court appoints must be ready to litigate, efficiently and effectively. For these reasons, the Court should appoint Ms. Keller and Ms. Weaver to the leadership team.

Moreover, under the facts at issue in this litigation, a narrow, BIPA-focused approach is insufficient to protect the interests of all putative class members or resolve thorny questions arising out of Defendant's practices. For example, any motion for temporary restraining order should cover not just an Illinois subclass and the collection of biometric data, but also, for example, the interests of other class members (such as California residents) whose MAC addresses were stolen, an allegation that features prominently in Ms. Weaver and Ms. Keller's Amended Complaint, premised on the exclusive retention of the experts who uncovered the problem. Amended Complaint, *R.S. et al. v. TikTok, Inc.*, No. 20-cv-04728 (N.D. Ill. Aug. 13, 2020), ECF No. 17, ¶¶ 82-91.

---

[1] Katy Stech Ferek, *Data Privacy Increasingly a Focus of National Security Reviews* (Sept. 14, 2020, 3:19 PM EST), https://www.wsj.com/articles/data-privacy-increasingly-a-focus-of-national-security-reviews-11600111141?st=yd9zcg1dcsk5l4l&reflink=article_email_share.

This is not the only example where Ms. Keller and Ms. Weaver's work stands out on its merits. In addition to the above-described MAC address allegations, DLG and BFA identified and pled a Video Privacy Protection Act ("VPPA") claim before any other plaintiff did, mindful of the profound harms addressed and equally powerful statutory penalties available under that statute ($2500 per violation, compared to the baseline $1000 BIPA penalty). *Iyer, et al. v. TikTok Inc., et al.*, No. 20-cv-05217 (N.D. Ill.), filed as *Iyer, et al., v. TikTok Inc., et al.*, No. 5:20-cv-03795 (N.D. Cal. Jun. 9, 2020), ECF No. 1. DLG and BFA's work rests on multiple experts' comprehensive analysis of how TikTok has collected and transferred users' PII to foreign corporate affiliates. *R.S.* Amended Complaint, ¶¶ 67-76.[2] The *R.S.* Complaint—which DLG and BFA filed—describes how Plaintiffs' video viewing preferences are paired with other contact data, website traffic, app activity, and ad engagement with other TikTok data. The goal of such aggregation is not just the ability to sell product, but also to influence the behavior of children and adults alike, and the involvement foreign entities with interests hostile to the U.S. *Id.* ¶¶ 77-81. DLG and BFA's *R.S.* Complaint is one of just two on file here that identifies some of those entities and seeks redress for those harms. These concerns reach far beyond the collection of biometric data and must be considered and addressed in both the litigation and resolution of this litigation. The fact is that without including and evaluating these claims herein, it is impossible to accurately determine the true value of this case. Conversely, excluding counsel representing broader claims from any resolution process—like Ms. Weaver and Ms. Keller— "may raise concerns regarding the equity and fairness of the overall negotiation process." CMO 2; *accord Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 282 (7th Cir. 2002) (noting in dicta that "[c]onflicts of interest can create serious

---

[2] Settling Plaintiffs assert that they "discussed" (ECF No. 81 at 6, n.7) the VPPA claim in their settlement negotiations. This is surprising, given that they excluded the counsel who had developed the factual and legal bases for these claims.

3

problems for class action settlements and require the creation of separately represented subclasses.") (citations omitted).

Such problems, however, are easily cured here by ensuring that future litigating and settlement teams include a balance of counsel who represent those claims (instead of counsel who only plead BIPA claims) and clients and who have invested focused resources on exploring what has occurred and who has been affected. The settlement team should include seasoned lawyers who have demonstrated experience in engaging in complex, high-profile settlement discussions with government actors. Ms. Keller and Ms. Weaver possess this experience. Ms. Keller's expertise includes extensive settlement negotiations including federal and state regulators in the *Equifax* Litigation, and Ms. Weaver as a federal and state settlement liaison in the *In re Volkswagen "Clean Diesel"* Litigation. They have already demonstrated their commitment by investing more resources into merits analysis than any of the settling counsel, at a minimum.

Ms. Keller and Ms. Weaver have consistently advocated behind the scenes for both the "settling" and "litigating" groups to work together in an inclusive fashion, rather than focusing on perceived grievances, which simply creates noise that distracts from more important issues. Unfortunately, some of those grievances appear to be foreshadowing the important legal issues present in the litigation. Significantly, Ms. Keller and Ms. Weaver have not aligned with any particular faction or pledged support in exchange for any promise of support or payment of fees upon resolution of the case.[3] They have also not communicated support for a proposed settlement whose terms have not been revealed to them. In prior litigations—including pending nationwide

---

[3] One submission supporting proposed Settling Co-Leads falsely claims that DLG/BFA have not had contact with all counsel in this case, citing this as the only reason DLG/BFA are not fit to lead. ECF No. 78 at 2. The statement is untrue—we have had numerous conversations with putative co-lead counsel and also participated in numerous joint calls and emails and actively sought to bridge differences. ECF No. 51-1 ¶¶ 7, 9.

4

litigations that they are presently leading—Ms. Keller and Ms. Weaver have always placed quality and deliberation over expedience and exclusion. For that reason, they cannot support applicants whose sole contribution to date rests on support for a settlement they have yet to see. These are issues easily cured by the Court's appointment of a balanced, experienced team of lawyers who will work collaboratively to resolve problems and advance the litigation. They are prepared either to lead that team or participate on an executive committee; they have each done both with great success.

This litigation presents cutting-edge questions about how data collection and algorithms based upon it invade U.S. consumers' privacy and influence their behavior—adults and children alike. This case has the potential to concretely address those questions, but a quick deal with terms that cannot be vetted by a broader group could foreclose real engagement on those issues, thereby exacerbating the problem rather than actually solving it. As a recent *New York Times* article lamented, "[t]he fight about TikTok wasn't only about TikTok. It should have been a moment for engaged debate about what Americans should expect out of our technology and our government. Instead, the big questions went unasked and unanswered."[4] Perhaps the author was not focused on this forum, which has the authority to host such a debate. DLG and BFA are confident that the Court will pick a team to represent those consumers who will ask and answer those questions in a collaborative, merits-focused process and they would be honored to participate in any role that the Court deems appropriate.

---

[4] Shira Ovide, *TikTok Was a Wasted Opportunity*, New York Times (Sept. 14, 2020), https://www.nytimes.com/2020/09/14/technology/tiktok-oracle.html.

| | |
|---|---|
| Dated: September 15, 2020 | Respectfully submitted by:<br><br>*/s/ Amy E. Keller*<br>Amy E. Keller<br>**DICELLO LEVITT GUTZLER LLC**<br>Ten North Dearborn Street<br>Sixth Floor<br>Chicago, Illinois 60602<br>Telephone: (312) 214-7900<br>Facsimile: (440) 953-9138<br>akeller@dicellolevitt.com<br><br>Lesley E. Weaver<br>**BLEICHMAR FONTI & AULD LLP**<br>555 12th Street, Suite 1600<br>Oakland, California 94607<br>Telephone: (415) 445-4003<br>Facsimile: (415) 445-4020<br>lweaver@bfalaw.com<br><br>*Counsel for Plaintiffs R.S., J.S., Czajka, Iyer, Johnson, Quinteiro, and the Putative Classes* |

**CERTIFICATE OF FILING**

I hereby certify that a copy of the foregoing was filed via this Court's CM/ECF service, which will send notification of such filing to all counsel of record this 15th day of September 2020.

By: */s/ Amy E. Keller*
Amy E. Keller