**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: TIKTOK, INC., CONSUMER PRIVACY LITIGATION, | MDL No. 2948 |
| | Master Docket No. 20-cv-4699 |
| | Judge John Z. Lee |
| | Magistrate Judge Sunil R. Harjani |
| This Document Relates to All Cases | |

**PLAINTIFFS' MOTION FOR**
**PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

# Table of Contents

INTRODUCTION ......................................................................................................... ii

FACTUAL AND PROCEDURAL BACKGROUND ................................................... 2

    A.    Plaintiffs' Allegations ..................................................................... 2

    B.    The Risks of TikTok's Defenses to Plaintiffs and the Class ............................ 4

    C.    Litigation and Procedural History ................................................................. 8

    D.    The Settlement Agreement ........................................................................... 12

        1.    Proposed Class Definition ...................................................................... 12

        2.    Monetary Relief ...................................................................................... 12

        3.    Plan of Allocation ................................................................................... 13

        4.    Injunctive Relief ...................................................................................... 14

        5.    Notice and Settlement Administration Costs .......................................... 15

        6.    Release ..................................................................................................... 16

        7.    Attorneys' Fees and Costs for Class Counsel, and Service Awards for Class Representatives .............................................................................. 16

        8.    Class Size Representations and Confirmatory Discovery ..................... 17

ARGUMENT ............................................................................................................. 18

    A.    This Settlement well surpasses the Seventh Circuit's standards for the approval of class action settlements. .......................................................................................... 18

    B.    The Settlement should be preliminarily approved. ....................................... 19

        1.    The Settlement provides substantial relief to the Class, particularly given the risks posed by continued litigation. ............................................ 20

        2.    The Settlement value is well within the range of reasonableness. ......... 23

        3.    Continued litigation would be complex, costly, and lengthy. ................. 32

        4.    Proposed Class Counsel are competent, well-informed, and experienced and they strongly endorse the Settlement. ................................................. 34

        5.    The Settlement was reached after significant analysis and arm's-length negotiation. 34

    C.    The Class and Subclass should be provisionally certified for settlement purposes. ...... 37

        1.    The requirements of Rule 23(a) are satisfied. ........................................ 38

        2.    The requirements of Rule 23(b)(3) are satisfied. ................................... 43

    D.    Court-Appointed Co-Lead Counsel are experienced and knowledgeable and have dedicated themselves to this case; they should be appointed Class Counsel. ............... 44

    E.    The proposed class notice plan provides the best practicable notice and does so in an easily understood format. .......................................................................... 45

    F.    The Court should schedule a fairness hearing to finally approve the settlement. .......... 47

CONCLUSION .......................................................................................................... 47

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
No. 07 C 2898, 2011 WL 3290302 (N.D. Ill. July 26, 2011) .................................... 34

*Amchem Prods. Inc. v. Windsor*,
521 U.S. 591 (1997) ............................................................................................... 37, 43

*Armstrong v. Bd. of Sch. Dirs. Of the City of Milwaukee*,
616 F.2d 305 (7th Cir. 1980) ............................................................................. 18, 20, 34

*Borcea v. Carnival Corp.*,
238 F.R.D. 664 (S.D. Fla. 2006) ............................................................................... 33

*Carrier iQ, Inc., Consumer Privacy Litig.*,
No. 12-md-02330-EMC, 2016 U.S. Dist. LEXIS 114235 (N.D. Cal. Aug. 25, 2016) ............. 30

*Cotton v. Hinton*,
559 F.2d 1326 (5th Cir. 1977) ................................................................................. 32

*CV Reit, Inc. v. Levy*,
144 F.R.D. 690 (S.D. Fla. 1992) ............................................................................... 41

*Dohrmann v. Intuit, Inc.*,
823 F. App'x 482 (9th Cir. 2020) ............................................................................... 5

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ..................................................................................... 23

*Facebook Biometric Info. Privacy Litig.*,
No. 15-cv-03747-JD, 2018 WL 2197546 (N.D. Cal. May 14, 2018) ...................................... 22

*Facebook BIPA*,
No. 3:15-cv-03747, 2020 WL 4818608 (N.D. Cal. Aug. 19, 2020) ............................ 25, 26, 26

*Fogarazzao v. Lehman Bros., Inc.*,
232 F.R.D. 176 (S.D.N.Y. 2005) ............................................................................... 41

*Fox v. Asset Acceptance, LLC*,
No. CV 14-734-GW(FFMx), 2015 U.S. Dist. LEXIS 193865, at *23 (C.D. Cal. Aug. 17, 2015) ............................................................................................................................. 36

*Fraley v. Facebook, Inc.*,
966 F. Supp. 2d 939 (N.D. Cal. 2013) ....................................................................... 30

## TABLE OF AUTHORITIES (cont.)

Page(s)

**Cases (cont.)**

*Gen. Tel. Co. of the Sw. v. Falcon*,
 457 U.S. 147 (1982) ............................................................................................. 44

*Hanlon v. Chrysler Corp.*,
 150 F.3d 1011 (9th Cir. 1998) ............................................................................. 20

*Harris v. Circuit City Stores, Inc.*,
 No. 07-cv-2512, 2008 WL 400862 (N.D. Ill. Feb. 7, 2008) .................................... 44

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
 270 F.R.D. 330 (N.D. Ill. 2010) ..................................................................... passim

*In re Capital One Telephone Consumer Protection Act Litig.*,
 80 F. Supp. 3d 781 (N.D. Ill. 2015) ...................................................................... 30

*In re Equifax Customer Data Sec. Breach Litig.*,
 MDL Docket No. 2800, 2020 U.S. Dist. LEXIS 118209 (N.D. Ga. Mar. 17, 2020) ............. 31

*In re Google Buzz Privacy Litig.*,
 No. C 10-00672 JW, 2011 WL 7460099 (N.D. Cal. June 2, 2011) ......................... 30

*In re Google LLC Street View Electronic Communications Litigation*,
 No. 3:10-md-02184, 2020 U.S. Dist. LEXIS 47928 (N.D. Cal. Mar. 18, 2020) ...................... 30

*In re Mexico Money Transfer Litig.*,
 164 F. Supp. 2d 1002 (N.D. Ill. 2000) .................................................................. 34

*In re Netflix Privacy Litig.*,
 No. 5:11-cv-00379, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) .................... 29, 33

*In re Nickelodeon Consumer Privacy Litig.*,
 827 F.3d 262 (3d Cir. 2016) .................................................................................. 23

*In re Nissan Radiator*,
 No. 10 CV 7493 (VB), 2013 U.S. Dist. LEXIS 116720 (S.D.N.Y. May 30, 2013) ................. 37

*In re Northfield Labs., Inc. Sec. Litig.*,
 No. 06 C 1493, 2012 WL 366852 (N.D. Ill. Jan. 31, 2012) .................................... 46

*In re Southwest Airlines Voucher Litig.*,
 No. 11-cv-8176, 2013 WL 4510197 (N.D. Ill. Aug. 26, 2013) ............................... 20

**TABLE OF AUTHORITIES (cont.)**

Page(s)

**Cases (cont.)**

*In re Target Corp. Customer Data Sec. Breach Litig.*,
   892 F.3d 968 (8th Cir. 2018) ........................................................................... 32

*In re Warner Commc'ns Sec. Litig.*,
   618 F. Supp. 735 (S.D.N.Y. 1985) .................................................................. 35

*Isby v. Bayh*,
   75 F.3d 1191 (7th Cir. 1996) ......................................................... 18, 19, 20, 34

*Johnson v. Uber Techs., Inc.*,
   No. 16-cv-5468, 2018 U.S. Dist. LEXIS 161155 (N.D. Ill. Sep. 20, 2018) .............................. 5

*Kaye v. Amicus Mediation & Arbitration Group, Inc.*,
   300 F.R.D. 67 (D. Conn. 2014) ...................................................................... 43

*Kessler v. Am. Resorts International's Holiday Network, Ltd.*,
   No. 05 C, 5944, 2007 WL 4105204 (N.D. Ill. Nov. 14, 2007) ................................. 19

*Kline v. Dymatize Enters., LLC*,
   No. 15-CV-2348-AJB-RBB, 2016 U.S. Dist. LEXIS 142774 (S.D. Cal. Oct. 13, 2016) ........ 36

*Lane v. Facebook, Inc.*,
   696 F.3d 811 (9th Cir. 2012) .............................................................. 20, 29, 33

*Lo v. Oxnard European Motors, LLC*,
   No. 11CV1009 JLS (MDD), 2011 U.S. Dist. LEXIS 144490 (S.D. Cal. Dec. 15, 2011) ........ 36

*McCabe v. Crawford & Co.*,
   210 F.R.D. 631 (N.D. Ill. 2002) ..................................................................... 38

*McKinnie v. JP Morgan Chase Bank, N.A.*,
   678 F. Supp. 2d 806 (E.D. Wis. 2009) ............................................................ 34

*Medeiros v. HSBC Card Servs.*,
   No. CV 15-09093 JVS (AFMx), 2017 U.S. Dist. LEXIS 178484 (C.D. Cal. Oct. 23, 2017) .. 30

*Miracle-Pond v. Shutterfly, Inc.*,
   No. 19-cv-04722, 2020 U.S. Dist. LEXIS 86083 (N.D. Ill. May 15, 2020) .............................. 5

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) ...................................................................................... 45

**TABLE OF AUTHORITIES (cont.)**

Page(s)

**Cases (cont.)**

*Parker v. Risk Mgmt. Alternatives, Inc.*,
    206 F.R.D. 211 (N.D. Ill. 2002)............................................................................ 41

*Parker v. Time Warner Entm't Co., L.P.*,
    631 F. Supp. 2d 242 (E.D.N.Y. 2009) ................................................................. 30

*Peter v. DoorDash, Inc.*,
    No. 19-CV-06098-JST, --- F. Supp. 3d ---, 2020 WL 1967568 (N.D. Cal. Apr. 23, 2020)....... 5

*Pollard v. Remington Arms Co., LLC*,
    320 F.R.D. 198 (W.D. Mo. 2017)......................................................................... 24

*Reliable Money Order, Inc. v. McKnight Sales Co.*,
    704 F.3d 489 .................................................................................................. 44

*Roach v. T.L. Cannon Corp.*,
    773 F.3d 401 (2d Cir. 2015)................................................................................ 43

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011) ............................................................. 32, 33

*Simerlein v. Toyota Motor Corp.*,
    No. 3:17-cv-1091 (VAB), 2019 U.S. Dist. LEXIS 96742 (D. Conn. June 10, 2019) .............. 36

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011)................................................................................ 24

*Synfuel Techs, Inc. v. DHL Express (USA), Inc.*,
    463 F.3d 646 (7th Cir. 2006) ..................................................................... 19, 20, 34

*Wal-Mart Stores, Inc. v. Dukes*,
    565 U.S. 338 (2011)........................................................................................... 38

*Yershov v. Gannett Satellite Information Network, Inc.*,
    820 F.3d 482 (1st Cir. 2016)............................................................................... 22

*Young v. Rolling in the Dough, Inc.*,
    No. 1:17-CV-07825, 2020 WL 969616 (N.D. Ill. Feb. 27, 2020) ........................... 19

*Zyburo v. NCSPlus, Inc.*,
    44 F. Supp. 3d 500 (S.D.N.Y. 2014)................................................................... 42

## <u>TABLE OF AUTHORITIES (cont.)</u>

**Page(s)**

**Statutes**

18 U.S.C § 2710(c)(2) ............................................................................................................ 29

18 U.S.C. § 2710 ................................................................................................................... 31

28 U.S.C. § 1715 ............................................................................................................... 2, 47

50 U.S.C. § 1601 ..................................................................................................................... 9

50 U.S.C. § 1701 ..................................................................................................................... 9

740 ILCS §14/1 ....................................................................................................................... 3

California Civil Code § 3344 ................................................................................................ 30

Section 301 of Title 3, United States Code ............................................................................ 9

**Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................................................................... 6

Fed. R. Civ. P. 23 .................................................................................................................. 44

Fed. R. Civ. P. 23(a) .................................................................................................. 38, 41, 42

Fed. R. Civ. P. 23(a)(1) ......................................................................................................... 38

Fed. R. Civ. P. 23(a)(1)-(4) ................................................................................................... 38

Fed. R. Civ. P. 23(a)(2) ......................................................................................................... 38

Fed. R. Civ. P. 23(a)(3) ......................................................................................................... 41

Fed. R. Civ. P. 23(a)(4) .................................................................................................... 41, 42

Fed. R. Civ. P. 23(b)(1), (b)(2), or (b)(3) ............................................................................. 45

Fed. R. Civ. P. 23(b)(3) ......................................................................................................... 43

Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii) ....................................................................................... 46

Fed. R. Civ. P. 23(e)(1) ......................................................................................................... 46

Fed. R. Civ. P. 23(e)(1)(B) .................................................................................................... 45

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

**Rules (cont.)**

Fed. R. Civ. P. 23(e)(2) ................................................................................................ 19

Fed. R. Civ. P. 23(g) ................................................................................................... 45

Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv) .............................................................................. 44

Fed. R. Civ. P. 23(g)(1)(B), (2), (4) ........................................................................... 44

**Other Authorities**

4 *Newberg on Class Actions* § 11.41 (4th ed. 2002) .................................................. 18

H. Newberg, A. Conte, Newberg on Class Actions § 11.41 (4th ed. 2002) ................ 36

Manual for Complex Litigation § 21.632 (4th ed. 2004) ............................................ 37

**INTRODUCTION**

After more than a year of litigation, an expert-led inside look at TikTok's source code, two hard-fought mediations strategized by top firms from the plaintiffs' bar and guided by renowned mediator Honorable Layn Phillips (ret.), and subsequent negotiations for additional relief after Co-Lead Counsel was appointed, Plaintiffs have achieved a $92 million non-reversionary cash settlement fund and meaningful injunctive relief for the Settlement Class.[1] In reaching this substantial result, Plaintiffs overcame concrete litigation risks and capitalized on unique defense-side political and settlement pressures.

Indeed, Plaintiffs faced material risks stemming from arbitration clauses and class action waivers. And they asserted highly technical legal claims, rooted in developing areas of data privacy law, arising from Defendants' novel technology. But Plaintiffs were unrelenting in their pursuit of class-wide relief and took advantage of unique political factors (including the potential for a presidentially mandated rush sale) resulting in an outstanding recovery for Plaintiffs and the Class.

This multidistrict litigation (MDL) consists of 21 putative class actions against U.S. defendants TikTok Inc. ("TikTok") and ByteDance Technology Inc. ("ByteDance"), and foreign defendants TikTok, Ltd. and Beijing ByteDance Technology Co. Ltd. ("Beijing ByteDance") (collectively, "Defendants" or, in the Settlement, "Defendant's Released Parties"). The cases allege that Defendants invaded Plaintiffs' and putative class members' privacy through the popular TikTok application and its predecessor application Musical.ly (the "App"), a video-sharing social networking service used to create short videos.

---

[1] Capitalized terms have the same meanings as set forth in the September 4, 2020 Settlement Agreement and Release ("Settlement Agreement"), as clarified by the February 16, 2021 Addendum No. 1 to Settlement Agreement and Release ("Addendum") (collectively, the "Settlement") attached as Exhibit A.

Though the litigation has been contentious, both as among Plaintiffs pre-MDL, and vis-à-vis Defendants, the settling Parties have reached consensus, and jointly endorse the proposed Settlement now before the Court. The Settlement provides substantial relief to the Class, including a non-reversionary $92 million cash fund to pay Class members, and prospective injunctive relief that addresses the complained-of conduct by requiring TikTok to make disclosures in keeping with the laws Plaintiffs claim were violated and to initiate a newly designed data privacy compliance training program for all TikTok employees and contractors.

A recovery of this magnitude ranks among the nation's highest privacy-related settlements, even in those matters involving significant statutory damages claims. The proposed Settlement will also eliminate the risk and uncertainty of continued proceedings in this Court, in which the foreign Defendants would contest personal jurisdiction and the domestic Defendants would immediately pursue motions to compel arbitration and to dismiss Plaintiffs' claims.

Balancing the risks against the substantial attendant benefits, the Court should find that the Settlement is fair, adequate, and reasonable and enter an Order (i) granting preliminary approval of the Settlement Agreement; (ii) provisionally certifying the Class for settlement purposes; (iii) appointing Class Representatives and Class Counsel; (iv) approving the form and manner of the Notice Plan and appointing a Settlement Administrator; (v) establishing deadlines for requests for exclusion and the filing of objections to the proposed settlement contemplated by the Settlement Agreement; (vi) finding that the parties have complied with 28 U.S.C. § 1715; and (vii) scheduling a fairness hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Plaintiffs' Allegations

This case involves Defendants' collection, use, and transmission of highly sensitive personal data via Defendants' ubiquitous TikTok app. *See* Consolidated Amended Class Action

Complaint ("Complaint"), ECF No. 114. The App allows users to create and share 60-second videos—typically of people doing activities such as dancing, lip-syncing, and stunts—and boasts a substantial worldwide fanbase. *Id.* at ¶¶ 2, 128, 131, 134. TikTok's popularity has exploded over the past year as the COVID-19 pandemic has left users bored and spending more time at home.

Specifically, Plaintiffs allege that the TikTok app infiltrates its users' devices and extracts a broad array of private data including biometric data and content that Defendants use to track and profile TikTok users for the purpose of, among other things, ad targeting and profit. *Id.* at ¶¶ 9-18, 137-192, 240-298, 402-417.

With regard to Plaintiffs' core claims under the Illinois Biometric Information Privacy Act (BIPA), 740 ILCS §14/1, *et seq.*, the Complaint alleges that the App uses a complex system of artificial intelligence to recognize facial features in users' videos, which allows the user to use various filters and stickers. *Id.* at ¶¶ 240-281, 402-417. Plaintiffs allege that the App also analyzes faces to determine the user's age, race/ethnicity, and gender, using proprietary algorithms to attempt to prevent minor children from using the App and to recommend content and profiles for the user to follow. *Id.* at ¶¶ 242-243, 245, 250, 258-259. By utilizing this private and biometric information, Plaintiffs contend, TikTok maintains a competitive advantage over other social media apps and profits from its use of improperly obtained data, all while failing to comply with the minimum requirements for handling users' biometric data established by BIPA.

The Complaint also alleges violations of a number of other statutory, common law, and constitutional claims arising from Defendants' alleged taking and transmission of other private, legally protected data. Plaintiffs assert claims for violations of the Computer Fraud and Abuse Act (CFAA), California Comprehensive Data Access and Fraud Act (CDAFA), California Constitutional Right to Privacy, California Unfair Competition and False Advertising laws, Video

3

Privacy Protection Act (VPPA), Intrusion Upon Seclusion, and Restitution/Unjust Enrichment. *Id.* at ¶¶ 338-401. Underlying Plaintiffs' VPPA claim, for example, are allegations that TikTok unlawfully transmitted class members' personal and private viewing histories to third parties like Facebook and Google. *Id.* at ¶ 159. In support of their CFAA claim, as another example, Plaintiffs allege that Defendants exceeded the scope of their authorized access to Plaintiffs' and class members' devices and the private information contained on those devices. *Id.* at ¶ 340.

While these data privacy violations alone support Plaintiffs' legal claims, TikTok's apparent ties to China compound Plaintiffs' concerns. *Id.* at ¶¶ 3. The Complaint alleges that Defendants do not adequately disclose that user data collected from Plaintiffs is stored and shared with affiliates in countries outside the United States, such as China (conduct which TikTok denies). Beijing ByteDance has spent the last decade using technologies such as artificial intelligence and facial recognition. *Id.* at ¶ 271. Defendants' reported connections to the Chinese government have very recently come under close public scrutiny and several U.S. Senators formally requested a risk assessment of Defendants' data collection activities, and the U.S. Department of Defense issued an internal memorandum encouraging its employees to avoid installing the App. *Id.* at ¶¶ 4, 6, 200, 203, 205, 219, 342.

**B. The Risks of TikTok's Defenses to Plaintiffs and the Class**

TikTok has taken the position that the foreign Defendants are not subject to personal jurisdiction, and that Plaintiffs' claims are based on speculation about how the App works and an incorrect interpretation of governing law.

First, TikTok has repeatedly asserted that Plaintiffs' claims are subject to an arbitration and class action waiver agreement. According to TikTok, at all relevant times, every TikTok user agreed to an arbitration and class-waiver provision in the App's Terms of Service ("Terms"). When users create their accounts in the App, they encounter a sign-in screen with hyperlinks to the Terms

that read: "By continuing, you agree to TikTok's Terms of Use and confirm that you have read TikTok's Privacy Policy."

While Plaintiffs believe TikTok's policies were not adequately presented or otherwise disclosed to its users, and that class members should not be bound by their provisions, Plaintiffs acknowledge that courts have consistently held that users were on notice of—and thus had agreed to—virtually identical disclosures. *See, e.g., Miracle-Pond v. Shutterfly, Inc.*, No. 19-cv-04722, 2020 U.S. Dist. LEXIS 86083, at *2 (N.D. Ill. May 15, 2020) (granting motion to compel arbitration and staying class action where contract was formed with hyperlinked policies near a sign-in button); *Peter v. DoorDash, Inc.*, No. 19-CV-06098-JST, --- F. Supp. 3d ---, 2020 WL 1967568, at *4 (N.D. Cal. Apr. 23, 2020) (same); *Johnson v. Uber Techs., Inc.*, No. 16-cv-5468, 2018 U.S. Dist. LEXIS 161155, at *3-4 (N.D. Ill. Sep. 20, 2018) (same); *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482 (9th Cir. 2020) (reversing denial of motion to compel arbitration where website required acknowledgment of agreement before proceeding).

According to TikTok, even minors who may be able to disaffirm the arbitration agreement may not be able to establish disaffirmance collectively on behalf of a class because disaffirmance purportedly presents individualized issues. Thus, TikTok's position is that arbitration would create a dispositive threshold procedural problem for Plaintiffs before any factual or legal merits are even considered. And even if minors could overcome the arbitration agreement through disaffirmance, some of the claims asserted in this litigation would, according to TikTok, be released in connection with another action, *T.K., et al. v. Bytedance Technology Co., Ltd. Et al.*, No. 1:19-cv-07915 (N.D. Ill.), if not for the settlement benefits achieved here. As part of the Settlement, TikTok has agreed not to dispute claims filed by members of the class in *T.K.*

In addition, with respect to the foreign Defendants, TikTok has repeatedly asserted that they do not have sufficient contacts with any of the forums in which the underlying putative class actions were filed for this Court to exercise personal jurisdiction because the foreign entities have no direct relationship with Plaintiffs and do not operate in the United States. Though Plaintiffs believe they could overcome the jurisdictional hurdle with discovery, Defendants' arguments carry a significant risk if this case were to proceed in litigation.

If Plaintiffs were able to overcome these procedural issues, TikTok has asserted multiple defenses to the merits of Plaintiffs' claims. With regard to BIPA, for example, TikTok has represented that TikTok does not and never has collected from its users any biometric identifiers or derivative information protected by law, nor has it ever shared U.S. user data with the Chinese government. Defendants have expressed their confidence that, if this case were to proceed on a litigation track, they will secure a Federal Rule of Civil Procedure ("Rule") 12(b)(6) dismissal for failure to state a claim based on, *inter alia*, technical arguments that: (1) Defendants' App compiles only anonymized, generalized "demographic data" through "facial landmarking," and does not collect any biometric information of TikTok users; and (2) even if the information the App utilizes does constitute biometric information within the meaning of BIPA, that information resides on the users' devices, and is not collected or stored by Defendants within the meaning of applicable law.

In support of its position that it has not violated BIPA, TikTok has asserted that its user video data is not used to identify anyone. TikTok has explained that App users cannot tag or label faces in videos with a user's real name or identity. This contrasts with Facebook, for example, which requires its users to use and display "the same name that you use in everyday life" when using Facebook. Facebook also allows users to tag the faces of their friends and themselves in photos and videos. Because Facebook users must use their real names, their faces are tagged with

their real names whenever they are tagged in a photo or video. By contrast, TikTok does not have a face-tagging feature, nor a real name requirement, and thus does not associate a particular face with an individual's identity.

The TikTok App also has special effects features that enable users to alter, enhance, and modify their facial features in their video images. TikTok has explained that the technique employed to enable these special effects features is called "landmarking" and uses artificial intelligence to locate the position of a face or specific facial features within a video frame, e.g., the location of a nose relative to the location of the eyes. That general "landmarking," according to TikTok, does not involve generating any face template or personally identifiable data, and thus does not give rise to biometric privacy violations under BIPA.

Although TikTok has admitted that the App uses technology for "demographic classification," which includes recognizing visual patterns that indicate age, gender or other characteristics, TikTok has contended that this is fundamentally different than facial recognition because it does not create facial templates and is not capable of identifying a user. While Plaintiffs disagree with TikTok's contentions, Plaintiffs recognize that the question of what constitutes biometric information under BIPA is novel and evolving, and is a risk if the litigation proceeds.

As another example, TikTok asserts Plaintiffs will be unable to state a claim under the VPPA, which protects consumers against the disclosure of their video viewing histories. TikTok has contended that it is not a video service provider within the meaning of the statute, it does not transmit the requisite personally identifiable information (PII) with video viewing histories, any such transmission is subject to the statute's ordinary course of business exception, and that its privacy policy fully discloses its data sharing practices. While Plaintiffs have rebuttals to each of these arguments, they acknowledge the real risk of continued litigation, that circuit court decisions

on this claim have reached varying conclusions on comparable sets of facts, and the dearth of successful settlements of VPPA claims.

With respect to Plaintiffs' CFAA claim, aimed at protecting against hacking, Defendants have argued that Plaintiffs cannot establish proof of economic damages. TikTok has further contended the claim will be substantively defeated because Plaintiffs voluntarily granted TikTok access to their devices and TikTok complied with the disclosures in its privacy policy about the data it would access and collect, i.e., it never exceeded the scope of its authorized access. Again, while Plaintiffs are well prepared to refute these arguments, each step of litigation brings risk that Co-Lead Counsel balanced against the benefits achieved through the Settlement.

### C. Litigation and Procedural History

The history leading up to the settlement began long before the Judicial Panel on Multidistrict Litigation's (JPML) August 4, 2020 transfer order creating the MDL in this District.[2] The first filed case of all related cases in this MDL is *Hong v. ByteDance, Inc. et al.*, 5:19-cv-07792-LHK, filed in the Northern District of California in November 2019. Led by court-appointed Co-Lead Counsel Mr. Rhow, counsel from *Hong* first mediated with Judge Layn Phillips (Ret.) in April 2020 (before the additional cases comprising the MDL were filed). Although the parties engaged in an in-depth analysis of the issues involved, the first mediation was unsuccessful.

Beginning in late April 2020, additional class action cases against TikTok were filed in four federal districts: the Northern District of Illinois, the Southern District of Illinois, the Northern District of California, and the Central District of California. On May 15, 2020, counsel from the Southern District of Illinois filed a motion with the JPML seeking transfer and coordination in the

---

[2] The relevant procedural history of the related litigation in California is detailed in the accompanying Declaration of Ekwan Rhow. The relevant procedural history of the related litigation in the Northern District of Illinois is detailed in the Declaration of Katrina Carroll.

Southern District of Illinois, or in the alternative, in this Court. MDL No. 2948. Highly contentious litigation among groups of Plaintiffs' counsel and Defendants ensued thereafter. On August 4, 2020, the JPML consolidated the related actions and transferred them to this District.

The second mediation with Judge Phillips, which occurred on August 13, 2020, was spearheaded by a group of Plaintiffs' counsel led by now-Co-Lead Counsel Katrina Carroll. As described in her Declaration, 16 firms, representing 11 of the 19 consolidated actions, collaborated in the months leading up to the mediation, well before the JPML's consolidation order, to pursue the second settlement opportunity. Ms. Carroll and PSC member Jonathan Jagher traveled to California to appear in person and five additional delegates selected by participating plaintiffs' counsel actively participated by phone.[3]

By the time the parties met with Judge Phillips on August 13, 2020, tremendous political pressure had mounted against TikTok, creating a unique settlement opportunity for the Class. Just one week before the mediation, on August 6, 2020, then-President Trump issued an executive order pursuant to the International Emergency Economic Powers Act, 50 U.S.C. 1701, *et seq.*, the National Emergencies Act, 50 U.S.C. 1601, *et seq.*, and section 301 of title 3, United States Code, titled Executive Order on Addressing the Threat Posed by TikTok (the "First Executive Order").[4]

In the First Executive Order, President Trump stated that TikTok presented a "national emergency" that "threaten[s] the national security, foreign policy, and economy of the United States." The First Executive Order stated that the TikTok App would be banned in the U.S. unless

---

[3] Seven delegates participated in the second mediation: Co-Lead Counsel Katrina Carroll; PSC members Jonathan Jagher (Freed Kanner London & Millen LLC) and Michael Gervais (Susman Godfrey LLP); and Robert Foote (Foote, Mielke, Chavez & O'Neil, LLC); Joseph Guglielmo (Scott+Scott Attorneys at Law LLP); Tina Wolfson (Ahdoot & Wolfson, PC); and Tiffany Yiatras (Consumer Protection Legal, LLC).

[4] https://www.federalregister.gov/documents/2020/08/11/2020-17699/addressing-the-threat-posed-by-tiktok-and-taking-additional-steps-to-address-the-national-emergency

ByteDance Ltd. sold or spun-off its domestic TikTok operations to a U.S. company within 45 days. President Trump later extended the 45-day deadline to 90 days through a second executive order titled Regarding the Acquisition of Musical.ly by ByteDance Ltd. (the "Second Executive Order").[5] The Second Executive Order also prohibited ByteDance from any ownership interest in Musical.ly and required that ByteDance divest: (i) any interests in assets or property in the operation of TikTok in the United States; (ii) any data obtained or derived from TikTok or musical.ly; and (iii) immediately upon divestment, destroy any data obtained or derived from TikTok or Musical.ly.

TikTok was thus motivated at the second mediation session to resolve this litigation in order to shed existing liabilities and maximize its value in preparation for its imminent sale. The second mediation session was hard-fought on all fronts and lasted almost 13 hours, culminating in an agreement in principle and a signed term sheet for a class-wide resolution, later memorialized in a signed agreement on September 4, 2020.

At the time of the second mediation, the MDL was in a state of procedural limbo: the administrative transfer of the related actions had not been fully effectuated and the Court had not created a leadership structure subsequent to its pre-consolidation appointment of current Co-Lead Counsel Katrina Carroll as interim lead Plaintiffs' counsel. ECF No. 18. After the Court appointed the Leadership Group on September 28, 2020,[6] that group immediately began collaborating to vet

---

[5]https://www.federalregister.gov/documents/2020/08/19/2020-18360/regarding-the-acquisition-of-musically-by-bytedance-ltd

[6] The Court appointed: Katrina Carroll (Carlson Lynch, LLP), Elizabeth A. Fegan (Fegan Scott LLC), and Ekwan Eric Rhow (Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.) as Plaintiffs' Co-Lead Counsel; and Shannon Marie McNulty (Clifford Law Offices, P.C.) as Plaintiffs' Liaison Counsel; and Jonathan Jagher (Freed Kanner London & Millen LLC), Megan E. Jones (Hausfeld LLP), Michael Gervais (Susman Godfrey LLP), Amanda K. Klevorn (Burns Charest LLP), and Albert Y. Chang (Bottini & Bottini, Inc.) as Plaintiffs' Steering Committee ("PSC") (collectively, the "Leadership Group"). ECF No. 94.

and analyze the Settlement Agreement, conduct and evaluate confirmatory discovery, continue negotiations with defense counsel, negotiate the Addendum to the Settlement Agreement, and ultimately reach consensus on the Settlement terms Plaintiffs now present to the Court for approval.

As detailed in the Declaration of Co-Lead Counsel Elizabeth Fegan, various members of the Leadership Group were charged with analyzing a broad array of legal, factual, and strategic issues. The Leadership Group engaged in a candid, collaborative—and at times oppositional—process to assess the case and the proposed settlement benefits. Through that process, and six months of continued negotiations with defense counsel, Co-Lead Counsel was able to improve the already substantial Class recovery obtained in the Settlement Agreement through the clarification of some of its core terms. For example, as detailed in the Addendum and Ms. Fegan's declaration, the Addendum makes clear that the scope of the injunctive relief applies to defendants other than TikTok, and assures that the injunction's prohibitions of wrongful conduct (and the warranty relating to that conduct) extend beyond the function of the App, and apply to Defendants' treatment of App-derived data on the server. The Addendum also specifies that a third party will oversee TikTok's privacy compliance training program.

Through that process, and six months of continued negotiations with defense counsel, the Leadership Group was able to improve upon the already substantial Class recovery through the Addendum. For example, as detailed in the Addendum and Ms. Fegan's declaration, the Addendum expanded the scope of the injunctive relief to apply to defendants other than TikTok, ensured that prohibitions of wrongful conduct and the warranty relating to that conduct extended beyond the function of the App and applied to Defendants' treatment of App-derived data on the server, and now requires third-party oversight of TikTok's privacy compliance training program.

The substantial Settlement has also garnered the support of firms outside of the Leadership Group, who have been involved in this litigation since before consolidation, and their class member clients, who are proposed class representatives. *See* Exhibit B (listing class representatives).

### D.  The Settlement Agreement

The Settlement Agreement and the Addendum, contain the following key terms:

### 1.  Proposed Class Definition

Plaintiffs ask that the Court provisionally certify the following Classes for settlement purposes only:

**Nationwide Class**: All persons who reside in the United States who used the App— the TikTok video-sharing application (or its Musical.ly predecessor) distributed in the U.S.— prior to issuance of the Preliminary Approval Order. Settlement Agreement §§ 2.2, 2.19; and

**Illinois Subclass**: All persons who reside in the State of Illinois and used the App in the State of Illinois to create videos prior to issuance of the Preliminary Approval Order. Settlement Agreement § 2.17.

### 2.  Monetary Relief

Defendants have agreed to pay cash in the amount of $92,000,000 to create a Settlement Fund for the benefit of Class Members, who receive a pro rata payment (per the Plan of Allocation described below), after the deduction of settlement-related costs, including the expenses of the settlement administrator and the costs of notice to the Class, any service awards, any fee award, and any other administrative fees and expenses which may be approved by the Court. *Id.* at § 4.1-5. Defendants will fund the settlement within 90 days after entry of the Preliminary Approval Order. *Id.* at § 4.1. No portion of the Settlement Fund will be returned to Defendants. *Id.* at § 4.5.

12

Class Members may submit one claim per Class Member to receive a payment from the Settlement Fund according to the proposed Plan of Allocation (attached as Exhibit C). *Id.* at § 5.3.1.

### 3. Plan of Allocation

To determine the allocation as between the Nationwide Class and Illinois Subclass, Co-Lead Counsel discussed and recognized that Subclass Counsel without conflicting interests should be appointed for the Nationwide Class and separately for the Illinois Subclass. *See* Addendum, ¶ 3.1; *See also* Fegan Decl., ¶22. Co-Lead Counsel further recognized that Subclass Counsel should not be restricted to any particular methodology or multiplier for determining how to allocate the Settlement Fund as between the Subclasses. Rather, Co-Lead Counsel agreed that Subclass Counsel should conduct their own assessment of the relative strengths and weakness of the various claims alleged in the Complaint, as well as the consideration itself, and conduct independent negotiations to reach a consensus as to the Plan of Allocation.

To that end, Co-Lead Counsel asked James Zouras for the Illinois Subclass and Jonathan Rotter for the Nationwide Class to research and analyze the merits of the claims asserted, advocate the interests of their respective subgroups, and negotiate an allocation of Settlement funds between the two groups. *See* Declaration of Jim Zouras, ¶¶ 6-9; Declaration of Jonathan Rotter, ¶¶ 6-7.

After at least 10 negotiation sessions, Subclass Counsel agreed that the Plan of Allocation should provide that the net settlement fund will be divided into *pro rata* shares that are equal to the sum of (1) the total number of valid claims submitted by Nationwide Class members and (2) the total number of valid claims submitted by Illinois Subclass members multiplied by five. *See* Rotter Decl., ¶¶ 7-9; Zouras Decl., ¶ 12. Each Illinois Subclass member who submits a valid, authorized claim will be paid six pro rata shares (one as member of the Nationwide Class and five

as a member of the Illinois Subclass). *See id.* Each Nationwide Class member who is not a member of the Illinois Subclass will be paid one pro rata share *See id*.

### 4. Injunctive Relief

TikTok, together with the other Defendants' Released Parties, has agreed ***not*** to do the following unless disclosed expressly in the TikTok Privacy Policy and in compliance with all applicable laws:

- Use the App to collect or store a user's biometric information or identifiers (as defined by applicable law);

- Use the App to collect geolocation or GPS data;

- Use the App to collect information in user's clipboards;

- Use the App to transmit U.S. user data outside of the U.S.;

- Store U.S. user data in databases outside of the U.S.; or

- Pre-upload U.S. user-generated content.

*Id.* § 6.1; Addendum § 2.1 ("'App' means the TikTok video-sharing application (or its Musical.ly predecessor) distributed in the U.S., including its device-side and server-side operations."); Addendum § 2.5 ("[w]ith respect to the Injunctive Relief in Section 6 of the Agreement, "TikTok" means any of Defendants' Released Parties to the extent they are engaged in the operation of the App or involved in receiving or accessing user data obtained through the App").

Consistent with the intent of the injunctive relief in Section 6 of the Settlement Agreement, the Parties jointly reviewed multiple categories of user data potentially in TikTok's possession that should be deleted from TikTok's servers. Following confirmation from TikTok as to what categories existed and should be deleted, TikTok has agreed to delete any Pre-Uploaded User-Generated Content identified in Section 6.2 of the Settlement Agreement. Addendum § 4.2.

14

In addition, TikTok will require newly designed training on compliance with data privacy laws and company procedures for all relevant incoming employees and contractors, and annual training thereafter. Settlement Agreement § 6.3. TikTok will provide a written verification under oath of compliance with the foregoing within 90 days of the Effective Date. *Id.* § 6.4. TikTok will, at its own expense, hire a third party to review the data privacy law compliance training for a period of three years and to provide a written verification of this review along with the verification required by Section 6.4 of the Settlement Agreement to Class Counsel. Addendum § 4.3. TikTok will not disclose to any third party the "personally identifiable information" of a "consumer" who uses the App, as those terms are defined by the VPPA, except to the extent such disclosure is not prohibited by the Video Privacy Protection Act; nor will TikTok share user data collected through the App with third parties without disclosing in its Privacy Policy the categories of third parties with whom user data is shared. Addendum § 4.1.

**5. Notice and Settlement Administration Costs**

All Notice and Administrative Costs will be paid from the Settlement Fund. Settlement Agreement § 4.5. Class members will be notified through a program led by a highly experienced, well-regarded, third-party administrator (Angeion Group, LLC) by the methods ordered by the Court after certification of the Class for settlement purposes. The proposed Notice Plan is described in the Declaration of Steven Weisbrot, Esq. of Angeion Group LLC Re: The Proposed Notice Plan ("Weisbrot Declaration"). The content of the proposed notice ("Proposed Notice"), which seeks to communicate Class Members' rights and options under the Settlement in plain, easily understood language is attached as Exhibit D and submitted for this Court's approval.

**6. Release**

In exchange for the relief afforded by the Settlement Agreement, Defendants' Released Parties[7] will receive a release of all Released Claims.[8] The release is narrowly tailored to the claims related to "the Civil Actions or the collection and use of any user data, including biometric data" and thus covers the claims actually at issue (or that could have been asserted based on the alleged facts) in this MDL through the date of preliminary approval.

**7. Attorneys' Fees and Costs for Class Counsel, and Service Awards for Class Representatives**

The Settlement Agreement permits Plaintiffs' counsel to apply to the Court seeking a reasonable portion of the Settlement Fund as payment of any reasonable attorneys' fees and costs (the "Fee Award"). *Id.* § 13.1. Class Counsel intends to make an application to the Court for a reasonable Attorneys' Fee Award in an amount not to exceed 33.33% of the Settlement Fund, plus reasonable expenses incurred, in keeping with Seventh Circuit precedent. There is no "clear sailing" provision, and TikTok may object to any fee and expense request if it so desires. Nor is there any "kicker" provision, and any reduction in Plaintiffs' counsel's requested fee returns to the Class, not Defendants.

---

[7] "The current defendants in the Civil Actions, as well as any and all of their current or former directors, officers, members, administrators, agents, representatives, servants, employees, attorneys, parents, subsidiaries, affiliates, divisions, branches, units, shareholders, successors, predecessors, assigns, and all other individuals and entities acting on their behalf." Settlement Agreement § 2.10.

[8] "[A]ny and all claims, complaints, actions, proceedings, or remedies of any kind, whether known or unknown (including, without limitation, claims for attorneys' fees and expenses and costs), arising from or related to the Civil Actions or the collection and use of any user data, including biometric data, whether in law or in equity, under contract, tort or any other subject area, or under any statute, rule, regulation, order, or law, whether federal, state, or local, on any grounds whatsoever, arising from the beginning of time through the Effective Date, that were, could have been, or could be asserted by the Releasing Parties." Settlement Agreement § 2.30

Co-Lead Counsel will also seek service awards for Class Representatives[9] to be paid from the Settlement Fund, in an amount up to $2,500.00 each. *Id.* § 13.2. Each proposed Class Representative has contributed to the prosecution of this litigation, including researching and filing their complaints, participating in the thorough vetting process undertaken by the Leadership Group, and responding to counsel's requests for information for the benefit of the entire Class. Should the Court award less than any amount requested as an Incentive Award, the difference in the amount sought and the amount ultimately awarded shall remain in the Settlement Fund for the benefit of the Class. *Id.*

The Settlement Agreement is neither dependent nor conditioned upon the Court approving the aforementioned payments, nor upon the Court awarding the particular amounts sought. *Id*. § 13.4.

### 8. Class Size Representations and Confirmatory Discovery

TikTok provided representations to Plaintiffs as to the approximate class size (together with a confidential sworn declaration from the company describing how the numbers were ascertained). The class size is estimated to be 1.4 million for the Illinois Subclass and 89 million for the Nationwide Class (which includes the Illinois Subclass, leaving approximately 87.6 million Non-Illinois Nationwide Class Members).

In the Settlement Agreement, TikTok "warrants that it has not used the App to collect biometric identifiers or biometric information as defined by" BIPA and agreed to confirmatory discovery including the ongoing source code inspection, interrogatories, document requests, and

---

[9] The proposed class representatives and subclass representatives are listed in Exhibit B.

depositions concerning these issues. *Id*. § 7.[10] Co-Lead Counsel conducted confirmatory discovery as specified in the Settlement Agreement, with the participation of a world-renowned computer science expert.[11]

## ARGUMENT

**A. This Settlement well surpasses the Seventh Circuit's standards for the approval of class action settlements.**

As the Seventh Circuit recognizes, federal courts strongly favor and encourage settlements—particularly in class actions and other complex matters where the inherent costs, delays, and risks of protracted litigation might otherwise overwhelm any potential benefit the class could hope to obtain:

> It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. In the class action context in particular, there is an overriding public interest in favor of settlement. Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.

*Armstrong v. Bd. of Sch. Dirs. Of the City of Milwaukee*, 616 F.2d 305, 312-13 (7th Cir. 1980) (citations and quotations omitted), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir. 1998); *see also Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); 4 *Newberg on Class Actions* § 11.41 (4th ed. 2002) (collecting cases).

---

[10] This warranty is not intended to cover features and operations of the App that are not used to identify an individual, such as image landmarking operations used for special effects and demographic classification, speech-to-text operations used to generate text of words spoken in a video, and similar non-identifying operations. The warranty is only meant to cover the use of the App to collect biometric data to identify individual App users—whether that biometric data is collected directly upon being uploaded to TikTok's servers through the App or whether that biometric data is later collected after being extracted from other user content that has been uploaded through the App to TikTok's servers. Addendum § 5.1.

[11] Plaintiffs' confirmatory discovery efforts are detailed in the Declaration of Katrina Carroll.

The proposed Settlement, negotiated at arm's length by competent, experienced counsel, with the assistance of a highly regarded mediator, provides Class Members substantial monetary and injunctive relief in a prompt and efficient manner while at the same time mitigating the risk of protracted litigation and/or a negative outcome that would preclude any recovery whatsoever for the Class.

## B. The Settlement should be preliminarily approved.

Rule 23(e) provides that a court may approve a proposed class settlement "on a finding that it is fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23(e)(2); *see also Synfuel Techs, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (7th Cir. 2006); *Young v. Rolling in the Dough, Inc.,* No. 1:17-CV-07825, 2020 WL 969616, at *3 (N.D. Ill. Feb. 27, 2020). At the preliminary approval stage, the district court should assess whether the proposed settlement falls "within the range of possible approval," in order to "ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Id*.

While "[f]ederal courts naturally favor the settlement of class action litigation," *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 345 (N.D. Ill. 2010) (*quoting Isby*, 75 F.3d at 1196), district courts must nonetheless consider the following four factors to determine whether a proposed settlement is fair, reasonable, and adequate: (a) the strength of the plaintiff's case compared to the amount of the settlement offer; (b) the length, complexity, and expense of further litigation; (c) the opinion of competent counsel; and (d) the stage of the proceedings and amount of discovery completed. *See Synfuel*, 463 F.3d at 653 (citing *Isby*, 75 F.3d at 1199). "Although this standard and the factors used to measure it are ultimately questions for the fairness hearing that comes after a court finds that a proposed settlement is within approval range, a more summary version of the same inquiry takes place at the preliminary phase," *Kessler v. Am. Resorts International's Holiday Network, Ltd.*, No. 05 C 5944, 2007 WL 4105204, at *5 (N.D. Ill. Nov.

14, 2007) (citing *Armstrong*, 616 F.2d at 314), under which the facts are viewed "in the light most favorable to the settlement," *Isby*, 75 F.3d at 1199.

Each of these factors weighs in favor of finding the proposed settlement fair, reasonable, and adequate, warranting its preliminary approval.

1. **The Settlement provides substantial relief to the Class, particularly given the risks posed by continued litigation.**

"The most important factor relevant to the fairness of a class action settlement is . . . the strength of the plaintiff's case on the merits balanced against the amount offered in the settlement." *Synfuel*, 463 F.3d at 653 (internal quotes and citations omitted). "Because the essence of settlement is compromise, courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs." *In re AT&T Mobility*, 270 F.R.D. at 347 (citations omitted).

Given the significant litigation risks, the $92 million common fund provides a significant recovery to class members, together with the injunctive relief, which offers increased protection over consumers' data and requires company-wide privacy compliance training. Plaintiffs continue to believe that their claims against Defendants have merit; it is, however, clear to Plaintiffs that the legal uncertainties associated with continued litigation may pose substantial risk of non-recovery to the Class. *See In re Southwest Airlines Voucher Litig.*, No. 11-cv-8176, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013) ("In considering the strength of plaintiffs' case, legal uncertainties at the time of settlement favor approval."). [12]

---

[12] "While a district court must of course assess the plaintiffs' claims in determining the strength of their case relative to the risks of continued litigation," it may properly "evaluat[e] the strength of the plaintiffs' *case* in its entirety rather than on a claim-by-claim basis," especially where, as here, the "claims arise under similar [laws and] plaintiffs' likelihood of success with regard to each of those claims depends on the same basic legal theories and factual issues." *Lane v. Facebook, Inc.*, 696 F.3d 811, 823 (9th Cir. 2012) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)) (emphasis in original).

For example, Defendants contend that Plaintiffs' claims are subject to an arbitration and class action waiver agreement incorporated in TikTok's terms of service (which all users are required to accept before using the App), which would preclude maintenance of this class action from the outset. Though Plaintiffs believe they have reasonable arguments against compelling arbitration and/or enforcing the purported class action waiver (especially as to minor class members), Defendants' success on this argument would render it highly unlikely Plaintiffs and the Class would recover anything given the prohibitive time and expense of pursuing millions of individual arbitrations.

Furthermore, Defendants have repeatedly asserted confidence that they would win dismissal for failure to state a claim under the biometric privacy laws—which form the core of Plaintiffs' case and the statutory damages sought— based on technical arguments that: (1) Defendants' App compiles "demographic data" through "facial landmarking," not biometric information of TikTok users, and (2) even if Defendants do gather biometric information, that information resides on the users' phone and is not collected or stored by Defendants within the meaning of applicable law. Defendants thus insist that the TikTok App does not and has never collected from its users any biometric identifiers or derivative information protected by law, nor has TikTok ever shared U.S. user data with the Chinese government. These positions underscore the risks of continued litigation.

While Plaintiffs believe that TikTok's landmarking and other activities do give rise to statutory and common law privacy violations sufficient to survive a motion to dismiss, the case would be complex, rife with technical experts, and likely to be hard fought through trial, much as the Northern District of California ruled in the Facebook biometric privacy litigation. *See*

*Facebook Biometric Info. Privacy Litig.*, No. 15-cv-03747-JD (hereinafter, "*Facebook BIPA*"), 2018 WL 2197546 (N.D. Cal. May 14, 2018).

Indeed, Facebook similarly argued that its technology worked just like a human brain, recognizing a face without capturing biometric information in violation of BIPA. There, the court denied Facebook's motion for summary judgment, holding these issues present a "quintessential dispute of fact." *Id.* at *3. Thus, even assuming Plaintiffs' BIPA claim could clear all of the pre-trial litigation hurdles Plaintiffs face in litigating inevitable motions to compel arbitration, to dismiss Plaintiffs' claims, to certify Plaintiffs' class, and for summary judgment, there would be no quick exit for Plaintiffs short of trial. And if the case proceeds to the factfinder and Defendants' litigation position is accepted, Plaintiffs' claims will fail on the merits and they (and the Class) will recover nothing.

Similar risks arise in connection with Plaintiffs' other claims. For example, TikTok's novel technology and service make establishing a claim under the VPPA—a 1988 statute originally aimed at video service providers like Blockbuster—an ambitious undertaking. If Plaintiffs successfully establish that TikTok is a "video service provider" under the statute, and that Plaintiffs are "subscribers," they will then be faced with divided case law from other circuits regarding whether the type of information TikTok discloses is "personally identifiable" within the meaning of the statute. Plaintiffs will vigorously and zealously argue that TikTok discloses its users' device and advertising identifiers along with users' video viewing histories, and that those identifiers can be de-anonymized to personally identify an individual class member. The First Circuit has held that such device identifiers, when combined with GPS information, amount to personally identifiable information ("PII") under the VPPA. *Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482 (1st Cir. 2016). The Third and Ninth Circuits, however, have

suggested that numeric identifiers may not be enough. *Eichenberger v. ESPN, Inc.,* 876 F.3d 979, 985 (9th Cir. 2017); *In re Nickelodeon Consumer Privacy Litig.,* 827 F.3d 262, 286 (3d Cir. 2016). While Plaintiffs strongly believe that the identifiers *here* plainly amount to PII – particularly given that they are associated with social services (Facebook and Google) that can readily identify their users' actual identities - Plaintiffs acknowledge that continued litigation carries risks.

Each claim presents its own hurdles associated with contradicting Defendants' contentions regarding the operations of their proprietary technology, factually and legally refuting the adequacy of Defendants' disclosures in their privacy policies and terms of service, and fitting Defendants' use and misuse of novel technology into the confines of laws that pre-date the existence of apps.

Even if Plaintiffs survived a motion to compel arbitration, motion to dismiss, and motion for summary judgment, Defendants will oppose class certification, arguing, *inter alia*, that individual issues regarding each user's experience with the App predominate and that a unique inquiry is necessary to evaluate each user's review of and assent to the relevant arbitration agreement and class action waiver. Denial of class certification on these or any other grounds would also result in no recovery at all for the Class.

Plaintiffs maintain that Defendants have more to lose at trial and face more risks, warranting the material recovery Plaintiffs have achieved in this proposed settlement, but nonetheless acknowledge that settling now reduces risks to themselves and the Class Members.

## 2. The Settlement value is well within the range of reasonableness.

The Settlement provides a $92 million cash fund for the approximately 89 million members of the Nationwide Class, to be allocated 6:1 between the Illinois Subclass and the Nationwide Class members who are not also members of the Illinois Subclass ("Non-Illinois Class Members"),

*supra.* If every class member were to submit a valid claim, the fund would provide a gross recovery of approximately $5.75 per Illinois Subclass member and $0.96 per Non-Illinois Class Member.[13]

The actual value of each claim depends on the number of valid claims submitted. While claims rates are difficult, if not impossible, to predict, a typical claims rate for a class of this size is around 1.5%.[14] As discussed below, in *Facebook BIPA,* an unusually high 22% of Illinois class members made claims. The below table provides some potential scenarios with those numbers in mind:

| Hypothetical Illinois Claims Rate | Hypothetical Non-Illinois Claims Rate | Approximate Illinois Claim Value | Approximate Non-Illinois Claim Value |
|---|---|---|---|
| 1.5% | 1.5% | $383.33 | $63.89 |
| 2% | 2% | $287.50 | $47.92 |
| 15% | 1.5% | $214.45 | $35.74 |
| 22% | 1.5% | $174.57 | $29.10 |
| 20% | 20% | $28.75 | $4.79 |

As explained below, these estimates demonstrate that the proposed Settlement is squarely within the range of reasonableness of other comparable class action privacy settlements.

> **a. The settlement achieved here compares favorably with consumer BIPA settlements.**

A recent consumer BIPA comparator is *Facebook BIPA, supra.* While that case has material distinctions from this matter, both cases involve allegations that a social media service collected biometric information from its users. The settlement in *Facebook BIPA* provided for a

---

[13] These estimates reflect the gross recovery before the deduction of notice and claims administration expenses, attorneys' fees and costs, or service awards.

[14] *See infra,* § B.2.A (average claims rate for classes above 2.7 million class members is 1.4%). *See also* Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns, Federal Trade Commission, September 2019, at 11, available at: www.ftc.gov/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns (median claims rate is 9% and weighted mean (cases weighted by the number of notice recipients) is 4%); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (*en banc*) (claims rates in consumer class action settlements "rarely" exceed 7%, "even with the most extensive notice campaigns"); *Pollard v. Remington Arms Co., LLC*, 320 F.R.D. 198, 214 (W.D. Mo. 2017) (citing numerous finally approved settlements with claims rates less than 1%).

non-reversionary $650 million fund to be distributed to the approximately 6.9 million Illinois class members. *Facebook BIPA*, No. 3:15-cv-03747, 2020 WL 4818608 (N.D. Cal. Aug. 19, 2020); *see also* 3:15-cv-03757, ECF No. 517 and 517-2 (amended motion for final approval of settlement and accompanying expert declaration).

In *Facebook BIPA*, the claims rate was approximately 22% (over 1.5 million claimants) and each class member received approximately $342 after the payment of fees and expenses (averaging approximately $428 before those deductions). 15-cv-03747, ECF No. 517. A claims rate of that magnitude is highly unusual. In *Facebook BIPA*, plaintiffs' counsel introduced expert declarations from Professor William B. Rubenstein, the Bruce Bromley Professor of Law at Harvard Law School and a leading national expert on class action law and practice. ECF No. 499-3 and 517-2. Professor Rubenstein maintains what "is likely the largest collection of data on claims rates." ECF No. 517-2, p. 1.

As Professor Rubenstein noted, claims rates with classes above 286,493 members average less than 6% and classes above 2,682,347 average a claims rate of 1.4%. ECF No. 517-2, p. 4. He reported that the claims rate in *Facebook BIPA* was substantially higher than he would have predicted based on both class size and claim amount. *Id.* at, *e.g.,* ¶¶ 5-6. However, for the sake of comparison, if the same 22% claims rate were applied to the Illinois Subclass here, and a more typical claims rate of 1.5% percent were applied to the Non-Illinois Class Members, each Illinois Subclass member would receive a gross recovery of approximately $174.57, and each non-Illinois member of the Nationwide Class would receive approximately, $29.10. If the claims rate is a more realistic, but still above average, 2% for both groups, each Illinois Subclass member would receive a gross recovery of approximately $287.50, and each non-Illinois member of the Nationwide Class would receive approximately $47.92.

25

Even assuming the Illinois Subclass makes claims at the atypically high rate present in *Facebook BIPA*, their recovery would be over 40% of that achieved in *Facebook BIPA* (gross recovery of $174.57 compared to $428). That result is imminently equitable in light of the distinctions between the two matters. The plaintiffs in *Facebook BIPA* did not face the threat of arbitration that Plaintiffs here face – which could end Plaintiffs' opportunity to reap settlement benefits at all.

And the factual contentions underlying *Facebook BIPA* differ from those here. In *Facebook BIPA*, plaintiffs alleged that Facebook implemented facial recognition technology by creating and storing personally identifiable facial templates from its users' photos. Facebook, unlike TikTok, admitted that it implemented personally identifying facial recognition technology, but denied that its conduct violated BIPA. *See generally* 3:15-cv-03747, 2018 U.S. Dist. LEXIS 81044, at *10-*11 (N.D. Cal. May 14, 2018). Facebook claimed that, rather than "explicitly detect[ing] human-notable facial features," its technology analyzed the pixels in the image of a face, and that the technology was not the type of technology that BIPA sought to address, in part because the technology would calculate a "face signature" even for something other than a face. *Id.* at *10-*11 (citing report of Facebook's expert Dr. Matthew Turk, ECF No. 291-1 at 3). In contrast, TikTok has warranted that its App does not use such facial recognition technology—whether via human features of the face or pixels from the images of a face. Plaintiffs acknowledge that TikTok users are not offered facial recognition features that "tag" and identify individuals appearing in photos, as Facebook offers its users. TikTok has also warranted (and provided confirmatory discovery regarding its warranty) that it neither creates nor stores personally identifiable templates or personally identifiable facial landmarking data.

Also, the court in *Facebook BIPA* noted at its June 4, 2020 hearing on the motion for preliminary approval of the settlement in that action: "It looks to me that what Facebook did to violate the BIPA may also have been a violation of that prior FTC consent decree, in which case you have a pretty good argument that this is an intentional or reckless violation of BIPA that would warrant $5,000," instead of the $1,000 statutory damages provided for negligent violations. While Plaintiffs here would certainly contend that TikTok's actions were intentional and reckless, Plaintiffs lack *Facebook BIPA's* persuasive foundation for that argument.

In addition, *Facebook BIPA* settled on the eve of trial – in a much different procedural posture than this case is in. The settlement in *Facebook BIPA* was reached after five years of litigation, including multiple contested motions to dismiss, a motion for class certification, multiple motions for summary judgment, years of intense discovery, key court rulings, an appeal to the Ninth Circuit, petition for writ of certiorari to the Supreme Court, trial preparation including the exchange of motions *in limine* and trial subpoenas, and several rounds of mediation. *See, e.g.,* 3:15-cv-03747, ECF No. 499-1 (Declaration of Class Counsel). While those meritorious efforts resulted in a noteworthy result, following that path toward trial would repeatedly expose Plaintiffs to risks that they may be unable to surmount, and would delay their recovery for years, if one is achieved at all.

Thus, the relief afforded by the settlement here, given the early litigation stage, differences in the underlying conduct alleged, and risks of forced arbitration, is substantial and compares favorably with the settlement in *Facebook BIPA.*

Few other consumer BIPA settlements exist. In *Sekura v. L.A. Tan Enters., Inc.*, plaintiffs alleged that L.A. Tan violated BIPA when collecting fingerprints for customers' check-in verification. No. 2015 CH 16694 (Ill. Cir. Ct. Cook Cty. First Amended Class Complaint filed

27

Apr. 8, 2016). The parties agreed to a $1.5 million settlement for approximately 37,000 class members (roughly $40.54 per class member). In *Prelipceanu v. Jumio Corp.*, plaintiffs alleged that defendant's service, which scanned pictures of consumers' faces to verify their identity and/or age for websites, violated BIPA. 2018 CH 15883 (Ill. Cir. Ct.). The class received a $7 million settlement fund; the settlement approval documents did not provide the size of the class. *Id.*

There have been some non-consumer settlements of BIPA claims that have provided for larger potential per-class member recoveries, but they are generally limited to cases brought by employees. They involve much smaller classes, allege the collection of biometric identifiers expressly enumerated within the text of BIPA (fingerprints), and involve biometric collection as a condition of class members' employment. For example, in *Jones v. CBC Restaurant Corp d/b/a Corner Bakery Café*, the court granted approval of a $3,210,400 settlement providing $800 per class member to the 4,000-person class of employees required by their employer to use a fingerprint time clock. No. 1:19-cv-06736 (N.D. Ill.), ECF No. 45 (preliminary approval order) and ECF No. 53 (final approval order). In *Fluker v. Glanbia Performance Nutrition, Inc.*, a settlement was obtained providing $800 per class member to the 921-person class of employees who were required to use a fingerprint time clock. 2017-CH-12993 (Cook Cty. Cir. Ct. May 12, 2020 preliminary approval; August 20, 2020 final approval). And alongside those recoveries are settlements that achieved no monetary relief, and only credit monitoring. *E.g., Carroll v. Crème de la Crème, Inc.,* 2017-CH-01624 (Ill. Cir. Ct.).

There are few parallels between employment BIPA cases and the case here—in which Defendants deny that the disputed data ever left class members' personal devices, the parties dispute whether the relevant data falls within the protections of BIPA at all, and the Illinois Subclass comprises approximately 1.4 million individuals who voluntarily used the App.

28

As discussed above, this case more closely resembles the facts underlying *Facebook BIPA*, and a settlement of the magnitude achieved here is a meaningful, substantial recovery, even when compared to that historical result.

### b. Non-BIPA privacy settlements typically feature lower recoveries.

Settlements of privacy-based class actions that lack BIPA claims tend to feature lower per-person recoveries. These types of cases, many of which feature statutory damages typically settle for much less than BIPA matters, and in many cases achieve only *cy pres* relief and no direct monetary benefit to each class member. For example, the VPPA allows for actual damages of not less than $2,500, punitive damages, attorneys' fees and costs, and equitable remedies (18 U.S.C §2710(c)(2)), but most VPPA settlements have provided minimal monetary relief. *See In re Vizio, Inc., Consumer Privacy Litig.*, No. 8:16-ml-02693 (C.D. Cal.) ($1.06 per class member); *Lane v. Facebook, Inc.* No. 5:08–cv–03845–RS, 696 F.3d 811, 820-22 (9th Cir. 2012), *cert. denied* 134 S. Ct. 8 (2013) ($2.59 per class member). Indeed, a prior class action against TikTok based on allegations that the company illegally collected the personal information of children included a VPPA claim and provided for a very modest recovery. *See T.K. v. TikTok*, No. 1:19-cv-07915 (N.D. Ill.) ($0.19 per class member).

Many VPPA settlements achieve *cy pres* only relief. For example, in *Lane v. Facebook, Inc.,* 696 F.3d 811, 818 (9th Cir. 2012), the Ninth Circuit upheld approval of a *cy pres*-only settlement of $9.5 million where the settlement class included VPPA claims of 3,663,651 class members, resulting in *cy pres* relief of approximately $2.59 class member. In *In re Netflix Privacy Litig.*, No. 5:11-cv-00379, 2013 WL 1120801 at *1 (N.D. Cal. Mar. 18, 2013), the court approved a *cy pres* settlement of $9 million where the settlement class included VPPA claims of approximately 62 million class members, resulting *in cy pres* relief of approximately 14 cents per

class member. *See also In re Google Buzz Privacy Litig.*, No. C 10-00672 JW, 2011 WL 7460099, at *3-5 (N.D. Cal. June 2, 2011) (approving $8.5 million *cy pres* payment as sole monetary relief in case where statutory damages of up to $10,000 per claim were available to a class of millions).

The monetary benefits achieved here are well within the range of comparable consumer privacy settlements.[15]

### c. Non-monetary components of the proposed settlement serve to ensure users' privacy rights.

In addition to the $92 million in cash, the Settlement also provides meaningful injunctive relief to remedy the complained-of conduct and prevent future violations – including a company-wide data privacy training initiative. That injunctive relief includes, e.g., agreements that:

---

[15] The Settlement also compares favorably with other privacy and consumer class actions pursuing statutory damages. *See, e.g., In re Google LLC Street View Electronic Communications Litigation*, No. 3:10-md-02184, 2020 U.S. Dist. LEXIS 47928 (N.D. Cal. Mar. 18, 2020) (approving *cy pres* distribution of $13 million fund in case with 60 million person class (equating to $0.22 per person before fees, expenses, or administration costs) in Electronic Communications Privacy Act (ECPA) matter with $10,000 available statutory damages); *In re Carrier iQ, Inc., Consumer Privacy Litig.*, No. 12-md-02330-EMC, 2016 U.S. Dist. LEXIS 114235 (N.D. Cal. Aug. 25, 2016) (approving $5.9 million settlement of ECPA claims with $10,000 available statutory damages for class with approximately 30 million members ($0.20 per class member), with funding to be distributed to *cy pres* recipients if a high volume of eligible claims made distribution economically unfeasible (the 0.14% claims rate did not trigger that provision)); *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 943-44 (N.D. Cal. 2013) ($15 per claimant was reasonable for violations of several states' laws, even in light of the $750 statutory damages available under California Civil Code § 3344, given hurdles of litigation through final judgment, large class size, and due process concerns over size of maximum damages: "adequacy . . . should not be evaluated against some theoretically available judgment, but against what plaintiffs could reasonably expect to recover."); *Parker v. Time Warner Entm't Co., L.P.*, 631 F. Supp. 2d 242, 261-62 (E.D.N.Y. 2009) ("When the benefit is . . . placed in the context of the risks and delay of continued litigation[,]" a settlement providing $6.75 per class member was "clearly within the range of reasonableness" for claims brought under the Cable Communications Policy Act of 1984 which provides for minimum statutory damages of $1,000); *Medeiros v. HSBC Card Servs.*, No. CV 15-09093 JVS (AFMx), 2017 U.S. Dist. LEXIS 178484, at *12 (C.D. Cal. Oct. 23, 2017) (Collecting cases approving settlements with average gross per-class-member recoveries as low as $0.75 under the California Invasion of Privacy Act, which provides a $5,000 statutory penalty); *In re Capital One Telephone Consumer Protection Act Litig.*, 80 F. Supp. 3d 781, 787 (N.D. Ill. 2015) (providing $34.60 to each claiming class member under the Telephone Consumer Protection Act, which provides $500 in statutory damages).

- Defendants will not collect or store biometric information, biometric identifiers, geolocation or GPS data, or information in users' device clipboards, unless expressly disclosed and in compliance with all applicable laws;

- Defendants will not transmit U.S. data outside of the United States or store U.S. user data in databases outside of the United States, unless expressly disclosed and in compliance with all applicable laws;

- Defendants will delete pre-uploaded, user-generated content collected from users who created videos but did not "save" or "post" the content;

- Defendants will not disclose to any third party the "personally identifiable information" of a "consumer" who uses the App, as those terms are defined by the Video Privacy Protection Act (18 U.S.C. § 2710), except to the extent such disclosure is not prohibited by the Video Privacy Protection Act;

- Defendants will not share user data collected through the App with third parties without disclosing in its Privacy Policy the categories of third parties with whom user data is shared; and

- Defendants will require newly designed training on compliance with data privacy laws and company procedures for all relevant incoming employees and contractors, and annual training thereafter, and TikTok will, at its own expense, hire a third party to review the data privacy law compliance training for a period of three years and to provide a written verification of this review along with the verification required by Section 6.4 of the Settlement Agreement to Class Counsel.

Thus, the Settlement affords a framework of compliance and future protection of the privacy rights of Plaintiffs and the Class—a valuable benefit. *E.g., In re Equifax Customer Data*

*Sec. Breach Litig.*, MDL Docket No. 2800, 2020 U.S. Dist. LEXIS 118209, at *256 (N.D. Ga. Mar. 17, 2020) ("The Court specifically finds that the injunctive relief class counsel obtained here is a valuable benefit to the class because it reduces the risk that their personal data will be compromised in a future breach."); *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 974 n.6 (8th Cir. 2018) (security measures implemented after a data breach have "value to all class members.").

### 3. Continued litigation would be complex, costly, and lengthy.

Preliminary approval is also favored because "[s]ettlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011). As explained above, there is tremendous risk that this case will either be dismissed outright or else compelled to arbitration. If Plaintiffs survive these early procedural hurdles and this litigation were to continue on the merits, it would be lengthy, very expensive, and involve extensive motion practice, including a motion for class certification (and possibly a motion for decertification), motions for summary judgment, and various pretrial motions, as well as extensive fact and expert discovery including the preparation of expert reports, expert depositions, and Daubert *motions*. *See Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("[C]lass action suits have a well-deserved reputation as being most complex.").

The case would probably not go to trial for years. And even if the Class recovered a judgment at trial in excess of the $92 million provided by the Settlement, post-trial motions and the appellate process would deprive them of any recovery for years, and possibly forever in the event of a reversal.

Importantly, unlike a more typical case in which plaintiffs may need to progress through numerous risky litigation hurdles to gain adequate leverage to obtain a fair and reasonable result,

Plaintiffs here achieved substantial, material relief in the early stages of the case. This victory owed in large part to Plaintiffs' insistence on engaging in a second mediation during a uniquely opportune time, when TikTok was under tremendous pressure as a result of presidential executive orders requiring its swift sale. With those pressures now abated, Plaintiffs would be unlikely to obtain a settlement opportunity like this one until trial—if ever. Indeed, courts have repeatedly ruled against President Trump's ban, and on February 10, 2021, the Biden administration asked that the proceedings against TikTok be put on hold while the administration could review the prohibitions and determine whether the ban was appropriate. TikTok's pending sale has been shelved indefinitely.[16]

Rather than embarking on years of protracted and uncertain litigation, Plaintiffs and their counsel took advantage of a unique opportunity to negotiate a Settlement that provides immediate, certain, and meaningful relief to all Class Members. *See Schulte*, 805 F. Supp. 2d at 586. This certainty and immediacy are particularly valuable in the midst of a global pandemic. *See Lane*, 696 F.3d at 820 ("the immediate benefits represented by the Settlement outweighed the possibility—perhaps remote—of obtaining a better result at trial"); *In re Netflix Privacy Litig.*, No. 5:11-cv-00379 EJD, 2013 WL 1120801, at *5 (N.D. Cal. Mar. 18, 2013) (determining that the settlement was fair, adequate and reasonable when the calculation of the value of the case took into account the time value of money). Moreover, the proposed Settlement is also endorsed as adequate and fair by Judge Phillips, as explained in his Declaration. Accordingly, the second factor weighs in favor of finding the Settlement fair, reasonable and adequate. *See Borcea v. Carnival*

---

[16] *See, e.g.,* https://www.npr.org/2021/02/10/966584204/biden-administration-pauses-trumps-tiktok-ban-backs-off-pressure-for-tiktok-to-s; https://www.wsj.com/articles/tiktok-sale-to-oracle-walmart-is-shelved-as-biden-reviews-security-11612958401.

*Corp.*, 238 F.R.D. 664, 674 (S.D. Fla. 2006) (noting that "[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush").

### 4. Proposed Class Counsel are competent, well-informed, and experienced and they strongly endorse the Settlement.

The third factor examines the opinion of competent counsel as to whether a proposed settlement is fair, reasonable, and adequate. *Isby*, 75 F.3d at 1200. In assessing the qualifications of counsel under this factor, a court may rely upon affidavits submitted by class counsel as well as its own observations of class counsel during the litigation. *Id*. This Court appointed Ms. Carroll, Ms. Fegan, and Mr. Rhow as Co-Lead Counsel, in recognition of their significant experience in class action and complex litigation and good judgment. Co-Lead Counsel endorse this settlement and strongly recommend its approval.

Accordingly, the third factor weighs in favor of finding the Settlement fair, reasonable, and adequate. *See, e.g., McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 812 (E.D. Wis. 2009) (that "counsel endorses the settlement and it was achieved after arms-length negotiations facilitated by a mediator . . . suggest that the settlement is fair and merits final approval."); *see also In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) (placing "significant weight on the . . . strong endorsement of [this] settlement" by a "well-respected" attorney).

### 5. The Settlement was reached after significant analysis and arm's-length negotiation.

The last factor concerns the stage of the proceedings and amount of discovery completed at the time the settlement is reached. *Synfuel*, 463 F.3d at 653. This factor "indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 C 2898, 2011 WL 3290302 (N.D. Ill. July 26, 2011) (quoting *Armstrong*, 616 F.2d at 325) (internal quotations omitted).

The proposed Settlement was reached after more than a year of litigation on two litigation tracks that were ultimately consolidated before this court, and it is informed by counsel's thorough investigation and Plaintiffs' experts' analysis of the issues at the heart of this case. Armed with this information, Plaintiffs and their counsel had "a clear view of the strengths and weaknesses" of the case and were in a strong position to negotiate a fair, reasonable, and adequate settlement. *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985), aff'd 798 F.2d 35 (2d Cir. 1986).

Mediation was also hard-fought, as Judge Phillips attests. The parties engaged in two rounds of mediation, four months apart, spearheaded by two different plaintiff legal teams who ultimately came together under the Court's Leadership Group to reach the Settlement Agreement now before the Court. Plaintiffs researched and drafted three mediation statements, and analyzed the arguments made in three statements drafted by Defendants. The parties were able to reach an agreement in principle after extensive negotiations across two mediations assisted by Judge Phillips; that Settlement Agreement was only possible because it was based on a robust and fully informed factual background. In addition, the Leadership Group continued its in-depth analysis of this case as negotiations continued even after the initial agreement in principle.

Indeed, significant confirmatory discovery, claims analysis, and negotiations continued for several months after the Court appointed the Leadership Group and after the agreement in principle was reached. The Leadership Group served interrogatories; conducted a deposition by written question; retained a renowned expert to conduct on-site source code review over the course of several weeks and subsequent analysis; and coordinated a follow-up Q&A session with Co-Lead Counsel, defense counsel, and Plaintiffs' source code expert to allow the candid, open exchange of technical information. Co-Lead Counsel and members of the PSC undertook several, detailed

research projects to analyze the core legal issues in this case—assessing risks and determining how to maximize benefits to the class. With this analysis by a well-credentialed, experienced team of attorneys, the Leadership Group was well positioned to analyze the strength of Plaintiffs' claims and confirm that the settlement achieved well surpassed all tests for fairness, reasonableness, and adequacy.

In addition, James Zouras and Jonathan Rotter acted as independent counsel representing the discrete interests of the Illinois Subclass and the non-Illinois Subclass members of the Nationwide Class to negotiate the allocation of settlement funds between the two groups. As explained in their declarations, Messrs. Zouras and Rotter engaged in a collegial, but frank and adversarial process over nearly an eight-week period. They each conducted extensive research and analysis of the claims, both in connection with the allocation negotiations, and for months prior in connection with their pursuit of claims in the MDL.

Because the Settlement "is the product of arm's length negotiations, sufficient discovery has been taken to allow the parties and the court to act intelligently, and counsel involved are competent and experienced," the Court may presume the settlement to be fair, adequate, and reasonable. H. Newberg, A. Conte, Newberg on Class Actions § 11.41 (4th ed. 2002).[17]

---

[17] *See also, e.g., Fox v. Asset Acceptance, LLC*, No. CV 14-734-GW(FFMx), 2015 U.S. Dist. LEXIS 193865, at *23 (C.D. Cal. Aug. 17, 2015) ("At this point, the parties have participated in multiple mediations and Plaintiff has conducted additional confirmatory discovery — before reaching this Settlement. . . . Such discovery supports a finding of fairness."); *Lo v. Oxnard European Motors, LLC*, No. 11CV1009 JLS (MDD), 2011 U.S. Dist. LEXIS 144490, at *17-18 (S.D. Cal. Dec. 15, 2011) (Finding settlement fair, reasonable, and adequate when reached upon "only . . . limited confirmatory discovery" because the parties determined they had exchanged sufficient information to make an informed decision; the parties' counsel were well versed in class action litigation and the subject matter underlying the case; and the disputed issues were legal, not factual, such that extensive discovery may not have been required.); *Kline v. Dymatize Enters., LLC*, No. 15-CV-2348-AJB-RBB, 2016 U.S. Dist. LEXIS 142774, at *14-15 (S.D. Cal. Oct. 13, 2016) (The "time and effort" associated with post-settlement and post-mediation negotiations, confirmatory discovery, and informal discovery "militate in favor or preliminary approval."); *Simerlein v. Toyota Motor Corp.*, No. 3:17-cv-1091 (VAB), 2019 U.S. Dist. LEXIS 96742, at *59-61 (D. Conn. June 10, 2019) (Finding plaintiffs "gained a sufficient understanding of their case such that they have

Accordingly, the final factor weighs in favor of finding the Settlement fair, reasonable and adequate.

**C. The Class and Subclass should be provisionally certified for settlement purposes.**

The Court should find that the proposed Class is appropriate for provisional certification pursuant to Rule 23(a) and that it fits into one of the three subsections of Rule 23(b). *See Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 621 (1997); *In re AT&T Mobility*, 270 F.R.D. at 340-45 (citations omitted); *see also* Manual for Complex Litigation § 21.632 (4th ed. 2004). Provisional certification will allow the Class to receive notice of the Settlement and its terms, including the rights of Class Members to submit a Claim Form and recover a Cash Award if the Settlement is finally approved, to object to and/or be heard on the Settlement's fairness at the Fairness Hearing, and to opt out of the Settlement.

For the reasons below, the Court should provisionally certify the following Classes[18] under Rule 23(a) and Rule 23(b)(3) for settlement purposes only:

**Nationwide Class**: All persons who reside in the United States who used the App prior to issuance of the Preliminary Approval Order.

---

had an opportunity to evaluate the strengths and weaknesses of their claims as well as the adequacy of settlement" even though "Class Counsel only completed informal and confirmatory discovery and had not yet adjudicated pending motions to dismiss. . . ."); *In re Nissan Radiator*, No. 10 CV 7493 (VB), 2013 U.S. Dist. LEXIS 116720, at *13-14 (S.D.N.Y. May 30, 2013) ("[T]he settlement agreement is the product of extensive, arm's-length negotiations by parties represented by experienced and talented counsel with expertise in these types of cases. Additionally, although settlement was reached before extensive merits discovery, plaintiffs conducted an investigation prior to commencing the action, retained experts, and engaged in confirmatory discovery in support of the proposed settlement. . . . Therefore, the Court believes the settlement is the result of serious, informed, and non-collusive negotiations.").

[18] Excluded from the Classes are (i) TikTok, its parent, subsidiaries, successors, affiliates, officers, and directors; (ii) the judge(s) to whom the Civil Actions are assigned and any member of the judges' or judges' immediate family; (iii) Persons who have settled with and released TikTok from individual claims substantially similar to those alleged in the Civil Actions; (iv) Persons who submit a valid and timely Request for Exclusion; and (v) all Class Counsel and counsel of record in the Civil Actions. Settlement Agreement §2.6.

**Illinois Subclass**: All persons who reside in the State of Illinois and used the App in the State of Illinois to create videos prior to issuance of the Preliminary Approval Order.

### 1. The requirements of Rule 23(a) are satisfied.

Rule 23(a) requires that (1) the proposed settlement class is so numerous that joinder of all individual class members is impracticable (numerosity); (2) there are questions of law or fact common to the proposed settlement class (commonality); (3) plaintiff's claims are typical of those of the class (typicality), and (4) the plaintiff and class counsel will adequately protect the interests of the class (adequacy). Fed. R. Civ. P. 23(a)(1)-(4); *In re AT&T*, 270 F.R.D. at 340-44. The settlement classes satisfy each of these requirements.

### a. Numerosity: The Class includes tens of millions of individuals and the numerosity requirement is readily met.

The first requirement of Rule 23(a) is that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Nationwide Class consists of an estimated 89 million individuals dispersed throughout the United States and the Illinois Subclass consists of 1.4 million individuals. Joinder of all Class Members is obviously impractical. *See McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002) (40 or more class members is generally sufficient to establish numerosity). Numerosity plainly exists here.

### b. Commonality: Common questions regarding Defendants' privacy violations predominate the case.

The second requirement is that "there are questions of law or fact common to the class." Rule 23(a)(2). The commonality requirement is satisfied where a plaintiff asserts claims that "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 565

U.S. 338, 389-90 (2011). Many questions of law and fact are common to the Classes, including, for example:

a. Whether Defendants collected, captured, and otherwise obtained the biometric identifiers and information of Plaintiffs and Class Members;

b. Whether Defendants possessed the biometric identifiers and information of Plaintiffs and Class Members;

c. Whether Defendants disclosed, redisclosed and otherwise disseminated the biometric identifiers and information of Plaintiffs and Class Members;

d. Whether Defendants profited from the biometric identifiers and information of Plaintiffs and Class Members;

e. Whether Defendants obtained enforceable written releases from Plaintiffs and Class Members or their authorized representatives before collecting, capturing, obtaining, disclosing, redisclosing and otherwise disseminating the biometric identifiers and information or Plaintiffs and Class Members;

f. For the Illinois Subclass, whether Defendants provided the notice required by BIPA[19] before collecting, capturing, obtaining, disclosing, redisclosing and otherwise disseminating the biometric identifiers and information of Plaintiffs and Class Members;

g. For the Illinois Subclass, whether Defendants had in place – and disclosed to the public – the written retention and destruction policies required by

---

[19] While the BIPA claim is asserted only on behalf of the Illinois Subclass, and legal questions concerning BIPA are common to that Subclass alone, Plaintiffs contend that the undisclosed collection of biometric identifiers and biometric data factually support the data privacy claims asserted by the Nationwide Class as well, e.g., Intrusion Upon Seclusion and the California Constitution's Right to Privacy.

BIPA while in possession of Plaintiffs' and Class Members' biometric identifiers and information;

h.     Whether Defendants protected Plaintiffs' and Class Members' biometric identifiers and information from disclosure using the reasonable standard of care within Defendants' industry and in a manner that was the same as or more protective than the manner in which Defendants protects other confidential and sensitive information;

i.     Whether Defendants wrongfully disclosed class members' video viewing histories to third parties in violation of the VPPA;

j.     Whether Defendants exceeded the scope of their authorized access to Plaintiffs' devices in violation of the CFAA;

k.     Whether Defendants wrongfully accessed Plaintiffs' and class members' devices and data to wrongfully control or obtain that data in violation of the CDAFA;

l.     Whether Defendants' collection, use, storage, and/or transmission of private data violated Plaintiffs Right to Privacy under the California Constitution or California Unfair Competition and False Advertising laws;

m.     Whether Defendants alleged conduct constitutes Intrusion Upon Seclusion;

n.     Whether Defendants were unjustly enriched through their alleged wrongful conduct;

o.     Whether Plaintiffs and Class Members suffered damages as a proximate result of Defendants; and

p.     Whether Plaintiffs and Class Members are entitled to damages, equitable

relief, and other relief.

Accordingly, the commonality requirement of Rule 23(a) is satisfied. *See Parker v. Risk Mgmt.*

*Alternatives, Inc.*, 206 F.R.D. 211, 213 (N.D. Ill. 2002) ("[A] common nucleus of operative fact is

usually enough to satisfy the [commonality] requirement.").

> ### c. Typicality: The proposed class representatives' and class members' claims all arise out of the use of the App and their claims are typical.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical

of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The typicality requirement is not

demanding." *Fogarazzao v. Lehman Bros., Inc.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005).

Plaintiffs (i.e., the proposed Class Representatives) submit that their claims are typical of

the claims of Class Members because Plaintiffs' claims arise out of the same "event, practice or

course of conduct that gives rise to the claim[s] of the other class members" and "are based on the

same legal theory." *Parker*, 206 F.R.D. at 213. Plaintiffs and each Class Member are all users of

the App who experienced the same privacy violations in the same manner. Moreover, Plaintiffs

and the putative Class members all seek the same statutory and actual damages. Accordingly, the

typicality requirement of Rule 23(a) is satisfied for purposes of preliminary approval.

> ### d. The proposed class representatives and their counsel exceed the requirements to adequately represent the class.

The fourth and final Rule 23(a) requirement is "adequacy of representation," Fed. R. Civ.

P. 23(a)(4), which has two components: (1) "the representatives must not possess interests which

are antagonistic to the interests of the class" and (2) "the representatives' counsel must be qualified,

experienced and generally able to conduct the proposed litigation." *CV Reit, Inc. v. Levy*, 144

F.R.D. 690, 698 (S.D. Fla. 1992) (citation omitted).

The first component is satisfied because the proposed class representatives' interests in this litigation are aligned with, and not antagonistic to, those of the classes they seek to represent. *See G.M. Sign*, 2009 U.S. Dist. LEXIS 73869, at *15-16; *Zyburo v. NCSPlus, Inc.*, 44 F. Supp. 3d 500, 503 (S.D.N.Y. 2014) (holding that "the adequacy requirement is satisfied with respect to the lead plaintiff in this kind of consumer case unless plaintiff's interests are antagonistic to the interest of other members of the class") (quotation omitted). The proposed representatives and class members are all TikTok users (or were, during the relevant time period) and *all* want to protect their privacy. To pursue that end, the proposed representatives retained counsel, filed actions that were consolidated as part of this MDL, participated in a vetting process conducted by the Leadership Group to assess each plaintiff's suitability to serve as a class representative, assisted with the litigation, vigorously prosecuted the case on behalf of the Class, and considered and approved the Settlement terms.

Moreover, the proposed representatives for the Illinois Subclass are Illinois residents who used TikTok to create videos in Illinois, are entitled to the protections of BIPA, and their interests are aligned with the subclass they seek to represent.

The second component of Rule 23(a)(4) is satisfied because Plaintiffs hired qualified and competent counsel who are highly experienced in class actions generally and consumer privacy litigation in particular. Proposed Class Counsel has successfully investigated, commenced, and prosecuted many complex cases and class actions, including the instant action. Proposed Class Counsel are the same Co-Lead Counsel the Court selected and appointed to drive the litigation to this point. Accordingly, the adequacy of representation requirement of Rule 23(a) is satisfied for purposes of preliminary approval.

42

**2. The requirements of Rule 23(b)(3) are satisfied.**

Finally, because Plaintiffs seek certification for settlement purposes, under Rule 23(b)(3), they must additionally show (1) that common questions of law or fact predominate over questions affecting only individual class members (predominance); and (2) that a class action is superior to other available methods of resolving the controversy (superiority). Fed. R. Civ. P. 23(b)(3); *In re AT&T Mobility*, 270 F.R.D. at 344-45. Both requirements are easily satisfied by the proposed Classes.

**a. Common questions predominate.**

The predominance requirement of Rule 23(b)(3) is satisfied because common questions comprise a substantial aspect of the case and can be resolved for all Class and Subclass members in a single adjudication. *See Roach v. T.L. Cannon Corp.*, 773 F.3d 401, 405 (2d Cir. 2015) (predominance is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof"). Here, the central questions in this case are all capable of resolution on a class-wide basis by looking to the Defendants' uniform data collection and privacy practices. Predominance is satisfied.

**b. Class treatment of Plaintiffs' claims is superior.**

Rule 23(b)(3) also requires that a class action be superior to other available methods for adjudicating the controversy. "The superiority requirement is often met where class members' claims would be too small to justify individual suits, and a class action would save litigation costs by permitting the parties to assert their claims and defenses in a single proceeding." *Kaye v. Amicus Mediation & Arbitration Group, Inc.*, 300 F.R.D. 67, 81 (D. Conn. 2014); *see also Amchem*, 521 U.S. 617 (noting that "the Advisory Committee had dominantly in mind vindication of the rights

of groups of people who individually would be without effective strength to bring their opponents into court at all").

A class action is the superior method for the fair and efficient adjudication of these claims. Plaintiffs' claims are shared by millions of other TikTok users nationwide. The resolution of all claims of all Class Members in a single proceeding promotes judicial efficiency and avoids inconsistent decisions. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (noting "the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23"). Further, it is unlikely that any Class Member would be willing or able to pursue relief on an individual basis.

Accordingly, superiority is satisfied and the Court should provisionally certify the Class for purposes of settlement.

### D. Court-Appointed Co-Lead Counsel are experienced and knowledgeable and have dedicated themselves to this case; they should be appointed Class Counsel.

Upon certifying a class, Rule 23 requires that a court appoint class counsel who will "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B), (2), (4); *Harris v. Circuit City Stores, Inc.*, No. 07-cv-2512, 2008 WL 400862, at *11 (N.D. Ill. Feb. 7, 2008) (citation omitted). In appointing class counsel, the court must consider (1) the work counsel has done in identifying or investigating potential claims; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the case; (3) counsel's knowledge of the applicable law; and (4) the resources class counsel has committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv); *Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 498 n. 7 (7th Cir. 2013).

In this case, proposed Class Counsel (identical to the Co-Lead Counsel the Court previously appointed, ECF No. 94) readily satisfies the criteria of Rule 23(g). First, proposed Class counsel has devoted substantial time, effort, and resources to this litigation, beginning with their initial investigation of Plaintiffs' allegations, continuing through litigation and confirmatory discovery, and ending with arm's length settlement negotiations and mediation. Indeed, as the Court is aware, Plaintiffs' counsel have not always agreed on the best manner of litigating this case. However, the competing views that were once contentious have ultimately resulted in proposed Class Counsel being able to take a well-rounded, diverse, and objective look at the case and soberly evaluate its strengths, weaknesses, and potential outcomes.

Second, as discussed above, proposed Class Counsel have extensive experience in complex and class action litigation, in district courts of the Seventh Circuit and elsewhere, and have served as class counsel in other complex class actions and cases involving data privacy generally and BIPA specifically.

### E. The proposed class notice plan provides the best practicable notice and does so in an easily understood format.

"Rule 23(e)(1)(B) requires the court to 'direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise' regardless of whether the class was certified under Rule 23(b)(1), (b)(2), or (b)(3)." *Manual for Compl. Lit.*, *supra*, at § 21.312. The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). The notice must contain specific information in plain, easily understood

language, including the nature of the action and the rights of class members. Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii); *see also In re AT&T Mobility*, 270 F.R.D. at 352.[20]

As explained in the Weisbrot Declaration, Angeion Group LLC, the Settlement Administrator, has designed a proposed Notice Program that provides individual direct email notice to all reasonably identifiable Class Members combined with a state-of-the-art media campaign comprised of internet advertising, social media advertising and a paid search campaign. Settlement Agreement § 9.2, Weisbrot Decl., ¶¶ 12, 19, 24; *see* Fed. R. Civ. P. 23(e)(1) (calling for notice to be provided in a "reasonable manner to all class members who would be bound by the proposal"); *In re Northfield*, 2012 WL 366852, at *7. The Notice Program includes a dedicated settlement website and toll-free telephone line where Class Members can learn more about their rights and options pursuant to the terms of the Settlement. Weisbrot Decl., ¶ 14. The Notice Program also includes a social media campaign utilizing Facebook, Instagram, and Twitter as well as a paid search campaign to help drive Settlement Class Members who are actively searching for information about the Settlement to the dedicated Settlement Website. Weisbrot Decl., ¶¶ 36, 40.

The notice will direct Class Members to the Settlement Website, which will contain the Class Notice and an electronic version of the Claim Form that can be submitted online, the toll-free Settlement telephone number, and copies of the full Settlement Agreement and other important documents (including the Complaint, this Motion, all Orders of this Court concerning the Settlement, and Plaintiffs' forthcoming motions for attorneys' fees and service award and final approval of the Settlement).

---

[20] Proposed drafts of the Class Notices are attached hereto as Exhibit D and the draft Claim Form is attached hereto as Exhibit E.

The Notice Program outlined above includes direct notice to all reasonably identifiable Class Members, combined with a robust media campaign consisting of state-of-the-art internet advertising, robust social media campaign, and a paid search campaign. Weisbrot Decl., ¶ 48. Accordingly, Plaintiffs respectfully request that the proposed Notice Program be approved, together with the Class Notices and Claim Form.

**F. The Court should schedule a fairness hearing to finally approve the settlement.**

The last step in the settlement approval process, after completion of the Class notice program, will be a Final Approval Hearing to consider the fairness, reasonableness, and adequacy of the proposed Settlement, and to determine the reasonableness of the requested Attorneys' Fee, Expense, and Service Awards. *See* Settlement Agreement § 2.15. Plaintiffs will submit a proposed Order containing a proposed schedule of events for the Court's consideration before the hearing on the instant motion.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this motion in its entirety and enter an order (i) granting preliminary approval of the Settlement Agreement; (ii) certifying the Class for settlement purposes; (iii) appointing Class Representatives, Subclass Representatives, and Class Counsel; (iv) approving the form and manner of the Notice Plan and appointing a Settlement Administrator; (v) establishing deadlines for requests for exclusion and the filing of objections to the proposed settlement contemplated by the Settlement Agreement; (vi) finding that the Parties have complied with 28 U.S.C. § 1715; and (vii) scheduling the fairness hearing.

Dated: February 25, 2021        Respectfully Submitted,

                                 By: */s/ Katrina Carroll*
                                 Katrina Carroll
                                 CARLSON LYNCH, LLP

111 W. Washington St.
Suite 1240
Chicago IL 60602
312.750.1265
kcarroll@carlsonlynch.com

By: */s/ Elizabeth A. Fegan*
Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

By: */s/ Ekwan Rhow*
Ekwan Rhow
BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS, LINCENBERG & RHOW,
P.C.
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067
(310) 201-2100
erhow@birdmarella.com

*Plaintiffs' Co-Lead Counsel*

Jonathan Jagher
Freed Kanner London & Millen LLC
923 Fayette Street
Conshohocken, PA 19428
(610) 234-6487
jjagher@fklmlaw.com

Michael Gervais
Susman Godfrey LLP
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 789-3100
mgervais@susmangodfrey.com

Albert Y. Chang
Bottini & Bottini, Inc.
7817 Ivanhoe Avenue
Suite 102
La Jolla, CA 92037

48

(858) 914-2001
achang@bottinilaw.com

Megan E. Jones
Hausfeld LLP
1700 K Street NW, Suite 650
Washington, D.C. 20006
(202) 540-7200
mjones@hausfledllp.com

Amanda K. Klevorn
Burns Charest LLP
365 Canal Street
Suite 1170
New Orleans, LA 70130
(504) 799-2845
aklevorn@burnscharest.com

*Plaintiffs' Steering Committee*

Shannon Marie McNulty
Clifford Law Offices, P.C.
120 North LaSalle Street, Suite 3100
Chicago, IL 60602
(312) 899-9090
smm@cliffordlaw.com

*Plaintiffs' Liaison Counsel*