**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: TIKTOK, INC.,**<br>**CONSUMER PRIVACY**<br>**LITIGATION,**<br><br><br><br>**This Document Relates to All Cases** | **MDL No. 2948**<br><br>**Master Docket No. 20-cv-4699**<br><br>**Judge John Z. Lee**<br><br>**Magistrate Judge Sunil R. Harjani** |

**DECLARATION OF ELIZABETH A. FEGAN**
**IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

I, Elizabeth A. Fegan, under oath, declare and state as follows:

1.      I am Managing Partner of the law firm Fegan Scott LLC and one of the court-appointed Co-Lead Counsel.

2.      I submit this declaration in support of the motion for preliminary approval of the proposed class action settlement, including the September 4, 2020 Settlement Agreement and Release ("Settlement Agreement") as clarified by Addendum No. 1 to Settlement Agreement and Release ("Addendum") (collectively, "the Settlement").

3.      I, along with members of the court-appointed leadership group, have undertaken extensive analyses of the claims and defenses in this case, as well as the underlying facts (as probed by confirmatory discovery and the involvement of highly regarded technical experts and consultants), the benefits conferred by the Settlement, and the risks associated with continued litigation. Based on that comprehensive assessment, and my experience litigating complex class actions, I believe the Settlement is fair, reasonable, and adequate for the Nationwide Class and Illinois Subclass.

### A. My Background

4.     I have over 20 years of experience representing plaintiffs in complex class action litigation. After 15 years as Managing Partner of Hagens Berman's Chicago office, I founded Fegan Scott LLC in May 2019 to help victims of consumer fraud, negligence, abuse, and discrimination.

5.     I have successfully led numerous nationwide class actions as court-appointed counsel.

6.     For example, I was part of the Co-Lead Counsel team in *In re NCAA Student-Athlete Concussion Injury Litigation*, No. 1:13-cv-9116 (N.D. Ill.), which was litigated before this Court. That case resulted in a historic nationwide class settlement on behalf of four million current and former NCAA student-athletes, including the creation of a $70 million, 50-year medical monitoring program to diagnose the short- and long-term effects of concussions and the accumulation of subconcussive hits.

7.     Additional examples of successful class action cases in which I have led the prosecution include:

- *Senior annuities consumer protection class actions*: In a series of class actions against insurance companies that sold equity-indexed deferred annuities that targeted, but were inappropriate for, senior citizens, I was appointed to lead counsel and executive committee positions. These cases led to numerous settlements, *e.g.* American Equity Senior Annuities Fraud (C.D. Cal.) ($129 million settlement) and Midland Senior Annuities Fraud (C.D. Cal.) ($79.5 million settlement).

- *Baby Products Antitrust* (E.D. Pa.): As co-lead counsel for a class of consumers overcharged for high-end baby products (e.g. strollers, high chairs) as the result of a price-fixing conspiracy between Babies 'R Us and baby product manufacturers, I achieved a $35 million settlement after class certification was granted, summary judgment denied, and on the eve of trial.

- *Pre-Filled Propane Tank Marketing and Sales Practices* (W.D. Mo.): As MDL co-lead counsel for a class of consumers who purchased propane tanks for barbecues, I prosecuted this antitrust class action against the two dominant manufacturers who engaged in price fixing. The case settled for a $35 million common fund.

- *RC2 Corp. Toy Lead Paint Products Liab. Litig.*, No. 07 CV 7184, MDL No. 1893 (N.D. Ill.): As MDL co-lead counsel in this nationwide consumer fraud class action on behalf of purchasers of toys covered with lead paint, we successfully settled the MDL, in conjunction with related a state court case, for product refunds and blood lead testing valued at $30 million.

- *Nexium Pharmaceutical Antitrust Fraud* (Mass.): After class certification, I joined the trial team to try antitrust claims on behalf of Massachusetts payors for Nexium. This single-state case settled the night before trial for $20 million.

8.      I have also served on special master teams in the Northern District of Illinois and Circuit Court of Cook County, appointed by the courts to manage discovery and oversee class counsel fee petitions in federal and state court class actions. *See In re Waste Mgmt. Sec. Litig.* (N.D. Ill.); *Wolens et al. v. American Airlines* (Cir. Ct. Cook County).

### B. Co-Lead Counsel reached consensus after an exhaustive and in-depth analysis of the Settlement, followed by additional hard-fought negotiations.

9.      On September 28, 2020, the Court appointed a leadership team of three Co-Lead Counsel, a five-attorney Plaintiffs' Steering Committee (PSC), and Liaison Counsel (the "Leadership Group"). ECF No. 94.

10.      The Leadership Group includes a cross section of lawyers from various teams who filed privacy cases related to the TikTok application, including lawyers from two groups that had been litigating on parallel tracks in two different district courts (the Northern District of California and the Northern District of Illinois), as well as several others whose cases were also consolidated and transferred to this Court by the Judicial Panel on Multidistrict Litigation (JPML).

11.      As the Court is aware, the pre-appointment litigation was, at times, contentious – especially among Plaintiffs' counsel. Plaintiffs' counsel disputed, *inter alia*, in which court the cases should proceed, whether the cases should be consolidated, the appropriate claims to pursue, whether certain cases should proceed at all, who leadership counsel should be, whether

3

intervention was appropriate – and even whether settlement discussions should be had and with whom on the Plaintiffs' side.

12.     During the hearing regarding the numerous leadership applications, the Court acknowledged that some applicants suggested that a combination of the various groups would result in a "forced marriage" or "a team of rivals." 09/25/2020 Hearing Transcript ("Transcript"), ECF No. 91, at 11:19-21.

13.     However, the Court viewed the Leadership Group differently:

> I . . . would like to think of it as an all-star team of sorts or an Olympic team, made up of individuals form perhaps different individual teams, but who are asked to come together to pursue the interests of all plaintiffs as a whole in this litigation.

Transcript, 11:21-12:2.

14.     The Court's willingness to bring once-adverse plaintiffs' counsel together proved to be the right approach.

15.     After the Court's appointment, the Leadership Group came together and leveraged their diverse perspectives, experience, and prior dealings with defendants and their counsel to the Class's benefit.

16.     The Leadership Group zealously questioned one another's viewpoints and advocated their own, analyzed the claims asserted in the now-consolidated actions and the inevitable defenses, and engaged in a candid, collaborative—and at times oppositional—process that allowed the Leadership Group to truly vet the case and the adequacy of the proposed Settlement benefits.

17.     For example, members of the Leadership Group were assigned to assess discrete issues and present their views to Co-Lead Counsel. Those assignments included, e.g., the analysis of particular causes of action, the analysis of legal issues related to arbitration clauses –

4

including whether they bind minor class members, consultation with technology experts and consultants, the analysis of jurisdictional and liability issues related to the foreign defendants, drafting of and participation in confirmatory discovery, research regarding prior recoveries in analogous cases, the vetting of named plaintiffs and proposed class representatives, the drafting of the Consolidated Amended Complaint, negotiations with Defendants, and the drafting of the Addendum.

18.    Co-Lead Counsel also gave careful, critical attention to the confirmatory discovery Plaintiffs obtained as part of the Settlement Agreement. For example, experts and consultants that various teams had retained prior to the Court's leadership appointment were brought together to exchange ideas and assess one another's analyses. The consultants contributed to and cross-checked one another's requests for information made via interrogatories, and jointly assessed TikTok's responses.

19.    That feedback led to a candid question-and-answer session between Co-Lead Counsel, TikTok's counsel, and Plaintiffs' source code expert – in which Plaintiffs' expert was given further free rein to probe TikTok's relevant technology, source code (both in terms of scope and with questions stemming from the expert's findings), and answers to the deposition on written questions.

20.    Co-Lead Counsel was able to advocate for the issues identified by the Leadership Group and leverage those issues into additional settlement relief provided in the Addendum. And the parties' discussions and negotiations regarding confirmatory discovery continued after that meeting, also contributing to the settlement.[1]

21.    Co-Lead Counsel also took an inclusive approach regarding the identification of

---

[1] Additional details about confirmatory discovery are provided in the contemporaneously filed declaration of Co-Lead Counsel Katrina Carroll.

named plaintiffs and class representatives. As part of the Leadership Group's plaintiff vetting process, we took the unusual step of inviting all counsel who filed now-consolidated cases (including those outside of the Leadership Group) to recommend their plaintiffs for inclusion in the consolidated amended complaint. Co-Lead Counsel also gave each named plaintiff's counsel the opportunity to review the terms of the Settlement before seeking the Court's preliminary approval and allowed them to recommend their respective plaintiffs as proposed class representatives.

22.     Co-Lead Counsel also engaged James Zouras and Jonathan Rotter, two attorneys outside of the Leadership Group who filed cases that were consolidated with this MDL, to represent the respective interests of the Illinois Subclass and the non-Illinois members of the Nationwide Subclass; further vet the strengths, weaknesses, and value of each claim; and independently negotiate the allocation of settlement funds without regard to the prior allocation provisions of the Settlement Agreement.[2]

23.     Numerous well-qualified attorneys spent considerable time in the six months following the Court's leadership appointment to thoroughly consider the case and Settlement benefits (in addition to their extensive case analysis during the months of litigation that predated the cases' consolidation) and, in doing so, achieved a resolution that is in the best interests of the Class.

###     C. Co-Lead Counsel engaged in months of continued negotiations with defense counsel and improved upon an already substantial recovery.

24.     Prior to reaching an agreement on the Addendum, Co-Lead Counsel engaged with defense counsel countless times – via phone calls, video conferences, emails, and the exchange

---

[2] Additional detail about the analysis and process underlying the allocation of settlement benefits is addressed in the contemporaneously filed declarations of Messrs. Zouras and Rotter.

of revisions and draft documents – in hard-fought, post-mediation negotiations. In many ways, that process benefited from the Leadership Group's varying perspectives and the reality that TikTok had to present settlement terms, provide insight into the companies' operations, and engage in confirmatory discovery that met the expectations of a diverse amalgamation of highly experienced class action and privacy counsel.

25.     Through that process, which took place over six months, Co-Lead Counsel was able to improve upon the terms of the original Settlement Agreement with the new Addendum, including with respect to the following:

a.      **Definition of "TikTok."** For example, the Settlement Agreement includes an array of injunctive relief regarding TikTok's treatment of its users' data, as well as a provision requiring TikTok to initiate privacy compliance training. Settlement Agreement, § 6. The Leadership Group had questions about the application of the injunctive relief provisions to the other defendants, TikTok's affiliates. Though the Settlement Agreement refers to "TikTok" alone, the Addendum redefined "TikTok" to make clear that the injunctive relief applies to *all* of the defendants who were engaged in the operation of the App or who are involved in receiving or accessing user data obtained through the App. Addendum, § 2.5 (clarifying that references to "TikTok" in the injunctive relief section apply to Defendants' Released Parties).

b.      **Definition of "the App."** As another example, the Settlement Agreement includes injunctive relief prohibiting TikTok from "us[ing] the App" to collect, store, and/or transmit various categories of private user data – absent disclosure and compliance with all applicable laws. Settlement Agreement, § 6.1. It also includes other provisions regarding "the App," including a warranty that TikTok does not use the App to collect biometric information or identifiers. Settlement Agreement, § 7.1. The Leadership Group expressed concern regarding

7

whether the use of the word "App" was an appropriate limitation would exclude TikTok's conduct after user data left the App and was transmitted to TikTok's servers. The Addendum now makes clear that settlement provisions regarding the "App" go beyond the application's operation on class members' devices, i.e., "device-side" operations, and extend to "server-side operations" as well. Addendum, § 2.1.

        c.     **The Warranty.** The Settlement Agreement includes a "Warranty" representing that "TikTok . . . has not used the App to collect biometric identifiers or biometric information as defined by the Illinois Biometric Information Privacy Act [BIPA]" and providing for confirmatory discovery on that issue. Settlement Agreement, § 7.1. However, the Leadership Group questioned, for example, whether TikTok used something other than "the App" (e.g., TikTok's servers) to collect biometric data and whether the parties had a mutual understanding as what data qualified as "biometric identifiers or biometric information" under BIPA.  The Addendum addresses those questions and eliminates ambiguity as to the scope of the warranty and TikTok's conduct. The Warranty now represents that many of the features underlying Plaintiffs' claims are non-identifying. In other words, TikTok acknowledges that it engages in functions like "image landmarking operations used for special effects and demographic classification, speech-to-text operations used to generate text of words spoken in a video, and similar non-identifying operations" (which Plaintiffs contend is biometric data)—but, per the warranty, those are not used by TikTok to identify an individual. *Id.*

d.　　**Privacy Compliance Training.** As another example, the Settlement Agreement provides that TikTok will "require newly designed training on compliance with data privacy laws and company procedures for all relevant incoming employees and contractors, and annual training thereafter." Settlement Agreement, § 6.3. The Addendum does not leave that training program in TikTok's hands alone. Through the Addendum, the Settlement now requires that TikTok hire a third party to review the training program for a period of three years, and to provide a written verification of that review to Plaintiffs' counsel. Addendum, § 4.3.

e.　　**The VPPA.** In addition, the Addendum includes provisions prohibiting violations of the Video Privacy Protection Act (VPPA), § 4.1.1.

f.　　**Allocation.** The Addendum also makes clear that the determination regarding how settlement benefits are allocated among classes with divergent interests (i.e., among the Nationwide Class and Illinois Subclass) was not bound by the provisions in the Settlement Agreement. Addendum, § 3.1. As a result, Co-Lead Counsel appointed independent Subclass Counsel to negotiate the plan of allocation. Moreover, this independence eliminated any risk that Defendants' viewpoints as to the strength of Plaintiffs' claims, or their concerns about setting precedent for settlement valuation in other matters, could impact class members' recovery or upend the settlement.

26.　　In sum, Co-Lead Counsel conducted six months of thorough, research-intensive deliberations to assess the case and Settlement terms, and as a result of that process, now present to the Court a fair, reasonable, and adequate Settlement which offers the class $92 million and valuable injunctive relief.

I declare that the foregoing is true and correct.

Dated: February 25, 2021　　　　　　_____
　　　　　　　　　　　　　　　　　　　Elizabeth A. Fegan

9