IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: TIKTOK, INC., CONSUMER PRIVACY LITIGATION, | MDL No. 2948 |
| | Master Docket No. 20-cv-4699 |
| | Judge John Z. Lee |
| | Magistrate Judge Sunil R. Harjani |
| This Document Relates to All Cases | |

**DECLARATION OF EKWAN E. RHOW
IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

I, Ekwan E. Rhow, under oath, declare and state as follows:

1. I am a principal with Bird Marella Boxer Wolpert Nessim Drooks Lincenberg & Rhow, P.C. and one of the court-appointed Co-Lead Counsel.

2. I submit this declaration in support of the motion for preliminary approval of the proposed class action settlement, including the September 4, 2020 Settlement Agreement and Release ("Settlement Agreement") as clarified by Addendum No. 1 to Settlement Agreement and Release ("Addendum") (collectively, "the Settlement").

3. I, along with members of the court-appointed leadership group, have undertaken extensive analyses of the claims and defenses in this case, as well as the underlying facts (as probed by our extensive pre-filing investigation, formal discovery, confirmatory discovery, and the involvement of highly regarded technical experts and consultants), the benefits conferred by the Settlement, and the risks associated with continued litigation. Based on that comprehensive assessment, and my experience litigating complex class actions, I believe the Settlement is fair, reasonable, and adequate for the Nationwide Class and Illinois Subclass.

1

### A. I have significant prior legal experience relevant to this case.

4. Class actions have been a significant area of my 25-plus years of practice. I personally have litigated and resolved numerous class actions involving the automotive, electronics, telecommunications, financial services and apparel industries with potential liabilities ranging from $100 million to $1 billion. Clients of mine in this area include Samsung, Hyundai and Vizio. My class action experience also includes serving as lead trial counsel for a class of current and former account and sales manager employees of IBM-spinoff Lexmark. We prevailed on behalf of plaintiffs and the class in Lexmark after a lengthy trial and again on appeal.

5. My firm and I also have substantial experience representing at least a dozen major Chinese corporations, as well as Chinese individuals and others doing business in China and the United States. I personally have represented numerous Chinese and Asian entities in various litigations and international arbitrations, as well as individuals doing business in China. Through these varied experiences, I have developed knowledge of the Chinese government and its unique relationship with Chinese companies.

6. I also have had a long personal and professional interest in privacy issues attendant to new and emerging technologies. My personal interest in data privacy litigation and my familiarity with source code arose from two prior copyright infringement actions. I represented a start-up Korean company that invented a certain type of keystroke encryption security software designed to protect one's privacy and private data. At trial in one of these cases, I cross-examined several witnesses concerning the keystroke encryption technology and its source code. On the morning of closing arguments, we reached a favorable settlement agreement that resolved the case. The jury was polled and indicated its intent to award damages in the eight figures. As a result of these lawsuits involving data privacy issues, I developed

personal relationships with executives and technical teams who focus on this area. Those relationships have led to my litigating other matters touching on data privacy, including other class actions on behalf of U.S. and Asia-based companies.

7. I have substantial experience in litigating cutting-edge complex civil matters and leading the teams of lawyers that handle them. In over 25 years of practice, following my graduation from Stanford University and Harvard Law School, I have tried over 40 cases as lead counsel to a final verdict or award, and have litigated to resolution numerous other complex civil cases. I am a Fellow of the American College of Trial Lawyers, I have been named by Benchmark Litigation as one of the top 20 trial lawyers in California and one of the top 100 trial lawyers in the United States, and I have been recognized by Chambers & Partners as a "trial expert" who is often called upon to "undertake high-profile work" and "bet-the-firm litigation."

### B. My team and I performed substantial work developing this case prior to the September 2020 leadership appointment.

8. Beginning in 2018, before the Congressional investigations of TikTok became trending news, my colleague and Senior Counsel Marc Masters and I began to suspect the existence of, and initiated research on, privacy issues relating to a number of smartphone applications, including TikTok and its predecessor Musical.ly. This research, including technical expert investigation, led me and Mr. Masters to suspect the app was misappropriating private and personally-identifiable user data and transferring it to servers in China.

9. We continued this internal investigation, but when it became clear the issues and the potential class action might have nationwide and even global implications, we decided a broader coalition of lawyers would be necessary to address the full scope of any violations of law. That coalition would need to cooperate, leverage resources, and develop a comprehensive complaint to remedy the myriad threats to U.S. users our investigation was uncovering.

10. Accordingly, in early 2019, we reached out to Glancy Prongay & Murray LLP, which has a strong national reputation in the class action space. Our collective efforts, which started in early 2019, included:

- working closely with highly trained source code experts in analyzing multiple versions of the Musical.ly and TikTok apps to uncover (1) the various types of private and personally-identifiable data taken by defendants and third-party entities whose software development kits and analytic libraries are secretly embedded within the apps, and (2) the domestic and foreign destinations of such misappropriated data;
- collecting and analyzing numerous iterations of the TikTok terms of use and privacy policies upon which defendants might rely for their arbitration and consent defenses, and developing the arguments and evidence necessary to counter those defenses;
- thoroughly researching the defendant corporations – with the aid of two teams of investigators in California and in China, an ESI expert, and colleagues with Chinese-language skills to translate documents – to better understand defendants' corporate structure, document and data collection and retention systems, internal reporting systems, business and advertising models, artificial intelligence and patent development programs, and other relevant foreign and domestic activities, all of which is relevant to establishing the statutory and common law violations, the class's damages, defendants' unjust enrichment, and the alter ego defense to the foreign defendant companies' anticipated personal jurisdiction challenge;
- consulting with well-credentialed experts who have conducted original research into the intersection of data privacy, artificial intelligence, Chinese corporations and the Chinese government, including Chinese laws requiring corporations to share data with the government; and

- researching numerous legal issues in the data privacy field as they relate to this case – such as (1) jurisdiction and venue; (2) potential causes of action; (3) standing; (4) damages; (5) injunctive relief; (6) notice and consent, and (7) arbitration and class action waivers – to craft our November 27, 2019 complaint and our May 11, 2020 amended complaint.

11. After the extensive investigation above, my firm, in concert with Glancy Prongay, filed the first class action against TikTok in this MDL, and publicly announced our intention to amend to add Illinois clients and an Illinois Biometric Information Privacy Act ("BIPA") claim on April 15, 2020.

12. In early 2020, my firm and Glancy Prongay began collaborating with Phillips Erlewine Given & Carlin, LLP to develop the factual and legal foundation for a BIPA claim. Our three firms invested substantial time and resources to this end, including hiring another highly trained source code expert and a biometrics expert with notable experience in BIPA litigation, both of whom helped to develop the unlawful face geometry scanning allegations.

13. The 89-page amended *Hong* complaint was the first-filed BIPA claim against the China-based defendants, and the only one served on them prior to this Court's appointment of leadership. It contains extremely thorough BIPA allegations incorporated into the final Consolidated Amended Class Action Complaint pending before this Court, focusing not just on the app's conspicuous Augmented Reality ("AR") features, but also on other allegations of BIPA violations (and violations of other statutes and common law), such as:

- the functionality and code of the TikTok app, including (1) content recommendations based on TikTok users' race/ethnicity and age; (2) scans of face geometry to determine TikTok users' age; (3) censoring video content to remove

        people defendants consider "ugly"; (4) code for deepfake videos; and (5) code for age, race/ethnicity and emotion recognition;

- ongoing work in China, including (1) the application of facial recognition technology to TikTok users' videos by highly-trained engineers skilled in computer vision, convolutional neural network and machine learning; (2) patent applications for face, voice, age, race/ethnicity and emotion recognition technologies; and (3) the publicly-known functionality of the Chinese version of TikTok (Douyin) that allows its users to perform facial recognition on faces selected by such users from other users' videos; and

- the defendants' legal and political obligations to accumulate and share vast troves of data, including biometrics, in order to assist the Chinese government in achieving world dominance in artificial intelligence, and population surveillance and control.

14. My firm, along with Glancy Prongay and Phillips Erlewine, participated in an April 6, 2020 mediation of the eight original claims and the BIPA claim before former United States District Judge Layn Phillips. Preparation for this mediation involved additional technical expert work, further developing responses to defendants' anticipated motions, and formulating specific changes to defendants' business practices that would bring them into compliance with applicable law.

15. My firm and Glancy Prongay also served eight sets of discovery on defendants prior to mediation, and defendants responded to each. Additionally, we negotiated and agreed to a protective order with defendants to facilitate discovery.

16. Although we had informed the Honorable Lucy H. Koh, before any BIPA cases were filed, that we would be amending our complaint to add a BIPA claim, we teamed up with

6

the first firms to file such a claim against the domestic defendants: Hausfeld LLP and Burns Charest LLP. After follow-on cases were filed, Judge Koh consolidated all of those cases filed in the Northern District of California into *In re: TikTok, Inc. Privacy Litigation*.

17. On July 14, 2020, before *In re: TikTok, Inc. Privacy Litigation* was transferred to this Court, I was appointed interim lead counsel pursuant to Fed.R.Civ.P. 23(g). Judge Koh also appointed an executive committee consisting of me and one lawyer from each of the other four firms in our original group: Glancy Prongay, Phillips Erlewine, Hausfeld, and Burns Charest.

18. I worked closely with this group of experienced lawyers and their colleagues. We added a Video Privacy Protection Act claim to an amended complaint based on original work we performed with our experts concerning TikTok's transmission of users' video viewing histories to Facebook and Google. This work was also incorporated into the final Consolidated Amended Class Action Complaint pending before this Court.

### C. Co-Lead Counsel engaged in months of continued negotiations with defense counsel and improved upon an already substantial recovery.

19. Co-Lead Counsel gave careful, critical attention to the confirmatory discovery Plaintiffs obtained as part of the Settlement Agreement. For example, experts and consultants that various teams had retained prior to the Court's leadership appointment were brought together to exchange ideas and assess one another's analyses. The consultants contributed to and cross-checked one another's requests for information made via interrogatories, and jointly assessed TikTok's responses.

20. That feedback led to a candid question-and-answer session between Co-Lead Counsel, TikTok's counsel, and Plaintiffs' source code expert – in which Plaintiffs' expert was given further free rein to probe TikTok's relevant technology, source code (both in terms of scope and with questions stemming from the expert's findings), and answers to the deposition on

written questions. The parties' discussions and negotiations regarding confirmatory discovery continued after that meeting, also contributing to the settlement.[1]

21. Prior to reaching an agreement on the Addendum, Co-Lead Counsel engaged with defense counsel countless times – via phone calls, video conferences, emails, and the exchange of revisions and draft documents – in hard-fought, post-mediation negotiations. In many ways, that process benefited from the Leadership Group's varying perspectives and the reality that TikTok had to present settlement terms, provide insight into the companies' operations, and engage in confirmatory discovery that met the expectations of a diverse amalgamation of highly experienced class action and privacy counsel.

22. Through that process, which took place over six months, Co-Lead Counsel were able to improve upon the terms of the original Settlement Agreement with the new Addendum, including with respect to the following:

    a. **Definition of "TikTok."** For example, the Settlement Agreement includes an array of injunctive relief regarding TikTok's treatment of its users' data, as well as a provision requiring TikTok to initiate privacy compliance training. Settlement Agreement, § 6. The Leadership Group had questions about the application of the injunctive relief provisions to the other defendants, TikTok's affiliates. Though the Settlement Agreement refers to "TikTok" alone, the Addendum redefined "TikTok" to make clear that the injunctive relief applies to *all* of the defendants who were engaged in the operation of the App or who are involved in receiving or accessing user data obtained through the App. Addendum, § 2.5 (clarifying that references to "TikTok" in the injunctive relief section apply to Defendants' Released Parties).

    b. **Definition of "the App."** As another example, the Settlement Agreement

---

[1] Additional details about confirmatory discovery are provided in the contemporaneously filed declaration of Co-Lead Counsel Katrina Carroll.

includes injunctive relief prohibiting TikTok from "us[ing] the App" to collect, store, and/or transmit various categories of private user data – absent disclosure and compliance with all applicable laws. Settlement Agreement, § 6.1. It also includes other provisions regarding "the App," including a warranty that TikTok does not use the App to collect biometric information or identifiers. Settlement Agreement, § 7.1. The Leadership Group expressed concern regarding whether the use of the word "App" was an appropriate limitation that would exclude TikTok's conduct after user data left the App and was transmitted to TikTok's servers. The Addendum now makes clear that settlement provisions regarding the "App" go beyond the application's operation on class members' devices, i.e., "device-side" operations, and extend to "server-side operations" as well. Addendum, § 2.1.

        c.     **The Warranty.** The Settlement Agreement includes a "Warranty" representing that "TikTok . . . has not used the App to collect biometric identifiers or biometric information as defined by the Illinois Biometric Information Privacy Act [BIPA]" and providing for confirmatory discovery on that issue. Settlement Agreement, § 7.1. However, the Leadership Group questioned, for example, whether TikTok used something other than "the App" (e.g., TikTok's servers) to collect biometric data and whether the parties had a mutual understanding as what data qualified as "biometric identifiers or biometric information" under BIPA. The Addendum addresses those questions and eliminates ambiguity as to the scope of the warranty and TikTok's conduct. The Warranty now represents that many of the features underlying Plaintiffs' claims are non-identifying. In other words, TikTok acknowledges that it engages in functions like "image landmarking operations used for special effects and demographic classification, speech-to-text operations used to generate text of words spoken in a video, and similar non-identifying operations" (which Plaintiffs contend is biometric data)—but, per the

9

warranty, those are not used by TikTok to identify an individual. *Id.*

    d.  **Privacy Compliance Training.** As another example, the Settlement Agreement provides that TikTok will "require newly designed training on compliance with data privacy laws and company procedures for all relevant incoming employees and contractors, and annual training thereafter." Settlement Agreement, § 6.3. The Addendum does not leave that training program in TikTok's hands alone. Through the Addendum, the Settlement now requires that TikTok hire a third party to review the training program for a period of three years, and to provide a written verification of that review to Plaintiffs' counsel. Addendum, § 4.3.

    e.  **The VPPA.** In addition, the Addendum includes provisions prohibiting violations of the Video Privacy Protection Act (VPPA), § 4.1.1.

    f.  **Allocation.** The Addendum also makes clear that the determination regarding how settlement benefits are allocated among classes with divergent interests (i.e., among the Nationwide Class and Illinois Subclass) was not bound by the provisions in the Settlement Agreement. Addendum, § 3.1. As a result, Co-Lead Counsel appointed independent Subclass Counsel to negotiate the plan of allocation. Moreover, this independence eliminated any risk that Defendants' viewpoints as to the strength of Plaintiffs' claims, or their concerns about setting precedent for settlement valuation in other matters, could impact class members' recovery or upend the settlement.

  23.  In sum, Co-Lead Counsel conducted six months of thorough, research-intensive deliberations to assess the case and Settlement terms, and as a result of that process, now present to the Court a fair, reasonable, and adequate Settlement which offers the class $92 million and valuable injunctive relief.

I declare that the foregoing is true and correct.

Dated: February 24, 2021  /s/ *Ekwan E. Rhow*

Ekwan E. Rhow