IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: TIKTOK, INC., CONSUMER PRIVACY LITIGATION | ) ) ) ) ) ) ) | MDL No. 2948 |
| | | Master Docket No. 20-cv-4699 |
| | | Judge John Z. Lee |
| This Document Relates to All Cases | ) | Magistrate Judge Sunil R. Harjani |

**INITIAL OBJECTIONS TO PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT BY MARK S., AS PARENT AND LEGAL GUARDIAN OF HIS MINOR SON, A.S.**

Dated: March 1, 2021

                                                        Respectfully submitted,
                                                        MARK S.

                                  By:    /s/ Scott R. Drury
                                                SCOTT R. DRURY

Mike Kanovitz
Scott R. Drury
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
drury@loevy.com

Pursuant to Fed. R. Civ. P. 23(e)(5), Mark S., as parent and legal guardian of his minor son, A.S., objects to Plaintiffs' Motion for Preliminary Approval of Class Action Settlement (the "motion") (Dkt. 122) because the proposed settlement is unfair, unreasonable and inadequate.

## INTRODUCTION

Notwithstanding what facially appears to be a large settlement value – $92 million – the Agreement[1] suffers from numerous defects that preclude its preliminary approval. Specifically:

- The Agreement does not account for serious conflicts between minor class members, on the one hand, and Nationwide Class members and Illinois Subclass members, on the other, arising out of: (a) the minors' abilities to disaffirm any arbitration agreement or class action waiver; and (b) TikTok's statutory obligation to delete data collected about them;

- the proposed settlement value is unfair, unreasonable and inadequate and is far below the net expected value of continued litigation, *see Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002);

- the proposed Notice Plan is defective in that it: (a) fails to provide notice to the class members via the TikTok App; (b) fails to set forth the estimated claim value; and (c) is designed to suppress the claims and objections rates; and

- the proposed release is overly broad and requires class members to release pending claims in *T.K. v. ByteDance Technology Co., Ltd.* ("*T.K.*"), No. 19-cv-7915 (N.D. Ill.).

Moreover, the Agreement is tainted due to the failure of TikTok's counsel to disclose the *T.K.* matter to the Joint Panel on Multidistrict Litigation ("JPML"), which, at minimum, was a tag-along action and the first-filed case against TikTok in the Northern District of Illinois. After a lengthy hearing on Mark S.'s objections to a proposed settlement in *T.K.* that concluded on August 7, 2020 and demonstrated the value of class members' claims exceeded $200 million, TikTok attended the August 13, 2020 mediation in the above-captioned matter (the "MDL") motivated to

---

[1] Capitalized terms have the same meaning set forth in the Settlement Agreement and Release that was attached as Exhibit A to the Motion (Dkt. 122-1).

1

settle. Notably, the Agreement requires class members in *T.K.* to release their valuable claims in *T.K.*

To avoid the waste of moving forward with the defective Agreement, the Court should deny the motion.[2]

## SUPPLEMENTAL FACTS

Mark S. sets forth facts here that supplement the facts set forth in Plaintiffs' motion and which he believes provide a necessary foundation for his objections.

### *TikTok's Large Child Userbase*

The TikTok App was launched in 2017.[3] At the time, it competed with a similar app called Musical.ly.[4] TikTok then bought Musical.ly and merged it into TikTok.[5] Musical'ly's CEO, Alex Zhu, because the chief executive of TikTok.[6]

During a December 2016 interview, Zhu, stated that "a lot of [Musical'ly's] users, especially top users, they're under 13."[7] He further acknowledged that children lied about their

---

[2] Plaintiffs filed their lengthy motion and proposed Settlement Agreement on February 25, 2021. Since that time Mark S.'s counsel have diligently worked to identify the defects in the Agreement prior to the scheduled March 2, 2021 hearing. In hopes of having additional time to complete a more thorough analysis, Mark S.'s counsel requested that Plaintiffs' counsel agree to strike the scheduled hearing date and request that the Court schedule a status the week of March 15, 2021. *See* Exhibit 1 (email chain). Plaintiffs' counsel refused but indicated they were open to answering questions. *See id.* However, the first date they offered to have a discussion was March 4, 2021, despite Mark S.'s counsel agreeing to be available over the weekend of February 27 and 28, 2021. *See id.* Plaintiffs' Co-Lead Counsel also refused to talk with Mark S.'s counsel regarding the Agreement after their appointment by the Court in September 2020. *See* Exhibit 2-3 (emails). Accordingly, and given the overlapping nature of *T.K.* and the MDL, Mark S. respectfully requests the opportunity to supplement this filing after he has the opportunity to more fully review the Agreement.
[3] Jia Talentino, *How TikTok Holds Our Attention,* The New Yorker (Sept. 23, 2019), https://www.newyorker.com/magazine/2019/09/30/how-tiktok-holds-our-attention (last accessed on Mar. 1, 2021).
[4] *Id.*
[5] *Id.*
[6] Sam Shead, *TikTok's Former CEO Is Now Making Investments on Behalf of Parent Company ByteDance*, CNBC (July 22, 2020), https://www.cnbc.com/2020/07/21/alex-zhu-tiktok-bytedance.html (last accessed on Feb. 28, 2021).
[7] TechCrunch, *From Brush to Canvas with Alex Zhu of Musical.ly*, YouTube (Dec. 6, 2016), https://www.youtube.com/watch?v=ey15v81pwII (last accessed on Mar. 1, 2021).

age in order to use TikTok.[8] As of June 2020, 32.5% of TikTok's active U.S. users were between the ages of 10 and 19.[9] Further, according to an August 2020 *New York Times* article, as of July 2020, TikTok classified more than a third of its U.S. users as being 14 years old or younger.[10] The discrepancy between the figures likely results from children who misstate their ages but who TikTok has identified as being under 14 years old based on its algorithms. *See id.*

On February 27, 2019, the FTC filed a federal enforcement action against Musical.ly and Musical.ly, Inc. for their multiple violations of the Child Online Privacy Protection Act, 15 U.S.C. § 6501, *et seq.* ("COPPA"). COPPA empowers parents to maintain control over what information is collected about their young children – *i.e.*, children under 13 – online. *See id.*[11] Pursuant to a Stipulated Order for Civil Penalties, Permanent Injunction, and Other Relief (the "Stipulated Order"), the Musical.ly defendants agreed to a $5.7 million civil penalty and injunctive relief that required, *inter alia*, the deletion of specified personal information of TikTok users. Exhibit 4 (Stipulated Order). A flaw in the Stipulated Order is that it only required deletion of data of users who self-identified as being under 13. *See id.* at 9-10. As discussed above, TikTok knew that child users identified as being over 13, even though they were not.

**The T.K. Action and Mark S.'s Objection**

The class action complaint in *T.K.* was filed against TikTok on December 3, 2019. *T.K.* Dkt. 1. Therein, the plaintiffs sought to certify a National Class, a California Subclass and an

---

[8] *Id.*
[9] H. Tankovska, *Distribution of TikTok Users in the United States as of June 2020, by Age Group*, Statista (Jan. 28, 2021), https://www.statista.com/statistics/1095186/tiktok-us-users-age/ (last accessed on Feb. 28, 2021).
[10] Raymond Zhong, *et al.*, *A Third of TikTok's U.S. Users May Be 14 or Under, Raising Safety Questions*, New York Times (Aug. 14, 2020), https://www.nytimes.com/2020/08/14/technology/tiktok-underage-users-ftc.html (last accessed on Feb. 28, 2021).
[11] *See also Complying with COPPA: Frequently Asked Questions* (Mar. 20, 2015), https://www.ftc.gov/tips-advice/business-center/guidance/complying-coppa-frequently-asked-questions (last accessed on Mar. 1, 2021).

Illinois Subclass, consisting of approximately six million children under 13 and their parents and/or legal guardians, respectively. *Id.* ¶ 61, 57, 65.[12] The complaint alleged the following five causes of action: (a) violation of the VPPA; (b) Intrusion Upon Seclusion; (c) violation of the California Constitutional Right to Privacy; (d) violation of the California Consumer Legal Remedies Act; and (e) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. *Id.*, ¶¶ 70-110.

On December 5, 2019, the plaintiffs in *T.K.* sought preliminary approval of a $1.1 million settlement on behalf of the following settlement class:

> All persons residing in the United States who registered for or used the Musical.ly and/or TikTok software application prior to the Effective Date when under the age of 13 and their parents and/or legal guardians.

*T.K.* Dkt. 5. The proposed settlement agreement granted TikTok an extremely broad release that required class members to release viable claims that class counsel failed to allege and for which class counsel did not seek compensation, including claims under the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq. See T.K.* Dkt. 5-1 §§ 2.2, 2.24, 11.1.

Judge Blakey preliminarily approved the settlement. *T.K.* Dkt. 12-13. In the preliminary approval order, Judge Blakey entered a preliminary injunction that prevented settlement class members from bringing any new class actions asserting, or amending an existing action to assert, any "Released Claim," broadly defined as any claim arising out of or related to the *T.K.* action or the subject matter of the complaint therein. *T.K.* Dkt. 13 ¶ 16; Dkt. 5-1 § 2.24.

Mark S. objected to the proposed settlement on the grounds that, *inter alia*, it failed to provide adequate relief (18 cents per class member before deducting attorneys' fees and administrator expenses), it failed to provide any injunctive relief, the release was overbroad and

---

[12] The Class Action Complaint is mis-numbered as follows: 61, 57, 62.

4

the notice program was defective. *See* Dkt. 24. After the parties briefed the objections, Judge Blakey held a hearing on August 4 and 7, 2020. During the hearing, Mark S.'s counsel argued that the VPPA claim had a potential value of up to $15 billion and a net expected value of $204 million. Exhibit 5 (8/7/2020 Tr.) at 42:22-44:9.

Mark S.'s counsel further addressed the broad nature of the proposed release that extinguished valuable claims, including BIPA, and the confusion caused by that release. Exhibit 6 (8/4/2020 Tr.) at 18:12-23:8. For instance, Mark S.'s counsel explained that the MDL cases did not include the *T.K.* class members until TikTok and the plaintiffs incorrectly said, in response to Mark S.'s objections, that the release did not cover BIPA claims. *Id.* At the hearings, Mark S.'s counsel also argued that: (a) the proposed settlement failed to provide injunctive relief, including a requirement to delete class members' data; and (b) TikTok could not enforce the purported arbitration agreement against the minor class members. *Id.* at 9:12-17, 13:8-14. On August 13, 2020, six days after the hearing concluded, TikTok's counsel agreed to the $92 million settlement before this Court, which seeks to resolve the claims of 89 million people, including VPPA claims, and requires the *T.K.* class members to release their claims. *See* Dkt. 122-1 § 2.30, 12.1; Dkt. 122-6 ¶ 22.

Judge Blakey has not yet ruled on Mark S.'s objections. Also pending before Judge Blakey is a motion to enforce the above-described preliminary injunction and to consolidate the MDL with *T.K.* or, alternatively, to coordinate the two actions. *T.K.* Dkt. 52.

## ARGUMENT

**I. Legal Standards.**

Approval of a proposed class action settlement "usually involves a two-stage procedure." *Manual for Complex Litig., Fourth* § 13.14 (2004). During the first stage, a "judge reviews the

5

proposal preliminarily to determine whether it is sufficient to warrant public notice and a hearing." *Id.* When a court is confronted with a request for settlement-only class certification, it must give "undiluted, even heightened, attention" to Rule 23 protections "designed to protect absentees by blocking unwarranted or overbroad class definitions." *Amchem Products v. Windsor*, 521 U.S. 591, 620 (1997). Included in this analysis is the adequacy inquiry under Rule 23(a)(4). *See id.* at 625. This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Id.* A conflict arises where the interests of those within a single class are not aligned. *See id.* at 626.

## II. Conflicts Exist Between Minor Class Members and Nationwide Class and Illinois Subclass Members.

Here, the Agreement does not satisfy Rule 23(a)(4)'s adequacy requirement because at least two conflicts exist between minor class members and Nationwide Class and Illinois Subclass members that necessitate additional subclasses. First, Plaintiffs make clear that the primary litigation risk which drives the $92 million figure stems from a purported arbitration agreement and class action waiver. *See* Dkt. 122 at ECF 9-10, 12-13, 29. However, as Plaintiffs concede (*see id.* at ECF 29), the risk faced by minor class members is far different, if it exists at all, than that faced by other class members because minors can disaffirm any such agreements. *See, e.g.*, *Villalobos v. Cicero School Dist. 99*, 841 N.E.2d 87, 94 (Ill. App. Ct. 2005) (Illinois law); Cal. Family Code § 6710 (California law). Notably, Mark S. raised the same disaffirmance issue in his objections in *T.K. See T.K.* Dkt. 24 at ECF 35; Dkt. 38 at ECF 10; Ex. 6 at 13:8-14. By lumping the minor class members in with those class members against whom the arbitration agreement and class action wavier are enforceable, Plaintiffs have settled TikTok's $204 million VPPA liability as to the minor class, as well as its $48 million BIPA liability as to the minor plaintiffs (a conservative estimate of the net expected value of that claim,), at a level far below those figures.

6

Second, minors under the age of 13 require unique injunctive relief in order to ensure that personal information TikTok unlawfully collected about them is deleted and that they are informed of the identities of the entities with whom TikTok shared their data. The Agreement does not provide that relief. *See* Dkt. 122-1 § 6, Addendum § 4. Notably, the Agreement does not require any third-party monitoring of any data deletion requirements. *See* Dkt. 122-1 § 6. Such monitoring would be necessary for the children's data and should be part of the injunctive relief, generally. Again, Mark S. raised the need for this type of injunctive relief in his objections in *T.K. See* Dkt. 24 at ECF 29; Dkt. 38 at ECF 7-8.

Neither the motion nor the Agreement accounts for the above-described conflicts. The Agreement does not create Nationwide and Illinois subclasses for class members: (a) under the age of 18; and (b) under the age of 13. Plaintiffs' counsel certainly are aware of the need to ensure that different groups of class members receive adequate representation, as evidenced by the ten negotiating sessions between counsel appointed by Co-Lead Counsel to determine the settlement allocation to Nationwide Class and Illinois Subclass members. *See* Dkt. 122 at ECF 21-22.

Minor class members required, but did not receive, similar treatment. Had Plaintiffs' counsel properly considered minor class members' interests, those class members would have received a separate, and significantly greater, allocation than Nationwide Class and Illinois Subclass members, and the injunctive relief would, at minimum, have included deletion of the personal information of minors under the age of 13.[13]

---

[13] Importantly, the FTC stipulated settlement does not preclude such injunctive relief due to its voluntary nature. *See In re Vizio, Inc. Cons. Priv. Litig.*, No. 8:16-ml-2693-JLS-KES, 2017 WL 11420284, at *3-4 (C.D. Cal. July 25, 2017) (consent decree is akin to voluntary cessation that does not preclude further injunctive relief); *see also Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 189 (2000); *Fraley v. Facebook*, 966 F.Supp.2d 939, 945 (N.D. Cal. 2013) (settling parties can craft relief not obtainable via a contested judgment).

In the motion, Plaintiffs state that TikTok contends that disaffirmance presents individualized issues that may preclude class treatment. Dkt. 122 at ECF 13. Not so. The issue of disaffirmance can easily by handled via the claims submission process – *i.e.*, the notice packet and claim form can and should be drafted to explain this right and allow any person eligible to disaffirm his or her agreements with TikTok to affirmatively do so on the form.

Plaintiffs also state that TikTok contends that if minor class members are allowed to disaffirm their agreements with TikTok, some of their claims would be released in connection with the settlement in *T.K.* Dkt. 122 at ECF 13. As a threshold matter, no final settlement has been approved in *T.K.* and Judge Blakey has that very objection before him. Further, TikTok's attempt to use *T.K.* as a sword in the MDL demonstrates the impropriety of its decision to game the JPML by not disclosing the related nature of *T.K.* Having ensured that the JPML would not consolidate the MDL cases with *T.K.*, TikTok now seeks to play those cases off of one another to TikTok's benefit.

### III. The Agreement Does Not Reflect the Strength of the Claims as Compared to TikTok's Settlement Offer.

The Seventh Circuit has held the most important factor in determining whether a proposed settlement is fair, reasonable and adequate under Rule 23(e)(2) is the strength of the plaintiff's case as compared to the amount of the defendant's settlement offer. *Synfuel Tech., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006). In analyzing the strength of the plaintiff's case, the court should quantify the net expected value of continued litigation. *Id.* While a court cannot do this with a high degree of precision, the court should require the parties to present evidence that allows for possible outcomes to be estimated. *Id.* It follows that, in accordance with the policies requiring subclassing, the analysis should be specific to each set of plaintiffs with discrete rights. *See id.*; *see Amchem Products*, 521 U.S. at 625-26.

8

In their 47-page motion, Plaintiffs make no effort to estimate possible outcomes or to quantify the net expected value of continued litigation. In *Reynolds*, the Seventh Circuit set forth an easy way to calculate the net expected value of continued litigation, namely, identify four possible outcomes (high, medium, low and zero), along with the likelihood of each outcome coming to fruition, and combine the results. 288 F.3d at 285. In *Reynolds*, the Seventh Circuit ascribed 0.5% to the high option, 20% to the medium option; 30% to the low option and 49.5% to the zero option. *Id.*

Applying the Seventh Circuit's formula here reveals that the $92 million settlement value is far below the net expected value of continued litigation when only considering the VPPA and BIPA claims. The VPPA provides for statutory damages of $2,500. 18 U.S.C. § 2710(c)(2). Based on a class size of 89 million (Dkt. 122 at ECF 25), a high recovery would be $222.5 billion. Using the numbers set forth in *Reynolds*, assumed medium and low recoveries could be $200 million and $10 million, respectively. Using these conservative numbers and the percentages set forth above, the net expected value is $1.15 billion. For BIPA, conservatively assuming statutory damages of $1,000 per violation, *see* 740 ILCS 14/20, a high recovery for the 1.4 million class members would be $1.4 billion. Again, assuming medium and low recoveries of $200 million and $10 million, respectively, the net expected value would be $50,000,000. Thus, the net estimated value of the VPPA and BIPA claims is $1.45 billion – a figure that bears no resemblance to the $92 million settlement value.

Examining the anticipated per class member payout further shows that the proposed settlement is unfair, unreasonable and inadequate. Assuming Plaintiffs' counsel is awarded attorneys' fees of 33.33% of the Settlement Fund (*see* Dkt. 122 at ECF 24) and administrative costs of $1.8 million (the costs in the *Facebook BIPA* case heavily relied on by Plaintiffs) (*see*

9

Exhibit 7 (*Facebook BIPA* Decl.) ¶ 22), the amount left for class members is $59,536,400. Based on a class size of 89 million, each pro rata share is worth a paltry 67 cents. Using the allocation proposed by Plaintiffs,[14] the settlement amounts to $4.02 per Illinois Subclass member, and 60 cents per National Subclass member. Assuming a vibrant notice program akin to the one mandated by the Court in *Facebook BIPA* that resulted in a 22% claims rate, each Illinois Subclass member would receive $18.24, and each National Class member would receive $3.04. As discussed below, given the similarities between Facebook and TikTok, a notice plan similar to the one used in *Facebook BIPA* should be utilized here.

Plaintiffs arrive at loftier numbers in their motion only by basing the payout on the full $92 million and relying on an artificially low claims rate that they seek to achieve through a defective Notice Plan. *See* Dkt. 122 at ECF 32-33; Dkt. 122-12. While Plaintiffs attempt to support their predicted claims rate of 1.5% with data gathered by Professor Rubenstein (Dkt. 122 at ECF 33), they omit half of the professor's data. *See* Exhibit 8 (Prof. Rubenstein Decl. in *Facebook BIPA*). Professor Rubenstein's data predicts claims rates in two different ways: (1) based on class size; and (2) based on size of the claim. *See id.* ¶ 3. According to the data, a claims rate of 1.5% would indicate a very small claim size. *See id.* ¶ 6. To the extent Plaintiffs publish notice predicting payments of $383 and $63.89 (Dkt. 122 at ECF 32), Professor Rubenstein's data would predict corresponding claim rates of 12.9% and 8.8%, respectively. Ex. 8 ¶ 6. Of course, at those claim rates, the actual payments would be far below $383 and $63.89; they would be $45 and $7.55, respectively. Moreover, fixing the glaring omission of failing to provide notice on the App itself, as was done in *Facebook BIPA*, *see infra*, should drive the claims rate much higher than what is

---

[14] Mark S. also objects to the Plan of Allocation. According to the Agreement, no confirmatory discovery was conducted regarding the validity of the VPPA claim. *See* Dkt. 122-1 ¶ 7. As such, it is unclear how Plaintiffs arrives at the 6:1 allocation plan.

10

reflected in Professor Rubenstein's dataset and result in the payouts at the 22% claims rate discussed above. In short, Plaintiffs necessarily rely on an artificially low claims rate in an effort to convince the Court that the settlement is fair, reasonable and adequate. It is none of those things.

**IV.     The Notice Plan Does Not Provide the Best Notice Practicable.**

Rule 23(c)(2)(B) requires that upon a court ordering notice under Rule 23(e)(1), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Where individual class members can be identified, they are entitled to individual notice even if providing such notice would be very costly. *Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672, 676-77 (7th Cir. 2013). The "notice requirement of Rule 23 is designed to guaranty that those bound by the ruling in a class action were accorded their due process rights to notice and an opportunity to be heard." *Chaffee v. A&P Tea Co.*, Nos. 79 C 2735 and 79 C 3625, 1991 WL 5859, at *2 (N.D. Ill. Jan. 16, 1991).

The Notice Plan suffers from many defects that will suppress the claims rate. The most glaring defect is the Plan's inexplicable failure to provide direct notice via the TikTok App. In *Facebook BIPA*, the Court mandated such notice, and the corresponding claims rate was 22%. *See* Exhibit 9 (*Facebook BIPA* Final Approval Order) at 4. Importantly, the TikTok App allows for "push notifications," whereby TikTok can provide information to users, and targeted advertising. *See* Exhibit 10 (push notification information); Exhibit 11 (TikTok ad information). The Notice Plan contains no discussion of the decision to forego using the App to notify class members of the settlement.

Plaintiffs' chosen, but less effective notice methods, also suffer from defects. For instance, according to the Notice Plan, the administrator will have email addresses for one-third of the class

11

members and the media plan will only reach 34.68 million people, many of whom likely will not be class members. Dkt. 122-12 ¶¶ 18, 26. The settlement administrator does not state how Plaintiffs intend to reach all 89 million class members by *any* form of notice.

The reason many of the 34.68 million people targeted by the Notice Plan likely will not be class members is because the Notice Plan targets the wrong people. As discussed above, TikTok has an outsized percentage of young users. Data shows that 62% of TikTok users are between the ages of 10 and 29. *See Distribution of TikTok Users in the U.S.*, *supra*. However, according to the Notice Plan, over 53% of the Target Audience is between 18 and 34, with a median age of 33.7. Dkt. 122-12 ¶ 27. Clearly, the Target Audience's median age of 33.7 is incorrect.

Instead of trying to contact TikTok users directly through TikTok, the Notice Plan seeks to contact them through Facebook, Twitter and Instagram. Dkt. 122-12 ¶ 36. The settlement administrator does not state why he chose those social media platforms.

In addition to defects with direct notice and targeting, the proposed notice and claim form are also defective. The proposed notice fails to state the estimated amount a claimant will receive. *See* Dkt. 122-4. Rather, it merely states that the settlement provides $92 million to pay class members and that Illinois class members may get up to six times some unspecified payment. Dkt. 122-4 at ECF 2. The *Facebook BIPA* notice informed claimants that it was estimated they would receive between $200 and $400. Exhibit 12 (*Facebook BIPA* Notice). In order for the notice to provide this information, the settlement administrator would have to disclose the anticipated claims rate based on his proposed Notice Plan. However, he fails to provide that information.

As discussed below, the Notice also fails to inform *T.K.* class members that by submitting a claim in the MDL, they are releasing their claims in *T.K.*

12

The settlement also prevents claims by persons it seeks to bind. According to the Agreement, to submit a claim, a class member must provide to the settlement administrator, *inter alia*, the class member's full name, address, email address, mobile telephone number for the class member's devices used to access the App, and any and all TikTok user names used by the class member. Dkt. 122-1 § 5.3.5. However, a TikTok user is not required to provide a mobile telephone number in order to register to use the App. Thus, requiring class members to provide the mobile telephone number for the devices used to access the App is deceptive and will suppress the claims rate. Notably, the proposed claim form deceptively indicates that providing a mobile telephone number and email is optional, a fact that will lure claimants into providing less information than is purportedly required to submit a valid claim. *See* Dkt. 122-5 at ECF 3. A class member should only have to provide the minimum information necessary for TikTok to verify that the class member is, in fact, in the class. Neither the motion nor the Agreement describes that minimum information.

According to the Agreement, the class action notice will seek to suppress objections by mandating unnecessary information. *See id.* § 11.3. Specifically, similar to the claims process, the Agreement states that objectors must provide their mobile telephone number used to access the App, even though such information is not required to register to use the App. *Id.* Thus, persons who are disadvantaged by the settlement's failure to allow claims without the phone number are also told they cannot object. Further, the Agreement requires an objector to: (a) name his or her counsel and list the number of objections her counsel has filed in the last five years, along with information regarding each case in which an objection was submitted; (b) provide the retainer or engagement agreement with counsel; and (c) sign the objection under penalty of perjury. *Id.* Each of these requirements serves to suppress and intimidate potential objectors.

13

## V. The Release Is Overbroad

Plaintiffs contend that the Release is narrowly-tailored. Dkt. 122 at ECF 24. In actuality, the Release broadly covers all claims arising from or related to the MDL or the "collection and use of any user data . . . that were, could have been, or could be asserted by" class members. Dkt. 122-1 § 2.30. As such, the Release requires class members to release their claims in *T.K.*, which clearly arises out of the collection and use of user data. This is another example of TikTok's gamesmanship in terms of concealing *T.K.* from the JPML and then trying to avoid the objections in that case by obtaining a broad release of those claims in the MDL. The Court should not countenance those games. The Court should not permit a release of any claims included in Judge Blakey's preliminary injunction or not asserted in the operative complaint in the MDL. Moreover, the Court should not permit the release to cover any of the claims in *T.K.*

## VI. Mark S. Respectfully Suggests that Coordinating the MDL with *T.K.* Will Be Efficient and Conserve Judicial Resources.

Recognizing that the Court has handled complex MDLs in the past and would have no issue reviewing and ruling on Plaintiffs' motion and these objections, Mark S. respectfully suggests that the Court coordinate this MDL with *T.K.* in order to maximize efficiencies and conserve judicial resources. Through gamesmanship, TikTok has finagled a way to litigate the same claims and the same issues in different courtrooms. When TikTok believed it could resolve all claims and obtain a broad release in *T.K.* for $1.1 million, it pursued that path. However, when Mark S. submitted his objections and demonstrated the paltry nature of that settlement, TikTok turned its sights to the MDL. Just six days after the hearing on Mark S.'s objections in *T.K.* in which he made clear that the net estimated value of the case was $204 million, TikTok agreed to resolve the MDL for $92 million and a broad release that covers the claims in *T.K.* To ensure there

14

was no doubt as to TikTok's counsel shopping strategy,[15] it also agreed to allow the *T.K.* class members to submit claims in the MDL notwithstanding any release in *T.K. See* Dkt. 122-1 ¶ 2.4.

While Mark S. is pleased that his efforts already have vastly increased the amount TikTok has agreed to pay to the *T.K.* class members, for the reasons set forth above, the proposed Agreement contains numerous deficiencies. Because the Court in *T.K.* already has begun considering many of the same issues, coordination of the MDL and *T.K.* likely would conserve judicial resources and provide for the most efficient resolution of both matters. Coordination is also the solution to TikTok's gamesmanship in concealing *T.K.* from the JPML and preventing any appearance of counsel shopping.

### VII. Mark S. Alternatively Requests that the Court Reschedule the Hearing on the Motion and Grant Him the Opportunity to Obtain Discovery into the Agreement.

Mark S. prepared this objection without the benefit of discovery. To the extent the Court believes additional information is necessary to rule on his objections, Mark S. requests that the Court reschedule the hearing on the motion and grant him the opportunity to conduct discovery regarding the Agreement.

### CONCLUSION

The Agreement does not satisfy Rule 23(a)(4)'s adequacy requirement and, otherwise, is not fair, reasonable and adequate. Moreover, the Notice Plan is deficient and does not accord with Due Process. Accordingly, Mark S. respectfully requests that the Court deny the motion and reject the proposed Agreement or, alternatively, that the Court reschedule the hearing date on the motion and grant Mark S. the opportunity to conduct discovery.

---

[15] In stating that TikTok had a counsel-shopping strategy, neither Mark S. nor his counsel are contending that Plaintiffs' counsel were partners to the strategy. Mark S.'s counsel is co-counsel with Ms. Carroll's firm in numerous BIPA cases throughout the country, including in a case in front of Judge Kocoras.

## **CERTIFICATE OF SERVICE**

I, Scott R. Drury, an attorney, hereby certify that, on March 1, 2021, I filed the foregoing document using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Scott R. Drury
*One of the attorneys for Mark S.*