# EXHIBIT 9

1

2

3

4          UNITED STATES DISTRICT COURT

5          NORTHERN DISTRICT OF CALIFORNIA

6

7    IN RE FACEBOOK BIOMETRIC                Case No.  15-cv-03747-JD
     INFORMATION PRIVACY LITIGATION
8
                                             **ORDER RE FINAL APPROVAL,**
9                                            **ATTORNEYS' FEES AND COSTS,**
                                             **AND INCENTIVE AWARDS**
10
                                             Re: Dkt. Nos. 499, 517
11

12          By any measure, the $650 million settlement in this biometric privacy class action is a

13   landmark result.  It is one the largest settlements ever for a privacy violation, and it will put at

14   least $345 into the hands of every class member interested in being compensated.  At the Court's

15   request, the parties jointly developed an innovative notice and claims procedure that generated an

16   impressive claims rate.  The settlement attracted widespread support from the class, and drew only

17   three objections out of millions of class members.

18          All of this was achieved in the context of a new and untested statute, the Illinois Biometric

19   Information Privacy Act (BIPA), 740 Ill. Comp. Stat. 14/1 *et seq*. (2008).  The case raised several

20   complicated and intensely litigated issues, including the question of whether a statutory privacy

21   injury was sufficiently "real" and concrete to establish an injury in fact for standing under

22   Article III and the BIPA.  The Court determined that it was, and two other courts -- the Illinois

23   Supreme Court and the Ninth Circuit -- reached the same conclusion.  The standing issue makes

24   this settlement all the more valuable because Facebook and other big tech companies continue to

25   fight the proposition that a statutory privacy violation is a genuine harm.  In a pending Supreme

26   Court case about the Fair Credit Reporting Act, which is unrelated to this action, Facebook,

27   Google, and eBay filed an amicus brief that points to this settlement and asks the Court to reverse

28   the "mistaken holding" that a statutory privacy violation is an actual injury.  *See* Brief for Amici

Curiae eBay, Inc. *et al*. Supporting Petitioner at 4, *Trans Union LLC v. Ramirez*, No. 20-297 (U.S. Feb. 8, 2021). This underscores the considerable legal risks both sides would have faced had this case continued on.

Overall, the settlement is a major win for consumers in the hotly contested area of digital privacy. Final approval of the class action settlement is granted. Attorneys' fees and costs, and incentive awards to the named plaintiffs, are also granted, although in lesser amounts than requested.

## BACKGROUND

This case has traveled a long and winding road since it was filed in 2015, and the Court focuses here on the key events most pertinent to final approval and the fees award. A heavily litigated class certification motion was resolved in favor of certification of a class of Facebook users located in Illinois for whom Facebook created and stored a face template after June 7, 2011. Dkt. No. 333 at 15. The certified class, which is also the class for the settlement, Dkt. No. 468, Ex. A at 5-6 (¶ 1.7), challenged Facebook's "Tag Suggestions" program, which looks for and identifies people's faces in photographs uploaded to Facebook to promote user tagging. The class members alleged that Facebook collected and stored their biometric data -- namely digital scans of their faces -- without prior notice or consent, thereby violating Sections 15(a) and 15(b) of the BIPA, 740 Ill. Comp. Stat. 14/15(a)-(b).

After substantial briefing and argument, the Court concluded that a violation of the BIPA was enough to establish an injury in fact for purposes of Article III standing. *See* Dkt. No. 294. This was not the only serious disagreement between the parties in the early stage of the case. A significant battle was also fought over a choice-of-law provision in Facebook's user agreements, and whether California law applied to the exclusion of a claim under the BIPA, as Facebook argued. The Court held an evidentiary hearing to help resolve that dispute, and concluded that Illinois law applied. *See* Dkt. No. 120. But the injury-in-fact issue stands out both because it was a threshold issue for the litigation as a whole, and because it became a central issue in Facebook's discretionary appeal to the Ninth Circuit of the Court's certification of the class. *See* Dkt. Nos. 406, 416. The circuit court affirmed the Court's conclusions about standing and certification.

Dkt. No. 416. The Supreme Court denied Facebook's petition for certiorari. Dkt. No. 426. While these events were unfolding in federal court, the Illinois Supreme Court published a decision in another BIPA case that cited and adopted the Court's construction of the statute on the question of who counts as an "aggrieved" person with a right of action under the statute. *See Rosenbach v. Six Flags Entm't Corp*., 129 N.E.3d 1197 (Ill. 2019).

The settlement of the case was its own long chapter in this litigation. Three days before a trial setting conference, the parties advised that a settlement in principle had been reached. Dkt. No. 427. The Court denied preliminary approval of the initial settlement proposal over concerns about the discount on statutory damages under the BIPA, a conduct remedy that did not appear to require meaningful changes by Facebook, over-broad releases by the class, and the form of notice to class members. Dkt. No. 456.

The parties responded substantively to the Court's concerns. After another round of negotiations, they revised the proposed settlement in several significant ways. To start, Facebook agreed to increase its settlement payment by $100 million, which brought the total amount of the non-reversionary common fund to $650 million. The settlement administration expenses, taxes, and class representative incentive awards and attorney's fees and costs will be paid from this fund, and the balance will be distributed on a pro rata basis to each class member who submits a valid claim. Dkt. No. 468, Ex. A at 10 (¶ 1.31). The parties also clarified the changes that Facebook will implement. For all users who have not affirmatively opted in or consented to biometric scans, Facebook will set its "Face Recognition" default user setting to "off," and it will delete all existing and stored face templates for class members unless Facebook obtains a class member's express consent after a separate disclosure about how Facebook will use the face templates. *Id*. at 13-14 (¶ 2.9). It will also delete the face templates of any class members who have had no activity on Facebook for three years. *Id*. at 14 (¶ 2.9(c)). At the preliminary approval hearing, Facebook's product manager for the Face Recognition program stated under oath that this change to the Face Recognition default setting to "opt in" would be not just in Illinois or the United States, but "global." Dkt. No. 470 at 10:11-17.

3

United States District Court
Northern District of California

For the notice and claims procedures, the parties maximized outreach to class members by leveraging Facebook's direct access to users and using other internet channels. Facebook advised the Court that it would deploy "the most aggressive methods that we use to reach users in the ways that we best can at Facebook," and the Court further encouraged the parties to optimize outreach by consulting a behavioral economist or psychologist to provide expert advice on techniques. Dkt. No. 470 at 19:19-21; 25:13-25. The claim form was easy to complete online or by mail, and required only basic information about class members' Facebook accounts, and in the event their email address was not found in Facebook's records, the class member's "approximate dates and addresses where you lived in Illinois" for at least 6 months during the class period. *See* Dkt. No. 468, Ex. A (Ex. A). Class members had their choice of four payment options: paper check, Zelle, PayPal, or direct deposit. *Id*. These measures generated a claims rate of approximately 22%, a result that vastly exceeds the rate of 4-9% that is typical for consumer class actions. *See* Fed. Trade Comm'n, *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns* 11 (2019) ("Across all cases in our sample requiring a claims process, the median calculated claims rate was 9%, and the weighted mean (*i.e.*, cases weighted by the number of notice recipients) was 4%.").

The scope of the release was revised to limit it to the boundaries of this litigation. Class members who did not opt out will release Facebook, Inc., Face.com, and their associated entities, from known or unknown claims "arising from or related to plaintiffs' allegations regarding the alleged collection, storage, or dissemination of biometric data related to facial recognition technology from Facebook users located in Illinois, including all claims and issues that were litigated in the action or that could have been brought in the Action and claims for any violation of the Illinois Biometric Information Privacy Act ('BIPA') or other Illinois statutory or common law related to facial recognition." Dkt. No. 468, Ex. A at 8 (¶¶ 1.25, 1.26). Put more simply, the class is releasing only the claims that were or could have been litigated here. In addition, in response to a concern on the Court's part, the release now excludes Facebook's affiliated entities Instagram, Inc., WhatsApp Inc., and Oculus VR Inc., which were included originally even though they did

4

not use the Tag Suggestions feature. *See id*. at 8 (¶ 1.26). Claims may be pursued against those companies under the BIPA irrespective of this settlement.

Based on these and other substantive revisions, the Court granted preliminary approval of the settlement. Dkt. No. 474. An unusual development ensued. A law firm that hitherto had played no role whatsoever in this case posted a misleading online solicitation about the settlement. *See* Dkt. No. 477. The post deceptively invited people to "sign up for a claim" when the law firm actually was trying to recruit opt-outs. The parties brought the problem to the Court's attention, and the Court held a hearing on the matter at which the law firm appeared and participated. Dkt. No. 486. The law firm agreed to take down the posts and to send a curative notice to approximately 3,724 class members who had responded to the misleading solicitation. Dkt. No. 494. This appears to have fully corrected the situation, and there is no evidence of any residual issues.

As the notice and claims procedures unfolded, the parties kept the Court apprised of progress with regular status reports. *See* Dkt. Nos. 475, 476, 492, 496, 501, 503, and 506. The claims period ended on November 23, 2020.

This order resolves plaintiffs' motion for final approval, and motion for fees, expenses, and costs. Dkt. Nos. 499, 517. It also addresses and overrules three objections filed by four objectors. *See* Dkt. Nos. 497 (objection of Kevin C. Williams), 504 (objection of Dawn Frankfother and Cathy Flanagan), 519 (objection of Kara Ross). Objectors Frankfother and Flanagan also filed an opposition to plaintiffs' motion for final approval. Dkt. No. 518.

The Court has carefully reviewed all of the voluminous filings with respect to final approval and fees, which include expert declarations, letters from class members, and other materials. On January 14, 2021, the Court held a lengthy final approval hearing. Dkt. No. 530. The hearing featured arguments by the parties, the objectors Frankfother, Flanagan, and Ross, who appeared through their counsel, as well as remarks by the class's expert, Professor William B. Rubenstein of Harvard Law School. *Id*.

United States District Court
Northern District of California

5

**DISCUSSION**

**I.      FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

   **A.      Legal Standards and Choice of Law**

   Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, the claims of a certified class may be settled only with the Court's approval. Rule 23(e) outlines the procedures that apply to the proposed class settlement, including the requirement to direct notice in a reasonable manner to all class members who would be bound by the proposal. Fed. R. Civ. P. 23(e)(1).

   Under Rule 23(e)(2), the Court may approve a proposal that would bind class members "only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

   (A) the class representatives and class counsel have adequately represented the class;

   (B) the proposal was negotiated at arm's length;

   (C) the relief provided for the class is adequate, taking into account:

       (i) the costs, risks, and delay of trial and appeal;

       (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

       (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

       (iv) any agreement required to be identified under Rule 23(e)(3); and

   (D) the proposal treats class members equitably relative to each other."

Fed. R. Civ. P. 23(e)(2).[1]

   In addition, our circuit has held that "[t]he factors in a court's fairness assessment will naturally vary from case to case, but courts generally must weigh: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of

---

[1] This amended version of Rule 23(e)(2) went into effect on December 1, 2018. The Court finds it just and practicable to apply it to this case, which was filed in 2015, especially given that plaintiffs referenced this version of the Rule in their final approval motion, Dkt. No. 517 at 8, and no party or class member has expressed any concerns about it.

United States District Court
Northern District of California

counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." *In re Bluetooth Headset Products Liability Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).

Although this case was transferred here from the Northern District of Illinois and involved an Illinois state statute, the Court follows the Ninth Circuit on final approval of the settlement, and not the Seventh Circuit, as objectors Frankfother and Flanagan suggest. *See* Dkt. No. 518 at 4-6. Final approval under Federal Rule of Civil Procedure Rule 23 is a federal issue governed by the precedent in the transferee court. *Newton v. Thomason*, 22 F.3d 1455, 1460 (9th Cir. 1994).

### B. The Rule 23(e) Factors

#### 1. Notice

In the course of denying the original proposed settlement, the Court challenged the parties to come up with forms of notice that fit the reality of our online lives. The old methods of U.S. Mail and a print ad were not going to cut it in 2020. The parties rose to the occasion and proposed an array of innovative ways to reach class members. These included notice via direct email, Facebook's "jewel" and newsfeed notifications, publication in the leading Illinois newspapers, a dedicated settlement website, and an internet ad campaign on non-Facebook platforms. *See* Dkt. No. 474 at 6; Dkt. No. 468, Ex. A at 15 (¶ 4.2).

These were robust measures, and they paid off in spades. The settlement administrator, Gilardi & Co., sent initial notices by email to 15,372,960 addresses, which were associated with 12,340,049 accounts. Dkt. No. 517-1 ¶ 7. In this initial batch, 10,295,502 notices were successfully delivered to at least one of the email addresses linked to an account. *Id.* ¶ 9. When counsel discovered around 5.7 million emails on Gmail had been routed to users' spam folders, they worked directly with Google to fix the problem, which resulted in a 99.9% delivery success rate outside the spam folders. Dkt. No. 517 at 4; Dkt. No. 492; Dkt. No. 517-1 ¶¶ 10-11. A reminder email notice was also sent to 12,888,208 addresses in the class list, of which 9,956,299 were successfully delivered. Dkt. No. 517-1 ¶¶ 12-13.

A summary notice approved by the Court was published in the September 23, 2020 editions of the *Chicago Tribune* and *Chicago Sun-Times*. Dkt. No. 517-1 ¶ 15. Almost 28 million

1    impressions advertising the settlement were delivered through the Google Display Network. *Id.*

2    ¶ 16.  A website was established at www.facebookbipaclassaction.com, which, as of December 1,

3    2020, had received 6,230,922 visits. *Id.* ¶ 17.  A toll-free telephone number was also set up, which

4    logged a total of 5,063 calls as of the same date. *Id.* ¶ 18.

5           For the jewel and newsfeed notices on the Facebook platform, a Facebook software

6    engineer submitted a declaration stating that the total number of impressions to unique users

7    delivered as of December 3, 2020, was 9,124,351. Dkt. No. 512 ¶ 2.  The combined click-through

8    rate for the notices was 30.47%. *Id.* ¶ 3.

9           Overall, this was a thorough, effective, and far-reaching program for giving notice to the

10   class, which even one of the objectors has acknowledged. Dkt. No. 532 at 25:6-8 ("I think these

11   guys did a significantly better job than in most cases of actually getting notice out.").  Objector

12   Kara Ross's different views about the adequacy of notice, *see* Dkt. No. 519 at ECF p. 2, have been

13   withdrawn and would have been overruled for these reasons.[2]  The Court concludes that the notice

14   was extremely thorough and diligently given in a reasonable manner to all class members who

15   would be bound by the proposal. Fed. R. Civ. P. 23(e)(1).[3]

16          The Court appreciates that counsel acted on its suggestion at the preliminary approval

17   hearing and consulted with Professor Dan Ariely, professor of psychology and behavioral

18   economics at Duke University, "so as to maximize the likelihood that class members would file

19   claims." Dkt. No. 499-1 ¶ 134.  Based on Professor Ariely's advice about the "no-action bias,"

20   which is the "principle that people generally prefer to do nothing over something," class counsel

21   and Facebook "agreed to change the claim form flow so that class members who try to leave the

22   website without submitting a claim (i.e., 'do nothing') can't proceed without clicking a button

23   indicating their understanding that their share of the settlement would be distributed pro rata to

24   other class members (i.e., 'do something')." *Id.*

25   _____

26   [2] Class counsel has represented that objector Ross withdrew her objection as to the sufficiency of notice. *See* Dkt. No. 517 at 6.

27   [3] Gilardi & Co. also delivered notices to state and federal officials in compliance with the Class Action Fairness Act, 28 U.S.C. § 1715. *See* Dkt. No. 517-1 ¶¶ 2-6.

28

United States District Court
Northern District of California

### 2.    Adequacy of Class Representatives and Class Counsel

As stated in the class certification and preliminary approval orders, there is no serious question about the adequacy of the class representatives and class counsel.  Dkt. No. 474 at 4.  The Court's independent review validated both points.  Consequently, Nimesh Patel, Adam Pezen, and Carlo Licata were confirmed as class representatives, and Edelson PC, Robbins Geller Rudman & Dowd LLP, and Labaton Sucharow LLP were confirmed as class counsel.

Nothing has changed on either score.  If anything, more evidence has been adduced in favor of those appointments.  The Court has taken into account the comments at the final approval hearing by Facebook's lead attorney, who complimented the "willingness of very experienced counsel . . . to negotiate with me and my team in a way where we were able to look honestly collectively at the issues." Dkt. No. 532 at 65:14-17.  He also said that class counsel should be "applauded" and that they had a "skill level, just in the negotiation, itself." *Id*. at 65:20-66:1.  These and other facts in the record speak well of the professionalism both sides brought to this challenging litigation, particularly in its later stages.  The class representative and class counsel appointments remain in place and weigh in favor of final approval.

### 3.    Negotiation of Proposal at Arm's Length

The parties engaged in several rounds of mediation with respected neutrals, including a retired judge, a magistrate judge, and a former United States Ambassador who is also an attorney.  The settlement agreement does not contain a "clear sailing" provision, and all indicia point to a finding that the proposed settlement was the product of serious, informed, and noncollusive negotiations.  This factor supports final approval.

### 4.    Adequacy of Relief Provided for the Class

For obvious reasons, the adequacy of relief provided for the class typically is the make-or-break factor in the final approval of a class settlement.  The Court devoted substantial attention to it in denying preliminary approval to the original settlement proposal, and it is the factor that the pending objections focus on.

In evaluating the adequacy of relief under Rule 23(e)(2)(C), the Court considers the costs, risks, and delay of trial and appeal; the effectiveness of the proposed method of distributing relief

1  to the class; the terms of any proposed award of attorney's fees, including timing of payment; and

2  any agreement required to be identified under Rule 23(e)(3). Several of the factors discussed in

3  the *Churchill Village* case overlap with the Rule 23(e)(2)(C) subfactors, and also go to evaluating

4  the adequacy of relief for the class. These include the strength of plaintiff's case; the risks,

5  expense, complexity, and likely duration of further litigation; the risks of maintaining class action

6  status throughout the trial; the amount offered in settlement; the extent of discovery completed and

7  stage of proceedings; and the presence or nonpresence of a governmental participant. *Churchill*

8  *Vill.*, 361 F.3d at 575.

9        Our circuit has acknowledged that judging the adequacy of the payout to the class under

10  these factors is "an amalgam of delicate balancing, gross approximations and rough justice."

11  *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (quotations omitted). The

12  Court declines the objectors' invitation to adopt the Seventh Circuit's approach of basing the

13  evaluation on probabilities expressed in specific percentages. *See* Dkt. 518 at 4-6. That is not the

14  law of our circuit, which "put[s] a good deal of stock in the product of an arms-length, non-

15  collusive, negotiated resolution, and ha[s] never prescribed a particular formula by which that

16  outcome must be tested." *Rodriguez*, 563 F.3d at 965 (citations omitted). It can also cloak the

17  adequacy analysis in a robe of pseudo-science. All good trial lawyers and judges know that it is a

18  fool's errand to predict a jury verdict. Consequently, it makes little sense to say a payout to class

19  members is adequate or not because there is a 5% or 65% chance of success at trial. Those

20  percentages create a false sense of analytical rigor about an outcome that is unknowable until the

21  jury foreperson signs the verdict form.

22        What matters is a realistic assessment of the overall risks and rewards of a trial in the

23  context of each specific case. The record here leaves no doubt that the class would face

24  substantial hurdles to prevailing at trial, and if successful, preserving the verdict on appeal. These

25  hurdles include genuine disputes of fact about: (1) the geographic location of Facebook's servers

26  vis-à-vis its Illinois users, and whether servers located outside the state were within the purview of

27  the BIPA; (2) whether Facebook's facial recognition technology collects a "scan" of "face

28  geometry" as required under BIPA, 740 Ill. Comp. Stat. 14/10, or used photographs, which are

United States District Court
Northern District of California

expressly excluded as a basis for liability in the BIPA, *id.*; (3) whether Facebook obtained user consent for collection and storage of the scans; and (4) whether Facebook had a good-faith belief that its actions were permissible under the BIPA such that a finding of a reckless or even negligent violation would not be possible. These would be major factual disputes for the jury to decide on the basis of highly contested evidence. The Court has denied summary judgment for that very reason. *See* Dkt. No. 372. There is also the ongoing legal dispute over standing, which Facebook and other tech companies continue to press in other cases, including the FCRA case pending before the Supreme Court.

Taken as a whole, these risks amply justify a settlement payout of at least $345 per claimant. To be sure, this is less than the full statutory rate available under the BIPA. For a "prevailing party," the BIPA provides for "liquidated damages" of (1) $1,000 or actual damages, whichever is greater, against an entity that "negligently" violated the statute; and (2) $5,000 or actual damages, whichever is greater, against an entity that "intentionally or recklessly" violated the statute. 740 Ill. Comp. Stat. 14/20(1)-(2). But simply pointing out, as objectors do, that the $650 million settlement amount is less than the theoretical possibility of billions of dollars were the class to hit a home run at trial is not illuminating. *See* Dkt. No. 518 at 5. The objectors did not meaningfully account for the factual disputes that the jury would be called upon to decide, or for the threat of a change in the law of standing. An adverse determination on any of these disputed issues would defeat any recovery under the BIPA. And because the objectors did not meaningfully engage with these challenges, they did not propose any rational estimates of the probabilities of success at trial that were grounded in the facts of this case.

Rather than doing that work, the objectors randomly pick various percentages of success at trial as purported measures of adequacy. They "believe," for example, that it's reasonable to assume at least a 15% likelihood that the class would win at trial, which they say implies a "total litigation value" of approximately $1.88 billion. *See id.* at 5-6. This comment is striking mainly for its lack of any connection to the issues and record in this case. The objectors made no effort to tie it and similar remarks to the disputes that would actually go to trial. In effect, the 15% is just a number pulled out of thin air. The objectors try to dress it up a bit saying it is based on "Seventh

11

1   Circuit standards," *id.*, but even assuming that might be accurate, it does not change their straw

2   into gold, particularly under the standards of our circuit. The objectors also overlook the strong

3   likelihood that a complicated class action case with a 15% chance of success would never see a

4   jury. Few if any lawyers would spend their time and money on a long trial in the face of an 85%

5   probability of losing.

6           Consequently, the objectors' complaint that the settlement leaves a pot of money on the

7   table is entirely unpersuasive. While that is enough to put the objections to rest, it is also worth

8   noting that a multi-billion dollar verdict could create its own major risk for the class. A number of

9   courts have commented on the potential for a due process problem when statutory damages are

10  pursued by a large class, such as the one here. The resulting damages could be so large as to

11  constitute a severe penalty out of all proportion to the harm the legislature sought to redress, or

12  that the class members suffered. *See Parker v. Time Warner Ent. Co., L.P.*, 331 F.3d 13, 21-23

13  (2d Cir. 2003); *see also Kline v. Coldwell Banker & Co.*, 508 F.2d 226, 234 (9th Cir. 1974)

14  (noting in *dicta* that allowing thousands of class members to recover full statutory damages under

15  the Truth in Lending Act would result in "outrageous amounts" and be an "absurd and stultifying"

16  result beyond the goal of the statute) (quotation omitted). Some courts have denied class

17  certification for that reason. *See, e.g., Ratner v. Chemical Bank New York Trust Co.,* 54 F.R.D.

18  412 (S.D.N.Y. 1972). That is a dubious outcome for many reasons, not least because it perversely

19  insulates wrongful conduct from liability just for being widespread, but other solutions are also

20  fraught with doubts. A concurrence in *Parker* suggests that statutory damages clauses simply

21  should "not . . . be applied according to their literal terms when doing so achieves a result

22  manifestly not intended by the legislature." *Parker*, 331 F.3d at 27 (Newman, J., concurring).

23  The problem, as the concurrence acknowledges, is that "this approach cannot be reconciled with

24  the terms of the statute," which "for some . . . would be an insuperable obstacle." *Id.*

25          This sticky issue need not be resolved here because the class has been certified and the

26  $650 million settlement amount is fair, reasonable, and consistent with the Illinois Legislature's

27  intent in the BIPA. The issue bears mention mainly because it further underscores the holes in the

28  objectors' comments. The objectors demand that the class risk everything at trial for the

United States District Court
Northern District of California

uncertainty of a multi-billion dollar recovery, but offer no good analysis of why that would not create a due process problem. They make a cursory comment in a footnote that they "do not believe" a verdict of $5 billion would be an issue, *see* Dkt. No. 518 at 6 n.8, but what that arbitrary number is based on and why it is not a due process trigger are again left insufficiently explained. Contrary to the objectors' intuitions, an argument can be made that the Illinois legislature did not intend the BIPA to be the basis of such a massive damages award.

Turning to the actual payouts to the class, the proposed method of distributing payments is straightforward and effective. Class members had only to fill out a simple claim form, online or in hard copy, and choose their preferred form of payment among several online options or by a check. Dkt. No. 517 at 19. The award of attorney's fees is discussed in the next section, but neither the amount nor timing of payment will take away from the adequacy of the relief provided to the class. The Court is not aware of any agreements in this case that were required to be identified under Rule 23(e)(3).

For the non-overlapping *Churchill Village* factors, there was always a risk that a class could be decertified at any time. The circuit court highlighted this possibility in the order affirming certification. Dkt. No. 416 at 23. The amount offered in settlement, $650,000,000.00, is substantial by any measure. The case was on the cusp of trial and so was fully developed, and counsel on both sides had a mature understanding of the issues and risks on both sides. And unlike in many other cases, here there was no governmental participant, and the class was acting more as private attorney generals blazing a trail in uncharted territory.

The objections about a certain degree of fuzziness at the margins of the class size, *see* Dkt. No. 518, are of no moment. Populating the class to reasonably ensure it was limited to the Illinois residents covered by the BIPA was not an easy task in light of the server location issues and related concerns. The parties developed a sound methodology that fairly balanced the need to define the class against due process problems of being over- or under-inclusive. The objectors have not shown otherwise, or that the size of the class bars final approval. Facebook has previously acknowledged that it "does not possess data that would allow it to precisely determine the number of people actually in the class, but it provided to plaintiffs' counsel a variety of data

13

and associated analysis that support an alternative estimate in the range of 6.9 million." Dkt. No. 447 at 12 n.9. This number was an alternative to the approximately 9.4 million potential class members who appeared on the class notice list. But this $650 million settlement is a good settlement, whether at 6.9 million class members or 9.4 million. Moreover, using a possibly overbroad class notice list was the right decision in the class's favor and should not be used as a factor that counts against final approval.

### 5. Proposed Treatment of Class Members Relative to Each Other

Other than the incentive awards issue which is discussed below, there are no proposals to treat any class member differently from any other. Each class member who has submitted a valid claim will receive a pro rata share of the common fund, less court-approved fees, expenses and other payouts. This factor weighs in favor of final approval.

### 6. Reaction of the Class and Requests for Exclusion

The reaction of the class to this proposed settlement has been extraordinarily positive. As of December 14, 2020, 1,571,608 claim forms had been timely filed. Dkt. No. 517-1 ¶ 19. Using a class size of 6.9 million, this amounts to a claims rate of around 22%. In the Court's experience, this should not be, but is, an unprecedentedly positive reaction by the class. Moreover, there were only 109 opt-outs and three objections. This is an extremely positive response and this factor weighs in favor of final approval. The 109 opt-outs will be ordered excluded from the settlement.

### C. Conclusion re Final Approval

Final approval of the proposed class action settlement is granted.

## II. ATTORNEYS' FEES

### A. Legal Standards and Choice of Law

Pursuant to Rule 23(h) of the Federal Rules of Civil Procedure, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Although the usual "American Rule" provides that courts "generally are without discretion to award attorneys' fees to a prevailing plaintiff," exceptions to this rule exist, including for when "fee-shifting is expressly authorized by the governing statute" or "the successful litigants have created a common fund for recovery or extended a substantial

benefit to a class." *In re Bluetooth*, 654 F.3d at 941 (quotations and citations omitted). "The award of attorneys' fees in a class action settlement is often justified by the common fund or statutory fee-shifting exceptions to the American Rule, and sometimes by both." *Id.*

When awarding fees in a common fund case like this one, the guiding principle is "the equitable notion that those who benefit from the creation of the fund should share the wealth with lawyers whose skill and effort helped create it." *In re Washington Public Power Supply System Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994). To that end, the Court has "discretion to employ either the lodestar method or the percentage-of-recovery method." *In re Bluetooth*, 654 F.3d at 942. "Because the benefit to the class is easily quantified in common-fund settlements, [the circuit has] allowed courts to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar." *Id.* The choice between lodestar and percentage calculation depends on the circumstances, and "in common fund cases, [there is] no presumption in favor of either the percentage or the lodestar method." *In re Washington Public Power Supply*, 19 F.3d at 1296.

"As always, when determining attorneys' fees, the district court should be guided by the fundamental principle that fee awards out of common funds be '*reasonable under the circumstances*.'" *Id*. (quotation omitted; emphasis in original). "Common fund fees are essentially an equitable substitute for private fee agreements where a class benefits from an attorney's work." *Staton v. Boeing Co.*, 327 F.3d 938, 968 (9th Cir. 2003). "At the fee-setting stage when fees are to come out of the settlement fund, the district court has a fiduciary role for the class." *Rodriguez*, 563 F.3d at 968. In that role, the district court must "act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) (quotations omitted).

The attorneys' fees issue is a matter of federal law arising under Rule 23(h), and it is again appropriate to apply the law of the Ninth Circuit under *Newton*, 22 F.3d at 1460. The objectors made a few mild comments about this proposition but did not genuinely quarrel with it. *See* Dkt. No. 532 at 63:25-64:3 (objectors' counsel stating, "[O]n federal issues, you know, the Northern

United States District Court
Northern District of California

15

District of California will apply Ninth Circuit law.  And a fee request is arguably a federal issue under 23(h)."); *see also* Dkt. No. 521 at 5 (class counsel stating that this "appears to be an issue of federal law," and "the resolution of the fee petition arguably presents a federal question to which this Court must apply Ninth Circuit law.").  This is not an occasion to turn to the Seventh Circuit, and the Court need not decide whether Illinois state law might apply.  Class counsel stated that "the differences between the law of Illinois and of the Ninth Circuit on this matter are immaterial," Dkt. No. 521 at 6, and neither Facebook nor the objectors have disagreed.  Consequently, the Court applies the law of the Ninth Circuit to the question of attorney's fees, and makes the following findings of fact and conclusions of law as required by Rules 23(h)(3) and 52(a).

### B.    Findings of Fact and Conclusions of Law

Class counsel request an attorneys' fee award of $110 million.  Dkt. No. 499.  Counsel frame this amount as either 20% of the "original $550 million" only (*i.e.*, common fund amount from the previous version of the settlement which the Court rejected) and nothing from the additional $100 million that was added, or "16.9% of the total [current] Settlement Fund" of $650 million.  *Id*. at 1.  The Court agrees with the class's expert, Professor William B. Rubenstein, that the better course is not "to ignore the additional $100 million the class will receive," Dkt. No. 499-3 at 1 n.2, and so the Court will stick with the conceptualization of the requested award as 16.9% of the $650 million common fund.

The lawyers for the class say that the percentage method is preferred in cases where there is a cash-based common fund, as there is here, and they point out that their requested 16.9% is within the 25% "benchmark" typically applied in common fund cases.  Dkt. No. 499 at 8-9.  But the question is whether this is a typical case that might warrant the application of a 25% contingency fee as a benchmark.  The $650 million size of the fund indicates that it is not.  *See In re Washington Public Power Supply,* 19 F.3d at 1297 (noting for a $687 million common fund that "the 25 percent 'benchmark' is of little assistance in a case such as this."); *see also In re Optical Disk Drive Products Antitrust Litig.*, 959 F.3d 922, 931 (9th Cir. 2020) ("we have said a twenty-five percent benchmark may be 'of little assistance' in megafund cases").  "[W]here awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the hours spent on

16

the case, courts should adjust the benchmark percentage or employ the lodestar method instead." *In re Bluetooth*, 654 F.3d at 942.

That is the situation here. To be clear, the Court recognizes the skill, dedication, and hard work class counsel brought to this case and their clients. The fact that the Court cannot in good conscience award fees on the presumption of a 25% contingency cut should not be read as detracting from that in any way. It is simply a matter of fairness and proportion. A 25% presumption is too big to be applied to common funds as large as this one. The lawyers will be well paid, and no one could rationally say otherwise about the award the Court makes below, but the starting point of the analysis should not be the equivalent of a Willy Wonka golden ticket.

Turning to the basics, class counsel states, and the Court finds, that they spent 30,103.80 hours on the case. Dkt. No. 528. This consists of 9,577.30 hours spent on the litigation by the Robbins Geller firm; 8,103.40 hours spent by the Labaton Sucharow firm; and 12,423.10 hours spent by Edelson PC. Dkt. Nos. 499-4, 499-5, 499-6. These hours have been adequately documented and detailed to the Court by timekeeper, category of work, and number of hours, and the Court finds that these hours were expended as represented and that they were reasonable.

The problem is that for the 30,103.80 hours spent on this case, the requested 16.9% award of $110 million would indeed yield "windfall profits for class counsel in light of the hours spent on the case." *In re Bluetooth*, 654 F.3d at 942. That would equate to an hourly billing rate of $3,654 per hour, which is not reasonable by any measure. The task for the Court is to adjust the contingency percentage in a reasoned and reasonable manner. *Id*.

Our circuit has "identified several factors courts may consider when assessing requests for attorneys' fees calculated pursuant to the percentage-of-recovery method: (1) the extent to which class counsel achieved exceptional results for the class; (2) whether the case was risky for class counsel; (3) whether counsel's performance generated benefits beyond the cash settlement fund; (4) the market rate for the particular field of law; (5) the burdens class counsel experienced while litigating the case; and (6) whether the case was handled on a contingency basis." *In re Optical Disk Drive*, 959 F.3d at 930 (citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002)). This is not "an exhaustive list of factors for assessing fee requests calculated using the

17

percentage-of-recovery method." *Id*. "Ultimately, district courts must ensure their fee awards are 'supported by findings that take into account all of the circumstances of the case.'" *Id*.

On these factors, the Court has no trouble finding that class counsel achieved an excellent result for the class. The $650 million paid by Facebook is real money by any standard, and sets a new high bar for privacy-related settlements. Even so, "the large size of the settlement fund obtained by Class Counsel relative to recoveries in other cases does not, *ipso facto*, mean that it is an extraordinary result." *In re Washington Public Power Supply*, 19 F.3d at 1303. Rather, the large size of the recovery has more to do with the large size of the class. *See In re Optical Disk Drive*, 959 F.3d at 933 ("in many instances the increase in recovery is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.") (quotations omitted). The results here were excellent, particularly in light of how hard fought this case was and the substantial factual disputes that remained for trial, but they were not a total home run bar none for attorney's fees purposes. This is of course a different inquiry from the benefit-to-the-class analysis for final approval. *See In re Bluetooth*, 654 F.3d at 944.

With respect to the considerations set out by the circuit in *Vizcaino*, 290 F.3d 1043, the market rate factor is particularly useful here. *Vizcaino* determined that in "most cases it may be more appropriate to examine lawyers' reasonable expectations, which are based on the circumstances of the case and the range of fee awards out of common funds of comparable size." 290 F.3d at 1050. The *Vizcaino* court attached as an appendix a table of percentage-based attorneys' fee awards in common fund cases of a similar size. Similar evidence is available in this case. The class's expert, Professor Rubenstein stated that "[e]mpirical research demonstrates that percentage awards tend to decrease as the size of the fund increases." Dkt. No. 499-3 at 21. While "pinning down percentage awards for this level of settlement is more difficult given that relatively few settlements reach this magnitude," he cited one study that "found that the mean award in the top tranche (settlements over $175.5 million) was 12%"; another study reflected a mean award of 12.9% in settlements in the $500 million to $1 billion range. *Id*. In Professor Rubenstein's own dataset, "there are 11 similarly sized settlements ($400-$800 million), with the

18

1 average percentage award across 10 of these settlements being 16.0% and the percentage award in

2 the median case of the 10 being 15.5%." *Id*. at 21-22.

3       This data from class counsel's own expert supports the Court's finding that 15.0% rather

4 than 16.9% is a more reasonable percentage of the $650 million common fund for the contingency

5 award. 15% is just slightly less than the average (16.0%) and median (15.5%) percentages found

6 in Professor Rubenstein's dataset of similarly sized settlements, and it is meaningfully higher than

7 the 12% and 12.9% means found in the studies he cited. And a 15% rate yields an award of

8 $97,500,000, a very sizeable sum. That is a sum that would have been in line with the lawyers'

9 reasonable expectations, and it is also what the Court finds to be a reasonable award in light of all

10 of the circumstances of this case and this settlement.

11       A lodestar cross check confirms that this amount is more reasonable than the one requested

12 by class counsel. The lodestar figure is "calculated by multiplying the number of hours the

13 prevailing party reasonably expended on the litigation (as supported by adequate documentation)

14 by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*,

15 654 F.3d at 941. Although the lodestar figure is "presumptively reasonable," the court may

16 "adjust it upward or downward by an appropriate positive or negative multiplier reflecting a host

17 of 'reasonableness' factors, 'including the quality of representation, the benefit obtained for the

18 class, the complexity and novelty of the issues presented, and the risk of nonpayment.'" *Id*. at

19 941-42. "Foremost among these considerations . . . is the benefit obtained for the class." *Id*.

20       Class counsel's lodestar in this case is $20,685,153.20, Dkt. No. 528, which consists of a

21 $7,165,427.75 lodestar from Robbins Geller, $5,140,083.00 lodestar from Labaton Sucharow, and

22 $8,379,642.50 lodestar from Edelson PC. The Court finds that the hourly rates used by the three

23 law firms for attorneys and staff were reasonable for the applicable localities and experience levels

24 of the timekeepers. Based on the $20,685,153.20 lodestar, the total fee amount requested, $110

25 million, would have resulted in a positive multiplier of 5.317. This is too high. While Professor

26 Rubenstein shows that "multipliers tend to rise as the size of the class's fund increases," his table

27 on "empirical data on multipliers in cases of comparable size" shows average multipliers between

28 2.39 and 4.50. Dkt. No. 499-3 at 38. Professor Rubenstein forthrightly acknowledges that "the

United States District Court
Northern District of California

multiplier sought here is higher than the average multiplier in cases with similar fund sizes." *Id*. And his table on empirical data on lodestar multipliers in all cases shows average multipliers in the range of 1.42 and 3.89. *Id*. at 37.

Reducing the fee here to $97,500,000, reduces the multiplier to 4.71. This is more in line with comparable settlements, still sufficiently and appropriately generous, and more reasonable in the circumstances here. The results obtained and the risks at trial warrant a higher-end multiplier of 4.71, but not more.

### C.    Conclusion re Attorneys' Fees

The Court will award $97.5 million in attorneys' fees to the three class counsel firms. 15% of the award will be held back pending further order, to be issued after counsel have filed the post-distribution accounting required by the District's Procedural Guidance on Class Action Settlements. Consequently, $82,875,000.00 is authorized for disbursement from the common fund upon entry of this order.

### III.    COSTS

Class counsel has also requested reimbursement of expenses in the amount of $915,454.37. Dkt. No. 499 at 26-27. These amounts were sufficiently documented and were for reasonable expenses incurred in the normal course of this litigation. The requested reimbursement is granted. The proposed settlement administrator's costs are also approved.

### IV.    INCENTIVE AWARDS

Class counsel has requested $7,500 incentive awards for each of the three named plaintiffs in this case. Objectors' arguments to the contrary, circuit authority permits the Court to order incentive awards. "Incentive awards are fairly typical in class action cases." *Rodriguez*, 563 F.3d at 958; *see also In re Online DVD-Rental Antitrust Litig*., 779 F.3d 934, 947-48 (9th Cir. 2015) (approving $5,000 incentive awards for each of nine class representatives as reasonable where litigation was "complicated" and "took up quite a bit of the class representatives' time").

Here, there are just three named plaintiffs who would be receiving incentive payments. The payments would be a miniscule proportion of the settlement amount, and the requested size of each payment is $7,500.

United States District Court
Northern District of California

It is true that this was a long-running litigation and each plaintiff was deposed at least twice. The named plaintiffs also each submitted declarations attesting to having spent 55-60 hours in service of this litigation. Dkt. Nos. 499-7; 499-8; 499-9. However, $7,500 is still too high, especially in comparison to the amount other class members will be receiving.

The Court will award $5,000 to each of the three named plaintiffs.

## CONCLUSION

Final approval of the class action settlement is granted. The 109 persons who opted out are ordered excluded from the settlement. *See* Dkt. No. 535, Addendum A.

Class counsel is awarded $97.5 million in attorneys' fees, with 15% of the award to be held back pending a further order, which will be issued after counsel have filed the post-distribution accounting required under our District's Procedural Guidance for Class Action Settlement settlements. *See* https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/. Payment of $82,875,000.00 is authorized now.

Class counsel is ordered reimbursed $915,454.37 for their litigation expenses. The settlement administrator is awarded costs in the amount of $1,828,009.89. The three named class representatives are each awarded $5,000 incentive payments.

The Court orders that the remaining settlement fund be distributed pro rata to claiming class members, consistent with the Settlement Agreement and as expeditiously as possible. The parties will comply with all other provisions of the Settlement Agreement, as well as the District's Procedural Guidance for Class Action Settlements.

All objections are overruled for the reasons discussed in this order and at the final approval hearing. The case will be closed, but counsel can and should file the post-distribution accounting document on the ECF docket when the time comes.

**IT IS SO ORDERED.**

Dated: February 26, 2021

JAMES DONATO
United States District Judge