# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE: TIKTOK, INC., CONSUMER PRIVACY LITIGATION, | MDL No. 2948 |
| | Master Docket No. 20-cv-4699 |
| | Judge John Z. Lee |
| | Magistrate Judge Sunil R. Harjani |
| This Document Relates to All Cases | |

## PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

# Table of Contents

I.     INTRODUCTION ................................................................................................ 1

II.    DISCUSSION .................................................................................................... 1

    A.    Minor Class Members were adequately represented by both
    proposed Class Representatives and counsel. ...................................................... 1

          1.    Minor Class Members are represented by proposed Class
          Representatives, those representatives' guardians, the Leadership
          Group, and the individual counsel retained by the minor Class
          Representatives. ................................................................................ 1

          2.    The objection regarding the need for separate representation of
          minor versus adult Class Members is without merit. ................................ 3

    B.    Plaintiffs' counsel made an exhaustive inquiry as to the strength of
    Plaintiffs' case—including the value of the claims—and the consequent
    fairness of the proposed Settlement. .................................................................... 7

          1.    The Leadership Group conducted an extensive analysis of the
          merits of each claim and of the case as a whole. ..................................... 8

          2.    Co-Lead Counsel's assessment made clear that the $92 million
          settlement (plus injunctive relief) is fair, reasonable, and adequate. ................. 11

          3.    The objectors offer nothing that warrants risking the Class's
          recovery in continued litigation. .......................................................... 21

    C.    In addition to direct email notice to more than 60 million email
    addresses and a Notice Plan designed to reach 95% of users several
    times—the parties will provide notice through TikTok's "Inbox" feature,
    subject to a Court order. ..................................................................................... 24

III.    CONCLUSION ................................................................................................ 25

# Table of Authorities

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997) ............................................................................................... 3, 5, 6

*Bower v. AT&T Mobility, LLC,*
    127 Cal. Rptr. 3d 569 (Ct. App. 2011) ................................................................... 17

*Brodsky v. Apple Inc.,*
    No. 19-CV-00712-LHK, 2019 WL 4141936 (N.D. Cal. Aug. 30, 2019) ................ 18

*C.M.D.,*
    621 Fed. Appx. 488, 2015 WL 6575724 ............................................................. 4, 12

*Cleary v. Philip Morris Inc.,*
    656 F.3d 511 (7th Cir. 2011) ................................................................................. 19

*Eichenberger v. ESPN, Inc.,*
    No. 14-463, 2015 U.S. Dist. LEXIS 157106 (W.D. Wash May 7, 2015) .............. 22

*Eichenberger v. ESPN, Inc.,*
    876 F.3d 979 (9th Cir. 2017) ................................................................................. 23

*Ellis v. Cartoon Network, Inc.,*
    803 F.3d 1251 (11th Cir. 2015) ........................................................................ 14, 15

*Entm't Am., LLC,*
    801 F.3d 1045 (9th Cir. 2015) ............................................................................... 16

*Facebook, Inc. v. Power Ventures, Inc.,*
    844 F.3d 1058 (9th Cir. 2016) ............................................................................... 18

*Fraley v. Batman,*
    638 F. App'x 594 (9th Cir. 2016) ........................................................................ 3, 4

*Gregory v. Albertson's, Inc.,*
    104 Cal. App. 4th 845, 128 Cal. Rptr. 2d 389 (2002) ............................................ 19

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) ............................................................................. 4, 5

*Hernandez v. Hillsides, Inc.,*
    47 Cal. 4th 272 (2009) ........................................................................................... 19

i

# Table of Authorities (cont.)

**Page(s)**

**Cases (cont.)**

*In re Facebook Biometric Info. Priv. Litig.*,
  No. 15-CV-03747-JD, 2020 WL 4818608 (N.D. Cal. Aug. 19, 2020) .................................... 22

*In re Google Android Consumer Privacy Litig.*,
  No. 11-MD-02264 JSW, 2013 U.S. Dist. LEXIS 42724 (N.D. Cal. Mar. 26, 2013) ............... 18

*In re Google Assistant Privacy Litig.*,
  457 F. Supp. 3d 797 (N.D. Cal. 2020) .................................................................................... 23

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
  988 F. Supp. 2d 434 (D. Del. 2013) ......................................................................................... 18

*In re Google, Inc. Privacy Policy Litig.*,
  58 F. Supp. 3d 968 (N.D. Cal. 2014) ....................................................................................... 19

*In re iPhone Application Litig.*,
  844 F. Supp. 2d 1040 (N.D. Cal. 2012) ................................................................................... 18

*In re LinkedIn User Privacy Litig.*,
  309 F.R.D. 573 (N.D. Cal. 2015) ............................................................................................. 20

*In re Netflix Privacy Litig.*,
  2013 U.S. Dist. LEXIS 37286 (N.D. Cal. March 18, 2013) .................................................... 22

*In re Nickelodeon Consumer Privacy Litig.*,
  827 F.3d 262 (3d Cir. 2016) ............................................................................................. 15, 16

*In re Online DVD—Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015) ..................................................................................................... 5

*In re Pork Antitrust Litig.*,
  Nos. 18-1776, 19-1578, 19-2723, 2020 U.S. Dist. LEXIS 191675 (D. Minn. Oct. 16, 2020). 19

*In re Sony PS3 "Other OS" Litig.*,
  2017 U.S. Dist. LEXIS 203402 ................................................................................................ 20

*Kwikset Corp. v. Superior Court*,
  51 Cal. 4th 310 (2011) ............................................................................................................. 17

*McDonald v. Kiloo A/S*,
  No. 17-cv-04344-JD, 2020 U.S. Dist. LEXIS 175865 (N.D. Cal. Sep. 24, 2020) .................. 20

# Table of Authorities (cont.)

**Page(s)**

**Cases (cont.)**

*Moreno v. S.F. Bay Area Rapid Transit Dist.*,
  No. 17-cv-02911-JSC, 2019 U.S. Dist. LEXIS 13309 (N.D. Cal. Jan. 28, 2019) ................... 20

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999) ...................................................................................................... 5, 6

*Petrovic v. Amoco Oil Co.*,
  200 F.3d 1140 (8th Cir. 1999) ............................................................................................ 5

*Reynolds v. Beneficial Nat'l Bank*,
  288 F.3d 277 (7th Cir. 2002) ............................................................................................ 21

*Sterk v. Redbox Automated Retail, LLC*,
  770 F.3d 618 (7th Cir. 2014) ............................................................................................ 16

*United States v. Nosal*,
  676 F.3d 854 (9th Cir. 2012) ............................................................................................ 18

*Williams v. Apple, Inc.*,
  No. 19-CV-04700-LHK, 2020 WL 1492718 (N.D. Cal. Mar. 27, 2020) ............................. 18

*Williams v. Facebook, Inc.*,
  384 F. Supp. 3d 1043 (N.D. Cal. 2018) ............................................................................. 17

**Statutes**

18 U.S.C. § 1030 ................................................................................................................... 11

18 U.S.C. § 1030(c)(4)(A)(i)(I) and (g) ................................................................................. 17

18 U.S.C. § 2710 ................................................................................................................... 11

18 U.S.C. § 2710(a)(4) .......................................................................................................... 15

18 U.S.C. § 2710(b)(1) .......................................................................................................... 15

18 U.S.C. § 2710(b)(2)(B) ..................................................................................................... 16

740 ILCS 14/1 ....................................................................................................................... 11

740 ILCS 14/15(b) ................................................................................................................. 13

740 ILCS 14/5, 14/10 ............................................................................................................ 13

## Table of Authorities (cont.)

**Page(s)**

**Statutes (cont.)**

Bus. & Prof. C. § 17200 .................................................................................................. 11

Bus. & Prof. C. § 17500 .................................................................................................. 11

Cal. Bus. & Prof. Code § 17204 ...................................................................................... 17

Cal. Pen. C. § 502 ........................................................................................................... 11

**Rules**

Fed. R. Civ. P. 23(c)(2)(B) ............................................................................................. 25

# I.     INTRODUCTION

At the March 2, 2021 hearing ("Hearing") regarding Plaintiffs' Motion for Preliminary Approval of the Settlement ("Motion," ECF No.122), the Court asked Co-Lead Counsel to provide supplemental briefing regarding three issues: (1) the representation of minor class members; (2) the process through which Co-Lead Counsel valued the claims; and (3) consideration of class notice by email and/or in-App[1] notifications.[2] *See* Hearing Transcript ("Transcript"), pp. 45-47.[3] Each of those topics is addressed below.

# II.     DISCUSSION

## A.  Minor Class Members were adequately represented by both proposed Class Representatives and counsel.

At the Hearing, the Court asked Co-Lead Counsel to address "the representation of the minor [class members], . . . the involvement of the guardians of the minors as part of the settlement, and the consideration that class counsel gave to those minors and the differences between them and the adult class members." Transcript, 45:21-46:1.

### 1.  Minor Class Members are represented by proposed Class Representatives, those representatives' guardians, the Leadership Group, and the individual counsel retained by the minor Class Representatives.

The interests of the minor Class members are adequately represented—both by counsel and by the proposed Class Representatives. As the Court recognized at the Hearing (Transcript,

---

[1] Unless otherwise noted, capitalized terms shall have the same meaning as set forth in the Settlement Agreement and Release ("Settlement Agreement") and Addendum No. 1 to Settlement Agreement and Release ("Addendum") (collectively, "Settlement"). ECF No. 122-1.

[2] The Court did not request supplemental briefing regarding historical claims rates, which were addressed in the Motion and at the Hearing. However, Plaintiffs are concerned with Jay Edelson's (counsel for an objector) misleading communications with the public and potential class members concerning the Settlement, including issues pertaining to notice and claims rates. These concerns are set forth in the accompanying Declaration of Katrina Carroll.

[3] For the Court's convenience, a copy of the Transcript is attached as Exhibit E to the Carroll Declaration.

27:23-28:3), the majority of the proposed Class Representatives are minors who are represented by their guardians and parents. Indeed, 28 of the 35 proposed Class Representatives are minors. ECF No. 122-2.

As the Court also presumed at the Hearing (Transcript, 28:4-11), counsel advocated the minors' interests throughout the litigation and settlement process. Not only did the Leadership Group represent minors' interests in their role as Court-appointed counsel for the Class, but many of the lawyers who litigated, negotiated, settled, and/or approved the Settlement in this consolidated matter were directly retained by minors. Co-Lead Counsel Elizabeth Fegan and Katrina Carroll filed initial complaints exclusively on behalf of minor named plaintiffs. ECF No. 122-2. Co-Lead Counsel Ekwan Row represents both adult and minor plaintiffs. *Id.* And counsel retained by the proposed Class Representatives—each of whom reviewed and approved the terms of the Settlement before it was submitted to the Court—likewise reflect adequate representation of the minor and non-minor Class Members.[4]

In addition, throughout this litigation, each minor plaintiff was represented by a parental guardian who supervised the minor's role in the litigation, liaised with counsel, advocated their child's or children's interests, and gave approval at each step. The parental guardians were involved in pursuing these consolidated actions, participating in the vetting of named plaintiffs and Class Representatives, and considering and approving the terms of the Settlement.

Finally, the Leadership Group gave meaningful consideration to actual and potential differences among minors and adult class members. While the details of the Leadership Group's

---

[4] For example, the law firm of Foote, Mielke, Chavez & O'Neil, LLC represents only an adult proposed Class Representative. *Id.* Mr. Foote, though not a member of the Leadership Group, was a participant in the second mediation and a signatory to the initial settlement agreement, ECF No. 122-1, p. 18, in addition to his review and approval of the Addendum and final agreement.

strategy, internal deliberations, and work product are not laid bare in the motion for preliminary approval, that brief nonetheless reflects some of those considerations. *E.g.,* ECF No. 122, pp. 5, 21. The Leadership Group engaged in significant analysis and discussion regarding, for example: whether minors were bound by and/or could disaffirm class action waivers and arbitration clauses (and the hurdles minors would face in overcoming those clauses); whether and to what extent some minors' claims would be waived in connection with the settlement pending in *T.K., et al. v. ByteDance Tech. Co., Ltd., et al.*, 1:19-cv-07915 ("*T.K.*"); ensuring that minors' interests were well represented by counsel, Class Representatives, and plaintiffs' legal guardians; ensuring that the proposed Settlement is in the Class's, including the minor members', best interests; and ensuring that the Notice of Proposed Class Action Settlement would alert guardians as to their children's rights and reach those guardians through the Notice Plan. Through that process, the Leadership Group determined that the Settlement is fair, reasonable, and adequate to minors.

### 2. The objection regarding the need for separate representation of minor versus adult Class Members is without merit.

Rule 23(a)(4) requires class representatives to "fairly and adequately protect the interests of the class." The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). One objector complains that a conflict of interest exists between minor and adult Class Members. ECF No. 126, pp. 6-8. This objection should be rejected because all Class Members are entitled to compensation based on the relative strength of the laws applicable to them, and because each and every class member has the opportunity to opt out and pursue greater relief if they so choose.

A similar objection was raised in *Fraley v. Batman*, 638 F. App'x 594, 597-98 (9th Cir.

2016). There, a settlement was reached on behalf of 150 million Facebook users who appeared in advertisements displayed to the users' friends on the Facebook website. The settlement created a common fund of $20 million and included injunctive relief.

Certain objections to the settlement argued that a structural conflict between minors and adult class members required the appointment of separate counsel for the minor subclass. Rejecting the argument, the Ninth Circuit explained:

> There was no structural conflict of interest requiring the appointment of separate counsel for the minor subclass. The evidence that a structural conflict of interest existed is sparse, especially given that (1) two of the three named representatives were minors, (2) most of the injunctive relief in the settlement benefitted only the minors, and (3) the minors were free to opt out of the settlement (as, in fact, many did). *See Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1021 (9th Cir. 1998); *see also C.M.D*., 621 Fed. Appx. 488, 2015 WL 6575724.

*Id.* at 597. Like in *Fraley*, no structural conflict exists here. The Class Representatives include 28 minors through their parents. The injunctive relief benefits all Class Members, including by requiring TikTok to: refrain from collecting user data like biometrics, GPS data, or information in users' clipboards unless expressly disclosed and in compliance with all applicable laws (including those laws that apply only to minors); delete pre-uploaded user-generated content; and initiate a privacy compliance training program which must be reviewed for three years by a third party. ECF No. 122-1, Settlement Agreement, § 6, and Addendum, § 4. And the minors are free to opt out of the settlement. *E.g.,* Settlement Agreement, § 10.

The Ninth Circuit in *Fraley* also rejected the argument that a conflict existed because the minors had more valuable claims. *Fraley*, 638 F. App'x at 598. The court explained:

> The objectors claim that a conflict existed because the minors had significantly more valuable claims than the adults. We have held that part of the minors' case was not meritorious, *see C.M.D*., 621 Fed. Appx. 488, 2015 WL 6575724, indicating that the objectors may have exaggerated the relative strength of minor subclasses'

> claims as compared to the adults' claims. Furthermore, a difference
> in value of claims does not necessarily mean there is a
> structural conflict of interest requiring separate counsel. *See In re Online
> DVD—Rental Antitrust Litig.*, 779 F.3d 934, 942-43 (9th Cir.
> 2015); *Hanlon*, 150 F.3d at 1021.

*Id.* The same analysis applies here. First, neither BIPA nor the VPPA nor any of the other claims

raised provide the potential for greater recovery for minors. Second, the fact that some class

member recovery could vary does not create a conflict. The Eighth Circuit's decision in *Petrovic

v. Amoco Oil Co*. addressing the propriety of subclasses provides guidance:

> If the objectors mean to maintain that a conflict of interest
> requiring subdivision is created when some class members receive
> more than other class members in a settlement, we think that
> argument is untenable. It seems to us that almost every settlement
> will involve different awards for various class members. Indeed,
> even if every class member were to receive an identical monetary
> award in settlement, the true compensation would still vary from
> member to member since risk tolerance varies from person to
> person.

*Petrovic v. Amoco Oil Co*., 200 F.3d 1140, 1146 (8th Cir. 1999).

Thus, this case is not, as the objector suggests, similar to the settlement classes in

*Amchem* and *Ortiz*, which failed in part because they suffered from disabling intraclass conflicts.

*See Amchem*, 521 U.S. 591; *Ortiz v. Fibreboard Corp*., 527 U.S. 815 (1999). In *Amchem*, the

Supreme Court detected an intraclass conflict between those class members with immediate

injuries and those class members who were merely exposed to asbestos where the terms of the

settlement reflected "essential allocation decisions designed to confine compensation and to limit

[the] defendants' liability." *Amchem*, 521 U.S. at 627. Specifically, the Supreme Court pointed

out that the settlement included no adjustment for inflation and only a few claimants per year

could opt out at the back end. Thus, under those circumstances, the Court held that the settling

parties "achieved a global compromise with no structural assurance of fair and adequate

representation for the diverse groups and individuals affected." *Id.*

Here, however, the Settlement is fundamentally different because all Class Members have already suffered injury; there is no set-aside for future injuries by TikTok. *See generally* ECF No. 122-1 (Settlement Agreement and Addendum). Moreover, all Class Members have the right to opt out. *Id.*, Settlement Agreement, § 10.

This settlement is also fundamentally different than that in *Ortiz.* There, part of the settlement fund comprised an insurance policy that covered the defendant for pre-1959 asbestos claims but was being used to fund post-1959 claims. *See Ortiz*, 527 U.S. at 850, 857. The Supreme Court found that this type of allocation decision represented an intraclass conflict that revealed the lack of structural protection for the class as required by Rule 23(a)(4). Unlike *Ortiz*, Class Counsel here has not been forced to allocate an insurance policy dedicated to minors among adult class members; rather, TikTok itself has offered to fund a settlement to resolve all claims.

The fact that TikTok's venue-based defenses, such as those regarding the arbitration agreement, may be stronger as to adult class members than as to minors (*see* ECF No. 126, p. 8) does not suggest the minors are entitled to a larger recovery or require subclass representation. And whether a minor could prove his case in court versus an adult at arbitration does not affect the amount each could potentially recover and, therefore, the ultimate potential risk to TikTok. Rather, the affirmative defenses raised were part of the calculus of TikTok's risk of liability and overall willingness to pay to resolve all claims.

The objector also suggests that, if adequately represented, minors under the age of 13 would have received preferential settlement treatment. *See* ECF No. 126, at p. 7 (regarding injunctive relief); Transcript 29:19-30:17 (regarding the Child Online Privacy Protection Act (COPPA)). That, too, fails. It ignores that: (1) COPPA is a statute with no private right of action;

6

(2) the injunctive relief provides for deletion of minors' data and requires ongoing compliance with data privacy and data collection laws that would apply to minors;[5] and (3) those under-13 minors would not likely have claims at all in this action if not for the benefits achieved in this Settlement.[6] The fact that *T.K.* class members, i.e., TikTok users under age 13, may recover in this case reflects the Leadership Group's advocacy for the minor Class members' interests.

Accordingly, this Court should reject the objection that minors were required to be subclassed with separate representation, and find that minors, like all Class Members, are adequately represented.

### B. Plaintiffs' counsel made an exhaustive inquiry as to the strength of Plaintiffs' case—including the value of the claims—and the consequent fairness of the proposed Settlement.

At the Hearing, the Court requested "some more information with regard to the valuation process and the process that plaintiffs' counsel went through . . . in arriving at the settlement amount," i.e., "some more information as to what you thought the strengths and weaknesses of your cases were and your claims were." Transcript, 46:2-20 (recognizing, however, that Rule 23

---

[5] *E.g.*, ECF No. 122-1, Settlement Agreement, § 6 (addressing categories of data that Defendants cannot collect or transmit absent disclosure and compliance with "all applicable laws"; Addendum, § 4.2 (addressing deletion of previously collected data to be "consistent with the intent of the injunctive relief in Section 6").

[6] In *T.K.,* plaintiffs alleged that TikTok tracked, collected, and disclosed the personally identifiable information and/or viewing data of children under the age of 13, without parental consent. 1:19-cv-07915, ECF No. 1 (complaint), ¶ 1. That case was settled on behalf of minors under the age of 13. *Id.* at ECF No. 5-1 (settlement agreement). If the court finally approves that settlement (it has already been preliminarily approved), those minor users' VPPA, Intrusion Upon Seclusion, California Constitutional Right to Privacy, California Consumers Legal Remedies Act, and Illinois Consumer Fraud and Deceptive Business Practices Act claims will be released, along with any other actual or potential claim arising out of the facts underlying the complaint. *Id.*; *see also id.* at ECF No. 1 (complaint). However, Co-Lead Counsel here negotiated a provision allowing *T.K.* class members to file claims in this Settlement anyway. ECF No. 122-1, Settlement Agreement, § 2.4.

does not require a detailed valuation or percentage-based success estimate breakdown, as one objector suggested).

### 1. The Leadership Group conducted an extensive analysis of the merits of each claim and of the case as a whole.

In evaluating the case's value, Co-Lead Counsel, *inter alia*: (1) assessed a broad range of potentially applicable claims (some of which they did not ultimately pursue); (2) determined the damages available under each claim; (3) analyzed the strength of each claim and of the case as a whole; (4) worked with consultants and experts to assess the factual underpinnings of the case; (5) researched and considered results in other comparable cases (including both settlements and dismissals); (6) evaluated settlement pressures and factors beyond the claims themselves; and (7) considered the advice and perspective of the parties' highly experienced mediator, who is also a former federal judge.

As discussed in the Motion and Co-Lead Counsel Elizabeth Fegan's declaration in support, the Leadership Group engaged in months of research, analysis, advocacy, internal debate, and negotiation to assess the value of the claims and defenses in this ligation. Motion, *e.g.,* pp. 11-14; Fegan Decl., ECF No. 122-7, *e.g.,* ¶¶ 15-23. Well aware of the maximum damages underlying each claim, members of the Leadership Group undertook discrete research projects to assess the strength of those claims and the case as a whole. *See id.* at ¶ 17.

As just one example of the post-leadership-appointment analysis, and without waiving the protections for attorney work product, one member of the Leadership Group, at Co-Lead Counsel's direction, drafted a 16-page single-spaced memorandum regarding the strengths of the VPPA claim alone, which was then independently vetted by members of the Co-Lead Counsel team several times during the parties' settlement negotiations and when crafting the consolidated

amended complaint ("Complaint," ECF No. 114).[7] A member of the Co-Lead Counsel team prepared a comprehensive memorandum regarding the potential valuation of BIPA and non-statutory privacy claims with nearly 30 different potential recovery scenarios. That, too, was discussed and vetted by Co-Lead Counsel multiple times before the Settlement was submitted for approval. These are just examples of the extensive work product undertaken to evaluate and value the claims here.

Co-Lead Counsel and other members of the Leadership Group also analyzed the claims and defenses at numerous other stages of the litigation, including, e.g.:

- researching and drafting the initial complaints;

- vetting the claims asserted in various now-consolidated actions in connection with motions for consolidation and transfer before the Judicial Panel for Multidistrict Litigation and subsequent motions requesting appointment as lead counsel;

- preparing mediation statements for two mediations and analyzing TikTok's own mediation briefing;

- researching and drafting the consolidated amended complaint;

---

[7] One objector claims "Co-Lead Counsel evaluated the VPPA claim in less than a week without the benefit of any discovery." ECF No. 132, at p. 7. He bases this conclusion on a self-concocted theory that counsel here first learned of the VPPA claim's value at an August 7, 2020 status hearing in *T.K.* and later mediated this case on August 13, 2020. *Id.* There is no question that, at the time of the mediation, VPPA claims had long been pending against TikTok in both the *T.K.* case and in a complaint consolidated in this MDL. And the VPPA claims were addressed with the mediator in this case well before the August 7 status hearing the objector chose simply because it was closest in time to the mediation.

The absence of the VPPA claim in the vast majority of the now-consolidated complaints was not an oversight by dozens of the country's best privacy and class action lawyers. Rather, it speaks volumes about the claim's historical weaknesses. And this Court recognized the pitfalls of kitchen sink pleading in denying an earlier motion to intervene in this action: an "attempt to represent an expansive class may delay or even defeat class certification. At a minimum, bringing more claims against more defendants promises to widen the scope of discovery and prolong this litigation." 1:20-cv-02810, ECF No. 46, p. 8. Though Co-Lead Counsel, after much consideration, ultimately decided to pursue the VPPA claim, it is not without risk.

- engaging in ongoing settlement negotiations;

- working with technology experts and consultants, and conducting confirmatory discovery; and

- assessing and negotiating the allocation of settlement funds between subclasses with different claims (more information about that process is available in the declarations of allocation counsel, ECF Nos. 122-10 and 122-11).

Simply put: the Leadership Group revisited the claims, defenses, litigation risks, and valuation *numerous* times. This rigorous analysis was, in part, the result of the way the Leadership Group was brought together from a mix of teams who asserted different claims and had different perspectives about how the case should proceed.

Co-Lead Counsel also worked with experienced technology experts who reviewed TikTok's application code, data transfers, and source code and provided valuable information regarding whether and how plaintiffs would be able to prove their claims. And Co-Lead Counsel considered practical and external factors—like hurdles associated with obtaining discovery from and/or enforcing a judgment against foreign defendants, and settlement pressures related to, for example, former President Trump's executive orders requiring the sale of TikTok, judicial and legislative initiatives to undermine BIPA or overturn it altogether, and challenges to class member standing in actions asserting statutory violations (like that currently pending before the Supreme Court in *TransUnion LLC v. Ramirez,* Case No. 20-296).

No stone was left unturned. By assessing the strengths and weakness of the claims, and in light of their decades of experience with class actions like this one, Co-Lead Counsel were able to assess the case's value now, and at trial—and balance that with the risks of continued litigation.

### 2. Co-Lead Counsel's assessment made clear that the $92 million settlement (plus injunctive relief) is fair, reasonable, and adequate.

The Complaint asserts nine claims.[8] Co-Lead Counsel assessed each of these claims (and others), as well as other case-wide risks (e.g., arbitration clauses, jurisdictional issues, class certification, and legislative changes), in valuing the case and assessing the Settlement.[9] Some of these considerations are addressed in the Motion and below.

### a. All of Plaintiffs' claims are subject to overarching risk and they will be compelled to individual arbitration.

The valuation of Plaintiffs' claims is impacted by terms of service that could effectively dispose of the claims in their entirety. TikTok's terms of service include an arbitration clause, as well as a class action and class arbitration waiver. The enforcement of these provisions would moot Plaintiffs' class case as a threshold matter even before a motion to dismiss is considered, effectively valuing all asserted claims at $0 (absent individual pursuit of those claims in arbitration). *See also*, Motion, pp. 4-5.

---

[8] The Complaint alleges violations of the: Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030; California Comprehensive Data Access and Fraud Act (CDAFA), Cal. Pen. C. § 502; Right to Privacy – California Constitution; Intrusion Upon Seclusion; California Unfair Competition Law (UCL), Bus. & Prof. C. §§ 17200 *et seq.*; California False Advertising Law (FAL), Bus. & Prof. C. §§ 17500 *et seq.*; Restitution / Unjust Enrichment; Video Privacy Protection Act (VPPA), 18 U.S.C. § 2710, *et seq.*; and Illinois' Biometric Information Privacy Act (BIPA), 740 ILCS 14/1, *et seq.* The Complaint also asserts a tenth alternative cause of action for violations of state consumer protection statutes in the event California law is not applied nationwide. Complaint, ¶¶ 322, 418-427.

[9] In providing this supplemental memorandum, Co-Lead Counsel have attempted to balance the Court's need to assess the settlement, with Co-Lead Counsel's need to protect their work product, particularly to the extent it identifies case weaknesses that might cut against the interests of the Class, who would have to resume litigation and zealous advocacy of their claims if the Settlement is not approved.

In this brief, Plaintiffs focus on some of the risks of and defenses to their case because those factors shed light on the reasons why a settlement that recovers less than maximum damages is nevertheless in the best interests of the Class and exceeds Rule 23's requirements for approval. However, Co-Lead Counsel have faith in Plaintiffs' claims, and the $92 million fund (with injunctive relief) is reflective of the positive merits of this case.

Plaintiffs would argue that, even if the terms are valid, minors could disaffirm their agreement to those provisions. Some cases have held, however, that disaffirmance would require minors to cease using the TikTok application permanently (and to have done so before filing their complaint)—a big ask given the App's widespread popularity with teenagers. *See, e.g., C.M.D. ex rel. De Young v. Facebook, Inc.*, 621 F. App'x 488, 489 (9th Cir. 2015). Even if minors can legally disaffirm TikTok's terms and are willing to cease use of the App to do so, the ability to disaffirm these provisions on a class-wide basis is relatively novel and untested. Plaintiffs have not located a single ruling from any jurisdiction to date supporting the concept of class-based disaffirmance.

The substantial risk of forced arbitration factored meaningfully into counsel's valuation of Plaintiffs' claims.

**b. The statutory damages claims provide high maximum damages, with equally high barriers to success and weak track records.**

The claims that provide the overwhelming majority of the maximum potential damages in this case are the Video Privacy Protection Act (VPPA) and Illinois Biometric Information Privacy Act (BIPA) claims—which provide statutory damages ($2,500 for VPPA violations; $1,000 for negligent BIPA violations; and $5,000 for intentional or reckless BIPA violations— though neither objector asserts that class members would be entitled to $5,000 here). No consumer class has ever recovered full statutory damages for either claim. To be sure, the statutes set compelling minimum damages amounts. But to recover anything at all, Plaintiffs must, of course, prove their underlying claims (and overcome Defendants' arguments as to arbitration and class certification).

### i. BIPA

BIPA was enacted in 2008 to regulate the collection, use, storage, and handling of biometric identifiers. The law is not yet well developed beyond motion to dismiss rulings. This provides an opportunity for Plaintiffs to create new, favorable law—but it also creates substantial risk that courts will construe the law in an undesirable way.

In valuing Plaintiffs' BIPA claims (and the likelihood of obtaining statutory damages), Co-Lead Counsel considered, *inter alia*:

- Whether the Court and jury will conclude that TikTok's facial landmarking constitutes a "biometric identifier" as defined in the statute, given the nature of the landmarking (TikTok contends its landmarking does not use facial recognition and is not used—nor can it be used—to identify a person, and that TikTok does not otherwise collect biometric data). 740 ILCS 14/5, 14/10.

- Whether the Court and jury will conclude that TikTok's facial landmarking constitutes a "biometric information" as defined in the statute, e.g., information that can be "used to identify an individual," given that TikTok's facial landmarking data is not associated with a name or other personally identifying information. 740 ILCS 14/5, 14/10.

- Whether the Court and jury will conclude TikTok was "in possession" and/or "collect[ed], capture[d], purchase[d], receive[d] through trade, or otherwise obtain[ed]" Plaintiffs' biometrics in light of TikTok's contentions that facial landmarking data remained on users' devices and in light of the confidential confirmatory discovery regarding any transfer of such data. 740 ILCS 14/15(b).

Plaintiffs also considered potential changes to the legal and legislative treatment of BIPA over the potential years of ongoing litigation should the Settlement be rejected. BIPA defendants often contend the statute is unconstitutional, violates the Dormant Commerce Clauses, and/or cannot be applied extraterritorially. Courts have often rejected or deferred determinations on these arguments. But anti-BIPA legislation is currently pending in Illinois that threatens to eliminate BIPA's private right of action, eliminate BIPA's statutory damages, and/or otherwise materially limit its reach. *See* Laura Ann Wood, *Illinois Bill Seeks To File Down Biometric Law's Sharp Teeth*, LAW360 (March 22, 2021) (attached hereto at **Exhibit A**).[10] Plaintiffs could overcome arbitration clauses, certify a class, get favorable interim legal interpretations of BIPA, gather proof of the alleged facts through months or years of discovery and high-tech expert work—only to find that BIPA's key provisions are stripped by the time of trial.

And, of course, Plaintiffs considered other settlements in comparable consumer BIPA cases (none has gone to trial). The Motion details those recoveries and, in particular, addresses similarities and differences between the facts here and those underlying the recent recovery in *Facebook BIPA*. Motion, pp. 24-29. *See also* **Exhibit B** (chart of relevant settlements). These factors demonstrate that the recovery here is fair, adequate, and reasonable.

### ii.  VPPA

The VPPA was enacted in 1988 as a reaction to the disclosure of a Supreme Court nominee's video store rental records in a newspaper. *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1252 (11th Cir. 2015). Though the VPPA has been around two decades longer than BIPA,

---

[10] *E.g.*, Illinois SB 3593: https://tinyurl.com/myfknh2p; SB2134: https://tinyurl.com/znm5vchc; SB0056: https://tinyurl.com/24xk8ksm; HB0559: https://tinyurl.com/yffnyznr; HB0560: https://tinyurl.com/hsmvfp2e.

and a greater number of relevant decisions exist—that law is not entirely favorable. And TikTok's cutting edge technology is not a square fit with the statute's outdated phrasing.

In valuing plaintiffs' VPPA claim (and the likelihood of obtaining statutory damages), Co-Lead Counsel considered a number of the statute's elements, e.g.:

- Whether the Court and jury will conclude TikTok is a "video tape service provider" engaged in a business involving "cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4);

- Whether the Court and jury will conclude each TikTok user is a "renter, purchaser, or subscriber of goods or services from a video tape service provider." *See id.* at (a)(1); *See Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1258 (11th Cir. 2015) ("free downloading of a mobile app . . . to watch free content, without more, does not a 'subscriber' make"; though registering and establishing a profile, for example, likely does);

- Whether the Court and jury will conclude TikTok's alleged disclosure of anonymized third-party advertising identifiers constitutes disclosure of "personally identifiable information" (PII)—particularly as courts have held that the VPPA protects "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *See* 18 U.S.C. § 2710(b)(1); *e.g., In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 290 (3d Cir. 2016);

- Whether the Court and jury will conclude TikTok obtained "informed, written consent" to such disclosures in light of its privacy policies, which include certain

15

disclosures about TikTok's sharing of information with third parties. *See* 18 U.S.C. § 2710(b)(2)(B); and

- Whether the Court and jury will conclude the transfer of the alleged information to TikTok's business partners is "incident to the ordinary course of business" of TikTok and thus falls within an exception to the statute. *See id.* at (b)(2)(E); *See, e.g., Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 621, 623 (7th Cir. 2014) (dismissing VPPA claim because video tape service providers "may use third parties in their business operations"); *Rodriguez v. Sony Comput. Entm't Am., LLC*, 801 F.3d 1045, 1054 (9th Cir. 2015) (affirming dismissal of VPPA claims alleging disclosure of personal information to affiliate entities).

*See also* Motion at 7-8, 22-23 (further discussing relevant case law, including Third and Ninth Circuit decisions suggesting numeric identifiers are not PII under the VPPA, and a First Circuit decision suggesting they may be, if combined with GPS information, for example).

The hurdles associated with a VPPA claim are reflected in the results of numerous prior VPPA class cases, which Plaintiffs also considered in valuing the claim. Many were dismissed at the motion to dismiss stage. And those that resulted in a settlement conferred minimal or *cy pres*-only relief without any money actually paid to class members. These are discussed in the Motion. *See* Motion, pp. 29-30 ($1.06 per class member in *Vizio*, $0.18 per class member in *T.K.* (pending final approval); *cy pres* settlement amounting to $0.14 per class member in *Netflix*; *cy pres* settlement averaging $2.59 per class member in *Lane v. Facebook* (which also asserted an ECPA claim with $10,000 in statutory damages and other claims). *See also* **Exhibit B** (identifying these and other cases in more detail).

16

In valuing Plaintiffs' VPPA claim, Co-Lead Counsel considered all the attendant strengths and weaknesses of the claim and balanced the sought-after $2,500 statutory damages with the risks of litigation and the reality that class members have historically recovered closer to $1, if anything at all.

### c. Plaintiffs' additional claims also carry their own risks, without the potential upside of statutory damages.

Plaintiffs' seven other claims (four consumer statutes, one California Constitutional violation, and two common law claims) each have factual and legal hurdles as well, and none offers statutory damages.

With respect to the factual underpinnings of those claims, for example, *The Wall Street Journal* reported just yesterday that national security fears concerning TikTok's connections to China may have been unfounded and that the TikTok app is no more intrusive in terms of data collection than its competitors. *See* Eva Xiao, *TikTok Doesn't Pose Overt Threat to U.S. National Security, Researchers Say*, THE WALL STREET JOURNAL (March 22, 2021) (attached hereto at **Exhibit A**).

Regarding the legal requirements of these claims, many cases have held that the consumer statutes each require allegations of pecuniary damages to state a claim.[11] Courts have often rejected the contention that "that the unauthorized collection, use, or disclosure of personal

---

[11] Defendants would argue, for example, that: The CFAA provides a civil remedy when a plaintiff "suffers damage or loss" stemming from a violation of the Act of at least $5,000 in value during a one-year period. 18 U.S.C. § 1030(c)(4)(A)(i)(I) and (g). CDAFA claims requires economic harm or loss. *Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1050 (N.D. Cal. 2018). The UCL requires "injury in fact and . . . lost money or property as a result of the unfair competition," i.e., "some form of economic injury." Cal. Bus. & Prof. Code § 17204; *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323 (2011); FAL requires "injury in fact" and "lost money or property . . . ." *Bower v. AT&T Mobility, LLC*, 127 Cal. Rptr. 3d 569, 578 (Ct. App. 2011).

information constitutes economic damages for the purposes of" these claims.[12] Without the requisite showing of damages, Plaintiffs would lack standing and their claims would be entirely dismissed. (Plaintiffs have alleged that deficiencies associated with their devices—e.g., battery and bandwidth drain—are damages; TikTok would dispute that suffices).

There are additional risks with establishing other elements of these claims. The Computer Fraud and Abuse Act (CFAA), for example, is aimed at hacking, and Plaintiffs must overcome defenses that they voluntarily downloaded and authorized the App's access to user data as disclosed in TikTok's privacy policy. *See, e.g., Brodsky v. Apple Inc.*, No. 19-CV-00712-LHK, 2019 WL 4141936, at *8 (N.D. Cal. Aug. 30, 2019) (rejecting CFAA claim where plaintiffs did not allege that they had revoked consent for defendant's servers to receive plaintiffs' login activities); *United States v. Nosal*, 676 F.3d 854, 858, 863 (9th Cir. 2012) (CFAA is aimed at conduct wrongfully "circumventing technological access barriers").

The California Comprehensive Data Access and Fraud Act (CDAFA) is California's state-law parallel to the CFAA, though it lacks a $5,000 loss minimum (it does, however, require loss or damages). The analysis under the CFAA and the CDAFA are similar, and authorized access is not actionable. *See Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069 (9th Cir. 2016). Plaintiffs would thus be required to show that TikTok exceeded the scope of its authorized access to their devices.

The California False Advertising Law (FAL) and California Unfair Competition Law (UCL) claims depend on false advertisements and unfair conduct, respectively. *E.g., Williams v.*

---

[12] *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 988 F. Supp. 2d 434, 448 (D. Del. 2013) (regarding CFAA), *aff'd in part, vacated in part, remanded*, 806 F.3d 125 (3d Cir. 2015); *see id.* at 450 (regarding UCL); *see also In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1068 (N.D. Cal. 2012) (regarding CFAA); *In re Google Android Consumer Privacy Litig.*, No. 11-MD-02264 JSW, 2013 U.S. Dist. LEXIS 42724, at *34-25 (N.D. Cal. Mar. 26, 2013) (regarding CDAFA).

*Apple, Inc.*, No. 19-CV-04700-LHK, 2020 WL 1492718, at *14 (N.D. Cal. Mar. 27, 2020);

*Gregory v. Albertson's, Inc*., 104 Cal. App. 4th 845, 854, 128 Cal. Rptr. 2d 389, 394 (2002).

Plaintiffs would have to identify specific advertisements and conduct that both (1) meet the

requirements of these claims and (2) are not rebutted or disclosed by TikTok's expansive terms

of service and privacy policies. They would also have to overcome arguments as to reliance.

The California Constitutional claim requires proof of a "highly offensive," intentional

intrusion into a place where Plaintiffs had a reasonable expectation of privacy that is

"'sufficiently serious' . . . to constitute an 'egregious breach' of the social norms." *Hernandez v.

Hillsides, Inc.*, 47 Cal. 4th 272, 287 (2009). This is a high bar. It is made higher by TikTok's

various privacy policies and terms of service which make numerous disclosures about data

access and disclosures.

Similarly, the intrusion on seclusion claim requires a showing of a "highly offensive"

disclosure. *In re Google, Inc. Privacy Policy Litig.*, 58 F. Supp. 3d 968, 987-88 (N.D. Cal. 2014)

(finding that disclosure of a person's name and identity, contact list, and contents of

communications to third-party developers was not highly offensive).

Unjust enrichment claims often survive a motion to dismiss, with complicated state-by-

state and class-related analyses to come later. *E.g., In re Pork Antitrust Litig*., Nos. 18-1776, 19-

1578, 19-2723, 2020 U.S. Dist. LEXIS 191675, at *61 (D. Minn. Oct. 16, 2020). However, such

claims may require that a plaintiff at least show a "detriment—and, significantly, a connection

between the detriment and the defendant's retention of the benefit." *Cleary v. Philip Morris Inc*.,

656 F.3d 511, 519 (7th Cir. 2011); *id.* at 520 (plaintiffs' "claim that the defendants had a

concerted plan to intentionally mislead consumers and conceal the truth about their cigarettes, is

insufficient to support a cause of action for unjust enrichment. Unjust enrichment is not a mode

of imposing punitive damages; it is a means of recovering something that the defendant is not entitled to but is unfairly possessing to the plaintiff's detriment"). Plaintiffs will have to overcome arguments that they have experienced no detriment because they paid nothing for the App, they enjoyed its benefits, consumer data is not valuable to consumers themselves, and/or the alleged wrongdoing is inadequately linked to TikTok's profit. TikTok may be profitable, but that alone does not establish Plaintiffs' right to recover those profits.

### d. Plaintiffs' non-statutory damages claims generally resolve for nominal damages (if anything).

The high-level overview in this brief identifies just a few of the factors Co-Lead Counsel considered in evaluating the likelihood of success in pursuing, *inter alia,* restitution, actual damages, and/or injunctive relief through these claims. Another important factor was the historical recoveries in cases alleging these claims. They are low.

Setting aside the countless cases that have been dismissed, settlements of these claims in the privacy context include, e.g., $0.25 per class member in a claims-made settlement of CFAA claims in *In re Sony PS3 "Other OS" Litig.*, 2017 U.S. Dist. LEXIS 203402; a *cy pres*-only settlement of CFAA, VPPA, and ECPA claims in *Lane v. Facebook, Inc.*, No. 5:08–cv–03845–RS (N.D. Cal.); preliminary approval of an injunctive-only relief settlement of intrusion upon seclusion, California Constitutional right to privacy, UCL, and other New York and Massachusetts state-law claims in *McDonald v. Kiloo* A/S, No. 17-cv-04344-JD, 2020 U.S. Dist. LEXIS 175865, at *22 (N.D. Cal. Sep. 24, 2020) ("further litigation would have been time-consuming and risky, and any damage award was uncertain and likely to have been nominal for most class members."); $1.56 per class member in case alleging violations of UCL and breach of contract in *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 584 (N.D. Cal. 2015) and 12-cv-03088, ECF No. 136 (preliminary approval order). *See also Moreno v. S.F. Bay Area Rapid*

20

*Transit Dist.*, No. 17-cv-02911-JSC, 2019 U.S. Dist. LEXIS 13309, at *29 (N.D. Cal. Jan. 28, 2019) (injunctive-only relief settlement of a California Cellular Communications Interception Act claim after other claims alleged here – including intrusion upon seclusion and California Constitutional right to privacy—were dismissed). *See also* **Exhibit B**.

In sum, Plaintiffs face risks in establishing these claims and the recoveries are typically quite low.

### 3. The objectors offer nothing that warrants risking the Class's recovery in continued litigation.

One objector (providing no substantive analysis),[13] represented by Scott Drury, values the VPPA claim at $1.15 billion and the BIPA claim at $50 million. ECF No. 126, at p. 9. The Settlement's monetary fund far exceeds the objector's BIPA valuation—yet, he apparently takes issue with the recovery for the VPPA claim. Similarly, the other objector, represented by Jay Edelson, says nothing about the Settlement's recovery as it pertains to the BIPA claim, but notes that the VPPA is "potentially 2.5x as valuable as the . . . BIPA claim" (referring to bare statutory damages). ECF No. 132, p. 8. While Co-Lead Counsel appreciate that the objectors find the Complaint so persuasive and compelling that it warrants a result that exceeds by many multiples any other VPPA (or privacy) settlement in history—the reality of the applicable laws and

---

[13] Drury made no real attempt to value this case, despite referencing the Seventh Circuit's "easy" "formula" in *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002), ECF No. 126, pp. 1, 9— which this Court recognized is of limited import here, Transcript, pp. 35-36. Drury simply applied the numbers that the Seventh Circuit itself repeatedly described as "arbitrary." *Id.*; 288 F.3d at 285. He disregarded the "discount[]" the court contemplated "depending on an estimate of the likely duration of the litigation." *Id.* And he ignores that his "medium" value of $200 million would be the largest recovery in VPPA history and the largest BIPA recovery when class size is considered. Even his basic math doesn't add up: he claims the "net expected value" of the VPPA and BIPA claims is $1.15 billion and $50 million, respectively—but totals that to $1.45 billion. ECF No. 126, p. 9. Regardless, rather than apply "arbitrary" numbers to a theoretical formula, Co-Lead Counsel analyzed this case, and, *inter alia*, considered comparable cases that have actually recovered monetary funds for classes, to assess the value here.

relevant facts do not support shunning a $92 million fund and injunctive relief in favor of continued litigation.

Edelson claims that a split in authority on VPPA "places the claim on equal or stronger footing than the BIPA claim" because the court in *Facebook BIPA* noted the "dearth" of authority regarding issues present here. ECF No. 132, p. 8 (citing 2020 WL 4818608, at *3). He fails to tell the whole story. That "division in authority" concerns only one of several relevant, risky elements of VPPA—and it falls in defendants' favor. Even the supportive circuit court case is based on facts that go beyond what Plaintiffs here have alleged. And that "dearth" of BIPA authority is now complemented by the $650 million settlement in *Facebook BIPA*. No VPPA settlement approaches that amount, let alone does one eclipse it by 2.5 times.

Edelson is no stranger to VPPA actions or their hurdles. When he settled *In re Netflix Privacy Litig.*, No. 11-cv-00379 (N.D. Cal.) in 2012, that class received nothing. 2013 U.S. Dist. LEXIS 37286. But Edelson told the Ninth Circuit Court of Appeals that the $9 million *cy pres* distribution (averaging a "value" of $0.14 per class member) provided "relief in excess of what could reasonably be expected from trial." *In re Netflix Privacy Litig.*, No. 13-15723 (9th Cir.), ECF No. 51-1, p. 17 (attached as **Exhibit C**). He justified a request for $6.4 million in fees by stating that, even if plaintiffs fully prevailed on the merits: "given that Netflix's theoretical liability exceeded $150 *billion*, both constitutional and pragmatic concerns suggested that no court would award such an amount, and, in class counsel's opinion, a best-case recovery for those claims would be $3 million." *Id.* at p. 58 (emphasis in original).

Court-approved settlements are not the only barometer of Plaintiffs' likelihood of success or the value of their claims—many cases never make it past a motion to dismiss. Edelson represented plaintiffs in *Eichenberger v. ESPN, Inc.*, No. 14-463, 2015 U.S. Dist. LEXIS 157106

22

(W.D. Wash May 7, 2015)—the VPPA claim there was dismissed with prejudice after the second amended complaint. That decision was affirmed, 876 F.3d 979 (9th Cir. 2017), contributing to the unfavorable Circuit split weighing against Plaintiffs here. Edelson also represented plaintiffs in *Perry v. CNN, Inc.*, 854 F.3d (11th Cir. 2017), another Circuit Court-affirmed dismissal of a VPPA claim.

Edelson, citing a 2016 case from the Eastern District of Wisconsin, also contends that California's "unique" laws permit restitution of profits. ECF No. 132, pp. 8-9. A 2020 case from the Northern District of California, however, rejected plaintiffs' attempt to seek restitution in connection with a UCL claim that alleged defendants wrongfully monetized and profited from their personal content and information, dismissing plaintiffs' claims outright. *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 840-41 (N.D. Cal. 2020).

Edelson and his co-counsel achieved a historical settlement in *Facebook BIPA*. But the facts here are different, as are the claims. Edelson's objections are entirely divorced from the realities of *this* case. Instead, they are rooted in his feigned surprise that this result, which compares favorably to *Facebook BIPA*, was well-informed and accomplished without the five years of litigation and threat of trial. *See, e.g.,* ECF No. 132, pp. 7, 8. The resolution here was efficient, yes—but it was effective, too. And it was neither achieved overnight nor ill-considered. The first MDL complaint was filed a year before the settlement was submitted for approval; and the Leadership Group vetted the settlement for six months—with confirmatory discovery and candid discussions taking the place of motion briefing and formal discovery processes. Co-Lead Counsel undertook an informed vetting and valuation of this case.

C. **In addition to direct email notice to more than 60 million email addresses and a Notice Plan designed to reach 95% of users several times—the parties will provide notice through TikTok's "Inbox" feature, subject to a Court order.**

At the Hearing, the Court asked Co-Lead Counsel to address why the Notice Plan does not include "some sort of notice that's provided through the app. . . ." Transcript, 46:21-24. The Court also asked "the parties . . . to go back and talk about whether or not there is a way to email, or otherwise, to provide some sort of notice through the app itself." Transcript, 46:26-47:5.

Direct individual notice by email is the foundation of the proposed notice program here. The Parties conservatively estimate that the email notice (to be sent to 60 million plus email addresses in TikTok's possession) will provide at least one-third—and potentially more than two-thirds (70%)—of class members with direct, individual notice.[14] In addition to the direct email notice, the Parties, in conjunction with proposed claims administrator Angeion, have proposed a comprehensive publication notice designed to reach 95% of the target audience more than five times. The Federal Judicial Center (FJC) has concluded that a notice plan that reaches at least 70% of the class is reasonable. Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide, p. 3 (2010). The proposed notice program far surpasses the 70% threshold.[15]

Per the Court's instruction at the Hearing, the Parties again conferred further about providing notice through the App. TikTok was previously resistant to providing inbox notice

---

[14] The Parties provide this conservative number as an estimate as it is unknown how many TikTok accounts with email addresses are duplicate accounts created by the same user using different email addresses.

[15] Prior to submitting the Settlement for preliminary approval, Angeion also developed a notice plan that would reach 80.63% of class members an estimated 4.47 times—which also surpasses the FJC's target threshold. Co-Lead Counsel nevertheless selected the more comprehensive, "enhanced" notice option.

through the App because of, *inter alia*, concerns that: (i) users had not consented to receive "Inbox" and "push" notifications that are not part of the integral features of the App; (ii) the default setting for Android users, and an elective setting for Apple (iOS) users, is to receive "push" notifications for each Inbox notification; and (iii) TikTok is prohibited by its agreements with the app stores (like Apple and Google) from sending push notifications for unsolicited content beyond the "integral features" of the App.

Following numerous conferences related to providing supplemental notice, TikTok has agreed, pursuant to Section 17.5 of the Settlement Agreement ("to take all additional action that may be necessary or appropriate to give full force and effect to the basic terms and intent of this Agreement"), to provide Inbox notice, at its own cost, if the Court determines that (1) Fed. R. Civ. P. 23(c)(2)(B) requires use of the Inbox feature to provide the best notice practicable; and (2) the benefit to class members in receiving this notice outweighs any detriment they may experience in receiving in-app and system notifications for non-integral features of the App.

## III.  CONCLUSION

For the foregoing reasons, and those explained in Plaintiffs' Motion, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Preliminary Approval, and grant such and other further relief as the Court deems appropriate.

Dated: March 23, 2021          Respectfully Submitted,

By: */s/ Katrina Carroll*

Katrina Carroll
CARLSON LYNCH, LLP
111 W. Washington St.
Suite 1240
Chicago IL 60602
312.750.1265
kcarroll@carlsonlynch.com

By: */s/ Elizabeth A. Fegan*
Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

By: */s/ Ekwan Rhow*
Ekwan Rhow
BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS, LINCENBERG &
RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067
(310) 201-2100
erhow@birdmarella.com

*Plaintiffs' Co-Lead Counsel*

Jonathan Jagher
Freed Kanner London & Millen LLC
923 Fayette Street
Conshohocken, PA 19428
(610) 234-6487
jjagher@fklmlaw.com

Megan E. Jones
Hausfeld LLP
1700 K Street NW, Suite 650
Washington, D.C. 20006
 (202) 540-7200
mjones@hausfledllp.com

Michael Gervais
Susman Godfrey LLP
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 789-3100
mgervais@susmangodfrey.com

Amanda K. Klevorn
Burns Charest LLP
365 Canal Street
Suite 1170
New Orleans, LA 70130

(504) 799-2845
aklevorn@burnscharest.com

Albert Y. Chang
Bottini & Bottini, Inc.
7817 Ivanhoe Avenue
Suite 102
La Jolla, CA 92037
(858) 914-2001
achang@bottinilaw.com

*Plaintiffs' Steering Committee*


Shannon Marie McNulty
Clifford Law Offices, P.C.
120 North LaSalle Street, Suite 3100
Chicago, IL 60602
(312) 899-9090
smm@cliffordlaw.com

*Plaintiffs' Liaison Counsel*