IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: TIKTOK, INC., CONSUMER PRIVACY LITIGATION,<br><br>This Document Relates to All Cases | MDL No. 2948<br><br>Master Docket No. 20-cv-4699<br><br>Judge John Z. Lee<br><br>Magistrate Judge Sunil R. Harjani |

### DECLARATION OF KATRINA CARROLL IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

KATRINA CARROLL, declares as follows:

1. I am the managing partner of the Chicago, Illinois office of Carlson Lynch LLP, a nationally recognized litigation boutique specializing in the prosecution of plaintiff-side class actions. I have been appointed by the Court as Co-Lead Counsel for Plaintiffs in this matter, I have personal knowledge of the facts stated herein, and I submit this Declaration in support of Plaintiffs' Supplemental Memorandum in Further Support of Their Motion for Preliminary Approval of Class Action Settlement.

2. As the Court is aware, Mr. Edelson filed an objection to preliminary approval of the settlement. Mr. Edelson also has a developed record of objecting to other class action settlements.

3. Putting the merits of his objections aside, Plaintiffs' Co-Lead Counsel is concerned with Mr. Edelson's misleading communications with the public and potential class members concerning the settlement pending before the Court. Mr. Edelson has also violated the rules of

civility in this Court. Should such conduct continue, Plaintiffs will seek an appropriate order to address this situation.

4. Mr. Edelson chose to "live tweet" during the March 2, 2021 preliminary approval proceedings.

5. In those tweets, Mr. Edelson routinely violated the Seventh Circuit standards for civility and attorney professionalism by mischaracterizing the representations of counsel, direct quoting statements that were never made, and creating a misleading impression of others by failing to provide relevant context. Mr. Edelson's relevant tweets are attached hereto as **Exhibit A**.

6. For example, Mr. Edelson tweeted:

> #tiktok preliminary approval hearing. Class Counsel is predicting a 1-2% claims rate (i.e. 1/10 of our FB rate). Their argument is bizarrely that "in large classes, the take rate goes down." True if we are talking about a 100 person class…..where word of mouth could drive claims. Absolutely not true when you are comparing classes that are in the millions.

7. Compare, however, Mr. Edelson's motion for final approval of the *Facebook BIPA* settlement, which he filed just three months ago.[1] In that motion, he called a 22% claims rate "a remarkable figure in consumer class actions generally, **particularly for classes of this size**, and exceeds claims rates in the handful of other consumer settlements under [BIPA]." ECF No. 517, p. 1 (emphasis added). He noted the "claims rate is among the highest of any consumer class action (and **the highest of one this size**.)" *Id.* at 4 (emphasis added). He called the claims rate "an enormous number, **particularly in light of the size of the Class**. . . " and noted it "outperforms

---

[1] *In re Facebook Biometric Information Privacy Litigation* ("*Facebook BIPA*"), 3:15-cv-03747, ECF No. 517 (Notice of Motion and Amended Motion for Final Approval of Class Action Settlement; Memorandum of Points and Authorities in Support Thereof) (filed 12/14/2020). A true and correct copy of this motion is attached as **Exhibit B.**

2

historical norms." *Id.* at 20 (emphasis added). He also noted the rate far exceeded his expert's predictions based on historical claims rates. *See id.*

8. The expert report Mr. Edelson filed in support of that motion stated clearly: "my data show that **claims rates are highest in very small classes and then decrease as class size grows,** with large amorphous classes such as this one having the lowest levels of claiming." *Facebook BIPA*, ECF No. 517-2, ¶ 5 (emphasis added).[2] *See also id.* at 4 (tables reflecting claims rate by class size and reflecting a decrease in the claims rate as class size grows).

9. Just two months before that, in Mr. Edelson's Motion for Attorneys' Fees, Expenses, and Incentive Awards in that same case, he called the 22% claims rate "unprecedented." *Facebook BIPA*, ECF No. 499 (filed 10/15/20) at 8 and 10.[3] He called the 0.67% claims rate in the Yahoo! data breach litigation "typical in a consumer class action." *Id.* at 12. He cited authority noting that "consumer class actions tend to result in claims rates in the low single digits" and cited a case "approving a 2% claims rate." *Id.* at 12-13 (citations omitted).

10. In his own case, Mr. Edelson represented to the Court that single-digit claims rates were common and claims rates are lower for larger classes. Now, to the public and potential class members, in a case in which he objects, he says that is "bizarre[]" and "[a]bsolutely not true."

11. Mr. Edelson, despite purporting to quote counsel, also misrepresented what I said to the Court. I noted that claims rates are "hard to predict," that "data regarding large settlements . . . [shows] the claims rate is typically lower," that, in my experience, "it's not atypical for a claims rate to be 1 percent or 2 percent, especially when there are so many people in the class," and that

---

[2] A true and correct copy of the Second Expert Declaration of Professor William B. Rubenstein is attached as **Exhibit C.**

[3] A true and correct copy of the Motion for Attorneys' Fees, Expenses, and Incentive Awards is attached as **Exhibit D.**

"by virtue of the relief being offered, there could be a larger claims rate" for Illinois claimants, and I referenced the chart in Plaintiffs' preliminary approval motion which gives a range of hypothetical scenarios. *See* **Exhibit E** (3/2/21 Tr. at 7:24-9:11).

12. While Co-Lead Counsel certainly hope for a higher-than-normal claims rate and widespread support for the Settlement, we also intend to uphold our duty to inform the Court and the Class honestly and accurately.

13. As another example, with respect to the Court's inquiries concerning the possibility of in-app notice as a means of giving notice to the Class, Mr. Edelson tweeted:

> Judge asks the key question: why is notice not being done through the app? Class Counsel: "we discussed it, but I am not comfortable discussing the tech."

14. This statement is false and again misquotes my representation to the Court. During the hearing, I stated that in-app notification (mistakenly transcribed as "inactive notification") was discussed, that tech-related issues were fully vetted, and that defense counsel was in the best position to give detail to the Court since such matters are covered by settlement privilege:

> MS. CARROLL: Judge, I can tell you that it was discussed. It was discussed heavily. I'm going to let Mr. Weibell -- because I don't want to speak out of turn regarding anything tech-related as it relates to TikTok. So he can answer, Judge, if you have specific questions about the technological reasons that we vetted and why we're not doing them. But I can tell you that we did discuss various channels of inactive [sic.] notification, including giving notice through push notifications on the TikTo[k] App. Giving notice through -- there is an inbox notice on the TikTo[k] App. We discussed that. And Mr. Weibell can fill you in on the specific technological reason why that's not included.

*See* **Exhibit E** (3/2/21 Tr. at 10:12-23). Mr. Weibell then proceeded to give a detailed technical explanation in response to the Court's question. Mr. Edelson then proceeded to attack Mr. Weibell in further tweets.

4

15. Mr. Edelson had the opportunity to correct his misrepresentation when a Twitter commenter asked: "Why was Class Counsel hesitant to discuss the tech? Did he [sic] want to leave that to Defense counsel?" Instead, Mr. Edelson replied: "I don't like to guess at motivations . . . ." *See* **Exhibit A**.

16. The tweets also include offensive, uncivil, discourteous, disparaging, and acrimonious comments directed at Ms. Fegan and myself. Mr. Edelson tweeted, for example: "Hearing interrupted by dog barking. The dog is making the most sense at this point."

17. When Ms. Fegan was highlighting the importance of direct email notice to class members and the secondary aspect of the media notice plan (Tr. at 15:19-16:4), Mr. Edelson tweeted:

> Class Counsel, in a clear nod to the mysterious barking dog, getting real notice is kind of "the tail wagging the dog." Very nice point. And now my dogs are barking.

18. Mr. Edelson again mischaracterized the statements of counsel in an attempt to convey to the public that email notice is not "real notice."

19. While Mr. Edelson might escape the obligations of Federal Rule of Civil Procedure 11 by reserving his commentary for Twitter, the Seventh Circuit Standards for Professional Conduct[4] enumerate specific duties on counsel:

> Lawyers' Duties to Other Counsel
>
> 1. We will practice our profession with a continuing awareness that our role is to advance the legitimate interests of our clients. In our dealings with others we will not reflect the ill feelings of our clients. We will treat all other counsel, parties, and witnesses in a civil and courteous manner, not only in court, but also in all other written and oral communications.

---

[4] Available at:
https://www.ilnd.uscourts.gov/_assets/_documents/_forms/_policy/conduct.htm#Lawyers'%20Duties%20to%20Other%20Counsel

5

2. We will not, even when called upon by a client to do so, abuse or indulge in offensive conduct directed to other counsel, parties, or witnesses. We will abstain from disparaging personal remarks or acrimony toward other counsel, parties, or witnesses. We will treat adverse witnesses and parties with fair consideration.

\*     \*     \*

4. We will not, absent good cause, attribute bad motives or improper conduct to other counsel or bring the profession into disrepute by unfounded accusations of impropriety.

\*     \*     \*

29. We will not ascribe a position to another counsel that counsel has not taken or otherwise seek to create an unjustified inference based on counsel's statements or conduct.

U.S.C.S. Ct. App. 7th Cir., Professional Conduct (emphasis added).

20. Similarly, Rule 8.4 of the Illinois Rules of Professional Conduct states that it is "professional misconduct for a lawyer to: . . . (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. (d) engage in conduct that is prejudicial to the administration of justice."

21. Mr. Edelson's tweets violate these standards of professionalism in this Court and in Illinois.

22. I declare under penalty of perjury that the foregoing is true and correct.

Date: March 23, 2021

*[signature: Kat Carroll]*

_____
Katrina Carroll