1

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3
      IN RE:  TIKTOK, INC.,          ) Docket No. 20 C 4699
 4    CONSUMER PRIVACY LITIGATION,   )
                                     ) Chicago, Illinois
 5                                   ) April 19, 2021
                                     ) 2:00 o'clock p.m.
 6

 7         TRANSCRIPT OF PROCEEDINGS - VIDEOCONFERENCE STATUS
                  BEFORE THE HONORABLE JOHN Z. LEE
 8

 9    APPEARANCES:

10
      For the Plaintiffs:        CARLSON LYNCH
11                               BY:  MS. KATRINA CARROLL
                                 111 W. Washington St.,  Suite 1240
12                               Chicago, Illinois  60602

13                               FEGAN SCOTT, LLC
                                 BY:  MS. ELIZABETH A. FEGAN
14                               150 South Wacker Drive, 24th Floor
                                 Chicago, Illinois  60606
15

16    For Defendants:            WILSON, SONSINI, GOODRICH & ROSATI
                                 BY:  MR. ANTHONY J. WEIBELL
17                               650 Page Mill Road
                                 Palo Alto, California  94304
18

19    For Objector Mark S.:      LOEVY & LOEVY
                                 BY:  MR. SCOTT R. DRURY
20                               311 North Aberdeen, 3rd Floor
                                 Chicago, Illinois  60607
21

22    For Objector Brian Behnken LABATON SUCHAROW, LLP
      and Joshua Dugan:          BY:  MR. JONATHAN GARDNER
23                               140 Broadway
                                 New York, New York  10005
24

25
```

```
 1    APPEARANCES (Cont'd):

 2
      For Objector Dennis        EDELSON PC
 3    Litteken:                  BY:  MR. RYAN D. ANDREWS
                                      MR. J. ELI WADE-SCOTT
 4                               350 North LaSalle Street, 14th Fl.
                                 Chicago, Illinois  60654
 5

 6    Court Reporter:            MR. JOSEPH RICKHOFF
                                 Official Court Reporter
 7                               219 S. Dearborn St., Suite 2128
                                 Chicago, Illinois  60604
 8                               (312) 435-5562

 9
                    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
10
                         PROCEEDINGS RECORDED BY
11                        MECHANICAL STENOGRAPHY
                     TRANSCRIPT PRODUCED BY COMPUTER
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        (Proceedings had via videoconference:)

2            THE CLERK:  20 CV 4699, In Regards to TikTok, Inc.,

3    Consumer Privacy Litigation.

4            THE COURT:  All right.  So, first of all, why don't

5    the attorneys for the settling plaintiffs, the lead attorneys

6    who will be making arguments or anyone else from the

7    leadership group that will be making arguments, you can enter

8    your appearance for the record now, please.

9            MS. CARROLL:  Judge, good afternoon.  Katrina Carroll

10   on behalf of plaintiffs and the class -- for settling

11   plaintiffs and the class, and I will be taking the lead this

12   afternoon.

13           THE COURT:  All right.  Very good.

14           Who is appearing on behalf of defendant?

15           MR. WEIBELL:  Good afternoon, your Honor, this is

16   Tony Weibell of Wilson, Sonsini, lead counsel for the

17   defendants.

18           THE COURT:  Okay.

19           And I know that there have been several counsel for

20   the objectors who have also wanted to address the Court today.

21   Who is appearing on behalf of the Michael S. objector?  Is

22   that Mr. Drury?  Are you with us today?

23           MR. DRURY:  Yes, your Honor.  Scott Drury on behalf

24   of objector Mark S.

25           THE COURT:  Okay.

```
 1              And who is appearing on behalf of objectors Behnken
 2   and Dugan?
 3              MR. GARDNER:  Good afternoon, your Honor, Jonathan
 4   Gardner from Labaton Sucharow on behalf of Brian Behnken and
 5   Joshua Dugan.
 6              THE COURT:  And who is appearing on behalf of the
 7   objector -- is it Litteken?
 8              MR. ANDREWS:  Litteken, your Honor.
 9              Ryan Andrews and J. Eli Wade-Scott of Edelson PC on
10   behalf of Dennis Litteken.
11              THE COURT:  Very good.
12              So, Ms. Carroll, I reviewed the supplemental filings
13   that the plaintiffs have submitted in response to my questions
14   at the last hearing on plaintiffs' motion for preliminary
15   approval of settlement.  There you addressed a number of
16   issues.  I know that in follow-up briefing, some of the
17   objectors have raised some points with regard to some of the
18   arguments that you've made.  I'll give you a chance to make a
19   record now with regard to the issues that you've raised in
20   your supplemental brief.
21              MS. CARROLL:  Thank you, Judge.
22              As you know, the Court asked us to address three
23   issues when we were last here.  One being whether in-app
24   notice can be provided, in addition to the other mechanisms
25   that we're proposing, to provide notice to the class.  The
```

1  second was with respect to whether minors were represented

2  during the negotiations by us.  And the third was just a

3  little more on the thought process that went into valuation of

4  the settlement.

5      I think we've said all we need to say on those three

6  topics in our papers.  I have nothing to add.  But briefly --

7  and I know this is perhaps the most discussed topic, which is

8  in-app notice.

9      As the Court knows, when we were here before, the

10  cornerstone of the notice plan that we were proposing is

11  direct e-mail notice to over 60 million e-mail addresses, in

12  addition to a supplemental media plan.  That is still the

13  case.  We believe -- I know initially we had estimated that

14  the 60 million e-mail addresses contained some duplicates, and

15  we were being conservative in our initial estimate that those

16  e-mail addresses constituted one-third of the class.  Really,

17  it's probably two-thirds of the class, and even more.  And I

18  think TikTok put it in a supplemental brief, as well, where

19  they explained that.  But that is absolutely the foundation of

20  our notice plan.

21      We are proposing also a media plan in response to the

22  Court's questions last time.  I think I explained that the

23  media plan is designed to target not only the TikTok users,

24  but also the parents of minor TikTok users that might not have

25  been users of the TikTok app.  And for that reason, we are

1   estimating that the media plan -- apart, of course, from the

2   direct e-mail notice -- is designed to reach 95 percent of the

3   targeted audience, more than five times each.  That's well in

4   excess of the 70 percent standard pursuant to the Federal

5   Judicial Center guidelines.

6            With respect to in-app notice, after the last hearing

7   we made some great progress.  Prior to our hearing, when we

8   had initially discussed the concept of in-app notice with

9   TikTok, TikTok was very resistant.  They were resistant

10  because:  A, users hadn't consented to receive in-app

11  notification where the notification itself did not relate to

12  an integral feature of the app.

13           Also, TikTok had some agreements with Google and

14  Apple, the app store providers; and, under those agreements,

15  TikTok was prohibited from sending app notifications which,

16  again, did not relate to the integral features of the app.

17           And for that reason, because our media plan and, of

18  course, the direct e-mail notice was sufficient in our view,

19  we kind of put the concept of in-app notice to the side.

20           Since the last hearing, we've had an opportunity to

21  revisit it; we've negotiated with TikTok; and we've gotten to

22  a place where TikTok has now agreed that if the Court orders

23  and finds that in-app notice is required and will constitute

24  the best notice practicable, in addition with all the other

25  means of notice, that they will -- and, also, secondly, that

1    the benefit of providing the in-app notice outweighs the

2    detriment of annoying users and, of course, contravening the

3    agreements that are already in place and the fact that the

4    users have not yet consented, if the Court were to order

5    in-app notice to be provided, they could do it and they will

6    do it.  So, we thought that was really good progress on that

7    point.

8         The other two -- the second thing the Court asked us

9    to brief was the representation of minors.  I think this has

10   been a focus of Mr. Drury's objection.  And to the extent the

11   Court has further questions, I'm happy to answer them within

12   the context of that objection; but I think we've laid out in

13   our papers all of the ways that we represented the minors.

14        28 out of 35 of the current class representatives are

15   minors.  And one thing I want the Court to know is there is a

16   distinction -- a slight distinction -- or at least Mr. Drury,

17   I believe, is urging a distinction, or perhaps not making it

18   clear.  Minors, in our view, are anyone under the age of 18.

19        Now, the minors that are covered in the T.K. case are

20   minors under the age of 13.  When we went to the mediation

21   table, I believe we had one minor under the age of 13; but all

22   the other minors that participated, and I think the vast

23   majority who are in now, are minors over the age of 13.  And

24   those minors can adequately and fairly represent the class of

25   all minors who stand to benefit from this terrific settlement

1    that we are urging the Court to approve preliminarily.

2         But briefly, when we went to mediation, we looked at

3    every available claim, both with respect to minors and with

4    respect to adults.  We looked at every claim and also the

5    unique defenses that are available to the minors,

6    especially --

7         It sounds like someone's not on mute.  I'm just

8    getting some background noise.  So, if somebody could mute if

9    you're not already.

10        But one of the main issues that we looked at with

11   respect to minors was -- apart from any available claims was

12   -- whether or not a minor could have an additional defense to

13   arbitration.  And it's well-known that a minor can disaffirm

14   an arbitration agreement, unlike an adult.  And, so, there is

15   that additional defense available.  We looked at all of the

16   relevant law, and that went into our analysis.

17        We also looked exhaustively at whether or not the

18   minors under 13 were precluded from potentially recovering

19   under the settlement that we were negotiating for them.  And,

20   so, we looked at the relief language in the related T.K.

21   settlement, and we determined that those minors should be able

22   to also recover in our settlement.  And that's something we

23   negotiated heavily with TikTok.  They very easily could have

24   bound or tried to bind the under-13 minors to that release,

25   but really we negotiated an exception to that.  And that, I

1   think, just underscores why and how we've protected the

2   under-13 minors at all times, in addition to the under-18

3   minors, during the entire history of our negotiations.

4          Putting that aside, as I've already explained -- and

5   I don't need to go into it in further detail, but -- the

6   reason we targeted notice to the parents and used social media

7   other than TikTok as a big component of the notice plan was in

8   recognition that the minors are a big part of the class here,

9   and that those minors should get notice and should be able to

10  recover.

11         Again, these were all things that were considered all

12  along.  And, of course, the minors have always been at the top

13  of our concern, and that's why we negotiated the broad

14  injunctive relief that the settlement provides for, which

15  protects minors and, of course, you know, adults as well, but

16  also stops TikTok from doing the conduct that is complained

17  of.  So, taking the -- and collecting the -- information of

18  minors, using their clipboards, taking the pre-uploaded,

19  user-generated content.  And, of course, we have a compliance

20  training program that we negotiated.

21         There's no -- and we briefed this in our papers.

22  There was no structural -- there's no structural conflict here

23  between the minors and the adults.  There's no reason that

24  they needed any separate representation or that we couldn't

25  have adequately represented them.  And I think the fact that

1   the minors can double recover under our settlement is just

2   proof that we did everything in our power to make sure those

3   minors were represented.

4        The third thing the Court asked us to -- or for more

5   information on was the information available to us on how we

6   valued the settlement.  And I think our papers really go into

7   detail on this claim by claim.  And I don't want to take up,

8   you know, a ton of time here discussing each claim, but, you

9   know, so many factors went into it.  Clearly, we looked at a

10  broad array of claims available to the plaintiffs.  We looked

11  at statutory damages.  We looked at regular common law, like,

12  damages available.

13       We analyzed the strengths and weaknesses of the case.

14  In this particular case, there were a lot of threshold-level

15  risks that would have completely eliminated the plaintiffs'

16  ability to even get out of the gate:  Arbitration, personal

17  jurisdiction, and failure to state a claim.  All of these

18  things are outlined in our papers.

19       But we worked extensively with experts.  We looked at

20  comparable settlements.  And I think we've outlined those for

21  the Court in Exhibit B, which is the chart of comparable

22  settlements in this area.  If the Court takes a look at the

23  chart, it will find that most of the settlements in this area

24  do not approach the value that we've gotten for the class and

25  it's not even close.  And, of course, that is even with claims

1   with very substantial statutory damages and theoretical

2   damages in the billions of dollars.

3           So, this settlement here is squarely within the range

4   of reasonableness, and that's why we're recommending it.

5           I think that's all for my presentation, unless the

6   Court has any further questions it would like me to address.

7           THE COURT:  With regard to the in-app notice that

8   TikTok would be willing to provide if so ordered, I reviewed

9   the submission by TikTok as to kind of how that would go.  But

10  from what I understand, it would be a -- would it be a message

11  into the inbox of the TikTok app and then the user would

12  notice that there's a new message or notification in that

13  notification box?  Is that pretty much how it would go?

14          MR. RIGHT:  They would receive the notification even

15  if the app wasn't open.  So, just similar to any notification

16  that you normally would receive.  But that assumes, of course,

17  that the user has enabled the notification.

18          THE COURT:  And if the user has not enabled the

19  notifications, then when they open up the app, they would see

20  some sort of notation in the app that there is a notification

21  or message that needs to be viewed?

22          MS. CARROLL:  I believe that's correct, yes.

23          THE COURT:  All right.

24          Mr. Weibell, I know you're here on behalf of TikTok,

25  and perhaps you might have a better understanding as to how

1  this goes, but is my characterization pretty much accurate or

2  am I missing something as to if I were to order in-app

3  notifications, is that how it would kind of play out?

4       MR. WEIBELL:  That is correct, your Honor.  There's

5  a -- the inbox feature.  So, when you open the app, there's a

6  menu at the bottom that lists different icons.  One of those

7  is for the inbox.  If there is a notification in the inbox

8  that has not been read, there will be an indication.  I think

9  some people call that a jewel notification because you see a

10 little indication right that there's something there.  So, it

11 would prompt the user to click on it to read the notification

12 that's in there.

13      And, then, if the users had enabled the settings to

14 receive a push notification, then once that inbox notification

15 hits the app, it would trigger like a system notification or a

16 push notification.  So, if their phone's in their pocket,

17 whatever, they would get a buzz or an alarm where they would

18 see it if they had enabled those features.  That's correct.

19      THE COURT:  Thank you.

20      Ms. Carroll, one of the things that came up at the

21 last hearing and something I've been thinking about was the

22 procedures for opting out.  That's something that a couple of

23 the objectors have raised.  I know that for the Web site, the

24 TikTok Privacy Litigation or TikTok Privacy Settlement Web

25 site will have a form for claim submission.  That is, a class

1    member can go to the Web site, download the claim form; they

2    would fill it out; and, then, they would upload it back onto

3    the Web site or they can mail it via U.S. mail to the claims

4    administrator.

5            From what I understand, there is no similar mechanism

6    for opt-outs.  And I was wondering whether there was a way for

7    the claims administrator to facilitate opt-outs by providing

8    just that.  That is, a form on the Web site for a class

9    member -- individual putative class member can go onto the Web

10   site, download an opt-out form, fill it all out, sign it, and

11   then upload it up onto the claims administrator Web site, as

12   opposed to have to mail it via first class mail.

13           Is that something, number one, that the claims

14   administrator can do as a technical matter -- I'm assuming

15   that answer will be yes; and, number two, is that something

16   that the plaintiffs and the defendants would consider as part

17   of the settlement process in making opt-out -- opting out a

18   bit -- or facilitating opt-outs, given the current issues that

19   people have had with regard to USPS.

20           MS. CARROLL:  Judge -- and that's a good question.

21           One thing I want to highlight for the Court is that

22   our settlement agreement actually provides for an opt-out form

23   to be agreed upon by the parties.  And we haven't submitted it

24   for the Court's consideration, and I'm happy to do that.

25           In terms of submitting the opt-out form, I haven't

1    been involved in any cases where an opt-out form is uploaded.

2    I believe the settlement administrator can set up a dedicated

3    e-mail address where opt-out forms are simply e-mailed to the

4    administrator.

5           But I think our position isn't, you know, that the

6    opt-out process itself needs to be a complicated process.  I

7    think the courts recognize that the decision of whether to opt

8    out is an individual one.  And our concern is that when people

9    exercise their right to opt out, they need to do that in a way

10   that is informed and voluntary.  And, so, there needs to be a

11   signature.  There needs to be the submission of basic

12   information by the person so as to evidence their intent that

13   they really, you know, aren't bound here and they want to opt

14   out and pursue an individual claim.

15          And just based on my experience in other settlements,

16   people are very confused.  And a lot of times they think that

17   when they're submitting an opt-out, they believe they are a

18   submitting a claim.  And, so, we want to make sure that as a

19   fraud prevention mechanism, that we do everything possible to

20   make sure that people understand what they're doing and that

21   they're not filing a claim, they're not choosing to

22   participate.

23          But in terms of process itself, you know, the

24   submission could be set up via dedicated e-mail, you know, if

25   the Post Office is what's causing the Court concern.

1          THE COURT:  Yeah, I think that it would be helpful to

2     have a method by which individual putative class members can

3     opt out electronically.  And that doesn't mean just -- and by

4     electronically, what I mean is rather than mailing a form in

5     where they can scan it and send it to a e-mail box or in some

6     electronic way.

7          Perhaps you're right.  Perhaps, you know, if we have

8     it uploaded to the Web site -- or to the claims administration

9     Web site -- that might cause some confusion.  But, certainly,

10    it seems like an easy thing for the settlement administrator

11    to create a separate e-mail address for opt-outs that people

12    can e-mail their opt-out forms to.

13         I also do think that it would be helpful for the Web

14    site to have an opt-out form because -- and I would like to

15    see one that the parties have agreed to, because in other

16    cases, I have ordered opt-out forms to be sent out along with

17    notices, frankly.  And I think just what it does is it

18    decreases the friction that an individual may encounter in

19    trying to exercise their rights to opt out.

20         And, so, that's something that I would like as part

21    of the settlement, is to have a method -- number one, to have

22    a opt-out form available on the Web site that describes

23    clearly what it is; and, number two, a method by which a

24    person can e-mail that or send it in via electronically to the

25    settlement administrator to voice their intent to opt out of

1   the settlement.

2            So, given that, let's go ahead and hear from -- first

3   of all, from Mr. Gardner -- Jonathan Gardner -- who is

4   representing two individual objectors, Behnken and Mr. Dugan.

5            Mr. Gardner?

6            MR. GARDNER:  Good afternoon, your Honor, and thank

7   you.

8            As an initial matter and something that kind of

9   underlies our entire objection, you know, we believe that the

10  settlement is preempted by the Federal Arbitration Act for

11  those TikTok users who want to pursue arbitration.  The FAA

12  ensures enforcement of arbitration agreements according to

13  their terms.

14           THE COURT:  I guess, Mr. Gardner, my --

15           MR. GARDNER:  The agreement here --

16           THE COURT:  Mr. Gardner, I guess I'm not quite sure I

17  understand that argument because, presumably, any of them can

18  initiate arbitration now.  I don't know how many of them have.

19  But as part of the settlement -- so, TikTok is, basically,

20  waiving its right to arbitration.  There's nothing that would

21  prohibit any putative class member from opting out and

22  initiating arbitration or initiating an arbitration now,

23  frankly.

24           And, so, I guess I'm a bit confused as to why or how

25  the FAA would preclude two parties to an arbitration agreement

1   consenting to do away with the arbitration agreement and

2   settling a -- their claims otherwise.

3          If that were the case, then once -- then, basically,

4   what you're saying is no two parties can ever settle a claim

5   that has an arbitration provision unless they actually went to

6   arbitration.

7          MR. GARDNER:  I'm not arguing that the -- that you

8   can never settle on a class basis where there's an arbitration

9   provision.  TikTok users are free to waive their right to

10   arbitration if they want to participate in the settlement.

11          What I'm saying is you can't craft onto an

12   individual's right to arbitrate an additional term that's not

13   in the agreement itself.  Here, that would be taking the

14   affirmative step of having to opt out under the specific

15   provisions of the opt-out, which we believe are burdensome in

16   this case.

17          But you're adding a term to the agreement to

18   arbitrate between TikTok's and users; that term being you have

19   to take the affirmative step of opting out.  The FAA, I

20   believe, preempts it.

21          But, your Honor, we're not there yet.  It's premature

22   argument.  I just wanted to raise it because I wanted it --

23   because it does underlie the circumstances in this case.

24          Here, we're at a preliminary stage.  The settlement

25   hasn't been preliminarily approved yet.  So, what we're trying

1    to do is work with the Court, work with plaintiffs' counsel to

2    make the opt-out procedure appropriate in this particular

3    case.  And not every two cases are the same.  Opt-out

4    procedures have to be crafted to the circumstances and the

5    context of this case.

6          In this case, there is an arbitration agreement

7    that's unlike the Facebook BIPA case, and it's unlike every

8    securities class action case.  Here, there's an arbitration

9    provision.  In fact, the arbitration provision was used by

10    TikTok as a bludgeon against the plaintiffs' counsel in order

11    to drive down the value of the settlement.  All parties

12    acknowledge that.  They've said the number one risk we faced

13    in this case was the fact that defendants would move to

14    arbitrate and we would get nothing.

15          Why in those circumstances would you make it as

16    difficult as possible for people to exercise their opt-out

17    rights and pursue arbitration when you've then taken away the

18    number one argument the defendants have used to drive the

19    value of this case?

20          I would submit that the FAA requires making the

21    opt-out procedures easier.  And what we're asking the Court to

22    do here is simply allow people who want to opt out to do so

23    through counsel without a wet-ink signature.  Those

24    requirements -- as found by a number of judges, including

25    Judge Breyer in Intuit, and Judge Alsup alluded to this in

1    DoorDash -- you know, in certain circumstances when you have

2    an arbitration provision requiring a mail-in, requiring a

3    wet-ink signature is burdensome when you have counsel

4    representing those individuals.  And --

5             THE COURT:  But, I guess, Mr. Gardner, how burdensome

6    is it for someone to sign a piece of paper if they want to opt

7    out?  I mean, there has to be some sort of affirmative showing

8    of intent.

9             I mean, I've read the Intuit case.  And, as you say,

10   Mr. Gardner, that's kind of the beauty and the painfulness of

11   class actions is that every case is individual, right?  So,

12   like no two cases --

13            MR. GARDNER:  Correct.

14            THE COURT:  -- are unique.  And, so, it comes upon

15   the discretion of the district court to try to fashion

16   something within the bounds of the Federal Rules and the

17   Constitution as to how cases like this can be resolved, if

18   they can be resolved.

19            And I guess in Intuit, it made sense for Judge Breyer

20   in that case to look toward or lean upon electronic signature

21   because Intuit was the creator of online tax return

22   submissions, right?  And, so, Judge Breyer said, well, if

23   Intuit can't figure out how to do this via electronic

24   signature without worrying about authenticity and genuine

25   signatures, then no one can; and, surely, Intuit has the tools

1    to do that.

2           But here, I really wonder whether in a case like this

3    whether having, you know, the individual putative class

4    members actually just sign a piece of paper -- and, you know,

5    a form of it would be provided on the Web site.  The parties

6    have more or less agreed that it could be submitted via e-mail

7    to the settlement administrator.  And, of course, they don't

8    have to do it, I suppose.  I suppose counsel can gather those

9    forms up and submit it en masse.

10          So, I'm wondering how big of a burden is it, really?

11          MR. GARDNER:  Well, two things, your Honor.  First,

12   in order to become a TikTok user, all you have to do is go to

13   their app, put in a telephone number and e-mail and you're a

14   user.  It's very simple.  It's straightforward.  No signature.

15   No mail.  That's it.

16          In order to be a claimant in this settlement, all you

17   have to do is go to the settlement Web site, fill out a form

18   and submit it.  No signature.  No mail-in.  Simple.

19          Why is it more complicated to opt out of this

20   settlement than it is to make a claim in this settlement?  Why

21   is it more complicated to opt out of this settlement than it

22   is to become a TikTok user?  The only reason is because the

23   settling parties want to make it as burdensome as possible on

24   people to opt out.  That's the reason in this case.

25          Secondly, why is it that it's inappropriate for

1    counsel making the affirmative representation that we are

2    representing these individuals and they have authorized us to

3    opt them out of this settlement, why is it inappropriate for

4    counsel to do that?  Counsel take steps on behalf of their

5    clients all the time in all kinds of contexts.  I take my

6    responsibility to my client seriously.  I take my

7    responsibilities to inform my clients of their options

8    seriously.

9         If this settlement is going to be preliminarily

10   approved and notice is going to be disseminated, we will

11   communicate with our clients; we will lay out their options;

12   we will give them the best advice possible that we can make.

13        And I know how to value this case.  We were

14   co-counsel in the Facebook BIPA case that settled for $650

15   million just for Illinois BIPA -- just for Illinois users.

16        So, I will take all those responsibilities seriously.

17        And, so, why is it that I can't opt out my clients

18   who have authorized me to do that?  Why make that more

19   complicated?  I don't understand it.

20        And in context, your Honor, you know, I think I would

21   recommend the concluding paragraph of Judge Alsup's decision

22   in DoorDash, where he notes the historical context we're in.

23   You know, for years, companies have used these mandatory

24   arbitration provisions to completely shield themselves from

25   liability, knowing that contingent plaintiffs' counsel would

1    not take on individual arbitrations for most consumer cases

2    because they economically can't do it and individuals can't

3    afford to hire counsel to pursue individual arbitrations.

4    Corporate America has fought hard, all the way up to the

5    Supreme Court, to allow these mandatory arbitration provisions

6    to stand and act with impunity.

7         Now, with social media and technological advances,

8    contingent plaintiffs' counsel are turning this around.  We've

9    begun to represent a large number of individuals and bring

10   back the economies of scale.  Defendants are not happy about

11   this.  They want to make it as hard as possible.

12        And because we represent numerous individual clients,

13   there is no doubt that requiring each one of them to print out

14   a form, sign it, upload it, and send it back when they've

15   already retained counsel will diminish the number of people

16   that do it.  It's just clear that that's going to happen.

17   And, so, why require it when I can do it on their behalf?  And

18   counsel does all sorts of things on behalf of clients.

19        THE COURT:  Well, Mr. Gardner, I suppose -- let's say

20   you represent 12 individuals -- just taking a number out of

21   the hat -- who want to opt out and exercise their individual

22   arbitration rights.  Couldn't you have a assistant or a

23   paralegal --

24     (Brief interruption.)

25        MS. FEGAN:  Judge Lee, this is Beth.  It's very hard

1   to hear you today, for everyone.

2         MR. GARDNER:  I was doing fine until about ten

3   seconds ago when I lost you completely, your Honor.

4     (Brief pause.)

5         THE COURT:  So, I guess, Mr. Gardner, my question

6   was:  If these forms are available on the settlement Web site,

7   if you were representing, say, 12 or 20 individuals who wanted

8   to opt out and pursue their individual arbitration rights,

9   couldn't you just have an assistant or someone just download

10   the forms, send them out to your clients and have them send

11   them back to you signed?

12         And, presumably, if you are going to initiate

13   arbitration procedures on behalf of these clients, aren't they

14   going to have to sign something before the AAA or whatever

15   arbitration forum you're going to be pursuing arbitration in?

16         MR. GARDNER:  I mean, we certainly could do that if

17   we were representing 12 individuals.  But as I indicated

18   earlier, representing 12 individuals in an arbitration of this

19   kind is not economically feasible for my firm and we wouldn't

20   do it.  We are representing over a thousand individuals and

21   may represent more than a thousand.

22         THE COURT:  All right.  So --

23         MR. GARDNER:  So --

24         THE COURT:  -- I guess the question is:  Couldn't

25   your assistant just download one form and copy a thousand of

1    them and have your clients sign them?

2           I mean, because after all, like I said, if you're

3    going to start an arbitration proceeding for each of them --

4    which I guess is your intent if you're going to opt out, so

5    they can exercise their arbitration rights -- when they submit

6    an arbitration claim, don't they have to sign it?  Or perhaps

7    I'm wrong.  Perhaps --

8           MR. GARDNER:  They actually don't, your Honor.  The

9    arbitration forms don't require individual signatures, the

10   same as a complaint in federal court doesn't require a

11   individual plaintiff to sign the complaint.  Counsel signs

12   those things on their behalf.

13          THE COURT:  All right.

14          But, presumably, you send them all to your -- you

15   would send them all to your clients for their review and

16   approval, right, before you submit them.  So, I guess, I'm

17   just not --

18          MR. GARDNER:  Of course.

19          THE COURT:  I'm sure that's the case.  I have no

20   reason to doubt that you would.

21          And, so, I guess I'm still just trying to understand

22   why that would be so burdensome to do.

23          Anyway, that's something that I'll just have to kind

24   of consider.

25          MR. GARDNER:  Not every individual has a scanner.

1   Not every individual -- I mean, it's just a unnecessary

2   administrative step that these folks would have to do.

3          And I don't think it's a leap to infer and believe

4   that requiring that additional administrative step to have

5   somebody print out a form, sign it and scan it and send it

6   back is going to involve attrition.  And it's not necessary.

7          I mean, counsel before in her presentation said this

8   is necessary as a fraud prevention mechanism.  She's accusing

9   me of fraud, like I'm going to send in -- you know, I will be

10  communicating with these folks electronically.  Technology has

11  allowed that to happen.  We will make every effort to make

12  sure these individuals have accounts.

13         There is a mechanism in place where we're supposed to

14  work with TikTok's counsel.  There's a 30-day time frame

15  within which we discussed, you know, these claims.  We

16  submitted our list of proposed arbitration clients, that is

17  required by the terms of service.  We've given them notice.

18         There's a provision in there where counsel is

19  supposed to work together.  If they believe some of these

20  people don't exist or don't have accounts, tell us who they

21  are.  We'll go back to them and we'll straighten it out.

22         That's the arbitration process.  But there's no

23  reason why that can't happen through counsel.

24         THE COURT:  Okay.  Thank you, Mr. Gardner.

25         Do you have anything else that you'd like to add on

1    the record today?

2            MR. GARDNER:  I think that pretty much covers it.

3    And I appreciate the time your Honor took to hear that.

4            THE COURT:  Thank you, Mr. Gardner.

5            MS. CARROLL:  Judge, can I --

6            THE COURT:  Hold on, Ms. Carroll.  I'm going to ask

7    you to address all of them -- all of the various points -- at

8    once at the end.  Okay?

9            Let's move on, then, to Mr. Andrews for Objector

10   Litteken.

11           MR. ANDREWS:  Thank you, Judge.

12           Ryan Andrews, Edelson PC, on behalf of Mr. Litteken.

13   Thank you for giving me a chance to address the Court again.

14           What's happening here at preliminary approval where

15   we have three very experienced class action firms all

16   independently sounding the alarm on the inadequacy of this

17   proposed settlement I find strange.  And I do appreciate the

18   Court taking the time to hear all of us out on these initial

19   issues.

20           So, just with notice that we've talked about, one of

21   the main issues that our client was concerned about was that

22   there was a very easy way to give the required direct notice,

23   and the settling parties here are ignoring it.  It's the inbox

24   feature of the app.  TikTok has agreed to give notice via that

25   particular function, as we suggested, and we request that the

1    Court order them to do it.

2          While I think that will go a long way toward making

3    notice adequate, we're still getting mixed messages about the

4    reach on the direct notice from the parties.  The focus has

5    shifted now to this e-mail campaign for the initial

6    preliminary approval brief focused on publication notice.

7    They initially said they only had a third of the e-mails for

8    the class.  Now they have two-thirds or 60 million.

9          The parties were able to give very specific numbers

10   for how many people their publication notice plan would reach.

11   I just think they should provide the Court and the class

12   members with the same type of concrete estimates that their

13   in-app and e-mail notice will reach before the Court approves

14   the notice plan.  There's no real notice plan in writing that

15   involves the direct notice.  I just think we need to see it.

16   We need to make sure it's getting to all the right people, and

17   that they've done all the work they need to do to get people

18   direct notice of this deal.

19         Now, so the parties have essentially agreed to an

20   in-app form of notice.  And I would have expected the

21   supplemental presentation to acknowledge that the claims rate

22   is going to increase beyond the 1.5 that they initially

23   predicted.  But the prediction is staying the same.

24         And everyone is focused on this Facebook BIPA deal.

25   But that's not the only recent privacy case with a high claims

1    rate.  Say what you will about the Equifax settlement, but

2    there were 147 million class members there, and they got over

3    a ten percent claims rate.  There are others similar to the

4    VPPA claims that are being released here.  There are several

5    cases.  One, Edwards vs. Hearst that had 4 million class

6    members.  They got a seven-and-a-half percent claims rate.

7    And we just did a BIPA case with several hundred thousand

8    class members that got a 12-and-a-half percent claims rate.

9           It can be done if effort is going into it.  And

10   really the best notice track of all is what is being given.

11   Class members will file claims.

12          But the problem, I think, here is if there are

13   substantial claims, the relief that's being offered begins to

14   look inadequate.  Our client is a non-Illinois class member

15   that even half the claims rate of the Facebook deal, most

16   class members will get six dollars, which is barely enough to

17   purchase a coffee at Starbucks.  If they had a five percent

18   claims rate -- which is highly probable here -- many class

19   members will maybe get enough to buy lunch.

20          So, these amounts continue to tend to be justified by

21   references to other settlements, many reached over a decade

22   ago.  I just think that times have changed.  So has most

23   people's view of what sufficient relief for privacy cases is.

24   The public thinks they deserve more.  The courts are requiring

25   more.  Congress and enforcement agencies are taking note of

1    privacy violations.  I think we need to do better.

2         And just what's left from their presentations and

3    their supplemental papers, it's still unclear why there is a

4    six-to-one allocation.  As TikTok pointed out in its

5    supplemental brief, co-lead counsel agreed to a warranty

6    that's in the settlement agreement that TikTok's not violating

7    BIPA the way that's alleged in the complaint.  If there was

8    never a BIPA violation, I do not understand why non-Illinois

9    class members are going to get a check that's so small they

10   won't bother cashing it or they probably won't even bother

11   making a claim.

12        One final point just to wrap up, we're not taking any

13   position on Labaton's opt-out argument, but opposed to the

14   papers, we are not in any secret agreement with Labaton.  We

15   haven't discussed this matter with anyone at Labaton.  We have

16   no involvement with the retention of any of their clients for

17   arbitration.  Any assertion to the contrary is completely

18   baseless.

19        So, this whole discussion about the opt-outs in the

20   papers I just want to comment on because it's all focused

21   around Facebook, and there are several things all the parties

22   failed to mention.  One is that in the Facebook settlement, we

23   allowed opt-outs by e-mail without a wet-ink signature.  We've

24   done this for every case that has occurred via the pandemic.

25   Your Honor was right on.  The class -- the claims

1   administrator can acquire an e-mail address.  People should be

2   able to send an e-mail, including all the required information

3   and stating they want to opt out.

4        I will also note that there was an objection in

5   Facebook by a lawyer who wanted to opt out several of his

6   clients without requiring any of that, and the parties let him

7   do it.

8        That is all, unless the Court has any questions for

9   me.

10       THE COURT:  All right.  Thank you very much.

11       MR. ANDREWS:  You're welcome.  Thank you.

12       THE COURT:  Mr. Drury, you are next.

13       MR. DRURY:  Thank you, your Honor.  Good afternoon,

14   your Honor.

15       Given the amount of argument that has gone into

16   talking about the notice and the return on the claims, I want

17   to focus on the unique aspect of our objection, which is the

18   conflict of interest that we've raised.

19       Ms. Carroll did raise the point that there are two

20   separate subclasses that we say should be represented.

21   There's a subclass of minors under the age of 13, which is

22   approximately 6.1 million children; and, then, there's a

23   subclass of children under the age of 18, because those

24   children are not subject to the arbitration and class action

25   waiver provisions that are set forth in TikTok's agreements.

1       With respect to the subclass of minors under the age

2  of 13, as we set forth in our recent reply, there are very

3  serious issues as to the representation that plaintiffs -- in

4  turn, plaintiffs' class counsel -- was able to provide to the

5  class members under the age of 13.

6       As your Honor is well aware, there's another case

7  pending in the Northern District, T.K. vs. ByteDance

8  Technology Company, Inc.  That case had a preliminary

9  settlement proposed to Judge Blakey back in December of 2020.

10 It was preliminarily approved on December 19th, 2020, at which

11 point a preliminary injunction was put into place that

12 prevented settlement class members from filing any new claims

13 that are encompassed in the T.K. matter or from amending any

14 existing claims to include the claims that existed in T.K.

15       Our position has always been that the overlap between

16 T.K. and this case when it comes to privacy claims, and

17 specifically the Video Privacy Protection Act in BIPA, were

18 encompassed and are encompassed in the T.K. case.  We brought

19 a motion to enforce that injunction in front of Judge Blakey.

20 And, as we've stated, he hasn't ruled on it yet, but he set a

21 status hearing for this Wednesday to talk about the overlap

22 and what may be the violation of the injunction by class

23 members in this case who brought claims.

24       Why is that important?  Because when the class

25 members in this case and when counsel in this case went to the

1    settlement hearing on August 13th, which was just six days

2    after the hearing on final approval in the T.K. matter, your

3    Honor, they had the concern -- and TikTok put this in their

4    papers -- that they were in violation of the injunction in

5    T.K., and that they shouldn't even be bringing claims on

6    behalf of the six million children that were under 13.  And

7    with that and knowing that, your Honor, they went ahead and

8    they pressed ahead and they tried to settle claims on behalf

9    of all of these members.

10          However, other than the members that were involved in

11   the MDL settlement negotiations, the other six million

12   children weren't burdened by any potential violation of a

13   preliminary injunction order.  And the way they would view

14   these claims might be vastly different had independent counsel

15   been there.

16          Now, plaintiffs' counsel takes the position that but

17   for them negotiating this settlement, the T.K. class members

18   wouldn't have gotten anything.  And I submit to your Honor

19   that that's the wrong analysis there because the proper

20   procedure to have been pursued is what Mark S. was doing in

21   T.K., which was objecting to the settlement and objecting to

22   the broad release of claims in T.K. because the relief wasn't

23   valuable enough, awaiting for Judge Blakey to make his ruling;

24   and, if his ruling said that that release was too broad or

25   didn't cover the Video Privacy Protection Act claims or didn't

1  cover the BIPA claims, then those claims would not be

2  released.

3        But what the plaintiffs' counsel in this case want to

4  do, they essentially want to be rewarded for violating or

5  potentially violating an injunction.  And that can't be the

6  right result here on behalf of six million class members.  And

7  as Ms. Carroll acknowledged, while maybe 28 of the 35

8  representative class members are minors, it sounds like only

9  one of them was under 13.

10        And what's important, your Honor, to know is that the

11  original complaint that Ms. Carroll filed in this case, the

12  class was defined as minors ages 14 to 17.  And that was

13  actually filed after the injunction was put into place.  It

14  wasn't until after the objections were filed in T.K. that the

15  complaints were amended in the MDL to include all class

16  members under 18 including class members under 13, which was

17  in direct violation or seeming violation of the language in

18  Judge Blakey's preliminary injunction.

19        Another issue that was raised in the supplemental

20  papers of plaintiff's counsel is that when there's an

21  injunction for -- or when there's an arbitration agreement for

22  children under -- for children -- in order to disaffirm, some

23  courts have stated that the -- that the minor trying to

24  disaffirm has to stop using the app, even -- and must have

25  stopped using the app at the time the complaint was filed.

1        Here, we don't have any information about these 28

2   plaintiffs and whether or not they had stopped using the

3   TikTok app at the time they filed their application.  If they

4   hadn't, your Honor -- and we just don't have the discovery on

5   that -- those 28 plaintiffs are in a different position than

6   plaintiffs who had stopped using the app and wouldn't have any

7   issue disaffirming the arbitration provision here.

8        And, so, that, again, is another way in which these

9   plaintiffs' counsel were not adequately representing the

10   millions of minors at stake here.

11        And while they say that they tried to do their best

12   -- and I'm not here to say that they didn't go into those

13   negotiations and try to get a good result -- they were saddled

14   with these conflicts.  One was that there was a violation of

15   the injunction, and two was that we don't know the status of

16   their clients' use of the TikTok app.

17        Now, they state that the -- that what we're trying to

18   get through this is a different value, a different settlement

19   amount for the minor plaintiffs.  That's not the case at all,

20   your Honor.  What our objection is stating is that these minor

21   plaintiffs have a different claim and the strength of their

22   claim is stronger than the adult members because they're not

23   subject to the arbitration provision.

24        And on Page 17 of the plaintiffs' supplemental

25   papers, they flat-out state that the arbitration provision and

1   class action waiver provisions in this case made the class

2   values potentially worth zero.  That's true for people over

3   18, your Honor, but it was never true and is not true for

4   class members that are under the age of 18, and certainly not

5   for class members under the age of 13.

6           Finally, your Honor, I want to highlight one aspect

7   unique to class members under 13 because there seems to be

8   some issue as to the injunctive relief that those class

9   members are entitled to.

10          We don't dispute that there's injunctive relief

11  that's part of the proposed settlement in front of your Honor.

12  But that injunctive relief does not go far enough for the

13  class members that are under the age of 13.  For those class

14  members, TikTok never should have taken any information about

15  those minors.  And any information that TikTok has about

16  minors under the age of 13 should be deleted.

17          Now, the plaintiffs state, well, the Children's

18  Online Privacy Protection Act doesn't have a private right of

19  action.  And we don't dispute that, your Honor.  But this is a

20  settlement.  And if they're there negotiating on behalf of six

21  million minors under the age of 13, one thing that should be

22  pressed for is that these minors should be put in the same

23  position they would have been had TikTok not violated the law

24  to begin with and not invaded their privacy.

25          And here, TikTok has information on minors.  The New

1    York Times did a big article stating that TikTok keeps track

2    of all minors under 14, and I think it's 40 percent of their

3    users are under 14 but not valid in stating their ages.

4    TikTok shouldn't have that information, and that information

5    should be deleted.

6         So, for these reasons, your Honor, the plaintiffs'

7    counsel and plaintiffs' representatives -- and I don't say

8    this in a demeaning way -- had an antagonistic or conflicting

9    interest to those of the six million class members under the

10   age of 13 and the millions of class members under the age of

11   18.  And for that reason, this settlement shouldn't be

12   approved and there should be subclasses for both of these

13   minor victims, your Honor.

14        I could talk more about the notice provisions and the

15   value of the settlement, but I think -- and I haven't been

16   working with co-counsel on preparing our arguments.  But I

17   don't want to waste the Court's time in stating things that

18   it's already heard.  But I'm certainly happy to answer any

19   questions on any of the issues that we've raised in our

20   objections.

21        THE COURT:  Thank you, Mr. Drury.

22        Ms. Carroll?

23        MS. CARROLL:  There's a lot to unpack there.  We'll

24   start with the opt-out procedure.

25        The opt-out procedures that are being proposed here,

1    Judge, are not burdensome.  These are the same opt-out
2    procedures that are used in thousands of class action cases.
3    This is standard operating procedure.  We've cited in our
4    papers several current settlements that the Labaton firm is
5    doing in the securities arena that have the same signature
6    requirement as what we're proposing to the Court.  In fact,
7    this opt-out procedure is the exact same procedure that they
8    used in their Facebook case.
9            We're not adding any burden here.  What we're asking
10   for is basic information on who these people are.  And we need
11   to know that they're exercising their right to arbitrate
12   voluntarily and individually.
13           And as the Court knows, agreements to arbitrate are
14   made in an individual way between the defendant and a
15   plaintiff.  And if someone has not agreed to arbitrate, then
16   they can't proceed in this case where TikTok is not asserting
17   its rights to arbitrate.  And that is why the case law that is
18   cited by Labaton is not controlling here.
19           And, actually, Judge Breyer in the Intuit case -- if
20   the Court takes a look at Page 11, Footnote 9 -- Judge Breyer
21   went out of his way to distinguish the circumstances there
22   because defendant had not asserted its right to arbitrate --
23   here, defendant is not asserting its right to arbitrate.  In
24   Intuit, defendant filed a motion to compel arbitration.  They
25   went all the way up to the Ninth Circuit; the Ninth Circuit

1    upheld that arbitration agreement; and, then, they got a

2    hundred thousand demands for arbitration.  This was not a case

3    where people were soliciting mass opt-outs for arbitrations,

4    which is what is the case here.

5          Judge Breyer, at Page 11, Footnote 9 of Intuit

6    specifically cited the CenturyLink case -- which we put in our

7    papers before the Court -- which is the exact situation that

8    is happening here, where a law firm is attempting to solicit

9    people for arbitration, putting aside whether they're doing it

10   in an ethical way or not.  I don't think that is a question

11   for today.  But I do think it is suspicious that they've told

12   this Court that 957 people want to opt out and pursue

13   arbitration but haven't given the Court any single iota of

14   information regarding those 957 people, or any evidence that

15   they are actually wanting to opt out and they're choosing to

16   opt out.

17         And, again, whether or not their clients are, in

18   fact, wanting to opt out and pursue arbitration is perhaps

19   something that is not for today.  Today we're just talking

20   about the process itself.  But if the Court reviews the

21   CenturyLink opinion, which dealt with this exact issue --

22   where the court required not only signatures, but for the

23   class members to supply additional information about the case

24   and their account information to make sure that this was an

25   informed process -- the Court will find that that CenturyLink

1   case is far more persuasive.

2          And there, Keller Lenkner -- which was soliciting the

3   arbitration opt-outs -- got like 16,000 of them, or that's

4   what they told the Court.  But after the Court made them

5   comply with basic opt-out procedures -- again, similar to the

6   ones Labaton is doing in all of these other settlements and in

7   its Facebook case -- the 16,000 dwindled to less than five

8   people who actually wanted to arbitrate.  I think those

9   results speak for themselves, as we said in our brief.

10         And, again, I'm not accusing anyone of committing

11  fraud.  All I'm saying is that we need to know that

12  arbitration is the route that these people are choosing

13  voluntarily.  And the way to do that is to make sure the

14  process is easy for them, but also that they are making these

15  decisions voluntarily.

16         Now -- and that's all I've got to say about the

17  Labaton objections and their opt-outs.

18         The next objector, Mr. Litteken, I think we've talked

19  exhaustively about notice.  I don't know why they keep

20  bringing up the concept of us not giving direct notice.  We

21  are giving direct notice.  Again, the cornerstone of our

22  notice program is direct e-mail notice to 60 million e-mail

23  addresses.

24         Again, we have a supplemental media plan that reaches

25  95 percent of our target audience, more than five times.  And

1    now we're adding to that in-app notification, which we didn't

2    think was necessary before but the Court can order if it wants

3    it.  I don't think there's anything more to say about notice

4    other than the notice in this case far exceeds the standard

5    for best notice practicable.

6         In terms of the claims rate predictions, we never

7    said at any point that the claims rate in this case was

8    expected to be 1.5 percent.  What we did was we took the

9    numbers that counsel from Facebook gave to Judge Donato, which

10   also included a declaration -- actually, more than one

11   declaration -- from Professor Rubenstein, who did an

12   exhaustive analysis of claims rates in class action

13   settlements.  And we gave data regarding large classes of

14   millions of millions of people and expected claims rate when

15   you're dealing with that many people.  And we created a chart

16   for the Court of hypothetical scenarios where the claims

17   rate -- of course, here, there's an Illinois subclass and a

18   nationwide class.  The nationwide class is much larger, and

19   the Illinois subclass is obviously just a fraction of that.

20        At Page 32 of our preliminary approval brief, we made

21   a chart for the Court of the range of possible scenarios.  Of

22   course, here we're just at preliminary approval.  The claims

23   haven't come in.  So, we're just speculating on what we can

24   expect to find.

25        But even if our Illinois claims rate -- this is the

1   key takeaway.  Even if our Illinois claims rate is the same as

2   what they got in Facebook of 22 percent and we applied their

3   own Professor Rubenstein claims rate for the nationwide class,

4   which was 1.5 percent -- as he said, it was actually 1.4

5   percent, is what he postulated; but we put 1.5 in our chart --

6   the approximate claim value is still well within the range of

7   not only reasonableness, but probably at the high end of what

8   class members are getting in similar privacy settlements.

9            So, if the Court takes a look at our chart, on Line 4

10  is where that analysis appears, where there's a 22 percent

11  hypothetical Illinois claims right and a 1.5 percent

12  nationwide claims rate -- which, again, is like 90 million

13  people -- the Illinois claim value comes out to be $174.57 per

14  class member, and then the nationwide class would get $29.10

15  per class member, where if you take a look at the comparable

16  settlements that we've laid out for the Court in our chart,

17  where a lot of these settlements have settled for no money and

18  just cy pres relief; where other settlements have actually

19  gotten monetary recovery for the class, they've averaged a

20  dollar, we far, far, far surpassed that.  And this is really a

21  terrific settlement, especially in light of all the threshold

22  risks and the very early stage in litigation at which we've

23  achieved this settlement.

24           But we never said that the claims rate was going to

25  be 1.5 percent.  And, of course, we want the claims rate to be

1    as high as possible, and we want people to take advantage of

2    the settlement and to make their claims.

3              I think counsel brought up an allocation point

4    questioning why do we have a six-to-one allocation. And I can

5    address for the Court any process questions your Honor may

6    have. But we appointed independent allocation counsel to vet

7    the BIPA claim in comparison to the claims of the nationwide

8    class. And they negotiated, vetted, reviewed all the relevant

9    facts, including facts that we got from our expert relating to

10   the factual underpinnings of those claims. And this

11   allocation was negotiated. And that's what they came up with.

12             And it's premised on our views of the BIPA claims as

13   being meritorious and looking at their strengths and

14   weaknesses. That was negotiated and arrived at in a

15   meaningful way, and it was done in an independent way, through

16   experienced counsel who knows -- or was well-acquainted with

17   these issues.

18             And just for the Court's understanding, we appointed

19   Mr. Rotter, who was representing the claims of the nationwide

20   class, and Mr. Zouras who was representing the claims of the

21   BIPA class. And Mr. Rotter was involved with Mr. Rhow very

22   early on in this case. He's probably the one with the largest

23   amount of background and investigation into all of the claims

24   that resulted in where we are today on the nationwide class.

25   And Mr. Zouras is a very experienced BIPA litigator. He's

1  probably done more BIPA cases than anybody in the State of
2  Illinois.

3          So, we appointed the two of them to handle the issues
4  relating to the allocation.  They met.  I believe they put in
5  declarations on preliminary approval, each separate,
6  describing their process.  There was nothing improper about
7  that.  And the number that they arrived at takes into
8  consideration the strengths and weaknesses of all the claims.

9          On to Mr. Drury.

10         So, I think I talked about our representation of the
11 minors earlier on in the presentation.  I do want to just
12 touch on the concept of the injunction.  We didn't violate any
13 injunction in going to the settlement table.  Again, I think
14 Mr. Drury just pointed out that my original plaintiff in this
15 case, and the way I pled my class, was that the minor was over
16 the age of 13.  So, that person could not have violated the
17 injunction.  And I understand that that motion is pending in
18 T.K.  We're not in T.K., and I don't know how Judge Blakey is
19 going to rule.

20         But the big takeaway is that the reason the
21 injunction is there, Judge, is for TikTok's benefit.
22 TikTok -- or a defendant -- when you settle a case, they want
23 an injunction because they don't want to be sued by more
24 people who come out of the woodwork when there's a settlement
25 pending.

1          In this case -- or in the T.K. case, Mr. Drury came

2    out and objected, and they're hashing those arguments out.  If

3    TikTok wanted to argue that we didn't have authority to settle

4    some of these claims because of an injunction, it was TikTok's

5    right to do so.  But they didn't raise that.

6          And the reason why the injunction is there was not to

7    protect an objector and also, even worse, have an objector

8    come into this court and tell you, Judge, that you need to

9    throw out a $92 million settlement, which would benefit the

10   class, because we violated an injunction.

11         The goal here, obviously, is to get the best result

12   possible for the class.  And it just shows that the objectors'

13   interest is not aligned with that of the class and of class

14   counsel.

15         One thing I do want to talk about is these COPPA

16   claims.  As Mr. Drury said, these claims are available to

17   under-13 minors.  There's no private right of action for those

18   claims.  And, so, there's no justification of why these

19   under-13 minors could not be adequately represented by counsel

20   representing minors who were 18 or just under the age of 18.

21   Because there's no additional claim, the defense that Mr.

22   Drury alludes to for disaffirmance was also available to my

23   client, who is under the age of 18.  Therefore, you know, I

24   and my co-counsel were fully entitled to negotiate on their

25   behalf, and we recognize that this was a defense that was

1    available.

2            As we said in our papers, disaffirmance, again, is

3    available to an individual; but as of right now, there's not a

4    single case anywhere that says that disaffirmance can be made

5    on behalf of a class.

6            So, as Mr. Drury said, hey, we need to look at the

7    individual circumstances of, did their minors stop using the

8    app or didn't they?  Well, that just shows that disaffirmance

9    could present an individualized issue, and that a class of

10   minors disaffirming this agreement would not be possible.

11           So, you know, in sum, there's not -- there's no

12   additional claim available to the under-13.  Disaffirmance

13   would also apply to the under-18.  We fully looked at their

14   claim and, you know, got to the conclusion that we got to.

15           And, again, the Fraley case is the one that stands

16   for the prop- -- in the Ninth Circuit.  It stands for the

17   proposition that sometimes people or minors may have an extra

18   argument against, you know, a defendant, but that doesn't mean

19   there was a structural conflict in the negotiation of the

20   settlement or that they need a separate subclass for some

21   reason.

22           And, again, here we've gotten great monetary relief.

23   We've gotten broad injunctive relief.  And the injunctive

24   relief says that TikTok has to comply with all of the laws.

25   And to the extent Mr. Drury says we need more for someone who

1    is under 13, that's going to protect them.  And, of course, if

2    they violate the injunction, then we'll be able to proceed

3    accordingly.

4            But in this case, there's nothing -- there was

5    nothing improper.  We've represented everyone well.  And the

6    settlement is a great result, and we think it should be

7    approved.

8            THE COURT:  All right.  Thank you, Ms. Carroll.

9            So, as I said, I've reviewed all of the submissions

10   that were submitted by the parties.  The parties have raised

11   some points today that gave me some additional food for

12   thought.  I'm going to take the motion under advisement, and I

13   will issue a written opinion with regard to my decision.

14           Thank you, everyone.

15           MR. DRURY:  Thank you, Judge.

16           MS. CARROLL:  Thank you, Judge.

17           MR. GARDNER:  Thank you, your Honor.

18                    *    *    *    *    *

19

20   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
21

22
     /s/ Joseph Rickhoff                      April 25, 2021
23   Official Court Reporter

24

25