**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILILNOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: TIKTOK, INC., | ) | |
| CONSUMER PRIVACY | ) | MDL No. 2948 |
| LITIGATION | ) | |
| | ) | Master Docket No. 20 C 4699 |
| | ) | |
| | ) | Judge John Z. Lee |
| | ) | |
| | ) | Magistrate Judge Sunil R. Harjani |
| This Document Relates | ) | |
| to All Cases | ) | |

## MEMORANDUM OPINION AND ORDER

In August 2018, the Beijing-based technology company ByteDance, Ltd. ("ByteDance") launched a social media platform and entertainment application known today as TikTok ("TikTok" or "the App," formerly known as Musical.ly) in the United States and elsewhere abroad. The App, which allows users to share relatively short homemade videos, quickly became one of the most ubiquitous in the world, and boasts more than 800 million active users across the globe today.

Soon after the App exploded in popularity across the United States, however, so too did concerns, and litigation, about its handling of user data. The lead plaintiffs ("Plaintiffs") in this multidistrict litigation ("MDL") are United States residents who allege that the subsidiaries of ByteDance—TikTok, Inc. (formerly Musical.ly, Inc.), TikTok, Ltd., ByteDance Inc., and Beijing ByteDance Technology Co., Ltd. (collectively, "Defendants")—have been flouting U.S. privacy law by surreptitiously harvesting and profiting from Plaintiffs' private information, including their biometric data, geolocation information, personally identifiable information, and

unpublished digital recordings, through the App. Following months of negotiations, Plaintiffs have reached a settlement agreement with Defendants that would provide $92 million in monetary relief and an array of injunctive relief for the putative settlement class.

Before the Court is Plaintiffs' motion for preliminary approval of the settlement agreement, as well as various objections from putative class members. For his part, Objector Dennis Litteken contends that the settlement agreement is not fair, reasonable, and adequate, because it does not reflect the net expected value of continued litigation to the class, and that the proposed notice plan is deficient. Objector Mark S., as parent and legal guardian of his minor son, A.S., echoes these contentions and adds that the settlement does not account for conflicts between minor and non-minor class members and that the proposed release is overly broad vis-à-vis the proposed settlement in a somewhat related case pending in this judicial district. Finally, Objectors Brian Behnken and Joshua Dugas insist that the proposed opt-out procedure is so onerous as to violate due process and the Federal Arbitration Act. For the reasons set forth below, the objections are overruled, and Plaintiffs' motion for preliminary approval is granted.

## I. <u>Background</u>

### A. **Procedural History**

The first of the twenty-one putative class actions comprising this MDL was filed in the Northern District of California in November 2019. *See Hong v. ByteDance, Inc.*, No. 19 C 7792 (N.D. Cal.) (Koh, J.). Led by one of the future members of

Plaintiffs' Interim Co-Lead Counsel team, the parties in *Hong* first engaged in mediation in April 2020. The mediation was facilitated by Layn R. Phillips, a former United States District Judge for the Western District of Oklahoma and founder of Phillips ADR Enterprise, an experienced and well-respected alternative dispute resolution firm.

Beginning in late April 2020, the other twenty putative class actions were filed in four separate federal districts: the Northern District of California, the Central District of California, the Southern District of Illinois, and the Northern District of Illinois. On May 15, 2020, counsel from one of these cases filed a motion with the Judicial Panel on Multidistrict Litigation ("JPML") to consolidate the then-nineteen related actions and to transfer them to one district court for pretrial proceedings pursuant to 28 U.S.C. § 1407. After some contentious litigation, the JPML selected this district, and specifically this Court, on August 12, 2020. *See* 8/12/20 JPML Transfer Order, MDL No. 2948, ECF No. 2.

The next day, on August 13, 2020, Defendant's counsel and Plaintiffs' counsel from eleven of the MDL member cases participated in a second round of mediation with Judge Phillips. Spearheaded by another future member of Plaintiffs' Interim Co-Lead Counsel team, this mediation had been months in the making. By that time, extraordinary political pressure had mounted against TikTok's U.S. operations, culminating in an August 6, 2020, executive order by then-President Trump declaring that TikTok presented "a national emergency" that "threaten[s] the national security,

foreign policy, and economy of the United States." Exec. Order No. 13,942, 85 Fed. Reg. 48,637 (Aug. 6, 2020).

The executive order gave ByteDance forty-five days to sell TikTok's U.S. operations to a U.S. company before the App would be banned in this country, although the White House later extended the deadline. *See* Proclamation No. 10,061, 85 Fed. Reg. 51,297 (Aug. 14, 2020). In light of this ultimatum, Defendants were motivated at the second mediation session to resolve this litigation in order to shed TikTok's existing liabilities and maximize its value in preparation for sale.[1] After more than twelve hours of negotiation, this mediation session ended in an agreement in principle for class-wide resolution. The terms were later memorialized in a signed agreement on September 4, 2020, although it remained confidential, even from the Court, for some time thereafter.

On September 28, 2020, the Court appointed three attorneys to serve as Plaintiffs' Co-Lead Counsel, one to serve as Plaintiffs' Liaison Counsel, and five to serve as members of the Plaintiffs' Steering Committee (collectively, the "Plaintiffs' Leadership Group"). *See* Case Management Order No. 3, ECF No. 94. In making these selections, the Court drew upon the attorneys' efforts "in identifying or investigating potential claims in the action"; their "experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; their

---

[1]     Although ByteDance initially agreed to sell its U.S. operations of TikTok to Oracle and Walmart later in September 2020, a final agreement never materialized, and negotiations have since stalled as the Biden administration has shelved Trump's threat to blacklist the App. *See, e.g.*, Bobby Allyn, *Biden Administration Pauses Trump's TikTok Ban, Backs Off Pressure to Sell App*, National Public Radio, Feb. 10, 2021, https://www.npr.org/2021/02/10/966584204/ (last accessed Sept. 29, 2021).

"knowledge of the applicable law"; and the resources that they would "commit to representing the class"; as well as among other factors pertaining to their "ability to fairly and adequately represent the interests of the class." *See* Fed. R. Civ. P. 23(g)(1)(A)–(B). The Court also was driven by a desire to diversify the members of the Plaintiffs' Leadership Group in terms not only of their individual experiences, locations, attributes, and qualifications, but also of their relationship to and involvement in the settlement efforts thus far, in hopes that such diversity would promote more robust efforts to represent the interests of the putative class as a whole.

Once the Court designated the members of the Plaintiffs' Leadership Group, they engaged in an extensive effort to evaluate the September 4, 2020, settlement agreement. Members were tasked with analyzing an array of legal, factual, and strategic issues; evaluating confirmatory discovery, including interrogatories, document requests, depositions by written question; reviewing the results of a weeks'-long, on-site inspection of TikTok's source code conducted by a world-renowned expert; and engaging in further negotiations with Defendants. *See* Pls.' Mot. Prelim. Approval Class Action Settlement ("Pls.' Mot."), Ex. F, Carroll Decl. ¶¶ 29–37, ECF No. 122-6. Through these efforts, the Plaintiffs' Leadership Group achieved an addendum to the settlement agreement that strengthens many of its terms, especially with regard to injunctive relief, as well as a consensus amongst Plaintiffs on the terms now presented before the Court.

Amid these settlement efforts, Plaintiffs filed a consolidated amended class action complaint on December 18, 2020. *See* Consolidated Am. Class Action Compl.

("Compl."), ECF No. 114. The complaint identifies a Nationwide Class, defined as all United States residents who have used the App prior to preliminary approval, and an Illinois Subclass, defined as all Illinois residents who have used the App to create one or more videos prior to preliminary approval, which is premised on alleged violations of Illinois's Biometric Information Privacy Act ("BIPA"), 740 Ill. Comp. Stat. 14/1 *et seq.* Compl. ¶ 322.

In addition to the BIPA claim (brought on behalf of the putative Illinois Subclass), the complaint asserts nine counts on behalf of the putative Nationwide Class: violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; violation of the Video Privacy Protection Act ("VPPA"), *id.* § 2710; violation of California's Comprehensive Computer Data Access and Fraud Act ("CCDAFA"), Cal. Penal Code § 502; violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; violation of California's False Advertising Law ("FAL"), *id.* § 17500 *et seq.*; violation of the right to privacy under the California Constitution, *see* Cal. Const. art. I, § 1; intrusion upon seclusion under California common law; unjust enrichment under California common law; and violation of consumer protection statutes in various other states. Compl. ¶¶ 338–427.[2]

After five months of vetting and working to improve upon the original settlement agreement, Plaintiffs moved for preliminary approval on February 25,

---

[2]    According to the complaint, California substantive law (unlike Illinois substantive law under BIPA) should apply to every member of the putative Nationwide Class, regardless of the member's state of residence, because California's substantial contacts with the asserted claims—Defendants' U.S. headquarters and principal place of business are located there, and the alleged misconduct emanated from there—give it a substantial interest in regulating Defendants' U.S. operations. Compl. ¶¶ 334–37.

2021, at which time its terms were first unveiled. *See* Pls.' Mot., Ex. A, Settlement Agreement and Release ("Settlement Agreement"), ECF No. 122-1. In brief, the Settlement Agreement provides as follows.

**B.      Terms of the Settlement Agreement**

First, the Settlement Agreement provides for monetary relief in the form of a $92 million escrow account that Defendants would fund within 90 days for the benefit of Settlement Class members. Settlement Agreement § 4.1. After deducting all Court-approved settlement-related costs and fees, including reasonable attorneys' fees, the fund would be divided into a total number of *pro rata* shares equal to the sum of (1) the number of Nationwide Class members (an estimated 89 million persons) who submit a valid claim and (2) five times the number of Illinois Subclass members (an estimated 1.4 million persons, all members of the Nationwide Class as well) who submit a valid claim. *Id.* §§ 4.5, 5.2–5.3, 13.1; *id.*, Ex. C, Plan of Allocation and Distribution of Settlement Funds at 2, ECF No. 122-3. In this way, members of the Nationwide Class would each receive one share, while members of the Illinois Subclass would each receive one share (for being members of the National Class) plus five additional shares, for six shares overall.[3]

Members selected as class representatives also may be eligible for a service award of up to $2,500 each. Settlement Agreement § 13.2. And any residual funds

---

[3]      In order to arrive at the multiplier for the Illinois Subclass, Plaintiffs' Leadership Group designated separate independent counsel to represent the interests of the Nationwide Class and the interests of the Subclass. After evaluating the strength and weaknesses of the respective claims, the attorneys then engaged in arms-length negotiations to arrive at the multiple. Pls.' Mot., Ex. J, Rotter Decl. ¶¶ 7–9, ECF No. 122-10; *id.*, Ex. K, Zouras Decl. ¶¶ 6–12, ECF No. 122-11.

would be redistributed to class members to the extent feasible or otherwise distributed on terms approved by the Court. *Id.* §§ 5.4.1–5.4.2. Nothing would revert to Defendants. *Id.* § 4.5.

In addition to monetary relief, the Settlement Agreement provides for broad injunctive relief. Specifically, Defendants agree to refrain from using the App to collect or store a domestic user's biometric data, geolocation information, or 'clipboard' content; from storing or transmitting a domestic user's data outside of the United States; and from pre-uploading domestic user-generated content; unless expressly disclosed in TikTok's privacy policy and in compliance with all applicable laws. *Id.* § 6.1. Defendants also would delete all pre-uploaded user-generated content collected from domestic users who did not 'save' or 'post' the content, and would require a newly designed annual training program for their employees and contractors on compliance with data privacy laws. *Id.* §§ 6.2–6.3.

What is more, Defendants agree to hire a third-party firm at their own expense to review their data privacy training for a period of three years and to provide a written verification of that review. *Id.*, Attach., Addendum No. 1 to Settlement Agreement § 4.3, ECF No. 122-1. Defendants would not share users' personally identifiable information with any third party to the extent prohibited by the Video Privacy Protection Act and would disclose the extent to which they share any user data with third parties in TikTok's privacy policy. *Id.* § 4.1.

In exchange for such monetary and injunctive relief, members of the Settlement Class agree to release Defendants from any and all claims that were or

could have been asserted in this MDL relating to the collection and use of user data. *Id.* §§ 2.30, 12.1–12.5.[4] To opt out of this bargain, a member of the Settlement Class must timely complete, sign, and mail a request for exclusion using a designated form to a designated settlement administrator, setting forth: (i) the name of this matter; (ii) the person's or entity's full name, address, email address and telephone number; (iii) a specific statement of the person's or entity's intention to be excluded from the settlement; (iv) the identity of the person's or entity's counsel, if represented; and (v) the date on which the request was signed. *Id.* § 10.1.

The parties propose to provide notice of the Settlement Agreement to members of the Settlement Class through a program led by an experienced third-party administrator. *See id.* § 9.1; *id.*, Ex. L, Weisbrot Decl., ECF No. 122-12. The program will include direct notice to all class members whose email addresses the administrator is able to identify and validate from an analysis of class data records as well as a national media campaign consisting of targeted advertisements via the internet, Facebook, Instagram, Twitter, and various search engines, with specific emphasis on reaching Illinois Subclass members. Weisbrot Decl. ¶¶ 12, 19, 24, 36, 40. The digital media campaign alone is anticipated to reach over 95% of class members more than five times each, while at least one-third of class members are

---

[4]     At the same time, Defendants agree to waive their right to enforce the release to the extent that the release would prevent class members from participating in the pending settlement in *T.K. v. ByteDance Tech. Co.*, No. 19 C 7915 (N.D. Ill.) (Blakey, J.). Settlement Agreement § 2.4; *see also* 4/28/21 Min. Entry, *T.K.*, ECF No. 68 (noting that Defendants "do not object to an ostensible 'double recovery' by members of the settlement class" in both that case and this case). For this reason, the Court overrules Mark S.'s objection that the release in this case is overbroad by making class members choose between the proposed settlement in this case and in *T.K.*

expected to receive direct email notice. *Id.* ¶¶ 15, 18, 47. The proposed notice plan also calls for a dedicated settlement website and a toll-free telephone line. *Id.* ¶ 14.

Furthermore, while Defendants were initially reluctant to provide notice via the TikTok App's 'inbox' feature for a variety of reasons, they have since agreed to do so at their own cost. Pls.' Suppl. Mem. Supp. Mot. Prelim. Approval Class Action Settlement at 25, ECF No. 137.

## II.    <u>Legal Standard</u>

"Federal Rule of Civil Procedure 23(e) requires court approval of any settlement that effects the dismissal of a class action." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002) (cleaned up). When parties seek preliminary approval of a class-action settlement agreement under Rule 23(e), the district court must undertake three essential inquiries.

First, the court must determine whether it "will likely be able" to certify the putative class for purposes of judgment on the proposed settlement. Fed. R. Civ. P. 23(e)(1)(B)(ii); *see Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, Nos. 07 C 2898, 09 C 2026, 2011 WL 3290302, at *3 (N.D. Ill. July 26, 2011). The criteria for class certification "demand undiluted, even heightened attention" in the Rule 23(e) context given that "a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *see also Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 985 (7th Cir. 2002).

Second, the district court must determine whether the proposed settlement is

10

"within the range of possible approval" with regard to the criteria set forth in Rule 23(e)(2). *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982) (cleaned up); *see* Fed. R. Civ. P. 23(e)(1)(B)(i). Under Rule 23(e)(2), the court may finally approve a proposal settlement "only after a hearing and only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). At the preliminary approval stage, however, the purpose of the inquiry is only "to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing," *Gautreaux*, 690 F.2d at 621 n.3, "not to conduct a full-fledged inquiry into whether the settlement meets Rule 23(e)'s standards," *Am. Int'l Grp.*, 2011 WL 3290302, at *6. "Thus, although neither the Federal Rules of Civil Procedure nor binding case law requires it," courts in this district have tended to perform "a more summary version of the final fairness inquiry" at the preliminary approval stage. *Id.* (collecting cases); *see In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 (7th Cir. 1979) (stating that preliminary approval hearings are preferable but not mandatory).

The Seventh Circuit's "longstanding guidance" on Rule 23(e)(2) instructs district courts to consider the following factors in conducting a fairness inquiry: "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed." *Wong v. Accretive Health, Inc.*, 773 F.3d 859,

863 (7th Cir. 2014) (quoting *Gautreaux*, 690 F.2d at 631); *see also* Fed. R. Civ. P. 23(e)(2) (listing factors for final approval). "The most important factor relevant to the fairness of a class action settlement is the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *In re Gen. Motors*, 594 F.2d at 1132 n.44. At the same time, courts "do not focus on individual components of the settlements, but rather view them in their entirety in evaluating their fairness." *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996) (cleaned up).

Third, if the district court finds that it will likely be able to certify the putative class and that the proposed settlement is within the range of possible approval, the court must then direct the plaintiffs to provide notice "in a reasonable manner to all class members who would be bound" by the proposed settlement agreement. Fed. R. Civ. P. 23(e)(1). For any Rule 23(b)(3) class proposed to be certified for purposes of a settlement under Rule 23(e), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). This notice requirement "is designed to guaranty that those bound by the ruling in a class action were accorded their due process rights to notice and an opportunity to be heard." *Chaffee v. A&P Tea Co.*, Nos. 79 C 2735 and 79 C 3625, 1991 WL 5859, at *2 (N.D. Ill. Jan. 16, 1991).

Before proceeding to this three-part inquiry, it bears emphasizing the Seventh Circuit's recognition that, due to "the built-in conflict of interest in class action suits," the law "quite rightly requires more than a judicial rubber stamp when the lawsuit

that the parties agreed to settle is a class action." *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014). On the contrary, the ever-present problem in class action litigation of lawyers who "may . . . place their pecuniary self-interest ahead of that of the class . . . . requires district court judges to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions." *Reynolds*, 288 F.3d at 280. The appellate court has even "gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." *Id.* At the same time, it has recognized that "[f]ederal courts naturally favor the settlement of class action litigation." *Isby*, 75 F.3d at 1196.

### III. <u>Analysis</u>

### A. Whether the Putative Class Is Likely To Be Certified

The first issue is whether the Court "will likely be able" to certify the putative Settlement Class for purposes of a judgment on the proposed settlement. Fed. R. Civ. P. 23(e)(1)(B)(ii). This inquiry focuses on two rules: Rule 23(a) and Rule 23(b)(3).

### 1. Rule 23(a)

First, under Rule 23(a), the Court must determine whether it is likely to find that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

The first three of these prerequisites are readily satisfied in this case. Given its estimated 89 million members nationwide, the Class is plainly too numerous for joinder to be practicable. *Cf. McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002) ("Although there is no 'bright line' test for numerosity, a class of forty is generally sufficient to satisfy Rule 23(a)(1)."). And there are abundant questions of law and fact arising from the "nucleus of operative fact" common to those 89 million class members, including, to name some of the key examples:

- Whether Defendants improperly collected, stored, disseminated, or otherwise used class members' biometric data and personally identifiable information;

- Whether Defendants exceeded the scope of their authorized access to class members' electronic devices;

- Whether Defendants were unjustly enriched through their alleged misconduct;

- Whether class members consented to Defendants' alleged misconduct by agreeing to TikTok's terms of service;

- Whether class members suffered actual damages; and

- Whether class members are entitled to monetary and injunctive relief.

*Cf. Parker v. Risk Mgmt. Alternatives, Inc.*, 206 F.R.D. 211, 213 (N.D. Ill. 2002) ("[A] common nucleus of operative fact is usually enough to satisfy the [commonality] requirement."). Similarly, because each class member is a user of the App who confronted the same alleged misconduct in much the same manner, the claims of the proposed class representatives typify those of the absent class members. *Cf. id.* ("Typicality is satisfied if a plaintiff's claims arise from the same event, practice or

14

course of conduct that gives rise to the claim of the other class members, and if the claims are based on the same legal theory.").

The Court also finds that the proposed representative parties will fairly and adequately protect the interests of the Nationwide Class and Illinois Subclass as a whole, and have done so thus far. This prerequisite of Rule 23(a) has two components: (1) "the representatives must not possess interests which are antagonistic to the interests of the class," and (2) "the representatives' counsel must be qualified, experienced and generally able to conduct the proposed litigation." *CV Reit, Inc. v. Levy*, 144 F.R.D. 690, 698 (S.D. Fla. 1992); *see also Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598 (7th Cir. 1993).

Here, the proposed Nationwide Class representatives' interests are aligned with, not antagonistic to, those of the absent Nationwide Class members, because they all want to use the App without having their privacy rights violated and to receive compensation for their allegations that Defendants have previously violated those rights under law that applies nationwide. The same goes for the proposed Illinois Subclass representatives' interests in vindicating the privacy rights of Illinois users of the App under BIPA. And especially given that the proposed class counsel are the same attorneys whom the Court vetted and selected to serve as Plaintiffs' Interim Co-Lead Counsel, the Court is confident that they possess the qualifications, experience, and capabilities needed to champion these interests.

Disagreeing with this conclusion, Mark S. objects that the proposed settlement does not satisfy Rule 23(a)(4) because, in his view, it omits additional subclasses

15

needed to account for two conflicts that exist between minor and non-minor putative class members. First, Mark S. contends that minor class members should receive greater compensation because, unlike non-minor class members, they are able to disaffirm the purported arbitration agreements and class action waivers found in TikTok's terms of service, which are among the primary litigation risks Plaintiffs face. But Mark S. overlooks that disaffirmance would seem to require individual minor class members, at the very least, to stop using the App, which may not be worthwhile. *Cf., e.g.*, *C.M.D. ex rel. De Young v. Facebook, Inc.*, 621 F. App'x 488, 489 (8th Cir. 2015) ("By continuing to use facebook.com after bringing their action, Plaintiffs manifested an intention not to disaffirm the contract."). And Mark S. does not contend that any minor class members have disaffirmed these agreements to date. In any event, twenty-eight of the thirty-five proposed class representatives are themselves minors and have an interest in ensuring that their rights (and those of other minor class members) are aggressively pursued. And, indeed, the proposed class counsel, all of whom represent minor Plaintiffs, represent that they studied this issue while negotiating the settlement.

Second, Mark S. posits that minors under the age of thirteen require unique injunctive relief in order to ensure that Defendants delete all of their personal information and disclose the identities of the entities with whom Defendants previously shared this information. But Mark S. fails to explain why this is so, and the Court discerns no reason why minor class members under thirteen would suffer

harms that are different than those of older minor class members, after the settlement is implemented.

## 2. Rule 23(b)(3)

Because Plaintiffs seek to certify the Class under Rule 23(b)(3), the Court also must consider whether it is likely to conclude that: "the questions of law or fact common to the class members predominate over any questions affecting only individual members"; and "a class action is superior over other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Factors particularly pertinent to these issues here "include: (A) the class members' interests in individually controlling the prosecution . . . of separate actions" and "(B) the extent and nature of any litigation concerning the controversy already begun." *See id.*

These prerequisites are satisfied as well. Predominance is met because many of the issues of law and fact common to members of the Nationwide Class and Illinois Subclass, respectively, may be resolved "through generalized proof"—namely, by examining Defendants' uniform data collection and privacy practices against their legal obligations. And these issue "are more substantial" than any issues that may be "subject only to individualized proof." *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015).

The requirement of superiority also is met because, given the relatively modest amounts that class members would stand to recover in individual actions, it is improbable that many "would possess the initiative to litigate individually." *See Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1165 (7th Cir. 1974); *cf.*

17

*Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." (cleaned up)). Indeed, as the procedural history of this MDL illustrates, this is precisely the kind of matter in which "a class suit is the best, and perhaps the only, way to proceed." *See Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 880 (7th Cir. 2000).

In sum, the Court will likely be able to certify the proposed Nationwide Class and Illinois Subclass.

## B.  Whether the Proposed Settlement is Within the Range of Possible Approval

The next issue is whether the proposed settlement is "within the range of possible approval" with regard to its fairness, reasonableness, and adequacy to class members. *Gautreaux*, 690 F.2d at 621 n.3 (cleaned up); *see* Fed. Rs. Civ. P. 23(e)(1)(B)(i), 23(e)(2). The Court must consider a variety of factors in making this determination, including: "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed," as noted. *Wong*, 773 F.3d at 863 (quoting *Gautreaux*, 690 F.2d at 631).

"The most important factor relevant to the fairness of a class action settlement," *In re General Motors*, 594 F.2d at 1132 n.44, the first of these is also the most challenging to assess. After all, litigating the merits is precisely what

settlements are designed to avoid. And the Seventh Circuit has "instructed district courts 'to refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights'" when considering this factor. *Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 877 F.3d 276, 285 (7th Cir. 2017) (quoting *Isby*, 75 F.3d at 1196–97).

To complicate matters further, two Objectors—Mark S. and Dennis Litteken— insist that the Settlement Agreement's monetary component does not reflect the strength of Plaintiffs' case on the merits. Mark S. does so based on *Reynolds*, while Dennis Litteken contrasts the value of the proposed settlement in this case with that of the settlement his attorneys helped to achieve in *In re Facebook Biometric Information Privacy Litigation*, 522 F. Supp. 3d 617 (N.D. Cal. 2021), *appeal dismissed*, No. 21-15555, 2021 WL 2660668 (9th Cir. June 22, 2021).

In *Reynolds*, the Seventh Circuit held that, "in the suspicious circumstances" through which the settlement in that case was reached, the district court should have made some effort "to quantify the net expected value of continued litigation to the class." 288 F.3d at 284–85. "Determining that value," the court explained, "require[s] estimating the range of possible outcomes and ascribing a probability to each point on the range." *Id.* at 285. While the court recognized that "[a] high degree of precision cannot be expected in valuing a litigation," it noted that the district court "could have insisted that the parties present evidence that would enable four possible outcomes to be estimated: call them high, medium, low, and zero," in terms of the "approximate . . . probability of obtaining each of these outcomes in a trial," thereby deriving "a

19

ballpark valuation." *Id.*; *cf. Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (stating that district courts "should" undertake this analysis). Here, Mark S. contends that Plaintiffs have not provided the Court with enough details to perform such a valuation.

In more recent years, however, the Seventh Circuit has clarified that "the *Synfuel/Reynolds* evaluation of potential outcomes need not always be quantified, particularly where there are other reliable indicators that the settlement reasonably reflects the merits of the case." *Kaufman*, 877 F.3d at 285 (citing *Wong*, 773 F.3d at 864); *see also Martin v. Reid*, 818 F.3d 302, 307 (7th Cir. 2016) (characterizing the "estimate of trial recovery" under *Reynolds* as "important where [the] settlement is problematic"); *cf. Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 634 (7th Cir. 2011) ("A district court must take special care in performing this assessment when the proposed settlement evinces certain warning signs."). In *Wong*, for instance, the court affirmed the district court's decision to approve a class action settlement without attempting to quantify the net expected value of continued litigation in the absence of any "suspicious circumstances." 773 F.3d at 864 (quoting *Reynolds*, 288 F.3d at 284). To the contrary, the court observed that the settlement "was reached through extensive arms'-length negotiations with an experienced third-party mediator," during which "the parties' positions on liability and damages were extensively briefed and debated; that the defendant "was prepared to vigorously contest the lawsuit, having raised potentially valid defenses"; its motion to dismiss had been "fully briefed and argued"; and that the lead plaintiff "had received access

to extensive public documents," although "formal discovery had not yet commenced." *Id.*[5] The court noted too that further litigation "almost certainly would have involved complex and lengthy discovery and expert testimony" and that the attorneys who negotiated the settlement were "highly experienced." *Id.*

Many of the same reliable indicators of a reasonable, negotiated settlement are present here. The Settlement Agreement was initially reached through hard-fought, arms'-length negotiations, which were mediated, on two separate occasions, by a reputable former federal judge. It was refined through further negotiation by a Court-appointed leadership group comprising a diverse cast of experienced plaintiffs' attorneys. Defendants have forcefully disputed their liability at every stage, raising a host of factual and legal defenses. The parties have exhaustively analyzed and debated their respective positions as part of their negotiations. And Plaintiffs have reviewed substantial confirmatory discovery, including an expert-led analysis of TikTok's source code. What is more, although the initial agreement was inked while this MDL was in its early stages, it capitalized on urgent and extraordinary political pressure upon Defendants to shed TikTok's existing liabilities, and the Settlement Agreement has since been vetted again by the entire Plaintiffs' Leadership Group.

---

[5]     Several circuits even apply a presumption that a class action settlement reached through "arm's-length negotiations between experienced, capable counsel after meaningful discovery" is fair, reasonable, and adequate. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *see also City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996) (same); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) (similar); *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, Nos. 07 C 2898, 09 C 2026, 2012 WL 651727, at *10 (N.D. Ill. Feb. 28, 2012) (following *Wal-Mart*); *see generally* 4 Newberg on Class Actions § 13:45 (5th ed. 2013) ("[C]ourts have long held that the process of an arms-length negotiation supports a presumption that the settlement is fair.").

Consequently, the Court need not undertake the type of mechanical mathematic valuation exercise upon which Mark S. insists. Instead, it need only recognize that the proposed settlement ensures meaningful, immediate monetary and injunctive relief for 89 million individuals, and weigh those benefits against the substantial risks that Plaintiffs would face in seeking a better outcome at trial. And, as will be explained, after such an analysis, the Court finds that the settlement agreement is well within the range of fairness, reasonableness, and adequacy

One set of risks that Plaintiffs could have to overcome arise from the many colorable defenses, whether affirmative or failure-of-proof, that Defendants have raised. For starters, Defendants contend that class members are subject to the class action waiver and arbitration agreements incorporated in TikTok's terms of service. Given the prohibitive time and expense of undertaking millions of individual arbitrations, Plaintiffs "would likely receive nothing" if Defendants succeeded on this front. *See Kaufman*, 877 F.3d at 285. In addition, Defendants have gone so far as to warranty and confirm through discovery that they have "not used the App to collect biometric information or [] identifiers as defined by [BIPA]." Settlement Agreement § 7.1; *see also id.* §§ 7.2–7.3. And Defendants have disputed Plaintiffs' VPPA claim on numerous colorable grounds, including that TikTok is not "engaged in the business . . . of rental, sale, or delivery or prerecorded video cassette tapes or similar audio visual materials," *see* 18 U.S.C. § 2710(a)(4); that class members do not count as "subscriber[s]" of TikTok's services, *see id.* § 2710(a)(1); *cf. Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1255 (11th Cir. 2015) (reviewing disagreement among district

courts as to whether users of an app are subscribers under the VPPA); that the user data at issue does not constitute "personally identifiable information," *see* 18 U.S.C. § 2710(a)(3); that their alleged disclosures of user data to third parties fall under the "incident to the ordinary course of business" exemption, *see id.* § 2710(b)(2)(E); and that Plaintiffs provided "informed, written consent" for these alleged disclosures by agreeing to TikTok's terms of service, *see id.* § 2710(b)(2)(B).

Defendants' position that class members consented to the alleged misconduct by accepting TikTok's terms of service poses an obstacle for Plaintiffs' remaining claims as well. For example, their CFAA and CCDAFA claims hinge on unauthorized access to their mobile devices. *See Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1068–69 (9th Cir. 2016). Their FAL and UCL claims require actual reliance on misrepresentations or nondisclosures. *See Williams v. Apple, Inc.*, 449 F. Supp. 3d 892, 912 (N.D. Cal. 2020). Their California constitutional claim calls for an intrusion of a reasonable expectation of privacy so serious "as to constitute an egregious breach of the social norms." *See Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1073 (Cal. 2009) (cleaned up). Their intrusion upon seclusion claim similarly demands a "highly offensive" intrusion, a "high bar" that courts have found even unauthorized disclosure of user data to fail. *See In re Google, Inc. Privacy Pol'y Litig.*, 58 F. Supp. 3d 968, 987–88 (N.D. Cal. 2014) (cleaned up). And their unjust enrichment claim asks whether Defendants are "unfairly possessing" data to which they are "not entitled." *See Cleary v. Philip Morris Inc.*, 656 F.3d 511, 520 (7th Cir. 2011).

Another set of litigation risks derive from the difficulty of proving damages for Plaintiffs' claims. Although BIPA and the VPPA offer statutory damages ranging from $1,000 to $5,000 per violation, consumer class actions under these statutes settle for far less. Settlements under the VPPA typically achieve *cy pres*-only relief worth a few dollars or less per class member. *See, e.g.*, *Lane v. Facebook, Inc.*, 696 F.3d 811, 817, 819 (9th Cir. 2012), *cert. denied* 134 S. Ct. 8 (2013) (about $2.59 per class member); *In re Netflix Privacy Litig.*, No. 11 C 379, 2013 WL 1120801, at *1–2 (N.D. Cal. Mar. 18, 2013) (about $0.14 per class member). The few consumer settlements under BIPA also have featured relatively modest recoveries. *See, e.g.*, *Sekura v. L.A. Tan Enters., Inc.*, No. 2015-CH-16694, 2016 WL 10672183, at *2 (Ill. Cir. Ct. Dec. 01, 2016) (approving settlement providing gross recovery of about $40.54 per class member). In addition, Defendants will no doubt argue that violations of BIPA, without more, do not qualify as injuries for purposes of Article III standing under *Spokeo, Inc. v. Robins*. *See* 136 S. Ct. 1540, 1550 (2016) (holding that "a bare procedural violation" of a statute is not an injury-in-fact); *cf. Patel v. Facebook Inc.*, 290 F. Supp. 3d 948, 952–56 (N.D. Cal. 2018) (discussing this issue).

Plaintiffs' other claims will require proof of actual damages, a hurdle given that courts "[g]enerally . . . have rejected the contention that the unauthorized collection, use, or disclosure of personal information constitutes economic damages," *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 988 F. Supp. 2d 434, 448–50 (D. Del. 2013), *aff'd in relevant part, vacated in other part*, 806 F.3d 125 (3d Cir. 2015) (dismissing claims under the CFAA, UCL, and CCDAFA for lack of Article

24

III standing), while non-economic damages can be just as hard to prove. Indeed, it is not uncommon for consumer class action settlements based on such claims to yield no monetary relief at all. *See, e.g.*, *McDonald v. Kiloo A/S*, No. 17 C 4344, 2020 WL 5702113, at *5 (N.D. Cal. Sept. 24, 2020) (granting preliminary approval to settlement providing only injunctive relief and noting that "any damage award" for claims of intrusion upon seclusion and violations of the California constitutional right to privacy, the UCL, and various consumer protection statutes "was uncertain and likely to have been nominal for most class members").

These litigation risks reveal why *In re Facebook* is a poor comparator to this case. Class counsel in that case achieved a stellar settlement, providing a gross recovery of about $428 per class member, even at an impressive 22% claims rate.[6] Unlike Defendants, however, Facebook conceded that it had implemented personally identifying facial recognition technology that could automatically "tag" individuals appearing in photos, while denying that this technology performed facial scans within the meaning of BIPA. *See In re Facebook Biometric Info. Privacy Litig.*, No. 15 C 3747, 2018 WL 2197546, at *2 (N.D. Cal. May 14, 2018). The court found Facebook's

---

[6]      According to the plaintiffs' expert witness in *In re Facebook*, the average claims rate for classes above 2.7 million class members is less than 1.5%. *See* 2d Expert Decl. Prof. William B. Rubenstein ¶ 5, *In re Facebook*, ECF No. 517-2; *see also Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (*en banc*) (noting that claims rate in consumer class action settlements "rarely exceed seven percent"); *Pollard v. Remington Arms Co., LLC*, 320 F.R.D. 198, 214–15 (W.D. Mo. 2017) (collecting cases that have approved settlements "where the claims rate was less than one percent"). In this case, a 1.5% claims rate would result in a gross recovery of $383.33 for each member of the Illinois Subclass and $63.89 for each non-Illinois member of the Nationwide Class, whereas a claims rate of 20% would yield gross recoveries of $28.75 for each member of the Illinois Subclass and $4.79 for each non-Illinois member of the Nationwide Class.

25

position to raise "a quintessential dispute of fact for the jury to decide." *Id.* at *3. And the case ultimately settled just days before trial. *In re Facebook*, 2021 WL 757025, at *2. Here, by contrast, Defendants warrant that TikTok does not use any such facial recognition technology. And, when this defense is combined with the others noted above (such as the risk of being compelled to arbitrate, which was not raised in *In re Facebook*), such defenses raise appreciable doubt as to whether Plaintiffs' BIPA claim would survive summary judgment and prevail at trial.

The remaining factors likewise reveal that the proposed settlement is within the range of fairness, reasonableness, and adequacy. In addition to being risky, further litigation in this case—assuming that Plaintiffs' claims survived motions to compel arbitration and dismiss—would almost certainly be complex, lengthy, and expensive. *Cf. Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("[C]lass action suits have a well deserved reputation as being most complex."). Proceeding to trial likely would take years and entail extensive fact and expert discovery and motion practice, including, in all probability, a contested motion to certify, motions for summary judgment, and *Daubert* motions. Furthermore, after the completion of pretrial proceedings, many of the individual cases that comprise this MDL would be sent back to their transferor courts for trial, absent a stipulation by the parties to try the cases in this Court, potentially resulting in even further motion practice and delay. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 32–40 (1998); *Armstrong v. LaSalle Bank Nat. Ass'n*, 552 F.3d 613, 615–16 (7th Cir. 2009).

The Court also finds it noteworthy that, out of an estimated 89 million members of the Settlement Class, only two (Mark S. and Dennis Litteken) have objected to the fairness, reasonableness, and adequacy of this widely published settlement so far. Moreover, all three of Plaintiffs' Interim Co-Lead Counsel, whom the Court found well qualified to serve in that role, have attested to their belief that the proposed settlement is fair, reasonable, and adequate. Carroll Decl. ¶ 41; Pls.' Mot, Ex. G, Fegan Decl. ¶ 3, ECF No. 122-7; *id.*, Ex. H, Rhow Decl. ¶ 3, ECF No. 122-8. Add to this the opinion of Judge Phillips (whom Chambers and Partners, a respected legal company, has named one of the top mediators in the United States) that the settlement is fair, adequate, and reasonable, "especially when measured against the significant obstacles standing in the way of . . . Plaintiffs' claims." *Id.*, Ex. I, Phillips Decl. ¶ 12, ECF No. 122-9. And combine all this with the many months Plaintiffs' counsel spent engaging in arms'-length negotiations and performing exhaustive analysis of relevant law and evidence, giving them "a clear view of the strengths and weaknesses" of their case in reaching the proposed settlement. *See In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986). These factors bolster the Court's confidence that the proposed settlement was the result of careful consideration and robust negotiations.

For all of these reasons, the Court find that the proposed settlement is "within the range of possible approval" and likely to satisfy the requirements of Rule 23(e)(2). *See Gautreaux*, 690 F.2d at 621 n.3 (cleaned up).

**C.      Whether the Proposed Notice Plan Provides the Best Notice Practicable**

The final issue is whether the proposed notice plan provides "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The best notice practicable is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950); *see Appleton Elec. Co. v. Advance-United Expressways*, 494 F.2d 126, 140 (7th Cir. 1974).

**1.      Notice Plan**

The notice plan proposes to provide direct email notice to every member of the Settlement Class whose email address the settlement administrator is able to identify from its analysis of class data records; Plaintiffs' counsel estimates that this group would consist of one-third or more of class members.  The settlement administrator also will implement a comprehensive digital media campaign calculated to reach over 95% of class members more than five times each.  The Federal Judicial Center has found that a notice plan calculated to reach between 70% and 95% of the class in total is reasonable and that, according to a study of recent published decisions, the median reach calculation on approved notice plans is 87%.  Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide at 3 (2010), https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf (last accessed Sept. 12, 2021).

28

Believing that this plan does not do enough to provide direct notice to putative class members, Objectors Mark S. and Dennis Litteken argue that notice should be provided through the TikTok App as well. Initially, Defendants were reluctant to provide in-app notice due to concerns that users have not consented to receive 'inbox' notifications unrelated to integral features of the App. In response to this objection, however, Defendants subsequently offered to provide 'inbox' notice at their own cost if the Court so orders. And, in that regard, the Court agrees with Mark S. and Dennis Litteken that notice through the App itself would significantly enhance the notice program and that the benefit to class members of providing in-app notice outweighs any detriment. Thus, the Court accepts Defendants' offer and orders them to provide 'inbox' notice through the App, at their own cost, to every identifiable U.S. user.

The Objectors' remaining challenges to the proposed notice plan fail to persuade. Mark S. argues that the proposed notices should indicate the estimated amount that each claimant will recover, as opposed to the total amount of the settlement fund, but Rule 23(c)(2) does not require such information. *See* Fed. R. Civ. P. 23(c)(2)(B). And given that the total amount is substantial, disclosing that figure alone is reasonably calculated to induce claims. Moreover, while Mark S. complains that the proposed claim form asks claimants to provide information not required to use the App, like their mobile telephone number, these modest demands are unlikely to suppress claims. For his part, Dennis Litteken questions why the settlement administrator cannot guarantee direct email notice to every member of the Class.

Because Defendants must now provide in-app notice as well, the Court declines to require a more expansive email-notice campaign.

### 2. Opt-Out Procedure

Contesting the notice plan's proposed opt-out procedure, Objectors Brian Behnken and Joshua Dugan, along with 957 unidentified others who, their lawyers represent, wish to opt out of the Settlement Class and arbitrate their claims (collectively, the "Arbitration Claimants"), argue that the opt-out procedure is so onerous that it violates their due process rights. Instead of having to complete, sign, and mail in individual paper opt-out forms, the Arbitration Claimants insist that they should be able to opt out *en masse* by means of a single unsigned, electronic filing from their lawyers.

Just as the requirements of notice and opportunity to opt out are designed to protect the due process rights of individual class members, courts have recognized that "opting out is an individual right" that "must be exercised individually." *In re Diet Drugs Prods. Liab. Litig.*, 282 F.3d 220, 241 (3d Cir. 2002) (cleaned up); *accord, e.g.*, *In re Nat'l Football League Players' Concussion Inj. Litig.*, No. 14-1995, 2019 WL 95917, at *5 (E.D. Pa. Jan. 3, 2019); *Wai Hoe Liew v. Cohen & Slamowitz, LLP*, 265 F. Supp. 3d 260, 275 (E.D.N.Y. 2017); 3 Newberg on Class Actions § 9:49 (5th ed. 2013). For this reason, courts have routinely enforced the requirement that class members individually sign and return a paper opt-out form as "vital" to ensuring "that the class member is individually consenting to opt out." *In re Centurylink Sales Pracs. & Sec. Litig.*, No. C 17-2832, 2020 WL 3512807, at *3–4 (D. Minn. June 29,

2020) (collecting cases); *see also In re Deepwater Horizon*, 819 F.3d 190, 197 (5th Cir. 2016) (noting that "this common and practical requirement" is "consistently enforced" in MDLs (cleaned up)). Courts also have noted that such a requirement is not unduly burdensome, especially given that e-filing "makes it easier for third parties and their counsel to file unauthorized mass opt-outs." *In re Centurylink*, 2020 WL 3512807, at *3 (cleaned up); *see also In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 118 (D.N.J. 2012) (finding it not overly burdensome for opt-outs to have to "provide some proof of class membership"). In fact, courts have frequently rejected the very sort of "attempts by lawyers to opt out class members *en masse*" that counsel for the Arbitration Claimants ask the Court to approve here. *See In re Diet Drugs*, 282 F.3d at 241 (italics added). As one court has put it, "mass unsigned opt outs are highly indicative of a conclusion that . . . counsel did not spend very much time evaluating the merits of whether or not to opt out in light of the individual circumstances of each of their clients and in consultation with them." *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex.*, 910 F. Supp. 2d 891, 939 (E.D. La. 2012), *aff'd sub nom. In re Deepwater*, 739 F.3d 790.

Although the Arbitration Claimants cite a handful of cases from the Northern District of California that did not require individual signatures to opt out, the Court respectfully declines to follow them. Most of these cases failed to grapple with the reasons why courts have required individual signatures in the first place. *See Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1067 (N.D. Cal. 2020); *Hadley v. Kellogg Sales Co.*, No. 16 C 4955, 2020 WL 836673, at *8 (N.D. Cal. Feb. 20, 2020);

*Knight v. Concentrix Corp.*, No. 18 C 7101, 2019 WL 3503052, at *6 (N.D. Cal. Aug. 1, 2019); *In re MyFord Touch Consumer Litig.*, No. 13 C 3072, 2018 WL 10539267, at *2 (N.D. Cal. June 7, 2018). Another cited case held only that individual signatures were not necessary "given the unique circumstances" at hand and without suggesting they would have violated due process. *See Arena v. Intuit Inc.*, No. 19 C 2546, 2021 WL 834253, at *10 (N.D. Cal. Mar. 5, 2021). Nor is the Arbitration Claimants' reliance upon *In re Piper Funds, Inc., Institutional Government Income Portfolio Litigation*, helpful. 71 F.3d 298 (8th Cir. 1995). In *Piper*, the court held that it was a violation of the Federal Arbitration Act to *enjoin* a class member, who had sought to opt out, from arbitrating its claim before the settlement was finally approved. *Id.* at 302–03. No such injunction is requested here.

The Arbitration Claimants' suggestion that the entire Settlement Agreement violates the FAA by abrogating Defendants' arbitration agreements with opt-in class members is equally meritless. It is well established that parties may waive their own rights to arbitrate, as the settling parties intend to do here. *See St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co.*, 969 F.2d 585, 590 (7th Cir. 1992) (noting that courts "treat a waiver of the right to arbitrate the same as [they] would treat the waiver of any other contract right"). Neither *Piper* nor *Bigger v. Facebook, Inc.*, 947 F.3d 1043 (7th Cir. 2020), which the Arbitration Claimants also cite, suggest otherwise. In *Bigger*, the Seventh Circuit placed limitations on a district court's ability to issue notice (there, of a collective action) when the defendant seeks to

*enforce*—not waive—its arbitration agreements with the parties to be noticed. *Id.* at 1048–50.

Yet another problem with this objection is that, given their intent to opt out, the Arbitration Claimants lack standing to object to the substantive terms of the proposed settlement because, once they opt out, they will have "no stake" in the settlement itself. *See Olden v. LaFarge Corp.*, 472 F. Supp. 2d 922, 931 (E.D. Mich. 2007); *cf. Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 246 (7th Cir. 1992) ("The general rule, of course, is that a non-settling party does not have standing to object to a settlement between other parties.").

To sum up, the Court approves the proposed notice plan, notices, claim form, and opt-out procedure, with the caveat that Defendants must also provide in-app notice at their own cost to every putative class member, as they have agreed to do.

## IV.    <u>Conclusion</u>

For the reasons set forth above, Plaintiffs' motion for preliminary approval is granted, and the objections of Mark S., Dennis Litteken, Brian Behnken, and Joshua Dugas are overruled. The Court will enter a separate order granting preliminary approval of the class action settlement.

**IT IS SO ORDERED.**                    **ENTERED: 9/30/21**

_____
**John Z. Lee**
**United States District Judge**