**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: TIKTOK, INC., CONSUMER PRIVACY LITIGATION,** | **MDL No. 2948**<br><br>**Master Docket No. 20-cv-4699**<br><br>**Judge John Z. Lee**<br><br>**Magistrate Judge Sunil R. Harjani** |
| **This Document Relates to All Cases** | |

## MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

**Table of Contents**

I.      INTRODUCTION ............................................................................................. 1

II.     BACKGROUND ............................................................................................. 2

    A.  Plaintiffs' Allegations ............................................................................ 2

    B.  The Risks of TikTok's Defenses to Plaintiffs and the Class ................................ 4

    C.  Litigation and Procedural History........................................................................ 8

III.    SETTLEMENT TERMS ................................................................................ 13

    A.  The Settlement Classes ....................................................................... 13

    B.  Monetary Relief for Settlement Class Members................................................. 13

    C.  Plan of Allocation ............................................................................... 14

    D.  Injunctive Relief.................................................................................. 15

    E.  Release ................................................................................................ 16

    F.  Class Representative Service Awards.................................................. 17

    G.  Attorneys' Fees and Costs .................................................................. 17

    H.  Settlement Administration .................................................................. 17

IV.     CLASS NOTICE & RESPONSE ................................................................. 18

    A.  Notice was disseminated via a robust multi-faceted campaign including widespread publication and advertising, direct emails, and in-App notice. ....... 18

    B.  The claims rates of 1.4% for the Nationwide Class and 13% for the Illinois Subclass falls well within the range of comparable class action settlements. .... 22

    C.  Only a fraction of 1% of the class opted out of the Settlement. ......................... 23

    D.  Only four individuals objected, and none of their objections is colorable. ........ 24

    E.  CAFA notice was provided and no objections followed. .................................. 24

V.      STANDARDS FOR SETTLEMENT APPROVAL ....................................... 24

VI.     FINAL APPROVAL IS WARRANTED......................................................... 28

    A.  The strength of Plaintiffs' case compared to the amount of the Settlement favors final approval. .................................................................................... 28

    B.  An assessment of the likely complexity, length, and expense of continued litigation favors approval of the Settlement..................................................... 30

    C.  The lack of opposition to the Settlement favors final approval. ........................ 32

        1.  The Helfand Objection was filed by a serial objector and lacks merit. .. 32

        2.  The Cochran Objection was filed by a serial objector, did not comply with the requirements of the Preliminary Approval Order, and lacks merit. ................................................................................................ 37

3. The Mark S. Objection did not comply with the requirements of the Preliminary Approval Order, restates objections previously considered and rejected by the Court, and fails to disclose that Mark S. has asked another court to award him legal fees for this "remarkable" Settlement. 39

4. The Litteken Objection failed to comply with the requirements of the Preliminary Approval Order, restates objections this Court has already considered and rejected, and continues a string of baseless and irrelevant *ad hominem* attacks. ........................................................................ 45

D. The stage of the proceedings and the amount of discovery completed at the time of Settlement, as well as the opinion of competent counsel, favor final approval. ........................................................................................................... 57

VII. CONCLUSION ................................................................................................. 59

## Table of Authorities

**Cases**                                                                    **Page(s)**

*Adkins v. Facebook, Inc.*,
No. 18-CV-05982, 2021 U.S. Dist. LEXIS 87097 (N.D. Cal. May 6, 2021) .................. 29-30

*Armstrong v. Bd. of Sch. Dirs.*,
616 F.2d 305 (7th Cir. 1980) ............................................................... 24

*Bayat v. Bank of the W.*,
No. C-13-2376, 2015 U.S. Dist. LEXIS 50416 (N.D. Cal. Apr. 15, 2015) ........................... 22

*Bower v. MetLife, Inc.*,
No. 1:09-CV-351, 2012 U.S. Dist. LEXIS 149117 (S.D. Ohio Oct. 17, 2012) .................... 50

*Brown v. Hain Celestial Grp., Inc.*,
No. 3:11-CV-03082, 2016 U.S. Dist. LEXIS 19275 (N.D. Cal. Feb. 17, 2016) .................... 34

*Burns v. Elrod*,
757 F.2d 151 (7th Cir. 1985) ............................................................... 20

*Champs Sports Bar & Grill Co. v. Mercury Payment Sys., LLC*,
275 F. Supp. 3d 1350 (N.D. Ga. 2017) ...................................................... 38, 40, 41

*Collins v. Quincy Bioscience, LLC*,
No. 19-22864, 2020 U.S. Dist. LEXIS 218673 (S.D. Fla. Nov. 16, 2020) ............... 33, 34, 35

*Cotton v. Hinton*,
559 F.2d 1326 (5th Cir. 1977) .............................................................. 31

*Ferron v. Kraft Heinz Foods Co.*,
No. 20-CV-62136, 2021 U.S. Dist. LEXIS 129955 (S.D. Fla. July 13, 2021) .................... 38

*Fraley v. Facebook, Inc.*,
966 F. Supp. 2d 939 (N.D. Cal. 2013) ....................................................... 29

*Gascho v. Glob. Fitness Holdings, LLC*,
No. 2:11-CV-436, 2014 U.S. Dist. LEXIS 46846 (S.D. Ohio Apr. 4, 2014) ........................ 51

*Gehrich v. Chase Bank U.S.*,
316 F.R.D. 215 (N.D. Ill. 2016) ............................................................ 30

*Grady v. De Ville Motor Hotel, Inc.*,
415 F.2d 449 (10th Cir. 1969) ............................................................. 30

*Halley v. Honeywell Int'l, Inc.*,
  861 F.3d 481 (3d Cir. 2017) ................................................. 51

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ................................................. 30

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
  270 F.R.D. 330 (N.D. Ill. 2010) ................................................. 25, 28

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
  789 F. Supp. 2d 935 (N.D. Ill. June 2, 2011) ................................................. 20, 32

*In re Briscoe*,
  448 F.3d 201 (3d Cir. 2006) ................................................. 21, 22

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
  No. 1:17-MD-2800, 2020 U.S. Dist. LEXIS 118209 (N.D. Ga. Mar. 17, 2020) ................. 38

*In re Google Buzz Privacy Litig.*,
  No. 10-00672, 2010 U.S. Dist. LEXIS 146767 at *4-10 (N.D. Cal. June 2, 2011) ............. 29

*In re Google LLC St. View Elec. Commc'ns Litig.*,
  No. 10-md-02184, 2020 U.S. Dist. LEXIS 47928 (N.D. Cal. Mar. 18, 2020) ..................... 29

*In re Google Plus Profile Litig.*,
  No. 5:18-CV-06164, 2021 U.S. Dist. LEXIS 13571 (N.D. Cal. Jan. 25, 2021) ................... 29

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*,
  No. 08-1999, 2010 U.S. Dist. LEXIS 121684 (E.D. Wis. Oct. 28, 2010) ........................... 50

*In re LinkedIn User Priv. Litig.*,
  309 F.R.D. 573 (N.D. Cal. 2015) ................................................. 29

*In re Mercury Interactive Corp. Sec. Litig.*,
  618 F.3d 988 (9th Cir. 2010) ................................................. 51

*In re Mexico Money Transfer Litig.*,
  164 F. Supp. 2d 1002 (N.D. Ill. 2000) ................................................. 58

*In re NFL Players Concussion Injury Litig.*,
  821 F.3d 410 (3d Cir. 2016) ................................................. 50-51

*In re Northfield Lab'ys, Inc. Sec. Litig.*,
  No. 06-C-1493, 2012 U.S. Dist. LEXIS 12741 (N.D. Ill. Jan. 31, 2012) ........................ 25, 26

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
527 F. Supp. 3d 269 (E.D.N.Y. 2021) .................................................................... 54

*In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*,
No. 08-C-1832, 2016 U.S. Dist. LEXIS 25290 (N.D. Ill. Feb. 29, 2016) ........................ 21, 28

*In re Suboxone Antitrust Litig.*,
No. 16-5073, 2021 U.S. Dist. LEXIS 166675 (E.D. Pa. Sept. 2, 2021) .................................. 53

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
No. 2445, 2021 U.S. Dist. LEXIS 231508 (E.D. Pa. Dec. 3, 2021) ....................................... 54

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
895 F.3d 597 (9th Cir. 2018) ................................................................................ 49-50, 53

*In re Syngenta AG MIR 162 Corn Litig.*,
357 F. Supp. 3d 1094 (D. Kan. 2018) .................................................................... 38

*Isby v. Bayh*,
75 F.3d 1191 (7th Cir. 1996) ................................................................. 24, 27, 28, 58

*Johnson v. Uber Techs.*,
No. 16-C-5468, 2018 U.S. Dist. LEXIS 161155 (N.D. Ill. Sept. 20, 2018) ............................ 5

*Kaufman v. Am. Express Travel Related Servs.*,
877 F.3d 276 (7th Cir. 2017) ............................................................................. 51, 52

*Kaufman v. Am. Express Travel Related Servs.*,
No. 07-CV-1707, 2016 U.S. Dist. LEXIS 26167 (N.D. Ill. Mar. 2, 2016) ............................. 20

*Keil v. Lopez*,
862 F.3d 685 (8th Cir. 2017) .............................................................................. 50

*Kolinek v. Walgreen Co.*,
311 F.R.D. 483 (N.D. Ill. 2015) ....................................................................... 22, 25

*Lane v. Facebook, Inc.*,
696 F.3d 811 (9th Cir. 2012) ............................................................................. 29

*Legg v. Lab. Corp. of Am. Holdings*,
No. 14-61543-CV, 2016 U.S. Dist. LEXIS 122695 (S.D. Fla. Feb. 18, 2016) ............... 34-35

*Manigault-Johnson v. Google, LLC*,
No. 2:18-cv-1032, 2019 U.S. Dist. LEXIS 59892 (D.S.C. Mar. 31, 2019) .................... 43, 44

*McKinnie v. JP Morgan Chase Bank, N.A.*,
  678 F. Supp. 2d 806 (E.D. Wis. 2009) .................................................................. 58

*Miracle-Pond v. Shutterfly, Inc.*,
  No. 19-CV-04722, 2020 U.S. Dist. LEXIS 86083 (N.D. Ill. May 15, 2020) ...................... 4-5

*Norcia v. Samsung Telcomms. Am., LLC*,
  No. 14-CV-00582, 2021 U.S. Dist. LEXIS 135256 (N.D. Cal. July 20, 2021) .............. 34, 35

*Parker v. Time Warner Ent. Co., L.P.*,
  631 F. Supp. 2d 242 (E.D.N.Y. 2009) .................................................................. 29

*Perez v. Asurion Corp.*,
  501 F. Supp. 2d 1360 (S.D. Fla. 2007) .................................................................. 22

*Peter v. Doordash, Inc.*,
  445 F. Supp. 3d 580 ................................................................................................ 5

*Poertner v. Gillette Co.*,
  618 F. App'x 624 (11th Cir. 2015) .................................................................. 22

*Pollard v. Remington Arms Co., LLC*,
  320 F.R.D. 198 (W.D. Mo. 2017) .................................................................. 23

*Redman v. Radioshack Corp.*,
  768 F.3d 622 (7th Cir. 2014) .................................................................. 51, 52

*Schulte v. Fifth Third Bank*,
  805 F. Supp. 2d 560 (N.D. Ill. 2011) .................................................................. 31

*Spann v. J.C. Penney Corp.*,
  No. CV 12-0215, 2016 U.S. Dist. LEXIS 137184 (C.D. Cal. Sept. 30, 2016) ...................... 33

*Sullivan v. DB Invs., Inc.*,
  667 F.3d 273 (3d Cir. 2011) (en banc) .................................................................. 23

*Synfuel Techs., Inc. v. DHL Express, Inc.*,
  463 F.3d 646 (7th Cir. 2006) .................................................................. 28

*T.K. v. ByteDance Tech. Co*,
  No. 19-CV-7915, 2022 WL 888943 (N.D. Ill. Mar. 25, 2022) ............................................ 41

*Wilkins v. HSBC Bank Nev., N.A.*,
  No. 14-C-190, 2015 U.S. Dist. LEXIS 23869 (N.D. Ill. Feb. 27, 2015) ........................ 20-21

*Wong v. Accretive Health, Inc.*,
  773 F.3d 859 (7th Cir. 2014) ................................................................ 27

*Wright v. Nationstar Mortg. LLC*,
  No. 14-C-10457, 2016 U.S. Dist. LEXIS 115729 (N.D. Ill. 2016) ....................................... 30

**Statutes**

28 U.S.C. § 1715 ................................................................................ 24

50 U.S.C. § 1601 ................................................................................. 9

50 U.S.C. § 1701 ................................................................................. 9

740 Ill. Comp. Stat. §14/1, et seq. ............................................................ 3, 4

**Rules**

Fed. R. Civ. P. 23 .......................................................................... *passim*

## I.     INTRODUCTION

The Settlement presented for approval here is one of the largest data privacy settlements in history – a $92 million non-reversionary cash settlement fund with additional injunctive relief that directly addresses the privacy concerns raised by Plaintiffs' claims.[1] The Court preliminarily approved the Settlement on September 30, 2021, after a hearing and thorough consideration of objections to Plaintiffs' motion for approval. ECF Nos. 161 (Memorandum Opinion) and 162 (Preliminary Approval Order) (collectively, the "Preliminary Approval Orders").

After the Court preliminarily approved the Settlement, Notice was issued to the Class via a nationwide media campaign, a social media campaign across multiple platforms, a paid search campaign, direct emails to class members, and direct messages within the TikTok application ("App"). The Notice Plan has been successful. Over 1.2 million individuals submitted Valid Claims. Each Nationwide Class Member who submitted a Valid Claim will receive approximately $27.19, and each Illinois Subclass Member who submitted a Valid Claim will receive approximately $163.13 after the deduction of Settlement-related costs, including the expenses of the Settlement Administrator and the costs of Notice to the Class, any service awards, any fee awards, and any other administrative fees and expenses which may be approved by the Court. This result compares favorably with other court-approved privacy class action settlements.

In contrast to the 1.2 million individuals who found the Settlement terms favorable and submitted a Valid Claim, only four have objected to the Settlement and just 28 filed valid requests to opt out of the Settlement. Of those four objections, two were filed by individuals who objected at the preliminary approval stage and raise substantially similar arguments to those the Court

---

[1] Capitalized terms have the same meanings as set forth in the September 4, 2020 Settlement Agreement and Release ("Settlement Agreement"), as clarified by the February 16, 2021 Addendum No. 1 to Settlement Agreement and Release ("Addendum") (collectively, the "Settlement"), ECF No. 122-1.

already considered and rejected. The other two objections were filed by serial objectors and lack both credibility and merit.

These facts indicate a successful Notice Plan and widespread support for the Settlement by Class Members. Accordingly, Plaintiffs now seek final approval of the Settlement and final certification of the Nationwide Class and the Illinois Subclass. The Settlement achieved an excellent result for the Class and satisfies all criteria for final settlement approval.

## II.     BACKGROUND

This multidistrict litigation (MDL) consists of 21 putative class actions against U.S. defendants TikTok Inc. ("TikTok") and ByteDance Technology Inc. ("ByteDance"), and foreign defendants TikTok, Ltd. and Beijing ByteDance Technology Co. Ltd. ("Beijing ByteDance") (collectively, "Defendants" or, in the Settlement, "Defendant's Released Parties"). The cases allege that Defendants invaded Plaintiffs' and putative class members' privacy through the popular TikTok application and its predecessor application Musical.ly, a video-sharing social networking service used to create short videos.

### A.  Plaintiffs' Allegations

This case involves Defendants' collection, use, and transmission of highly sensitive personal data via Defendants' ubiquitous TikTok App. *See* Consolidated Amended Class Action Complaint ("Complaint"), ECF No. 114. The App allows users to create and share 60-second videos—typically of people doing activities such as dancing, lip-syncing, and stunts—and boasts a substantial worldwide fanbase. *Id.* at ¶¶ 2, 128, 131, 134. TikTok's popularity has exploded over the past year as the COVID-19 pandemic has left users bored and spending more time at home.

Specifically, Plaintiffs allege that the TikTok App infiltrates its users' devices and extracts a broad array of private data including biometric data and content that Defendants use to track and

profile TikTok users for the purpose of, among other things, ad targeting and profit. *Id.* at ¶¶ 9-18, 137-192, 240-298, 402-417.

With regard to Plaintiffs' core claims under the Illinois Biometric Information Privacy Act (BIPA), 740 Ill. Comp. Stat. §14/1, *et seq.*, the Complaint alleges that the App uses a complex system of artificial intelligence to recognize facial features in users' videos, which allows the user to use various filters and stickers. *Id.* at ¶¶ 240-281, 402-417. Plaintiffs allege that the App also analyzes faces to determine the user's age, race/ethnicity, and gender, using proprietary algorithms to attempt to prevent minor children from using the App and to recommend content and profiles for the user to follow. *Id.* at ¶¶ 242-243, 245, 250, 258-259. By utilizing this private and biometric information, Plaintiffs contend, TikTok maintains a competitive advantage over other social media apps and profits from its use of improperly obtained data, all while failing to comply with the minimum requirements for handling users' biometric data established by BIPA.

The Complaint also alleges violations of a number of other statutory, common law, and constitutional claims arising from Defendants' alleged taking and transmission of other private, legally protected data. Plaintiffs assert claims for violations of the Computer Fraud and Abuse Act (CFAA), California Comprehensive Data Access and Fraud Act (CDAFA), California Constitutional Right to Privacy, California Unfair Competition and False Advertising laws, Video Privacy Protection Act (VPPA), Intrusion Upon Seclusion, and Restitution/Unjust Enrichment. *Id.* at ¶¶ 338-401. Underlying Plaintiffs' VPPA claim, for example, are allegations that TikTok unlawfully transmitted class members' personal and private viewing histories to third parties like Facebook and Google. *Id.* at ¶ 159. In support of their CFAA claim, as another example, Plaintiffs allege that Defendants exceeded the scope of their authorized access to Plaintiffs' and class members' devices and the private information contained on those devices. *Id.* at ¶ 340.

While these data privacy violations alone support Plaintiffs' legal claims, TikTok's apparent ties to China compound Plaintiffs' concerns. *Id.* at ¶¶ 3. The Complaint alleges that Defendants do not adequately disclose that user data collected from Plaintiffs is stored and shared with affiliates in countries outside the United States, such as China (conduct which TikTok denies). Beijing ByteDance has spent the last decade using technologies such as artificial intelligence and facial recognition. *Id.* at ¶ 271. Defendants' reported connections to the Chinese government have very recently come under close public scrutiny and several U.S. Senators formally requested a risk assessment of Defendants' data collection activities, and the U.S. Department of Defense issued an internal memorandum encouraging its employees to avoid installing the App. *Id.* at ¶¶ 4, 6, 200, 203, 205, 219, 342.

### B. The Risks of TikTok's Defenses to Plaintiffs and the Class

TikTok has taken the position that the foreign Defendants are not subject to personal jurisdiction, and that Plaintiffs' claims are based on speculation about how the App works and an incorrect interpretation of governing law.

First, TikTok has repeatedly asserted that Plaintiffs' claims are subject to an arbitration and class action waiver agreement. According to TikTok, at all relevant times, every TikTok user agreed to an arbitration and class-waiver provision in the App's Terms of Service ("Terms"). When users create their accounts in the App, they encounter a sign-in screen with hyperlinks to the Terms that read: "By continuing, you agree to TikTok's Terms of Use and confirm that you have read TikTok's Privacy Policy."

While Plaintiffs believe TikTok's policies were not adequately presented or otherwise disclosed to its users, and that class members should not be bound by their provisions, Plaintiffs acknowledge that courts have consistently held that users were on notice of—and thus had agreed to—virtually identical disclosures. *See, e.g., Miracle-Pond v. Shutterfly, Inc.*, No. 19-CV-04722,

2020 U.S. Dist. LEXIS 86083, at *7-8 (N.D. Ill. May 15, 2020) (granting motion to compel arbitration and staying class action where contract was formed with hyperlinked policies near a sign-in button); *Peter v. Doordash, Inc.*, 445 F. Supp. 3d 580, No. 19-CV-06098 (N.D. Cal. 2020) (same); *Johnson v. Uber Techs.*, No. 16-C-5468, 2018 U.S. Dist. LEXIS 161155, at *3-4 (N.D. Ill. Sept. 20, 2018) (same); *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482 (9th Cir. 2020) (reversing denial of motion to compel arbitration where website required acknowledgment of agreement before proceeding).

According to TikTok, even minors who may be able to disaffirm the arbitration agreement may not be able to establish disaffirmance collectively on behalf of a class because disaffirmance purportedly presents individualized issues. Thus, TikTok's position is that arbitration would create a dispositive threshold procedural problem for Plaintiffs before any factual or legal merits are even considered. And even if minors could overcome the arbitration agreement through disaffirmance, some of the claims asserted in this litigation would, according to TikTok, be released in connection with another action, *T.K., et al. v. Bytedance Tech. Co., Ltd. et al.*, No. 1:19-CV-07915 (N.D. Ill.) (Blakey, J.) (*"T.K."*), if not for the settlement benefits achieved here. As part of the Settlement, TikTok has agreed not to dispute claims filed by members of the class in *T.K.*

In addition, with respect to the foreign Defendants, TikTok has repeatedly asserted that they do not have sufficient contacts with any of the forums in which the underlying putative class actions were filed for this Court to exercise personal jurisdiction because the foreign entities have no direct relationship with Plaintiffs and do not operate in the United States. Though Plaintiffs believe they could overcome the jurisdictional hurdle with discovery, Defendants' arguments carry a significant risk if this case were to proceed in litigation.

If Plaintiffs were able to overcome these procedural issues, TikTok has asserted multiple defenses to the merits of Plaintiffs' claims. With regard to BIPA, for example, TikTok has represented that TikTok does not and never has collected from its users any biometric identifiers or derivative information protected by law, nor has it ever shared U.S. user data with the Chinese government. Defendants have expressed their confidence that, if this case were to proceed on a litigation track, they will secure a Federal Rule of Civil Procedure ("Rule") 12(b)(6) dismissal for failure to state a claim based on, *inter alia*, technical arguments that: (1) Defendants' App compiles only anonymized, generalized "demographic data" through "facial landmarking," and does not collect any biometric information of TikTok users; and (2) even if the information the App utilizes does constitute biometric information within the meaning of BIPA, that information resides on the users' devices, and is not collected or stored by Defendants within the meaning of applicable law.

In support of its position that it has not violated BIPA, TikTok has asserted that its user video data is not used to identify anyone. TikTok has explained that App users cannot tag or label faces in videos with a user's real name or identity. This contrasts with Facebook, for example, which requires its users to use and display "the same name that you use in everyday life" when using Facebook. Facebook also allows users to tag the faces of their friends and themselves in photos and videos. Because Facebook users must use their real names, their faces are tagged with their real names whenever they are tagged in a photo or video. By contrast, TikTok does not have a face-tagging feature, nor a real name requirement, and thus does not associate a particular face with an individual's identity.

The TikTok App also has special effects features that enable users to alter, enhance, and modify their facial features in their video images. TikTok has explained that the technique employed to enable these special effects features is called "landmarking" and uses artificial

intelligence to locate the position of a face or specific facial features within a video frame, e.g., the location of a nose relative to the location of the eyes. That general "landmarking," according to TikTok, does not involve generating any face template or personally identifiable data, and thus does not give rise to biometric privacy violations under BIPA.

Although TikTok has admitted that the App uses technology for "demographic classification," which includes recognizing visual patterns that indicate age, gender or other characteristics, TikTok has contended that this is fundamentally different than facial recognition because it does not create facial templates and is not capable of identifying a user. While Plaintiffs disagree with TikTok's contentions, Plaintiffs recognize that the question of what constitutes biometric information under BIPA is novel and evolving, and is a risk if the litigation proceeds.

As another example, TikTok asserts Plaintiffs will be unable to state a claim under the VPPA, which protects consumers against the disclosure of their video viewing histories. TikTok has contended that it is not a video service provider within the meaning of the statute, it does not transmit the requisite personally identifiable information (PII) with video viewing histories, any such transmission is subject to the statute's ordinary course of business exception, and that its privacy policy fully discloses its data sharing practices. While Plaintiffs have rebuttals to each of these arguments, they acknowledge the real risk of continued litigation, that circuit court decisions on this claim have reached varying conclusions on comparable sets of facts, and the dearth of successful settlements of VPPA claims.

With respect to Plaintiffs' CFAA claim, aimed at protecting against hacking, Defendants have argued that Plaintiffs cannot establish proof of economic damages. TikTok has further contended the claim will be substantively defeated because Plaintiffs voluntarily granted TikTok access to their devices and TikTok complied with the disclosures in its privacy policy about the

data it would access and collect, i.e., it never exceeded the scope of its authorized access. Again, while Plaintiffs are well prepared to refute these arguments, each step of litigation brings risk that Co-Lead Counsel balanced against the benefits achieved through the Settlement.

### C. Litigation and Procedural History

The history leading up to the Settlement began long before the Judicial Panel on Multidistrict Litigation's (JPML) August 4, 2020 transfer order creating the MDL in this District. *See also* ECF Nos. 122-6 and 122-8 (Declarations of Katrina Carroll and Ekwan Rhow, discussing pre-MDL procedural history). The first filed case of all related cases in this MDL is *Hong v. ByteDance, Inc. et al.*, 5:19-cv-07792-LHK, filed in the Northern District of California in November 2019. Led by court-appointed Co-Lead Counsel Mr. Rhow, counsel from *Hong* first mediated with Judge Layn Phillips (Ret.) in April 2020 (before the additional cases comprising the MDL were filed). Although the parties engaged in an in-depth analysis of the issues involved, the first mediation was unsuccessful.

Beginning in late April 2020, additional class action cases against TikTok were filed in four federal districts: the Northern District of Illinois, the Southern District of Illinois, the Northern District of California, and the Central District of California. On May 15, 2020, counsel from the Southern District of Illinois filed a motion with the JPML seeking transfer and coordination in the Southern District of Illinois, or in the alternative, in this Court. MDL No. 2948. Highly contentious litigation among groups of Plaintiffs' counsel and Defendants ensued thereafter. On August 4, 2020, the JPML consolidated the related actions and transferred them to this District.

The second mediation with Judge Phillips, which occurred on August 13, 2020, was spearheaded by a group of Plaintiffs' counsel led by now-Co-Lead Counsel Katrina Carroll. As described in her declaration (ECF No. 122-6), 16 firms, representing 11 of the 19 consolidated actions, collaborated in the months leading up to the mediation, well before the JPML's

consolidation order, to pursue the second settlement opportunity. Ms. Carroll and PSC member Jonathan Jagher traveled to California to appear in person and five additional delegates selected by participating plaintiffs' counsel actively participated by phone.[2]

By the time the parties met with Judge Phillips on August 13, 2020, tremendous political pressure had mounted against TikTok, creating a unique settlement opportunity for the Class. Just one week before the mediation, on August 6, 2020, then-President Trump issued an executive order pursuant to the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.*, the National Emergencies Act, 50 U.S.C. § 1601, *et seq.*, and section 301 of title 3, United States Code, titled Executive Order on Addressing the Threat Posed by TikTok (the "First Executive Order").[3]

In the First Executive Order, President Trump stated that TikTok presented a "national emergency" that "threaten[s] the national security, foreign policy, and economy of the United States." The First Executive Order stated that the TikTok App would be banned in the U.S. unless ByteDance Ltd. sold or spun-off its domestic TikTok operations to a U.S. company within 45 days. President Trump later extended the 45-day deadline to 90 days through a second executive order titled Regarding the Acquisition of Musical.ly by ByteDance Ltd. (the "Second Executive Order").[4] The Second Executive Order also prohibited ByteDance from any ownership interest in Musical.ly and required that ByteDance divest: (i) any interests in assets or property in the

---

[2] Seven delegates participated in the second mediation: Co-Lead Counsel Katrina Carroll; PSC members Jonathan Jagher (Freed Kanner London & Millen LLC) and Michael Gervais (Susman Godfrey LLP); and Robert Foote (Foote, Mielke, Chavez & O'Neil, LLC); Joseph Guglielmo (Scott+Scott Attorneys at Law LLP); Tina Wolfson (Ahdoot & Wolfson, PC); and Tiffany Yiatras (Consumer Protection Legal, LLC).

[3] https://www.federalregister.gov/documents/2020/08/11/2020-17699/addressing-the-threat-posed-by-tiktok-and-taking-additional-steps-to-address-the-national-emergency.

[4] https://www.federalregister.gov/documents/2020/08/19/2020-18360/regarding-the-acquisition-of-musically-by-bytedance-ltd.

operation of TikTok in the United States; (ii) any data obtained or derived from TikTok or musical.ly; and (iii) immediately upon divestment, destroy any data obtained or derived from TikTok or Musical.ly.

TikTok was thus motivated at the second mediation session to resolve this litigation in order to shed existing liabilities and maximize its value in preparation for its imminent sale. The second mediation session was hard-fought on all fronts and lasted almost 13 hours, culminating in an agreement in principle and a signed term sheet for a class-wide resolution, later memorialized in a signed agreement on September 4, 2020.

At the time of the second mediation, the MDL was in a state of procedural limbo: the administrative transfer of the related actions had not been fully effectuated and the Court had not created a leadership structure subsequent to its pre-consolidation appointment of current Co-Lead Counsel Katrina Carroll as interim lead Plaintiffs' counsel. ECF No. 18.

On August 17, 2020, the Court entered Case Management Order No. 1, in which it set a process for the appointment of lead and liaison counsel for Plaintiffs. ECF No. 4. Numerous attorneys and attorney groups applied – including competing factions who attended the first and second mediations. At the September 25, 2020 hearing on those applications, the Court noted that some applications suggested that a combination of the various groups would result in a "forced marriage" or "a team of rivals." ECF No. 91, 11:19-21. The Court viewed the leadership group differently, however:

> I . . . would like to think of it as an all-star team of sorts or an Olympic team, made up of individuals form perhaps different individual teams, but who are asked to come together to pursue the interests of all plaintiffs as a whole in this litigation.

*Id.* at 11:21:12-2. The Court ultimately appointed three attorneys to serve as Co-Lead Counsel: Ekwan Rhow (from the lead Northern District of California action) and Katrina Carroll (from the

lead Northern District of Illinois action) along with Elizabeth Fegan (in recognition that, "perhaps most important of all in this circumstance, [she is] fair and level-headed."). *Id.* at 12:17-25.

After the Court appointed the Leadership Group,[5] that group immediately began collaborating to vet and analyze the Settlement Agreement, conduct and evaluate confirmatory discovery, continue negotiations with defense counsel, negotiate the Addendum to the Settlement Agreement, and ultimately reach consensus on the Settlement terms Plaintiffs now present to the Court for approval.

Various members of the Leadership Group were charged with analyzing a broad array of legal, factual, and strategic issues. The Leadership Group engaged in a candid, collaborative—and at times oppositional—process to assess the case and the proposed settlement benefits. *See also* ECF No. 122-7 (Declaration of Elizabeth Fegan further discussing process). Through that process, and six months of continued negotiations with defense counsel, Co-Lead Counsel was able to improve the already substantial Class recovery obtained in the Settlement Agreement through the clarification of some of its core terms. For example, as detailed in the Addendum and Ms. Fegan's declaration, the Addendum makes clear that the scope of the injunctive relief applies to defendants other than TikTok, and assures that the injunction's prohibitions of wrongful conduct (and the warranty relating to that conduct) extend beyond the function of the App, and apply to Defendants'

---

[5] The Court appointed: Katrina Carroll (now Lynch Carpenter LLP, formerly Carlson Lynch, LLP), Elizabeth A. Fegan (Fegan Scott LLC), and Ekwan Eric Rhow (Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.) as Plaintiffs' Co-Lead Counsel; Shannon Marie McNulty (Clifford Law Offices, P.C.) as Plaintiffs' Liaison Counsel; and Jonathan Jagher (Freed Kanner London & Millen LLC), Megan E. Jones (Hausfeld LLP), Michael Gervais (Susman Godfrey LLP), Amanda K. Klevorn (Burns Charest LLP), and Albert Y. Chang (Bottini & Bottini, Inc.) as Plaintiffs' Steering Committee ("PSC") (collectively, the "Leadership Group"). ECF No. 94.

treatment of App-derived data on the server. The Addendum also specifies that a third party will oversee TikTok's privacy compliance training program.

Through that process, and six months of continued negotiations with defense counsel, the Leadership Group was able to improve upon the already substantial Class recovery through the Addendum. For example, the Addendum expanded the scope of the injunctive relief to apply to defendants other than TikTok, ensured that prohibitions of wrongful conduct and the warranty relating to that conduct extended beyond the function of the App and applied to Defendants' treatment of App-derived data on the server, and now requires third-party oversight of TikTok's privacy compliance training program.

The substantial Settlement has also garnered the support of firms outside of the Leadership Group, who have been involved in this litigation since before consolidation, and their class member clients, who are proposed Class Representatives. *See* ECF No. 122-2 (Exhibit listing class representatives and their counsel).

On February 25, 2021, Plaintiffs filed a motion seeking preliminary approval of this Settlement. ECF No. 122. Three objections to that motion were filed – one by Mark S. (through his counsel Scott Drury), another by Dennis Litteken (through his counsel Edelson PC), and a third by Brian Behnken and Joshua Dugan (through their counsel Labaton Sucharow LLP). The Court held a hearing on Plaintiffs' motion on March 2, 2021. ECF No. 134. On March 23, 2021, at the Court's request, Plaintiffs filed supplemental briefing regarding the representation of minor Class Members, the process through which Co-Lead Counsel valued the claims in this action, and consideration of class notice by email and/or in-App notification. ECF No. 137 ("Supplemental Memo"). Following that Supplemental Memo, on September 30, 2021, the Court overruled the

pending objections and granted Plaintiffs' motion for preliminary approval of the Settlement. *See generally* Preliminary Approval Orders.

Plaintiffs, with the Court-approved Settlement Administrator, then implemented the Notice Plan. Now, after widespread support for the Settlement by the Class, Plaintiffs seek final approval of the Settlement, final approval of the Plan of Allocation, and final certification of the Nationwide Class and Illinois Subclass.

### III. SETTLEMENT TERMS

The Settlement Agreement and Addendum contain the following key terms, which are described in further detail in Plaintiffs' Motion for Preliminary Approval of Class Action Settlement ("Preliminary Approval Motion"), ECF No. 122, and its accompanying documents, including the Settlement itself:

### A. The Settlement Classes

The Settlement Classes, certified for settlement purposes only, are defined as follows:

> **Nationwide Class**: All persons who reside in the United States who used the App—the TikTok video-sharing application (or its Musical.ly predecessor) distributed in the U.S.—prior to September 30, 2021.

> **Illinois Subclass:** All persons who reside in the State of Illinois and used the App—the TikTok video-sharing application (or its Musical.ly predecessor) distributed in the U.S.—in the State of Illinois to create videos prior to September 30, 2021.

Preliminary Approval Order, ¶ 2 (also noting exclusions from the Settlement Class).

### B. Monetary Relief for Settlement Class Members

TikTok has agreed to pay $92,000,000 to create a Settlement Fund for the benefit of Class Members, who receive a pro rata payment (per the Plan of Allocation described below), after the deduction of settlement-related costs, including the expenses of the settlement administrator and the costs of notice to the Class, any service awards, any fee award, and any other administrative

fees and expenses which may be approved by the Court. *Id.* at § 4.1-5. *See also* Preliminary Approval Order, ¶ 13. No portion of the Settlement Fund will be returned to Defendants. *Id.* at § 4.5.

Class Members may submit one claim per Class Member to receive a payment from the Settlement Fund according to the Plan of Allocation (discussed *infra*). *Id.* at § 5.3.1.

While it is not possible to predict the precise amount each Class member will receive until the Settlement Administrator has completed vetting the claims and the Court has determined the amount to be awarded for fees, costs, and incentive awards, Class Counsel estimate that each Nationwide Class member will receive $27.19 and each Illinois Subclass member will receive $163.13 after deductions for Court-approved attorneys' fees and costs, Court-approved incentive awards to the Plaintiffs, and costs of Notice and claims administration.

### C. Plan of Allocation

The Plan of Allocation provides that the Net Settlement Funds will be divided into *pro rata* shares that are equal to the sum of (1) the total number of valid claims submitted by Nationwide Class members and (2) the total number of valid claims submitted by Illinois Subclass members multiplied by five. Plan of Allocation, ECF No. 122-3, p. 2. Each Illinois Subclass member who submits a valid, authorized claim will be paid six *pro rata* shares (one as a member of the Nationwide Class and five as a member of the Illinois Subclass). *Id.* Each Nationwide Class member who is not a member of the Illinois Subclass will be paid one *pro rata* share. *Id.*

This Plan of Allocation was determined through the independent analysis and negotiation of two attorneys selected by Co-Lead Counsel to analyze the merits of the claims asserted, advocate the interests of their respective subgroups, and negotiate an allocation of Settlement funds between the two groups. *See* Preliminary Approval Motion, pp. 13-14; Declaration of Jim Zouras, ECF No. 122-11; Declaration of Jonathan Rotter, ECF No. 122-10; Declaration of Elizabeth A.

14

Fegan, ECF No. 122-7. After this assessment, the Illinois Subclass was awarded additional shares, in part because of the value of the Illinois-only BIPA claim, which provides for statutory damages and has a historically higher settlement value than some other asserted claims.

### D. Injunctive Relief

TikTok, together with the other Defendants' Released Parties, has agreed ***not*** to do the following unless disclosed expressly in the TikTok Privacy Policy and in compliance with all applicable laws:

- Use the App to collect or store a user's biometric information or identifiers (as defined by applicable law);

- Use the App to collect geolocation or GPS data;

- Use the App to collect information in users' clipboards;

- Use the App to transmit U.S. user data outside of the U.S.;

- Store U.S. user data in databases outside of the U.S.; or

- Pre-upload U.S. user-generated content.

*Id.* § 6.1; Addendum § 2.1 ("'App' means the TikTok video-sharing application (or its Musical.ly predecessor) distributed in the U.S., including its device-side and server-side operations."); Addendum § 2.5 ("[w]ith respect to the Injunctive Relief in Section 6 of the Agreement, "TikTok" means any of Defendants' Released Parties to the extent they are engaged in the operation of the App or involved in receiving or accessing user data obtained through the App").

Consistent with the intent of the injunctive relief in Section 6 of the Settlement Agreement, the Parties jointly reviewed multiple categories of user data potentially in TikTok's possession that should be deleted from TikTok's servers. Following confirmation from TikTok as to what categories existed and should be deleted, TikTok has agreed to delete any Pre-Uploaded User-

Generated Content identified in Section 6.2 of the Settlement Agreement. Addendum § 4.2.

In addition, TikTok will require newly designed training on compliance with data privacy laws and company procedures for all relevant incoming employees and contractors, and annual training thereafter. Settlement Agreement § 6.3. TikTok will provide a written verification under oath of compliance with the foregoing within 90 days of the Effective Date. *Id.* § 6.4. TikTok will, at its own expense, hire a third party to review the data privacy law compliance training for a period of three years and to provide a written verification of this review along with the verification required by Section 6.4 of the Settlement Agreement to Class Counsel. Addendum § 4.3. TikTok will not disclose to any third party the "personally identifiable information" of a "consumer" who uses the App, as those terms are defined by the VPPA, except to the extent such disclosure is not prohibited by the Video Privacy Protection Act; nor will TikTok share user data collected through the App with third parties without disclosing in its Privacy Policy the categories of third parties with whom user data is shared. Addendum § 4.1.

**E. Release**

In exchange for the relief afforded by the Settlement Agreement, Defendants' Released Parties[6] will receive a release of all Released Claims.[7] The release is narrowly tailored to the claims

---

[6] Defendants' Released Parties are: "The current defendants in the Civil Actions, as well as any and all of their current or former directors, officers, members, administrators, agents, representatives, servants, employees, attorneys, parents, subsidiaries, affiliates, divisions, branches, units, shareholders, successors, predecessors, assigns, and all other individuals and entities acting on their behalf." Settlement Agreement § 2.10.

[7] Released Claims are: "[A]ny and all claims, complaints, actions, proceedings, or remedies of any kind, whether known or unknown (including, without limitation, claims for attorneys' fees and expenses and costs), arising from or related to the Civil Actions or the collection and use of any user data, including biometric data, whether in law or in equity, under contract, tort or any other subject area, or under any statute, rule, regulation, order, or law, whether federal, state, or local, on any grounds whatsoever, arising from the beginning of time through the Effective Date, that were, could have been, or could be asserted by the Releasing Parties." Settlement Agreement § 2.30.

related to "the Civil Actions or the collection and use of any user data, including biometric data" and thus covers the claims actually at issue (or that could have been asserted based on the alleged facts) in this MDL through the date of preliminary approval.

### F. Class Representative Service Awards

The Settlement Agreement permits Plaintiffs' counsel to seek service awards for Class Representatives to be paid from the Settlement Fund in an amount up to $2,500 each. Settlement Agreement, § 13.2. Contemporaneously with this motion, Plaintiffs have filed a motion seeking service awards of that amount. The Settlement is not contingent on Court approval of any service awards. *Id.* at § 13.4.

### G. Attorneys' Fees and Costs

The Settlement Agreement permits Plaintiffs' counsel to apply to the Court seeking a reasonable portion of the Settlement Fund as payment of any reasonable attorneys' fees and costs. *Id*. at § 13.1. The Settlement is not contingent on Court approval of an award of attorneys' fees or costs. *Id*. at § 13.4.

The Notice informed the Class that Class Counsel would seek an award of attorneys' fees of no more than 33.33% of the common fund and costs. Notice, ECF No. 122-4, p. 8. Contemporaneously with this motion, Class Counsel has filed a motion seeking an attorneys' fee award of 33.33% of the common fund and reimbursement of $789,836.62 in costs.

### H. Settlement Administration

All Notice and Administrative Costs will be paid from the Settlement Fund. Settlement Agreement, § 4.5. The Notice Plan and settlement administration was conducted by Angeion Group, LLC ("Angeion") by methods ordered by the Court and described in the Declaration of Steven Weisbrot of Angeion submitted in connection with preliminary approval, ECF No. 122-12, and the declaration of Steven Platt, also with Angeion, filed in connection with this motion ("Platt

Decl."). *See also* Preliminary Approval Motion, p. 15. The Notice and Administrative Costs as of January 31, 2022 are $2,143,540.55, and Angeion estimates that the future administrative cost will be $1,132,727.88, for a total cost of administration of $3,276,268.43. Platt Decl., ¶ 42.

## IV. CLASS NOTICE & RESPONSE

Per the Settlement, Notice Plan, and the Court's Preliminary Approval Orders, the Claims Administrator issued Class Notice. *See generally* Platt Decl. The Claims Administrator set up a Settlement Website, established and staffed a toll-free hotline, disseminated emails to nearly 81 million Class Member email addresses, coordinated with TikTok to commence in-App notification, and initiated media, social media, and paid search campaigns, as well as a custom claims-stimulation program with additional targeted social media advertising placements. *See generally id.*

### A. Notice was disseminated via a robust multi-faceted campaign including widespread publication and advertising, direct emails, and in-App notice.

On November 14, 2021, the Claims Administrator launched the Notice Plan. Platt Decl., *e.g.,* ¶¶ 7, 11, 12, 22, 26, 27, 28, 29. The Notice Plan included a comprehensive media notice program that targeted the known demographics of the Settlement Class and was designed to deliver an approximate 95.23% reach with an average frequency of 5.85 times each. *Id.* at ¶ 35. (This reach is separate from and in addition to the direct notice efforts, the Settlement Website, the toll-free hotline, the claims stimulation package, and the Illinois-specific notice plan). The nationwide media portion of the Notice Plan was successful; it resulted in an approximate 96.78% reach with an average of three times each. *Id.* at ¶ 36.

The number of impressions achieved by the media campaigns also exceeded Plaintiffs' and the Claims Administrator's initial targets. The internet banner notice portion of the Notice Plan was designed to serve approximately 64.3 million impressions nationally and 1.5 million

impressions in Illinois. *Id.* at ¶ 20. This aspect of the program exceeded those targets; it served

over 126.1 million impressions nationally and 3.5 million in Illinois. *Id*. at ¶ 20. The national social

media campaign also exceeded target impressions: for Facebook and Instagram, the Claims

Administrator served over 115.2 million impressions nationwide and 4.5 million for the campaign

focused on Illinois; for Twitter, the Claims Administrator served over 39.7 million and over 346

thousand impressions for the Nationwide and Illinois campaigns, respectively. *Id.* at ¶¶ 24-25. In

sum, there were hundreds of millions of views on various aspects of the Notice Plan's media

campaign.

Beginning on November 14, 2021, the Claims Administrator also commenced direct email

notice to over 80.9 million email addresses associated with Class Members, making multiple

attempts for certain email addresses as needed. *Id.* at ¶ 7. Approximately 70% of those mails were

successfully delivered. *Id.* at ¶ 10.

On November 15, 2021, TikTok also commenced and completed the in-App notification

to all standard mode TikTok accounts having certain data corresponding to a United States location

in the same manner that TikTok would distribute other TikTok-originated in-App notifications.[8]

*Id.* at ¶ 11.

The Claims Administrator also set up a Settlement Website linked to the ads, where

potential Settlement Class Members could find important documents and court filings including

the long form notice and the Preliminary Approval Order. The website was established at

www.TikTokDataPrivacySettlement.com on November 13, 2021. *Id.* at ¶ 30. Settlement Class

---

[8] This excludes users in the under-13 experience (called "TikTok for Younger Users") because
there is no Inbox feature in TikTok for Younger Users. *Id.*

Members could submit their claims directly through the website. *Id.* As of March 15, 2022, the settlement website had over 13.7 million page views. *Id.* at ¶ 31.

And finally, beginning November 13, 2021, the Claims Administrator established and maintained a 24/7 toll-free number to field questions about the settlement and to allow potential Class Members to request mail copies of the long form notice. *Id.* at ¶ 32. As of March 15, 2022, the Claims Administrator received a total of 2,579 calls to the toll-free number, totaling over 8,000 minutes of call time. *Id.* at ¶ 33.

Due process does not require that every class member receive notice. *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 968 (N.D. Ill. June 2, 2011) (collecting cases). Rather, parties are required, "within the limits of practicability, to send such notice as [is] reasonably calculated to reach most interested parties." *Burns v. Elrod*, 757 F.2d 151, 157 (7th Cir. 1985); *see also* Memorandum Opinion, p. 28 ("The best notice practicable is that which is 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action.'") (*quoting Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)) (other citation omitted).

The Notice Plan was successful. The media campaign alone has reached the vast majority of Class Members and exceeded the threshold for adequate notice. *See* Memorandum Opinion, p. 28 ("The Federal Judicial Center has found that a notice plan calculated to reach between 70% and 95% of the class in total is reasonable and . . . the median reach calculation on approved notice plans is 87%."); *see also, e.g., Kaufman v. Am. Express Travel Related Servs.*, No. 07-CV-1707, 2016 U.S. Dist. LEXIS 26167 (N.D. Ill. Mar. 2, 2016) (granting final approval where notice, including digital ads, was estimated to have reached 70% of the settlement class), *aff'd*, 877 F.3d 276, 288 (7th Cir. 2017); *Wilkins v. HSBC Bank Nev., N.A.*, No. 14-C-190, 2015 U.S. Dist. LEXIS

23869 (N.D. Ill. Feb. 27, 2015) (granting final approval where a combination of direct notice and banner ads were estimated to have reached 79.2% of the class); *In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, No. 08-C-1832, 2016 U.S. Dist. LEXIS 25290 (N.D. Ill. Feb. 29, 2016) (approving the use of banner ads as notice where many settlement class members could not be identified in Defendants' records); *In re Briscoe*, 448 F.3d 201, 207 (3d Cir. 2006) (affirming the trial court's decision to use a notice plan that included banner advertisements on the internet directing class members to the official settlement website). Of course, the Notice Plan was further supported by multiple means of direct notice in addition to the Settlement Website and broad media coverage of this high-profile Settlement. In sum, the Notice Plan was well executed and achieved the best practicable notice.

There was also significant media coverage of the Settlement. After the Notice period commenced, the Settlement, and information about filing a claim, was reported by USA Today,[9] NBC News,[10] Business Insider,[11] the New York Post,[12] Today,[13] Newsweek,[14] Mashable,[15] and numerous other national and local news outlets.

---

[9] https://www.usatoday.com/story/tech/2021/11/15/tiktok-settlement-class-action-lawsuit/8633539002/ (last accessed 3/28/2022).

[10] https://www.nbcnews.com/news/us-news/need-know-tiktoks-class-action-lawsuit-rcna5781 (last accessed 3/28/2022).

[11] https://www.businessinsider.com/tiktok-data-privacy-settlement-how-to-submit-claim-2021-11 (last accessed 3/28/2022).

[12] https://nypost.com/2021/11/17/tiktok-agrees-to-92m-settlement-users-in-for-a-payday/ (last accessed 3/28/2022).

[13] https://www.today.com/money/tiktok-notification-about-settlement-payment-isn-t-scam-here-s-t239286 (last accessed 3/28/2022).

[14] https://www.newsweek.com/tiktok-class-action-lawsuit-settlement-eligible-claim-1649615 (last accessed 3/28/2022).

[15] https://mashable.com/article/tiktok-settlement-claim (last accessed 3/28/2022).

**B. The claims rates of 1.4% for the Nationwide Class and 13% for the Illinois Subclass falls well within the range of comparable class action settlements.**

Class Members submitted an almost unprecedented 1,215,541 valid claims by the Claim Deadline, Platt Decl., ¶ 37 – TikTok has repeatedly maintained that it is impossible to estimate the total number of class members because they cannot account for the common practice of users creating multiple TikTok accounts on multiple devices or the creation of artificial accounts by information-gathering entities. At the high end, TikTok has provided a conservative estimate of 89 million class members while recognizing the actual class size could be much smaller. Using this high-end conservative estimate, approximately 1.4% of the Settlement Class submitted a claim. Of those claims, 177,024 are for the Illinois Subclass, amounting to a claims rate of approximately 13% of the roughly 1.4-million-member Illinois Subclass (again, using a very high-end conservative estimate that could in fact be much lower). *Id.* at ¶ 38.

These claims rates fall in line with other consumer class action settlements. *See, e.g.,* Declaration of Professor William B. Rubenstein, *In re Facebook Biometric Info. Privacy Litig.*, 15-CV-03747 (N.D. Cal.) ("*Facebook BIPA*"), ECF No. 517-2, p. 4 (classes above 2.7 million class members average claims rates of 1.4%); *Poertner v. Gillette Co.*, 618 F. App'x 624, 626 (11th Cir. 2015) (approving unfair trade practices settlement with 7.26-million-member settlement class and 1% claims rate); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1377 (S.D. Fla. 2007) (1.1% of 10.3-million-member settlement class filed claims); *see also Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 493 (N.D. Ill. 2015) (approving TCPA settlement with 2% claims rate); *Davenport v. Discover Fin. Servs.*, No. 1:15-CV-06052 (N.D. Ill. Dec. 19, 2017) (approving settlement with 3% claims rate); *Bayat v. Bank of the W.*, No. C-13-2376, 2015 U.S. Dist. LEXIS 50416, at *1 (N.D. Cal. Apr. 15, 2015) (approving TCPA settlement with approximately 1% claims rate); *Arthur v. SLM Corp.*, No. C10–0198 (W.D. Wash. Aug. 8, 2012) (claims rate of approximately 2%);

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (*en banc*) (claims rates in consumer class settlements "rarely" exceed 7%, "even with the most extensive notice campaigns"); *Pollard v. Remington Arms Co.*, *LLC*, 320 F.R.D. 198, 214 (W.D. Mo. 2017) (citing numerous finally approved settlements with claims rates less than 1%). *See also* Preliminary Approval Motion, pp. 24-25.

It is expected that Nationwide Class Members will receive an award of approximately $27.19 and Illinois Subclass members will receive an award of approximately $163.13, after deductions for Court-approved attorneys' fees and costs, Court-approved incentive awards to the Plaintiffs, and costs of notice and claims administration. *See* Platt Decl., ¶ 43. This is within the range of acceptable settlement amounts. *See infra* § VI. A.

Should the Court grant final approval of the Settlement, payments will be automatically issued to all Class Members who submitted Valid Claims within 14 days of the Effective Date. Settlement Agreement, ¶ 5.2.4.

**C.  Only a fraction of 1% of the class opted out of the Settlement.**

The Claims Administrator received only 28 valid requests for exclusion by the January 31, 2022 deadline. Platt Decl., ¶ 39. An additional 4,040 requests for exclusion (some duplicative) were submitted "in mass" by four law firms on behalf of 2,253 individuals, which the Settlement Administrator deemed invalid for violating the prohibition on mass opt outs in the Settlement Agreement. *Id.* at ¶ 40. Two other invalid requests for exclusion were made, as well – one postmarked after the deadline, and another that was filed with a Claim Form seeking payment in the Settlement. *Id.* Even including the invalid requests for exclusion, less than a tiny fraction of 1% of the Class (less than 0.005%) sought to opt out of the Settlement.

**D. Only four individuals objected, and none of their objections is colorable.**

Only four individuals filed objections: Mark S. and Daniel Litteken – whose objections were already denied at preliminary approval, and Steven Helfand and Jennifer Cochran by her counsel George Cochran – serial objectors who lack credibility. None of those objections has merit, and each is addressed in further detail below, in Section VI. C.

**E. CAFA notice was provided and no objections followed.**

On March 5, 2021, pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, the Claims Administrator caused Notice of the Settlement and related materials ("CAFA Notice") to be sent to the Attorneys General of all U.S. states and territories, as well as the Attorney General of the United States. Platt Decl., ¶ 5. No objections were received to the Settlement from the Attorneys General of the United States.

**V.  STANDARDS FOR SETTLEMENT APPROVAL**

As the Seventh Circuit recognizes, federal courts strongly favor and encourage settlements, particularly in class actions and other complex matters, where the inherent costs, delays, and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain:

> It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. In the class action context in particular, there is an overriding public interest in favor of settlement. Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.

*Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 312-13 (7th Cir. 1980) (citations and quotations omitted), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *see also Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation"); *4 Newberg on Class Actions* § 11.41 (4th ed. 2002) (citing cases).

The traditional means for handling claims like those at issue here—individual litigation on behalf of millions of individuals—would unduly tax the court system, require a massive expenditure of public and private resources and, given the relatively small value of the claims of the individual Settlement Class Members, be impracticable. Indeed, the Supreme Court has repeatedly recognized that class actions save the resources of the courts and parties, and ensure aggrieved plaintiffs can obtain relief:

> [T]he law recognizes class actions as a legitimate part of the U.S. litigation system. The Supreme Court has made this clear on several occasions. *See, e.g.*, *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 155 . . . (1982) (explaining that, in appropriate cases, "the class action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23"); *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 . . . (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device."). In addition, Federal Rule of Civil Procedure 23 provides for the use of such a procedure.

*Kolinek*, 311 F.R.D. at 497 (quoting *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 982 (N.D. Ill. 2011) (citations omitted). For these reasons, the proposed Settlement is the best vehicle for Settlement Class Members to receive relief to which they are entitled in a prompt and efficient manner.

Under Rule 23(e) of the Federal Rules of Civil Procedure, a class-action settlement may be approved if the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 345 (N.D. Ill. 2010). "Approval of a class action settlement is a two-step process." *In re Northfield Lab'ys, Inc. Sec. Litig.*, No. 06-C-1493, 2012 U.S. Dist. LEXIS 12741, at *15 (N.D. Ill. Jan. 31, 2012) (citing *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 346 (N.D. Ill. 2010) (quoting *Saranchak v. Beard*, 616 F.3d 292, 314 (3d Cir. 2010))). "First, the court holds a preliminary, pre-notification

hearing to consider whether the proposed settlement falls within a range that could be approved." *Id*. "If the court preliminarily approves the settlement, the class members are notified." *Id*.

The first step in the settlement approval process is a preliminary fairness determination. "The parties must provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class." Fed. R. Civ. P. 23(e)(1)(A). This is so the Court may make "a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms[.]" *Manual for Complex Litigation* § 21.632 (4th ed. 2004); *see also* 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions*, § 11.25 (4th ed. 2002); *see also* Fed. R. Civ. P. 23(e)(1)(B).

Fed. R. Civ. P. 23, as amended in 2018, calls for front-loaded scrutiny of a proposed settlement so that any issues are identified *before* notice goes out to the class. Fed R. Civ. P. 23(e) states that grounds exist for class notice where the parties show that "the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). To that end, where, as here, the proposed settlement "would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether":

(A)     the class representatives and class counsel have adequately represented the class;

(B)     the proposal was negotiated at arm's length;

(C)     the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and

(D)     the proposal treats class members equitably relative to each other.

26

Fed. R. Civ. P. 23(e)(2). If the court preliminarily finds that the settlement is fair, adequate, and reasonable, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal . . . ." Fed. R. Civ. P. 23(e)(1)(B).

The second step in the process is a final fairness hearing. Fed. R. Civ. P. 23(e)(2); *also Manual for Complex Litigation*, § 21.633-34; *In re Northfield Lab'ys, Inc. Sec. Litig.*, No. 06 C 1493, 2012 U.S. Dist. LEXIS, at *15-16 ("Second, the court holds a fairness hearing and considers, among other things, any objections filed by class members.").

The first step in this process—including front-loaded scrutiny of the settlement and the consideration of objection to preliminary approval—has occurred. Plaintiffs now respectfully request that the Court take the second step in the process by granting final approval of the Settlement.

A proposed class action settlement should be approved if the Court, after allowing absent class members an opportunity to be heard, finds that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). When making this determination at the final approval stage, courts in this Circuit consider the following factors:

(1)      the strength of plaintiffs' case compared to the terms of the proposed settlement;

(2)      the likely complexity, length, and expense of continued litigation;

(3)      the amount of opposition to settlement among affected parties;

(4)      the opinion of competent counsel; and

(5)      the stage of the proceedings and the amount of discovery completed.

*Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014) (*quoting Gautreaux v. Pierce*, 690 F.2d 616, 631 (7th Cir. 1982)); *Isby*, 75 F.3d at 1199; *see also* Fed. R. Civ. P. 23(e)(2) (listing factors for final approval). In reviewing these factors, courts view the facts "in the light most favorable to the settlement." *Isby*, 75 F.3d at 1199. In addition, courts "should not substitute their

own judgment as to the optimal settlement terms for the judgment of the litigants and their counsel." *In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, 2016 U.S. Dist. LEXIS, 25290, at *26-27 (citing *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 315 (7th Cir. 1980)).

## VI.    FINAL APPROVAL IS WARRANTED

### A.  The strength of Plaintiffs' case compared to the amount of the Settlement favors final approval.

"[T]he 'most important factor relevant to the fairness of a class action settlement' is the first one listed: the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *Synfuel Techs., Inc. v. DHL Express, Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (internal quotes and citations omitted). Courts "do not focus on individual components of the settlements, but rather view them in their entirety in evaluating their fairness." *Isby*, 75 F.3d at 1199 (cleaned up). Because the "essence of settlement is compromise, courts should not reject a settlement 'solely because it does not provide a complete victory to plaintiffs.'" *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. at 347 (citations omitted).

While Plaintiffs strongly believe in their claims, Plaintiffs recognize that Defendants have asserted a number of potentially case-dispositive defenses. The Court recognized this, too. Indeed, in its Memorandum Opinion, the Court found numerous risks associated with continued litigation, for example:

- the class action waiver and arbitration agreements in TikTok's terms of service;
- TikTok's warranty and confirmatory discovery regarding whether TikTok used the App in violation of BIPA;
- "numerous colorable" disputes to Plaintiffs' VPPA claim, including whether TikTok is engaged in a covered business or Class Members are "subscribers";
- Class Members' acceptance of TikTok's terms of service;

- the "high bar" prescribed by California Constitutional and intrusion upon seclusion;

- the difficulty establishing damages; and

- the low or cy-pres-only historical settlements in comparable cases.

Memorandum Opinion, pp. 22-24.

Despite these material risks, Plaintiffs achieved an excellent result for the Class. The estimated recovery of $ 27.19 per Nationwide Class Member and $163.13 per Illinois Subclass Member is well within the range of recovery for other comparable, court-approved privacy class action settlements, many of which only obtain injunctive relief. *E.g.*, *T.K.*, 19-cv-07915, ECF No. 94 ($3.06 per claimant in privacy class action); *In re Google Plus Profile Litig.*, No. 5:18-CV-06164, 2021 U.S. Dist. LEXIS 13571, at *14 (N.D. Cal. Jan. 25, 2021) (estimated per-claimant recovery of $0.20 to $29.60 with an average of $2.50 in privacy class action); *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 942–44 (N.D. Cal. 2013), *aff'd sub nom.*, *Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016) ($15 per claimant in privacy class action); *In re LinkedIn User Priv. Litig.*, 309 F.R.D. 573 (N.D. Cal. 2015) (approximately $14.81 per claimant in privacy class action); *Parker v. Time Warner Ent. Co., L.P.*, 631 F. Supp. 2d 242, 258, 268–69 (E.D.N.Y. 2009), *aff'd sub nom. Lobur v. Parker*, 378 F. App'x 63 (2d Cir. 2010) ($5 per claimant in privacy class action); *Lane v. Facebook, Inc.*, 696 F.3d 811, 820–22 (9th Cir. 2012) (cy-pres-only resolution of Electronic Communications Privacy Act (ECPA) claim brought on behalf of tens of millions of class members); *In re Google Buzz Privacy Litig.*, No. 10-00672, 2010 U.S. Dist. LEXIS 146767 at *4-10 (N.D. Cal. June 2, 2011) (cy-pres-only settlement of ECPA claims); *In re Google LLC St. View Elec. Commc'ns Litig.*, No. 10-md-02184, 2020 U.S. Dist. LEXIS 47928 (N.D. Cal. Mar. 18, 2020) (cy-pres-only settlement of ECPA claims); *Adkins v. Facebook, Inc.*, No. 18-CV-05982,

2021 U.S. Dist. LEXIS 87097 (N.D. Cal. May 6, 2021) (injunctive-only relief in data breach case); *Carroll v. Crème de la Crème, Inc.*, 2017-CH-01624 (Cir. Ct. Cook Cnty. June 25, 2018) (credit monitoring and no monetary relief in BIPA case). *See also* ECF No. 137-2 (chart of comparable privacy settlements).

  "In light of the potential difficulties at class certification and on the merits . . ., the time and extent of protracted litigation, and the potential of recovering nothing, the relief provided to class members in the Settlement Agreement represents a reasonable compromise." *Wright v. Nationstar Mortg. LLC*, No. 14-C-10457, 2016 U.S. Dist. LEXIS 115729, at *39 (N.D. Ill. 2016).

### B. An assessment of the likely complexity, length, and expense of continued litigation favors approval of the Settlement.

"In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." Newberg on Class Actions, § 11:50. This is, in part, because "the law should favor the settlement of controversies, and should not discourage settlement by subjecting a person who has compromised a claim to the hazard of having the settlement proved in a subsequent trial." *Grady v. De Ville Motor Hotel, Inc.*, 415 F.2d 449, 451 (10th Cir. 1969). It is also, in part, because "[s]ettlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998); *see also Gehrich v. Chase Bank U.S.*, 316 F.R.D. 215, 228 (N.D. Ill. 2016) ("The essential point here is that the court should not 'reject[ ]' a settlement 'solely because it does not provide a complete victory to plaintiffs,' for 'the essence of settlement is compromise'").

Litigation would be lengthy and expensive if this action were to proceed. *See, e.g., Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("[C]lass action suits have a well deserved reputation as being most complex."). Although the parties engaged in certain confirmatory discovery to evaluate the Settlement, continued discovery would likely include the production and review of millions of pages of documents, numerous depositions, and extensive expert analyses. Continued litigation would involve extensive motion practice (including motions to compel arbitration, to dismiss Plaintiffs' claims, for class certification, and for summary judgment) and ultimately a trial on the merits—each of which has the potential for appeal, further risking and delaying any benefit to the Class. The Court recognized this at preliminary approval:

> Proceeding to trial likely would take years and entail extensive fact and expert discovery and motion practice, including, in all probability, a contested motion to certify, motions for summary judgment, and Daubert motions. Furthermore, after the completion of pretrial proceedings, many of the individual cases that comprise this MDL would be sent back to their transferor courts for trial, absent a stipulation by the parties to try the cases in this Court, potentially resulting in even further motion practice and delay.

Memorandum Opinion, p. 26 (citations omitted).

Instead of facing the uncertainty of a potential award in their favor years from now, the Settlement allows Plaintiffs and Settlement Class Members to receive immediate and certain relief. *See, e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) ("Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation.") (citation omitted). This factor thus favors settlement approval.

**C. The lack of opposition to the Settlement favors final approval.**

In contrast to the 1.2 million claims in support of the Settlement, only four objections were filed.[16] "Such a remarkably low level of opposition supports the Settlement." *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d at 965 (the "tiny fraction" of opt-outs and objections supports approval); Memorandum Opinion, p. 27 ("The Court also finds it noteworthy that, out of an estimated 89 million members of the Settlement Class, only two (Mark S. and Dennis Litteken) have objected to the fairness, reasonableness, and adequacy of this widely published settlement so far.").

Moreover, none of the objections raises meritorious concerns. Two of the objections (Helfand and Cochran) were filed by serial objectors with material credibility concerns. Three of the objections (Cochran, Mark S., and Litteken) have procedural deficiencies and should be stricken as invalid. And all four objections fail on their merits, having raised issues already considered and rejected by this Court in connection with preliminary approval, or parroting one another's claims that Class Members do not have an opportunity to respond to Class Counsel's fee request, which is simply untrue. None of the objections provides a basis to deny final approval and relief to more than one million claimants who support the Settlement.

**1. The Helfand Objection was filed by a serial objector and lacks merit.**

**a. Mr. Helfand's claim that he is a Class Member who was injured is not credible.**

Mr. Helfand is a former attorney who was disbarred because of conduct related to class action settlement objections. The State Bar of California found that, among other egregious

---

[16] The objections were filed by: Steven Franklyn Helfand, pro se, ECF Nos. 182 and 192; Dennis Litteken, through his counsel Edelson PC, ECF No. 184; Jennifer Cochran, through her counsel George W. Cochran, ECF No. 186; Mark. S., as Parent and Legal Guardian of His Minor Son, A.S., through his counsel Scott R. Drury of Loevy & Loevy, ECF No. 187.

conduct, Mr. Helfand: (1) filed objections in the name of class members without being authorized by the class member to do so, (2) misled a court and opposing counsel, (3) settled an objection on appeal without the client's authorization, (4) misappropriated settlement proceeds, and (5) committed other acts of moral turpitude. *In re Equifax Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800, 2020 U.S. Dist. LEXIS, at *268 (N.D. Ga. Mar. 17, 2020) (citation omitted); *In re Steven Franklyn Helfand*, No. 206667 and *Joseph Darrell Palmer*, No. 125147, Case Nos. 17-O-00411 and 17-O-00412 (State Bar Court of Los Angeles).

Nevertheless, Mr. Helfand continues to act as a serial objector.[17] Here, the timing of Mr. Helfand's download of the TikTok application suggests that he downloaded the application for the sole purpose of objecting. Mr. Helfand downloaded the TikTok application on April 10, 2021, six weeks after Plaintiffs moved for preliminary approval of the Settlement on February 25, 2021. According to the screen shots attached to his objection, Mr. Helfand follows just one other TikTok account, is not followed by any accounts, and he has never shared a video on the application. Mr. Helfand has a history of "falsely claim[ing] to have purchased products, so he could file objections." *Collins v. Quincy Bioscience, LLC*, No. 19-22864, 2020 U.S. Dist. LEXIS 218673, at *14. Mr. Helfand appears to have been similarly motivated here to interfere with the Settlement and extort a payment, rather than to benefit the Class. Accordingly, his objection should be given little, if any, weight.

---

[17] *Collins v. Quincy Bioscience, LLC*, No. 19-22864, 2020 U.S. Dist. LEXIS 218673, at *5 (S.D. Fla. Nov. 16, 2020) (Helfland is "a well-known serial objector who has represented himself and third parties in objecting to multiple class action settlements.") (quoting *Gay v. Tom's of Maine, Inc.*, No. 0:14-cv-60604, ECF No. 43, at 4 n.1 (S.D. Fla. Mar. 11, 2016)). *See also Spann v. J.C. Penney Corp.*, No. CV 12-0215, 2016 U.S. Dist. LEXIS 137184, at *32 n.11 (C.D. Cal. Sept. 30, 2016) (Steven Helfand is a "known serial objector").

Moreover, Mr. Helfand failed to disclose the dozens of objection he has filed as required by the Preliminary Approval Order. In 2020, Mr. Helfand testified that he had objected to 50 or more class action settlements. *Collins v. Quincy Bioscience, LLC*, No. 19-CV-22864, 2020 U.S. Dist. LEXIS 218673, at *16. *See also Norcia v. Samsung Telcomms. Am., LLC*, No. 14-CV-00582, 2021 U.S. Dist. LEXIS 135256, at *11 (N.D. Cal. July 20, 2021) (noting Mr. Helfand's "50 or 60 cases . . . as an objector or as an attorney for objectors.") (citation omitted). Although the Preliminary Approval Order requires the disclosure of any other class settlement objection made within the previous five years, Mr. Helfand did not disclose any of these dozens of objections. He suggests he was not required to do so because he is proceeding pro se, and the notice requires disclosure regarding "times in which *that counsel* has objected to a class action settlement." Helfand Obj., p. 5 (emphasis in original). Such gamesmanship should not be rewarded.

This is not the first time he has filed objections to settlements in which he is not a class member, including by making false or misleading claims that he purchased the product at issue, nor objections that fail to meet the requirements of courts' preliminary approval orders. *E.g.*, *Hooker v. Sirius XM Radio Inc*., No. 4:13-CV-00003, ECF No. 209, ¶ 20 (E.D. Va. Dec. 22, 2016) (striking objection because Helfand was not a class member and the objection did not meet the requirements of the preliminary approval order) (cited in *Collins v. Quincy Bioscience, LLC*, 2020 U.S. Dist. LEXIS 218673, at *8); *Brown v. Hain Celestial Grp., Inc*., 3:11-CV-03082, 2016 U.S. Dist. LEXIS 19275 (N.D. Cal. Feb. 17, 2016) (Mr. Helfand is a "professional objector" whose efforts courts have "repeatedly turned aside"; he has "provided no proof that he is a class member"; "he neither provides receipts nor identifies the products he claims to have bought"; and "[t]he court could therefore almost certainly strike his objection"); *Legg v. Lab. Corp. of Am. Holdings*, No. 14-61543-CV, 2016 U.S. Dist. LEXIS

34

122695, at *9 n.2 (S.D. Fla. Feb. 18, 2016) ("objector[] Steven Helfand . . . [is] not [a] member[] of the Settlement Class and therefore lack[s] standing to object to the Settlement"). Other courts have similarly found his testimony "uncooperative, evasive, vague, confrontational, difficult, inconsistent, rude, [and] threatening." *Collins v. Quincy Bioscience, LLC*, 2020 U.S. Dist. LEXIS 218673, at *4. *See also Norcia*, 2021 U.S. Dist. LEXIS 135256, at *11 (making an "adverse credibility finding" after considering the substance of his deposition and in-court testimony, and observing his demeanor at the final approval hearing.").

### b. Further undermining his credibility, even if he is a Settlement Class Member, Mr. Helfand's objection lacks merit.

In addition to Mr. Helfand's lack of credibility, the two bases for his objection lack merit. First, Mr. Helfand contends that Plaintiffs' fee application (due March 31, 2022) will be filed after the objection deadline (January 31, 2022). Helfand Obj., pp. 2-3. This, according to Mr. Helfand, violates due process, Rule 23(h), and Ninth Circuit case law holding that class members should be allowed an opportunity to examine counsel's fee motion. *Id.* But responses to Plaintiffs' Motion for Final Approval and Motion for Attorneys' Fees are not due until April 14, 2022 (the "Fee Response Date"). Preliminary Approval Order, ¶ 25. Class members will have an adequate opportunity to examine and respond to counsel's fee motion prior to final approval. Mr. Helfand's objection is thus meritless.

After his objection, Mr. Helfand filed a second submission (without leave of Court), complaining that the Fee Response Date was added to the home page of the Settlement Website in January 2022. ECF No. 192. There is nothing improper about the addition of information that may be of assistance to Settlement Class Members. In fact, it is one of the explicit purposes of the Settlement Website; the Preliminary Approval Order requires that the website:

> [M]ake available copies of this [Preliminary Approval] Order, Class
> Notices, the Settlement Agreement and all Exhibits thereto;

> instructions on how to submit Claims online, by email, or by mail; Orders of the Court pertaining to the Settlement; **and such other information as may be of assistance to Settlement Class Members** or required under the Settlement Agreement.

Preliminary Approval Order, ¶ 15 (emphasis added). The Fee Response Date is in the Court's Preliminary Approval Order (which is on the Settlement Website and has been throughout the notice period). The date was later added to the landing page of the Settlement Website for additional clarity and assistance to the Class. It is unclear exactly what Mr. Helfand's criticism of this information is, other than that it is "too little and too late." But the Fee Response Date has long been prescribed by Court order available on the Settlement Website, it was further highlighted on the website more than a month before any fee petition was due and even further before any responses to that petition would be required, and no Class Member has been deprived of their right to respond to counsel's fee request.

As a second basis for his objection, Mr. Helfand complains about the allocation of the settlement fund between the Nationwide Class and Illinois Subclass. He suggests that the Illinois Subclass was given preferential treatment and was able to "extract concessions" as a result of home-court favoritism stemming from the case having been filed in an Illinois court, in part by Illinois-based plaintiffs' attorneys. Helfand Obj., pp. 3-4. He complains that the two classes are being treated differently "based simply on where they live and/or used the application." *Id.* at 3-4.

Of course, there is no support for the idea that this Court or counsel have given improper preferential treatment to the Illinois Subclass. Illinois Subclass members are entitled to more shares of the Settlement because the Illinois BIPA claim provides a unique avenue for statutory damages available only to Illinois users. *Supra*. Co-Lead Counsel appointed independent counsel for each of the classes to consider the strengths and weaknesses of the claims available to the respective classes and to research, negotiate, and make a recommendation regarding the appropriate

settlement allocation between the two classes. *Supra*. Each class is represented by multiple Class Representatives. *Supra*. The provision of additional Settlement shares to Illinois Subclass members is well founded and proper.

Later in his objection, tacitly recognizing the valid, BIPA-related distinction between the two classes, Mr. Helfand contends that the Illinois Subclass should not be entitled to additional shares because that subclass cannot be certified. Helfand Obj., pp. 4-5.[18] But Mr. Helfand further contends that the Nationwide Class cannot be certified either. *Id.* If anything, Mr. Helfand's arguments regarding class certification risks support that the $92 million (plus injunctive relief) Settlement is an excellent result in a case that faces meaningful risks should it proceed in litigation.

For these reasons, Mr. Helfand's objection should be denied.

### 2. The Cochran Objection was filed by a serial objector, did not comply with the requirements of the Preliminary Approval Order, and lacks merit.

#### a. Ms. Cochran failed to provide the information required by the Preliminary Approval Order.

The Cochran Objection also carries no weight. As a procedural matter, the objection should be stricken because Ms. Cochran did not provide the Court-ordered information required for each objection. The Preliminary Approval Order requires that objectors disclose: "the identity of all counsel who represent the objector . . . along with a statement of the number of times in which that

---

[18] Mr. Helfand raises a number of hypothetical questions in arguing that the Illinois Subclass definition is ambiguous such that the Subclass cannot be certified. Each of his hypotheticals is plainly answered by the Subclass definition.

For example, Mr. Helfand queries whether a person who "happens to use TikTok while waiting to board a new plane at O'Hara is a member of the Subclass, even if they only filmed video in Iowa?" Helfand Obj., p. 4. No. The Subclass definition requires that the individual used the App "to create videos" in Illinois. As another example, Mr. Helfand queries: "What about if they filmed video in O'Hare and were using TikTok, but their video was not going to be used on TikTok, but then they decide to use it that way after all?" *Id.* That person would be a Class Member if they are an Illinois resident, because they used the App "to create videos" while in Illinois.

counsel has objected to a class action settlement within five years preceding the submission of the objection, the caption of the case for each prior objection, and a copy of any relevant orders addressing the objection." Preliminary Approval Order, ¶ 9.

Ms. Cochran's counsel is George W. Cochran. Cochran Obj., p. 2. Mr. Cochran "is a serial objector to class action settlements, with a history of attempting to extract payment for the withdrawal of objections." *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1104 (D. Kan. 2018); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800, 2020 U.S. Dist. LEXIS 118209, at *266 (N.D. Ga. Mar. 17, 2020) (same). Indeed, the Cochran Objection notes that Mr. Cochran has objected to 17 class settlements (that he can recall) in the last five years. Cochran Obj., p. 3. But the Cochran Objection does not include "a copy of any relevant orders addressing" any of those 17 objections, as the Preliminary Approval Order requires. *Supra*.

The objection must also include "the objector (and the objector's attorney's) signature on the written objection" and "all agreements that relate to the objection or the process of objecting, between the objector or objector's counsel and any other person or entity." Preliminary Approval Order, ¶ 9. Mr. Cochran has not signed the objection, nor has Ms. Cochran produced her retainer with Mr. Cochran or any other agreement relating to the objection.

Because the objection fails to provide this Court-ordered information, it should be stricken. *Ferron v. Kraft Heinz Foods Co.*, No. 20-CV-62136, 2021 U.S. Dist. LEXIS 129955, at *43 (S.D. Fla. July 13, 2021) ("[b]ecause [objector] failed to comply with the Court's Order Preliminarily Approving Class Action Settlement and Certifying the Settlement Class, this Court strikes his Objection as invalid."); *Champs Sports Bar & Grill Co. v. Mercury Payment Sys., LLC*, 275 F. Supp. 3d 1350, 1353 (N.D. Ga. 2017) (striking objection for "willful refusal to comply with the requirements of the Preliminary Approval Order."); *Hooker*, 4:13-cv-00003, ECF No. 209, ¶ 20

(*supra*). And because Mr. Cochran is a serial objector, the substance of Ms. Cochran's objection, if considered, should be given little weight.

> **b. Ms. Cochran objects to a fee request of one-third of the Settlement fund; Class Counsel has not made such a request.**

Even if the Court opts to consider the substance of Ms. Cochran's objection, it should be denied on its merits. Ms. Cochran's sole objection is to a hypothetical attorneys' fee award that Class Counsel had not yet requested (nor had the opportunity to support with briefing and lodestar). Plaintiffs will address their fee request and the appropriate bases for award in their separate motion.

Accordingly, Ms. Cochran's objection should be denied.

> **3. The Mark S. Objection did not comply with the requirements of the Preliminary Approval Order, restates objections previously considered and rejected by the Court, and fails to disclose that Mark S. has asked another court to award him legal fees for this "remarkable" Settlement.**

Mark S.'s objection also lacks merit. Mark S., via his counsel Scott Drury, makes substantially the same objections he made in connection with preliminary approval. *See* ECF No. 126. The Court already considered and rejected those objections. *See generally* Memorandum Opinion.

What is more, despite Mark S.'s opposition to this Settlement at preliminary approval, his attempt to enjoin this Settlement in other proceedings against TikTok before Judge Blakey, and his present objection to final approval – Mark S. has sought attorneys' fees and a plaintiff service award in the TikTok action before Judge Blakey, claiming responsibility for *this* Settlement's benefits.

The Mark S. Objection should be denied.[19]

### c. Mark S. objects to the Settlement but seeks legal fees for its "remarkable" benefits.

The Mark S. Objection focuses on relief to minors under the age of 13. This focus stems from Mark. S.'s objection (via his counsel here, Scott Drury) in another action against TikTok which specifically focuses on that age group, *T.K. v. ByteDance Technology, Ltd.*, et al., 19-cv-07915 (N.D. Ill.) (Blakey, J.). The *T.K.* settlement achieved a $1.1 million fund for under-13 TikTok users who alleged VPPA claims, among other privacy violations. *Id.* at ECF Nos. 5 (motion), 94 (order).

In September 2020, Mark S. asked the *T.K.* Court to enjoin this MDL Settlement, and to deprive all Class Members of relief in this case, in deference to the *T.K.* settlement. *Id.* at ECF Nos. 51-52. He sought that injunction despite contending that the *T.K.* settlement was inadequate, and in disregard of the millions of MDL Class Members above the age of 13 who were not members of the *T.K.* class at all. *Id.* at ECF Nos. 51-52. Judge Blakey denied that request. *Id.* at ECF No. 68 (also denying Mark S.'s motion to intervene). No one – not even defendants – objected to the under-13 minors' "double recovery" under both the *T.K.* and MDL settlements except Mark S. *See id*. Mark S.'s objection did nothing to increase the settlement fund in *T.K.* and likewise, his objection at preliminary approval here in no way benefited this Class.

---

[19] Moreover, despite the requirements of the Preliminary Approval Order, the Mark S. Objection does not include "a copy of any relevant orders addressing" counsel's prior class settlement objection. Instead, the objection simply states that the "objection and related orders are publicly available." Mark S. Obj., p. 7. The objection also does not include the following requirements (Preliminary Approval Order, ¶ 9(v) and (vii)): "all agreements that relate to the objection or the process of objecting, between the objector or objector's counsel and any other person or entity" or "a declaration under penalty of perjury that the information provided by the objector and objector's counsel is true and correct." The objection should be stricken for these willful failures to comply with the Court's order. *Supra*.

Nevertheless, in June 2021, Mark S. requested over <u>$1.5 million in legal fees</u> and a $2,500 service award in *T.K. Id.* at ECF No. 71. In seeking those fees, Mark S. claimed that he and his counsel were responsible for the Settlement benefit <u>here</u>, in the MDL. *Id.* In other words, despite seeking to enjoin this Settlement, twice objecting to it, and having in no way increased its value, Mark S. takes credit for $6.256 million of the MDL Settlement benefits (amounting to 6.8% of the Settlement fund, based on Mark S.'s estimate that 6.8% of the Class is under 13). *Id.* at p. 5.[20] Recognizing that his request exceeded the entire *T.K.* settlement fund, Mark S. offered to take a pro rata value of his fees in *T.K.*, and noted his intention to also seek fees in this MDL. *Id.* at pp. 2, 13. On March 25, 2022, the court denied Mark S.'s requests for a service award and fees (and all of his objections to the *T.K.* settlement), stating: "[e]ven *if* Mark S. could somehow take credit for Defendants' agreement to permit a 'double recovery' for members of the Proposed Settlement Class (which he cannot), his request is utterly misplaced. . . . Mark S. did not obtain a substantial benefit for the Proposed Settlement Class." *T.K. v. ByteDance Tech. Co*, No. 19-CV-7915, 2022 WL 888943, at *27-28 (N.D. Ill. Mar. 25, 2022).

While taking credit for this Settlement in *T.K.* – and boasting that its benefits are "quite remarkable" and "easily justif[y] a fee award of 33.33%" (*Id.* at ECF No. 71 at pp. 2, 12) – Mark S. yet again objects to this Settlement here in the MDL. These objections should again fail.

### d. The Mark S. Objection fails on its merits.

First, Mark S. argues, as he did at preliminary approval, that conflicts exist between minor and non-minor class members and minors were not adequately represented. Mark S. Obj., pp. 8-10. At the preliminary approval hearing, the Court requested that Class Counsel provide

---

[20] The first of 21 putative class actions comprising this MDL was filed six months *before* Mark S.'s objection to the *T.K.* settlement. Nothing about Mark S's objections in either *T.K.* or this MDL have benefited the Class.

supplemental briefing specifically addressing representation of and advocacy for minor class members' interests, and Class Counsel did so. ECF No. 137 ("Supplemental Memo"). That briefing noted that minor class members were well represented by proposed Class Representatives, those representatives' guardians, the Leadership Group, and individual counsel retained by minor Class Representatives. *Id.* at 1-7. The Supplemental Memo further explained that the issues Mark S. raised regarding the representation of and relief to minors were thoroughly vetted by Class Counsel. *Id.* The Court considered Mark S.'s objection and overruled it. Memorandum Opinion, pp. 15-17.

Nevertheless, Mark S. continues to contend that minors are in a better legal position than non-minors because they have a right to disaffirm arbitration agreements. *Id.* at 8-10. He claims that "Class Counsel negotiated the Settlement believing the alternative was worthless class claims. That was not the case for minor class members." *Id.* at 9. That is simply untrue. Class Counsel was well aware of and considered arguments related to disaffirmance in negotiating and evaluating the Settlement. Supplemental Memo, pp. 3, 12. Both Class Counsel and the Court recognized, however, the risks associated with such an argument. *Id.;* Memorandum Opinion, p. 16 (overruling this objection in light of those risks and noting that "proposed class counsel, all of whom represent minor Plaintiffs, represent that they studied this issue while negotiating the settlement").

Mark S. argues that a "second conflict" arises because the Settlement did not require that TikTok destroy the personal information of individuals who represented upon sign up that they were over the age of 13, but who TikTok can "estimate" are actually below the age of 13. Mark S. Obj., p. 10. Mark S. fails to explain the need for this relief, as he failed to do when he raised the same issue at preliminary approval. Memorandum Order, p. 16. His argument appears to stem from the Children's Online Privacy Protection Rule ("COPPA") and its prohibitions against certain

collection of minors' data. *See* Mark S. Obj., p. 2. But COPPA has no private right of action that Plaintiffs here could enforce. *See Manigault-Johnson v. Google, LLC*, No. 2:18-cv-1032, 2019 U.S. Dist. LEXIS 59892, at *18-20 (D.S.C. Mar. 31, 2019).

Moreover, Mark S. recognizes that the FTC has already pursued such claims against TikTok and personal data for those who "self-identified as being under 13" is already being destroyed pursuant to the FTC order. *Id.* at p. 2.[21] In addition, the Settlement Agreement here provides for the deletion of data for *all* Class Members, including those under 13. Settlement Agreement ¶ 6.2, Addendum, ¶ 4.2. With this in mind, the Court considered and overruled this same objection by Mark S. at preliminary approval. Memorandum Opinion, pp. 16-17 ("the Court discerns no reason why minor class members under thirteen would suffer harms that are different than those of older minor class members, after the settlement is implemented"). For the same reasons, Mark S's objection should be overruled again.

Second, the Mark S. Objection argues that Class Counsel had yet another purported conflict when they negotiated and agreed to the Settlement. Mark S. Obj., pp. 10-11. But the objection does not identify what that conflict was. Instead, it argues that Class Counsel were in a "weakened and conflicted position during any settlement discussions" because "they were saddled with their violation of the *T.K.* preliminary injunction which precluded them from bringing new claims or amending existing claims that fell within the broad release in *T.K.*" i.e., BIPA and VPPA claims on behalf of minors under 13. *Id.* at 10-11. That makes no sense. None of the complaints filed in this action omit claims for minors under 13, and there is no indication that Class Counsel ever felt

---

[21] Even if Plaintiffs could pursue COPPA claims, Mark S.'s proposed data deletion relief fails to consider the practicability of using artificial intelligence-driven age estimates to implement class-wide relief and the class certification issues that continued litigation of such claims would raise.

"saddled" with the preliminary injunction in *T.K.* or failed to pursue minors' claims.[22] Indeed, Mark S. was unsuccessful in his attempt to enforce the *T.K.* injunction in this case.

Based on Mark S.'s contention, minors under 13 should get <u>nothing</u> in the Settlement here, having released their claims in the *T.K.* action. But Class Counsel ensured that they do benefit from this Settlement. ECF No. 122-1, Settlement Agreement, § 2.4 (provision expressly allowing *T.K.* class members to participate in this Settlement). In fact, it is Mark S. who has repeatedly sought to prevent under-13 class members from recovering in this case, *supra*, and it is Plaintiffs who have advocated for those minors and obtained relief on their behalf. Mark S.'s objection should be rejected.

Third, the Mark S. Objection again challenges the Settlement's value, claiming that it is "suspicious" that there is no basis for the $92 million amount. Mark S. Obj., p. 12.[23] In truth, Class Counsel's Supplemental Memo explains how Class Counsel evaluated and valued the claims. ECF No. 137, pp. 7-23. And again, the Court overruled this identical objection at preliminary approval. Memorandum Opinion, pp. 20-22 ("[T]he Seventh Circuit has clarified that 'the *Synfuel/Reynolds* evaluation of potential outcomes need not always be quantified, particularly where there are other reliable indicators that the settlement reasonably reflects the merits of the case.' . . . Many of the same reliable indicators of a reasonable, negotiated settlement are present here. . . . And . . . the

---

[22] In fact, Mark S. and his counsel argued before Judge Blakey that the *T.K.* case did not involve BIPA at all. *E.g.*, *T.K.*, ECF No. 52-3, p. 8 ("MR. DRURY: [. . .] Now I don't want to get bogged down in BIPA because this case is not about BIPA and I want to make that clear for the Court."). *See also id.* at ECF No. 50-14 (Mark S.'s proposed consolidated complaint, which contains no BIPA claim).

[23] Mark S. also falsely claims that Plaintiffs "rel[ied] on an artificially low claims rate in an effort to convince the Court that the Settlement is fair, reasonable, and adequate." Mark S. Obj., p. 14. The preliminary approval motion included a range of potential claims rates. Preliminary Approval Motion, pp. 24-25. Moreover, this brief provides the actual claims rate ( conservatively estimated to be at least 1.4%) which us typical in class actions like this one and is in line with Plaintiffs' prior projections.

Court finds that the settlement agreement is well within the range of fairness, reasonableness, and adequacy[.]") (citations omitted). It should be overruled again.

Finally, Mark S. again argues that the notice plan does not provide the best notice practicable. Here, the target audience was determined by the Settlement Administrator's research and expertise, together with input from TikTok, with the goal of reaching TikTok users of all ages, and Notice was also provided to Class Members by email and in-App notification. *E.g.*, ECF No. 122-12 (Weisbrot Declaration regarding Notice Plan). This issue, too, was raised at preliminary approval and overruled by the Court. *See* ECF No. 126 (Mark S.'s initial objections), p. 12; Memorandum Opinion, p. 33.[24] Mark S.'s objection fails again.

Mark S. has provided no basis to upend this Settlement, particularly while seeking fees for the "remarkable" Settlement benefits that Mark S. had nothing to do with. The Mark S. Objection should be denied.

> **4. The Litteken Objection failed to comply with the requirements of the Preliminary Approval Order, restates objections this Court has already considered and rejected, and continues a string of baseless and irrelevant *ad hominem* attacks.**
>
> > **a. Mr. Litteken's continued *ad hominem* attacks are false, do nothing to undermine the value of the Settlement, and should be rejected.**

As has been commonplace in Mr. Litteken's efforts in this case, the Litteken Objection begins with a histrionic and false narrative claiming that the Settlement was the result of a "reverse auction." Litteken Obj., pp. 1-2. In support, Mr. Litteken complains that the Settlement was reached prior to the appointment of lead counsel and before discovery and motions practice. *Id.* As has been well established, however, settlement analyses and negotiations continued for months

---

[24] The Mark S. Objection also argues final approval is improper because the fee petition is due after objections. Mark S. Obj., pp. 7-8. As addressed herein, all Class Members will have an opportunity to review and respond to the fee petition prior to final approval.

after the initial Settlement Agreement was reached in September 2020. *See, e.g.,* Declaration of Elizabeth A. Fegan, ECF No. 122-7. Indeed, the Court appointed the Leadership Group that same month, and the Leadership Group then diligently vetted the settlement and continued the dialogue with TikTok. *See id.* That Court-appointed counsel conducted confirmatory discovery, including via expert-led onsite review of TikTok's source code. *See id.* In February 2021, a Settlement Addendum was added that further strengthened and clarified the Settlement. *See id.* And only then – after five additional months of analyses, negotiations, and confirmatory discovery – did Plaintiffs seek Court approval of the Settlement. *See* ECF No. 122 (Preliminary Approval Motion). The "motion practice" that Mr. Litteken complains has not yet occurred includes inevitable motions to compel arbitration and to dismiss the case entirely – motions which could have decimated Plaintiffs' claims prior to any discovery at all. *See, e.g.,* Memorandum Opinion, p. 26. The fact that those motions have not yet occurred weighs in favor of the Settlement, not against it. *See id.*

Mr. Litteken tries to undermine the integrity of the pre-leadership settlement negotiations by falsely suggesting the Settlement was initially reached by a single attorney and an "undisclosed client." Litteken Obj., pp. 2, 11. That is irrelevant, given the work performed by the Leadership Group, and it is also untrue. The single attorney on which Mr. Litteken directs his focus – Katrina Carroll – was Court-appointed Interim Lead Counsel at the time the August 2020 mediation was scheduled. (She is now one of the Court-appointed Lead Counsel). She was one of <u>seven</u> attorneys, each from a different law firm, who attended that mediation and entered into the initial Settlement Agreement on behalf of Plaintiffs. ECF No. 122-6, ¶¶ 17-19.[25] And those seven attorneys represented seven proposed class representatives who were named in the initial agreement.

---

[25] Those seven attorneys were a delegation from a broader group of <u>16 law firms</u> that came together to collaborate on behalf of Plaintiffs in the months leading up to the mediation. ECF No. 122-6 (Carroll Decl.), ¶ 18.

Settlement Agreement, ECF No. 122-1, p. 18. Even still, Settlement approval was not sought until further analyses, confirmatory discovery, negotiation, and agreement by the Court-appointed Leadership Group.

And when approval was finally sought, it was done with support extending well beyond the seven attorneys who reached the initial agreement, the initial seven proposed class representatives, and the renowned mediator who facilitated the Settlement. Indeed, Settlement supporters included the three Court-appointed Class Counsel firms, six additional firms in the Leadership Group, more than a dozen additional law firms who were retained by Class Representatives, and 35 proposed Class Representatives. *See* ECF No. 122-2 (Class Representatives and their counsel). In other words, there were dozens of potential "auction bidders" who could have opposed the Settlement had any of them believed the Settlement process was "ineffectual" – as Mr. Litteken now suggests even though the Settlement dwarfs many of his counsel's own privacy settlements (ECF No. 137-2 (settlement comparables chart)).[26] In fact, none of the dozens of law firms who filed cases that were consolidated in the MDL now objects to the Settlement. And what is most important, the Settlement now has the support of over 1.2 million Class Members who have filed Valid Claims.

Mr. Litteken's counsel's preoccupation with Ms. Carroll is misguided and appears to be motivated by his personal legal issues. *See* ECF No. 166 (Edelson PC motion stemming from unrelated Edelson arbitration). The Leadership Group achieved an excellent result for the Class through hard-fought, arms'-length negotiations.

---

[26] Moreover, as Mr. Litteken notes (Litteken Obj., pp. 10-11), some of the counsel who now support the Settlement were skeptical about it before seeing its terms. Those concerns were resolved when that counsel saw the benefits achieved for the Class and participated in the robust, months-long analyses of the Settlement and continued negotiations.

**b. The Litteken Objection fails to comply with the requirements in the Court's Preliminary Approval Order.**

In his objection, Mr. Litteken acknowledges that he intentionally failed to comply with the Preliminary Approval Order's requirements for objections. Litteken Obj., pp. 4-5. The Preliminary Approval Order requires that objectors provide "a copy of any relevant orders addressing" prior class settlement objections (of which Edelson disclosed four), "all agreements that relate to the objection or the process of objecting, between the objector or objector's counsel and any other person or entity," and "a declaration under penalty of perjury that the information provided by the objector and objector's counsel is true and correct." Preliminary Approval Order, ¶ 9 (iv), (v) and (vii). Instead, Mr. Litteken states that he will not provide "his retainer agreement with his counsel, his declaration, [or] his counsel's declaration" absent further Court instruction, and that "[t]he orders addressing each of [Edelson's prior] objections are matters of public record." Litteken Obj., pp. 4-5. The objection should be stricken for these willful failures to comply with the Court's order. *Supra*.

**c. The Litteken Objection repeats the same arguments the Court considered and rejected at preliminary approval.**

The substantive sections of the Litteken Objection offer no more support for disrupting the Settlement than its ad hominem attacks. Mr. Litteken's objections are almost entirely repetitive of the objections that he raised at preliminary approval, which the Court considered and overruled.

**i. Mr. Litteken's request for additional class notice regarding attorneys' fees is not supported by Rule 23 or the precedent he cites.**

First, Mr. Litteken mimics the Helfand Objection's claims about the need for Class Members to have the opportunity to respond to counsel's request for attorneys' fees. Litteken Obj,

pp. 5-8. As discussed above, that objection is without merit; Class Members have an opportunity to oppose Counsel's fee request and no Class Member has been aggrieved.[27]

In fact, Mr. Litteken's proposed remedy for this objection illustrates that Class Members have been provided adequate notice of and opportunity to respond to counsel's fee request. More specifically, Mr. Litteken suggests that Plaintiffs "re-notic[e] … the class so that they have all information about Class Counsel's fee request to which they are entitled at the time they are obligated to object." Litteken Obj., p. 8. But Class Members already have all information "to which they are entitled" – and more, including counsel's detailed fee application – weeks prior to the Fee Response Date.

While Class Members are entitled to respond to counsel's fee request, there is no requirement that the deadline to object to a fee request be the same as the deadline for objections to settlement approval. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 895 F.3d 597, 615 (9th Cir. 2018) ("Rule 23(h) does not require that class counsel's fee motion be filed before the deadline for class members to object to, or opt out of, the substantive *settlement*. Rather, the rule demands that class members be able to 'object to *the motion*'—that is,

---

[27] Mr. Litteken's suggestion that the Fee Response Date applies only to the Defendant (Litteken Obj., p. 7) is wrong. Plaintiffs and Defendant both recognize the Court's Order as providing Class Members the right to oppose an attorneys' fees request by the Fee Response Date.

the motion that class counsel must file to make a claim for fees under Rule 23") (citations omitted) (emphasis in original).[28]

Rule 23(h) requires only that fee motions be "served" on the parties and "directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h)(1). Plaintiffs have complied with this provision via the Notice, the posting of the Preliminary Approval Order, the public filing of their motion for attorneys' fees, and the posting of that motion on the website upon filing.

The Notice discloses that "Class Counsel intends to request up to 33.33% of the Settlement fund for attorneys' fees." ECF No. 122-4, p. 7. The Notice states that "[t]he Court will hold a hearing to decide whether to approve the Settlement and any requests for fees and expenses" and provides information about the hearing. *Id.* at 9. The Notice refers Class Members to the Settlement Website several times, provides the website's URL in the footer of every page, and informs Class Members that they are "urged to review more details in the Settlement Agreement" and to visit the website for those details. *Id.* at 9. Class Counsel's attorneys' fees motion, with the specifics of their fee request, is being publicly filed on the Court's docket and placed on the Settlement Website. The requirements of Rule 23 have therefore been met. *See, e.g., In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 446 (3d Cir. 2016) (Notice that allowed class members to

---

[28] *See also Bower v. MetLife, Inc.*, No. 1:09-CV-351, 2012 U.S. Dist. LEXIS 149117, at *14-16 (S.D. Ohio Oct. 17, 2012) (Rule 23(h) "does not by its plain language require that the fee petition be submitted at any specific time. . . .[C]lass members were informed of the maximum amount of fees, expenses, and contribution awards that would be sought by Class Counsel in the notice(s) months ago. Such notice comports with the requirements of Rule 23(h). . . . [And] objectors had a fair opportunity to prepare objections to the fee petition after it was filed and before the Fairness hearing."); *Keil v. Lopez*, 862 F.3d 685, 706 (8th Cir. 2017) (A schedule that failed to provide class members with *any* opportunity to respond to a fee request prior to final approval – which is not the case here because of the Fee Response Date – was at most harmless error because the objectors had the opportunity to respond via appeal); *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, No. 08-1999, 2010 U.S. Dist. LEXIS 121684, at *21 (E.D. Wis. Oct. 28, 2010) (same where class members could have responded (and some did) following class notice or after reviewing the full fee motion).

"ballpark the size of class counsel's eventual fee request. . . [e]ven if the class members were missing certain information—for example, the number of hours class counsel worked and the terms of any contingency fee arrangements class counsel have with particular [plaintiffs]—[still provided] enough information to make an informed decision about whether to object to or opt out from the settlement.").[29]

Neither of the Seventh Circuit cases Mr. Litteken cites – *Kaufman v. Am. Express Travel Related Servs. Co*., 877 F.3d 276 (7th Cir. 2017) and *Redman v. Radioshack Corp*., 768 F.3d 622 (7th Cir. 2014) – supports a different reading of Rule 23. *Kaufman* and *Redman* follow the Ninth Circuit's decision in *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993-95 (9th Cir. 2010). In *Mercury*, the court held that "a schedule that requires objections to be filed before the fee motion itself is filed denies the class the full and fair opportunity to examine and oppose the [fee] motion that Rule 23(h) contemplates." *Id.* at 995.

Following that reasoning, *Redman* reversed the approval of a settlement where the attorneys' fee motion was not filed until after the objection deadline. 768 F.3d at 637-38. The court found that objectors were "handicapped" at the time of the objection deadline because detailed hours, expenses, and rationale in support of the fee request had not been submitted. *Id.* at 638. But

---

[29] *See also, e.g., Halley v. Honeywell Int'l, Inc.*, 861 F.3d 481, 500 (3d Cir. 2017) (Notice that included a smaller fee percentage than counsel actually requested after the deduction of costs still provided "the critical information" and "did not deprive the class members of the ability 'to make informed decisions' on whether to opt out of the settlement or object to the fee award.") (citation omitted); *Gascho v. Glob. Fitness Holdings, LLC*, No. 2:11-CV-436, 2014 U.S. Dist. LEXIS 46846, at *96 (S.D. Ohio Apr. 4, 2014) (Notice of fee request was "directed to class members in a reasonable manner" where maximum fee request was in long-form notice and motion for attorney's fees was filed in advance of fairness hearing); *T.K.*, 19-cv-07914, ECF No. 94, pp. 20-21 (finding that the class "received sufficient notice of fees" and "had ample opportunity to voice their concerns" in light of the settlement notice, which specified the maximum fee request and a fee motion filed two weeks in advance of the objection deadline, even though "the settlement notice does not appear to provide class members with information about the *filing* of the full fee petition") (emphasis in original).

*Redman* makes no mention of *any* opportunity to respond to class counsel's fee motion at all. *See generally id.* Here, in contrast, there is a discrete deadline for Class Members to respond to the attorneys' fees request – the Fee Response Date – and it falls *after* the submission of supporting details and rationale in Plaintiffs' March 31, 2022 brief.

*Kaufman* is distinguishable too. In *Kaufman*, the court addressed whether briefs in support of a settlement (not attorneys' fees) must be filed prior to the objection deadline. 877 F.3d at 284. In dicta, *Kaufman* referenced *Mercury* and *Redman* in comparing Rule 23(h), which requires supporting motions before a fee objection deadline, and Rule 23 more broadly, which "has no provision that would require parties to file briefs in support of the settlement prior to the deadline to file objections." *Id.* The decision's reference to "the deadline to object to the settlement" (on which Mr. Litteken relies) was imprecise, and did not contemplate a scenario with separate settlement and fee objection deadlines (which was irrelevant to the issue under consideration), but it was not a holding that such scenarios are improper or that attorneys' fees motions must be filed before objections to the settlement itself. *See id.* at 284 ("The Intervenors urge us to extend *Redman*'s reach to apply to the filing of briefs in support of settlement before the deadline to object. But, as the Ninth Circuit made clear [in *Mercury*], the plain text of Rule 23(h), which deals exclusively with attorneys' fees and costs, is what requires parties to file motions for attorneys' fees before the deadline to object to the settlement. There is no such requirement for the filing of briefs in support of a settlement agreement").

Indeed, the Ninth Circuit itself has repeatedly made clear that *Mercury* "rejected as insufficient Rule 23(h) notice when the motion for attorneys' fees was due after the deadline for class members to object to *the attorneys' fees motion*." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954 (9th Cir. 2015) (emphasis added) (finding notice sufficient where it stated the

requested fee percentage and class members had 15 days after the filing of a fee motion to object). "Rule 23(h) does not require that class counsel's fee motion be filed before the deadline . . . to object to . . . the substantive *settlement*." *Volkswagen*, 895 F.3d at 615 (emphasis in original).

Through the Notice and the March 31, 2022 motion for attorneys' fees, Class Members have the information they need to consider counsel's fee request and respond by the April 14, 2022 Fee Response Date. Accordingly, Mr. Litteken's demand for additional notice should be denied and his objection should be overruled.

### ii. The Court has already rejected Mr. Litteken's request to mandate app-store subpoenas because the Notice Plan provides the best notice practicable under the circumstances.

Second, Litteken raises issues about notice that the Court already considered and rejected at Preliminary Approval. Litteken Obj., pp. 8-10; Memorandum Opinion, pp. 29-30. In addition to the publication, email, and in-App notice that has already occurred, Mr. Litteken claims that Class Counsel should subpoena application ("app") platform providers for the email information of those who downloaded TikTok. *Id.* at 9. In support, Mr. Litteken cites *In re Suboxone Antitrust Litig.*, No. 16-5073, 2021 U.S. Dist. LEXIS 166675, at *16-23 (E.D. Pa. Sept. 2, 2021), which rejected publication-only notice in favor of 26 subpoenas to pharmacy benefit managers, third-party payors, and chain store pharmacies (entities that plaintiffs had identified as potential subpoena recipients more than a year prior in plaintiffs' motion for class certification).

But *Suboxone* did not have the expansive notice program that this case has – including direct email to nearly 81 million addresses, a media campaign that had well over 100 million impressions, and in-App notice to Class Members. As noted in a later *Suboxone* opinion: "Courts have consistently recognized that due process does not require that every class member receive actual notice so long as the court reasonably selected a means likely to apprise interested

parties. . . . Rule 23 does not require the parties to exhaust every conceivable method of identifying the individual class members." *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 2445, 2021 U.S. Dist. LEXIS 231508, at *22-23 (E.D. Pa. Dec. 3, 2021) (citations and quotations omitted). Indeed, notice requires only a "reasonable effort," taking into account the cost-benefit of further notice. *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 527 F. Supp. 3d 269 (E.D.N.Y. 2021) (rejecting the approach taken in *Suboxone* in another antitrust case with similar notice considerations).[30]

Mr. Litteken's proposal is not only legally unsupported and duplicative of the robust notice program that already occurred – there is no indication that the costly undertaking would increase the reach of the Notice program or drive additional claims. There is no suggestion that Class Members are more likely to check an email account used for app store purchases than the email account used to register the TikTok App. There is no suggestion that each Class Member has their own app store account such that more email addresses could be obtained from the app store providers than from TikTok itself (for example, family members may share an app store account or the TikTok App itself, even if they have their own TikTok accounts). There is no suggestion that the additional notice would be more effective than the actual Notice that already occurred – which reached more than 97% of the Class, multiple times, through digital media alone, and included other means of direct notice, too. Platt Decl., ¶ 36. But it is clear that Mr. Litteken's proposal would be costly and would delay the provision of Settlement benefits to the Class. As the Court previously concluded, the existing Notice Plan constitutes the best notice practicable under

---

[30] Mr. Litteken also requests that, in connection with "a second round of notice, the Court should also order the parties to produce information about whether this [first round of] notice truly was effective—for instance, did it translate to the types of claim rates one expects with robust direct notice?" *Id.* at 9. The claims rates are included in this brief as is routine in motions seeking the final approval of a class settlement.

the circumstances of this case. Memorandum Opinion, pp. 28-30 ("The Federal Judicial Center has found that a notice plan calculated to reach between 70% and 95% of the class in total is reasonable and that, according to a study of recent published decisions, the median reach calculation on approved notice plans is 87%.") (citation omitted).

### iii. Mr. Litteken's arguments about the Settlement's value and allocation are disingenuous and self-contradicting.

Finally, Mr. Litteken feigns concern over the unremarkable fact that the settling defendant has denied that it engaged in wrongdoing while agreeing to pay to resolve allegations of that wrongdoing. Litteken Obj., pp. 3-4, 10-14. Mr. Litteken complains that the allocation of additional Settlement shares to Illinois Subclass members is unfair because "everyone admits TikTok Didn't violate BIPA." *Id.* at 10. The Settlement, as all settlements are, was a balancing of both parties' independent strength and risk assessments. The fact that the Settlement achieves substantial compensation for wrongdoing that TikTok denies only supports the strength of the Settlement. And to be clear, TikTok denies *all* of the claims against it, as is plainly disclosed on the first page of the Notice. As Mr. Litteken's counsel is well aware, this is common – if not universal – in settlements, just as Facebook denied wrongdoing in *Facebook BIPA*.[31]

Mr. Litteken's complaints about the Settlement's value are self-contradicting. On one hand, Mr. Litteken complains that the additional shares to the Illinois Subclass overvalue the BIPA claim and are thus "not fair . . . and should be readjusted to reflect reality." Litteken Obj., pp. 13-14. On the other hand, Mr. Litteken claims "TikTok got off cheap," and cites *Facebook BIPA* as the top comparator, *id.* at pp. 14-15, even though the Court already deemed *Facebook BIPA* "a poor comparator to this case," Memorandum Opinion, p. 25. The fact that more shares were allocated

---

[31] https://www.facebookbipaclassaction.com/media/2989470/fby_not_200911.pdf ("Facebook denies all allegations of wrongdoing and liability.") (last accessed 3/28/2022).

to Class Members pursuing a BIPA claim – which is one of the few asserted claims with statutory damages, and which has higher historical success rates – reflects the Settlement's fairness and the careful consideration of the value of the case and each of its claims. Mr. Litteken's objection should be overruled.

### iv. Mr. Litteken's patchwork of other complaints is also unavailing.

Mr. Litteken's objection contains a hodgepodge of other irrelevant or untrue complaints. For example, Mr. Litteken claims that the Settlement's gross recovery of $1.03 per class member is "dead last" for "recent privacy settlement[s] with a class size of over a million people." Litteken Obj., pp. 14-15. In support, however, Mr. Litteken cites a table of the 20 "highest" settlements since 2015, not the most recent. *Id.* (citing table from the Declaration of William A. Rubenstein in *Facebook BIPA*, ECF No. 499-3).[32] As discussed above, this Settlement is well within the range of recoveries in comparable cases.

Mr. Litteken claims that the attorneys who determined the allocation did so "with information hand-selected for them." Litteken Obj., p. 13. In truth, allocation counsel was not limited in the information they were entitled to consider.

Mr. Litteken also complains that the mediator was not involved in allocation determinations (beyond overseeing the mediation that resulted in the allocation range in the initial Settlement Agreement). Litteken Obj., p. 13. But this was a benefit to the Class obtained by the Court-appointed Leadership Group. Leaving the allocation determination to independent Plaintiffs' counsel saved the Class costs associated with continued mediation and ensured that

---

[32] Professor Rubenstein also noted in that declaration that "most [privacy class action] settlements are far below $100 million and . . . many are 'full *cy pres*' settlements that return no money to class members directly." *Facebook BIPA*, ECF No. 499-3 at ¶¶ 13. He further recognized the risk in proceeding through class certification, including that "some courts . . . have taken the position that class cannot be certified for statutory damages." *Id.* at ¶ 19.

TikTok and its counsel could not affect Class Member recovery based on their own interests in the valuation of BIPA and non-BIPA claims.

Mr. Litteken claims Ms. Carroll "barred competing counsel" (now Co-Lead Counsel Ekwan Rhow) from participating in the August 2020 mediation. *Id.* at p. 11. In truth, Mr. Litteken's cited document reflects that "Ms. Carroll invited [Mr. Rhow] to participate in the August 13 mediation" and he initially declined. ECF No. 11-1 ¶¶ 4-8 (TikTok, *not* Ms. Carroll, later revoked a subsequent offer to participate in light of concerns related to a potential conflict of interest, but welcomed Mr. Rhow's co-counsel to attend). In any event, Mr. Rhow himself has since fully evaluated the Settlement, engaged in extensive negotiations with TikTok, and supports this Settlement.

As the Court concluded at Preliminary Approval, none of Mr. Litteken's objections warrant depriving the Class of the Settlement's benefits. In sum, the extremely low opposition to the Settlement, including just four objections that provide no credible reason to disrupt Class Members' recovery, support final approval.

**D. The stage of the proceedings and the amount of discovery completed at the time of Settlement, as well as the opinion of competent counsel, favor final approval.**

The Court has recognized the substantial effort Plaintiffs undertook to reach the Settlement here:

> The Settlement Agreement was initially reached through hard-fought, arms'-length negotiations, which were mediated, on two separate occasions, by a reputable former federal judge. It was refined through further negotiation by a Court-appointed leadership group comprising a diverse cast of experienced plaintiffs' attorneys. Defendants have forcefully disputed their liability at every stage, raising a host of factual and legal defenses. The parties have exhaustively analyzed and debated their respective positions as part of their negotiations. And Plaintiffs have reviewed substantial confirmatory discovery, including an expert-led analysis of TikTok's source code. What is more, although the initial agreement

> was inked while this MDL was in its early stages, it capitalized on urgent and extraordinary political pressure upon Defendants to shed TikTok's existing liabilities, and the Settlement Agreement has since been vetted again by the entire Plaintiffs' Leadership Group.

Memorandum Opinion, p. 21. This factor thus supports final approval of the Settlement. *See, e.g., Isby*, 75 F.3d at 1200 ("the discovery and investigation conducted by class counsel prior to entering into settlement negotiations was 'extensive and thorough.'").

Moreover, the Court appointed experienced, competent counsel to oversee this case. The Leadership Group comprises nine attorneys with considerable privacy and consumer class action experience. They each endorse this Settlement, and that, too, weighs in favor of final approval, as the Court previously recognized:

> Moreover, all three of Plaintiffs' Interim Co-Lead Counsel, whom the Court found well qualified to serve in that role, have attested to their belief that the proposed settlement is fair, reasonable, and adequate. Carroll Decl. ¶ 41; Pls.' Mot, Ex. G, Fegan Decl. ¶ 3, ECF No. 122-7; *id.*, Ex. H, Rhow Decl. ¶ 3, ECF No. 122-8. Add to this the opinion of Judge Phillips (whom Chambers and Partners, a respected legal company, has named one of the top mediators in the United States) that the settlement is fair, adequate, and reasonable, "especially when measured against the significant obstacles standing in the way of . . . Plaintiffs' claims." *Id.*, Ex. I, Phillips Decl. ¶ 12, ECF No. 122-9.

Memorandum Opinion, p. 27. *See also, e.g., In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) (placing "significant weight on the unanimously strong endorsement of these settlements" by "well-respected attorneys"); *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 812 (E.D. Wis. 2009) (factors including that "counsel endorses the settlement and it was achieved after arms-length negotiations facilitated by a mediator . . . suggest that the settlement is fair and merits final approval").

## VII.   CONCLUSION

This $92 million plus injunctive relief Settlement provides an excellent result for the Class. The Settlement has garnered substantial support from the Class, with over 1.2 million Valid Claims filed, fewer than 40 exclusions, and just four objections – none of which raises a credible concern. Accordingly, Plaintiffs respectfully request that the Court finally approve the Settlement.

Dated: March 31, 2022

By: */s/ Katrina Carroll*
Katrina Carroll
**LYNCH CARPENTER LLP**
111 W. Washington St.
Suite 1240
Chicago IL 60602
312.750.1265
katrina@lcllp.com

Elizabeth A. Fegan
Melissa Ryan Clark
**FEGAN SCOTT LLC**
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com


Ekwan Rhow
**BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067
(310) 201-2100
erhow@birdmarella.com

*Plaintiffs' Co-Lead Counsel*

Jonathan Jagher
Freed Kanner London & Millen LLC
923 Fayette Street
Conshohocken, PA 19428
(610) 234-6487
jjagher@fklmlaw.com

Michael Gervais
Susman Godfrey LLP
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 789-3100
mgervais@susmangodfrey.com

Albert Y. Chang
Bottini & Bottini, Inc.
7817 Ivanhoe Avenue
Suite 102
La Jolla, CA 92037
(858) 914-2001
achang@bottinilaw.com

Megan E. Jones
Hausfeld LLP
1700 K Street NW, Suite 650
Washington, D.C. 20006
(202) 540-7200
mjones@hausfledllp.com

Amanda K. Klevorn
Burns Charest LLP
365 Canal Street
Suite 1170
New Orleans, LA 70130
(504) 799-2845
aklevorn@burnscharest.com

*Plaintiffs' Steering Committee*

Shannon Marie McNulty
Clifford Law Offices, P.C.
120 North LaSalle Street, Suite 3100
Chicago, IL 60602
(312) 899-9090
smm@cliffordlaw.com

*Plaintiffs' Liaison Counsel*