**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: TIKTOK, INC., CONSUMER PRIVACY LITIGATION | MDL No. 2948:16-cv-08637 |
| | Master Docket No. 20-cv-4699 |
| | Judge John Z. Lee |
| This Document Relates to All Cases | Magistrate Judge Sunil R. Harjani |

**PLAINTIFFS' MOTION FOR ATTORNEYS' FEES,
REIMBURSEMENT OF EXPENSES, AND CLASS
REPRESENTATIVE SERVICE AWARDS**

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................ 1

II.    CLASS COUNSEL DEDICATED ENORMOUS RESOURCES TO THIS
MATTER AND FACED SIGNIFICANT RISKS TO SUCCESSFULLY
RESOLVE THIS CASE WITH DEFENDANTS ................................................ 3

    A.    Class Counsel Dedicated Tremendous Resources to Resolve Plaintiffs'
Claims. ................................................................................................... 3

    B.    Class Counsel Faced Significant Risk of Nonpayment. ........................ 7

        1.    Class Actions are Inherently Risky. ........................................... 8

        2.    Class Counsel Faced Complex Issues. ........................................ 8

        3.    Defendants Had Substantial Resources for Their Defense. ........ 9

III.    THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER
CONTROLLING LAW. ................................................................................... 10

    A.    The Settlement Creates a Common Fund from Which Percentage-of-
the-Fund is the Appropriate Method for Awarding Attorneys' Fees.... 10

    B.    Plaintiffs' Requested Fee is an Appropriate Market-Based Fee and
Should Be Approved. ........................................................................... 14

        1.    Class Counsel Overcame Serious Litigation Risks. .................. 15

        2.    Class Counsel Achieved an Excellent Result ........................... 18

    C.    A Lodestar Cross-Check Confirms that the Fee Requested is Proper. ................. 20

    D.    A "Sliding Scale" Approach is Neither Necessary Nor Appropriate
Here. ..................................................................................................... 23

IV.    COUNSEL'S LITIGATION EXPENSES WERE REASONABLY
INCURRED AND SHOULD BE APPROVED ............................................... 27

V.    THE CLASS REPRESENTATIVES SHOULD RECEIVE SERVICE
AWARDS ........................................................................................................ 27

VI.    CONCLUSION ................................................................................................ 29

## TABLE OF AUTHORITIES

### Cases

*Americana Art China Co., Inc. v. Foxfire Printing and Packaging, Inc.*,
  743 F.3d 243 (7th Cir. 2014) ................................................................. 11

*Arenson, et al. v. Bd. of Trade of City of Chicago*,
  372 F. Supp. 1349 (N.D. Ill. 1974) ...................................................... 10

*Beckman v. KeyBank, N.A.*,
  293 F.R.D. 467 (S.D.N.Y. 2013) ......................................................... 22

*Blum v. Stenson*,
  465 U.S. 886 (1984) ............................................................................. 14

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ..................................................................... 10, 11

*Brewer v. S. Union Co.*,
  607 F. Supp. 1511 (D. Colo. 1984) ..................................................... 10

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*,
  2012 WL 12540344 (N.D. Ga. Oct. 26, 2012) .................................... 22

*Cook v. Niedert*,
  142 F.3d 1004 (7th Cir. 1998) ............................................... 20, 21, 28

*Denius v. Dunlap*,
  330 F.3d 919 (7th Cir. 2003) ............................................................... 20

*Dial Corp. v. News Corp.*,
  317 F.R.D. 426 (S.D.N.Y. 2016) ......................................................... 25

*Dohrmann v. Intuit, Inc.*,
  823 F. App'x 482 (9th Cir. 2020) (reversing ...................................... 15

*Exch. Comm'n v. First Secs. Co. of Chicago*,
  528 F.2d 449 (7th Cir. 1976) ............................................................... 13

*Florin v. Nationsbank of Ga., N.A.*,
  34 F.3d 560 (7th Cir. 1994) ....................................................... 7, 13, 21

*Gaskill v. Gordon*,
  160 F.3d 361 (7th Cir. 1998) ............................................................... 11

*Gaskill v. Gordon ("Gaskill I*,
  942 F. Supp. 382 (N.D. Ill. 1996) ....................................................... 13

*Gastineau v. Wright*,
  592 F.3d 747 (7th Cir. 2010) ............................................................... 21

*George v. Kraft Foods Glob., Inc.*,
  2012 WL 13089487 (N.D. Ill. June 26, 2012) .................................... 20

*Hale v. State Farm Mut. Auto. Ins. Co.*,
  2018 WL 6606079 (S.D. Ill. Dec. 16, 2018 ........................................ 12

*Harman v. Lyphomed, Inc.*,
  945 F.2d 969 (7th Cir. 1991) ....................................................... 21, 22

*Heekin*, v. Anthem, Inc.,
  2012 WL 5878032 (S.D. In. Nov. 20, 2012) ...................................... 20

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983) ............................................................................. 13

*Hillson v. Kelly Servs. Inc.*,
  2017 WL 3446596 (E.D. Mich. Aug. 11, 2017) ..................................................... 22
*Horizon Healthcare Servs., Inc.*,
  2016 WL 6089713 (D.N.J. Oct. 18, 2016) ............................................................ 22
*In re Avandia Mktg., Sales Practices and Prods. Liab. Litig.*,
  2012 WL 6923367 (E.D. Pa. Oct. 19, 2012) ............................................................ 9
*In re Broiler Chicken Antitrust Litig.*,
  2021 WL 5709250 (N.D. Ill. Dec. 1, 2021) ...................................................... 11, 25
*In re Broiler Chicken Antitrust Litig.*,
  2021 U.S. Dist. LEXIS 229895 (N.D. Ill. Dec. 1, 2021) ......................................... 12
*In re Capital One Telephone Consumer Protection Act Litig.*,
  80 F. Supp. 3d 781 (N.D. Ill. 2015) ...................................................................... 8
*In re Dairy Farmers of America, Inc.*,
  80 F. Supp. 3d 838 (N.D. Ill. Jan. 20, 2015) ........................................................ 20
*In re Facebook Biometric Info. Priv. Litig.*,
  2022 WL 822923 (9th Cir. Mar. 17, 2022) ............................................................ 26
*In re Giant Interactive Group, Inc. Sec. Litig.*,
  279 F.R.D. 151 (S.D.N.Y.) ...................................................................................... 2
*In re Imax Secs. Litig.*,
  2012 WL 3133476 (S.D.N.Y. Aug. 1, 2012) ........................................................... 2
*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*,
  733 F. Supp. 2d 997 (E.D. Wis. 2010) ................................................................. 22
*In re Northfield Lab., Inc. Secs. Litig.*,
  2012 WL 2458445 (N.D. Ill. June 26, 2012) ......................................................... 11
*In re Ready-Mixed Concrete*,
  2010 WL 3282591 (S.D. Ind. Aug. 17, 2010) ....................................................... 27
*In re Schering-Plough Corp. Enhance Secs. Litig.*,
  2013 WL 5505744 (D.N.J. Oct. 1, 2013) ................................................................ 9
*In re Synthroid Mktg. Litig.*,
  264 F.3d 712 (7th Cir. 2001) .......................................................................... Passim
*In re Synthroid Mktg. Litig.*,
  325 F.3d 974 (7th Cir. 2003) ......................................................................... 24, 25
*In re VeriFone Holdings, Inc. Sec. Litig.*,
  2014 WL 12646027 (N.D. Cal. Feb. 18, 2014) ..................................................... 22
*In re Warner Comm'ns. Secs. Litig.*,
  618 F. Supp. 735 (S.D.N.Y. 1985) ........................................................................ 10
*In re WorldCom, Inc. Secs. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005) ............................................................... 9, 22
*Ins. Brokerage Antitrust Litig.*,
  282 F.R.D. 92 (D.N.J. Mar. 30, 2012) .................................................................... 9
*Jeffboat, LLC v. Dir., Office of Workers' Comp. Programs*,
  553 F.3d 487 (7th Cir. 2009) ................................................................................ 20
*Johnson v. Uber Techs., Inc.*,
  2018 U.S. Dist. LEXIS 161155 (N.D. Ill. Sep. 20, 2018) ..................................... 15
*Kirchoff v. Flynn*,
  786 F.2d 320 (7th Cir. 1986) .................................................................................. 7

iii

*Kolinek v. Walgreen Co.*,
    311 F.R.D. 483 (N.D. Ill. 2015) ........................................................................ 11
*Leung v. XPO Logistics, Inc.*,
    326 F.R.D. 185 (N.D. Ill. 2018) ........................................................................ 20
*Matter of Cont'l Illinois Sec. Litig.*,
    962 F.2d 566 (7th Cir. 1992) ............................................................................... 7
*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970) ................................................................................... 11, 26
*Miracle-Pond v. Shutterfly, Inc.*, No. 19-cv-04722,
    2020 U.S. Dist. LEXIS 86083 (N.D. Ill. May 15, 2020) ................................... 15
*Montgomery v. Aetna Plywood, Inc.*,
    231 F.3d 399 (7th Cir. 2000) ............................................................................. 11
*Paz v. Portfolio Recovery Assocs., LLC*,
    924 F.3d 949 (7th Cir. 2019) ............................................................................. 21
*Peter v. DoorDash, Inc.*,
    2020 WL 1967568 (N.D. Cal. Apr. 23, 2020) ................................................... 15
*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. Jul. 29, 2011) ................................................... 22
*Silverman v. Motorola Sols., Inc.*,
    739 F.3d 956 (7th Cir. 2013) ........................................................... 7, 23, 24, 25
*Skelton v. Gen. Motors Corp.*,
    860 F.2d 250 (7th Cir. 1988) ............................................................................. 21
*Spicer v. Chicago Bd. Options Exch., Inc.*,
    844 F. Supp. 1226 (N.D. Ill. 1993) ................................................................... 28
*Trist v. First Fed. Savings & Loan Ass'n of Chester*,
    89 F.R.D. 8 (E.D. Pa. 1980) ............................................................................. 10
*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ........................................................................... 22
*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ............................................................................... 25
*Williams v. Gen. Elec. Cap. Auto Lease*,
    1995 WL 765266 (N.D. Ill. Dec. 26, 1995) ....................................................... 11
*Williams v. Rohm & Haas Pension Plan* ("*Rohm & Haas II*"),
    658 F.3d 629 (7th Cir. 2011) ....................................................................... 11, 20
*Williams v. Rohm & Haas Pension Plan*) ("*Rohm & Haas II*"),
    2010 WL 4723725 (S.D. Ind. Nov. 12, 2010) ................................................... 27
*Wright v. Nationstar Mortg. LLC*,
    2016 WL 4505169 (N.D. Ill. Aug. 29, 2016) ..................................................... 20

**Rules**

Fed. R. Civ. P. 12(b)(6)...........................................................................................................16
Fed. R. Civ. P. 23(h) ...............................................................................................................26

**Other Authorities**

*ABA Regulation of Contingency Fees: Money Talks, Ethics Walks*,
   65 Fordham L. Rev. 247 (1996) ...........................................................................................14

## I.    INTRODUCTION

This multidistrict litigation ("MDL) case alleges that U.S. defendants TikTok Inc. ("TikTok") and ByteDance Technology Inc. ("ByteDance"), and foreign defendants TikTok, Ltd. and Beijing ByteDance Technology Co. Ltd. ("Beijing ByteDance") (collectively, "Defendants")[1] invaded Plaintiffs' and putative class members' privacy through the popular TikTok application and its predecessor application Musical.ly (the "App"), a video-sharing social networking service used to create short videos. Notably, unlike many civil cases that follow government investigations and prosecutions, this case came exclusively from Co-Lead Counsel's own extensive, independent investigation.[2]

After more than a year of litigation, an expert-led inside look at TikTok's source code, two hard-fought mediations before renowned mediator Honorable Layn Phillips (ret.), and subsequent negotiations for additional relief after Co-Lead Counsel was appointed, Plaintiffs have obtained a $92 million non-reversionary cash settlement fund ("Settlement Fund") and meaningful injunctive relief for the Settlement Class ("Class").

In reaching this excellent result, Plaintiffs overcame serious litigation risks and capitalized on unique defense-side political and settlement pressures. For example, Plaintiffs faced material risks stemming from arbitration clauses and class action waivers. And Plaintiffs asserted highly technical legal claims, navigating through developing areas of data privacy law, arising from Defendants' novel technology. But Plaintiffs were unrelenting in their pursuit of class-wide relief

---

[1] Capitalized terms have the same meanings as set forth in the September 4, 2020 Settlement Agreement and Release ("Settlement Agreement"), as clarified by the February 16, 2021 Addendum No. 1 to Settlement Agreement and Release ("Addendum") (collectively, the "Settlement").

[2] On September 28, 2020, the Court appointed Katrina Carroll, Elizabeth A. Fegan, and Ekwan E. Rhow, as Co-Lead Counsel.  ECF Doc. No. 94.

1

and took advantage of unique political factors, including the potential for a presidentially mandated rush sale, to achieve an outstanding recovery for Plaintiffs and the Class.

Though the litigation has been contentious, the settling Parties have reached consensus, and jointly endorse the proposed Settlement now before the Court. The Settlement provides substantial relief to the Class, including a non-reversionary $92 million cash payment, and prospective relief that addresses the complained-of conduct by requiring TikTok to make disclosures that comply with the laws Plaintiffs claim were violated and to initiate a newly designed data privacy compliance training program for all TikTok employees and contractors.

The Settlement, which ranks among the nation's highest privacy-related settlements, reflects the skill, expertise, and hard work of Co-Lead Counsel and other Plaintiffs' Counsel (collectively, "Class Counsel"),[3] and the benefit to class members is substantial, real, and concrete. Importantly, the proposed Settlement will eliminate the risk and uncertainty of continued proceedings in this Court, in which the foreign Defendants would contest personal jurisdiction and the domestic Defendants would pursue motions to compel arbitration and to dismiss Plaintiffs' claims. As such, Plaintiffs respectfully ask the Court to award Class Counsel 33.33% of the

---

[3] Under Co-Lead Counsel's direction, 28 other firms have prosecuted this case on Plaintiffs' behalf (together with Co-Lead Counsel, they are referred to collectively in this Memorandum as "Class Counsel"). At all times since appointment, Co-Lead Counsel directed and organized Class Counsel's work. Co-Lead Counsel requests discretion to allocate an award of attorneys' fees among Class Counsel. Co-Lead Counsel's good-faith determination will reflect each individual Class Counsel's contribution to the commencement, prosecution, and resolution of the litigation. *See e.g., In re Imax Secs. Litig.,* 2012 U.S. Dist. LEXIS 108516, *36, 2012 WL 3133476 (S.D.N.Y. Aug. 1, 2012) ("lead plaintiff's counsel is best able to fairly allocate the funds.") (citing *In re Giant Interactive Group, Inc. Sec. Litig.*, 279 F.R.D. 151 at 166 (ordering "fees shall be allocated among . . . counsel by lead plaintiffs' counsel in any manner which, in their good faith judgment, reflects each counsel's contribution to the institution, prosecution[,] and resolution of the action").

Settlement Fund or $30,663,600 as attorneys' fees, $789,836.62 as reimbursement for litigation expenses, and $2,500.00 in service awards to each of the 35 named class representatives.

All class members will have notice and an opportunity to be heard on this motion. As discussed more specifically in Plaintiffs' motion for final approval, Plaintiffs' request for attorneys' fees, reimbursement of expenses, and service awards for the class representatives will be posted on the case website, *www.tiktokdataprivacysettlement.com*, contemporaneously with the filing of this motion. Prior to the Court's fairness hearing on May 18, 2022, Class Counsel will report to the Court on any further objections received to this motion for fees, expenses, and service awards.

## II. CLASS COUNSEL DEDICATED ENORMOUS RESOURCES TO THIS MATTER AND FACED SIGNIFICANT RISKS TO SUCCESSFULLY RESOLVE THIS CASE WITH DEFENDANTS

From the inception of their investigation into this matter, Class Counsel dedicated their time, expertise, and capital to ensure the Class would recover for Defendants' wrongful conduct. A summary of those efforts is provided below.

### A. Class Counsel Dedicated Tremendous Resources to Resolve Plaintiffs' Claims.

As also discussed in Plaintiffs' accompanying motion for final approval, the Settlement was the ultimate result of the cohesion of various (and initially adverse) groups of Plaintiffs' attorneys coming together as a unit to solidify an outstanding result in the face of numerous potentially dispositive legal and factual challenges, any of which could have resulted in zero recovery for the Class. This consolidated litigation also proved to be on the cutting edge not only of BIPA and privacy litigation generally but of larger questions of state surveillance, national security, and the Chinese government's use of artificial intelligence and biometric technology to collect personal data from foreign nationals, including U.S. citizens. Class Counsel's investigation and pursuit of this multi-district litigation helped to shed light upon these issues more than two

3

years ago and was a precursor to the tremendous political pressure TikTok faced from the Trump administration in the late summer of 2020, which itself contributed to Plaintiffs' ability to settle the case on favorable terms at that time.

Class Counsel have dedicated tremendous time, effort, and expense hoeing that road, and they have done so entirely on a contingent basis, with no guarantee of compensation or even reimbursement of expenses. Since the inception of this case, Class Counsel invested thousands of hours of attorney and other legal professional time through February 28, 2022.[4] Co-Lead Counsel have worked diligently to ensure that Class Counsel's efforts have been coordinated, detailed, vigorous, and efficient. The result of these efforts is a substantial recovery for the Plaintiffs: a $92,000,000 non-reversionary cash settlement fund and important injunctive relief.

As the Court is well acquainted with the history of this case and the full procedural and factual history is set forth in the accompanying final approval motion (which is incorporated here by reference), the following is only an overview of Class Counsel's efforts to date:

- The first filed case of all related cases in this MDL was filed in November 2019. The complaint was the product of Class Counsel's extensive preparation, independent investigation, and research into the App that began in 2018, before the Congressional investigations of TikTok became trending news. An important aspect of the pre-filing investigation entailed working closely with highly trained source code experts who analyzed multiple versions of the Musical.ly and TikTok apps to uncover (1) the various types of private and personally-identifiable data taken by defendants and third-party entities whose software development kits and

---

[4] Class Counsel have limited the reporting of their time and lodestar through February 28, 2022 for the purpose of this motion.

analytic libraries are secretly embedded within the apps, and (2) the domestic and foreign destinations of such misappropriated data. ECF Doc. No. 122-8 (Rhow Declaration in Support of Preliminary Approval, ¶ 10);

- Class Counsel collected and analyzed numerous iterations of the TikTok terms of use and privacy policies upon which Defendants might rely for their arbitration and consent defenses and developed the arguments and evidence to counter those defenses. *Id.*;

- With the aid of two teams of investigators in California and China, an ESI expert, and colleagues with Chinese-language skills to translate documents, Class Counsel thoroughly researched the Defendant corporations to better understand Defendants' corporate structures, document and data collection and retention systems, internal reporting systems, business and advertising models, artificial intelligence and patent development programs, and other relevant foreign and domestic activities, all of which were relevant to establishing the alleged statutory and common law violations, class damages, Defendants' unjust enrichment, and the alter ego defense to the foreign Defendants' anticipated personal jurisdiction challenge. *Id.*;

- Class Counsel consulted with experts who have conducted original research into the intersection of data privacy, artificial intelligence, Chinese corporations and the Chinese government, including Chinese laws requiring corporations to share data with the government. *Id.*;

- Class Counsel researched numerous legal issues in the data privacy field including jurisdiction and venue, potential causes of action, standing, damages, injunctive relief, notice and consent, and arbitration and class waivers;

- After conducting the extensive investigation described above, Class Counsel filed numerous complaints against the Defendants alleging BIPA claims. Subsequently, when the MDL litigation was transferred to this Court, Class Counsel conducted additional legal research and factual investigation and prepared the operative Consolidated Amended Class Action Complaint, ECF Doc. No. 114;

- Class Counsel prepared and served eight sets of discovery on Defendant and negotiated a protective order with Defendants to facilitate discovery, ECF Doc. No. 122-8, ¶ 15;

- Beginning in April 2020, Class Counsel participated in mediation sessions with Defendants with Judge Layn Phillips (Ret.). *Id.*, ¶ 15. Ultimately, the hard-fought mediation with Defendants resulted in an agreement in principle and a signed term sheet for a class-wide resolution, which was later memorialized in a signed agreement on September 4, 2020. *Id.*, ¶ 2.

- Subsequently, Class Counsel engaged in a candid, collaborative process to assess the case and the proposed settlement benefits. Through that process, and six months of continued negotiations with defense counsel, Class Counsel was able to improve the already substantial Class recovery obtained in the Settlement Agreement through the clarification of some of its core terms. *Id.*, ¶¶ 21-22;

- Class Counsel prepared and executed the Addendum to the Settlement Agreement. *Id.*, ¶¶ 2, 21-22.

- Class Counsel prepared the pleadings and presented argument in connection with preliminary approval, which required the preparation of additional pleadings addressing several objections. ECF Doc. Nos. 145, 159

- Class Counsel worked closely with Angeion Group, LLC, a well-regarded settlement administrator to prepare a proposed Notice Plan and related notice documents. ECF Doc. Nos. 122, 122-4, 122-5, 122-12.

- Class Counsel prepared the pleadings in support of final approval of the proposed Settlement and will continue to oversee all aspects of claims administration.

### B. Class Counsel Faced Significant Risk of Nonpayment.

A material consideration in determining an appropriate fee is the risk of nonpayment. *See Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001). "The lawyers for the class receive no fee if the suit fails." *Matter of Cont'l Illinois Sec. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992), *as amended on denial of reh'g* (May 22, 1992). "Contingent fees compensate lawyers for the risk of nonpayment. The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel." *Silverman*, 739 F.3d at 958 (citing *Kirchoff v. Flynn*, 786 F.2d 320 (7th Cir. 1986)).

To determine a fee award in a class action settlement, a court must assess counsel's risk of taking a particular case and the probability of success as it existed "*at the outset* of the litigation." *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565 (7th Cir. 1994). Therefore, a court must do its best to estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers at the outset of the case, when the risk of loss still existed, rather than at the end of a successful case:

> The best time to determine this rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low). This is what happens in actual markets.

*In re Synthroid*, 264 F.3d at 718; *see also In re Capital One Telephone Consumer Protection Act Litig.*, 80 F. Supp. 3d 781, 788–89 (N.D. Ill. 2015) (the probability of success at the outset of litigation helps determine the reasonableness of the fee).

As discussed below, Class Counsel faced a significant risk of nonpayment because of the complexity of Plaintiffs' claims based on developing areas of data privacy laws and the material risks stemming from arbitration clauses and class action waivers. Class Counsel believed in Plaintiffs' case, invested extensive time, effort, and money, and prosecuted it vigorously. Class Counsel did so at the risk of no recovery and declined other opportunities because of the complexity, time, and expense this case demanded. Class Counsel also conceived and brought this case without the benefit of any related government investigation or enforcement action. The investigation that led to the commencement of this litigation began in 2018, before the Congressional investigations of TikTok.

1.  Class Actions are Inherently Risky.

In a study analyzing class actions against insurers, only 12% of 564 attempted class actions led to a class settlement. Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. EMPIR. L. STUD. 248, at 24 (2010) (citing Nicholas M. Pace, Stephen J. Carroll, Ingo Vogelsang, & Laura Zakaras, *Insurance Class Actions in the United States*, 47 tbl.3.16 (2007)). This case was especially risky because the law governing enforcement of BIPA and other data privacy laws is relatively unsettled.

2.  Class Counsel Faced Complex Issues.

Investigating and proving Plaintiffs' core claims under BIPA and other data privacy laws is difficult. The Complaint alleges that the App uses a complex system of artificial intelligence to recognize facial features in users' videos. ECF Doc. No. 114 (Consolidated Amended Complaint), ¶¶ 3, 250. Plaintiffs allege that the App also analyzes faces to determine the user's age,

8

race/ethnicity, and gender, using proprietary algorithms to attempt to prevent minor children from using the App and to recommend content and profiles for the user to follow. *Id.*, ¶¶ 245-59. Plaintiffs contend that Defendants used this private and biometric information to maintain a competitive advantage over other social media apps and profit from its use of improperly obtained data, all while failing to comply with the minimum requirements for handling users' biometric data established by BIPA. *Id.*, ¶ 240-43. The complexity of the issues Class Counsel confronted is amply demonstrated by the number of experts Class Counsel necessarily relied on to gain an understanding into Defendants' alleged misconduct. *See, e.g.,* Declarations of Katrina Carroll and Ekwan Rhow in Support of Plaintiffs' Motion for Preliminary Approval, ECF Doc. Nos. 122-6 (¶¶ 29-39) and 122-8 (¶¶ 10, 12, 14).

### 3. Defendants Had Substantial Resources for Their Defense.

Not only did Class Counsel confront the inherent uncertainties of bringing an action alleging relatively novel claims, but they also faced Defendants with substantial resources to mount a vigorous defense, who are represented by skilled and experienced legal counsel. The quality of Defendants' legal representation is an important factor in analyzing the value of Class Counsel's services. *E.g.*, *In re Schering-Plough Corp. Enhance Secs. Litig.*, No. 2:08-cv-02177, 2013 WL 5505744, at *25 (D.N.J. Oct. 1, 2013) (emphasizing the importance of evaluating the result in light of Defendants' representation by "first-rate defense counsel"); *In re Avandia Mktg., Sales Practices and Prods. Liab. Litig.*, MDL No. 1871, 2012 WL 6923367, at *5 (E.D. Pa. Oct. 19, 2012) (collecting cases) (considering "the performance and quality of opposing counsel" as a factor in awarding attorneys' fees); *In re Ins. Brokerage Antitrust Litig.* ("*In re Ins. Brokerage II*"), 282 F.R.D. 92, 121 (D.N.J. Mar. 30, 2012) (concluding the skill and efficiency of the attorneys involved favored approval of attorneys' fees in part because the settling defendants were represented by experienced attorneys from prominent law firms); *In re WorldCom, Inc. Secs.*

*Litig.*, 388 F. Supp. 2d 319, 357-58 (S.D.N.Y. 2005) (finding that counsel "obtained remarkable settlements for the Class while facing formidable opposing counsel from some of the best defense firms in the country."); *In re Warner Comm'ns. Secs. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ("The quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsels' work."); *Arenson, et al. v. Bd. of Trade of City of Chicago*, 372 F. Supp. 1349, 1354 (N.D. Ill. 1974) (noting that the quality, vigor, and prior success of opposing counsel is an important factor when assessing the quality of work performed by plaintiffs' counsel). Here, Defendants are represented by Wilson Sonsini Goodrich & Rosati, which is ranked among the Vault Law 100 for most prestigious law firms. *See* www.firsthand.co/best-companies-to-work-for/law/top-100-law-firms-rankings.

The breadth and disparity of resources available to opposing parties is also significant when considering the gravity of the risk class counsel faced. *See Brewer v. S. Union Co.*, 607 F. Supp. 1511, 1531 (D. Colo. 1984); *Trist v. First Fed. Savings & Loan Ass'n of Chester*, 89 F.R.D. 8, 13 (E.D. Pa. 1980). In *Brewer*, the court remarked that inequality of resources available to the parties greatly increases the risk to class counsel. *Brewer*, 607 F. Supp. at 1531. That inequality was prominent here; available resources vastly favored the extremely wealthy corporate Defendants. The class, meanwhile, was represented by individual users of the App.

## III. THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER CONTROLLING LAW.

### A. The Settlement Creates a Common Fund from Which Percentage-of-the-Fund is the Appropriate Method for Awarding Attorneys' Fees.

When a party obtains compensation for the class's benefit in the form of a common fund, courts have long recognized that the costs of the litigation, including an award of attorneys' fees, should be recovered from that common fund. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a lawyer who recovers a common fund for the benefit of persons other than himself or his client

is entitled to reasonable attorney's fee from the fund as a whole"); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 392 (1970). This approach equitably apportions the costs of litigation, including attorneys' fees, among the class members who benefit from the common fund. *Boeing Co.*, 444 U.S. at 478.

The Seventh Circuit has repeatedly endorsed the percentage-of-the-fund methodology. *See Gaskill v. Gordon* ("*Gaskill II*"), 160 F.3d 361, 363 (7th Cir. 1998) (collecting cases) ("When a class suit produces a fund for the class, it is commonplace to award the lawyers for the class a percentage of the fund, in recognition of the fact that most suits for damages in this country are handled on the plaintiffs' side on a contingent-fee basis."); *Williams v. Gen. Elec. Cap. Auto Lease*, No. 1:94-cv-07410, 1995 WL 765266, at *9 (N.D. Ill. Dec. 26, 1995) (collecting cases) ("The approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred on the class."); *see also Williams v. Rohm & Haas Pension Plan* ("*Rohm & Haas II*"), 658 F.3d 629, 635-36 (7th Cir. 2011); *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000); *In re Broiler Chicken Antitrust Litig.*, 2021 U.S. Dist. LEXIS 229895, *43, 2021 WL 5709250 (N.D. Ill. Dec. 1, 2021); *In re Northfield Lab., Inc. Secs. Litig.*, No. 1:06-cv-01493, 2012 WL 2458445, at *3 (N.D. Ill. June 26, 2012). The percentage-of-the-fund method utilizes an *ex ante* approach, in which courts award a fee approximating a hypothetical *ex ante* bargain between the class and its attorneys. *Americana Art China Co., Inc. v. Foxfire Printing and Packaging, Inc.*, 743 F.3d 243, 246-47 (7th Cir. 2014); *Rohm & Haas II*, 658 F.3d at 635.

A contingent fee based on a percentage of the recovery is the most common form of compensation for counsel representing classes in class action litigation. The normal practice in consumer class actions is to compensate attorneys based on a percentage of the plaintiffs' ultimate recovery. *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 501 (N.D. Ill. 2015). Because the percentage-

of-the-fund approach best mirrors typical contingency agreements, as well as market effects, it makes sense that the "vast majority of courts in the Seventh Circuit" use it. *Hale v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 6606079, at \*7. *See also In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. Aug. 31, 2001) (reversing district court's fee award in part where it imposed a lower fee percentage because the settlement fund was more than $100 million, holding that "[m]arkets would not tolerate that effect"); *In re Broiler Chicken Antitrust Litig.*, 2021 U.S. Dist. LEXIS 229895, at \*44 ("There is simply little to no precedent recommending anything other than an award of 33 percent. With the only real evidence of the "market rate" being one-third, that is what the Court will award."). *Cf.* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811, 814 (2010) ("Most federal judges chose to award fees by using the highly discretionary percentage-of-the-settlement method.").

Moreover, a percentage-of-the-fund approach is what the class would have negotiated with Class Counsel at the outset in a hypothetical *ex ante* bargain. Notably, such an approach has been used to determine a reasonable fee award in virtually every BIPA class action settlement in both federal and state courts, and in every BIPA settlement in this District. *See, e.g.*, *Crumpton v. Octapharma Plasma, Inc.*, No. 19-cv-08402 (N.D. Ill. Feb. 16, 2022) (Kendall, J.) (33.33%) (Exhibit 1); *Montgomery v. Peri Formwork Sys., Inc.*, No. 20-cv-07771 (N.D. Ill. Nov. 9, 2021) (Pallmeyer, J.) (33.33%) (Exhibit 2); *Davis v. Heartland Emp. Servs., LLC*, No. 19-cv-00680 (N.D. Ill. Oct. 25, 2021) (Valderarrama, J.) (33.33%) (Exhibit 3); *Burlinski v. Top Golf USA Inc.*, No. 19-cv-06700 (N.D. Ill. Oct. 13, 2021) (Chang, J.) (33.33%) (Exhibit 4); *Bedford v. Lifespace Communities, Inc.*, No. 20-cv-04574 (N.D. Ill. May 12, 2021) (Shah, J.) (33.33%) (Exhibit 5); *Lopez-McNear v. Superior Health Linens, LLC*, No. 19-cv-2390 (N.D. Ill. Apr. 27, 2021) (Pallmeyer, J.) (35%) (Exhibit 6); *Thome v. NOVAtime Tech, Inc.*, No. 19-cv-6256 (N.D. Ill. Mar.

8, 2021) (Kennelly, J.) (33.33%) (Exhibit 7); *Wickens v. Thyssenkrupp*, No. 19-cv-6100 (N.D. Ill. Jan. 26, 2021 (Dow, J.) (33.33%) (Exhibit 8); *Bryant v. Loews Chicago Hotel, Inc.*, No. 19-cv-03195 (N.D. Ill. Oct. 30, 2020) (Norgle, J.) (33.33%) (Exhibit 9); *Martinez v. Nando's Rest. Grp., Inc.*, No. 19-cv-07012 (N.D. Ill. Oct. 27, 2020) (33.33%) (Exhibit 10); *Cornejo v. Amcor Rigid Plastics USA, LLC*, No. 18-cv-07018 (N.D. Ill. Sept. 10, 2020) (Pacold, J.) (35%) (Exhibit 11); *Alvarado v. Int'l Laser Prods., Inc.*, No. 18-cv-7756 (N.D. Ill. Jan. 24, 2020) (Pallmeyer, J.) (35%) (Exhibit 12); *Dixon v. Washington & Jane Smith Cmty.-Beverly*, No. 17-cv-8033 (N.D. Ill. May 31, 2018) (Kennelly, J.) (33.33%) (Exhibit 13).

The percentage-of-the-fund method also conserves judicial resources. Unlike a lodestar calculation, percentage fees are easy to calculate and are not subject to manipulation by counsel. Courts are not forced to review years of bills or scrutinize each decision made by counsel during the course of a complex, multi-year case. *See Florin*, 34 F.3d at 565-66 (noting "there are advantages to utilizing the percentage method in common fund cases because of its relative simplicity of administration."); *Gaskill v. Gordon* ("*Gaskill I*"), 942 F. Supp. 382, 386 (N.D. Ill. 1996) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (observing that "the percentage of the fund method saves the court the time it would have to spend reviewing eight years of billing documents."). Instead, compensation is based on the level of class counsel's success, as it would be in a similar contingency case on behalf of a private party. The percentage-of-the-fund method also allows a court to "dispose of [the] last issue in [] prolonged proceedings as expeditiously as possible." *Gaskill I*, 942 F. Supp. at 386. (quoting *Sec. & Exch. Comm'n v. First Secs. Co. of Chicago*, 528 F.2d 449, 454 (7th Cir. 1976)).

**B.**     **Plaintiffs' Requested Fee is an Appropriate Market-Based Fee and Should Be Approved.**

A fee award of 33.33%  reflects a real-world arm's length transaction between the Class

and Class Counsel and is a generally accepted percentage in the Seventh Circuit, especially in

BIPA cases.[5] *See Crumpton* (Exhibit 1), *Montgomery* (Exhibit 2), *Davis* (Exhibit 3), *Burlinski*

(Exhibit 4), *Bedford* (Exhibit 5), *Thome* (Exhibit 7), *Wickens* (Exhibit 8) , *Bryant* (Exhibit 9)

*Martinez* (Exhibit 10).[6] Judge Kendall recently awarded attorneys' fees of 33.3% of the common

fund in a BIPA case, holding that such an award "is in line with fee awards provided in similar

BIPA cases in this District and is reasonable in light of both the substantial risk that Class Counsel

took on in accepting the case and the excellent relief Class Counsel ultimately obtained for the

Settlement Class." *Crumpton*, Exhibit 1 (awarding class counsel 33.3% of $9,987,380 settlement).

The fee award requested here is similarly justified because of the excellent results obtained by

Class Counsel – a $92 million non-reversionary settlement and meaningful injunctive relief – and

the risks faced by Class Counsel when they took on the litigation.

---

[5] Common fund fee awards of 35% have also been granted in BIPA cases in the Northern District of Illinois. *See Alvarado* (Exhibit 12); *Lopez-McNear* (Exhibit 6); and *Cornejo* (Exhibit 11). And fee awards totaling 35-40% of common funds have been awarded in BIPA cases by Illinois state courts. *See*, *e.g.*, *Kusinski v. ADP LLC*, 2017-CH-12364 (Cir. Ct. Cook Cnty. Feb. 10, 2021) (Atkins, J.) (35%) (Exhibit 14); *Prelipceanu v. Jumio Corp.*, 2018-CH-15883 (Cir. Ct. Cook Cnty. July 21, 2020) (Mullen, J.) (40%) (Exhibit 15).

[6] Thirty-three and one-third percent is a standard percentage in many fee agreements, including large, complex non-class cases. *See* Lester Brickman, *ABA Regulation of Contingency Fees: Money Talks, Ethics Walks*, 65 FORDHAM L. REV. 247, 248 (1996) (noting that "standard contingency fees" are "usually thirty-three percent to forty percent of gross recoveries"); *see also Blum v. Stenson*, 465 U.S. 886, 903 (1984) (Brennan, J., concurring) ("In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery.").

         1.    <u>Class Counsel Overcame Serious Litigation Risks</u>.

After the commencement of this litigation, Defendants took the position that Plaintiffs'
claims are both procedurally and substantively deficient. First and foremost, Defendants have
repeatedly asserted that Plaintiffs' claims are subject to an arbitration and class action waiver
agreement. Indeed, according to Defendants, every TikTok user agreed to an arbitration and class-
waiver provision in the App's Terms of Service ("Terms"). While Plaintiffs believe TikTok's
policies were not adequately presented or otherwise disclosed to its users, and that class members
should not be bound by their provisions, Plaintiffs must acknowledge that courts have consistently
held that users were on notice of—and thus had agreed to—virtually identical disclosures. *See,
e.g., Miracle-Pond v. Shutterfly, Inc.*, No. 19-cv-04722, 2020 U.S. Dist. LEXIS 86083, at *2 (N.D.
Ill. May 15, 2020) (granting motion to compel arbitration and staying class action where contract
was formed with hyperlinked policies near a sign-in button); *Peter v. DoorDash, Inc.*, No. 19-CV-
06098-JST, --- F. Supp. 3d ---, 2020 WL 1967568, at *4 (N.D. Cal. Apr. 23, 2020) (same); *Johnson
v. Uber Techs., Inc.*, No. 16-cv-5468, 2018 U.S. Dist. LEXIS 161155, at *3-4 (N.D. Ill. Sep. 20,
2018) (same); *Dohrmann v. Intuit, Inc.,* 823 F. App'x 482 (9th Cir. 2020) (reversing denial of
motion to compel arbitration where website required acknowledgment of agreement before
proceeding).

According to Defendants, even minors who may be able to disaffirm the arbitration
agreement may not be able to establish disaffirmance collectively on behalf of a class because
disaffirmance purportedly presents individualized issues. Thus, Defendants' position is that

arbitration would create a dispositive threshold procedural problem for Plaintiffs before any factual or legal merits are even considered.[7]

Additionally, Defendants maintain that the foreign Defendants do not have sufficient contacts with any of the forums in which the underlying putative class actions were filed for this Court to exercise personal jurisdiction because the foreign entities have no direct relationship with Plaintiffs and do not operate in the United States. Though Plaintiffs are optimistic they would overcome the jurisdictional hurdle with discovery, Defendants' arguments carry a significant risk if this case were to proceed in litigation.

Even assuming Plaintiffs were able to overcome the foregoing procedural issues, Defendants would assert multiple defenses to the merits of Plaintiffs' claims. Regarding BIPA, for example, Defendants maintain that TikTok does not and never has collected from its users any biometric identifiers or derivative information protected by law, nor has it ever shared U.S. user data with the Chinese government. Defendants have expressed their confidence that, if this case were to proceed on a litigation track, they will secure a Federal Rule of Civil Procedure ("Rule") 12(b)(6) dismissal for failure to state a claim based on, *inter alia*, technical arguments that: (1) Defendants' App compiles only anonymized, generalized "demographic data" through "facial landmarking," and does not collect any biometric information of TikTok users; and (2) even if the information the App utilizes does constitute biometric information within the meaning of BIPA, that information resides on the users' devices, and is not collected or stored by Defendants within the meaning of applicable law.

---

[7] Even if minors could overcome the arbitration agreement through disaffirmance, some of the claims asserted in this litigation would, according to TikTok, be released in connection with another action, *T.K., et al. v. Bytedance Technology Co., Ltd. Et al.*, No. 1:19-cv-07915 (N.D. Ill.), if not for the settlement benefits achieved here. Notably, as part of the Settlement, TikTok has agreed not to dispute claims filed by members of the class in *T.K.*

In support of their position that they have not violated BIPA, Defendants assert that TikTok's user video data is not used to identify anyone. Defendants contend that App users cannot tag or label faces in videos with a user's real name or identity. This contrasts with Facebook, for example, which requires its users to use and display "the same name that you use in everyday life" when using Facebook. Facebook also allows users to tag the faces of their friends and themselves in photos and videos. Because Facebook users must use their real names, their faces are tagged with their real names whenever they are tagged in a photo or video. By contrast, TikTok does not have a face-tagging feature, nor a real name requirement, and thus does not associate a particular face with an individual's identity.

The TikTok App also has special effects features that enable users to alter, enhance, and modify their facial features in their video images. TikTok has explained that the technique employed to enable these special effects features is called "landmarking" and uses artificial intelligence to locate the position of a face or specific facial features within a video frame, e.g., the location of a nose relative to the location of the eyes. According to Defendants, that general "landmarking" does not involve generating any face template or personally identifiable data, and thus does not give rise to biometric privacy violations under BIPA.

Although TikTok has admitted that the App uses technology for "demographic classification," which includes recognizing visual patterns that indicate age, gender or other characteristics, Defendants contend this is fundamentally different than facial recognition because it does not create facial templates and is not capable of identifying a user. While Plaintiffs disagree with Defendants' contentions, Plaintiffs recognize that the question of what constitutes biometric information under BIPA is novel and evolving and is a risk if the litigation proceeds.

Defendants further assert Plaintiffs will be unable to state a claim under the VPPA, which protects consumers against the disclosure of their video viewing histories. Defendants contend that TikTok is not a video service provider within the meaning of the statute, it does not transmit the requisite personally identifiable information (PII) with video viewing histories, any such transmission is subject to the statute's ordinary course of business exception, and that its privacy policy fully discloses its data sharing practices. While Plaintiffs have rebuttals to each of these arguments, they acknowledge the real risk of continued litigation, that circuit court decisions on this claim have reached varying conclusions on comparable sets of facts, and the dearth of successful settlements of VPPA claims.

With respect to Plaintiffs' CFAA claim, aimed at protecting against hacking, Defendants have argued that Plaintiffs cannot establish proof of economic damages. Defendants further contend the claim will be substantively defeated because Plaintiffs voluntarily granted TikTok access to their devices and TikTok complied with the disclosures in its privacy policy about the data it would access and collect, *i.e.*, it never exceeded the scope of its authorized access. Again, while Plaintiffs are well prepared to refute these arguments, each step of litigation brings risk that Co-Lead Counsel balanced against the benefits achieved through the Settlement.

In sum, taking the risks of pursuing this litigation into consideration, the market would agree that a 33.33% contingent fee was appropriate.

2.     Class Counsel Achieved an Excellent Result

As mentioned above, Class Counsel obtained a $92 million non-reversionary cash settlement fund and meaningful injunctive relief for the Settlement Class. Considering the numerous issues presented by Plaintiffs' claims, and the real possibility that the Class might not recover anything, the Settlement achieved by Class Counsel is an excellent result.

While the $92 million cash component of the Settlement is unquestionably substantial, the injunctive relief also provides substantial value to the Class. Specifically, TikTok, together with the other Defendants' Released Parties, has agreed *not* to do the following unless disclosed expressly in the TikTok Privacy Policy and in compliance with all applicable laws:

- Use the App to collect or store a user's biometric information or identifiers (as defined by applicable law);

- Use the App to collect geolocation or GPS data;

- Use the App to collect information in user's clipboards;

- Use the App to transmit U.S. user data outside of the U.S.;

- Store U.S. user data in databases outside of the U.S.; or

- Pre-upload U.S. user-generated content.

Settlement § 6.1; Addendum §§ 2.1, 2.5

Consistent with the intent of the injunctive relief in Section 6 of the Settlement Agreement, the Parties jointly reviewed multiple categories of user data potentially in TikTok's possession that should be deleted from TikTok's servers. Following confirmation from TikTok as to what categories existed and should be deleted, TikTok has agreed to delete any Pre-Uploaded User-Generated Content identified in Section 6.2 of the Settlement Agreement. Addendum § 4.2.

In addition, TikTok will require newly designed training on compliance with data privacy laws and company procedures for all relevant incoming employees and contractors, and annual training thereafter. Settlement Agreement § 6.3. TikTok will provide a written verification under oath of compliance with the foregoing within 90 days of the Effective Date. *Id.* § 6.4. TikTok will, at its own expense, hire a third party to review the data privacy law compliance training for a period of three years and to provide a written verification of this review along with the verification

required by Section 6.4 of the Settlement Agreement to Class Counsel. Addendum § 4.3. TikTok will not disclose to any third party the "personally identifiable information" of a "consumer" who uses the App, as those terms are defined by the VPPA, except to the extent such disclosure is not prohibited by the Video Privacy Protection Act; nor will TikTok share user data collected through the App with third parties without disclosing in its Privacy Policy the categories of third parties with whom user data is shared. Addendum § 4.1.

The totality of the relief recovered for the Class supports approval of Class Counsel's request of 33.33% of the Settlement Fund.

### C.    A Lodestar Cross-Check Confirms that the Fee Requested is Proper.

While the percentage-of-the-fund method is favored in the Seventh Circuit for calculating fees in common fund cases, *In re Dairy Farmers*, 80 F. Supp. 3d 838 at 844, courts may use a lodestar cross-check to understand class counsel's time and effort and determine the reasonableness of a fee. *Id.* But this cross-check is not required. *Rohm & Haas II*, 658 F.3d at 636 ("[C]onsideration of a lodestar check is not an issue of required methodology"); *accord Leung v. XPO Logistics, Inc.*, 326 F.R.D. 185, 204 (N.D. Ill. 2018) ("The Court is not required to check its percentage-of-fee determination against the lodestar."); *Wright v. Nationstar Mortg. LLC*, No. 1:14-cv-10457, 2016 WL 4505169, at *17 (N.D. Ill. Aug. 29, 2016) (noting that a lodestar cross-check is not required); *Heekin v. Anthem, Inc.*, 2012 WL 5878032, at *2 (criticizing a class member for "overstat[ing] the importance of the lodestar method in this Circuit."). In fact, "[t]he use of a lodestar cross-check has fallen into disfavor." *George v. Kraft Foods Glob., Inc.*, Nos. 1:08-cv-03799; 1:07-cv-01713, 2012 WL 13089487, at *3 (N.D. Ill. June 26, 2012). And the Seventh Circuit has "never ordered [a] district judge to ensure that the lodestar result mimics that of the percentage approach." *Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998).

The lodestar is derived by multiplying the hourly rate of the attorney or professional by the number of hours reasonably expended. *Wright*, 2016 WL 4505169, at *14. A reasonable hourly rate is one that is consistent with the common rate in the "community for similar services by lawyers of reasonably comparable skill, experience and reputation." *See Jeffboat, LLC v. Dir., Office of Workers' Comp. Programs*, 553 F.3d 487, 489 (7th Cir. 2009); *see also Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003) (holding that the attorney's billing rate for comparable work is generally appropriate).

The base lodestar is often augmented by a multiplier that takes into account factors that affect the amount of the fees awarded. *See Cook*, 142 F.3d at 1015; *Florin*, 34 F.3d at 565; *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 255 (7th Cir. 1988). These include the complexity of the legal issues, the degree of success, and the public interest advanced by the litigation. *Paz v. Portfolio Recovery Assocs., LLC*, 924 F.3d 949, 954 (7th Cir. 2019); *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010). Also considered is the risk of non-payment. *See Harman v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991).

In his declaration in *Facebook BIPA*, Professor William B. Rubenstein discussed his expertise in assessing attorneys' fees and his authorship of a "multiplier calculator" in the *Newberg on Class Actions* treatise. *In re Facebook Biometric Info. Priv. Litig.,* 15-cv-03747-JD (N.D. Cal. 2015), ECF Doc No. 499-3, ¶ 2. According to Professor Rubenstein, "risk factors each supporting a one point increase in the multiplier are: (1) unique cases, not based on rote, prior pleadings; (2) cases in which counsel themselves enforce the law and do not simply follow government enforcement actions; and (3) cases in which counsel are solely responsible for the case's costs and cannot share this risk among a larger group of firms." Each of those factors applies here, "supporting an increase from a 1 to a 4 multiplier." *See id*. Professor Rubenstein also discusses

21

further increasing the multiplier in cases where, as here, class members are able to receive compensation, and based on how that compensation compares to the value of the claim itself. *Id.*

Professor Rubenstein reported that, based on five studies examining various time windows between 1973 to 2013, "the average lodestar multiplier ranges from 1.42 to 3.89." *Id.* at ¶ 46. "Average" cases award multipliers of about 1.5, and multipliers tend to rise as the size of the class's fund increases. *Id.* at ¶¶ 47-48. The average multiplier in larger cases like this one – with common fund recoveries over $44 million – is 3.20 (ranging from 2.39 to 4.5), according to four studies examined by Professor Rubenstein. *Id.* at ¶ 48.

A lodestar cross-check in this case supports the requested fee. The risks, complexities and challenges Class Counsel faced are discussed in detail above. Using current rates, Class Counsel's collective base lodestar is $14,061,132.90. *See* Exhibit 16. Awarding a 33.33% fee would result in a multiplier of 2.18. Such a multiplier is well within accepted ranges,[8] and is warranted here.

---

[8] *E.g.*, *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 482 (S.D.N.Y. 2013) ("Here, the lodestar sought by Class Counsel, approximately 6.3 times, falls within the range granted by courts and equals the one-third percentage being sought. While this multiplier is near the higher end of the range of multipliers that courts have allowed, this should not result in penalizing plaintiffs' counsel for achieving an early settlement, particular where, as here, the settlement amount is substantial."); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359-60 (S.D.N.Y. 2003) (4.0 multiplier); *Hillson v. Kelly Servs. Inc.*, No. 2:15-CV-10803, 2017 WL 3446596, at *6 (E.D. Mich. Aug. 11, 2017) ("Here, as discussed, the risk in this case was considerable but not extraordinary. A multiplier of 4 would seem to adequately account for that risk."); *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, No. 1:04-CV-3066-JEC, 2012 WL 12540344, at *5 (N.D. Ga. Oct. 26, 2012) ("Here, the requested fee would represent a multiplier of approximately four times lodestar, which is well within the range of approved fees."); *In re VeriFone Holdings, Inc. Sec. Litig.*, No. C-07-6140 EMC, 2014 WL 12646027, at *2 (N.D. Cal. Feb. 18, 2014) ("[A]lthough the lodestar cross-check though reveals a high multiplier—4.3 compared to the Ninth Circuit's observation that over 80% of multipliers fall between 1.0 and 4.0—other courts have awarded multipliers in excess of 4.0, and the Court finds that the multiplier here is acceptable in light of the very substantial risks involved and Lead Plaintiff's risk and extensive work on the case."); *Demaria v. Horizon Healthcare Servs., Inc.*, No. 2:11-CV-07298 (WJM), 2016 WL 6089713, at *5 (D.N.J. Oct. 18, 2016) ("Although a lodestar multiplier of 4.3 is large, it is not unreasonable."); *Harman*, 945 F.2d at 976 (internal citations omitted) (observing that "[m]ultipliers anywhere between one and four

Finally, while this overall multiplier reflects market rates and is fair, appropriate, and reasonable under prevailing authority, Plaintiffs propose that, should the Court award specific fees to specific firms in lieu of leaving that distribution to the discretion of Co-Lead Counsel, Class Counsel be compensated commensurately with the risk and responsibility each has borne throughout the course of this litigation, as well as their contribution to the Class and the Settlement result. Plaintiffs therefore propose a tiered structure to any firm-specific fee award, with Co-Lead Counsel (Tier 1) receiving a 3.5 multiplier and each subsequent tier likewise receiving a multiplier reflecting the risk they took on and their involvement in the case, in the Court's discretion. Firms on the Executive Committee are identified at Tier 2, firms that were involved in and critical to either the first or second mediation before Judge Phillips are identified at Tier 3, and all other firms involved in this litigation pre-MDL and/or who were retained by Class Representatives are identified at Tier 4. *See* Exhibit 16 (Tier Chart).[9]  This approach would not alter the overall 33.33% fee award that Plaintiffs request and would still result in an average multiplier of 2.18.

### D.  A "Sliding Scale" Approach is Neither Necessary Nor Appropriate Here.

In preemptively objecting to counsel's fee request, the Cochran Objection, ECF Doc. No. 186, points to case law addressing tiered structures for class fee awards, in which the attorney fee

---

have been approved."); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 at 598 (approving an award that "represent[s] a multiplier of less than 2.5, which is not an unreasonable risk multiplier."); *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1015 (E.D. Wis. 2010) (awarding a fee that represented a multiplier of 2.07 on a lodestar cross-check and recognizing that "the mean risk multiplier in cases involving class settlements comparable in size to the present settlement is 2.70.") (citing Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees & Expenses in Class Action Litigation: 1993–2008*, 7 J. OF EMPIRICAL LEGAL STUD. 248, 274 tbl.15 (2010)); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (upholding a lodestar multiplier cross-check showing a multiplier of 3.65).

[9] Each firm has submitted a Declaration setting forth its involvement in and efforts to advance this case, along with summaries and descriptions of their time reporting and expenses.  *See* Exhibit 17 (Appendix of Counsel Declarations).  To further aid in the Court's assessment of the requested fees, Class Counsel will also provide their time records to the Court for *in camera* review.

percentage falls as the settlement fund increases, *id.* at 6-7. As indicated in the Cochran Objection's own authority, however, a tiered structure is not required. In *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013), for example, the Seventh Circuit noted that a flat fee award of 27.5% of a $200 million fund was high, but it held that the award was neither "legally excessive" nor an abuse of discretion. The court in *Silverman* referenced the tiered fee structure applied 10 years earlier in *In re Synthroid Mktg. Litig.*, 325 F.3d 974, 980 (7th Cir. 2003) (*Synthroid II*) – but it did not require such a structure. *Id.* at 959.

Nor did the court in *Synthroid II* set forth a prescription for class attorneys' fee awards. In *Synthroid II*, the court addressed fees for two sets of counsel: one representing third party payors (TPPs), who received a flat 22% of the fund for that class, and another representing consumers, who, after appeal, received 30% of the first $10 million, 25% of the next $10 million, 22% of the band from $20 to $46 million, and 15% of everything else. Since then however,

In determining the appropriate award, the Seventh Circuit recognized the need to compensate for the risk associated with representing consumers in contingent class actions. In fact, the Seventh Circuit criticized the district court's initial tiered fee award to consumer counsel -- which was 30% of the first $10 million, 25% of the next 10 million, and 10% of everything over $40 million. The court noted that the decreasing award – particularly when compared to the flat 22% fee negotiated by sophisticated TPPs for lower-risk work – "fail[ed] to compensate risk-bearing activities. . ." of consumer counsel. *Id.* at 978-79 ("Consumer class counsel bore the principal risk of outright loss. . . . Consumer class counsel . . . took the risk that they would come away with nothing –and . . . that was a significant risk, for the consumer class did not have an easy road."). The Seventh Circuit found it "unfortunate[]" that the district court did not adopt a structure

24

that ensured "consumer class counsel would recover at least as much as TPP counsel" at each band "and for the initial bands of recovery consumer counsel would recover more." *Id.* at 978.

*Synthroid II*, however, did *not* establish a tiered fee system to be applied in every class case. Instead, the court undertook an analysis to determine "the market rate for legal services" – which, in light of the facts of that particular case, looked to the fees negotiated by sophisticated TPP clients for their lower-risk claims in the same action, *see generally id.,* and which resulted in a tiered award in part because the Seventh Circuit, in ultimately taking it upon itself to determine the actual award, made an effort to "stick as close as possible to the district court's approach." *Id.* at 980.

Indeed, just a few months ago, Judge Durkin explicitly rejected the sliding scale structure and approved $55 million in fees, 33.33% of the settlement fund, in a comparable complex antitrust class action. *In Re Broiler Chicken Antitrust Litig.,* No. 16 C 8637, 2021 WL 5709250, at *5 (N.D. Ill. Dec. 1, 2021). As Judge Durkin explained:

> The Seventh Circuit has recognized that academic studies of attorney fees awards in common fund class settlement cases reveal a declining percentage with the size of the settlement. *See Silverman,* 739 F.3d at 959. But as Professor Fitzpatrick noted, "these findings are based on fee awards from other Circuits ... that are not even trying to capture how clients pay lawyers in the market like the Seventh Circuit does." R. 5048-1 at 20 n.7, Fitzpatrick Decl. These decisions are infected by default rules recommending smaller attorney fee award percentages for "megafunds." *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 123 (2d Cir. 2005) (affirming a 6.5 percent fee award from a common fund over $3 billion, reasoning that "the sheer size of the instant fund makes a smaller percentage appropriate"); *Dial Corp. v. News Corp.,* 317 F.R.D. 426 (S.D.N.Y. 2016) ("[I]n class actions where the recovered settlement fund runs into the multi-millions, courts typically decrease the percentage of the fees amount as the size of the fund increases."). The Seventh Circuit has expressly rejected the megafund rule because it is a perverse incentive. *See Synthroid*, 264 F.3d at 718 (reversing district court's fee award in part because it imposed a lower fee percentage because the settlement fund was more than $100 million, holding that "[m]arkets would not tolerate that effect"). Clients generally want to incentivize their counsel to pursue every last settlement dollar, and a declining percentage award operates to the contrary. Thus, to the extent that courts in other circuits have awarded percentages smaller than

what Appointed Counsel seek here, the Court finds those awards relatively unpersuasive.

*Id.*, at *3. *See also id.* at *2 (" the Seventh Circuit has explained that declining fee scale award structures do not reflect market realities and impose a perverse incentive 'ensuring that at some point attorneys' opportunity cost will exceed the benefits of pushing for a larger recovery, even though extra work could benefit the client'") (quoting *Synthroid*, 264 F.3d at 721).

Here, the "market realities" are further informed by looking to *Facebook BIPA*. In its Memorandum Opinion, the Court found *Facebook BIPA* to be a "poor comparator to this case" for the settlement itself because the defendant (unlike TikTok here) had conceded it implemented facial recognition technology and the case did not involve "the risk of being compelled to arbitration." Memorandum Opinion, pp. 25-30. But, just as the TPP class provided a lower-risk comparator for fees, *Facebook BIPA* can serve as a lower-risk comparator for the cost of legal services in complex BIPA cases like this one.

In an unpublished decision earlier this month, the Ninth Circuit affirmed an award of 15% of the $650 million settlement fund in *Facebook BIPA* – which amounted to a lodestar multiplier of 4.71. *In re Facebook Biometric Info. Priv. Litig.*, No. 21-15553, 2022 WL 822923, at *1 (9th Cir. Mar. 17, 2022). The Ninth Circuit recognized that typical multipliers range between 2.39 and 4.50, but that they tend to *increase* as the size of the recovery increases. *Id*. While *Facebook BIPA* settled on the eve of trial and was a larger fund and larger class than this case, it also involved materially less risk. Yet counsel's requested fee here averages to a multiplier of just 2.18, far lower than the multiplier awarded (and thus the "market rate for legal services") in *Facebook BIPA*.[10]

---

[10] As the Cochran Objection notes, Ms. Cochran did not know counsel's lodestar at the time of her preemptive objection to a hypothetical fee request.

26

The requested fee here falls below the market rate for attorneys in this type of complex action and is reasonable.

## IV. COUNSEL'S LITIGATION EXPENSES WERE REASONABLY INCURRED AND SHOULD BE APPROVED

Under the common fund doctrine, class counsel customarily are entitled to reimbursement of reasonable expenses incurred in the litigation. Fed. R. Civ. P. 23(h); *Mills*, 396 U.S. at 392 (recognizing the right to reimbursement of expenses where a common fund has been produced or preserved for the benefit of a class); Alba Conte, *Attorney Fee Awards* § 2.08, at 50-51 (3d ed. 2004). Reimbursable expenses are those "that are consistent with market rates and practices." *In re Ready-Mixed Concrete*, 2010 WL 3282591, at *3; *see also In re Synthroid*, 264 F.3d at 722 ("Reducing litigation expenses because they are higher than the private market would permit is fine; reducing them because the district judge thinks costs too high in general is not.").

In notifying Class members of the proposed Settlement, Class Counsel informed Class members that they would seek repayment of such litigation expenses. Class Counsel seeks reimbursement of $789,836.62 in expenses, which were reasonably necessary to advance the interests of the Class and to obtain the favorable result. *See* Exhibits 16, 17 and Declaration of Katrina Carroll submitted herewith. Due to the risk that they might never be recovered, Class Counsel endeavored to keep expenses to a minimum. Accordingly, Plaintiffs respectfully request that the Court approve these expenses in their total amount of $789,836.62.

## V. THE CLASS REPRESENTATIVES SHOULD RECEIVE SERVICE AWARDS

Courts in this district have regularly granted service awards to class representatives in BIPA cases in recognition of the time and effort they invested in the case. *See*, *e.g.*, *Dixon* (Exhibit 13) ($10,000); *Bryant* (Exhibit 9) ($10,000); *Martinez* (Exhibit 10) ($7,500); *Thome* (Exhibit 7) ($7,500); *Lopez-McNear* (Exhibit 6) ($5,000); and *Cornejo* (Exhibit 11) ($5,000). Like in this case,

class representatives frequently contribute to the successful resolution of a class action by assisting with the preparation of the pleadings, participating in discovery, continually providing information to class counsel, and participating in settlement negotiations. *Williams v. Rohm & Haas Pension Plan* ("*Rohm & Haas I*"), No. 4:04-cv-00078, 2010 WL 4723725, at *2 (S.D. Ind. Nov. 12, 2010), *aff'd*, 658 F.3d 629 (7th Cir. 2011) ("Because a named plaintiff plays a significant role in a class action, an incentive award is appropriate as a means of inducing that individual to participate in the expanded litigation on behalf of himself and others."). Their contributions undoubtedly benefit the class as a whole, and courts in this circuit often see fit to compensate class representatives for their service to the class. *See Cook*, 142 F.3d at 1016 (affirming $25,000.00 incentive award); *In re Potash Antitrust Litig.*, No. 1:08-cv-06910 (ECF No. 589) (N.D. Ill. June 12, 2013) (Bruckner Decl. Ex. 32) (awarding $15,000.00 apiece in incentive awards).

Courts consider various factors when determining an appropriate service award, including "the actions the [representative] has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the [representative] expended in pursuing the litigation." *Cook*, 142 F.3d at 1016 (citing *Spicer v. Chicago Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1267 (N.D. Ill. 1993)).

Here, Plaintiffs request that the Court confer service awards of $2,500.00 on each of the 35 Class Representatives. Throughout this litigation, the Class Representatives advised Class Counsel and approved pleadings, searched for, gathered, preserved, and produced documents to aid in investigation and litigation of the case, kept up to date on the progress of the case, and performed other similar activities. They were never promised that they would receive any additional compensation for leading the case. Rather, they devoted their time and efforts solely to address

the Defendants' alleged misconduct. (*Id.*)  Their help has been instrumental to the success of this litigation and, Plaintiffs respectfully submit, they are deserving of these service awards.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court award attorneys' fees in the amount $30,663,600, which is equivalent to 33.33% of the Settlement Fund, litigation expenses in the amount of $789,836.62, and service awards to the 35 Class Representatives in the amount of $2,500.00 apiece.

Dated: March 31, 2022

By: */s/ Katrina Carroll*
Katrina Carroll
**LYNCH CARPENTER LLP**
111 W. Washington St.
Suite 1240
Chicago IL 60602
312.750.1265
katrina@lcllp.com

Elizabeth A. Fegan
Melissa Ryan Clark
**FEGAN SCOTT LLC**
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

Ekwan Rhow
**BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS, LINCENBERG & RHOW,
P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067
(310) 201-2100
erhow@birdmarella.com

*Plaintiffs' Co-Lead Counsel*

Jonathan Jagher
Freed Kanner London & Millen LLC
923 Fayette Street
Conshohocken, PA 19428
(610) 234-6487
jjagher@fklmlaw.com

Michael Gervais
Susman Godfrey LLP
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 789-3100
mgervais@susmangodfrey.com

Albert Y. Chang
Bottini & Bottini, Inc.
7817 Ivanhoe Avenue
Suite 102
La Jolla, CA 92037
(858) 914-2001
achang@bottinilaw.com

Megan E. Jones
Hausfeld LLP
1700 K Street NW, Suite 650
Washington, D.C. 20006
(202) 540-7200
mjones@hausfledllp.com

Amanda K. Klevorn
Burns Charest LLP
365 Canal Street
Suite 1170
New Orleans, LA 70130
(504) 799-2845
aklevorn@burnscharest.com

*Plaintiffs' Steering Committee*

Shannon Marie McNulty
Clifford Law Offices, P.C.
120 North LaSalle Street, Suite 3100
Chicago, IL 60602
(312) 899-9090
smm@cliffordlaw.com

*Plaintiffs' Liaison Counsel*