IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: TIKTOK, INC., CONSUMER PRIVACY LITIGATION | ) ) ) ) ) ) ) | MDL No. 2948 <br><br> Master Docket No. 20-cv-4699 <br><br> Judge John Z. Lee <br><br> |
| This Document Relates to All Cases | ) | Magistrate Judge Sunil R. Harjani |

**LOEVY & LOEVY'S CONDITIONAL PETITION FOR
AND MEMORANDUM IN SUPPORT OF AN AWARD OF ITS
ATTORNEYS' FEES AND A SERVICE AWARD FOR OBJECTOR MARK S.**

## INTRODUCTION

For the reasons set forth in his objections (*see* Dkt. 187) to the proposed settlement under consideration by the Court (the "MDL Settlement"), Mark S. does not believe the Court should grant final approval to the MDL Settlement. Nevertheless, Mark S. recognizes the possibility that the Court may approve the MDL Settlement and, for that reason, he and has counsel submit this conditional petition for an award of attorneys' fees and a service award.

As a result of the efforts of Mark S. and his counsel, approximately 6 million class members under the age of 13 (the "*T.K.* class members") are able to participate in the MDL Settlement. Absent those efforts, the valuable claims of the *T.K.* class members alleged in this action would have been released in the related litigation of *T.K. v. ByteDance Tech. Co., Ltd.*, No. 19-cv-7915 (N.D. Ill.) (Blakey, J.) ("*T.K.*"), for grossly inadequate consideration. Indeed, based on the proposed $92 million settlement here, a conservative estimate of the value of the *T.K.* class members' claims in this case is $6,256,000, representing the *pro rata* value of the common fund attributable to *T.K.* class members. (If the number of Illinois *T.K.* class members were to be estimated and taken into account, the figure would be even higher based on the MDL Settlement's Plan of Allocation.) But the recently-approved settlement in *T.K.* originally sought to release the *T.K.* class members' valuable claims for the paltry amount of $1.1 million. Mark S. and his counsel prevented that unfair, unreasonable and inadequate result, thereby allowing the *T.K.* class members to participate in the MDL Settlement.

Additionally, Mark S.'s efforts have resulted in a much improved notice plan in this case. Because of Mark S.'s efforts, class members received direct notice of the MDL Settlement via the TikTok App. Based on an initial review of Plaintiffs' final approval motion (Dkt. 195), the claims

1

rate for Illinois class members was 13%, which is 11% higher than the rate originally estimated by Plaintiffs. *See id.* at 30; *see* Dkt. 122 at 32-33.

Accordingly, to the extent the Court grants final approval of the MDL Settlement (which it should not), Mark S. and his counsel respectively submit that the Court should award: (a) a $2,500 service award to Mark S.; and (b) attorneys' fees to his counsel in the amount of $1,564,000, representing 25% of the increased value of the *T.K.* class members' claims.

## FACTUAL BACKGROUND

### *The T.K. Complaint and Settlement*

On December 3, 2019, the complaint in *T.K.* was filed against ByteDance Technology Company, Ltd.; Musical.ly Inc.; Muscial.ly the Cayman Islands Corporation; and TikTok, Inc. (collectively "TikTok"), alleging violations of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, among other claims, on behalf of a putative nationwide class of "[a]ll persons residing in the United States who registered for or used the Musical.ly and/or TikTok software application prior to the Effective Date when under the age of 13 and their parents and/or legal guardians." *T.K.* Dkt. 1 ¶ 61 and Count I. At base, the complaint alleged that TikTok "surreptitiously tracked, collected, and disclosed the personally identifiable information and/or viewing data of children under the age of 13 – without parental consent" while the children used TikTok's software application (the "TikTok App"). *Id.* ¶ 1. The complaint further alleged that the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501, *et seq.*, prohibited that conduct. *Id.* ¶ 11. Quoting COPPA, the complaint alleged that "personally identifiable information" broadly meant "individually identifiable information about an individual collected online." *Id.* ¶ 13.

2

On December 5, 2019, plaintiffs' counsel in *T.K.* moved for preliminary approval of a proposed settlement (the "*T.K.* Settlement"). *T.K.* Dkt. 5. As proposed, the *T.K.* Settlement would provide each of the approximately 6,070,000 class members who submitted a valid claim with a *pro rata* share of $1.1 million net of fees, expenses and awards. *See T.K.* Dkt. 5-1 at 25-28 §§ 5.1, 6; Dkt. 5-1 at 187 (estimating class size).[1] The parties to the settlement intended that it would "fully, finally, and forever resolve, discharge and settle the Released Claims . . . ." on behalf of a settlement class that mirrored the class definition above. *See id.* at 22 §§ 1.2, 2.3. The *T.K.* Settlement's definition of "Released Claims" was sweeping in its scope:

> "Released Claims" means *any claims, complaints, actions, proceedings, or remedies of any kind* (including without limitation, claims for attorneys' fees and expenses and costs) whether in law or in equity, under contract or any other subject area, or under any statute, rule, regulation, order, or law whether federal, state, or local, *on any grounds whatsoever, arising from the beginning of time through the Effective Date,[2] that were, could have been or could be asserted by the [plaintiffs and class members] arising out of or relating to any acts, facts, omissions or obligations, whether known or unknown, whether foreseen or unforeseen, arising out of or relating to the Civil Actions or the subject matter of the Complaint.*

*Id.* at 24 § 2.24 (emphasis added). As used in the above release, "Civil Actions" meant "all of the civil actions, arbitrations, or other legal proceedings that have been, will be, or could be initiated by Plaintiffs relating to the subject matter at issue in the Complaint." *Id.* at 22 § 2.2. As discussed above, the subject matter of the *T.K.* complaint was TikTok's non-consensual collection and use of *T.K.* class members' personally identifiable information via the TikTok App – the same subject matter at issue in this case.

---

[1] Citations to docketed entries are to the CM/ECF-stamped page numbers at the top of the page.
[2] The *T.K.* Settlement Agreement defined "Effective Date" as the "first date after either (i) the time to appeal the Final Order and Judgment has expired with no appeal having been filed or (ii) the Final Order and Judgment is affirmed on appeal by a reviewing court and no longer reviewable by any court." *T.K.* Dkt. 5-1 at 22 § 2.10. Because the time for appealing the final approval order in *T.K.* has not yet expired, the Effective Date has not yet occurred.

3

*The T.K. Preliminary Injunction*

On December 19, 2019, the court in *T.K.* preliminarily approved the *T.K.* Settlement (*T.K.* Dkt. 12-13) and enjoined *T.K.* class members "from bringing any new alleged class actions asserting any Released Claim or attempting to amend an existing action to assert any Released Claim" (the "*T.K.* Preliminary Injunction") (*T.K.* Dkt. 13 at 8 ¶ 16).

*Mark S.'s Objections in T.K.*

Mark S. objected to the *T.K.* Settlement, contending that it was not fair, reasonable or adequate because, *inter alia*, it: (a) failed to obtain any meaningful benefit for *T.K.* class members; and (b) released valuable claims without adequate consideration. *T.K.* Dkt. 24 at 38-52. Mark S. highlighted that the settlement's paltry common fund and broad release failed to provide adequate consideration for available statutory claims, including the VPPA and Illinois' Biometric Information Privacy Act ("BIPA"), 740 Ill. Comp. Stat. 14/1, *et seq. Id.* at 43-44.

The court in *T.K.* held a final approval hearing on August 4 and 7, 2020, during which Mark S.'s counsel again argued that the *T.K.* Settlement was unfair, unreasonable and inadequate, in part, because of its broad release. *See* Dkt. 59-6 (Aug. 4, 2020 Hearing Tr.) at 18:12-21:7. The court took the matter under advisement. *T.K.* Dkt. 46.

*The Preliminary Injunction Violations and the MDL Settlement*

After entry of the *T.K.* Preliminary Injunction, multiple *T.K.* class members asserted "Released Claims" in this case, including BIPA and VPPA claims. *See* Dkt. 59-2 (Mark S.'s Memo of Law in Support of Mot. for Enforcement of Prelim. Inj. in *T.K.*) at 6-7; *see also* Dkt. 59-3 (compl. alleging VPPA violations); Dkt. 59-8 at 6, n.4 (showing BIPA claims filed after entry of *T.K.* Preliminary Injunction). Further, six days after the *T.K.* final approval hearing concluded, TikTok and multiple *T.K.* class members entered into the first iteration of the MDL Settlement,

which: (a) provided for the creation of a $92 million common fund; (b) included the *T.K.* class members; and (c) included claims that would have been covered by the *T.K.* Settlement release had the *T.K.* Settlement been approved. *See* Dkt. 1, 122, 122-1. Indeed, with respect to the released claims, TikTok has represented that "[a]t the time the MDL was formed, *TikTok did not believe there could be overlap between the TK Action and the MDL because both the preliminary approval order in the TK Action and the TK Settlement release precluded participation by TK Class Members in the MDL.*" *T.K.* Dkt. 63 at 7 (emphasis added); *see also* Dkt. 139 at 5 (similar); *T.K.* Dkt. 65 (Apr. 14, 2021 Dkt. Entry directing parties to "come [to next hearing] prepared to discuss case overlap [with the MDL], the nature of any revised injunctive relief, and a reasonable procedure for moving the case forward (*including whether the parties have any agreement or wish to revise the release clause to exclude claims in* [the MDL].")) (emphasis added).

The following timeline shows how Mark S.'s objections prevented the unfair release of *T.K.* class members' valuable claims, which ultimately resulted in *T.K.* class members' ability to participate in the MDL Settlement and *T.K.* Settlement:

- May 11, 2020 – Mark S. objects to *T.K.* Settlement based, in part, on unfair nature of release. *See T.K.* Dkt. 24 at 12, 31, 41.

- Aug. 4, 2020 – MDL is formed. *See* Dkt. 1 ¶ 1.

- Aug. 4 and 7, 2020 – final approval hearing in *T.K.*; court takes matter under advisement after hearing Mark S.'s objections; no claims are released at that time.

- Aug. 13, 2020 – MDL Settlement – includes *T.K.* class members and claims that would have been released had *T.K.* Settlement been approved and allows *T.K.* class members to participate in settlement even if *T.K.* Settlement approved first. Dkt. 122 at 13; Dkt. 122-1 at § 2.4.

- Sept. 9, 2020 – Mark S. informs this Court and court in *T.K.* of the *T.K.* Preliminary Injunction violation and moves for enforcement of the injunction. Dkt. 59; *T.K.* Dkt. 51-52.

- Mar. 1, 2021 – Mark S. objects to MDL Settlement based, in part, on its overly broad release and defective notice plan. Dkt. 126 at 2, 6, 12, 15.

- Various Dates – To avoid enforcement of the *T.K.* Preliminary Injunction and Mark S.'s objections in this case and *T.K.*, TikTok agrees to forego its rights under the *T.K.* Settlement release and preliminary injunction, as well as the MDL Settlement release, and agrees not to object to an "ostensible 'double recovery'" by *T.K.* class members. *See T.K.* Dkt. 68 (Apr. 28, 2021 Dkt. Entry); *see also* Dkt. 161 at 9, n.4.

The 6,070,000 *T.K.* class members' *pro rata* share of the MDL Settlement is $6,256,000.[3] This is a conservative estimate that does not account for the weighted value of the claims of *T.K.* class members from Illinois. *See* Dkt. 122 at 21.

### Final Approval of the T.K. Settlement

On March 25, 2022, the court in *T.K.* granted final approval to the *T.K.* Settlement and overruled Mark S.'s objections.[4] *See, generally, T.K.* Dkt. 94. In the same order, the court denied Mark S.'s request for attorneys' fees and a service award. *See id.* at 61-66. With respect to the request for attorneys' fees, the court stated in a parenthetical that Mark S. cannot take credit for TikTok's agreement to a double recovery. *Id.* at 62. Without referencing Mark S.'s role in preventing swift implementation of the unfair *T.K.* Settlement release or his efforts to enforce the preliminary injunction, the court stated that the parties in the MDL arrived at the "double recovery" without any help from him. *Id.* at 63. The court further stated that if Mark S. believes he is responsible for *T.K.* class members' right to recovery in the MDL, he could seek fees in that action. *See id.* at 62-63. Mark S. and his counsel respectfully disagree with the statements regarding Mark S.'s lack of contribution to the MDL Settlement and are in the process of evaluating whether to seek review of the March 25, 2022 Order.

---

[3] The *T.K.* class members represent 6.8% of the estimated 89 million MDL class members. *See* Dkt. 122 at 25 (estimating MDL class size). 6.8% of $92 million is $6,256,000.
[4] The court previously denied final approval based on Mark S.'s objection to the *T.K.* Settlement's notice program. *See T.K.* Dkt. 62 at 5-6. The court ordered a supplemental notice program which vastly improved the number of claims. *See T.K.* Dkt. 81 at 7.

*Mark S.'s Improvement of the Defective Notice Plan in This Case*

On March 1, 2021, Mark S. was the first to object to the MDL Settlement. MDL Dkt. 126. Therein, Mark S. objected to, *inter alia,* the proposed notice plan's glaring failure to "provide direct notice via the TikTok App." *Id.* at 12. At the subsequent preliminary approval hearing, Mark S.'s counsel further highlighted the absence of direct notice via the TikTok app. *See, e.g.,* Dkt. 138-5 (Mar. 2, 2021 Hearing Tr.) at 20. Thereafter, TikTok agreed to provide notice via the TikTok App if ordered to do so by the Court. *See* Dkt. 139 at 3.

While this Court ultimately granted preliminary approval of the MDL Settlement, it did so only after accepting TikTok's offer to provide notice via the TikTok App. Dkt. 161 at 29. In its Order, the Court expressly agreed with Mark S. "that notice through the App itself would significantly enhance the notice program and that the benefit to class members of providing in-app notice outweighs any detriment." *Id.* Based on an initial review of Plaintiffs' final approval motion (Dkt. 195), the claims rate for Illinois class members was 13%, which is 11% higher than the rate originally estimated by Plaintiffs. *See id.* at 30; *see* Dkt. 122 at 32-33.

**ARGUMENT**

I. **Legal Standards.**

Under the common-fund doctrine, a lawyer or litigant who recovers a common fund for beneficiaries other than himself or his client is entitled to recover a reasonable fee from that fund. *In re: Southwest Airlines Voucher Litig.*, 898 F.3d 740, 745 (7th Cir. 2018). In settlements involving the creation of common funds, the "common-fund doctrine applies as a default rule unless the parties draft their settlement agreement to depart from it." *See id.* at 745-46. A district court's equitable powers to award attorneys' fees from a common fund are not restricted to litigation that occurred directly before the court. *See Winniger v. SI Mgmt. L.P.*, 301 F.3d 1115,

7

1121 (9th Cir. 2002); *see also Donovan v. CSEA Local Union 1000*, 784 F.2d 98, 104 (2d Cir. 1986); *Angoff v. Goldfine*, 270 F.2d 185, 190 (1st Cir. 1959). Thus, "[w]hile any lawyers are . . . entitled to *seek* fees [from a common fund], the measuring stick of counsel's *entitlement to a fee* comes back to the single question of whether their efforts did in fact create, enhance, preserve, or protect the fund under the court's supervision." 5 Newberg on Class Actions § 15:60 (5th ed.) (emphasis in orig.); *see also Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 288 (7th Cir. 2002) (to seek claim to a fee, an objector must "produce an improvement in the settlement worth more than the fee they are seeking . . . ."). Efforts by collateral counsel that "lead to additions to a common fund settlement" are covered by the common fund doctrine. *See* 5 Newberg on Class Actions § 15:58 (5th ed.). A court should not deny collateral counsel attorneys' fees where an issue raised by the collateral counsel is later found to be moot based on information unknown at the time the issue was raised. *See Reynolds*, 288 F.3d at 288 (discussing objector's counsel's right to fees).

In setting a fee, a court should try to approximate the level the market would set "had bargaining occurred at the outset of the case (that is, when the risk of loss still existed)." *Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir. 1998); *In re: Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001). In common fund cases, a court may use a percentage-of-the-fund method of determining fees or a lodestar method. *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 566 (7th Cir. 1994). "[T]here are advantages to utilizing the percentage method in common fund cases because of its relative simplicity of administration." *Id.* A court may use the lodestar method as a check on the reasonableness of a percentage-of-the-fund award. *See, e.g., In re: Dairy Farmers of Am., Inc.*, 80 F.Supp.3d 838, 849-51 (N.D. Ill. 2015).

Under a lodestar method, a court multiplies the number of hours worked by counsel by their reasonable hourly rate and also considers "how much compensation class counsel should

receive for incurring the risk of nonpayment when it took the suit." *See id.* at 562 n.3, 565. The need for a multiplier for risk of nonpayment (usually between one and four) is "particularly acute in class action suits" because class counsel "receive no fee if the suit fails, so their entitlement to fees is inescapably contingent." *In the Matter of Continental Ill. Sec. Litig.*, 962 F.2d 566, 569 (7th Cir. 1992); *Harman v. Lyphomed Inc.*, 945 F.2d 969, 976 (7th Cir. 1991). A court may determine an attorney's reasonable hourly rate by looking: (a) to the attorney's "actual billing rate for comparable work," *Jeffboat LLC v. Director Ofc. of Workers Comp. Programs*, 553 F.3d, 487, 490 (7th Cir. 2009); or (b) at "the rate that lawyers of similar ability and experience in the community charge their paying clients for the type of work in question." *See id.* (quoting *Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544, 555 (7th Cir. 1999)).

## II. The Court Should Award Loevy & Loevy Attorneys' Fees for Its Efforts that Enhanced the Common Fund.

In the event the Court grants final approval of the MDL Settlement, it should award Loevy & Loevy $1.564 million in attorneys' fees for its efforts that enhanced the common fund. The requested fee is 25% of the estimated $6.256 million increased value of the common fund. Moreover, the requested fee is far less than the almost $31 million in fees that class counsel seek.[5] *See* Dkt. 197 at 8-9.

Because of Loevy & Loevy's efforts on behalf of Mark S. in *T.K.*, the *T.K.* class members did not release their valuable claims for the meager settlement amount in *T.K.* prior to the mediation that resulted in the MDL Settlement. As a result, TikTok could not have credibly contended at the mediation that the *T.K.* class members could not be included in the MDL

---

[5] In making this request for attorneys' fees, Loevy & Loevy recognizes that the court in *T.K.* did not grant Loevy & Loevy's fee request. Loevy & Loevy respectfully disagrees with the result in that case and respectfully submits that consideration of the arguments herein establishes the propriety of awarding the requested fees here.

9

Settlement. Moreover, because of Mark S.'s objections, TikTok recognized the improper nature of the overly broad *T.K.* Settlement release and waived its right to enforce that release in connection with the MDL Settlement. Thus, the recent approval of the *T.K.* Settlement has not impacted *T.K.* class members' ability to participate in the MDL Settlement. Again, TikTok cannot credibly contend it would have waived its right to enforce the release had it already been implemented.

The propriety of the above conclusions is underscored when one considers what would have happened in the absence of Mark S.'s objections. In that hypothetical scenario, no proper objections to the *T.K.* Settlement would have been raised (*see T.K.* Dkt. 94 at 55 (disregarding other objections), no objector would have appeared at the fairness hearing and, in all likelihood, swift final approval of the *T.K.* Settlement would have been granted. Included in that final approval would have been the *T.K.* Settlement's sweeping release. As the release's plain language makes clear, and as TikTok has acknowledged, the release covers the claims in this case.

Had TikTok had the all-encompassing *T.K.* Settlement release in hand at the time of the MDL Settlement negotiations, no serious argument could be made that TikTok would have considered including an additional 6 million class members in the settlement, especially given that their inclusion "significantly boost[ed] the total MDL Settlement amount." *See* Dkt. 139 at 5. TikTok is a for-profit business. That business does not include paying for claims for which it already obtained a court-ordered release.

Because of Mark S.'s objections to the *T.K.* Settlement, at the time of the MDL Settlement negotiations, TikTok did not know if it ever would obtain the release provided for in the *T.K.* Settlement. Moreover, because TikTok seemingly wanted to buy global peace, in order to ensure that the claims of the *T.K.* class members were released and TikTok would not be exposed to continued litigation with 6 million minors who had valuable claims, TikTok had to include them

10

in the MDL Settlement. Again, that incentive only existed because of Mark S.'s objections and advocacy. Indeed, so desperate was TikTok to resolve the claims of the *T.K.* class members, it went along with multiple *T.K.* class members' violations of the *T.K.* Preliminary Injunction. Mark S. caused TikTok's desperation.

The enhanced benefit to the *T.K.* class members and the common fund as a result of Mark S.'s objections is clear. Prior to the objections, *T.K.* class members would have received a total of $1.1 million and been required to release their valuable claims. After Mark S.'s objections, *T.K.* class members are entitled to their *pro rata* share of the $92 million common fund in this case, which conservatively equates to $6.256 million (the number is likely higher because of the weighted value of Illinois class members' claims). As discussed above, TikTok has acknowledged that the *T.K.* class members' participation in the MDL Settlement "significantly boost[ed]" the total value of the common fund. *See* Dkt. 139 at 5.

Notably, if subsequent to Mark S.'s objections in *T.K.*, TikTok had agreed to revise the *T.K.* Settlement to increase the compensation to the *T.K.* class members by more than $6 million, no question would exist as to the benefit Mark S. and his counsel conferred on those class members. The analysis does not change merely because TikTok played games and conferred the benefit in the MDL. *See Winniger*, 301 F.3d at 1121 ("it was within [the court's] equitable power to award fees for work that helped create the fund, even though the fees compensated for work done outside the strict confines of the litigation immediately before the court."); *Angoff*, 270 F.2d at 190 (failing to see why a benefit conferred in ancillary litigation should not be considered in determining fees in the main action).

In a filing with this Court, TikTok has stated that class counsel "negotiated heavily with TikTok to get TikTok to agree to allow the *TK* class members to also participate in the MDL

11

Settlement." Dkt. 139 at 5. TikTok further stated that while it initially resisted class counsel's request because the request would "significantly boost the total MDL Settlement amount," it ultimately yielded on the point and resolved potential litigation on the scope of the release. *Id.* It is not surprising that class counsel "negotiated heavily" for the inclusion of the *T.K.* class members. After all, at the time of the negotiations, the *T.K.* class members' claims had not been released, and it was not known if they ever would be. Mark S. is directly responsible for the existence of those factual circumstances.

However, had TikTok entered the negotiations with the *T.K.* Settlement release in hand, it would have been less costly to TikTok to litigate the straightforward issue of the scope of the *T.K.* Settlement release than to agree to increase the MDL Settlement by over $6 million. Class counsel cannot credibly contend that in that situation they would have insisted on inclusion of the *T.K.* class members at the risk of blowing up an $86 million settlement. This is especially true given that no credible contention could be made that the broad *T.K.* Settlement release does not cover the MDL claims. *See T.K.* Dkt. 1 ¶ 1 ("This case alleges that Defendants . . . surreptitiously tracked, collected, and disclosed the personally identifiable information and/or viewing data of children under the age of 13 – without parental consent – while they were using Defendants' video social networking platform, i.e. software application . . . ."); Dkt. 114 ¶ 13 ("Defendants . . . covertly collect and use TikTok users' highly sensitive and immutable biometric identifiers and information), ¶ 14 ("Defendants also covertly transmit personally identifiable information about each TikTok user's video viewing history to third parties without notice or consent, in violation of the [VPPA]."); *see also See T.K.* Dkt. 1 and Dkt. 114 (alleging VPPA claims).

**III.     The Amount of Loevy & Loevy's Requested Attorneys' Fees Is Proper.**

Loevy & Loevy's request for $1.564 million in attorneys' fees is proper. In this District, a "request for one-third of the settlement in attorneys' fees is consistent with the market." *Briggs v. PNC Fin'l Svcs. Grp. Inc.*, No. 1:15-cv-10447, 2016 WL 7018566, at *4 (N.D. Ill. Nov. 29, 2016) (St. Eve, J.). Further, "empirical data on fee awards demonstrate that percentage awards in class actions are generally between 20-30%," with the average in the Seventh Circuit being 31.6%. 5 Newberg on Class Actions § 15.83 (5th ed. – June 2021 Update); *see also Kaufman v. Am. Express Travel Related Services Co.*, 877 F.3d 276, 288 (7th Cir. 2017) (affirming objector's fee award of 34% of value added to class).

Here, Loevy & Loevy's request for attorneys' fees totaling 25% of the increased value of the *T.K.* class members' overall claims is below average. Moreover, Mark S. does not seek recovery of his costs. *See* Declaration of Scott R. Drury (filed contemporaneously herewith) ¶ 3.

As discussed throughout, Loevy & Loevy has done significant work in connection with obtaining the increased benefits for *T.K.* class members, including litigating in two separate cases, while TikTok played a game of "Catch Me if You Can." Based on the work performed by Loevy & Loevy and the results achieved to date,[6] a fee award in the amount of one-third of the increased value would be appropriate. Indeed, the agreement between Mark S. and his counsel allows his counsel to seek up to 40% of the obtained increase in the value of the settlement. Drury Decl. ¶ 1. Similarly, his counsel's standard contingency fee in its civil rights practice is 40%. *Id.* ¶ 7. In light of the foregoing, Loevy & Loevy's current request for 25% is eminently reasonable.

---

[6] To the extent the Court sustains Mark S.'s pending objections, Loevy & Loevy reserves the right to submit an additional fee petition.

### IV. A Lodestar Cross-Check Confirms the Reasonableness of the Requested Fees.

The reasonableness of Loevy & Loevy's fee request is underscored by a lodestar cross-check.[7] As set forth more fully in the Drury Declaration, the lodestar figure for Loevy & Loevy using current rates, *see Mathur v. Bd. of Trustees of S. Ill. Univ.*, 317 F.3d 738, 744-45 (7th Cir. 2003), is $564,938.75. *See* Drury Decl. ¶ 4. The rates used in calculating the lodestar are reasonable. They are consistent with the market rates for attorneys of similar experience providing similar legal services in Chicago and in line with the market rate charged by Mark S.'s primary attorney. *Id.* ¶¶ 5-6. Further, the hours expended by Loevy & Loevy in litigating in two different matters are reasonable. As discussed throughout, Mark S. did not passively object to a poor settlement in *T.K.* or sit idly by as TikTok tried to complicate things by entering into a separate settlement here. Rather, Mark S., by and through Loevy & Loevy, has vigorously pursued a fair, adequate and reasonable settlement for his child and the millions of other child victims and, thus far, achieved over $6 million in additional compensation.

Finally, given the extreme risk of nonpayment faced by Loevy & Loevy, a risk multiplier of 2.8 is appropriate. Representing an objector in class action litigation is an inherently risky proposition with a high likelihood of nonpayment. Courts frequently overrule objections. Even if a court sustains an objection, it can still refuse to award fees. Moreover, as evidenced in this case, beyond the risk of a court overruling objections or not finding that the objections added enough value to justify a fee award, objectors also have to confront defendants, like those here, who try to avoid the impact of objections by seeking resolution outside of the matter in which the objection

---

[7] Upon the Court's request, Loevy & Loevy will provide the Court with market rate evidence and detailed time entries for an *in camera, ex parte* review. To the extent the Court chooses to utilize a lodestar analysis or lodestar cross-check of Loevy & Loevy's fees, Mark S. respectfully submits that a similar analysis should be conducted with respect to class counsel's fees and that the Court allow limited discovery on the issue.

was asserted. Given the above factors, Loevy & Loevy would be justified in seeking a risk multiplier of four. Against this backdrop, the utilized risk multiplier of 2.8 is reasonable.

## V. Mark S. Is Entitled to a Service Award.

The Court should award Mark S. a service award for: (a) vastly enhancing the relief available to *T.K.* class members; and (b) his improvement of the MDL notice plan. The Seventh Circuit follows a market-based approach to determine when objectors should be compensated for their efforts. *See Synthroid*, 264 F.3d at 722-23.

Mark S.'s has pursued the relief described herein for almost two years. In doing so, Mark S. has consulted with counsel, reviewed filings and submitted a declaration. Further, Mark S. has made his minor son available for consultation with counsel. As discussed throughout, as a result of Mark S. pursuing his objections, millions of minor class members are permitted to participate in the MDL Settlement and likely received direct notice of the settlement. Moreover, Mark S. has provided meaningful assistance to the Court by making it aware of the *T.K.* Injunction Violation and its potential impact on the MDL Settlement and by timely highlighting the significant defect in the proposed notice program. His request for a $2,500 service award is in line with the awards sought by the named Plaintiffs in this case. *See* Dkt. 122-1 at § 13.2; *see also In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 332 F.R.D. 202, 229 (N.D. Ill. 2019) ($2,500 service award to objector who provided meaningful assistance to the court).

## CONCLUSION

For the foregoing reasons, the Court should grant Loevy & Loevy $1.564 million in attorneys' fees and award Mark S. a service award in the amount of $2,500.

Dated: March 31, 2022

                Respectfully submitted,
                MARK S.

          By:  /s/ Scott R. Drury
               SCOTT R. DRURY
               *One of the attorneys for Mark S.*

Mike Kanovitz (mike@loevy.com)
Scott R. Drury (drury@loevy.com)
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900

16

**CERTIFICATE OF SERVICE**

    I, Scott R. Drury, an attorney, hereby certify that, on March 31, 2022, I filed the foregoing document using the Court's CM/ECF system, which effected service on all counsel of record.

                                                  /s/ Scott R. Drury
                                                  *One of the attorneys for Mark S.*