**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: TIKTOK, INC., CONSUMER PRIVACY LITIGATION, | MDL No. 2948 |
| | Master Docket No. 20 C 4699 |
| | Judge John Z. Lee |
| This document relates to all cases | Magistrate Judge Sunil R. Harjani |

**OBJECTOR DENNIS LITTEKEN'S OPPOSITION**
**TO FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT**
**AND OBJECTION TO CLASS COUNSEL'S FEES**

## TABLE OF CONTENTS

I.     A Settlement Where 98.6% of the Class Gets Nothing Isn't Fair and Shouldn't be Approved .............................................................................................................................2

II.    Class Counsel's Publication-Focused Notice Plan Had Predictably Poor Results and the Direct Notice Was Insufficient ........................................................................................5

III.   In the Seventh Circuit, Class Counsel's Fee Brief Must be Filed Before the Objection Deadline. It Wasn't ................................................................................................7

IV.   Class Counsel's Explanations of the Process Leading to the Settlement and the Allocation Do Not Instill Confidence That the Settlement is Fair ...........................10

V.    Mr. Litteken Properly Objected to Class Counsel's Attempt to Inhibit Those Who are Critical of the Settlement ................................................................................................13

VI.   Class Counsel's Percentage Fee Request Ignores Seventh Circuit Law and Is Undermined by an Unbelievable Lodestar Amount ...................................................13

CONCLUSION ....................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

### <u>United States Appellate Court Cases</u>

*Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*,
    897 F.3d 825 (7th Cir. 2018) ..........................................................................18

*Creative Montessori Learning Centers v. Ashford Gear LLC*,
    662 F.3d 913 (7th Cir. 2011) ..........................................................................11

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
    999 F.3d 1247 (11th Cir. 2021) .........................................................................3

*In re Nat'l Football League Players Concussion Inj. Litig.*,
    821 F.3d 410 (3d Cir. 2016)...............................................................................9

*In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*,
    869 F.3d 551(7th Cir. 2017) ............................................................................12

*In re Sw. Airlines Voucher Litig.*,
    799 F.3d 701 (7th Cir. 2015) ..........................................................................11

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001) ..........................................................................14

*In re Synthroid Mktg. Litig.*,
    325 F.3d 974 (7th Cir. 2003) ..........................................................................17

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
    895 F.3d 597 (9th Cir. 2018) ............................................................................9

*Kaufman v. Am. Express Travel Related Servs. Co., Inc.*,
    877 F.3d 276 (7th Cir. 2017) ............................................................................7

*Keil v. Lopez*,
    862 F.3d 685 (8th Cir. 2017) ............................................................................9

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014) ..........................................................................14

*Redman v. RadioShack Corp.*,
    768 F.3d 622 (7th Cir. 2014) ................................................................. *passim*

*Silverman v. Motorola, Inc.*,
    739 F.3d 956 (7th Cir. 2013) ....................................................................15, 16

*Wong v. Accretive Health, Inc.*,
    773 F.3d 859 (7th Cir. 2014) ............................................................2, 12

**United States District Court Cases**

*Aranda v. Caribbean Cruise Line, Inc.*,
    No. 12 C 4069, 2017 WL 1369741 (N.D. Ill. Apr. 10, 2017)............................................16

*Breckenridge Brewery of Colorado, LLC v. Xcel Energy, Inc.*,
    No. 06-cv-01110-REB-MEH, 2021 WL 4060386 (D. Colo. July 23, 2021)....................19

*Crumpton v. Octapharma Plasma, Inc.*,
    19-cv-8402 (N.D. Ill. Feb. 16, 2022) ...................................................................3

*Douglas v. W. Union Co.*,
    328 F.R.D. 204 (N.D. Ill. 2018)...................................................................19

*E.R. v. TikTok*,
    No. 1:20-cv-02810, dkt. 1 (N.D. Ill. May 8, 2020)..........................................................20

*Higgins v. TV Guide Mag., LLC*,
    No. 15-cv-13769 (E.D. Mich. Dec. 5, 2018) ...................................................................3

*In re Anthem, Inc. Data Breach Litig.*,
    No. 15-MD-02617-LHK, 2018 WL 3960068 (N.D. Cal. Aug. 17, 2018)........................14

*In re Broiler Chicken Antitrust Litigation*,
    No. 16 C 8637, 2021 WL 5709250 (N.D. Ill. Dec. 1, 2021) ............................................15

*In re Capital One TCPA Litig.*,
    80 F. Supp. 3d 781 (N.D. Ill. 2015) ............................................................... *passim*

*In re Facebook Biometric Info. Priv. Litig.*,
    No. 15-cv-3747-JD (N.D. Cal.) ..................................................................... *passim*

*In re Facebook Biometric Info. Priv. Litig.*,
    522 F. Supp. 3d 617 (N.D. Cal. Feb. 26, 2021) ...............................................................3

*In re Trans Union Corp. Priv. Litig.*,
    No. 00 C 4729, 2008 WL 11358136 (N.D. Ill. Jan. 3, 2008) ...........................................5

*In re Trans Union Corp. Priv. Litig.*,
    No. 00 C 4729, 2009 WL 4799954 (N.D. Ill. Dec. 9, 2009) ...........................................17

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
    No. MDL 2672 CRB (JSC), 2016 WL 6248426 (N.D. Cal. Oct. 25, 2016)......................9

*Khoday v. Symantec Corp.*,
  No. 11-cv-180 (JRT/TNL), 2016 WL 1637039 (D. Minn. Apr. 5, 2016) ........................19

*Moeller v. American Media, Inc.*,
  No. 16-cv-11367 (E.D. Mich. Sept. 28, 2017) ....................................................................4

*Powers v. Filters Fast, LLC*,
  No. 20-CV-982-JDP, 2022 WL 461996 (W.D. Wis. Feb. 15, 2022) ..................................5

*Raden v. Martha Stewart Living Omnimedia, Inc., et al.*,
  No. 16-cv-12808 (E.D. Mich. July 17, 2019) ....................................................................4

*Redman v. RadioShack Corp.*,
  No. 11 C 6741, 2014 WL 497438 (N.D. Ill. Feb. 7, 2014)..................................................8

*Ruppel v. Consumers Union of United States, Inc.*,
  No. 16-cv-02444 (S.D.N.Y. Dec. 4, 2018) ........................................................................4

*Tait v. BSH Home Appliances Corporation*,
  No. SACV 10-0711-DOC (ANx), 2015 WL 4537463 (C.D. Cal. July 27, 2015)............19

*Thome v. NOVAtime Tech., Inc.*,
  No. 19-cv-6256 (N.D. Ill. Mar. 8, 2021)............................................................................3

**State Circuit Court Cases**

*Kusinski v. ADP LLC*,
  No. 2017-CH-12364 (Cir. Ct. Cook Cnty. Feb. 10, 2021) .................................................3

*Sekura v. L.A. Tan Enters., Inc.*,
  No. 2015-CH-16694 (Cir. Ct. Cook Cnty. Dec. 1, 2016) ..................................................3

**Miscellaneous Authority**

Cal. Bus. & Prof. Code § 6149 .......................................................................................13

Fed. R. Civ. P. 23 .................................................................................................... *passim*

Fed. R. Evid. 602 ...............................................................................................................6

Fed. Trade Comm'n,
  *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns*
  (Sept. 2019), available at https://www.ftc.gov/system/files/documents/reports/consumers-
  class-actions-retrospective-analysis-settlement-
  campaigns/class_action_fairness_report_0.pdf ................................................................2

Tik Tok Long Form Notice, available at
https://angeion-
     public.s3.amazonaws.com/www.TikTokDataPrivacySettlement.com/docs/TikTok+Long
     +Form+Notice+(website)+v3+draft+20211019.pdf ........................................................7, 8

It is now clear that Mr. Litteken isn't alone in his view that this settlement is unfair. 98.6% of the Class apparently thought the terms were so bad they didn't bother filing a claim. Either that or the notice plan was so ineffectual that the Class didn't learn about their rights in the first place. This "unprecedented" reaction from the Class didn't even meet the embarrassing 1.5% claims goal Class Counsel set for themselves. As recent trends in class action claims rates make clear, this poor showing is far below the double-digit participation rates that should have occurred had Class Counsel cared to put in the effort. The Court shouldn't approve a deal where 98.6% of the Class gets nothing and the lawyers get more than $30 million.

Attempting to justify the notice plan's resulting 1.4% claim rate, Class Counsel point to various metrics to claim both the direct notice and media publication "reached" a sufficient number of Class Members to satisfy due process. But the declaration they point to instead demonstrates that neither the direct individual notice nor media publication meet the bare minimum 70% percent threshold. Worse, the Settlement Administrator's declaration appears to demonstrate that the "reach" of the publication notice is less than half of what Class Counsel represent to the Court. All told, Class Counsel have failed to show the Class received sufficient notice of the settlement, which may account for the unacceptably low response rate. Given the insufficient notice and Class Counsel's failure to file their fee petition ahead of the objection deadline in violation of Seventh Circuit precedent, more notice should be conducted before this settlement can be approved, if it warrants approval at all.

And given the apparent collusion surrounding the settlement, approval should be withheld or at a minimum the allocation between the classes adjusted. Class Counsel have effectively no answer to how it's fair for the Illinois subclass to get 84% of the settlement funds

when Class Counsel confirmed through discovery that TikTok's warranty that its app didn't ever collect biometrics in violation of BIPA was true.

Should the Court reach the issue of Class Counsel's fees, the percentage request runs afoul of Seventh Circuit guidance for a fund of this size, and their claimed lodestar of over $14 million can't be taken seriously for a case where nothing of substance has happened. Applying the Seventh Circuit's approach to funds of this size yields at most $16,916,760.02. Ordering the production of Class Counsel's billing records and a subsequent review would likely produce an award of much less.

## I.    A Settlement Where 98.6% of the Class Gets Nothing Isn't Fair and Shouldn't be Approved.

Class Counsel boast that the "unprecedented" 1.2 million individuals that filed claims, representing just 1.4% of the Class, shows that the settlement has "substantial support" warranting final approval. To the contrary, "the reaction of members of the class to the settlement" is far below what should be acceptable and compels denial of approval at this time.[1] See Wong v. Accretive Health, Inc., 773 F.3d 859, 863 (7th Cir. 2014).

As a recent Federal Trade Commission study found, claims rates in consumer class actions generally are far higher than the 1.4% here. See Fed. Trade Comm'n, Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns 11 (Sept. 2019) ("Across all cases in our sample requiring a claims process, the median calculated claims rate was 9%, and the weighted mean (i.e., cases weighted by the number of notice recipients) was 4%.").

---

[1]    While Mr. Litteken continues his focus on the subpar claims rate, it's also noteworthy that Class Counsel and the Settlement Administrator assumed the role of this Court and unilaterally deemed invalid over 4,000 requests to opt out of the settlement. (Dkt. 196 ¶ 39.) These 4,000 Class Members and their counsel clearly believed that the settlement was inadequate and that they could do better in individual arbitrations or litigation.

Professor's Rubenstein's declaration in *In re Facebook Biometric Information Privacy Litigation*, No. 15-CV-3747 (N.D. Cal.) ("*Facebook BIPA*"), cited by the Class Representatives (dkt. 195 at 30), is not to the contrary. Professor Rubenstein's general conclusion was "that the average claims rate for the largest sized classes is 5.7%," which looked at classes larger than 286,000. *Facebook BIPA*, dkt. 517-2. Class Counsel claim that his analysis of the very top tier, the limited 7 case sample size used in his report where the class was larger than 2,682,347 members, would anticipate a 1.4% claims rate. But when the 22% claims rate from the Facebook BIPA case is added to the analysis that average increases to 3.975%. *Id.* While the claims rates predicted by Professor Rubenstein are still very low, they are 2.8 to 6.4 times higher than what Class Counsel achieved here, i.e., they should have got 3,360,000 to 8,900,000 claims from their 89-million-member class.

The 1.4% claims rate is also contrary to the recent trend of double-digit claims rates in privacy class actions, including in cases with millions of class members. *See In re Facebook Biometric Info. Priv. Litig.*, No. 15-cv-3747-JD, 522 F. Supp. 3d 617, 620 (N.D. Cal. Feb. 26, 2021) (22% claims rate in 6.9-million-member class); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1259 (11th Cir. 2021) (noting claims rate exceeded 10% of 147 million member class); *Crumpton v. Octapharma Plasma, Inc.*, No. 19-cv-8402, dkt. 92 (N.D. Ill. Feb. 16, 2022) (Kendall, J.) ("The Court further acknowledges the Parties achieved an excellent claims rate of 22% as a result of the Notice program."); *Sekura v. L.A. Tan Enters., Inc.*, No. 2015-CH-16694 (Cir. Ct. Cook Cnty. Dec. 1, 2016) (15% claims rate); *Kusinski v. ADP LLC*, No. 2017-CH-12364 (Cir. Ct. Cook Cnty. Feb. 10, 2021) (13% claims rate); *Thome v. NOVAtime Tech., Inc.*, No. 19-cv-6256, dkt. 90 (N.D. Ill. Mar. 8, 2021) (10% claims rate); *Higgins v. TV Guide Mag., LLC*, No. 15-cv-13769, dkt. 79 at 1 (E.D. Mich. Dec. 5, 2018) (15%

claims rate for privacy settlement under Michigan law); *Raden v. Martha Stewart Living Omnimedia, Inc., et al.*, No. 16-cv-12808, dkt. 52 at 1 (E.D. Mich. July 17, 2019) (13% claims rate for privacy settlement under Michigan law); *Ruppel v. Consumers Union of United States, Inc.*, No. 16-cv-02444, dkt. 111 (S.D.N.Y. Dec. 4, 2018) (16.8% claims rate for privacy settlement under Michigan law); *Moeller v. American Media, Inc.*, No. 16-cv-11367, dkt. 42 (E.D. Mich. Sept. 28, 2017) (10% claims rate for privacy settlement under Michigan law). The majority of the cases Class Counsel rely on to support the reasonableness of their 1.4% claims rate come from an era when certain counsel either ignored how many class members participated or sought to keep claims low to artificially inflate the individual payments made to class members. As noted above, that era should end, and the Court should demand greater participation to earn final approval.

In the end, Class Counsel achieved what they set out to do: get a low claims rate that allows them to claim the relief to the Class is comparable to other settlements. And as Mr. Litteken has argued, if Class Counsel achieved a reasonable claims rate, the relief to the Class is inadequate and unfair. (Dkts. 132 at 9, 184 at 14-15.) Instead of recognizing this as a failure and working to increase the number of Class Members interested in participating in their settlement, Class Counsel did the bare minimum, content with poor results. Class Counsel could have gone the extra mile and obtained more email addresses, and they could have sent reminder notice to the emails and reminder notice to the in-app inbox to increase participation. But if a 1.4% claims rate is acceptable, they have no incentive to try. Because additional notice is required as a result of Class Counsel's failure to satisfy due process and to file its fee petition before the objection deadline (more on that below), these steps should now be taken at Class Counsel's expense.

## II.  Class Counsel's Publication-Focused Notice Plan Had Predictably Poor Results and the Direct Notice Was Insufficient.

Even after achieving a claims rate under the 1.5% they had predicted, Class Counsel and their selected administrator still claim the notice campaign was successful. It plainly was not. The Class should not have to pay $3,276,268.43 for a notice plan that resulted in 98.6% of the Class getting nothing.

But determining what notice worked and what didn't is impossible to tell from the limited information provided by the Settlement Administrator. *See Powers v. Filters Fast, LLC*, No. 20-CV-982-JDP, 2022 WL 461996, at *1 (W.D. Wis. Feb. 15, 2022) ("The administrator's explanation of its notice procedures is rather vague. It doesn't explain how it determined that 89 percent of the class received notice. And though it provided a copy of the legal notice accompanying the emails it sent the class, it doesn't provide a sample of the actual email it sent, making it impossible for the court to determine whether the email adequately communicated to class members that they were receiving notice of a class settlement."). Here, what is provided fails to establish that the requisite *individual* notice was provided to the Class. *See, e.g.*, *In re Trans Union Corp. Priv. Litig.*, No. 00 C 4729, 2008 WL 11358136, at *10 (N.D. Ill. Jan. 3, 2008) (rejecting notice plan for providing insufficient individual notice). The Settlement Administrator says that it received 80,989,886 emails associated with Class Members. (Dkt. 196 ¶ 7.) No information is given about how many Class Members were identified that did *not* have an email or whether multiple emails were associated with a single account. What we do know is that only 56,457,812, or 70% of the emails they did have, were actually delivered. (*Id.* ¶ 10.) Further, nothing is provided about what steps were taken to ensure that the notices that were delivered were not delivered directly to spam folders. And nothing is said about whether any instances of notices going to spam were reported to the administrator or Class Counsel, and if so,

what was done. Finally, nothing is provided about what the email actually looked like (we have only the text) or how many people clicked through from the email to file claims. Ultimately, Class Counsel has failed to show that email notice was individually delivered to 70% of the 89-million-member class.

Worse is the Settlement Administrator's testimony about the in-app notice. To start, the Settlement Administrator doesn't have actual knowledge of how TikTok implemented this campaign or what its limits were but testifies about them anyway. (*Id.* ¶ 11; Fed. R. Evid. 602.) Evidence from someone at TikTok with actual knowledge of the in-app notice should be compelled by the Court. And the hearsay that the Settlement Administrator does testify to gives the Court no information about how many Class Members the in-app notice was provided to or how many Class Members "tapped" on the notice to go the settlement website. (Dkt. 196 ¶ 11.) TikTok certainly has this information. Given the lack of information provided, the Court cannot conclude that the requisite individual direct notice was provided to the Class to satisfy Rule 23 and due process.

And that leaves the focus of the Settlement Administrator's efforts, and likely greatest cost of the notice plan, on the media publication component. In addition to being no substitute for direct individual notice to Class Members, the "reach" or notice to actual Class Members appears to be far less that what Class Counsel represents to the Court. First, all of the Settlement Administrator's metrics, including its reach estimates, appear to be based on a constructed "Target Audience" that may or may not include actual Class Members, and which has a population of only 34,680,000 people, or about 42% of the Class (at best). (*Id.* ¶ 14.) Reaching a given percentage of a "Target Audience" is not the same thing as delivering notice to actual Class Members. (*See id.* at 4 describing the "Target Audience".) Thus, the Platt Declaration does

not establish that notice was provided to 96.78% of the Class three times like Class Counsel

claim. (Dkt. 195 at 26.) Moreover, providing or measuring "impressions" of ads is also not the

same thing as providing a copy of the Court-approved notice. The Settlement Administrator

failed to provide any copies of the digital ads they used and conspicuously omits the click-

through rate, even though he avers that Angeion tracked conversion rate in order to "driv[e]

optimizations." (Dkt. 196 ¶ 21.)

As such, Class Counsel has failed to show that the notice plan satisfied due process.

## III. In the Seventh Circuit, Class Counsel's Fee Brief Must be Filed Before the Objection Deadline. It Wasn't.

The Seventh Circuit could not have been more clear that fee motions *must* be filed before

the deadline to object. *Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 877 F.3d 276,

284 (7th Cir. 2017) ("the plain text of Rule 23(h) . . . requires parties to file motions for

attorneys' fees before the deadline to object to the settlement."); *Redman v. RadioShack Corp.*,

768 F.3d 622, 637–38 (7th Cir. 2014) ("Class counsel did not file the attorneys' fee motion until

after the deadline set by the court for objections to the settlement had expired. That violated

the rule. . . . There was no excuse for permitting so irregular, indeed unlawful, a procedure.").

Indeed, it is the universal practice of experienced class action lawyers practicing in this Circuit to

file any petition for attorneys' fees at least two weeks before the objection deadline.

Here, it is equally clear that this precedent was not followed. The deadline for Class

Members to file objections was January 31, 2022. That was the *only* deadline provided for in

notice. (Dkt. 196 (email notice) at 17 ("you may object to the settlement by submitting a written

objection by January 31, 2022."); available at https://angeion-

public.s3.amazonaws.com/www.TikTokDataPrivacySettlement.com/docs/TikTok+Long+Form+

Notice+(website)+v3+draft+20211019.pdf (twice listing January 31, 2022 as the only deadline to

object).) Nowhere in the direct notice or the website notice were Class Members told that after the objection deadline Class Counsel would move for fees, that the motion would be posted on the settlement website, and that a second secret objection deadline existed if they had specific objections to the fees. (*See id.*) Indeed, the so-called "Fee Response Deadline" was entirely absent from any notice provided to the Class until Class Counsel got called on by nearly all the objectors for their flagrant violation of Rule 23(h). Only then, and mere days before the objection deadline, did they inform the Class of the second deadline to object. (*See* dkt. 192 catching Class Counsel red-handed changing the settlement website to add the secret second objection deadline.)

Class Counsel offer several reasons why they believe the filing of their fee petition after the deadline for Class Members to object comports with Rule 23(h) and Seventh Circuit precedent. First, they claim their failure to follow precedent is excused because the class notice says they will ask for one-third of the settlement fund for fees, refers to the settlement website, and that the motion was posted "on the website upon filing." (Dkt. 195 at 58.) This argument is nearly identical to the district court's reasoning in *Redman* that the Seventh Circuit reversed. *Redman v. RadioShack Corp.*, No. 11 C 6741, 2014 WL 497438, at *12 (N.D. Ill. Feb. 7, 2014) (accepting argument that "the Notice of Class Action Settlement in this case gave objectors a clear understanding of the amount that class counsel would receive under the settlement terms. Ultimately, several objectors were able to challenge the proposed attorneys' fees because the class notice included the amount of the fee award. . . . The facts that objectors in this case identified and protested the requested fees belies any alleged prejudicial impact as a result of the objection deadline falling before the fee application was received.") *rev'd* 768 F.3d 622 (7th Cir.

2014). Further, the motion for fees was not posted on the website "upon filing" as Class Counsel state. They waited four days before bothering to post it on the website.

Nor do the out-of-circuit or pre-*Redman* decisions help Class Counsel. For instance, *In re National Football League Players Concussion Injury Litigation* agrees with *Redman* and isn't even about a situation where class counsel filed its fee petition after the objection deadline. 821 F.3d 410, 446 (3d Cir. 2016) ("In those cases, the district courts denied class members the opportunity to object to the particulars of counsel's fee request because counsel were not required to file a fee petition until after the deadline for class members to object expired. By the time they were served with notice of the fee petition, it was too late for them to object. We have little trouble agreeing that Rule 23(h) is violated in those circumstances. But in our case the fee petition has not yet been filed, the District Court has not set a deadline for objections to the fee petition, and the issue of whether class members will have an opportunity to object is hypothetical."). And *Keil v. Lopez* also agrees with *Redman* in substance, but directly splits with the Seventh Circuit on whether violating Rule 23(h) is harmless error. 862 F.3d 685, 705 (8th Cir. 2017) ("We hold only that the district court erred by setting the deadline for objections on a date before the deadline for class counsel to file their fee motion.") And the Ninth Circuit's decision *In re Volkswagen "Clean Diesel" Marketing Sales Practices & Product Liability Litigation* concerns a situation where two wholly separate deadlines to object to the settlement and to object to fees were clearly set out by the district court. 895 F.3d 597, 614 (9th Cir. 2018). Indeed, Class Counsel in that case didn't even move for fees until after the settlement was approved. *See In re: Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2016 WL 6248426, at *23 (N.D. Cal. Oct. 25, 2016) (discussing how the motion for fees would be filed after the fairness hearing and a separate deadline would be

established). That isn't what's going on here because Class Counsel isn't waiting until after final approval to move for fees, and they never told the Class about the second objection deadline until their failure to follow precedent was raised.

Accordingly, Class Counsel's fee petition was filed in violation of Rule 23(h) and governing precedent. As the notice effort likely fell short of satisfying due process and clearly resulted in an unacceptable claims rate, the Court should order renewed notice.

## IV. Class Counsel's Explanations of the Process Leading to the Settlement and the Allocation Do Not Instill Confidence That the Settlement is Fair.

Mr. Litteken's objections (dkts. 132, 184), argue that there is no justification for paying the Illinois subclass six times what he and everyone non-Illinois Class Member is entitled to. *See* Fed. R. Civ. P. 23(e)(2)(D). This is certainly the case where TikTok has warranted, and Class Counsel has apparently confirmed, that TikTok has "not used the App to collect biometric information or [] identifiers as defined by [BIPA]." (Dkt. 122-1 § 7.1; *see also id.* §§ 7.2–7.3; dkt. 161 at 22.) Class Counsel blows this off claiming that all settlements include defendants denying the merits of the claim. (Dkt. 195 at 63.) It's true such clauses are nearly universal, and this settlement also contains such a clause. (Dkt. 122-1 § 3.4 ("TikTok has denied and continues to deny each allegation and all charges of wrongdoing or liability of any kind whatsoever asserted or that could have been asserted in the Civil Actions.").) But that's not the issue. As the Court recognized, this settlement contains a highly unusual provision where TikTok swore and then confirmed to Class Counsel through discovery that the app never collected any biometrics in violation of BIPA. (Dkt. 161 at 22 ("In addition, Defendants have gone so far as to warrant[] and confirm through discovery that they have 'not used the App to collect biometric information or [] identifiers as defined by [BIPA].' Settlement Agreement § 7.1; *see also id.* §§ 7.2–7.3.").) That is not a simple denial of merits of the claims against it; that is apparently demonstrated proof of the

absence of wrongdoing by TikTok as it relates to BIPA. That the favored Illinois class receives the lion's share of the settlement funds for a meritless claim demonstrates that the plan of allocation is unfair.

Although paying a small portion of the Class most of the money for a meritless claim is sufficient to reject the proposed allocation, Class Counsel also attempts to defend the highly abnormal and seemingly collusive manner in which the settlement and allocation were reached. It is "irrelevant," they say, that settlement delegation was organized and led by an unappointed lawyer with a secret client, in a newly filed case, with only an apparently frivolous BIPA claim because the delegation includes attorneys from other firms and was later "vetted."[2] *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011) ("When class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class."). But if this still undisclosed client had a conflict or close relationship to counsel, it's not clear if any subsequent vetting by additional counsel can undo the impropriety (especially without knowing who the client is and their relationship to counsel). *See, e.g.*, *In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 714 (7th Cir. 2015) (stating that "class members can expect a defendant . . . to test the adequacy of a class representative [and] should be able to expect class counsel and class representatives to disclose such prior

---

[2]     Class Counsel state that Mr. Litteken unfairly focused his attention on Ms. Carroll due to his counsel's purported "legal troubles." But a review of Mr. Litteken's initial objection dispels this revisionist history. Nowhere does he mention Ms. Carroll (or any other Class Counsel) and addresses his arguments at the merits. (Dkt. 132.) It was Ms. Carroll's outrageous actions that followed the objection, including falsely claiming that Edelson was making misleading communications to Class Members (dkts. 137 at 1 n.2, 138), falsely claiming Mr. Edelson was colluding with other objectors to solicit opt-outs (dkt. 145 at 4), falsely claiming Mr. Edelson tweeted disparaging comments (dkt. 138), having her husband abuse his elected office by threatening Edelson if they didn't drop their objection (dkts. 165, 166, 178, 178-1, 179, 179-1), and orchestrating the very "legal troubles" to which they now point that crossed the line. (Dkts. 165, 166, 178, 178-1, 179, 179-1.)

professional, financial, personal, or other relationships between class counsel and a class representative that could reasonably be thought relevant to the ability of the representative to act on behalf of the class, if need be by disagreeing with class counsel.").

Nor is Class Counsel correct that its failure to engage in any motion practice or other litigation weighs in favor of approval. (Dkt. 195 at 54.) While it may show risk, the lack of any litigation testing the various claims, especially the short-changed claims of the national Class, shows that the case didn't proceed far enough for Class Counsel to have acquired the necessary information to effectively negotiate on behalf of the Class. *See Wong*, 773 F.3d at 863 (requiring consideration of the "stage of the proceedings and the amount of discovery completed."). If litigation and discovery had even minimally proceeded, Class Counsel apparently would have discovered their BIPA claim is meritless and the national class would receive a fair allocation of the settlement funds. *See In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*, 869 F.3d 551, 553–54 (7th Cir. 2017) (suggesting class counsel should change course when informal discovery reveals a meritless claim).

Finally, Class Counsel argue that changing their original settlement to remove Judge Phillips' oversight from the allocation negotiations actually benefited the Class by saving them the additional mediation expenses and removing TikTok from the process. (Dkt. 195 at 64.) Not only might TikTok have alerted Class Counsel to the unfair allocation of the bulk of the settlement fund to a meritless claim but removing Judge Phillips from the allocation stage removes any presumption of fairness that the presence of a third-party neutral, or other guarantee of arm's-length negotiations, might have provided that critical step.

**V.      Mr. Litteken Properly Objected to Class Counsel's Attempt to Inhibit Those Who are Critical of the Settlement.**

Class Counsel urge the Court to strike Mr. Litteken's objection because he objected to the inclusion of unnecessary prerequisites to filing an objection contained in the counsel-drafted preliminary approval order, absent further request from the Court.[3] This request is particularly improper given Class Counsel is demanding more information, under oath, from objectors than it does to file a claim, request exclusion, or even be a Class Representative. Mr. Litteken's counsel and Mr. Litteken have both signed the objection, they have identified the public record documents concerning his counsel's prior objections, and retainers in California (where Mr. Litteken lives) are privileged. Cal. Bus. & Prof. Code § 6149. Though Mr. Litteken is happy to produce his retainer if Class Counsel also produce the retainers for their clients.

**VI.     Class Counsel's Percentage Fee Request Ignores Seventh Circuit Law and Is Undermined by an Unbelievable Lodestar Amount.**

In a case where no litigation has occurred and where 98.6% of the Class is getting nothing, Class Counsel nonetheless have requested one-third of the fund amounting to over $30 million in attorneys' fees for a small army of lawyers who appear to have done no beneficial work for the Class.

Starting with percentage request, there are two issues. First, the request is made against the gross settlement fund, ignoring clear precedent in this Circuit saying the percentage award must be calculated after the costs of notice and administration are deducted from the gross fund amount. *See Redman*, 768 F.3d at 630. Here, the Settlement Administrator has averred that it will incur administrative expenses of $3,276,268.43. (Dkt. 196 ¶ 43.) Comparing the fee request to

---

[3]      Class Counsel fail to address Mr. Litteken's objection regarding the differing requirements between the preliminary approval order and notice that they drafted.

the money actually made available to Class Members, as required by *Redman*, shows that Class Counsel actually are asking for an award of fees at the 34.9% level, not 33.33%. *See also Pearson v. NBTY, Inc.*, 772 F.3d 778, 781, 784 (7th Cir. 2014) (extending *Redman* to other expenditures from a common fund that don't go to class members, including litigation costs and service awards). A 33.33% fee using the figures required by *Redman* and *Pearson* would total only around $29.25 million.

Second, and more significantly, Class Counsel asks for a flat award of 33.33% (or, really 34.9%) of the fund. "[P]ercentages over 33% are largely unheard-of with funds of this size." *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *6 (N.D. Cal. Aug. 17, 2018) (Koh, J.). Empirical studies show that percentage fee awards in comparably sized settlements are typically in the low 20s, if not lower. *See In re Capital One TCPA Litig.*, 80 F. Supp. 3d 781, 797 (N.D. Ill. 2015) (reviewing two empirical studies of fee awards which found that average percentage awards in funds of comparable size was 19.4% and 23.7%). And according to the declarations of Professor Rubenstein upon which Class Counsel continue to heavily rely, the average award for privacy settlements of with funds greater than $28.4 million was 25.3%, and the median was 23.97%, though Professor Rubenstein also made clear that awarded percentages tend to decrease as the size of the fund increases, and cited studies showing that average awards for common funds of this size was about 18%. *Facebook BIPA*, dkt. 499-3 ¶ 23.

Class Counsel recognizes that under governing law an award of fees must mimic as closely as possible the type of compensation Class Counsel would have received had the plaintiffs privately bargained for their services in a competitive market. *See In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001). And the Seventh Circuit also has explained how

14

privately bargained for compensation typically works: counsel receives a declining marginal percentage of any recovery. *See id.*; *see also Facebook BIPA*, dkt. 499-3 ¶ 23 ("Empirical research demonstrates that percentage awards tend to decrease as the size of the fund increases"). This reflects the basic fact that greater recoveries tend to be attributable to something other than the efforts of counsel; indeed, often in class actions the size of the fund has more to do with the size of the class than the efforts of the lawyers. *See Silverman v. Motorola, Inc.*, 739 F.3d 956, 959 (7th Cir. 2013). Courts in this District have observed that the rationale of *Synthroid* and *Silverman* applies with even more force to cases involving statutory damages claims, like this one, "because nearly all of counsel's efforts are devoted to determining liability. Damages are fixed by statute." *In re Capital One*, 80 F. Supp. 3d at 803.

Pointing principally to *Silverman*, Class Counsel contends that an award structured as a declining marginal percentage of the fund is unnecessary here. But the Seventh Circuit expressed "concern" about the flat-fee structure of the award in *Silverman*, ultimately affirming it because no class member proposed a declining-percentage, or sliding-scale, structure. *See* 739 F.3d at 959. Class Counsel also points to the decision in *In re Broiler Chicken Antitrust Litigation*, No. 16 C 8637, 2021 WL 5709250 (N.D. Ill. Dec. 1, 2021), but that case merely demonstrates why the sliding-scale structure is most appropriate here. Unlike in cases utilizing a sliding-scale approach, the court in *Broiler Chicken* explained, settlement there was "far from a foregone conclusion" and "Appointed Counsel invested massive resources of time and money when no other counsel expressed interest, with little assurance of success." *Id.* at *3.

Here, by contrast, the case settled before a motion to dismiss even was filed, and while Class Counsel naturally emphasizes the work they have done, it appears to be almost entirely post-settlement work (such as confirmatory discovery). And the Settlement itself was driven, as

TikTok candidly admitted, by the political pressure placed on TikTok by the former Presidential administration. If Class Counsel's filings demonstrate anything, it is that they have concluded that the BIPA claim attributing to most of the payout is completely meritless. That means, rather than representing an incredible achievement, the Settlement is essentially a nuisance value settlement driven by government actors, not the type of outstanding work that warrants an exception to the normal rule. Alternatively, if TikTok engaged in the conduct alleged, the Settlement is woefully inadequate, and Class Counsel sold out the Class for the chance of getting $30 million in fees. But given the lack of actual litigation or discovery, it's hard to tell which scenario is accurate.

Moreover, it seems beyond doubt that the market would not support the 34.9% fee proposed by Class Counsel in substantial part because this was not a case in which the supply of legal services was small: The fee petition memorializes the work of no fewer than 31 separate law firms, suggesting that any plaintiff had a deep bench of firms from which to choose. *Cf. Silverman*, 739 F.3d at 958 (noting that "[w]hen this suit got under way, no other law firm was willing to serve as lead counsel" and that "[l]ack of competition . . . implies a higher fee"). And the other BIPA examples touted by Class Counsel are of little help to them. Only two of the example settlements cited by Class Counsel exceeded $10 million (dkts. 197-7, 197-14). As explained below, under the standard sliding-scale analysis, settlements smaller than $10 million would support fee requests of 30-35%. *See In re Capital One*, 80 F. Supp. 3d at 804 (finding that 30% of the first $10 million in recovery reflected most awards in this District); *Aranda v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2017 WL 1369741, at *6 (N.D. Ill. Apr. 10, 2017) (awarding a 6% risk premium on the first $10 million of a settlement fund). And of the larger funds, in one class counsel received $1.365 million of a $14.1 million fund, or around 10% after

expenses were removed. A sliding-scale award would not only be more faithful to Seventh Circuit precedent, but the bottom line it produces would more accurately reflect the market for legal services here.

The Seventh Circuit first approximated what a sliding-scale fee structure might look like in a consumer class action in *In re Synthroid Marketing Litigation*, 325 F.3d 974, 980 (7th Cir. 2003). There, the court applied a formula that provided Class Counsel with 30% of the first $10 million in a fund, 25% of the next $10 million, 22% of recovery between $20 million and $45 million, and 15% of any recovery beyond that. *Id.* Applying these same figures to the net fund here produces a fee award of $17,416.760.02. In a subsequent consumer privacy action, Judge Gettlemen adopted the recommendation of a special master and applied a modified version of the *Synthroid* formula, developed following a review of several fee awards, which adjusted the percentage applied to the third band of recovery down to 20%. *See In re Trans Union Corp. Priv. Litig.*, No. 00 C 4729, 2009 WL 4799954, at *16 (N.D. Ill. Dec. 9, 2009). Here, that same scale would result in an award of $16,916,760.02. Several years later, then-Chief Judge Holderman exhaustively reviewed available data about fee awards and concluded that the modified *Synthroid* formula still reflected the market for legal services. *See In re Capital One*, 80 F. Supp. 3d at 807.

Class Counsel have pointed to nothing about this case or about the market for fees that merits a deviation from this established formula. Indeed, the modified *Synthroid* formula produces a total percentage fee award of 22.8%, right in the range of typical fee awards doled out in settlements with comparably sized common funds. If anything, such an award might be too generous here because, as even the litigants point out, the settlement value here was created almost entirely by action taken by the federal government, not by work done by Class Counsel.

At most, therefore, the Court should award fees in the amount of $16,916,760.02 if using the percentage method.

Of course, this Court has the discretion to employ the lodestar method either as the primary method of calculation or as a cross check to confirm the unreasonableness of Class Counsel's $30 million request. On its face, Class Counsel's lodestar is difficult to take seriously. Class Counsel's fee petition asks the Court and the Class to believe that a lodestar of around $14 million was racked up in a case in which the only meaningful development was settlement. There was no motion practice, no real discovery, no depositions, no class certification briefing, no summary judgment filings, no trial preparation or trial, and no appeals. Literally nothing happened other than a mediation and lawyers fighting for lead. Curiously (well, not so curiously) Class Counsel declines to say how many hours were expended on this litigation so as to reach that number. This alone justifies an award under the reported lodestar. *See Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, 897 F.3d 825, 829, 832-34 (7th Cir. 2018) (affirming a fee award below the lodestar where the case settled after very little litigation, counsel's reported time was suspiciously high, and "counsel had provided only a summary of the number of hours spent on the case," but no "details or documentation regarding how the $156,000 in fees had accumulated given how little work was done on the case").

A review of the various declarations submitted with the fee motion shows that the total number of hours expended on this case is 17,538.8. (About 4,500 of these hours, incurred by the Glancy Prongay and Bird Marella firms, are not broken out by timekeeper or task.) This results in a blended hourly rate of $801.72. As Class Counsel surely knows from reviewing the declaration submitted by William Rubenstein in *Facebook BIPA* it likes to cite, that is an exceptionally high number. *See Facebook BIPA*, dkt. 499-3 ¶ 31 (median blended hourly rate in

similar class actions was $607 in 2020 dollars, and only two similar consumer cases in Rubenstein's sample had a blended rate above $800).

Moreover, a simple comparison with more complex cases demonstrates that Class Counsel's hours are likely being misrepresented. For instance, in *Khoday v. Symantec Corp.*, No. 11-cv-180 (JRT/TNL), 2016 WL 1637039, at *10 (D. Minn. Apr. 5, 2016), counsel expended nearly 20,000 hours in a case in which they had completed fact and expert discovery, including 15 fact witness depositions, seven expert witness depositions, litigated motions for class certification, summary judgment, and to exclude witness testimony, and were preparing for trial. Class Counsel claims to have reasonably expended approximately 88% of what counsel in *Khoday* did for a case that has no work beyond settlement-related motions practice and fighting for lead counsel positions. In *Breckenridge Brewery of Colorado, LLC v. Xcel Energy, Inc.*, No. 06-cv-01110-REB-MEH, 2021 WL 4060386, at *4 (D. Colo. July 23, 2021), class counsel dedicated 17,000 hours to prosecution of that case, which stretched over a decade, and which involved full discovery work and an appeal. In *Tait v. BSH Home Appliances Corp.*, No. SACV 10-0711-DOC (ANx), 2015 WL 4537463, at *2 (C.D. Cal. July 27, 2015), counsel reported spending approximately 18,000 hours on the case, which involved "extensive and contentious" discovery, including 26 expert depositions, and motions practice regarding class certification and summary judgment. Again, although the litigation history here bears no resemblance to *Tait*, Class Counsel claim to have expended a comparable amount of attorney time prosecuting the case. This is not credible, and the court should inquire further. *Douglas v. W. Union Co.*, 328 F.R.D. 204, 221 (N.D. Ill. 2018) ("And because the reported hours seemed excessive for a case that was barely litigated before going to mediation, the court asked [Defendant]'s counsel to report how many hours *they* billed on the case.").

Part of the reason why this time is so high, quite obviously, is that the 31 firms and the horde of lawyers working on this case appear to have taken almost no efforts to avoid duplication of work. For instance, that the firms combined billed at least 2,976.6 hours to "mediation/settlement." (Again, about 4,500 hours, a little more than one-fourth of the total hours expended here, are not broken down by timekeeper or task. Doubtless some of these hours would have been billed to "settlement/mediation" as well.) To be sure, significant preparation goes into settlement negotiations. But it is difficult, if not impossible, to say that all of these hours benefited the Settlement Class, if they were even expended at all. Take the hours of Co-lead counsel Ms. Carroll. Ms. Carroll purports to have billed an eye-popping 2,076 hours in fewer than two years on this case, the most of any attorney submitting summaries. (Dkt. 198 at 18); *E.R. v. TikTok*, No. 1:20-cv-02810, dkt. 1 (N.D. Ill. May 8, 2020). But at the same time she claims to have billed more than 2,000 hours here, a Bloomberg report appears to show that Ms. Carroll was also apparently actively litigating 57 other matters. (*See* Ex. 1.) In any event, the level of detail provided does not permit anyone reviewing these bill summaries to determine what work is duplicative and what is not. Should the Court determine that a lodestar-based fee or a lodestar cross check is necessary, it should order Class Counsel to produce more detailed billing records.

## CONCLUSION

The low claims rate, lack of adequate notice, unfair allocation of the funds among the class, and the filing of the fee petition prior to the objection deadline require denial of final approval at this time.

20

Respectfully submitted,

Date: April 14, 2022 **DENNIS LITTEKEN,**

/s/ Ryan D. Andrews
One of Mr. Litteken's Attorneys

Jay Edelson
jedelson@edelson.com
Ryan D. Andrews
randrews@edelson.com
J. Eli Wade-Scott
ewadescott@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Objector*