**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE TIKTOK, INC., | ) | |
| CONSUMER PRIVACY | ) | MDL No. 2948 |
| LITIGATION | ) | |
| | ) | Master Docket No. 20 C 4699 |
| | ) | |
| This Document Relates to | ) | |
| All Cases | ) | Judge John Z. Lee |
| | ) | Magistrate Judge Sunil R. Harjani |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Tens of millions of Americans use the social media and entertainment application now known as TikTok ("TikTok" or "the App," formerly known as "Musical.ly") to view, create, and share short videos. That is all well and good, but according to the lead plaintiffs ("Plaintiffs") in this multidistrict litigation ("MDL"), the App's widespread popularity comes at the expense of its users' privacy rights. On behalf of a putative class comprising all TikTok users in the United States (an estimated 89 million people) and a subclass of Illinois users, Plaintiffs allege that ByteDance, Inc. (the China-based company that created TikTok) and its subsidiaries—TikTok, Inc., TikTok, Ltd., ByteDance Inc., and Beijing ByteDance Technology Co., Ltd. (collectively, "Defendants")—have used the App to surreptitiously harvest and profit from collecting the private information of users in violation of numerous federal and state consumer privacy laws.

Last year, the Court granted Plaintiffs' motion for preliminary approval of a class action settlement that would provide monetary relief to class members in the form of a $92 million settlement fund, as well as broad injunctive relief prohibiting

Defendants from engaging in the alleged privacy violations going forward. *See In re TikTok, Inc. Consumer Priv. Litig.*, 565 F. Supp. 3d 1076 (N.D. Ill. 2021), ECF No. 161.

Now, after disseminating notice to the class and receiving approximately 1.4 million claims, Plaintiffs have filed a motion for final approval of the settlement, as well as a motion for attorneys' fees, expenses, and service awards. Various objectors have filed objections to both motions, as well as their own fee and service award petitions. For the following reasons, the Court certifies the Nationwide Class and Illinois Subclass for purposes of the settlement, grants Plaintiffs' motion for approval of the settlement, approves the fee and service award petitions to the extent stated below, and makes other rulings as applicable.

## TABLE OF CONTENTS

I.   **Background** ............................................................................................... 4
   A.   Factual and Early Procedural History .................................................. 4
   B.   Plaintiffs' Claims ................................................................................... 9
      1.   Nationwide Class Claims................................................................ 9
      2.   Illinois Subclass Claims ............................................................... 11
   C.   Proposed Settlement Agreement ........................................................ 12
      1.   Monetary Relief............................................................................. 13
      2.   Injunctive Relief ........................................................................... 14
   D.   Order Granting Preliminary Approval ............................................... 15
   E.   The Notice and Claims Submission Period ........................................ 17
      1.   Notice............................................................................................ 17
      2.   Claims and Opt-Outs .................................................................... 20
II.   **Analysis** ..................................................................................................... 21
   A.   Class Certification .............................................................................. 21

1.    Legal Standard ................................................................ 21
2.    Rule 23(a) Factors ......................................................... 22
    i.    Numerosity, Commonality, and Typicality .............................. 22
    ii.   Adequacy of Representation ....................................... 23
3.    Rule 23(b)(3) Factors ................................................... 31
    i.    Predominance .................................................... 31
    ii.   Superiority ..................................................... 32

B.   Rule 23's Notice Requirement ............................................. 33
1.    Adequacy of Notice ....................................................... 33
2.    Objections to Notice Plan ............................................... 36
3.    Motion To Accept Opt-Outs ............................................... 41

C.   Rule 23(e)'s Fairness Inquiry ........................................... 44
1.    Legal Standard ......................................................... 44
2.    Strength of Plaintiffs' Case And Value of the Settlement.............. 45
3.    Other Settlement Factors ............................................... 53

D.   Attorneys' Fees and Service Awards ...................................... 56
1.    Legal Standard ......................................................... 56
2.    Class Counsel's Motion for Attorneys' Fees ............................ 57
    i.    Percentage Method................................................ 58
    ii.   Lodestar Cross-Check ........................................... 65
    iii.  Allocation of Fees Among Plaintiffs' Firms...................... 66
    iv.   Expenses ....................................................... 72
3.    Objector Mark S.'s Petition for Attorneys' Fees....................... 74
4.    Incentive and Service Awards ........................................... 77

III.  **Conclusion** .......................................................... **79**

# I.   Background[1]

## A.   Factual and Early Procedural History

The App is a social media and entertainment platform that allows users to view, create, and share short videos.  Using the App, individuals can record videos and overlay them with visual effects, background music, and other enhancements. *See* Consol. Am. Class Action Compl. ¶¶ 127–28 ("Compl."), ECF No. 114.  After recording a video, a user can either save the video to their device or "post" the video to their TikTok account.  *See id.* ¶¶ 146–47.

When a user posts a video to their account, the video is shared with the user's "followers" (that is, other users who subscribe to see the user's content) and also is posted publicly and displayed to users across the world using the App's proprietary content-delivery algorithm.  *Id.* ¶¶ 2, 7–9, 128.  The algorithm uses artificial intelligence technologies and machine learning to gather information about a user and to predict what types of videos the user would want to see.  *Id.* ¶¶ 8–9.  The App then shows the user a curated feed of content (and advertisements) based on those predictions.[2]  *Id.* ¶ 141.

---

[1]    The Court assumes familiarity with the facts of this case as stated in the Preliminary Approval Order.  *See In re TikTok*, 565 F. Supp. 3d at 1079–83.

[2]    For example, if a user "likes" or comments on a video of a dog dancing to a popular song, the App's algorithm will "learn" about the user's preference for such videos and will adjust to show the user more videos involving dogs or other animals dancing to music on the user's video feed.  *See* Compl. ¶ 268.

The simultaneous success and secrecy of TikTok's proprietary AI technology has prompted considerable backlash from privacy advocates, politicians, and the United States government. In February 2019, the Federal Trade Commission entered into a consent decree with several Defendants over the App's purported violations of the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501 *et seq.*[3] The Department of Defense expressed concerns that its employees' use of the App raised security issues because of the App's "ability to convey location, image and biometric data to its Chinese parent company." Compl. ¶ 6. And several United States Senators called on the intelligence community to investigate TikTok's alleged ties to the Chinese government and its potential as a "target of foreign influence campaigns like those carried out during the 2016 election on United States-based social media platforms." Letter from Senator Charles E. Schumer and Senator Tom Cotton to Joseph Maguire, Acting Director of National Intelligence (Nov. 27, 2019) (on file with the United States Senate), https://www.democrats.senate.gov/imo/media/doc/10232019%20TikTok%20Letter%20-%20FINAL%20PDF.pdf.

These privacy concerns also prompted a wave of putative class action lawsuits against TikTok in federal courts across the country. Beginning in 2018, several plaintiffs' law firms began to investigate whether Defendants' AI and machine

---

[3] Press Release, *Video Social Networking App Musical.ly Agrees to Settle FTC Allegations That It Violated Children's Privacy Law*, FTC (Feb. 27, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/02/video-social-networking-app-musically-agrees-settle-ftc-allegations-it-violated-childrens-privacy (last accessed May 20, 2022).

learning technologies violated United States privacy laws. The investigations focused in particular on whether the App's video camera collected, retained, and distributed App users' facial recognition information or other biometric information without the users' authorization. *See* Pls.' Mot. Prelim. Approval Class Action Settlement ("Mot. Prelim. Approval"), Rhow Decl. ¶¶ 8–10, ECF No. 122-8. The investigations also explored whether the App harvested other types of private information, such as geolocation data, video viewing histories, unpublished TikTok videos (*i.e.*, those not "saved" or "posted"), and personal identifying information such as email addresses, social media account information, or cell phone data, and whether Defendants transferred that data to third parties. *Id.*; *see, e.g.*, Compl. ¶¶ 155–57.

The first case against TikTok based on these allegations was filed in the Northern District of California in November 2019. *See Hong v. ByteDance, Inc.*, No. 19 C 7792 (N.D. Cal.). Other lawsuits followed in the Northern District of California, the Central District of California, the Southern District of Illinois, and the Northern District of Illinois, including one in this Court. *See E.R. v. TikTok, Inc.*, No 20 C 2810 (N.D. Ill.). Eventually, the burgeoning of litigation led the Judicial Panel on Multidistrict Litigation ("JPML") to consolidate the then-nineteen related actions and to transfer them to this Court for pretrial proceedings on August 4, 2020. *See In re TikTok, Inc., Consumer Priv. Litig.*, 481 F. Supp. 3d 1331, 1332 (J.P.M.L. 2020); JPML Transfer Order, *In re TikTok* (N.D. Ill. Aug. 12, 2020), ECF No. 2.

By that point, the political tensions surrounding TikTok had reached their zenith. Just two days after the JPML's transfer order, President Donald Trump

issued an executive order declaring that TikTok's continued operation in the United States presented "a national emergency" that "threaten[ed] the national security, foreign policy, and economy of the United States." Exec. Order No. 13,942, 85 FED. REG. 48,637 (Aug. 6, 2020). According to the executive order, immediate action was necessary because TikTok's "data collection threaten[ed] to allow the Chinese Communist Party access to Americans' personal and proprietary information." *Id.* The order gave ByteDance an ultimatum: sell TikTok's United States operations to an American company within forty-five days or face a ban of the App in this country. *See id.*[4]

After the Trump Administration's order, Defendants' motivation to settle the newly-consolidated cases was at an all-time high given its need to shed TikTok's liabilities in preparation for its anticipated sale. *See* Pls.' Mot. Final Approval Class Action Settlement at 9–10 ("Mot. Final Approval"), ECF No. 195. The attorneys in *Hong* had already engaged in months of comprehensive settlement discussions with Defendants, including a round of mediation in April 2020 led by Layn Phillips, a prominent retired federal judge. *Id.* at 8. To that point, however, the parties had not been successful. *Id.*; *see generally* Mot. Prelim. Approval, Carroll Decl., ECF No. 122-6 (discussing pre-MDL settlement negotiations); Rhow Decl. (same).

---

[4] ByteDance initially agreed to sell its United States operations of TikTok to Oracle and Walmart later in September 2020, but a final agreement never materialized, and the Biden Administration ultimately abandoned the Trump Administration's threat to ban the App. *See, e.g.*, Bobby Allyn, *Biden Administration Pauses Trump's TikTok Ban, Backs Off Pressure to Sell App*, NAT'L PUB. RADIO (Feb. 10, 2021), https://www.npr.org/2021/02/10/966584204/ (last accessed May 20, 2022).

On August 13, 2020, Plaintiffs' counsel in *E.R.*, a case originally filed in this Court, was able to assemble a coalition of attorney representatives from the various consolidated cases to attend a second round of mediation before Judge Phillips in hopes of achieving a global settlement. Mot. Final Approval at 8–9; Carroll Decl. ¶¶ 16–19. That thirteen-hour session proved fruitful and concluded with a settlement agreement in principle and a signed term sheet. Mot. Final Approval at 10. The parties memorialized the settlement in a signed agreement on September 4, 2020. *Id.*

Meanwhile, as part of its management of the MDL, the Court solicited applications from the attorneys who represented the various plaintiff classes in the MDL to serve as Lead Counsel and in other leadership roles. In September 2020, the Court selected three attorneys—Katrina Carroll, Ekwan Rhow, and Elizabeth Fegan—to serve as Co-Lead Counsel; attorney Shannon Marie McNulty to serve as Liaison Counsel; and five attorneys—Jonathan Jagher, Megan E. Jones, Michael Gervais, Amanda K. Klevorn, and Albert Y. Chang—to serve on the Plaintiffs' Executive Committee. *See* Case Management Order No. 3, ECF No. 94 (appointing counsel to these roles).

These attorneys worked with Defendants over the fall and winter of 2020 to assess the initial terms of settlement and negotiate revised terms to address the various concerns raised by different plaintiff groups. As part of this process, Plaintiffs' counsel also conducted a substantial amount of confirmatory discovery, which included interrogatories, document requests, and written depositions, and

arranged for a computer programming expert to inspect the App's source code onsite. *See In re TikTok*, 565 F. Supp. 3d at 1080–81.

## B. Plaintiffs' Claims

One product of these efforts was a consolidated amended class action complaint filed towards the end of 2020. The complaint proposes two classes. First, the complaint defines a Nationwide Class comprised of all United States residents who had used the App prior to preliminary approval of the settlement. Compl. ¶ 322. Second, the complaint seeks certification of an Illinois Subclass comprised of all Illinois residents who had used the App to create one or more videos prior to the preliminary approval of the settlement. *Id.* A brief summary of the classes' claims follows.

### 1. Nationwide Class Claims

On behalf of the Nationwide Subclass, the complaint asserts claims under federal statutes, as well as claims under California statutes and common law.

First, the complaint asserts for the Nationwide Class that Defendants have violated the federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and its California analogue, the Comprehensive Computer Data Access and Fraud Act ("CCDAFA"), CAL. PENAL CODE § 502, by collecting personal information and data, including user or device identifiers, biometric information, and unpublished TikTok videos, from App users' cell phones without authorization. Compl. ¶¶ 339–41, 345–46.

9

Next, Plaintiffs bring a claim under the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, which creates a private cause of action against a "video tape service provider who knowingly discloses, to any person" the "personally identifiable information" of its consumers. *Id.* § 2710(b). According to Plaintiffs, Defendants have violated VPPA by knowingly disclosing App users' personally identifiable information, including a record of the videos the user has watched, a record of the videos the user has "liked" or commented on, and the identities of the user's followers, to Facebook and Google. *See* Compl. ¶ 397.

Additionally, Plaintiffs assert that, in failing to disclose that they collect and disseminate App users' personal information, Defendants have violated two California consumer protection statutes[5]: the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, which bans "unlawful, unfair, or fraudulent business act[s] or practice[s]," *id.*, and the California False Advertising Law ("FAL"), *id.* § 17500 *et seq.*, which prohibits any "unfair, deceptive, untrue, or misleading advertising." *Id.*; *see* Compl. ¶¶ 372–78, 381–85.

Plaintiffs also assert three claims under California constitutional and common law. First, they argue that Defendants' collection and dissemination of their private information violates the right to privacy enshrined in article I of the California Constitution. *See* Cal. Const. art. I § 1; Compl. ¶¶ 351–53. Second, Plaintiffs raise

---

[5]    Plaintiffs also assert claims pursuant to several other state consumer protection statutes on behalf of a "Multi-State Consumer Protection Class," "in the alternative" to a Nationwide Class. *Id.* ¶ 419; *see id.* ¶ 322 n.167 (listing states with consumer fraud laws that may apply to Defendants' conduct).

a claim based on the common law tort of intrusion upon seclusion, arguing that the collection of App users' personal information constitutes an "intentional interference with [their] interest in solitude or seclusion . . . of a kind that would be highly offensive to a reasonable man." RESTATEMENT (SECOND) OF TORTS § 652B cmt. a (AM. LAW INST. 1977) (updated Oct. 2021); *see* Compl. ¶ 363.

Lastly, Plaintiffs seek recovery under a theory of unjust enrichment, contending that Defendants derived revenues and profits from the dissemination and transfer of App users' private and personal information. Compl. ¶ 387; *see* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 1 cmt. a (AM. LAW INST. 2011) (recovery under the doctrine of unjust enrichment is appropriate when the defendant "recei[ves] a benefit whose retention without payment would result in the unjust enrichment of the defendant at the expense of the claimant").

### 2. Illinois Subclass Claims

The Illinois Subclass asserts claims under the Illinois Biometric Information Privacy Act ("BIPA"), 740 Ill. Comp. Stat. 14/1 *et seq.*, which "embodies a fundamental policy of the state of Illinois. . . . of protecting its citizens' right to privacy in their personal biometric data," and in particular, its "concerns about the use of new technology by '[m]ajor national corporations' to collect personal biometric data." *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1169 (N.D. Cal. 2016) ("*In re Facebook*") (quoting 740 Ill. Comp. Stat. 14/5(b)). In short, BIPA requires a private entity that collects biometric information (defined as "any information . . . based on an individual's . . . retina or iris scan, fingerprint, voiceprint, or scan of hand

11

or face geometry," 740 Ill. Comp. Stat. 14/10) to "inform the subject or 'the subject's legally authorized representative' in writing about several things, such as the purpose of collecting the data and how long they will be kept, and obtain the consent of the subject or authorized representative." *Miller v. Sw. Airlines Co.*, 926 F.3d 898, 900 (7th Cir. 2019) (quoting § 14/15(b)).

BIPA also prohibits sales and limits transfers of biometric information and requires custodians to establish protocols for retaining the information and protecting it from disclosure. *See id.* at 901 (citing § 14/15(a)–(e)). Successful BIPA plaintiffs may recover either actual damages or liquidated damages—$1,000 for negligent violations and $5,000 for intentional or reckless violations—plus attorneys' fees, costs, and injunctive relief. *See* § 14/20.

Here, Plaintiffs claim that Defendants have violated BIPA by harvesting App users' facial scans without obtaining their consent, and by transferring and selling users' biometric information to third parties. Compl. ¶¶ 408–10. Plaintiffs also allege that Defendants routinely violate BIPA's disclosure and retention requirements. *Id.* ¶¶ 411–15.

## C.    Proposed Settlement Agreement

In exchange for a release of all of these claims, and any potential claims based on Defendants' collection or handling of App users' data,[6] the Settlement Agreement

---

[6]    More specifically, the release covers "any and all claims, complaints, actions, proceedings, or remedies of any kind . . . arising from or related to the Civil Actions or the collection and use of any user data, including biometric data . . . arising from the beginning

provides for monetary relief in the form of a $92 million settlement fund and a range of injunctive remedies to prevent Defendants from engaging in the alleged privacy violations in the future.

### 1. Monetary Relief

Pursuant to the Settlement Agreement, Defendants have agreed to pay $92 million into an escrow account, to be distributed among class members according to a Court-approved plan of allocation. *See* Mot. Prelim. Approval Ex. C, Proposed Plan of Allocation, ECF No. 122-3. The plan provides that the settlement funds are to be paid out in the following descending order: (1) payment of expenses incurred in connection with administering the settlement; (2) taxes associated with the settlement; (3) attorneys' fees, service fees, and other fee awards; and (4) payment to class members who submitted valid claims. Settlement Agreement § 5.2.

Once administration costs, taxes, and fees are distributed, the remainder of the settlement fund will be divided into prorated shares "that are equal to the sum of (1) the total number of valid claims submitted by Nationwide Class members and (2) the total number of valid claims submitted by Illinois Subclass members multiplied by five." Mot. Final Approval at 14. Each Nationwide Class member who submitted a valid claim will receive one prorated share, and each Illinois Subclass member who submitted a valid claim will receive six prorated shares—one as a

---

of time" to the date that the final approval of the settlement is either affirmed on appeal or the date that the time to appeal the final approval order has expired. *See* Mot. Prelim. Approval Ex. A, Proposed Settlement Agreement and Release § 2.30 ("Settlement Agreement"), ECF No. 122-1.; *id.* § 2.12.

member of the Nationwide Class, and five as a member of the Illinois Subclass. *See id.* Based on Plaintiffs' estimates, each Nationwide Class claimant will receive $27.19 and each Illinois Subclass claimant will receive $163.13 in monetary relief from the settlement. *See id.*; Platt Decl. ¶ 43, ECF No. 196.

### 2. Injunctive Relief

The Settlement Agreement also contains expansive injunctive remedies. As part of the settlement, Defendants have agreed to refrain, and upon approval of the settlement will be enjoined, from engaging the following conduct, unless disclosed expressly in TikTok's Privacy Policy: (1) using the App to collect or store a user's[7] biometric information; (2) using the App to collect geolocation or GPS data; (3) using the App to collect information in users' clipboards;[8] (4) using the App to transmit user data outside of the United States; (5) storing user data in databases outside of the United States; and (6) uploading content generated by users to the App's servers before the user saves or publishes it. Settlement Agreement §§ 6.1–6.2; *see generally id.* at Addendum § 4.

Defendants also pledge to create, at their own expense, a comprehensive data privacy training and compliance program for all newly hired employees and contractors and to institute annual privacy training for all employees. *Id.* § 6.3. And

---

[7]    All references to "a user" or "users" in the Settlement Agreement refer to a United States user or users.

[8]    A phone's "clipboard" is the function that allows the user to store text, images, and videos for the purpose of copying and pasting them within an app or between apps. *See* Compl. ¶¶ 181–85.

14

Defendants have agreed to pay for a third party to monitor this training for three years and to provide written verification of the review. *Id.* at Addendum § 4.3.

**D.    Order Granting Preliminary Approval**

On February 25, 2021, Plaintiffs presented the Settlement Agreement, the plan of allocation, and a proposed notice plan to this Court for preliminary approval. *See* Mot. Prelim. Approval.  Three objections to the preliminary approval motion were filed: one by Mark S., ECF No. 126; one by Dennis Litteken, ECF No. 132; and one by Brian Behnken and Joshua Dugas, ECF No. 142.

After the parties submitted supplemental briefs regarding the adequacy of representation of minor class members, the possibility of in-App notice, and the process by which Plaintiffs valued the claims, the Court granted Plaintiffs' motion for preliminary approval on September 30, 2021.  *See generally In re TikTok*, 565 F. Supp. 3d 1076; Order Granting Prelim. Approval Class Action Settlement, *In re TikTok* (N.D. Ill. Oct. 1, 2021) (setting forth procedures for notice, filing claims and objections, and the final approval process) ("10/1/21 Order"), ECF No. 162.

The Court made three principal findings at the preliminary approval stage. First, it found that it "[would] likely be able to certify" the proposed classes for purposes of approving the settlement. *In re TikTok*, 565 F. Supp. 3d at 1087; *see* FED. R. CIV. P. 23(e)(1)(B)(ii).  Second, the Court found that the proposed settlement was "within the range of fairness, reasonableness, and adequacy" in light of numerous factors, including the strength of Plaintiffs' case, the complexity of potential ongoing litigation, the amount of opposition to the settlement, and the reaction from class

15

members. *In re TikTok*, 565 F. Supp. 3d at 1087 (citing *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014) (listing certain factors to be considered)). Finally, the Court approved the proposed notice plan because it provided the best notice practicable to all class members, with the caveat that Defendants were required to provide in-App notice of the settlement to American users. *Id.* at 1091–92; *see id.* at 1094.

In making these findings, the Court overruled three objections to preliminary approval. The Court first overruled Litteken's objections that the Settlement Agreement undervalued Plaintiffs' claims. In doing so, the Court noted that *In re Facebook*, the case Litteken cited to support his contention that the settlement undervalued the BIPA claims, was "a poor comparator" because Defendants, unlike Facebook, do not concede that they use facial recognition technology to harvest App users' biometric information. *See id.* at 1090 (citing *In re Facebook*, No. 15-cv-3747–JD, 2018 WL 2197546, at *2 (N.D. Cal. May 14, 2018)).

The Court also rejected Mark S.'s argument that the settlement did not account for conflicts between minor and non-minor class members. It found Mark S.'s contention that minor class members should receive more compensation because they could potentially disaffirm the arbitration agreements in the App's terms of service unpersuasive, because disaffirmance would likely "require individual minor class members, at the very least, to stop using the App," which seems improbable. *Id.* at 1085–86.

16

Additionally, the Court rejected Mark S.'s argument that the Court should have denied preliminary approval because Plaintiffs had not undertaken a detailed quantitative analysis of the net expected value of continued litigation to the class. Instead, the Court found that there were "other reliable indicators"—including the hard-fought negotiation process, two rounds of arbitration supervised by a former federal judge, and substantial confirmatory discovery—that supported a finding of reasonableness. *Id.* at 1087 (quoting *Kaufman v. Am. Exp. Travel Related Servs. Co.*, 877 F.3d 276, 285 (7th Cir. 2017)); *see id.* at 1088–89.

Finally, the Court overruled Behnken and Dugas's objection to the opt-out procedure. Behnken and Dugas argued that the notice plan's requirement that class members who desire to opt-out of the settlement complete, sign, and mail individual opt-out request forms to Plaintiffs' counsel violated their due process rights. *Id.* at 1092. But as the Court noted, the requirement that class members individually fill out and mail an opt-out request form is "a common and practical requirement" that is "consistently enforced" in MDL settlements. *Id.* at 1093 (quoting *In re Deepwater Horizon*, 819 F.3d 190, 197 (5th Cir. 2016)); *see id.* (collecting cases). Accordingly, the Court concluded that the opt-out procedure did not violate due process.

## E. The Notice Program and Claims Submission Period

### 1. Notice Program

After the Court granted preliminary approval, Plaintiffs disseminated notice to the class through a notice program developed by the settlement administrator, Angeion Group ("Angeion"). Mot. Final Approval at 18; *see generally* Platt Decl. Per

the Court's scheduling order, the notice period began on November 14, 2021, and concluded on March 1, 2022. *See* 10/1/21 Order at 7–8; Mot. Final Approval at 18.

Angeion created a settlement website that contained information about the claims and the settlement, a claim-submission portal, a downloadable claim form, and a list of dates and deadlines for submitting claims, filing objections, and opting out of the settlement. Platt Decl. ¶ 30; *see* www.TikTokDataPrivacySettlement.com. Angeion also established a toll-free automated hotline that provided callers with information about the settlement. *Id.* ¶ 32. Angeion then commenced a "multi-faceted campaign" that was intended to reach a majority of class members multiple times. Mot. Final Approval at 18.[9]

First, Angeion sent direct emails to nearly 81 million email addresses associated with users' accounts. Platt Decl. ¶ 7. Seventy percent of these emails (or around 56 million) were successfully delivered. *Id.* ¶ 10.

Second, Plaintiffs purchased digital advertisements and disseminated them using a "programmatic" advertising model that uses an algorithm to place advertisements on the websites that members of a given demographic group are likely to visit. *Id.* ¶ 12. According to Plaintiffs, the digital advertising campaign served over 126 million impressions to the Nationwide Class and over 3.4 million impressions to Illinois Subclass members. *Id.* ¶ 21.

---

[9] As required by the Class Action Fairness Act, 28 U.S.C. § 1715, Angeion also served a notice of the settlement, along with a copy of the Settlement Agreement, on the attorneys general of all fifty states, as well as United States territories and the Attorney General of the United States. *See* Platt Decl. ¶¶ 4–5.

Third, Angeion launched a social media campaign using ads on Facebook, Twitter, and Instagram. *Id.* ¶ 22. The social media campaign ran concurrently with the Internet advertising campaign and provided the Nationwide Class with over 115 million impressions through Facebook and Instagram and over 39 million impressions through Twitter. *Id.* ¶ 24. At the same time, the Illinois Subclass received over 7.1 million impressions through Facebook and Instagram and over 346,000 impressions through Twitter. *Id.* ¶ 25. Additionally, Plaintiffs implemented a "claims stimulation noticing program" that placed additional ads on Facebook, Twitter, and Instagram that were specifically designed to motivate class members to submit claims. *Id.* ¶ 27.

In total, Plaintiffs estimate that the notice program resulted in a 96.78% reach,[10] with an average frequency of three impressions per person. *See id.* ¶ 36.

Finally, on November 15, 2021, Defendants provided an in-App notification of the settlement to all United States-based TikTok accounts for users aged thirteen and older via the App's "Inbox" feature.[11] *Id.* ¶ 11. The notification read: "Class

---

[10]    The 96.78% figure references the "target audience" for Angeion's media campaign, not the Nationwide Class itself. Platt Decl. ¶¶ 14, 36. That said, because Angeion constructed the "target audience" based on a demographic profile of the class, and because the "target audience" is more than one-third of the estimated class size, the Court views the reach estimate as probative. *Id.* ¶¶ 13–19; *see, e.g.*, *Schneider v. Chipotle Mexican Grill*, 336 F.R.D. 588, 596 (N.D. Cal. 2020) (finding a publication notice plan that reached approximately 70% of 30 million-member target audience satisfied Rule 23).

[11]    App users under the age of thirteen participate in a "limited app experience" that does not have an inbox feature. *TikTok for Younger Users*, TIKTOK (Dec. 13, 2019), https://newsroom.tiktok.com/en-us/tiktok-for-younger-users (last visited May 22, 2022); Platt Decl. ¶ 11.

19

Action Settlement Notice: United States residents who used TikTok before 01 OCT 2021 may be eligible for a class settlement payment" and listed the URL of the settlement website. *Id.* Users who clicked on the notification were automatically directed to the settlement website. *Id.*

In addition to these notice efforts, there was considerable media coverage of the settlement. News outlets such as NBC News, Business Insider, and USA Today published online articles about the settlement that included links to the settlement website.[12]

### 2. Claims and Opt-Outs

The deadline to submit a claim was March 1, 2022. *Id.* ¶ 37. By that date, 1,215,541 valid claims had been submitted—1,038,517 from members of the Nationwide Class, and 177,024 from members of both the Nationwide Class and the Illinois Subclass.[13] *Id.* ¶ 38. Based on the parties' estimate of 89 million total Nationwide Class members and 1.4 million Illinois Subclass members, it appears that

---

[12]     Palmer Haasch, *TikTok May Owe You Money from its $92 Million Data Privacy Settlement*, Bus. Insider (Nov. 19, 2021, 1:17 PM), https://www.businessinsider.com/tiktok-data-privacy-settlement-how-to-submit-claim-2021-11 (last visited May 22, 2022); Morgan Sung, *That TikTok Notification About a Settlement Payment Isn't a Scam. Here's What to Know*, NBC News (Nov. 16, 2021, 8:13 PM), https://www.nbcnews.com/news/us-news/need-know-tiktoks-class-action-lawsuit-rcna5781 (last visited May 22, 2022); Kelly Tyko, *TikTok Class Action: You Might Get Money in the $92 Million Proposed Settlement. Here's How to File a Claim*, USA Today (Nov. 15, 2021, 10:19 PM) https://www.usatoday.com/story/tech/2021/11/17/you-might-get-money-tiktok-class-action-suit-talking-tech-podcast/8648781002/ (last visited May 22, 2022).

[13]     Angeion received 1,240,080 claim forms. After reviewing the forms, Angeion denied 24,539 for failing to check the box attesting that the claimant had used the App while residing in the United States prior to September 30, 2021, for failing to sign the form, or for being a duplicate of another claim. Platt Decl. ¶ 37.

approximately 1.4% of the Nationwide Class, and 13% of the Illinois Subclass, submitted a claim. *See id.*; Mot. Prelim. Approval at 17.

Requests for exclusion ("opt-outs") were due by January 31, 2022. *Id.* ¶ 39. By that date, Angeion had received 4,068 such requests. *Id.* But Angeion determined that only twenty-eight requests were "valid," because 4,040 requests were submitted in groups by four law firms on behalf of 2,253 individuals. Mot. Final Approval at 23. Angeion declared these requests invalid in light of the Settlement Agreement's prohibition on "mass opt-outs." *Id.* (citing Settlement Agreement § 10.1); *see* discussion *infra* section II.B.3.

After the notice and claims submission period closed, Plaintiffs filed a motion for final approval of the settlement and a motion for attorneys' fees on March 31, 2022. Four class members—Steven Helfand, Litteken, Jennifer Cochran, and Mark S.—filed objections. *See* ECF Nos. 182, 184, 186, 187. For the reasons set forth below, the Court overrules the objections and grants both motions.

## II.  <u>Analysis</u>

A court may approve a class action settlement if: (1) it is able to certify the settlement class; (2) the class was provided adequate notice and a public hearing; and (3) it determines that the settlement is "fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(1)–(2). The Court takes these inquiries in turn, before turning to the question of attorneys' fees and service awards.

### A.  **Class Certification**

#### 1.  **Legal Standard**

A plaintiff seeking class certification has the burden to show that their proposed class meets the requirements of Rule 23(a) and the requirements for one of the three types of classes identified in Rule 23(b). *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1004 (7th Cir. 2019). Rule 23(a) requires a plaintiff to show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a).

Furthermore, Plaintiffs here seek certification as a Rule 23(b)(3) class. This means that they also must show that "the questions of law or fact common to the class members predominate over any questions affecting only individual members," and that "a class action is superior over other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).[14]

## 2. Rule 23(a) Factors

### i. Numerosity, Commonality, and Typicality

As the Court observed at the preliminary approval stage, the numerosity, commonality, and typicality requirements of Rule 23(a) "are readily satisfied" here. *In re TikTok*, 565 F. Supp. 3d at 1085. The 89-million-member Nationwide Class (and

---

[14] The Court does not consider whether the case would be manageable as a class action because that inquiry is unnecessary to certify a settlement-only class. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

the 1.4 million-member Illinois Subclass) satisfies the numerosity requirement because it is far too large for joinder to be practicable. *See Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021). As to commonality, there are numerous "common contention[s] . . . capable of classwide resolution" here: most notably, whether Defendants harvested class members' personal information and biometric data without their knowledge or consent, and whether Defendants transferred this data to third parties without authorization in contravention of federal and state privacy laws. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). And, as typicality requires, the named Plaintiffs' claims "share the same essential characteristics" with those of the absent class members because each named Plaintiff used the same App and was subjected to the same alleged misconduct as the absent class members. *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 606 (7th Cir. 2021).

### ii. Adequacy of Representation

The only Rule 23(a) factor in dispute is the requirement that class representatives fairly and adequately represent the class. Rule 23(a)(4); *see Howard*, 989 F.3d at 609. The purpose of this requirement is to protect the rights of absent class members by "uncover[ing] conflicts of interest between named parties and the class they seek to represent" and to "screen[] for conflicts of interest among class members." *Howard*, 989 F.3d at 609 (quoting *Amchem*, 521 U.S. at 625).

The Court found Plaintiffs' representation of the class and subclass to be adequate at preliminary approval and sees no reason why the conclusion should be

any different now. The named Plaintiffs' interests are the same as those of the absent class members—both groups want to enjoy using the App without their data being collected and disseminated to third parties without authorization. And based on its prior review of Plaintiffs' counsel's qualifications, the Court is confident that they possess the necessary experience and capabilities to protect class members' interests, and that they have done so here.

Three objectors to the settlement—Helfand, Mark S., and Litteken—disagree. First, Helfand argues that the inclusion of the proposed Illinois Subclass creates a conflict among class members. According to Helfand, because other states also have privacy statutes like BIPA, members of the Illinois subclass should not receive any more compensation than others.

As a preliminary matter, the Court notes that a number of courts have referred to Helfand as a "serial objector," who has been disbarred for, among other things, filing groundless objections to proposed class action settlements. *See Collins v. Quincy Bioscience, LLC*, No. 19-22864-CIV, 2020 WL 7135528, at *1–2 (S.D. Fla. Nov. 16, 2020). This puts his credibility and motivations in doubt from the get-go.[15]

---

[15]     Courts overseeing class action settlements routinely find Helfand's credibility wanting. *See, e.g.*, *In re Equifax Customer Data Sec. Breach Litig.*, No. 17-md-2800-TWT, 2020 WL 256132, at *42 (N.D. Ga. Mar. 17, 2020) (reciting Helfand's "history of improper conduct in class action litigation"), *rev'd in part on other grounds*, 999 F.3d 1247 (11th Cir. 2021); *Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877, 890 (C.D. Cal. 2016) (identifying Helfand as a 'serial' objector[] who [is] well-known for routinely filing meritless objections to class action settlements for the improper purpose of extracting a fee rather than to benefit the Class"), *aff'd in part, vacated in part, and remanded on other grounds*, 980 F.3d 645 (9th Cir. 2020); *Brown v. Hain Celestial Grp., Inc.*, No. 3:11-cv-03082-LB, 2016 WL 631880, at *9–10 (N.D. Cal. Feb. 17, 2016) (noting that Helfand is a 'professional' objector[]" and that "courts

24

Nevertheless, putting his credibility issues to the side, the Court finds Helfand's argument to be meritless.  The Illinois Subclass exists because of BIPA's uniquely comprehensive private right of action.  Most of the other state statutes Helfand cites do not provide a private cause of action.[16]  And the only statute in his list that does—California's Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.140(a)(1)—provides for such actions only in the context of a defendant's failure to prevent data breaches, not for unauthorized collection of personal information.  *See id.* (allowing private suits based on "[a] business's violation of the duty to implement and maintain reasonable security procedures and practices . . . to protect [the plaintiff's] personal information."); *McCoy v. Alphabet, Inc.*, No. 20-cv-05427-SVK, 2021 WL 405816, at *8 (N.D. Cal. Feb. 2, 2021) (dismissing CCPA claim in case involving Google's alleged use of internal program to collect users' data without authorization because plaintiff did not allege a "security breach").  Accordingly, Helfand's objection is overruled.

Next, Mark S. contends that Plaintiffs and their counsel do not adequately represent the interests of minor class members.  In his view, the settlement should have contained a subclass for minor class members, because their ability to disaffirm the App's arbitration agreement and terms of service gives them a stronger litigation

---

across the country . . . have repeatedly turned aside [his] efforts to upend settlements").

[16]  *See, e.g.*, Ark. Code Ann. §§ 4-110-101, 4-110-108; Colo. Rev. Stat. §§ 6-1-713, 713.5; Md. Com. Law § 14-3501 *et seq.*; N.Y. Gen. Bus. Law § 899-aa(6); N.Y Lab. Law § 201-a; Tex. Bus. & Com. Code Ann. § 503.001; Wash. Rev. Code § 19.375.010 *et seq.*

position when compared to non-minor class members.

But the Court already has rejected this argument in its preliminary approval order, *see In re TikTok*, 565 F. Supp. 3d at 1086, and Mark S. offers no new reason for the Court to hold otherwise. First, as the Court has observed, twenty-eight of the thirty-five proposed class representatives are minors and, thus, have an interest in obtaining the best settlement for themselves and of other minor class members. Moreover, their attorneys have participated actively throughout these proceedings, including during the various settlement negotiations. To the extent that Mark S. worries that the interests of minor class members have not been protected there, such worries are baseless.

What is more, Mark S.'s argument is predicated on the idea that there are swaths of absent minor class members who either already have disaffirmed, or are willing to disaffirm, the App's arbitration agreement and terms of service. But this would likely require them to stop using the App—which, as Plaintiffs point out, is "a big ask given the App's widespread popularity" with children and teens. Pls.' Suppl. Mem. Further Supp. Mot. Prelim. Approval at 12, ("Pls.' Suppl. Mem. Supp. Prelim. Approval") ECF No. 137; *see, e.g., C.M.D. ex rel. De Young v. Facebook, Inc.*, 621 F. App'x 488, 489 (9th Cir. 2015) ("By continuing to use facebook.com after bringing their action, Plaintiffs manifested an intention not to disaffirm the contract."); *Doe #1 v. Coll. Bd.*, 440 F. Supp. 3d 349, 355 (S.D.N.Y. 2020) ("[A]fter disaffirmance a minor 'is not entitled to retain an advantage from a transaction which he repudiates.'" (quoting *I.C. ex rel. Solovsky v. Delta Galil USA*, 135 F. Supp. 3d 196, 208 (S.D.N.Y.

2015)); *Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1036 (N.D. Cal. 2020) (requiring minor to have stopped playing a video game in order to have disaffirmed its terms of service). Indeed, as Mark S. himself recognizes, it is unlikely that any more than a *de minimis* number of absent minor class members have exercised, or would exercise, their right to disaffirm, rendering any divergence in interests between minor and non-minor class members largely speculative and not the sort of "fundamental" intra-class conflict fatal to class certification. *Cohen v. Brown Univ.*, 16 F.4th 935, 945–46 (1st Cir. 2021) (quoting 1 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 3:58 (5th ed. 2011)); *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 813 (7th Cir. 2013) (courts should not decline to certify a class because of "the mere possibility that a trivial level of intra-class conflict may materialize"); *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012) (collecting cases).[17]

Mark S. also argues that a concurrent proceeding, *T.K. through Leshore v. ByteDance Technology Co., Ltd.*, No. 19 C 7915, 2022 WL 888943 (N.D. Ill. Mar. 25, 2022), inhibited Class Counsel's ability to aggressively advocate for the interests of the putative class here. In *T.K.*, the plaintiffs brought a putative nationwide class

---

[17] Mark S. also claims that Plaintiffs have failed to adequately represent minor class members under the age of thirteen because the settlement does not include a provision requiring Defendants to comply with COPPA and their consent decree with the FTC that requires them to destroy all personal information collected from all minors under the age of thirteen (including those who falsely indicated that they were over thirteen when they registered for a TikTok account). But Plaintiffs have not brought a COPPA claim here—nor could they, given that COPPA has no private right of action. *See Hubbard v. Google LLC*, 508 F. Supp. 3d 623, 629 (N.D. Ill. 2020). And, in any event, differences in the relief to which class members are entitled are not, standing alone, the sorts of conflicts of interest that raise adequacy of representation concerns. *See Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2009).

action on behalf of all TikTok users under the age of thirteen and their parents or legal guardians for violations of BIPA, among other things. *Id.* at *1. The case eventually concluded with a $1.1 million settlement, but when the *T.K.* court preliminarily approved the settlement, it entered a preliminary injunction that prohibited *T.K.* class members from bringing any new actions asserting a claim they had already asserted in *T.K. See* Order Granting Prelim. Approval ¶ 16, *T.K.*, No. 19 C 7915 (N.D. Ill. Dec. 19, 2019). According to Mark S., this hindered Class Counsel's ability to effectively represent minors under the age of thirteen in this case.

But this theory lacks merit for several reasons. First, far from abandoning their fiduciary duties to *T.K.* class members, Plaintiffs negotiated heavily with Defendants to ensure that the injunction in *T.K.* would not, as a practical matter, threaten the ability of under-age-13 class members to recover in this case. *See, e.g.*, Prelim. Approval Hr'g Tr. at 8:23, *In re TikTok* (N.D. Ill. Apr. 19, 2021), ECF No. 159. In fact, Defendants notified the *T.K.* court—and Class Counsel here—that they would not seek to enforce here the release entered in *T.K.* Minute Entry, *T.K.*, No. 19 C 7915 (N.D. Ill. Apr. 28, 2021), ECF No. 68. Thus, Class Counsel was free to ignore the *T.K.* release when negotiating the settlement here.

The third objector, Litteken, argues that Class Counsel—and in particular, Co-Lead Counsel Katrina Carroll—have maneuvered behind the scenes to secure a windfall for the Illinois Subclass at the expense of the Nationwide Class. In various filings in this case, Litteken and his counsel have accused Class Counsel of: (1) conspiring to exclude competing counsel from participating in the mediation that

led to the initial settlement agreement; (2) failing to disclose alleged personal and business ties between Carroll and a class representative; and (3) pressuring Litteken's counsel to drop his objection to the settlement. *See, e.g.*, Litteken Obj. at 10–14, ECF No. 184. Having reviewed Litteken's submissions, the Court finds that they contain little more than conjecture and do not legitimately call into question the adequacy of Class Counsel's representation of the class.

Like Helfand, Litteken also contends that the allocation of the settlement fund unfairly favors the Illinois Subclass, but this is unfounded for the reasons already discussed. Undeterred, Litteken offers two additional observations in this regard, but neither helps him. First, Litteken contends that Class Counsel eliminated the value of the BIPA claims by allowing Defendants to warrant that they have not violated BIPA. Litteken Obj. at 10–11 (citing Settlement Agreement §§ 7.1–7.3). But the fact that Defendants do not admit that they violated BIPA does not mean that the BIPA claim was meritless *ex ante*. And it is clear that Class Counsel did and will continue to do their own homework to extensively investigate the BIPA claim. *See, e.g.*, Pls.' Suppl. Mem. Supp. Prelim. Approval at 13–14; Carroll Decl. ¶¶ 38–39. Litteken's bald assertion that these efforts were a ruse intended to cover up Plaintiffs' collusion is sheer speculation.

Second, Litteken points to "new evidence" that TikTok "indeed allows ByteDance access to U.S. consumer data." Objector Dennis Litteken Notice of Suppl. Authority at 1, ECF No. 254 ("Notice of Suppl. Authority"). This "new evidence" comes from a recent *BuzzFeed News* investigation that revealed that some China-

based ByteDance employees can use a "backdoor" to access United States App users' data. *See* Letter from Brendan Carr, Commissioner, FCC, to Tim Cook, CEO, Apple Inc., and Sundar Pichai, CEO, Alphabet, Inc., at 1 (June 24, 2022) (citing Emily Baker-White, *Leaked Audio From 80 Internal TikTok Meetings Shows That US User Data Has Been Repeatedly Accessed From China*, BUZZFEED NEWS (June 17, 2022, 12:31 PM), https://www.buzzfeednews.com/article/emilybakerwhite/tiktok-tapes-us-user-data-china-bytedance-access?bfsource=relatedmanual ("Baker-White, *Leaked Audio*")). In Litteken's view, the investigation's findings confirm that Defendants agreed to settle this case not because they believed the BIPA claims were meritorious, but instead to "keep the focus and discovery away from its provision of sensitive U.S. consumer data to the Chinese government." Notice of Suppl. Authority at 1.

Even assuming that the Court were to take judicial notice of the investigation, Litteken cites nothing in the record to support his belief that Defendants were motivated to enter into the $92 million settlement due to fear that this news would become public. Nor does Litteken explain how the information revealed in the investigation, if true, increases the value of the non-BIPA claims relative to the BIPA claims, when BIPA itself contains a provision prohibiting unauthorized dissemination of user data. *See* 740 Ill. Comp. Stat. 14/15(d).[18] Accordingly, the Court overrules Litteken's objections as well.

---

[18] Indeed, according to BuzzFeed, China-based engineers have access to everything TikTok collects, which presumably includes any biometric information that TikTok stores. *See* Baker-White, *Leaked Audio*.

30

3.      **Rule 23(b)(3) Factors**

i.      **Predominance**

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members."  FED. R. CIV. P. 23(b)(3).  The predominance inquiry requires the Court to "understand what the plaintiffs will need to prove and [to] evaluate the extent to which they can prove their case with common evidence."  *In re Allstate Corp Sec. Litig.*, 966 F.3d 595, 603 (7th Cir. 2020).  That is, "it is the method of determining the answer and not the answer itself that drives the predominance consideration."  *Gorss Motels, Inc.  v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 845 (7th Cir. 2022).

Predominance is readily satisfied here.  In this case, class members allege that they were all subjected to uniform data- and information-harvesting practices as a result of their use of the App.  These allegations are readily amenable to generalized proof.  At trial, Plaintiffs would make their case by presenting evidence of Defendants' data collection practices and measuring those practices against their legal obligations.  They also would introduce evidence that Defendants affirmatively concealed their collection of App users' personal information and dissemination of the same to third parties.  And, to the extent that some of Plaintiffs' state law claims require inquiry into their expectations and beliefs concerning Defendants' handling of their data, these claims are judged by an objective, reasonable-person standard that is resolvable on a class-wide basis.  *See, e.g.*, *Edwards v. Ford Motor Co.*, 603 F. App'x 538, 541 (9th Cir. 2015)  ("[A]n objective 'reasonable person' standard under

California law [is] an inquiry that is the same for every class member."); *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012) ("Claims under the UCL and FAL are ideal for class certification because they will not require the court to investigate class members' individual interaction with the product." (alterations and internal quotation marks omitted)).

To this, Helfand argues that the Illinois Subclass cannot be certified because the class definition would require the Court to conduct individualized inquiries into whether the class member used the App within the state of Illinois and whether they used it to "create videos." These concerns are overblown.

By its terms, Rule 23 does not require the complete absence of individualized determinations, only that common questions predominate. *See* FED. R. CIV. P. 23(b)(3) (common questions must "predominate over any questions affecting only individual members"). And the core questions at issue (whether Defendants systematically harvest user information in violation of privacy laws) could be decided through common evidence.

### ii.    Superiority

To certify the classes under Rule 23(b)(3), the Court also must find that a class action is "superior over other available methods for fairly and efficiently adjudicating" this case, keeping in mind "the class members' interests in individually controlling the prosecution . . . of separate actions" and "the extent and nature of any litigation concerning the controversy already begun." FED. R. CIV. P. 23(b)(3).

This requirement also is satisfied. Individual class members would likely have

little interest in prosecuting a complex data privacy case against a multinational technology company on their own, especially considering the relative sums they could expect to recover in damages. *See, e.g.*, 740 Ill. Comp. Stat. 14/20 (providing that successful plaintiffs may recover the higher of actual damages or liquidated damages of $1,000 for a negligent violation and $5,000 for a willful violation); *see also Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec.*, 137 S. Ct. 2042, 2054 (2017) ("The very premise of class actions is that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." (citation omitted)). What is more, by its very nature, class certification and settlement of this sprawling MDL will save years of costly litigation and appeals. *See In re Equifax*, 2020 WL 256132, at *14 (finding the same with respect to data security MDL with 147 million class members).

For all of these reasons, the Court concludes that Plaintiffs have satisfied their burden to show that the proposed classes meet the requirements of Rules 23(a) and 23(b)(3). Accordingly, the Court certifies the Nationwide Class and Illinois Subclass for purposes of the settlement.

## B.    Rule 23's Notice Requirement

In order to approve the settlement, the Court must next find that the notice program provided to the class "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." FED. R. CIV. P. 23(c)(2); *see also* FED. R. CIV. P. 23(e)(1).

### 1.    Adequacy of Notice

Neither Rule 23 nor due process requires that every class member actually

33

receives notice. Instead, "notice suffices if it is reasonably calculated to reach the absent parties." 3 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 8:36 (5th ed. 2011) (updated 2021). According to the Federal Judicial Center, notice to at least seventy percent of the class generally meets this standard. *See* FED. JUDICIAL CTR., JUDGES' CLASS ACTION NOTICE AND CLAIMS PROCESS CHECKLIST AND PLAIN LANGUAGE GUIDE 3 (2010), https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf (last accessed May 22, 2022).

Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances. FED. R. CIV. P. 23(c)(2)(B). And Rule 23(e)(1)(B) requires "notice in a reasonable manner to all class members." FED R. CIV. P. 23(e)(1)(B). The Court finds that Plaintiffs have satisfied these requirements.

Angeion has presented evidence that its media notice campaign alone reached 96.78% of its 34.6 million-member target audience based on a data-driven demographic profile of TikTok users. Platt Decl. ¶¶ 13–14, 36. The direct email campaign also had tremendous impact, resulting in the delivery of the settlement notice to over 56 million email addresses, which were validated and "de-duped" to ensure that each address corresponded to a different individual App user. Platt Decl. ¶ 10. Even assuming a degree of crossover between the recipients of direct email notice and the target audience of the media notice campaign, the combination of these traditional notice methods clears the Federal Judicial Center's seventy-percent threshold.

In addition, TikTok sent the following in-App notice to the "inboxes" of all

United States-based TikTok accounts:[19]



Platt Suppl. Decl. Ex. A, ECF No. 241; *see id.* ¶¶ 3–4.  This message was sent to every TikTok account "having certain data corresponding to a United States location in the same manner that TikTok would distribute other TikTok-originated in-app notifications using the Inbox feature."  *Id.* ¶ 3.  Although there is no data as to precisely how many App users actually saw the notification, the number is likely quite high, given that a typical TikTok user would regularly check the App's inbox, which provides notifications for other in-App occurrences such as comments, likes, new followers, and direct messages.  *See Notifications*, TikTok, https://support.tiktok.com/en/using-tiktok/messaging-and-notifications/notifications (last accessed June 1, 2022).  And this method of providing notice within the application environment has been favorably adopted by other courts.  *See In re*

---

[19]    This does not include TikTok users under the age of thirteen, who participate in the special program "TikTok for Younger Users," which does not have an inbox feature.  *See supra* note 11.

*Facebook*, 522 F. Supp. 3d 617, 624 (N.D. Cal. 2021) (approving notice plan that caused notifications to be sent to Illinois-based Facebook users through the Facebook platform, where class was comprised of people who had used Facebook in Illinois); *see also Lane v. Facebook, Inc.*, No. C 08–3845 RS, 2010 WL 9013059, at *1 (N.D. Cal. Mar. 17, 2010), *aff'd*, 696 F.3d 811 (9th Cir. 2012) (approving notice plan that included platform notifications to Facebook users).

### 2. Objections to Notice Program

Mark S. objects to the notice program, contending that the target audience of the media notice campaign, which had a median age of 33.7, was too old. In support, he cites statistics showing that over half of TikTok users are between ten and twenty-nine years old. But as Plaintiffs point out, the notice plan was intended to give notice to the parents of many younger TikTok users, rather than the younger users themselves. This was a reasonable choice, given that parents are more likely than their children to understand their child's rights as a class member and file a claim on their child's behalf. *Cf.* FED. R. CIV. P. 23(c)(2)(B) (stating the detailed information that must be provided in a notice of class certification). And, even assuming for the sake of argument that the media notice campaign was in some way deficient, the combination of direct email notice and in-App notice more than satisfies Rule 23's requirements.

Taking a different tack, Litteken challenges the direct email notice campaign. In his view, Plaintiffs should have asked the Court to subpoena "app platform providers" for lists of the email addresses of every person who has downloaded the

App.  Litteken Obj. at 9.  Litteken argues that their failure to do so resulted in a claims rate "far below the double-digit participation rate[]" that he believes should have resulted here.  Litteken Resp. at 1, ECF No. 212.

As an initial matter, Litteken's proposal would have entailed additional costs to the class and created a risk of costly and distracting satellite litigation, if the subpoenas were contested.  Furthermore, Litteken's assumption that his proposal would have increased the claims rate has no support in the record.  Indeed, there may be "any number of reasons" why class members who receive notice do not file claims, and a low claims rate is not "necessarily indicative of a deficient notice plan." *Pollard v. Remington Arms Co., LLC*, 896 F.3d 900, 906 (8th Cir. 2018) (rejecting objectors' argument that a 0.29% claims rate was evidence of insufficient notice).  And the average claims rate for class sizes over 2.7 million is about 1.4%.  *See In re TikTok*, 565 F. Supp. 3d at 1090 n.6 (citing 2d Expert Decl. Prof. William B. Rubenstein ¶ 5, *In re Facebook*, No. 15-cv-3747–JD (N.D. Cal.), ECF No. 517-2).

Next, Mark S., Litteken, and Helfand all argue that the notice program violates Rule 23 because the deadline for a class member to object to the motion for final approval (January 31, 2022) preceded the deadline for Class Counsel to file their petition for attorneys' fees, (March 31, 2022).  Citing *Redman v. RadioShack Corp.*, the objectors contend that scheduling the objection deadline prior to the fee petition deadline contravened Rule 23(h)(2), which provides that class members must have an opportunity to object to the fee petition.  *See* 768 F.3d 622, 637–38 (7th Cir. 2014) (citing Fed. R. Civ. P. 23(h)).

37

*Redman* involved a class settlement of claims under the Fair and Accurate Credit Transactions Act, 15 U.S.C. § 1681(g). 768 F.3d at 627. In response to plaintiffs' motion for final approval of the settlement, multiple objectors argued before the district court that they were prevented from meaningfully objecting to the plaintiffs' attorneys' fee petition because the deadline to file objections to the settlement and the fee petition came before the fee petition was due. *See Redman v. RadioShack Corp.*, No. 11 C 6741, 2014 WL 497438, at *11 (N.D. Ill. Feb. 7, 2014), *rev'd*, 768 F.3d 622. The district court overruled the objections because the notice to class members included a disclosure of the amount the attorneys were seeking in fees. *Id.* Because the objectors knew the total amount that plaintiffs' attorneys would seek in fees, the district court concluded that class members were not prejudiced by the schedule. *Id.* at *12.

The Seventh Circuit reversed. It held that the schedule violated Rule 23(h) because setting the objection deadline before the fee petition deadline "handicapped" class members' ability to object to the petition. *See Redman*, 768 F.3d at 637–38. Although they knew the total amount the attorneys would seek in fees, they did not have the information they needed to object in a meaningful manner, including the breakdown of the attorneys' hours and expenses, and the attorneys' arguments in support of their fee petition. *Id.* at 638.

This case is readily distinguishable. In *Redman*, the objectors were not provided any opportunity to respond to the petition for attorneys' fees after it was filed. The deadline to object to the settlement and the deadline to object to the motion

for attorneys' fees were one and the same and preceded the deadline for plaintiffs' fee petition. *Redman*, 768 F.3d at 637; *see generally* Prelim. Approval Order, *Redman*, No. 11 C 6741 (N.D. Ill. May 29, 2013), ECF No. 101.  Here, the scheduling order provided class members and interested parties the opportunity to object to the fee petition by providing them an opportunity to respond to the fee petition on April 14, 2022—two weeks *after* the fee petition was due.  *See* 10/1/21 Order ¶ 25.  Accordingly, not only was the class aware in November 2021 that Plaintiffs' counsel intended to seek up to one-third of the settlement fund in fees, Mot. Prelim. Approval Ex. D, Settlement Notice ¶ 15, ECF No. 122-4, but class members had two weeks to analyze the petition after it was filed and submit a response.

The objectors acknowledge this, but still claim it is not enough.  As they see it, an individual, who did not submit an objection in January but wanted to file an objection to the fee petition in April, was precluded from doing so by the schedule. But there are two problems with this argument.  First, nowhere in the preliminary approval order or the Settlement Agreement does it say that a class member cannot respond to the fee petition if she did not submit an objection by January 31.  And, reading the Court's 10/1/21 Order in its entirety, a class member would have reasonably understood the opposite.[20]  Second, under the current schedule, a class

---

[20]    The objectors also argue that, even if class members were given an opportunity to respond, they were nevertheless "handicapped" in exercising that right because only the objection deadline, and not the deadline for responses to the fee petition, appeared on the settlement notice.  But Rule 23 does not require the settlement notice to contain every last bit of information necessary to file an objection.  *See* FED. R. CIV. P. 23(c)(2)(b), 23(e)(1)(B);

member concerned about the amount of requested fees could have filed a general objection before January 31 and a more complete response after the actual fee petition was filed. And indeed, consistent with this understanding, a number of class members (including all of the objectors) did exactly that.[21]

Based upon this record, the Court finds that the schedule proposed by Plaintiffs and approved by the Court, while not a model of clarity, provided class members with sufficient notice of the request for fees and sufficient time to respond to the "specifics" of the fee petition as Rule 23(h) and due process require. *See* FED. R. CIV. P. 23 advisory committee's note to 2003 amendment (stating that "the court should provide sufficient time . . . to enable potential objectors to examine the motion"); *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (constitutional due process requires "notice, reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"); *Cassese v. Williams*, 503 F. App'x

---

*Kaufman v. Am. Exp. Travel Related Servs. Co.*, 283 F.R.D. 404, 406 (N.D. Ill. 2012) (noting that the trial court has "nearly complete discretion to determine the form and content of notice to class members" and collecting cases); 3 RUBENSTEIN § 8:17 (same). And class members had clear notice of the separate response due date both from the 10/1/21 Order and the settlement website. *See* Platt Decl. ¶ 11; *id.* Ex. B, Settlement Notice, *passim*.

[21] For example, objector Jennifer Cochran filed a "conditional objection" to the fee petition on January 25, 2022, in which she noted that her counsel advised her that the Plaintiffs' anticipated request for one-third of the settlement fund in fees may be grounds for an objection. 1st Cochran Obj. at 1, ECF No. 186. Twelve days after Plaintiffs filed their motion for attorneys' fees, Cochran filed her actual "objection" to the motion, which engaged in some detail with the arguments in Plaintiffs' motion. *See* 2d Cochran Obj., ECF No. 207. Plaintiffs accepted that objection and responded to it in their reply brief in support of the motion.

40

55, 57–58 (2d Cir. 2012) (holding that notice of attorneys' fee motion was reasonable under the circumstances where, although objection deadline came before deadline for fee motion, class members who had filed objections "had two weeks to crystallize their objections and request further information," *id.* at 58), *cert. denied sub nom. Komar v. Cassese*, 569 U.S. 958 (2013).

### 3.    Motion To Accept Opt-Outs

The last issue bearing on the notice and claims submission process concerns a group of 851 individuals who move the Court to honor their requests for exclusion from the settlement ("Opt-Out Movants"). Rather than individually submitting their opt-out forms, these movants retained counsel who combined the opt-out forms and submitted them *en masse*. *See* Hart Decl. ¶¶ 6–11, ECF No. 207-1; Swigart Decl. ¶¶ 6–10, ECF No. 207-2; Kind Decl. ¶¶ 39–43, ECF No. 207-3. As a result, Angeion refused to accept the opt-out requests on the grounds that they were "mass opt-outs," which the preliminary approval order prohibited. Platt Decl. ¶ 40.

Opting out of a class action settlement is an "individual right" that "must be exercised individually" in order to protect the due process rights of class members. *In re Diet Drugs*, 282 F.3d at 241. As a result, courts routinely require class members to fill out and sign individually a hardcopy opt-out form in order to be excluded from a settlement and prohibit so-called "mass opt-outs," where an attorney or law firm files a single, unsigned opt-out form on behalf of a large group of class members. *See id.*; *In re Deepwater Horizon*, 819 F.3d at 197; *see also In re TikTok*, 565 F. Supp. 3d at 1093 (collecting cases).

41

For these reasons, the preliminary approval order required prospective opt-outs to individually fill out an opt-out form that set forth:

(i)     the name of the Action;

(ii)    the person's or entity's full name, address, email address and telephone number;

(iii)   a specific statement of the person's or entity's intention to be excluded from the Settlement;

(iv)    the identity of the person's or entity's counsel, if represented; and

(v)     the person's or entity's authorized representative's signature and the date on which the request was signed.

10/1/21 Order ¶ 10; *see* Settlement Notice ¶ 10.

The Opt-Out Movants have satisfied these requirements. Each completed a form that listed the name of the case, the individual's personal information, a statement of the individual's desire to be excluded in order to retain a right to file an individual lawsuit against TikTok, an identification of their counsel, and an e-signature and corresponding timestamp. The fact that they were signed electronically is of no moment, because their counsel provided evidence under seal documenting that each e-signature came from a separate, unique IP address.

The "mass-opt outs" prohibited in the preliminary approval order are very different from the opt-outs at issue here. Two objectors to preliminary approval, Behnken and Dugas, sought to "opt out *en masse* by means of a single unsigned, electronic filing from their lawyers." *In re TikTok*, 565 F. Supp. 3d at 1092. The Court found that permitting lawyers to submit mass opt-outs on behalf of their clients

without proof of individualized consent from every client would risk violating the due process rights of individual class members, who must be afforded the opportunity to personally decide whether to participate in the settlement. *Id.* at 1093 (citing *In re Centurylink Sales Pracs. and Sec. Litig.*, No. C 17-2832, 2020 WL 3512807, at *3–4 (D. Minn. June 29, 2020)); *see also In re Syngenta AG MIR162 Corn Litig.*, MDL No. 2591, 2016 WL 11782482, at *1 (D. Kan. Nov. 23, 2016) (an individual signature requirement "ensure[s] that those who actually may possess a potential claim are in fact the decision makers").

By contrast, the Opt-Out Movants have individually filled out forms that comply with the preliminary approval order's requirements. These forms bear the Opt-Out Movants' e-signatures, which are the legal equivalents of their handwritten signatures. *See, e.g.*, 15 U.S.C. § 7001(a)(1) (providing that in the commercial context, "a signature, contract, or other record relating to [a] transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form"). And their counsel have authenticated the signatures by providing documentation verifying that the signatures come from different individual IP addresses. *See* FED. R. EVID. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.").[22]

---

[22] TikTok also argues that counsel for the Opt-Out Movants improperly "solicited" opt-outs using deceptive advertising. But neither the Settlement Notice nor the Settlement Agreement makes any reference to prohibiting solicitation of opt-outs. And even if the Court

Accordingly, the Court concludes that Angeion erred in determining that the Opt-Out Movants' submissions violated the Settlement Agreement's prohibition on "mass opt-outs." The Court orders Angeion to accept the 851 opt-out requests, subject to a determination that they meet the remaining opt-out criteria.

## C. Rule 23(e)'s Fairness Inquiry

### 1. Legal Standard

The Court now turns to the adequacy of the settlement itself. Before approving the settlement, the Court must find that the terms are fair, reasonable, and adequate in light of numerous factors, including: "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of [the] settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) [the] stage of the proceedings and the amount of discovery completed." *Wong*, 773 F.3d at 863; *see* FED. R. CIV. P. 23(e)(2) (listing factors).[23] This analysis does not "focus on individual components of the settlement,

---

were to follow the cases TikTok cites and read a ban on solicitation into the agreement, TikTok has not provided any evidence that these advertisements actually caused confusion among class members. *Cf., e.g.*, Hr'g Tr. at 3:2–6:11, *In re Facebook*, No. 15-cv-3747–JD (N.D. Cal. Sept. 22, 2020), ECF No. 486 (describing evidence of widespread consumer confusion in connection with misleading opt-out communication).

[23] Congress amended Rule 23 in 2018 to add a list of concerns that courts should consider when deciding whether to approve a class action settlement. FED. R. CIV. P. 23(e)(2), advisory committee note to 2018 amendment; *see* FED. R. CIV. P. 23(e)(2)(A)–(D). But Congress stated that these factors were not intended to "displace" any of the tests devised by the courts of appeals. FED. R. CIV. P. 23(e)(2), advisory committee note to 2018 amendment. Therefore, the Court applies the factors as stated in *Wong*, with a "focus" on the "core concerns"

44

but rather views it in its entirety in evaluating its fairness." *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996) (cleaned up).

In conducting the fairness inquiry, the Court "consider[s] the facts in the light most favorable to the settlement." *Id.* (internal quotation marks omitted). But at the same time, it is mindful that, when sizeable class action settlements are concerned, the parties may have incentives to "sell out the class" by accepting a "deal that promotes the self-interest of both class counsel and the defendant[s]" at class members' expense. *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014). As a result, the Court must act akin to "a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 780 (7th Cir. 2014) (internal quotation marks omitted).

### 2. Strength of Plaintiffs' Case And Value of the Settlement

The first and "most important" factor in the fairness inquiry asks the Court to balance the strength of the merits of Plaintiffs' case against the value that they will receive from the settlement. *Wong*, 773 F.3d at 864. Twenty years ago, in *Reynolds v. Beneficial National Bank*, the Seventh Circuit advised that, in making this inquiry, district courts should "quantify the net expected value of continued litigation" by "estimating the range of possible outcomes and ascribing a probability to each point on the range." 288 F.3d 277, 284–85 (7th Cir. 2002) (Posner, J.). The *Reynolds* court

---

expressed in the amended Rule. *Id.* Indeed, the enumerated factors in Rule 23(e)(2) are discussed throughout this opinion. That said, to the extent necessary, the Court expressly finds that the settlement is fair, reasonable, and adequate under the factors set forth in Rule 23(e)(2).

noted that quantitative analysis was important because of the "suspicious circumstances" surrounding the settlement in that case, where the history of the parties' settlement negotiations suggested that the settlement may have been the product of collusion rather than good-faith negotiation. *Id.* at 284; *see id.* at 280–82.

More recently, the Seventh Circuit has endorsed a less formulaic scrutiny of class action settlements when indicia of trustworthiness—third-party mediation, extensive confirmatory discovery, and hard-fought, arm's-length negotiation—work against any suggestion of impropriety. *See Kaufman*, 877 F.3d at 285; *Wong*, 773 F.3d at 864; *see also In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Inj. Litig.*, 332 F.R.D. 202, 218–19 (N.D. Ill. 2019) (approving class action settlement without quantifying net expected value where parties had reached settlement terms after prolonged, arms-length mediation sessions and extensive discovery), *aff'd sub nom. Walker v. Nat'l Collegiate Athletic Ass'n*, No. 19-2638, 2019 WL 8058082 (7th Cir. Oct. 25, 2019).

The history of this case shows a vigorously negotiated settlement reached in good faith. As recounted above, the settlement was the product of months of arms-length negotiation punctuated by two mediation sessions led by a well-respected former federal judge. It was refined through further negotiation by a Court-appointed leadership group, whose members had different views as to what constituted a favorable settlement. Additionally, the parties have conducted substantial confirmatory discovery, including a detailed expert analysis of TikTok's source code. And Defendants have raised a vigorous factual and legal defense and continue to

dispute liability for every claim.

Given these indicia of an arm's length adversarial process, the Court finds it unnecessary to "undertake the type of mechanical mathematic valuation exercise" that *Reynolds* endorsed.[24] *In re TikTok*, 565 F. Supp. 3d at 1088. This, however, does not mean that the Court will simply rubberstamp the settlement. Rather, the Court still must consider carefully the benefits of the monetary and injunctive relief to the classes against the risks and potential benefits of potential future litigation. *See Kaufman*, 877 F.3d at 285.

The Settlement Agreement provides the classes with two substantial benefits. First is the $92 million settlement fund, which will provide immediate monetary relief to class members. Based on Plaintiffs' estimates, each Nationwide Class member who submitted a valid claim will receive $27.19, and each Illinois Subclass member who submitted a valid claim will receive $163.13; both are nontrivial amounts.

Not only are these sums meaningful in their own right, but they also compare favorably to the monetary relief provided in other data privacy class settlements. *See, e.g.*, *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 944 (N.D. Cal. 2013) ($15 per claim in case alleging misappropriation of users' likenesses), *aff'd sub nom. Fraley v.*

---

[24] Mark S. again contends that the settlement is the product of a "reverse auction," alleging that Defendants hand-selected certain attorneys to participate in the first round of mediation. But the Court is satisfied that the subsequent months of renegotiation led by the Court-appointed Class Counsel, which resulted in substantial revisions to the final settlement, sufficiently addressed any such concerns.

*Batman*, 638 F. App'x 594 (9th Cir. 2016); *In re Vizio, Inc., Consumer Priv. Litig.*, No. 8:16-ml-02693-JLS, 2019 WL 12966638, at *4 (C.D. Cal. July 31, 2019) (VPPA settlement providing $16.50 per claim). Indeed, many privacy class actions award only *cy pres* relief. *See In re Google Inc. Street View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1113–14 (9th Cir. 2021) (collecting cases).

Along with the monetary relief, class members also receive wide-ranging injunctive relief that prohibits Defendants from collecting and transferring their data without their express consent. The Settlement Agreement also requires TikTok to delete all pre-uploaded content contained in its servers and refrain from collecting such content in the future without prior user consent. Furthermore, TikTok must implement a privacy compliance and training program for all of its employees, and its compliance with the program will be verified a third-party auditor for the first three years after the settlement is finalized. These injunctive remedies confer substantial benefits to the class. *See In re Equifax*, 2020 WL 256132, at *38 (holding that injunctive relief imposing data privacy compliance and monitoring requirements on defendants was of great value to the class).

With these benefits in mind, the Court must weigh them against "the probabilities and possibilities of victory or defeat" if litigation were to continue. *See Dorvit ex rel. Power Sols. Int'l, Inc. v. Winemaster*, 950 F.3d 984, 988 (7th Cir. 2020) (quoting *United Founders' Life Ins. Co. v. Consumers Nat'l Life Ins. Co.*, 447 F.2d 647, 655 (7th Cir. 1971)). Here, the significant litigation risks Plaintiffs would face if the cases were to proceed weigh heavily in favor of approving the settlement.

48

Foremost of these are the class action waivers and mandatory individual arbitration clauses contained in TikTok's terms of service,[25] to which every class member agreed when they signed up for a TikTok account. All parties concur that, if Defendants were able to enforce these clauses, Plaintiffs' claims would be essentially worthless due to the prohibitive time and expense that individual arbitration would impose upon each individual user. For example, a claimant would need to shoulder the cost of retaining an expert to prove that the App illegally expropriated their personal information. *See Kaufman*, 877 F.3d at 285; *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 245 (2013) (Kagan, J., dissenting) ("No rational actor would bring a claim worth tens of thousands of dollars if doing so meant incurring costs in the hundreds of thousands.").

Indeed, if Defendants were to bring a motion to compel arbitration against each Plaintiff, she would face an uphill battle. *See, e.g.*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) ("Courts routinely uphold [such] agreements for the

---

[25] Specifically, the terms of service provide that:

> Any Claim must be brought in the respective party's individual capacity, and not as a plaintiff or class member in any purported class, collective, representative, multiple plaintiff, or similar proceeding ("Class Action"). The parties expressly waive any ability to maintain any Class Action in any forum. . . . The parties understand that any right to litigate in court, to have a judge or jury decide their case, or to be a party to a class or representative action, is waived, and that any claims must be decided individually, through arbitration.

*Terms of Service*, TIKTOK, https://www.tiktok.com/legal/terms-of-service?lang=en, (last visited May 24, 2022).

principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'"); *Wilcosky v. Amazon.com, Inc.*, 517 F. Supp. 3d 751, 765–66 (N.D. Ill. 2021); *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 587 (N.D. Cal. 2020); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 469–70 (S.D.N.Y. 2017); *In re Facebook*, 185 F. Supp. 3d at 1166–67; *Miracle-Pond v. Shutterfly, Inc.*, No. 19-CV-04722, 2020 WL 2513099, at *6–7 (N.D. Ill. May 15, 2020).

Plaintiffs' assent to the App's terms of service creates another set of problems for them. Some of Plaintiffs' claims require them to prove that Defendants accessed their information "without authorization." 18 U.S.C. § 1030(a)(2) (CFAA); *see also, e.g.*, CAL. PENAL CODE § 502(c)(2) (CCDAFA) (imposing liability on one who "[k]nowingly accesses and without permission takes, copies, or makes use of any data"). The FAL and UCL claims require actual reliance on misrepresentations or nondisclosures. *See Williams v. Apple, Inc.*, 449 F. Supp. 3d 892, 912 (N.D. Cal. 2020). The California right-to-privacy claims require an unwelcome "intrusion" into their private lives so serious "as to constitute an egregious breach of . . . social norms." *Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1072 (Cal. 2009) (quoting *Hill v. Nat'l Collegiate Athletic Ass'n*, 865 P.3d 633, 655 (Cal. 1994)). And the unjust enrichment claims ask whether Defendants unfairly possess data to which they are not entitled. *See Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1065 (N.D. Cal. 2020). All of these claims could be undermined by the App's terms of service and privacy policy, which disclose the ways in which Defendants collect, use, and share data and

information submitted by App users.[26]

Defendants also could argue that Plaintiffs lack Article III standing to bring some of their claims, given that a "bare procedural violation" of a federal statute, without more, does not confer standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2213 (2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)); *see, e.g.*, *Thornley v. Clearview AI, Inc.*, 984 F.3d 1241, 1248 (7th Cir. 2021) (holding that plaintiffs' claims that Defendants violated BIPA by selling their data to third parties, without more, did not constitute Article III injury in fact).

Proving damages would present another set of hurdles. For example, courts typically hold that the unauthorized collection and transmission of a plaintiff's personal information, without more, does not constitute "economic damages" under the CFAA. *See, e.g.*, *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1262–63 (9th Cir. 2019) (the CFAA's "narrow conception of loss," *id.* at 1262, does not include expropriation of personal information); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1069 (N.D. Cal. 2012) (Koh, J.) (collecting cases). And, although VPPA provides for statutory damages, in practice, many VPPA cases end up settling, often for a smaller recovery than Plaintiffs will receive here. *See, e.g.*, *In re Vizio*, 2019 WL

---

[26]    *See, e.g.*, *Privacy Policy*, TikTok (June 2, 2021), https://www.tiktok.com/legal/privacy-policy-us?lang=en (stating that TikTok and its affiliates "automatically collect certain information from you when you use the [App], including internet or other network activity information such as your IP address, geolocation-related data . . . unique device identifiers, browsing and search history (including content you have viewed in the [App]), and Cookies"); *id.* (explaining how Defendants "share the categories of personal information listed above" with third parties).

12966638, at *4 (VPPA settlement resulting in $16.50 award per claimant after two motions to dismiss); *In re Netflix Priv. Litig.*, No. 11 C 379, 2013 WL 1120801, at *1–2 (N.D. Cal. Mar. 18, 2013) (*cy pres*-only relief that would have provided $0.14 per class member). Consumer class action settlements under BIPA also typically provide only relatively modest relief. *See, e.g.*, *Prelipceanu v. Jumio Corp.*, No. 2018 CH 15883 (Cir. Ct. Cook Cnty. July 21, 2020) ($41.17 per claimant).

In light of the foregoing, the objectors' contentions that the Settlement Agreement provides inadequate value to class members are unpersuasive. Litteken, in particular, argues that the settlement compares unfavorably to other large data privacy class settlements, contrasting the monetary relief in this case with the $93.14 per-class-member settlement in *In re Facebook*, 522 F. Supp. 3d 617. There, Facebook agreed to pay $650 million to settle BIPA claims of Illinois residents whose facial recognition information Facebook had surreptitiously collected. *Id.* at 620–21. But that case featured none of the aforementioned obstacles that Plaintiffs face here, and had other distinguishing factors.

For example, *In re Facebook* settled on the eve of trial, after plaintiffs had survived multiple motions to dismiss and motions for summary judgment and had won a hotly contested motion for class certification in the district court and on appeal. *See id.* at 621; *see also, e.g.*, 326 F.R.D. 535, 540 (N.D. Cal. 2018), *aff'd sub nom. Patel v. Facebook, Inc.*, 932 F.3d 1264 (9th Cir. 2019). Unlike in this case, where Defendants categorically deny that they collected facial recognition data without authorization, *see, e.g.*, Defs.' Suppl. Answers at 7, ECF No. 139, Facebook admitted

that it had used "tagging" software to collect facial recognition information from Facebook users in Illinois, while denying that this conduct violated BIPA. *See In re Facebook*, 2018 WL 2197546, at *2. For these reasons, the Court finds that *In re Facebook* is "a poor comparator" to judge the value of the settlement in this case. *In re TikTok*, 565 F. Supp. 3d at 1090.[27]

For all of these reasons, the Court overrules Mark S.'s and Litteken's objections to the value of the settlement to the class and finds that the relief the Settlement Agreement provides is substantial when considered against the risks and potential pitfalls of Plaintiffs' case.

### 3. Other Settlement Factors

The remaining settlement factors also support a finding that the settlement is fair, reasonable, and adequate.

Given the nature of the claims and number of putative class members, the complexity, length, and expense of future litigation in this case would be enormous. *See Wong*, 773 F.3d at 863. Proceeding to trial would take years of motion practice and extensive fact and expert discovery, assuming Plaintiffs could survive motions to compel arbitration and to dismiss. Moreover, because this is an MDL, once the Court is finished with pretrial proceedings, the individual cases must return to the transferor courts for trial preparation and trial, which would consume inordinate

---

[27] On a related note, objector Mark S. argues that the "net expected value" of the litigation to the class is more than ten times the size of the settlement fund. But for much of the reasons already discussed, the Court finds this unpersuasive.

judicial resources. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 23, 34–35 (1998).

The relative dearth of opposition to the settlement and the reaction of class members weighs in favor of approval as well. *See id.* With over 1.2 million claims filed and a class that includes approximately one in four Americans, only four class members have filed objections to the settlement, and only 4,068 have requested to be excluded. This level of opposition is remarkably low, especially for a widely publicized consumer class action concerning a popular social media platform. *Cf., e.g.*, *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 495 (N.D. Ill. 2015) (finding that, in case with a class size of 10 million, the fact that only twenty class members filed objections supported reasonableness of settlement, and collecting cases); *In re Equifax*, 2020 WL 256132, at *10 (referring to 388 objectors as a "miniscule number" in an MDL with a class size of 147 million and 15 million claims). Furthermore, two of the objectors are "serial" objectors who "have unsuccessfully asserted the same or similar objections in other class action settlements." *In re Equifax*, 2020 WL 256132, at *41 (referring to a group of objectors including Helfand); *see also* 1st Cochran Obj. at 3.

Additionally, the opinion of competent class counsel supports approval of the proposed settlement. *See Wong*, 773 F.3d at 863; *see also Jones v. Singing River Health Servs. Found.*, 865 F.3d 285, 300 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 1000 (2018). Here, the Court hand-picked a diverse group of highly qualified attorneys to represent the class, including attorneys who were not part of the pre-MDL settlement negotiations and who had voiced concerns regarding various aspects of the original

54

terms. The Court's intent was to force Plaintiffs' counsel who disagreed with one another to work together, and after going back to the drawing board, all three members of Plaintiffs' Co-Lead Counsel now attest that the settlement is fair, reasonable, and adequate.[28]  *See* Carroll Decl. ¶ 41; Rhow Decl. ¶ 23; Fegan Decl. ¶ 26, ECF No. 122-7. So too has Judge Phillips, a highly respected mediator. *See* Phillips Decl. ¶ 12, ECF No. 122-9.

The last factor—"the stage of the proceedings and the amount of discovery completed"—asks "how fully the district court and counsel [were] able to evaluate the merits of plaintiffs' claims" before reaching the settlement. *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 350 (N.D. Ill. 2010) (quoting *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 325 (7th Cir. 1980)). Although the settlement was reached at an early stage of litigation, Class Counsel conducted voluminous confirmatory discovery between the initial signing of the Settlement Agreement and Plaintiffs' motion for preliminary approval. Most notably, Plaintiffs retained a programming expert to conduct a two-week-long, in-person inspection of TikTok's source code, which gave Plaintiffs a more comprehensive understanding of the App's technology and served as a launchpad for further discovery. Carroll Decl. ¶¶ 29–39; *see id.* Ex. A, Zeidman Curriculum Vitae. This confirmatory discovery provided the parties with enough information to make an

---

[28]    It is also worth noting that Defendants' counsel appears to view the settlement as a boon for the class. *See, e.g.*, Defs.' Suppl. Answers at 6–7; Final Approval Hr'g Tr. at 43:9–11, *In re TikTok* (N.D. Ill. May 18, 2022), ECF No. 247.

informed decision about settlement.  *See Does 1–2 v. Déjà Vu Servs., Inc.*, 925 F.3d 886, 898–99 (6th Cir. 2019) ("[C]ourts have held that settlements are permissible where, 'notwithstanding the status of discovery, plaintiffs' negotiators had access to a plethora of information regarding the facts of their case.'" (quoting *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981)); *Cottle v. Plaid Inc.*, 340 F.R.D. 356, 376 (N.D. Cal. 2021).

For the above reasons, the Court finds that the proposed settlement is fair, reasonable, and adequate pursuant to the standards set forth in Rule 23(e).  And, with all three prerequisites—class certification, notice, and fairness—now satisfied, the Court grants Plaintiffs' motion for final approval of the class settlement.

## D.     Attorneys' Fees and Service Awards

### 1.     Legal Standard

One final issue remains—the compensation due to the attorneys, class representatives, and objectors.  Rule 23(h) permits a district court to award reasonable attorneys' fees "that are authorized by law or by the parties' agreement." FED. R. CIV. P. 23(h).  But in doing so, courts must be aware of the potential conflict of interest between class counsel and the class that arises when class counsel asks for fees to be paid out of a common fund, because every dollar the attorneys receive is a dollar that the class does not.  *Redman*, 768 F.3d at 629, 633 (courts must "bear[] in mind that the higher the fees the less compensation will be received by the class members").

When evaluating the reasonableness of a request for attorneys' fees, the

Seventh Circuit has stated that the district court must "compare attorney fees to what is actually recovered by the class," *In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, 867 F.3d 791, 793 (7th Cir. 2017), with a goal "to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, 897 F.3d 825, 832–33 (7th Cir. 2018) (quoting *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007)).

Because the market-price estimation is "inherently conjectural," district courts have discretion to use either the percentage method, which awards fees as a percentage of the common fund, or the "lodestar" method, which awards fees based on the attorneys' hours and billing rates, to assess the reasonableness of a fee request. *Douglas v. W. Union Co.*, 328 F.R.D. 204, 220 (N.D. Ill. 2018) (quoting *In re Trans Union Corp. Priv. Litig.*, 629 F.3d 741, 744 (7th Cir. 2011)), *aff'd*, 955 F.3d 662 (7th Cir. 2020); *see* 5 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 15:63 (5th ed. 2011) (updated 2021). Courts frequently use the percentage method in the first instance and cross-check the amount using the lodestar method. *See Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011); 5 RUBENSTEIN § 15:88 (stating that the lodestar cross-check is "a means of ensuring that the percentage award is not a windfall" to the attorneys). The Court will do so here, first with respect to Class Counsel's motion for attorney' fees and then with respect to the other fee petitions.

## 2. Class Counsel's Motion for Attorneys' Fees

i. **Percentage Method**

Class Counsel request $30,660,539.91 in attorneys' fees. Assessing the reasonableness of this request under the percentage method is a two-step process. First, the Court determines the value of the fund against which the requested fee percentage will be calculated. This is surprisingly complex because the gross value of the fund is not the proper denominator. Instead, the Seventh Circuit repeatedly has stated that a percentage fee award should be calculated against "the value received from the settlement by the members of the class"—*i.e.*, the net common fund after deduction of administrative expenses, litigation expenses, and service awards. *Pearson*, 772 F.3d at 781 (citing *Redman*, 768 F.3d at 630).

Here, the gross settlement fund is $92 million. After deducting $3,276,268.43 in notice and settlement administration expenses, $789,944.00 in litigation expenses, and $90,000 in service awards, the net common fund is $87,843,787.95. Platt Decl. ¶ 43; Pls.' Mot. Attys.' Fees ("Fee Mot.") at 3, ECF No. 197.

Second, the Court must consider the percentage of the fund that Class Counsel seek and determine whether that percentage—and the dollar amount resulting from it—is "reasonable." FED. R. CIV. P. 23(h); *see* 5 RUBENSTEIN § 15:72. In the Seventh Circuit, a percentage fee is reasonable if it roughly approximates the market rate for legal services, in light of the risk undertaken by the attorneys and the benefit conferred to the class. *See Camp Drug Store*, 897 F.3d at 832–33; *In re Sears*, 867 F.3d at 793. In making this inquiry, courts also can "look to actual fee agreements, data from similar cases, and class-counsel auctions" for guidance. *In re Stericycle Sec.*

*Litig.*, 35 F.4th 555, 560 (7th Cir. 2022) (quoting *Taubenfeld v. Aon Corp.*, 415 F.3d 597, 599 (7th Cir. 2005)).

Throughout this litigation, Class Counsel have stated—both to this Court and to the class in the settlement notice—that they intended to seek ""up to 33.33% of the Settlement Fund" in fees. Settlement Notice ¶ 15. And so here, Class Counsel seek one-third (33.33%) of the gross common fund in fees. But when calculated against the net common fund, the $30,660,539.91 requested actually constitutes approximately 34.9% of the common fund. Class Counsel argue that they are entitled to the higher number, citing cases where courts have approved percentage awards of 35 percent or higher. But Class Counsel has repeatedly stated that they will seek no more than one-third of the settlement fund in fees, *see, e.g.*, Settlement Notice ¶ 15, and the Court holds them to their promise. One-third of $87,843.787.95 (the net common fund) amounts to $29,279,203.44.

The objectors believe that this is still too much and ask the Court to adopt a "sliding scale" approach, which decreases the attorneys' fee percentage as the size of the overall settlement fund increases. *See In re Synthroid Mktg. Litig.*, 325 F.3d 974, 980 (7th Cir. 2003) ("*Synthroid II*") (applying a formula under which class counsel received 30% of the first $10 million in the fund, 25% of the next $10 million, and so on). The objectors contend that the size of the settlement and the early stage of litigation at which the settlement was reached support the use of a similar formula here.

Neither of those considerations compels the use of a sliding-scale approach in

this case. Although many sliding-scale cases involve large fund sizes, many courts confronted with settlement funds in the tens of millions do not use a sliding-scale formula. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2021 WL 5709250, at *5 (N.D. Ill. Dec. 1, 2021) (rejecting sliding-scale approach and awarding 33% of a $150 million settlement fund in fees). And, as demonstrated by the lodestar cross-check below, a flat percentage fee does not create a windfall to Class Counsel in light of the amount of work performed in this case and the risk involved.

Litteken's reliance on the Seventh Circuit's recent decision in *In re Stericycle Securities Litigation* is unavailing. In *Stericycle*, the Seventh Circuit held that the district court abused its discretion in awarding 25% of a $45 million securities fraud settlement to class counsel, because the district court did not consider the existence of an actual *ex ante* fee agreement or give sufficient weight to other factors, including prior litigation success (which reduced the risk of nonpayment) and the early stage of the litigation. *See Stericycle*, 35 F.4th at 562–66. But contrary to Litteken's contention, *Stericycle* did not create a general presumption in favor of a sliding-scale approach for large cases. Instead, the *Stericycle* court spoke approvingly of using a sliding-scale approach in cases where an actual *ex ante* fee agreement also has adopted a sliding-scale formula. *Id.* at 563 (district courts should give such agreements "substantial weight" in the reasonableness analysis).[29]

---

[29] A number of other factors distinguish *Stericycle* from this case. For example, the risk of nonpayment here was far higher than in *Stericycle*, in which "prior litigation . . . and subsequent, very substantial settlements" suggested that class counsel were reasonably sure

60

Indeed, as Class Counsel points out, a flat percentage fee award of one-third of the net common fund is typical in other data privacy settlements, including many BIPA settlements that courts have approved within this district. *See, e.g.*, *Crumpton v. Octapharma Plasma, Inc.*, No. 19-cv-08402, slip op. at 5–6 (N.D. Ill. Feb. 16, 2022); *Martinez v. Nando's Rest. Grp., Inc.*, No. 1:19-cv-07012, slip op. at 4 (N.D. Ill. Oct. 27, 2020); *Dixon v. Wash. and Jane Smith Home*, No. 17-cv-8033, slip. op. at 1 (N.D. Ill. Aug. 20, 2019).

A one-third flat fee also is routine for class action settlements in similarly complex fields, such as antitrust litigation, *see, e.g.*, *In re Broiler Chicken*, 2021 WL 5709250, at *4 (awarding a flat 33% of a $150 million common fund and stating "fee awards in antitrust cases in this circuit are almost always one-third"), and consumer protection litigation. *See, e.g.*, *Charvat v. Valente*, No. 12-cv-05746, 2019 WL 5576932, at *11 (N.D. Ill. Oct. 28, 2019) (collecting cases). Furthermore, a one-third fee aligns with the one-third contingency fee routinely charged by class action lawyers across the country. *See* 5 RUBENSTEIN § 15:73 ("The age-old assumption is that tort lawyers receive a third of their clients' recovery."); *id.* at n.9 (collecting cases); *see also Furman v. At Home Stores, Inc.*, No. 1:16–cv–08190, 2017 WL 1730995, at *4 (N.D. Ill. May 1, 2017) (the fact that "plaintiffs routinely agree to a one-third contingency fee arrangement[] reinforces that Plaintiff's Counsel are requesting the proper

---

of payment. *Id.* at 563. Furthermore, prior litigation had laid the groundwork for the *Stericycle* attorneys, who relied on that evidence to negotiate the settlement. *Id.* at 563–65. Here, Class Counsel had to do their own work.

61

market rate").

The significant litigation risks to Plaintiffs described above also increase the market value of Class Counsel's representation. *Camp Drug Store*, 897 F.3d at 833; *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 721 (7th Cir. 2001) ("*Synthroid I*"). Larger contingency fees are generally needed to persuade lawyers to take riskier cases because there is a lower chance that they will receive anything at the end. *See* John Leubsdorf, *The Contingency Factor in Attorney Fee Awards*, 90 YALE L.J. 473, 481–82 (1981) (endorsing a "probabilistic rationale" for awarding fees under which the size of the fee award correlates with the risk of nonpayment). Admittedly, quantifying risk is a challenging exercise, but in *Florin v. Nationsbank of Georgia, N.A.*, 60 F.3d 1245 (7th Cir. 1995), the Seventh Circuit held that factors supporting the reasonableness of plaintiffs' fee request included (1) the "unsettled and complex" nature of the law of the case; (2) numerous "plausible defenses" available to the defendants; and (3) legitimate doubts about whether the plaintiffs had suffered actual injury. *Id.* at 1247. All three factors support the fee award Class Counsel seek here.

Data privacy law is a relatively undeveloped and technically complex body of law, which creates uncertainty and, therefore, additional risk for Class Counsel. Defendants have a wide array of defenses to Plaintiffs' claims, some of which—the arbitration clause in particular—are more than "plausible." And as in *Florin*, damages may be difficult to recover for many of Plaintiffs' claims, which are untested.

The quality and amount of work that Class Counsel have performed also supports a one-third percentage fee. Class Counsel's timesheets indicate that several

of the lead attorneys have devoted essentially their entire professional lives to this case over the last three years. And judged in light of the considerable litigation risks and in comparison with other data privacy settlements, they have secured a substantial benefit to the class. The need to provide financial incentives for zealous and effective representation of consumers in legally and technologically complex data privacy cases such as this—especially in the age of pervasive social media—weighs in favor of granting the request. *Cf. In re Broiler Chicken*, 2021 WL 5709250, at *3 (noting that a substantial fee is necessary to attract high-quality counsel to litigate complex cases).

Finally, the quality of representation Defendants had for their defense supports the fee request as well. *See In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 357–58 (S.D.N.Y. 2005) (fact that class counsel "faced formidable opposing counsel from some of the best defense firms in the country" supported reasonableness of fee request, *id.* at 358). Defendants are represented by Wilson Sonsini Goodrich and Rosati, which is one of the leading privacy and data security law firms in the United States according to the legal industry researcher Chambers and Partners. *See Privacy and Data Security: The Elite in USA Legal Rankings*, CHAMBERS AND PARTNERS, https://chambers.com/legal-rankings/privacy-data-security-usa-2:3220:225:1 (last accessed May 30, 2022). Indeed, Defendants' counsel has secured victories for major technology companies in several similar consumer privacy cases. *See, e.g.*, *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 266, 295 (3d Cir. 2016) (affirming dismissal of VPPA and state law claims); *Mollett v. Netflix, Inc.*, 795

F.3d 1062, 1063–64 (9th Cir. 2015) (same). That Class Counsel were able to secure a favorable settlement in the face of this opposition weighs in favor of a one-third fee.

The objectors raise a flurry of additional arguments in opposition to the fee request. They complain that the settlement is simply too large for a one-third percentage fee to be reasonable. The Seventh Circuit, however, has "explicitly rejected" the so-called "megafund rule," which caps fees at a given percentage (usually ten to fifteen percent) where the size of the fund exceeds a certain amount, "because it [creates] a perverse incentive." *In re Broiler Chicken*, 2021 WL 5709250, at *3 (citing *Synthroid I*, 264 F.3d at 718 ("Private parties would never contract for such an arrangement, because it would eliminate counsel's incentive to press for more than [the threshold fund size] from the defendants.")); *see also In re Equifax*, 2020 WL 256132, at *36 (collecting cases rejecting the megafund rule)).

Next, the objectors contend that Class Counsel did not perform enough substantive work on the case to justify their requested percentage. That argument fails to appreciate the nearly three-year history of this case, the considerable resources Class Counsel have expended in confirming the merits of the classes' claims, and the novelty of many of the issues involved. *See, e.g.*, *In re Equifax*, 2020 WL 256132, at *32–33 (novelty and difficulty of legal issues in data privacy case strongly supported class counsel's fee request).

Litteken also argues that the United States government, and not Class Counsel, should get most of the credit for the settlement because Defendants agreed to settle only after the Trump Administration ordered ByteDance to sell its United

States-based operations.  Without more, however, the timing of the settlement alone does not permit an inference that the settlement efforts would have failed if not for the Executive Order.  *Cf. Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015) (timing alone is generally insufficient to establish causation).  But even assuming, for the sake of argument, that this external pressure played a role in Defendants' decision to settle this case, the Court declines to discount their fees on that basis.  If anything, attorneys should be rewarded, not punished, for leveraging external pressure (of course, within ethical bounds) to zealously promote the interests of their clients.

### ii. Lodestar Cross-Check

A lodestar cross-check also confirms the reasonableness of the one-third amount.  Under this approach, the Court first calculates the "lodestar" amount,  by multiplying the attorneys' reasonable hourly rates by the number of hours the attorneys reasonably expended on the case.  *See* 5 RUBENSTEIN § 15:87.  The proposed fee award then is divided by that amount, yielding a "multiplier," which is used to assess the reasonableness of the fee amount.  *Id.*  Here, the undisputed record indicates a collective lodestar of $14,324,394.90 for Class Counsel.  Measuring this figure against the proposed award of $29,279,203.44 results in a multiplier of 2.04.

In practice, most multipliers fall between one and four.  *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991); *see, e.g.*, *In re Nat'l Collegiate Athletic Ass'n*, 332 F.R.D. at 225 (1.5); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 598 (N.D. Ill. 2011) (2.65); *In re Lawnmower Engine Horsepower Mktg. & Sales Pracs. Litig.*,

733 F. Supp. 2d 997, 1015 (E.D. Wis. 2010) (2.07). And, given the considerable benefit that Class Counsel has obtained for the class in the face of significant litigation risk, the Court finds that a multiplier of 2.04 is reasonable for this case. *See Americana Art China Co. v. Foxfire Printing and Packaging, Inc.*, 743 F.3d 243, 245 (7th Cir. 2014) (referring to the multiplier as a "risk multiplier"); *Florin*, 60 F.3d at 1247 (same). Moreover, the Court observes that 2.04 is well below average for a fund of this size, *see* 5 RUBENSTEIN § 15:89 tbl.2 (for fund sizes over $44 million, the mean multiplier was 2.39), and less than half the multiplier for the fee awarded to class counsel in *In re Facebook*, 522 F. Supp. 3d at 633 (awarding "a higher-end multiplier of 4.71").

For the reasons stated above, the Court finds that Class Counsel's request for one-third of the net common fund is reasonable and appropriate in light of the work they performed on behalf of the Nationwide Class and Illinois Subclass.

### iii.    Allocation of Fees Among Plaintiffs' Firms

Co-Lead Counsel—comprised of Lynch Carpenter LLP; Bird Marella Boxer Wolpert Nessim Drooks Lincenberg & Rhow, P.C. ("Bird Marella"); and Fegan Scott LLC—also request that the Court delegate to them the task of allocating the fee award among the participating plaintiffs' firms. Such delegation is common when all the attorneys agree about how the fees should be distributed. *See, e.g.*, *In re Life Time Fitness, Inc., Tel. Consumer Prot. Act (TCPA) Litig.*, 847 F.3d 619, 623–24 (8th Cir. 2017) (affirming district court's decision to leave the allocation of the fee award to class counsel "without further judicial oversight or approval"); *In re Warfarin Sodium*

*Antitrust Litig.*, 391 F.3d 516, 533 n.15 (3d Cir. 2004) ("[D]istribution of an attorney fee award among counsel is and should be a private matter for the attorneys to resolve amongst themselves.").

But a blanket delegation to lead counsel is inappropriate where the attorneys for the class disagree among themselves about fees. For example, in *In re High Sulfur Content Gasoline Products Liability Litigation*, the Fifth Circuit held that a district court abused its discretion by abdicating its duty to supervise the allocation of a fee award when there was a dispute among class counsel over the proper allocation procedures. 517 F.3d 220, 235 (5th Cir. 2008). Instead of resolving the dispute itself, the district court impermissibly "rubber-stamped" the views of the committee it had tasked with allocating the fees. *Id.* at 229; *see also* 5 RUBENSTEIN § 15:23 ("[I]f multiple counsel in a class suit cannot agree, the court can no longer defer but must itself make the allocation decision.").

Unfortunately, this case is of the latter variety. Here, Co-Lead Counsel have proposed a fee distribution schedule that sorts the thirty-one plaintiffs' firms into tiers based upon the level of risk they assumed and their involvement in the litigation. *See generally* Fee Mot. Ex. 16, Lodestar Summary, ECF No. 197-16. Under the proposal, Tier 1 is comprised of Co-Lead Counsel; Tier 2 includes the remaining six firms that make up the Executive Committee and Liaison Counsel; Tier 3 consists of firms that participated in the mediation sessions but were not selected to serve on the Executive Committee; and Tier 4 is comprised of all other firms.

The dissenting view comes from two firms in Tier 3—Glancy Prongay &

Murray, LLP ("Glancy Prongay") and Philips, Erlewine, Given and Carlin LLP ("Philips Erlewine") (collectively the "objecting firms"). They argue that Co-Lead Counsel's proposal undervalues their respective contribution to the litigation and the risk they undertook as part of the first mediation team and the leadership committee appointed by Judge Koh. Consequently, they demand a multiplier equal to at least 75% of the multiplier that Co-Lead Counsel receive.

Given this disagreement, the Court declines to delegate the distribution of fees to Co-Lead Counsel. Rather, the Court will review the tiered fee schedule that Class Counsel proposes, as well as the underlying billing documents, and exercise its independent judgment based upon the amounts requested and particular circumstances of this case.

First, Co-Lead Counsel request a lodestar multiplier of 3.5 for their own fees. The Court agrees that Co-Lead Counsel have expended enormous time, effort, and resources on this litigation, which does justify a high multiplier. However, granting Co-Lead Counsel a 3.5 multiplier would distribute to Co-Lead Counsel more than two-thirds of the total fee award, when they contributed forty percent of Class Counsel's total lodestar. The Court finds that such a distribution unfairly short-shrifts the rest of the firms—in particular, the California firms that participated in the pre-MDL proceedings before Judge Koh. Accordingly, the Court awards Co-Lead Counsel the following fees: $8,117,302.50 to Lynch Carpenter; $7,073,527.50 to Bird Marella; and $2,090,244.00 to Fegan Scott. These awards reflect a multiplier of 3.0, which the Court finds adequately compensates Co-Lead Counsel for the additional

risk they have absorbed over and above the other firms.

As to the Tier 2 firms,[30] whom the Court appointed to the Executive Committee, Co-Lead Counsel propose that Freed Kanner London and Milliken ("Freed Kanner") receive a multiplier of 1.8, and that the five remaining firms in Tier 2 should receive a multiplier of 1.6. Co-Lead Counsel contend that the Tier 2 firms deserve a modest multiplier for their work researching and drafting the consolidated complaint and contributing to pre-MDL litigation strategy. Co-Lead Counsel further argue that Freed Kanner should receive a slightly higher multiplier than the rest of Tier 2, because it was extensively involved in organizing the second mediation and in the drafting of the Settlement Agreement itself.

The Court agrees that the Executive Committee firms materially benefitted the classes by conducting extensive pre-settlement investigation of Plaintiffs' claims (particularly the BIPA claim), securing favorable settlement terms during the second mediation, and negotiating amendments to the settlement agreement in the post-consolidation period. What is more, the Executive Committee invested this time and effort at a relatively early stage, before the Court granted preliminary approval of the settlement, which supports awarding a modest risk multiplier. And Freed Kanner's level of involvement exceeds that of every firm other than Co-Lead Counsel, warranting a slightly higher multiplier than the rest of Tier 2. At the same time,

---

[30]     The firms in Tier 2 include: Freed Kanner London & Millen LLC ("Freed Kanner"); Susman Godfrey LLP; Hausfeld LLP; Bottini & Bottini, Inc.; Burns Charest; and Clifford Law Offices.

because the Court reduced Class Counsel's total fee request by nearly $1.4 million, a slight downward adjustment of Co-Lead Counsel's suggested multiplier is appropriate. Accordingly, the Court awards the Tier 2 firms the following fees: $2,046,169.50 to Freed Kanner; $367,694.54 to Susman Godfrey; $875,144.30 to Hausfeld; $644,504.33 to Bottini & Bottini; $837,802.10 to Burns Charest; and $29,429.77 to Clifford Law Offices. These awards reflect a lodestar multiplier of 1.5 for Freed Kanner, and a lodestar multiplier of approximately 1.38 for the remaining firms on the Executive Committee.

The objecting firms in Tier 3 do not take issue with these recommendations. They contend, however, that Co-Lead Counsel's proposal for their own fees, which suggests awarding Glancy Prongay a multiplier of 1.3 and Philips Erlewine a multiplier of 0.9, fails to adequately compensate them for the risk they took on early in the litigation during the proceedings before Judge Koh. The Court agrees.

A fee award must reflect the level of risk the attorneys bore "at the outset of the case." *Harman*, 945 F.2d at 976. Here, that standard commands a higher multiplier for these firms than Co-Lead Counsel suggest. Along with Bird Marella, Glancy Prongay was the first to begin investigating the data privacy allegations against TikTok in January 2018, and the two firms were the first to file a complaint against TikTok in November 2019. *See* Fee Mot. Ex. H, Rotter Decl. ¶ 2, ECF No. 197-24 (citing *Hong*, No. 19 C 7792). Philips Erlewine joined the plaintiffs' team in *Hong* in March 2020 and helped to file an amended complaint in May 2020 that included more detailed factual allegations and a newly-added BIPA claim. *Id.* Ex. I,

70

Given Decl. ¶ 2, ECF No. 197-25. Not only did these two firms join this litigation earlier than any other firm save Bird Marella, but both firms also incurred greater out-of-pocket expenses than any firm save Co-Lead Counsel or Freed Kanner. *See generally* Lodestar Summary.[31]

For these reasons, the Court finds that the objecting firms are entitled to a greater multiplier than Co-Lead Counsel propose. That said, the Court finds that 2.25 (75% of Co-Lead Counsel's multiplier) is too high when compared to the multiplier awarded to other firms given their relative contributions; therefore, the Court awards $3,315,381.00 to Glancy Prongay and $679,018.00 to Philips Erlewine, reflecting a fee multiplier of 2.0.

Co-Lead Counsel also request that the twenty remaining firms in Tiers 3 and 4[32] receive "negative multipliers" (that is, less than their lodestar), ranging from 0.9 for several firms in Tier 3, to as low as 0.15 for Bleichmar Fonti, a firm in Tier 4. In support, Co-Lead Counsel contend that the discounts are appropriate, because these firms did not take on substantial pre-consolidation risk and did not participate in the post-MDL proceedings. They further argue that the Tier 4 firms did not confer direct

---

[31]    Indeed, Glancy Prongay alone incurred more out-of-pocket expenses than all of Co-Lead Counsel put together. Lodestar Summary at 1–2.

[32]    The firms in Tier 3 (other than Glancy Prongay and Philips Erlewine) include: Ahdoot & Wolfson, PC; Consumer Protection Legal, LLC; Scott+Scott LLP; Foote, Mielke, Chavez, & O'Neil, LLC ("Foot Mielke"); Erik H. Langeland P.C. ("Langeland"); Cafferty Clobes Meriwether & Sprengel LLP ("Cafferty Clobes"); Sauder Schelkopf LLP; Baird Law Firm; Stephan Zouras, LLP; Tostrud Law Group, P.C.; Wood Law Firm, LLC; and Gordon Law Offices, LLC. The firms in Tier 4 include: Cotchett, Pitre & McCarthy ("Cotchett Pitre"); DiCello Levitt; Bleichmar Fonti; Chimicles Schwartz Kriner & Donaldson-Smith LLP ("Chimicles Schwartz"); Girard Sharp LLP; Onderlaw LLC; Baer Law; and Lawrence Kamin.

or indirect benefits on the classes, because they merely represented individual class members who filed member cases and did not participate in the mediations or post-MDL litigation.

The Court disagrees that the Tier 3 and Tier 4 firms should receive discounts on their time. These firms all incurred material risks by taking on clients for what would have been protracted, expensive litigation, had the cases not been consolidated into this MDL. While Co-Lead Counsel are correct that they did not confer substantial benefits to the class in the end, that alone does not justify a negative multiplier in light of these early risks. Accordingly, the Court finds that a 1.0 multiplier is appropriate for the Tier 3 and Tier 4 firms, and awards fees to those firms as follows: $169,630.00 to Ahdoot & Wolfson; $286,913.90 to Consumer Protection Legal; $261,526.00 to Scott+Scott; $139,495.00 to Foot Mielke; $228,000.00 to Langeland; $286,825.00 to Cafferty Clobes; $163,840.00 to Sauder Schelkopf; $45,150.00 to Baird Law Firm; $255,242.50 to Stephan Zouras; $208,905.00 to Tostrud Law Group; $39,525.00 to Wood Law Firm; $72,502.00 to Gordon Law Offices; $211,130.00 to Cotchett Pitre; $126,810.00 to DiCello Levitt; $341,962.50 to Bleichmar Fonti; $49,322.50 to Chimicles Schwartz; $235,485.00 to Girard Sharp; $10,822.50 to Onderlaw; $29,549.00 to Baer Law; and $40,350.00 to Lawrence Kamin.

### iv. Expenses

Class Counsel are also entitled to reimbursement of reasonable litigation expenses. A request for reimbursement of litigation expenses is judged under the

same market-based standard as a fee petition; the Court must ask whether the expenses are in keeping with what "the private market would permit." *Synthroid I*, 264 F.3d at 722.

Class Counsel report that they have incurred $789,944.00 in litigation expenses throughout this case.[33] Given the scope and duration of the litigation and the Court's consideration of these costs, and in light of Class Counsel's attestations that they have endeavored to comply fully with the protocols listed in the Court's common benefit fee and expense order, Case Management Order No. 4 ¶¶ 5–7, 10, 13, the Court finds that their request for reimbursement of $789,944.00 in litigation expenses is reasonable and in line with private market standards and approves the request.[34]

---

[33]   This figure reflects $651,433.09 in expenses independently incurred by the individual firms, and $138,510.53 in payments made from the TikTok Litigation Fund, to which each member of Co-Lead Counsel and the Executive Committee contributed $25,000 and $15,000, respectively. *See* Decl. Katrina Carroll Supp. Pls.' Pet. Award Attorneys' Fees ¶ 9, ECF No. 198; Case Management Order No. 4 ¶¶ 17–23, *In re TikTok* (N.D. Ill. Nov. 18, 2020), ECF No. 105.

[34]   Specifically, the Court approves the reimbursement of litigation expenses to the individual firms as follows: $27,374.44 to Lynch Carpenter; $256,057.67 to Bird Marella; $611.10 to Fegan Scott; $309,218.63 to Glancy Prongay; $10,529.00 to Philips Erlewine; $11,555.07 to Freed Kanner; $1,871.63 to Susman Godfrey; $3,315.95 to Hausfeld; $9,867.45 to Bottini & Bottini; $1,511.10  to Burns Charest; $175.30 to Clifford Law Offices; $1,345.60 to Ahdoot & Wolfson; $1,076.00 to Consumer Protection Legal; $624.24 to Scott+Scott; $688.30 to Foot Mielke; $995.05 to Cafferty Clobes; $1,803.11 to Stephan Zouras; $1,928.08 to Tostrud Law Group; $1,767.35 to Wood Law Firm; $400.00 to Gordon Law Offices; $681.89 to Cotchett Pitre; $420.00 to DiCello Levitt; $4,523.92 to Bleichmar Fonti; $968.81 to Chimicles Schwartz; $1,401.44 to Girard Sharp; $705.06 to Onderlaw; and $16.90 to Lawrence Kamin.

### 3.     Objector Mark S.'s Petition for Attorneys' Fees

Loevy & Loevy ("Loevy"), counsel for Mark S., also seeks fees.  Courts have recognized that objectors "play an essential role in judicial review of proposed settlements of class actions" because their participation helps to ward off the possibility of collusion inherent in class action settlements and to ensure that the settlement terms adequately compensate the class for the value of their claims. *Pearson*, 772 F.3d at 787; *see In re Sw. Airlines Voucher Litig.*, 898 F.3d 740, 745 (7th Cir. 2018).  Such "participation is encouraged by permitting lawyers who contribute materially to the proceeding to obtain a fee."  *Reynolds*, 288 F.3d at 288.

Because the purpose of permitting objectors to participate in the settlement approval process is to benefit the class, in order to be entitled to a fee award an objector must "produce an improvement in the settlement worth more than the fee they are seeking; otherwise they have rendered no benefit to the class."  *Id.*  In determining whether to award fees to objectors' counsel, then, courts must distinguish objectors who actually add value to the settlement from those who "intervene[] for the purpose of getting paid to go away."  *Vollmer v. Selden*, 350 F.3d 656, 661 (7th Cir. 2003).[35]

---

The Court also approves the reimbursement of $138,510.53 to Co-Lead Counsel for expert costs paid from the TikTok Litigation Fund and orders Co-Lead Counsel to distribute that sum amongst themselves and the Executive Committee in accordance with each firm's respective contribution to the fund, and pursuant to the procedures set forth in the common benefit fee and expense order.  *See generally* Case Management Order No. 4.

[35]     In this vein, Litteken also purported to reserve the right to seek attorneys' fees "should

Loevy claims that, were it not for Mark S.'s efforts to carve out the claims of class members under the age of thirteen ("under-13 class members") in this action from the release in *T.K.*, no under-13 class members would have been able to participate in this settlement. As a result, Loevy contends, Mark S. added at least $6,256,000—the prorated share of the common fund that is attributable to under-13 class members—in value to the settlement and requests twenty-five percent of that number, or $1,564,000, in fees.

The proposition that Mark S. is responsible for the ability of under-13 class members to participate in this settlement is without merit. As the *T.K.* court recognized in denying Loevy's fee petition based on nearly identical arguments there, in as early as the fall of 2020, Plaintiffs and Defendants had "'expressly negotiated the right of class members in the *T.K.* settlement class . . . to participate in the MDL settlement class'" in order to "eliminate any potential impact" of the *T.K.* settlement on this case, all without any input from Mark S. Joint Status Report at 3 (N.D. Ill. Oct. 30, 2020), ECF No. 99; *see T.K.*, 2022 WL 888943, at *27. While those negotiations were underway, Mark S.—far from working to preserve the rights of *T.K.* class members to participate in this settlement—in fact was requesting that the *T.K.* court enforce the *T.K.* preliminary injunction *against* class members in this case in

---

the Court sustain any of [his] objections." Objector Litteken's Provisional Pet. Service Award at 4, ECF No. 193. Because Litteken's objections to final approval of the settlement and to attorneys' fees have been overruled in their entirety, they have not made a material difference to the benefit of class members. Accordingly, the Court will not entertain any such motion.

order to get the MDL reassigned to the *T.K.* docket.  *See* Notice of Filing Ex. A, Objector Mark S.'s Mot. Enforcement Prelim. Inj. and Reassignment and Consolidation Related *TikTok* MDL, *T.K.*, No. 19 C 7915 (N.D. Ill. Sept. 9, 2020), ECF No. 59.  Given the considerable resources Mark S. expended in trying to unravel the settlement, the Court finds Mark S.'s contention that he was acting in the best interests of the classes in this case without merit.

Mark S. also argues that his counsel should receive a fee award because he was the first to propose the in-App notice.  While the Court is confident that the notice program would have satisfied the Rule 23 and due process requirements without the in-App notice, it nonetheless acknowledges that in-App notice conferred a material benefit to the settlement classes.  And the Court finds that Loevy does deserve some compensation for this contribution.

That being said, Loevy's fee request of $1,564,000 far exceeds that contribution.  The Court similarly declines to award Loevy their reported lodestar of $564,938.75, because Loevy's timesheets reveal that much of the work done in connection with this MDL was devoted to undermining the settlement by attempting to enforce the *T.K.* preliminary injunction.  *See In re Sw. Airlines*, 898 F.3d at 745 (citing *Mirfaishi v. Fleet Mortg. Corp.*, 551 F.3d 682, 687–88 (7th Cir. 2008) (awarding objectors a small percentage of their requested fees after balancing the "very slight improvement" to the settlement against the objectors' "lack of constructive activity in the district court," *id.* at 687, and the "detriment caused by their courtroom antics." *Id.* at 688)).

Accordingly, the Court awards Loevy $100,000 in fees. Having reviewed Loevy's timesheets, the Court finds that this award approximates the percentage of Loevy's time that was devoted to improving the notice program. The Court will not award Loevy fees for any other work, because that work did not benefit (and indeed, in many cases attempted to harm) the class.

### 4. Incentive and Service Awards

Because a named plaintiff "is an essential ingredient of any class action," *Camp Drug Store*, 897 F.3d at 834 (internal quotation marks omitted), the Court may authorize incentive awards "when necessary to induce individuals to become named representatives." *Douglas*, 328 F.R.D. at 218 (quoting *Synthroid I*, 264 F.3d at 722). "To determine if an incentive award is warranted, a district court evaluates the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Camp Drug Store*, 897 F.3d at 834 (internal quotation marks and citation omitted).

Class Counsel seek an incentive award of $2,500 for each of the thirty-five named Plaintiffs.[36] At the outset of the cases, the thirty-five named Plaintiffs provided Class Counsel with extensive details about their use of the App, including when they downloaded it, how frequently they used it, whether they made any videos,

---

[36]     The named Plaintiffs are: Katherine Czajka; Misty Hong; Aparna Iyer; Brandy Johnson; Morgan Kukovec; Karina Quinteiro; and Meghan Smith; and minors A.S. *ex rel.* Laurel Slothower; A.S. *ex rel.* A.S.; A.R.; G.R.; C.W.; I.W.; P.S.; M.T.W.; N.T.; L.T.; S.P.; J.P.; K.P.; G.P.; L.M.; A.J.; E.R.; R.S.; J.S.; S.A.; L.B.; L.P.; M.P.; A.O.; H.S.; K.M.; C.H.; and D.M.

whether their videos contain recordings of their faces, and whether they used any of the App's video editing features or facial filters in their videos. *See generally* Compl. ¶¶ 19–98. These disclosures of Plaintiffs' personal and private information substantially benefited the classes by validating Class Counsel's legal theories and helping them to understand the App's technology.

The named representatives also expended time and effort on the case after the settlement agreement was reached by approving Class Counsel's pleadings and continuing to assist in confirmatory discovery. And these efforts resulted in substantial benefited the class as well.

Lastly, empirical data indicates that the requested incentive awards are modest. A study of approximately 1,200 class actions showed that the median incentive award per plaintiff was $5,250, over twice the amount Class Counsel requests here. 5 RUBENSTEIN § 17:8 tbl.1. Thus, the Court finds the request of $2,500 per named Plaintiff to be reasonable and appropriate.

Mark S. and Litteken also seek service awards of $2,500 and $1,000, respectively. *See In re Nat'l Collegiate Athletic Ass'n*, 332 F.R.D. at 228–29 (awarding service awards to objectors). For the reasons stated above, the Court concludes that Mark S. benefitted the class to some degree by advocating for in-App notice, but not to the degree of the named Plaintiffs. Accordingly, the Court provides him with a service award of $1,500.

As for Litteken, the Court is not convinced that he deserves as much credit for the in-App notice, given that Mark S. was the first to raise the issue. Nevertheless,

because Litteken's insistence on in-App notice impacted the Court's assessment of the costs and benefits of it, the Court finds that Litteken's request for a $1,000 service award is appropriate, and it is granted.

### III.  Conclusion

For the reasons stated above, the Court certifies the Nationwide Class and Illinois Subclass; grants the motion for final approval of the Settlement Agreement [195]; and grants the petitions for fees and service awards [193][197][201] to the extent stated above.  Additionally, the motion to accept opt-outs [207] is granted.  Co-Lead Counsel is instructed to provide a proposed final order within the next five days.


**IT IS SO ORDERED.**                     **ENTERED:  7/28/22**


                                          _____
                                          **John Z. Lee**
                                          **United States District Judge**